1  Ira D. Kharasch (CA Bar No. 109084)
   Scotta E. McFarland (CA Bar No. 165391)
2  Victoria A. Newmark (CA Bar No. 183581)
   Pachulski Stang Ziehl & Jones LLP
3  10100 Santa Monica Boulevard, 11th Floor
   Los Angeles, California 90067-4100
4  Telephone: 310/277-6910
   Facsimile: 310/201-0760
5  Email: ikharasch@pszjlaw.com
6         smcfarland@pszjlaw.com
          vnewmark@pszjlaw.com
7

8  [Proposed] Attorneys for Debtor and
   Debtor in Possession/Petitions to Practice
9  in Nevada are Pending

   Sallie B. Armstrong (NV Bar No. 1243)
   Downey Brand
   427 West Plumb Lane
   Reno, Nevada 89509
   Telephone: 775/329-5900
   Facsimile: 775/786-5443
   Email: sarmstrong@downeybrand.com

   [Proposed] Attorneys for Debtor and
   Debtor in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

10

11              UNITED STATES BANKRUPTCY COURT
                FOR THE DISTRICT OF NEVADA

12  In re:                          Case No. 10-51432-GWZ

13  SPECIALTY TRUST, INC.,          Chapter 11

14              Debtor.

15  In re                           Case No. 10-51437-GWZ

16  SPECIALTY ACQUISITION CORP,     Chapter 11

17              Debtor.

18  In re                           Case No. 10-51440-GWZ

19  SAC II,                         Chapter 11

20              Debtor.

21  In re                           Case No. 10-51441-GWZ

22  SAC D-1, LLC,                   Chapter 11

23              Debtor.            **DEBTORS' MOTION FOR INTERIM AND
                                    FINAL ORDERS (A) AUTHORIZING
24                                  DEBTORS TO UTILIZE CASH
                                    COLLATERAL PURSUANT TO 11 U.S.C.
25                                  § 363 AND (B) SCHEDULING A FINAL
                                    HEARING PURSUANT TO BANKRUPTCY
26                                  RULE 4001**

27                                  Hearing Date: OST requested for May 13, 2010
28                                  Hearing Time: OST requested for 2:00 p.m.

TO THE HONORABLE BANKRUPTCY JUDGE AND INTERESTED PARTIES:

The debtors and debtors in possession (the "Debtors") in the captioned chapter 11 cases (the "Cases"), pursuant to sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001 of the Local Rules of Bankruptcy Practice of the United States District Court for the District of Nevada (the "Local Rules"), hereby move this Court for entry of the interim order attached hereto (the "Interim Order") on an expedited basis, the scheduling of the final hearing on this Motion (the "Final Hearing"), and the entry of a final order on this Motion (the "Final Order"), seeking, without limitation, the following relief:

(i)    authorization pursuant to entry of the Interim Order of the Debtors' use of "cash collateral" as defined in section 363(a) of the Bankruptcy Code in which the Prepetition Secured Lenders (as defined herein) assert an interest on an interim basis through two days after the Final Hearing (as defined below), as may be extended by the Court;

(ii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion; and

(iii)    authorization pursuant to the Final Order of the Debtors' continued use of cash collateral through September 30, 2010.

The relief sought in the Motion is based upon the facts and argument set forth herein and in the Declaration of Nello Gonfiantini III (the "Gonfiantini Declaration") filed concurrently herewith. In support of this Motion, the Debtors represent as follows:

## I.

## <u>SUMMARY OF RELIEF REQUESTED</u>

Pursuant to Rule 4001(b) of the Bankruptcy Rules, the relevant provisions of the Interim Order are as follows:

### Table 1 – Compliance with Fed. R. Bank. Pro. 4001(b)

| Term | Description |
|------|-------------|
| Name of Each Entity with Interest in Cash Collateral | (i) U.S. Bank National Association, as administrative agent pursuant to that certain *Second Amended and Restated Credit Agreement*, dated as of February 1, 2010, among, on |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

yourself

the one hand, the agent and certain lenders thereto (the "Term Loan Lenders") and, on the other hand, debtor Specialty Trust, Inc., as borrower, and certain debtor and non-debtor affiliates as guarantors; and

(ii) Deutsche Bank National Trust Company in the following capacities:

(1) as trustee for the holders (the "Old Noteholders") of the notes (the "Old Notes") pursuant to that certain *Amended and Restated Indenture* dated as of August 1, 2006; and

(2) as trustee for the holders (the "New Noteholders" and, together with the Old Noteholders and the Term Loan Lenders, the "Prepetition Secured Lenders") of the notes (the "New Notes") pursuant to that certain *Second Amended and Restated Indenture* dated as of March 1, 2009.

