Ira D. Kharasch (CA Bar No. 109084)
Ellen M. Bender (CA Bar No. 116987)
Victoria A. Newmark (CA Bar No. 183581)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email: ikharasch@pszjlaw.com
       ebender@pszjlaw.com
       vnewmark@pszjlaw.com

*[Proposed] Attorneys for Debtor and Debtor in Possession / Petitions to Practice in Nevada are Pending*

Sallie B. Armstrong (NV Bar No. 1243)
Downey Brand LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone: 775/329-5900
Facsimile:  775/786-5443
Email: *sarmstrong@downeybrand.com*

*[Proposed] Attorneys for Debtor and Debtor in Possession*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>SPECIALTY TRUST, INC., et al.[1]<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Specialty Acquisition Corp.<br>☐ Affects SAC II<br>☐ Affects SAC D-1, LLC | Chapter 11<br><br>**Jointly Administered under Case No. 10-51432-GWZ**<br><br>Case Nos.<br>10-51432<br>10-51437<br>10-51440<br>10-51441<br><br>**DEBTORS' SUPPLEMENTAL BRIEF IN SUPPORT OF THE DEBTORS' REQUEST FOR AUTHORITY TO USE CASH COLLATERAL AND TO CONTINUE TO HONOR PREPETITION MANAGEMENT AGREEMENT**<br><br>Hearing Date:  June 2, 2010<br>Hearing Time:  2:00 p.m. |

The debtors and debtors in possession (the "Debtors") in the captioned chapter 11 cases hereby file this supplemental brief (the "Supplemental Brief") in support of the Debtors' request for

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Specialty Trust, Inc. (2463); Specialty Acquisition Corp. (3680); SAC II (2463); and SAC D-1, LLC (1858).

1

80662-002\DOCS_LA:220475.1

authority to use cash collateral to continue to honor obligations under the Debtors' prepetition management agreement with the Debtors' management company, Specialty Financial Corp.

   Concurrently herewith, the Debtors are filing the Declaration of Stephen V. Novacek (the "Novacek Declaration") and the Notice of Amended Budget. In addition, concurrently herewith, the Debtors are filing under seal pursuant to the Court's Order Exhibit A hereto, certain confidential information concerning the allocation of the management fees. A copy of this information filed under seal has been provided to counsel to the Official Committee of Equity Holders (the "Equity Holder Committee") and U.S. Bank National Association ("U.S. Bank"), subject to confidentiality agreements.[2]

   The Debtors also incorporate herein by this reference in their entirety (i) the *Debtors' Motion for Interim and Final Orders (a) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (b) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Cash Collateral Motion") [Docket No. 36]; (ii) *Declaration of Nello Gonfiantini III in Support of Motion for Interim and Final Orders (a) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (b) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Gonfiantini Declaration") [Docket No. 37]; (iii) *Omnibus Reply in Support of Debtors' Motion for Interim and Final Orders (a) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (b) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Omnibus Reply") [Docket No. 80]; and (iv) *Supplemental Declaration of Nello Gonfiantini III in Support of Motion for Interim and Final Orders (a) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (b) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Supplemental Gonfiantini Declaration") [Docket No. 82].

   In support of this Supplemental Brief, the Debtors state as follows:

// //

// //

// //

---

[2] The Debtors have not provided the Management Fee Allocation Memo to Deutsche Bank, as the Debtors have not yet received a signed confidentiality agreement.

# I.

# INTRODUCTION

It is critical that the Debtors be authorized to use cash collateral and to honor the management agreement, including payment of the management fees at the contract rate. At this early stage in the case, the Debtors would be harmed by interruption in day-to-day operations, marketing of non-core assets, and administration of the Chapter 11 cases. Substantially all of the tasks, or supervision thereof, is supplied by personnel of the management company, Specialty Financial Corp., which in turn utilizes the management fee to fund its payroll and other expenses.