Deutsche Bank is referred to herein from time to time as the "Indenture Trustee."

| | |
|---|---|
| Use of Cash Collateral | The Debtors request authority to use cash collateral only to pay, when due, the expenses set forth in the budget attached to the Gonfiantini Declaration as <u>Exhibit A</u> (the "Budget"), subject to certain variances as set forth in paragraph 2 of the Interim Order. *See* Interim Order, at ¶ 2. |
| Termination Date | Subject to entry of a Final Order, the Interim Order shall be in effect until two days after the date of the Final Hearing.[1] *See* Interim Order, at ¶ 2. |
| Adequate Protection | As discussed below, the Debtors submit that no adequate protection is required because the Prepetition Secured Lenders' interests are adequately protected by (i) the equity cushion in the value of the pledged assets, and (ii) the preservation and enhancement in the Debtors' going concern value from the utilization of cash collateral to operate the business. |

///

///

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[1] At the Final Hearing, the Debtors will seek authority to extend use of Cash Collateral through September 30, 2010, without prejudice to further requests for use of cash collateral.

80662-001\DOCS_LA:218417.4
1074748.1

## II.

## BACKGROUND

### A.    Jurisdiction and Venue

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). Venue for proceedings on this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.    General Background

On April 20, 2010 (the "Petition Date"), the Debtors commenced these Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Cases.

### C.    The Business and Assets

Specialty Trust, Inc. ("Specialty Trust") is a privately held mortgage finance company that acquires and holds, in a tax-advantaged real estate investment trust or REIT structure, mortgage loans and mezzanine loans secured by property located primarily in Nevada, Arizona and California. Specialty Trust was founded in 1997 by its current chairman and chief executive officer, Nello Gonfiantini III. Specialty Trust is held by approximately 435 shareholders, most of whom consist primarily of individuals, family trusts, and local businesses' pension and profit sharing plans. The total capital invested by the shareholders is approximately $170 million.[2]

Loans are generally made at low loan-to-value ratios, usually 50% or less. Most loans have terms of one to three years. The majority of Specialty Trust's mortgage loan balances are secured by first deeds of trust on the underlying real property, with the remaining mortgage loan balances secured by junior liens. Specialty Trust's mortgage loans may be secured by mortgages on unimproved as well as improved real property and non-income producing as well as income-producing real property.

---

[2] Mr. Gonfiantini personally owns approximately 5.9% of such shares.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Specialty Trust currently holds loans with a total amount owing from its borrowers of approximately $167 million, which loans have a book value of approximately $121 million. Specialty Trust also owns outright or through its subsidiaries REO property (property obtained through foreclosures or similar actions from its loan portfolio) with a current market value of approximately $55 million. Approximately 94% of these latter REO properties are held by three debtor subsidiaries of Specialty Trust, which include Specialty Acquisition Corp., SAC II, and SAC D-1, LLC.[3]    Specialty Acquisition Corp. and SAC II are wholly owned subsidiaries of Specialty Trust, and SAC D-1, LLC is a wholly owned subsidiary of Specialty Acquisition Corp.

Specialty Trust works in conjunction with three non-debtor affiliated entities that provide primary services to Specialty Trust. These entities include Specialty Financial Corp., which is responsible for Specialty Trust's day-to-day management and operations, Specialty Mortgage Corp., which originates and services certain of Specialty Trust's real estate loans, and Specialty Capital, LLC, a registered broker/dealer providing brokerage services to individual and institutional customers. Each of these three entities is owned or indirectly owned by Mr. Gonfiantini III.

In return for a management fee, Specialty Financial Corp. ("SFC") manages and runs Specialty Trust's management and day-to-day business operation and funds virtually all of Specialty Trust's overhead (except for one part-time employee), including the retention and payment of the individuals that manage Specialty Trust's business operations, and the payment of the rent and utilities on the building occupied by Specialty Trust. As part of its general management duties, SFC evaluates prospective real estate loans, generates loan originations and manages the loan and asset portfolio of Specialty Trust. This general management arrangement is fairly typical in a REIT structure, and has been in place between Specialty Trust and SFC, or SFC's predecessor,[4] for approximately 12 years.

///

///

---

[3] Specialty Trust transfers most of the REO properties to its subsidiaries for insurance purposes as well as to maintain compliance with regulations governing REITs.

[4] Prior to March 31, 2006, Specialty Mortgage Corp., also owned by Mr. Gonfiantini, was the entity that managed Specialty Trust's operations.