As discussed in detail below and in the accompanying Novacek Declaration, the management fee was carefully vetted by an active and disinterested Board of Directors and Compensation Committee upon consideration of market data, the evolving nature of the tasks performed by the manager, and the condition of the real estate market. The management fee was reviewed as recently as December of 2009. Moreover, since the filing of the bankruptcy cases, the manager's responsibilities have increased, as they have been charged with all of the case administration tasks to be performed on behalf of the Debtors. The manager has also taken responsibility for developing and implementing a comprehensive asset marketing strategy.

Rejecting or terminating the management agreement is unlikely to provide a meaningful economic benefit to the estate. The management company has been providing necessary postpetition services and would be entitled to compensation as an administrative claim to the extent that the management fee is unpaid. Furthermore, the management company could assert large rejection damages claims. In this case, where it is anticipated that general unsecured creditors will be paid in full, a significant rejection damages claim (and the legal costs incurred to liquidate the claims) would negatively impact stakeholder recoveries.

For the foregoing reasons, as further discussed below, the Debtors request that they be authorized to use cash collateral and to continue to honor the management agreement, including payment of the management fees at the contract rate.

// //

80662-002\DOCS_LA:220475.1

## II.

## BACKGROUND

Specialty Trust, Inc. ("Specialty Trust") is a privately held mortgage finance company that acquires and holds, in a tax-advantaged real estate investment trust or REIT structure, mortgage loans and mezzanine loans secured by property located primarily in Nevada, Arizona and California.

Specialty Trust works in conjunction with three non-debtor affiliated entities that provide primary services to Specialty Trust. These entities include Specialty Financial Corp., which is responsible for Specialty Trust's day-to-day management and operations, Specialty Mortgage Corp., which originates and services certain of Specialty Trust's real estate loans, and Specialty Capital, LLC, a registered broker/dealer providing brokerage services to individual and institutional customers. Each of these three entities is owned or indirectly owned by Mr. Gonfiantini III.

In return for a management fee, Specialty Financial Corp. ("SFC") manages and runs Specialty Trust's day-to-day business operation and funds virtually all of Specialty Trust's overhead (except for one part-time employee), including the retention and payment of the individuals that manage Specialty Trust's business operations, and the payment of the rent and utilities on the building occupied by Specialty Trust. As part of its general management duties, SFC evaluates prospective real estate loans, generates loan originations and manages the loan and asset portfolio of Specialty Trust. This general management arrangement is fairly typical in a REIT structure, and has been in place between Specialty Trust and SFC, or SFC's predecessor,[3] for approximately 12 years.

The management services relationship between SFC and Specialty Trust is currently governed by that certain *Seventh Amended and Restated Management Agreement* dated April 1, 2009 (the "Seventh Amended Management Agreement"). The Seventh Amended Management Agreement sets forth in detail the services that SFC is responsible for providing to the Debtors. *See* Seventh Amended Management Agreement, at § 2. As compensation for the management services provided, SFC is entitled to payment of (i) a monthly based asset management fee in the amount of one percent (1%) per annum of the total consolidated assets of the Debtors as of the prior calendar

---

[3] Prior to March 31, 2006, Specialty Mortgage Corp., also owned by Mr. Gonfiantini, was the entity that managed Specialty Trust's operations.

4

1  quarter, and (ii) a quarterly incentive compensation fee based on the Debtors' GAAP adjusted net
2  income for such quarter. *See* Seventh Amended Management Agreement, at § 6.
3      The Debtors' board of directors typically review the terms of the Seventh Amended
4  Management Agreement on an annual basis, as set forth in greater detail below. In 2009, the board
5  reviewed the Seventh Amended Management Agreement twice – once in April 2009 and again in
6  December 2009 – given the condition of the real estate market. The board consists of Mr.
7  Gonfiantini III and five disinterested board members. The Seventh Amended Management
8  Agreement, Mr. Gonfiantini's interests in SFC, and the management fees have been disclosed to
9  investors.

## III.

## ARGUMENT

### A. Specialty Financial Corp. Provides Services that Are Critical to the Debtors' Reorganization

The Debtors' primary concern on this issue is that they will lose critical services if the management fees are not paid.