80662-001\DOCS_LA:218417.4
1074748.1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**D.    The Financing of Specialty Trust**

Specialty Trust currently maintains a $29.25 million term loan (the "Term Loan") which includes three participating commercial banks of which US Bank is the agent bank. The Term Loan is secured by liens in certain qualified real estate and loans. The non-default rate of interest under the Term Loan is the sum of (i) LIBOR plus 3%, plus (ii) 5% per annum of PIK interest.

Additionally, Specialty Trust has $36.9 million outstanding under a secured and collateralized investment note program. This note program contains individual notes (the "Notes") with maturities ranging from 1 month to 10 years and annual interest rates varying from 4.5% to 8.5%. The Notes are comprised of two series of notes issued under two separate indentures, in aggregate amounts outstanding of $1.46 million (the "Old Notes") and $35.44 million (the "New Notes"). The Old Notes and the New Notes are secured separately by eligible assets comprised of real estate, loans, and other collateral that are pledged separate from the Term Loan collateral.

Specialty Trust also has approximately $29 million in unsecured subordinated notes (the "Subordinated Notes") maturing on January 30, 2037.

The Term Loan is secured by qualified real estate loans and REOs with a current fair market value of $86.52 million. The approximate $1.46 million owed to holders of the Old Notes is secured by an REO with a current fair market value of approximately $6.4 million. The approximate $35.44 million owed to the holders of the New Notes is secured by real estate loans and REOs with a current fair market value of $59.89 million. The Debtors' secured debt is apparently also secured by additional qualified assets in the form of stock in subsidiaries. The Debtors are presently investigating the status and beneficiary of the stock pledge. Debtor subsidiaries Specialty Acquisition Corp., SAC D-1, LLC, and SAC-II, and non-debtor subsidiaries JFP 1330, LLC, 5th & Lincoln, LLC, Oak Creek Condominiums, LLC are guarantors of the Term Loan.

**E.    Financial Problems and Chapter 11**

The real estate finance industry has experienced sharp contraction since 2007, when the national real estate market collapsed. Overall, there have been escalating rates of foreclosures on properties and many REITs, mortgage finance companies and real estate lenders have been forced to

close operations. All players within Specialty Trust's target regions have largely been affected by the economic crisis leaving a considerable void in these markets.

Specialty Trust has experienced a 37.2% decline in the value of its real estate loan portfolio between December 31, 2008 and December 31, 2009, while its REO portfolio has grown by 75.7%. Management believes the loan portfolio has stabilized and does not expect further material write downs to the portfolio beyond the year end 2009. Furthermore, management has identified and is in a position to capitalize on undervalued opportunities derived from the recent real estate market fallout.

Despite extensive and long-term negotiations with US Bank, Specialty Trust was not able to negotiate a restructuring of the US Bank debt that would give it the flexibility and requisite liquidity it needed to get through the current difficult economic environment. In light of a pending default under the Term Loan that would have occurred on April 20, 2010, which would give US Bank the immediate right to sweep all of the Debtors' cash, an event that would put the Debtors out of business, the Debtors were forced to file these chapter 11 cases. The chapter 11 case will give the Debtors the breathing room to enhance their liquidity by selling certain of their assets, and give them time to prepare and confirm a plan of reorganization that pays all of their secured debt in full, which will allow the Debtors to maintain shareholder value.

**F.    Need for the Use of Cash Collateral**

The Debtors have an immediate and critical need to use cash collateral in order to pay wages, management fees and other operating expenses and expenses of administration of the Cases. The Debtors' access to sufficient use of cash collateral is vital to the Debtors' operating their business (as well as the business of non-Debtors) as a going concern and maximizing the value of their assets and estates. Without the use of cash collateral, the Debtors cannot continue to operate or administer the Cases, and the Debtors and their estates would suffer immediate and irreparable harm.

The Debtors require the use of cash collateral, in accordance with the Budget attached to the Gonfiantini Declaration as Exhibit A and the terms of the Interim Order and the Final Order, to continue to fund operations and restructuring expenses in order to preserve the going concern value of their business and the businesses of their affiliates.

7

80662-001\DOCS_LA:218417.4
1074748.1

# III.

## BASIS FOR RELIEF

A.    **Legal Requirements For Use of Cash Collateral**

The Debtors' use of property of the Debtors' estates is governed by section 363 of the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or hearing, and may use property of the estate in the ordinary course of business without notice or hearing.

11 U.S.C. § 363(c)(1).

The Bankruptcy Code establishes a special requirement, however, regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . .."  11 U.S.C. § 363(a).  Section 363(c)(2) of the Bankruptcy Code permits the trustee to use, sell or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances exist:

(A)    each entity that has an interest in such cash collateral consents; or

(B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

If the secured creditor does not consent to the use of its cash collateral, the Court can authorize the trustee to use said cash collateral under section 363(c)(2)(B) of the Bankruptcy Code if the court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral.  11 U.S.C. § 363(e).