The Debtors have only one direct employee. SFC personnel are actively involved in the following three categories of tasks on behalf of the Debtors:

- *Day-to-day operations*. As set forth in paragraph 2 of the Seventh Amended Management Agreement, SFC personnel perform critical postpetition services such as (among other tasks) servicing of the loans, negotiating restructuring of loans and supervising foreclosures as to non-performing loans, overseeing maintenance of REO properties, and assisting with preparation of financial statements and tax filings and reports required to maintain REIT status.

- *Asset sales*. In addition, as set forth in the Omnibus Reply and Supplemental Gonfiantini Declaration, the Debtors are also in the process of marketing the sale of the real estate portfolio. As the Debtors have no direct employees, SFC personnel are handling negotiations. There is presently one sale that is currently in mid-negotiation.

- *Bankruptcy case administration*. Since the filing of the Chapter 11 cases, SFC personnel have been responsible for, among other tasks, preparation of the Debtors' schedules of assets and liabilities and U.S. Trustee reports, attendance at the section 341(a) meeting and court hearings, assisting with responses to discovery requests, and providing documents and information to bankruptcy counsel.

Based on the fee allocation information that has been filed under seal with the Court, if the Debtors failed to pay the management fees then SFC would run a substantial deficit. The Debtors will have no staff if SFC personnel quit or are laid off. Rent for office space to conduct business is also paid by SFC from the management fees and thus rent would need to be paid directly by the Debtors and/or new office space obtained if SFC defaults on the rent. Pending asset sale negotiations would be unfinished, and there would be substantial disarray in day-to-day operations if SFC no longer performed its duties.

B.  **The Debtors Engage in a Thorough Periodic Review to Ensure that the Management Agreement Is Appropriate and In-Line With Market[4]**

The Debtors engage in a thorough periodic review to ensure that the management agreement is appropriate and in-line with market. From its inception, Specialty Trust's Board of Directors has held regularly convened meetings on a quarterly basis, and more recently on a monthly basis, with additional informal meetings held on an as-needed basis. Additionally, the Compensation Committee has met at least once a year to review the management agreement with SFC, and make recommendations to the Board with respect to the same. During the past year or so, both the Board and the Compensation Committee have met much more frequently to deal with changing business needs arising as a result of declining conditions in the real estate market.

The structure of the management fee has changed over time. Under the original business model, a significant portion of SFC's fees were tied to loan originations and returns to the REIT, in order to incentivize the management company to produce maximum returns for the investors. The original management agreement fee had three components: (i) loan servicing fees, in an annual amount of 0.50% based upon the value of the loan, paid by Specialty Trust; (ii) loan origination fees, up to 2.5%, paid by the borrower; and (iii) an incentive fee paid by Specialty Trust, based upon performance of the loan portfolio. Thus, only the loan servicing fee and the incentive fee were paid by Specialty Trust under the original agreement. The incentive fee provided for 50% profit sharing of revenues after reaching a threshold yield, which was reviewed annually and determined by the

---

[4] The factual basis for the following discussion is set forth in the Novacek Declaration filed concurrently herewith.

80662-002\DOCS_LA:220475.1

Specialty Trust Board. Initially this threshold was 12%; it was adjusted at the request of the Board to 11% in 2005.

As Specialty Trust's business grew, so did the responsibilities of SFC. In order to accommodate additional responsibilities and personnel added to conduct the business, in 2003 the Board approved the addition of a base management fee to compensate SFC for such duties beyond the loan servicing obligations. In late 2003, the Board reviewed and approved the addition of a base management fee in the amount of ½ to 1% of the value of the loan portfolio. Again, these revisions were reviewed both by the Compensation Committee and the Board in light of what was paid by other mortgage REITs within Specialty Trust's peer group. All management fees approved by the Board were also set forth in the private placement memoranda and other investor disclosures.

Over the years, the Board continued to review and adjust the management fee paid to SFC, based upon the advice and recommendations of the Compensation Committee which reviewed these fees annually to ensure that they comported with the needs of Specialty Trust and industry trends. For example, in 2007 the incentive fee was changed from a tax-based fee to a GAAP-based fee, based upon the recommendation of one of the other Directors, Steve Johnson, a Certified Public Accountant, and Specialty Trust's outside auditors, Grant Thornton. Among other things, this was to provide more accurate auditing and reporting and avoid later earnings restatements; thus providing better accountability to Specialty Trust's shareholders.