Section 361 of the Bankruptcy Code provides that:

> [W]hen adequate protection is required . . . of an interest of an entity in property, such adequate protection may be provided by --
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section

8

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

363 of this title . . . results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such ... use ... results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief ... as will result in the realization by such entity of the indubitable equivalent in such entity's interest in such property.

11 U.S.C. § 361.

Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 361. However, the statute plainly provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C. §§ 361 & 363(e). *See also General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 & n.4 (Bankr. D. Utah 1982); O'Toole, *Adequate Protection and Post-Petition Interest in Chapter 11 Proceedings*, 56 AM. BANKR. L.J. 251, 263 (1982).

The phrase "value of such entity's interest," although not defined in the Bankruptcy Code, was addressed by the Supreme Court in the landmark *Timbers* decision, *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626 (1988). For the meaning of "value of such entity's interest," the Supreme Court was guided by section 506(a), which defines a creditor's allowed secured claim:

The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.' H.R. Rep. No. 950-595, pp. 181, 356 (1977); see also S. Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312. We think the phrase 'value of such entity's interest' in § 361(1) and (2), when applied to secured creditors, means the same.

*Id.* at 630 (emphasis added). *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against diminution in the value of the collateral securing the creditor's allowed secured claim. Under *Timbers*, therefore, where the "value of the collateral" is not diminishing by its use, sale, or lease, the creditor's interest is adequately protected. This conclusion flows directly from the equivalency of "value of such entity's interests" with "value of the collateral."

9

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    When adequate protection principles under *Timbers* are applied to cash collateral utilization,

2  the debtor need only provide adequate protection for any decrease in the value of the secured interest

3  in its collateral as a whole.  As set forth in the Budget, the Debtors' cash position will initially dip

4  below the starting cash position for a period of time, and then will recover almost to the level of the

5  starting cash position by the end of the budgeted period as a result of collections of interest and

6  principal payments from borrowers and of asset sale proceeds.  Even to the extent of the minor

7  decrease in that cash is not entirely replenished, there is value in the overall assets pledged to the

8  Prepetition Secured Lenders that is more than adequate to protect their interests.  The proposed use

9  of cash collateral to fund operations and restructuring expenses will ensure that the going concern

10  value of the business, including the Prepetition Secured Lenders' real estate collateral, is preserved.

11    Accordingly, the Debtors' use of cash collateral should be authorized pursuant to section

12  363(c)(2)(B) of the Bankruptcy Code.

13  **B.    The Equity Cushion Provides in and of Itself Adequate Protection to the Prepetition
        Secured Lenders for Any Diminution in Cash Collateral**

14

15    The examples of adequate protection described in section 361 of the Bankruptcy Code are

16  not exclusive.  *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984); *In re

17  O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987).  Moreover, the third example – the realization of

18  the "indubitable equivalent" – is "regarded as a catch all, allowing courts discretion in fashioning the

19  protection provided to a secured party.  Therefore, a determination of whether there is adequate

20  protection is made on a case by case basis." *Resolution Trust Group v. Swedeland Dev. Group (In re

21  Swedeland Development Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *O'Connor*, 808 F.2d at

22  1397).

23    It is now well accepted that an equity cushion may stand as and for adequate protection of a

24  secured creditor's interest in its collateral.  The Ninth Circuit made clear in *In re Mellor*, *supra*, that

25  in the case of an oversecured creditor, an equity cushion of 20% is considered clear adequate

26  protection of a secured creditor's interest in cash collateral, at least for some period of time.  *Mellor*,

27  734 F.2d at 1401.  In *Mellor*, a secured creditor with a second position lien in the amount of

28  $17,960.06 on real property with a value of $105,000 sought relief from stay for lack of adequate

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

80662-001\DOCS_LA:218417.4
1074748.1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    protection on the grounds that there was no equity in the property.  In addition to the movant

2    creditor's second position lien, there was a first position lien valued at $66,700 and a third position

3    lien valued at $123,278.  The court held that only the lien of the movant and any liens senior to it are

4    relevant in determining whether or not there is adequate protection in the form of equity in the

5    property, and thus the fact that the debtor lacked equity due to the third position lien was not

6    dispositive on the issue of adequate protection of the movant.  Moreover, the court held that the

7    equity cushion of $20,340 after taking into account the value of the movant's lien and the senior lien,

8    or 20% of the value of the property, was sufficient to protect the movant's interest.