In 2009, the state of Nevada Financial Institutions Division ruled that SFC could no longer receive a loan servicing fee. Through discussions with the Financial Institutions Division, management determined that this fee could instead be paid by increasing the base management fee paid to SFC. Therefore, the management agreement was amended to eliminate the loan servicing fee of 0.50% and increase the base management fee to 1.0%. Additionally, a 0.50% fee was added to cover the real estate portfolio (a "Real Estate Portfolio Fee"). However this latter fee was eliminated in April 2009, when the Board once again reviewed the management fees and concluded that to simplify the fee and stay within industry averages, a total management fee of 1.0% of the total consolidated assets of Specialty Trust (including both the loan portfolio and the real estate owned) was the appropriate benchmark.

80662-002\DOCS_LA:220475.1

Prior to review and approval of the Seventh Amended Management Agreement in April 2009, the Compensation Committee and the Board considered a number of factors before approving the 1% management fee. This included an Externally Advised Peer Group Base Management Fees survey of similarly situated privately held REITS prepared in March 2009 (the "Management Fee Survey"), reflecting current base management fees ranging from 1% to 1.75%. The Compensation Committee and the Board further reviewed historical data of Specialty Trust's Fee History from inception of the Company, data setting forth actual fees paid to SFC from inception of the Company to date, and the percentage of change over time. These materials reflected, among other things, that under the current base management fee structure, the fee of 1.0% would account for the lowest fee received by SFC since 1998 and reflect substantial reductions over the past 3-5 years alone. The estimated management fee to be paid in 2010 would actually represent a reduction of almost 75% from what SFC received in 2006.

In addition, at its meeting held on April 17, 2009, the Board discussed the need to increase SFC's responsibilities to deal with the increasing number of REO properties and workout loans. The prior management agreement did not contemplate such duties to be performed by SFC since, due to changes in the economy, Specialty Trust's activities had evolved from a real estate lending company to a real estate development company. Therefore, the Directors requested that the management agreement be further amended to provide that SFC would not only service loans, but for REO properties, SFC would take an active role in the ongoing management, improvement and disposition of real estate. Such duties were to include property entitlement, construction, demolition and property management as well as disposition of each asset to maximize value. Thus, the final version of the Seventh Amended Management Agreement included these additional duties of SFC, and further provided that the overall management fee would remain 1% but would include total consolidated assets of the Company at the end of the preceding calendar quarter, after adding back the allowance for loan losses.

In approving the Seventh Amended Management Agreement at the subsequent April 30, 2009 Board meeting, the Directors also agreed that, given the difficult economic environment, the SFC management fee would need to be reviewed more frequently than annually. Consequently, the

80662-002\DOCS_LA:220475.1

management fee was again reviewed by the Board in December 2009. Among other things, the Company's management presented updated information indicating that the peer rates reflected in the Management Fee Summary had not changed. The Board further reviewed and discussed various other potential cost-cutting alternatives, such as whether it would be less expensive to bring management inside the Company rather than continuing to have such services performed by SFC. The Board concluded that such alternative arrangements would only be more burdensome would not be cost effective.

Based upon the foregoing, at its meeting conducted on December 8, 2009, the Board determined that the Seventh Amended Management Agreement would be renewed without any further revisions. Given the substantial decline in loan origination revenue and reduction in fees by almost 75% over time, the fact that SFC was being required to perform significantly more tasks relating to its workout of loans and management of REO properties, and continued market data that the fee was well within industry standards, if not below them, for a privately held REIT, the Board unanimously concluded in its sound business judgment that the management fee was fair, reasonable, and appropriate. The Board further resolved, however, at the recommendation of the Compensation Committee, to continue to monitor and analyze expenses of SFC on a *quarterly* basis, given the still unsettled real estate market. The Board and the Compensation Committee have continued to do so.

To the best of the Debtors' knowledge, none of the members of the Board except for Mr. Gonfiantini III, has any connections with SFC other than their service on the Board of Specialty Trust. All of the members of the Board own shares in Specialty Trust.