9         Other courts have held similarly.  *See In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa.

10   1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development*

11   *Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (court decided that an equity cushion of

12   approximately 15% to 20% was sufficient adequate protection to the creditor); *see also In re*

13   *O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re Snead*, 2008 Bankr. LEXIS 1160 (Bankr.

14   E.D. N.C. 2008); *In re Wilson Scotch Mountain Angus LLC* (Bankr. D. Mont. 2007); and *In re*

15   *McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

16        Moreover, as clarified by the court in *In re McCombs*, *Timbers* teaches that an oversecured

17   creditor is entitled only to protection of the value of <u>the collateral</u>, not the equity cushion:

18        A secured creditor has no right to the equity cushion in its collateral.  It only has
          a right to look to the collateral for payment of its claim "upon completion of the
19        reorganization.  It is then that he must be assured 'realization . . . . of the
          indubitable equivalent' of his collateral."  *Timbers*, 98 L. Ed. 2d at 752.  The
20        unsecured creditors and the debtor have rights to the cushion.

21   88 B.R. at 266.  Thus, the accrual of postpetition interest or other amounts under the loan facilities is

22   irrelevant to the consideration of the sufficiency of the equity cushion to protect the secured

23   creditor's interest.  *Id.*

24        In the present case, the use of cash collateral should be permitted because of the equity

25   cushion that exists in the assets pledged to the Prepetition Secured Lenders.  As noted above, the

26   Term Loan, the Old Notes, and the New Notes are secured by different real estate interests.  The

27   Debtors have obtained recent third-party appraisals of the real estate in which the Debtors have

28   interests that have been pledged to the Prepetition Secured Lenders, copies of which appraisals have

11

been provided to the Indenture Trustee and U.S. Bank, as applicable, and are summarized in <u>Exhibit B</u> to the Gonfiantini Declaration. Based on such appraisals, the equity cushion for each of the Term Loan, the Old Notes, and the New Notes is calculated pursuant to *Mellor* as follows:

**Table 2 – Equity Cushion Calculations**

| Loan Facility | Loan Balance | Value of Collateral | Equity | Percentage Equity |
|---|---|---|---|---|
| Term Loan | $29.25 million | $86.52 million | $57.27 million | 66.19% |
| Old Notes | $1.46 million | $6.40 million | $4.94 million | 77.19% |
| New Notes | $35.44 million | $59.89 million | $24.45 million | 40.83% |

As set forth in <u>Table 2</u> above, even without taking into account cash collateral, the value of the assets pledged to secure the Term Loan exceeds such debt by approximately $57.27 million, the value of the assets pledged to secure the Old Indenture exceeds the balance of the Old Notes by approximately $4.94 million, and the value of the assets pledged to secure the New Indenture exceeds the balance of the New Notes by approximately $24.45 million. In each case, the equity cushion far exceeds the 20% found to be sufficient in *Mellor* and related authorities. Thus, the value of the pledged real estate assets should be deemed to adequately protect the Prepetition Secured Lenders without conditioning the Debtors' proposed cash collateral utilization on the provision of additional adequate protection pursuant to section 361 of the Bankruptcy Code.

**C.    <u>Use of Cash Collateral for Operating Expenses Will Preserve the Value of the Collateral</u>**

Adequate protection may be found, even in the absence of an equity cushion, if cash collateral is used to preserve or enhance property securing the pre-petition secured debt. *In re Hubbard Power & Light,* 202 B.R. 680, 685 (Bankr. E.D. N.Y. 1996); *Federal Natl. Mortgage v. Dacon Bollingsbrook Associates Limited Partnership*, 153 B.R. 204, 214 (N.D. Ill. 1993); *In re Triplett*, 87 B.R. 25 (Bankr. W.D. Tex. 1988); *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981). In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had

12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   no equity cushion for protection. The *Stein* court determined that the use of cash collateral was

2   necessary to the continued operations of the debtor, and that the creditor's secured position could

3   only be enhanced by the continued operation of the debtor's business. *See also In re McCombs*,

4   *supra*, where the court determined that the debtor's use of cash collateral for needed repairs,

5   renovations, and operating expenses eliminated the risk of diminution in the creditor's interest in the

6   cash collateral and such use would more likely increase cash collateral.