**C.    Stopping Payments to SFC Under the Management Agreement Is Unlikely to Provide a Meaningful Economic Benefit to the Estate**

Stopping payments to SFC under the Seventh Amended Management Agreement is unlikely to provide a meaningful economic benefit to the estate for several reasons.

**1.    SFC Could Assert Substantial Damages Claims**

SFC personnel have been providing necessary services to the estate since the petition date. As noted above, such necessary postpetition services performed by SFC personnel include, among

other tasks, preparation of the Debtors' schedules of assets and liabilities and U.S. Trustee reports, attendance at the section 341(a) meeting and court hearings, assisting with responses to discovery requests, and providing documents and information to bankruptcy counsel. Thus, SFC would be entitled to compensation as an administrative claim for such postpetition services – and for any other necessary services that SFC demonstrates that its personnel provided postpetition – even if the Seventh Amended Management Agreement is ultimately terminated or rejected. *See* 11 U.S.C. § 503(b)(1) (actual and necessary costs of preserving the estate shall be allowed as an administrative expense claim). Further, at a minimum, there is an argument that SFC could assert a general unsecured damages claim for any missed management fee payments coming due postpetition.

In addition, rejection or termination of the management agreement is likely to result in a significant additional damages claims. The management agreement contains a liquidated damages provision. *See* Seventh Amended Management Agreement, at § 9(b). The liquidated damages provision states that, in the event of early termination by the Debtors, SFC's damages shall be in an amount equal to the greater of (i) the fair market value of the management agreement determined by an independent appraiser or (ii) four percent (4%) of the consolidated real estate loan portfolio. *Id.*[5] Thus, if the Debtors are deemed to have rejected or terminated the management agreement during its term, SFC could take the position that they are entitled to assert a multi-million dollar damages claim against the estate.

SFC's assertion of a significant damages claim, even if relegated to general unsecured status pursuant to sections 365(g) and 502(g) of the Bankruptcy Code, would be meaningful in this case if allowed. Here, there is substantial equity in the value of the estate's assets over and above the amount of the Debtors' secured and unsecured indebtedness, and it is anticipated that all general unsecured claims, including any valid rejection damages claims, will be paid in full in a Chapter 11 plan. Accordingly, rejection or termination of the management agreement could result in the Debtors losing their management services without getting an offsetting elimination of debt.

///

---

[5] The liquidated damages provision has been a provision of all prior iterations of the Management Agreement since inception in 1998. *See* Novacek Declaration at ¶ 18.

80662-002\DOCS_LA:220475.1

### 2. Litigation Over Claims Adjudication Will Cause Increased Legal Costs

Disputing the validity and reasonableness of the liquidated damages clause and the value of SFC's administrative expense claims would result in significant legal costs. The issues would be fact-intensive and would potentially require expert testimony on market rates. There would be uncertainty as to the outcome of the disputes, such that the expenditure of legal costs might not be fully offset by the results obtained.

### 3. The Estate May Not Save Costs With a Replacement Management Company

Moreover, if SFC employees leave or are laid off because SFC can no longer afford to pay their employees due to decreased cash flow, then the Debtors would have to locate, hire, and compensate a suitable replacement management company in order to reorganize. Thus, a rejection scenario would require a variety of replacement management company costs. Based on the foregoing, it does not appear that preventing the Debtors from making payments under the management agreement is likely to result in a meaningful economic benefit for the estate.

## IV.

## CONCLUSION

The terms of the Seventh Amended Management Agreement have been thoroughly vetted by a disinterested board of directors. Even if the Debtors ignored these facts and moved to replace SFC as their management company, rejection of the management agreement would be extremely detrimental to the estate, both economically and operationally. Accordingly, the Debtors' request for use of cash collateral to continue to perform under the management agreement is a sound exercise of the Debtors' business judgment and in the best interests of the estate, and should be authorized.

DATED: May 28, 2010.

DOWNEY BRAND LLP

By: _____
SALLIE B. ARMSTRONG
[Proposed] Attorneys for Debtors
and Debtors in Possession

11

80662-002\DOCS_LA:220475.1

# **EXHIBIT A**

## **FILED UNDER SEAL PURSUANT TO COURT ORDER**

1