7        Here, the Debtors anticipate continuing operations while restructuring in chapter 11.

8   Moreover, it is the Debtors' intent to actively market and sell owned real estate during these Cases

9   and to use the cash generated to make new loans. To this end, 33% of the REO in the portfolio has

10  been listed with real estate sales professionals and is being actively marketed. In addition, 27% of

11  the REO portfolio is being assessed by real estate sales professionals with marketing and listing

12  proposals expected in the next 30 days. The remaining 40% of the REO portfolio is two properties,

13  one is being held pending resolution of a lawsuit involving the previous owner and title company;

14  the other property is part of a larger master planned community with ongoing negotiations with other

15  lender/owners to purchase the Debtors' interest. The Debtors have also retained the services of two

16  nationally recognized loan marketing companies. These two companies have begun the marketing

17  efforts for two of the more significant loans in the Debtors' portfolio. The remainder of the portfolio

18  is being assessed and marketing plans will be developed as appropriate.

19       Thus, the use of cash collateral in these Cases will encompass expenditures for the ordinary

20  and customary costs of maintenance, operation and preservation of the business that are incurred

21  while the Debtors implement their marketing plan. Such expenses include the management fees,

22  directors' fees, costs associated with maintaining the REO properties pending a sale or other

23  disposition, accounting, and legal services. The Budget sets forth the estimated weekly expenditures

24  in each of these categories. In addition, with respect to budgeted REO-related expenditures, the

25  Debtors anticipate that additional expenditures may be required if the Debtors take title to certain

26  resort property collateral located in Sedona, Arizona during the Budget period. The loan secured by

27  the Sedona property is non-performing, and the Debtors have recorded a notice of default. However,

28  until foreclosure proceedings are completed, it is unknown what maintenance costs will be required

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   and thus a special variance of up to $250,000 is requested for foreclosure and maintenance

2   expenditures related to the Sedona property on an interim and final basis.

3        All such expenses are the same expenses a lender or the lender's receiver would have to pay

4   to preserve and protect the value of collateral, and thus, there should be no dispute of the

5   appropriateness of payment of such expenses. *See In re Princeton Square Associates, L.P.*, 201 B.R.

6   90, 96 (Bankr. S.D.N.Y. 1996). Furthermore, the sale of owned real property will generate proceeds

7   that the Debtors can use to make new loans, thereby increasing the value of the business.

8   Accordingly, there cannot be a legitimate objection to the Debtors' use of cash collateral to pay the

9   expenses of operation of the business.

10  **D.    Cash Collateral May Be Used to Pay Allowed Fees and Expenses of the Estate's**

11       **Bankruptcy Professionals**

12       In order to implement their restructuring in chapter 11, the Debtors also require utilization of

13  cash collateral to pay allowed fees and expenses of professionals that are retained by the estate. The

14  estimated amounts that will be required to be paid through the end of the budgeted period are set

15  forth as separate line items in the Budget, which reflects a monthly run rate of approximately

16  $108,750 in July 2010 and $145,000 per month thereafter. In light of the size and complexity of the

17  estates, the Debtors believe that the estimated budgeted amounts for professional fees and expenses

18  are reasonable and necessary.

19       Payment of reasonable fees and expenses of estate professionals is a necessary expense in

20  chapter 11 and a permissible use of cash collateral pursuant to section 363 where, as here, the

21  secured creditor is adequately protected. *See, e.g., Sec. Leasing Partners, LP v. ProAlert, LLC (In re*

22  *ProAlert, LLC)*, 314 B.R. 436, 444-45 (B.A.P. 9th Cir. 2004) (cash collateral could be used to

23  compensate estate professionals where the cash was shown to be replaced by incoming cash

24  receipts); *In re James Wilson Assoc.*, 965 F.2d 160, 171 (7th Cir. 1992) (permitting debtor to use

25  cash collateral to pay attorney fees because secured creditor adequately protected); *In re Coventry*

26  *Commons Assoc.*, 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) (post-confirmation attorneys' fees

27  may be paid out of cash collateral of oversecured creditor); *In re Precast Structures, Inc.*, 122 B.R.

28

1    304 (Bankr. S.D. Tex. 1990) (allowing use of cash collateral to pay debtor's counsel where creditor

2    over collateralized and thus adequately protected).

3        As noted above, the Prepetition Secured Lenders are adequately protected by an ample

4    equity cushion in the real estate assets that have been pledged to them. Additionally, payment of

5    professionals to implement the Debtors' restructuring will enhance the going concern value of the

6    business. Accordingly, the Debtors should be authorized to utilize cash collateral to pay the

7    reasonable and necessary fees and expenses of professionals in accordance with the Budget and

8    subject to the allowance of the Court.

9    **E.**    **The Proposed Interim Use of Cash Collateral Is Appropriate Under The Circumstances**

10       Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may

11   not be commenced earlier than fourteen (14) days after the service of such motion. Upon request,

12   however, the Court is empowered to conduct a preliminary expedited hearing on the motion and

13   authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid

14   immediate and irreparable harm to a debtor's estate pending a final hearing.

15       Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an

16   expedited preliminary hearing on this Motion and (a) authorize the Debtors to use cash collateral on

17   an interim basis, pending entry of the Final Order, in order to (i) maintain and finance the ongoing

18   operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the

19   Debtors' estates and all parties in interest, and (b) schedule a hearing to consider entry of the Final

20   Order.

21       The Debtors have an urgent and immediate need for cash to continue to operate. Absent

22   immediate authority to use the cash collateral, the Debtors will not have sufficient funds with which

23   to operate their business and to pay the other administrative expenses incurred in connection with the

24   Cases. The value of the Debtors' estates would decline immediately and dramatically in the absence

25   of the relief requested herein. Accordingly, entry of the emergency Interim Order is necessary to

26   avoid immediate and irreparable harm to the Debtors' estates and, therefore, is appropriate under the

27   circumstances.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

80662-001\DOCS_LA:218417.4
1074748.1

The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied, to the extent applicable.

To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h), each to the extent applicable.

The Debtors further request that the Court schedule the Final Hearing on the Final Order no later than June 13, 2010.

**IV.**

**NOTICE**

**A.    Notice With Respect to Emergency Interim Financing Request**

This Motion has been served on the following parties or, in lieu thereof, on their counsel, if known: (i) the Office of the United States Trustee; (ii) the Prepetition Secured Lenders; (iii) other known secured creditors; (iv) the holders of the twenty largest unsecured claims of the Debtors; and (v) parties requesting notice under Bankruptcy Rule 2002 (the "Notice Parties").    The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**B.    Notice With Respect to Final Order**

The Debtors further request that, at the preliminary hearing on this Motion (the "Interim Hearing"), the Court schedule the Final Hearing.    Following the Interim Hearing, the Debtors propose to serve the Interim Order and notice of the Final Hearing on the Notice Parties.    The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

///

///

///

///

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

16

V.

## CONCLUSION

The Debtors respectfully request (i) entry of the Interim Order attached to this Motion as Exhibit A, approving the authority to use cash collateral on an interim basis pending the Final Hearing; (ii) scheduling the Final Hearing on this Motion for approval of the use of cash collateral on a final basis no later than June 13, 2010; (iii) final approval authorizing the use of cash collateral following the Final Hearing; and (iv) such further relief as is just and proper.

Dated:  May 3, 2010

DOWNEY BRAND LLP

Sallie B. Armstrong (Bar No. 1243)
Michelle N. Kazmar (Bar No. 10098)
DOWNEY BRAND LLP

PACHULSKI STANG ZIEHL & JONES LLP

Ira D. Kharasch (CA Bar No. 109084)
Scotta E. McFarland (CA Bar No. 165391)
Victoria A. Newmark (CA Bar No. 183581)

Proposed Counsel for the Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

17

# Exhibit A

# Exhibit A

Ira D. Kharasch (CA Bar No. 109084)
Scotta E. McFarland (CA Bar No. 165391)
Victoria A. Newmark (CA Bar No. 189301)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email:  ikharasch@pszjlaw.com
        smcfarland@pszjlaw.com
        vnewmark@pszjlaw.com
[Proposed] Attorneys for Debtors and
Debtors in Possession

Sallie B. Armstrong (NV Bar No. 1243)
Downey Brand
427 W. Plumb Lane
Reno, Nevada 89509
Telephone: (775) 329-5900
Facsimile:  (775) 786-5900
Email:  sarmstrong@downeybrand.com

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Chapter 11 |
| SPECIALTY TRUST, INC., et al. | **Jointly Administered under Case No. 10-51432-GWZ** |
| ☐ Affects this Debtor<br>☑ Affects all Debtors<br>☐ Affects Specialty Acquisition Corp.<br>☐ Affects SAC II<br>☐ Affects SAC D-1, LLC | Case Nos:<br><br>10-51432-GWZ<br>10-5137-GWZ<br>10-51440-GWZ<br>10-51441-GWZ<br><br>Jointly Administered<br><br>**INTERIM ORDER (A) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; AND (B) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001** |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

80662-001\DOCS_LA:218417.4
1074748.1

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in possession (the "Debtors") (a) seeking this Court's authorization pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001 to use any and all cash and cash equivalents which are currently and/or which will be in the Debtors' possession or control during the cases (the "Cash") if and to the extent that such Cash constitutes cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), (b) seeking an interim hearing (the "Interim Hearing") on the Motion to consider entry of this interim order pursuant to Bankruptcy Rule 4001 (the "Interim Order") pending the Final Hearing referred to below, and (c) requesting that a final hearing (the "Final Hearing," and collectively with the Interim Hearing, the "Hearings") be scheduled, and that notice procedures in respect of the Final Hearing be established, by this Court to consider entry of a final order (the "Final Order") authorizing on a final basis the use of the Cash Collateral; and due and sufficient notice of the Motion and the Interim Hearing having been given; and it appearing that the requirements of Rule 4001 of the Federal Rules of Bankruptcy Procedure and Local Rule 4001, have been satisfied; and upon the entire record made at the Interim Hearing and this Court having found good and sufficient cause appearing therefore,

**IT IS HEREBY FOUND** that:

A.    On April 20, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief with this Court under Chapter 11 of the Bankruptcy Code.  The Debtors are continuing to manage their properties and operate their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    This Court has jurisdiction over this case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.    The Debtors do not have sufficient available sources of working capital or funding to carry on the operation of their business without use of the Cash Collateral.  The Debtors' ability to pay management fees and certain other creditors and to otherwise fund postpetition operations is

---

[1] Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Motion.

2

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    essential to the Debtors' continued viability and the maximization of value for the estates.    In

2    addition, the Debtors' critical need for use of the Cash Collateral is immediate.  In the absence of the

3    use of the Cash Collateral, the continued operation of the Debtors' business would not be possible,

4    and serious and irreparable harm to the Debtors and the estates would occur.

5        D.    Subject to numbered paragraph 2 below, pending the Final Hearing, the Prepetition

6    Secured Lenders are found to be adequately protected for purposes of Bankruptcy Code sections 361

7    and 363.

8        E.    Notice of the Interim Hearing and the relief requested in the Motion has been given to

9    (i) the Office of the United States Trustee, (ii) the Prepetition Secured Lenders, (iii) the creditors

10   holding the twenty (20) largest unsecured claims against the Debtors, (iv) all other known secured

11   creditors; and (v) all parties requesting notice pursuant to Bankruptcy Rule 2002 (the "Notice

12   Parties").  Sufficient and adequate notice of the Interim Hearing and the relief requested in the

13   Motion has been given pursuant to all applicable provisions of the Bankruptcy Code and the

14   Bankruptcy Rules, including, without limitation, section 102(1) of the Bankruptcy Code and

15   Bankruptcy Rules 2002, 4001, 6003, and 6004(a), to the extent applicable.

16       F.    The permission granted herein as to the Debtors' use of the Cash Collateral is

17   necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry

18   of this Interim Order is in the best interest of the Debtors' estates and creditors as its implementation

19   will, among other things, allow for the continued operation of the Debtors' existing business and

20   enhance the Debtors' prospects for reorganization.

21       Based upon the foregoing findings and conclusions, and upon the record made before this

22   Court at the Interim Hearing, and good and sufficient cause appearing therefor,

23       **IT IS HEREBY ORDERED** that:

24       1.    The Motion is granted on an interim basis, subject to the terms and conditions set

25   forth in this Interim Order.

26       2.    The Debtor is authorized to use the Cash Collateral consistent with the Budget

27   through two (2) days after the Final Hearing, subject to the following variances:

28       a.    expenditures budgeted to be spent during a certain week, but not actually

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3

spent in such week, may be spent in later weeks;

b.  as to each line item in the Budget, total actual expenditures may exceed total budgeted expenditures by up to 15%;

c.  the variance between total actual and total budgeted expenditures may not exceed 15% in the aggregate; and

d.  notwithstanding sections b. and c. above, actual expenditures relating to foreclosure costs and maintenance of the REO property in Sedona, Arizona may exceed budgeted expenditures by a maximum amount of $250,000.

3.    Nothing herein is intended to acknowledge, recognize or allow any putative security interest in the Debtors' Cash Collateral and/or any other assets of the Debtors.  The Debtors and their estates expressly reserve all rights with respect to any putative security interest including that of the Prepetition Secured Lenders.

4.    The Final Hearing on the Motion shall be held before this Court on _____, 2010 at ___:____ __.m.  Any and all objections to the granting of the Motion and the relief requested thereby on a final basis shall be filed with the Court and served so as to be received by no later than 4:00 p.m. Pacific time on _____, 2010, by (i) the Debtors' proposed counsel and (ii) the Office of the United States Trustee.

5.    The Debtors shall serve a copy of this Interim Order via U.S. mail (or in their discretion, by any expedited means, including email, facsimile, messenger, or overnight delivery) on the Notice Parties within two (2) business days after entry of this Order.

6.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

7.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(g), 7062, 9014, or other rules, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

# # #

4

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

80662-001\DOCS_LA:218417.4
1074748.1