1   Ira D. Kharasch (CA Bar No. 109084)
    Scotta E. McFarland (CA Bar No. 165391)
2   Victoria A. Newmark (CA Bar No. 183581)
    Pachulski Stang Ziehl & Jones LLP
3   10100 Santa Monica Boulevard, 11th Floor
    Los Angeles, California  90067-4100
4   Telephone: 310/277-6910
    Facsimile:  310/201-0760
5   Email: ikharasch@pszjlaw.com
          smcfarland@pszjlaw.com
6           vnewmark@pszjlaw.com
7

8   *Attorneys for Debtor and*
    *Debtor in Possession*
9

Sallie B. Armstrong (NV Bar No. 1243)
Downey Brand LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone:  775/329-5900
Facsimile:  775/786-5443
Email:  sarmstrong@downeybrand.com

*Nevada Attorneys for Debtor and*
*Debtor in Possession*

10              **UNITED STATES BANKRUPTCY COURT**

11              **FOR THE DISTRICT OF NEVADA**

12   In re:

13   SPECIALTY TRUST, INC., et al.[1]

14   ☐ Affects this Debtor
    ☒ Affects all Debtors
15   ☐ Affects Specialty Acquisition Corp.
    ☐ Affects SAC II
16   ☐ Affects SAC D-1, LLC
17

**Jointly Administered under
Case No. 10-51432-GWZ**

Case Nos:

10-51432-GWZ
10-51437-GWZ
10-51440-GWZ
10-51441-GWZ

18
19   **DEBTORS' APPLICATION FOR AN
ORDER, PURSUANT TO 11 U.S.C.
20   §§327(a) AND 328(a), AUTHORIZING
EMPLOYMENT AND RETENTION
21   OF IMPERIAL CAPITAL, LLC AS
FINANCIAL ADVISOR AND
22   INVESTMENT BANKER,
EFFECTIVE JUNE 14, 2010**

23   Hearing Date:    June 22, 2010
    Hearing Time:    11:00 a.m.
24   Place:             300 Booth Street
                  Reno, NV 89509

25
26
27

28   [1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if
applicable, are:  Specialty Trust, Inc. (2463); Specialty Acquisition Corp. (3680); SAC II (2463); and SAC D-1,
LLC (1858).

*Left margin (vertical):* DOWNEY BRAND   427 West Plumb Lane   Reno, Nevada 89509   Tel: (775) 329-5900  Fax: (775) 786-5443

TO THE HONORABLE GREGG W. ZIVE, UNITED STATES BANKRUPTCY JUDGE:

Specialty Trust, Inc. ("Specialty Trust") and its affiliated debtors and debtors in possession (collectively, the "Debtors")[2], hereby submit this application ("the "Application") for an order pursuant to sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "Bankruptcy Code"), and Rule 2014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), authorizing the Debtors to employ and retain Imperial Capital, LLC ("Imperial") as their financial advisor and investment banker effective as of June 14, 2010. The facts and circumstances supporting this Application are set forth in the Declaration of Marc Bilbao (the "Bilbao Declaration"), filed concurrently herewith. In further support of this Application, the Debtors respectfully represent as follows:

## BACKGROUND

1. On April 20, 2010 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11, United States Bankruptcy Code (the "Bankruptcy Code"). The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. Specialty Trust, Inc. ("Specialty Trust") is a privately held mortgage finance company that acquires and holds, in a tax-advantaged real estate investment trust or REIT structure, mortgage loans and mezzanine loans secured by property located primarily in Nevada, Arizona and California. Specialty Trust was founded in 1997 by its current chairman and chief executive officer, Nello Gonfiantini III. Specialty Trust is held by approximately 435 shareholders, most of whom consist primarily of individuals, family trusts, and local businesses' pension and profit sharing plans. The total capital invested by the shareholders is approximately $170 million. Mr. Gonfiantini personally owns approximately 5.9% of such shares.

---

[2] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Specialty Trust, Inc. (2463); Specialty Acquisition Corp. (3680); SAC II (2463); and SAC D-1, LLC (1858).

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900  Fax: (775) 786-5443

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

3.      Loans are generally made at low loan-to-value ratios, usually 50% or less. Most loans have terms of one to three years. The majority of Specialty Trust's mortgage loan balances are secured by first deeds of trust on the underlying real property, with the remaining mortgage loan balances secured by junior liens. Specialty Trust's mortgage loans may be secured by mortgages on unimproved as well as improved real property and non-income producing as well as income-producing real property.

4.      Specialty Trust currently holds loans with a total amount owing from its borrowers of approximately $178 million, which loans have a book value of approximately $124 million.  Specialty Trust also owns outright or through its subsidiaries REO property (property obtained through foreclosures from its loan portfolio) with a current market value of approximately $63 million.  Approximately 97% of these latter REO properties are held by three debtor subsidiaries of Specialty Trust, which include Specialty Acquisition Corp., SAC II, and SAC D-1, LLC.[3]  Specialty Acquisition Corp. and SAC II are wholly owned subsidiaries of Specialty Trust, and SAC D-1, LLC is a wholly owned subsidiary of Specialty Acquisition Corp.

5.      Specialty Trust works in conjunction with three non-debtor affiliated entities that provide primary services to Specialty Trust.  These entities include Specialty Financial Corp., which is responsible for Specialty Trust's day-to-day operations, Specialty Mortgage Corp., which originates and services certain of Specialty Trust's real estate loans, and Specialty Capital, LLC, a registered broker/dealer providing brokerage services to individual and institutional customers.  Each of these three entities is owned or indirectly owned by Mr. Gonfiantini III.

6.      In return for a management fee, Specialty Financial Corp. ("SFC") manages and runs Specialty Trust's day-to-day business operation and funds virtually all of Specialty Trust's overhead (except for one employee), including the retention and payment of the individuals that manage Specialty Trust's business operations, and the payment of the rent and utilities on the building occupied by Specialty Trust.  As part of its general management duties, SFC evaluates prospective real estate loans, generates loan originations and manages the loan and asset

---

[3] Specialty Trust transfers most of the REO properties to its subsidiaries for insurance purposes as well as to maintain compliance with regulations governing REITs.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

portfolio of Specialty Trust.  This general management arrangement is fairly typical in a REIT structure, and has been in place between Specialty Trust and SFC, or SFC's predecessor,[4] for approximately 12 years.

7.     Specialty Trust currently maintains a $29.25 million term loan which includes three participating commercial banks of which US Bank is the agent.  Additionally, Specialty Trust has $37 million outstanding under a secured investment note program.  This note program contains individual notes with maturities ranging from 1 month to 10 years and annual interest rates varying from 4.5% to 8.5%.

8.     Specialty Trust has experienced a 37.2% decline in the value of its real estate loan portfolio between December 31, 2008 and December 31, 2009, while its REO portfolio has grown by 75.7%.  Management believes the loan portfolio has stabilized and does not expect further material write downs to the portfolio beyond the year end 2009.  Furthermore, management has identified and is in a position to capitalize on undervalued opportunities derived from the recent real estate market fallout.

9.     The Debtors require the services of a financial advisor and investment banker to assist them in exploring various different possibilities for reorganization, including, but not limited to, a potential sale of debt or equity securities, restructuring of their debt or equity, or the sale of the business.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b).  The statutory predicates for the relief sought herein are sections 327(a) and 328(a) of the Bankruptcy Code.

## RELIEF REQUESTED

11.     The Debtors desire to retain and employ Imperial as investment banker and financial advisor for the Debtors, effective as of June 14, 2010, pursuant to the terms of an

---

[4] Prior to March 31, 2006, Specialty Mortgage Corp., also owned by Mr. Gonfiantini, was the entity that managed Specialty Trust's operations.

engagement letter, dated as of June 14, 2010 (the "Engagement Letter"), a copy of which is attached to the Bilbao Declaration as Exhibit 1 and is incorporated herein by reference.

## IMPERIAL'S QUALIFICATIONS

12.  Imperial is a full-service investment bank offering sophisticated institutional sales and trading, a wide range of investment banking advisory, capital markets and restructuring services, and institutional research.  Imperial's institutional sales and trading professionals service over 1,200 institutional accounts.  Imperial's investment banking professionals provide advisory services to middle market corporations, institutional investors, and private equity funds. The Biographies of the employees of Imperial who will be primarily responsible for providing services to the Debtors are attached to the Bilbao Declaration as Exhibit 2.

13.  In particular, Imperial and its professionals have extensive experience working with financially troubled companies in complex financial restructurings both in chapter 11 cases and in out-of-court situations.  Imperial is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings.

14.  As an active bankruptcy and restructuring advisor with significant experience in a variety of industries, Imperial is well-qualified to serve as investment banker and financial advisor to the Debtors.  Imperial specializes in assisting and advising debtors, creditors, creditor's committees, shareholders, bondholders and other parties involved with financially distressed companies, both during and outside of bankruptcy cases, and has served as investment bankers, financial and strategic advisors for debtors, creditors, and other constituents in numerous chapter 11 cases. *See, e.g., In re Mesa Air Group, et al.,* No. 10-10018 (MG) (Bankr. S.D.N.Y. March 1, 2010) [Dkt. No. 372], *In re MagnaChip Semiconductor Finance Co.*, No. 09-12008 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Dkt No. 274], *In re Monaco Coach Corp.,* No. 09-10750 (KJC) (Bankr. D. Del. April 9, 2009) [Dkt No. 132], *In re Qimonda Richmond LLC,* No. 09-10589 (MFW) (Bankr. D. Del. May 18, 2009) [Dkt No. 370], *In re Landsource Communities Development LLC,* No. 08-11111 (KJC) (Bankr. D. Del. Aug. 27, 2008) [Dkt No. 504], *In re Aloha Airlines Inc.,* No. 08-00337 (LK) (Bankr. D. Haw. April 8, 2008) [Dkt No. 203], *In re*

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

*Movie Galley Inc.*, No. 07-33849 (DOT) (Bankr. E.D. Va. Nov. 27, 2007) [Dkt No. 1016], *In re Custom Food Products, Inc.*, No. 07-10495 (PJW) (Bankr. D. Del. June 14, 2007) [Dkt No. 307], and *In re Mesaba Aviation, Inc.*, No. 05-39258 (GFK) (Bankr. D. Minn. June 8, 2005) [Dkt No. 641].

15.    In light of the size and complexity of these chapter 11 cases, the Debtors require the service of a seasoned and experienced investment banker and financial advisor, and one that is familiar with the chapter 11 process. Additionally, the Debtors believe that by having a financial advisor and investment banker provide these services in these chapter 11 cases, other professionals in these cases – and company officers who might otherwise handle complex financial and financing matters – will be able to focus better on their respective competencies and their core tasks and efficiently and effectively advise in the management of the Debtors' businesses and operations and to facilitate a successful chapter 11 process. Imperial is well-qualified to provide the services being sought by the Debtors, and the employment of Imperial under the terms contained in the Engagement Letter will benefit the Debtors' estates and their reorganization efforts.

## SERVICES TO BE PROVIDED

16.    Pursuant to the terms of the Engagement Letter, Imperial will provide such consulting and advisory services as Imperial and the Debtors deem appropriate and feasible to advise the Debtors in the course of these chapter 11 cases. Specifically, Imperial will render various services to the Debtors including, but not limited to, the following:[5]

     a.   analysis of the Debtors' business, operations, properties, financial condition, competition, forecast, prospects and management;

     b.   financial valuation of the ongoing operations of the Debtors;

     c.   assisting the Debtors in developing, evaluating, structuring and negotiating the terms and conditions of a potential restructuring of their debt or equity interests in the Debtors, including, but not limited to, the execution of any

---

[5] To the extent any summary of the Engagement Letter in this Application and the terms of the Engagement Letter are inconsistent, the terms of the Engagement Letter (as the same may be modified by the Order approving this Application) shall control. Capitalized terms that are used but not defined in this Application shall have the meanings ascribed to them in the Engagement Letter.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

supplemental indenture, corporate bylaws, or amendments to the same or other agreements giving effect thereto; an offer to exchange, cancel, acquire or otherwise modify the terms of the debt against the Debtors; any modifications to, or suspensions of, the obligations to pay interest on any of the debt, or any amendments thereto;

d.  assisting the Debtors in the preparation of solicitation materials with respect to the Debtors' obligations, any securities to be issued in connection with the Restructuring and the Debtors (such solicitation materials, including, without limitation, all exhibits, amendments and supplements thereto, the "Restructuring Offering Materials");

e.  advising the Debtors on a proposed purchase price and form of consideration for a transaction, which transaction may include a merger, consolidation, or any other business combination, in one or a series of transactions, or a sale involving aggregate gross proceeds in excess of $10.0 million for the business, securities or assets of the Debtors, or one or more subsidiaries or divisions of the Debtors, or any transaction structured to substantially achieve the same result (each a "Transaction");

f.  assisting the Debtors in developing, evaluating, structuring and negotiating the terms and conditions of a potential Transaction;

g.  assisting the Debtors in the preparation of solicitation materials with respect to the Transaction and the Debtors (the "Transaction Offering Materials");

h.  identifying and contacting selected qualified buyers (the "Buyers") for the Transaction and furnishing the Buyers, on behalf of the Debtors, with copies of Transaction Offering Materials;

i.  assisting the Debtors in arranging for potential Buyers to conduct due diligence investigations;

j.  assisting the Debtors in developing, evaluating, structuring and negotiating the terms and conditions of a potential private placement, of such amount as may be agreed in writing between the parties, of debt or equity securities (the "Financing"), on a best efforts basis;

k.  assisting the Debtors in the preparation of solicitation materials with respect to the Financing, any securities to be issued in connection with the Financing and the Debtors (such solicitation materials, including, without limitation, all exhibits, amendments and supplements thereto, (the "Financing Offering Materials");

l.  identifying and contacting selected qualified purchasers (the "Purchasers") to participate in the Financing and furnishing the Purchasers, on behalf of the Debtors, with copies of Financing Offering Materials;

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

m. rendering expert testimony, if needed, provided in support of a Restructuring, Transaction, or Financing; and

n. providing such other financial advisory services with respect to the Debtors' financial issues as may from time to time be agreed upon between the Debtors and Imperial.

17.    In order to maximize the chance of a successful reorganization and the enhancement of the value of the estates, the Debtors require the services of a capable and experienced investment banker and financial advisor in these chapter 11 cases.  As noted above, Imperial has substantial expertise in these areas, and, as a result, Imperial is well qualified to perform these services and represent the Debtors' interest in these cases.

## PROFESSIONAL COMPENSATION

18.    Imperial's willingness to advise and assist the Debtors is contingent upon its ability to be retained in accordance with the terms and conditions of the Engagement Letter, including, without limitation, the indemnification provision contained in Schedule 1 to the Engagement Letter.

19.    The proposed overall compensation structure is comparable to compensation generally charged by financial advisors of similar stature for comparable engagements, both in and out of court and reflects a balance between a fixed fee, monthly fee and fees contingent on the consummation and closing of the transactions contemplated by the Engagement Letter.

20.    Except as described below, Imperial intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the District of Nevada (the "Local Rules"), any applicable guidelines (the "Guidelines") established by the United States Trustee for the District of Nevada, and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter (the "Compensation Structure").  Further because the Debtors are seeking to compensate Imperial pursuant to section 328(a) of the Bankruptcy Code, the Debtors believe that Imperial's

///

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

1082947.1

8

compensation should not be subject to any additional standard of review under section 330 of the Bankruptcy Code.

21.    As compensation for the services rendered pursuant to the Engagement Letter, the Debtors have agreed to pay Imperial the following fees (the "Fee Structure") in cash, which are presented here in summary form:

(a)    A monthly financial advisory fee of $50,000 (the "Monthly Advisory Fee"), payable in advance, beginning as of the date of the Engagement letter and continuing until the Debtors' emergence from chapter 11 proceedings or until the Engagement Agreement is earlier terminated pursuant to its terms. All Monthly Advisory Fees paid shall be credited against the Financing Fee and the Transaction Fee, both as defined below.

(b)    A cash fee (the "Financing Fee"), payable out of the proceeds of the Financing equal to:
   a.   3.0% of the face amount of any senior debt sold or arranged as part of the Financing;
   b.   4.0% of the face amount of any subordinated debt sold or arranged as part of the Financing;
   c.   5.0% of the face amount of any equity securities sold or arranged as part of the Financing.

No Financing Fee shall be payable for capital raised from the Company's existing shareholders or noteholders (current holders as of the date of this Agreement). The Financing Fee for any capital raised from Equifin, LLC[6] shall be reduced by 50%. The Financing Fee shall be credited against any Transaction Fee or Restructuring Fee, both as defined below.

(c)    A transaction fee equal to 2.0% of the Transaction Consideration (defined below) received by the Company and/or its equity security holders pursuant to the Transaction (the "Transaction Fee"). The Transaction Fee shall be payable upon consummation of the Transaction. For purposes of this Agreement, Transaction Consideration is the aggregate of all consideration received by the Company and/or its equity security holders, the amount of any debt assumed or repaid, or that remains outstanding after the transaction, any preferred stock redeemed, and consideration received with respect to the exercise or termination of options, warrants or other rights of conversion. Notwithstanding the foregoing, for any Transaction consummated with Equifin, LLC, the Transaction Fee shall be equal to 1.0% of Transaction Consideration received by the Company and/or its equity security holders. Any Transaction Fee will be credited against any Restructuring Fee, defined below.

---

[6] The reduction of fees for transactions involving Equifin, LLC is explained in the below section titled Payment of Ledgemont Fees.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

(d)    A restructuring fee equal to 2.0% of the Enterprise Value (defined below) implied by a plan of reorganization approved by the Bankruptcy Court (the "Restructuring Fee"). The Restructuring Fee shall be payable on or prior to the effective date of a plan or reorganization and/or consummation of a Restructuring. The Restructuring Fee will be made payable pursuant to any proposed plan of reorganization without the need for further application to the Bankruptcy Court for its payment. For the purposes of calculating the Restructuring Fee, Enterprise Value shall mean the consolidated book value of total assets of the reorganized entity, as reflected in the Debtors' financial statements prepared by an outside audit firm on, or nearest to, the date of consummation of the Restructuring. To the extent that the plan of reorganization contemplates a Transaction post confirmation, then the Restructuring Fee shall be payable at the close of the Transaction and fully credited toward any Transaction Fee that would be due under the Transaction.  Additionally, to the extent that there is a Financing that is closed with Equifin, LLC and Imperial has been paid the corresponding Financing Fees owed under (b) above, then the maximum fees payable shall be reduced by the amount paid.  For the avoidance of doubt, this limitation solely applies to a transaction with Equifin, LLC.

(e)    The maximum Restructuring Fee or Transaction Fee payable under will be as follows:

    (i)  $1,650,000 if a Restructuring or Transaction is consummated within six (6) months following the date of the Engagement Agreement;

    (ii) Between $1,650,000 and $2,650,000, calculated pro rata, if a Restructuring or Transaction is consummated after six (6) months but within eighteen (18) months following the date of the Engagement Agreement;

    (iii)$2,650,000 if a Restructuring or Transaction is consummated after eighteen (18) months following the date of the Engagement Agreement.

(f)    In addition, without regard to whether the Restructuring, Financing, or Transaction is consummated or the Engagement Agreement expires or is terminated, all fees, disbursements and out-of-pocket expenses (the "Expenses") incurred by Imperial Capital in connection with the services to be rendered under the Engagement Agreement (including, without limitation, reasonable attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses and other customary expenditures) shall be reimbursed to Imperial, or paid on behalf of Imperial, promptly as billed.

22.    As further consideration, the Debtors have agreed to the indemnification and other obligations set forth in Schedule I attached to the Engagement Agreement, which such Schedule is an integral part of the Engagement Agreement and is incorporated therein by reference.

///

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900  Fax: (775) 786-5443

23. None of the fees payable to Imperial pursuant to the Engagement Letter shall constitute a "bonus" or "fee enhancement" under applicable law.

24. Imperial was not employed by the Debtors prior to the Petition Date, therefore, it received no prepetition fees from the Debtors.

25. Imperial does not customarily maintain detailed time records similar to those customarily maintained by attorneys, and Imperial's services would not be compensated by reference to the number of hours and the Engagement Letter provides that Imperial shall receive, among other things, certain fixed fees as described above. Further, given the nature of their work (among other things, their focus on beneficial transactions and their incentive to implement such transactions), financial advisors, investment bankers, and similar professionals do not customarily bill on an hourly basis (or other increment thereof). The Debtors, therefore, request that Imperial be relieved of the obligation to record its time on an hourly basis or in other increments thereof.

26. The Debtors believe the Fee Structure appropriately reflects the nature of the services to be provided by Imperial, is reasonable and comparable to compensation generally charged by financial advisors and investment banking firms of similar stature to Imperial and for comparable engagement, both in and out of bankruptcy proceedings, and reflects a balance between a fixed, monthly fee, and a deferred amount which is tied to the consummation and closing of the transactions and services contemplated by the Debtors and Imperial in the Engagement Letter.

27. The hours worked, the results achieved, and the ultimate benefit to the Debtors for the work performed by Imperial in connection with its engagement may vary and the Debtors and Imperial have taken this into account in setting the above fees. **The Compensation Structure is consistent with Imperial's normal and customary billing practices for cases of this size and complexity both in and out of bankruptcy proceedings which require the level of services to be provided. Imperial's restructuring capabilities, mergers and acquisitions expertise as well as its capital raising experience, some or all of which may be required by the Debtors during the term of Imperial's engagement hereunder, were important factors**

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900  Fax: (775) 786-5443

**to the Debtors in determining the Compensation Structure.** The Debtors believe that the ultimate benefit of Imperial's services hereunder cannot be measured by reference to the number of hours expended by Imperial's professionals in the performance of such services. The Debtors believe that the fee arrangements in the Engagement Letter are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code, given (i) the numerous issues Imperial may be required to address in the performance of its services under the Engagement Letter, (ii) Imperial's commitment to the variable level of time and effort necessary to address all such issues as they arise and (iii) the market prices for Imperial's services for engagements of this nature in both out-of-court and chapter 11 contexts. Accordingly, Imperial and the Debtors believe the Compensation structure is both reasonable and market-based and should be approved under section 328(a) of the Bankruptcy Code.

28.     Imperial will not share or agree to share any compensation to be paid by the Debtors, in connection with services to be performed after the Petition Date, with any other person, other than other principals and employees of Imperial, in accordance with section 504 of the Bankruptcy Code.

### INDEMNIFICATION PROVISION

29.     As stated previously, as part of the overall compensation payable to Imperial under the terms of the Engagement Letter, the Debtors have agreed, among other things, to indemnify, and provide contribution and reimbursement to, Imperial and certain related parties in accordance with the provisions of the Indemnification Provision attached as Schedule 1 to the Engagement Agreement. The Debtors believe such provision is customary and reasonable for Imperial's engagement. Unlike the market for other professionals that the Debtors may retain, such provisions are standard terms of the market for financial advisors and investment bankers. Imperial and the Debtors believe that such provisions are comparable to those generally obtained by investment banking and financial advisory firms of similar stature to Imperial and for comparable engagements, both in and out of court.

30.     Accordingly, as part of this Application, the Debtors request that the Court approve the Indemnification Provision.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

**PAYMENT OF LEDGEMONT FEES**

31.    Pursuant to a letter agreement dated November 9, 2009 (the "Ledgemont Agreement"), Specialty Trust, Inc. engaged Ledgemont Capital Group LLC ("Ledgemont") as its financial advisor with respect to a proposed private placement of equity, equity-linked securities, debt or any combination thereof. A copy of the Ledgemont Agreement is attached hereto as **Exhibit A**. The Ledgemont Agreement terminated pursuant to its own terms 180 days after November 9, 2009, however, it contains a provision (the "Tail") that requires Specialty Trust to pay Ledgemont the fee provided in the Ledgemont Agreement if, within eighteen (18) months after the termination of the Ledgemont Agreement, any prospective qualified purchaser which Ledgemont introduced to Specialty Trust or with which Ledgemont had discussions or negotiations during the term of the Ledgemont Agreement on behalf of Specialty Trust, purchases securities from Specialty Trust (other than through a underwritten public offering). The "Cash Fee" that was to be paid to Ledgemont at the closing of the offering was to be five percent (5%) for equity, four percent (4%) for convertible debt and three percent (3%) for non-convertible debt.

32.    During the term of the Ledgemont Agreement, Ledgemont introduced Equifin, LLC to Specialty Trust as a potential qualified purchaser of securities, therefore, in negotiating the Engagement Agreement with Imperial, the Debtors negotiated a fifty percent (50%) reduction in the Transaction Fee and the Financing Fee to the extent Equifin, LLC is involved.

33.    In the event that capital is raised from or a Transaction is consummated with Equifin, LLC during the term of the Engagement Agreement, in order to avoid any disputes with Ledgemont over any fee due to it under the Tail, the Debtors hereby request that the Court authorize, but not direct, them to pay to Ledgemont, in full and complete satisfaction of any amounts due to Ledgemont under the Ledgemont Agreement and the Tail, an amount equal to the fifty percent (50%) reduction in the Transaction Fee or the Financing Fee due to Imperial. To be clear, the Debtors seek authority to pay the fee only if Ledgemont agrees that such payment is in full and complete satisfaction of any and all amounts owed by the Debtors to Ledgemont under the Ledgemont Agreement.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900  Fax: (775) 786-5443

**DISINTERESTEDNESS**

34.  Imperial has informed the Debtors that, except as may be set forth in the Bilbao Affidavit, it (i) has no connection with the Debtors, its creditors or other parties in interest in these cases; (ii) does not hold or represent any interest adverse to the Debtors' estates; and (iii) believes it is a "disinterested person" as defined within Bankruptcy Code section 101(14).

35.  Imperial has further informed the Debtors that it will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new material facts, connections or relationships are discovered or arise, Imperial will supplement its disclosure to the Court.

36.  As described in the Bilbao Declaration, Imperial and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Debtors pursuant to which Imperial may acquire information of interest to the Debtors.  Imperial shall have no obligation to disclose such information to the Debtors, or to use such information in connection with the matters set forth in Section 1 of the Engagement Letter.

**BASIS FOR RELIEF**

37.  Under §§ 327 and 328 of the Bankruptcy Code, a trustee, debtor in possession and committee appointed under § 1102 of the Bankruptcy Code may employ one or more professionals that do not hold or represent an interest adverse to the estates and that are disinterested persons to assist such parties in carrying out their duties under the Bankruptcy Code.

38.  Specifically, § 327(a) of the Bankruptcy Code provides that a debtor, subject to Court approval:

> may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estates, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title.

11 U.S.C. § 327(a).

39.  Section 328(a) provides, in relevant part, that a debtor:

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis.

11 U.S.C. § 328(a).

40.     Bankruptcy Rule 2014 requires that an application for retention include: [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.

Fed. R. Bankr. Proc. 2014.

**Approval Pursuant to Section 328 of the Bankruptcy Code**

41.     By this Application, the Debtors request that the Court approve the employment and retention of Imperial, as financial advisor and investment banker for the Debtors, pursuant to the terms of the Engagement Letter, including, but not limited to the compensation arrangements described above and in the Engagement Agreement pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code.  The compensation arrangements contained therein are highly beneficial to the Debtors' estates as they provide certainty and proper inducement for Imperial to act expeditiously and prudently with respect to the matters for which it will be employed.

42.     Section 328 of the Bankruptcy Code permits the compensation of professionals, including financial advisors such as Imperial, on flexible terms that reflect the nature of their services and market conditions.  Section 328(a), together with other provisions of the Bankruptcy Code, represent a rejection of the previously-existing standards of "conservation of the estate and economy of administration," as Congress determined that those standards discouraged practitioners from entering the bankruptcy field and that estates were ill-served by less able bankruptcy specialists. *See, e.g., In re Benassi*, 72 B.R. 44, 47 (D. Minn. 1987).  As one court explained it in affirming the approval of a professional's retention under section 328(a), "[i]f the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

1  their expertise and commitment." *In re National Gypsum Co.*, 123 F.3d 861, 862-63 (5th Cir.

2  1997).

3      43.    Various bankruptcy courts have recognized the paramount importance of this

4  pre-approval under section 328(a) and have approved the retention of financial advisors and

5  similar professionals thereunder. *See, e.g., In re Aloha Airlines, Inc.*, Case No. 08-00337 (LK)

6  (Bankr. D. Haw. Apr. 7, 2008 (authorizing debtors to retain and employ Imperial on similar

7  terms, including indemnification protection with exclusions in the case of bad faith, self-

8  dealing, gross negligence or willful misconduct); *In re Metabolife Int'l, Inc.*, Case No. 05-

9  06040 (JJH) (Bankr. S.D. Cal. Aug. 5, 2005) (authorizing debtors to employ financial advisor

10  under sections 327 and 328 pursuant to retention agreement, which included broad

11  indemnification protection except in the cases of gross negligence and willful misconduct; *In re*

12  *Flying J Inc.*, Case No. 08-13384 (MFW) (Bankr. D. Del. Apr. 3, 2009 (authorizing retention

13  of a financial advisor on similar terms); *In re Tronox Inc.*, Case No. 09-10156 (ALG) (Bankr.

14  S.D.N.Y. Apr. 7, 2009 (same)].

15      44.    Courts have examined section 328(a) retentions under a non-exclusive list of

16  factors that may be considered depending on the circumstances, including, for example, "(1)

17  whether the terms of an engagement agreement reflect normal business terms in the

18  marketplace; (2) the relationship between the Debtors and the professionals, *i.e.*, whether the

19  parties involved are sophisticated business entities with equal bargaining power who engage in

20  an arm's length negotiation; (3) whether the retention, as proposed, is in the best interests of the

21  estate; (4) whether there is creditor opposition to the retention and retainer provisions; and (5)

22  whether, given the size, circumstances and posture of the case, the amount of the retainer is

23  itself reasonable, including whether the retainer provides the appropriate level of 'risk

24  minimization,' especially in light of the existence of any other 'risk-minimizing' devices, such

25  as an administrative order and/or a carve-out." *In re Insilco Techs., Inc.*, 291 B.R. 628, 633

26  (Bankr. D. Del. 2003) (such list is not exclusive and not every factor will necessarily be of

27  equal weight). Viewed in more general terms, "[i]n deciding whether the terms of the

28  professional's employment is reasonable, the court must consider whether the terms are fair to

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

the professional, the debtor, and the creditors who must bear the expense." *In re LTV Steel Company, Inc.*, 2001 U.S. Dist. Lexis 25338 (N.D. Ohio 2001).

45.    The Debtors and Imperial negotiated the terms of the Engagement Agreement in good faith and at arm's length. Both the Debtors and Imperial are sophisticated business entities represented by counsel. The Debtors have previously engaged financial advisors and investment bankers and interviewed other firms before selecting Imperial, and , based on these experiences, the Debtors believe that the terms of the Engagement Letter reflect normal business terms in the marketplace, are reasonable, and provides the appropriate level of 'risk minimization, especially in light of the fact that there is no carve-out for professionals in these cases. As previously expressed, the Debtors believe the retention of a financial advisor and investment banker is necessary and appropriate in these chapter 11 cases in order to enhance the value of the estates for the benefit of the creditors and equity security holders.

**Approval of Indemnification Provisions**

46.    The Engagement Letter provides for certain indemnification and related protections for Imperial (the "Indemnification Provision"). The Indemnification Provision is a customary and reasonable term of consideration for financial advisors and investment bankers such as Imperial for proceedings both out of court and in chapter 11 cases. The terms of the Engagement Letter, including the Indemnification Provision, were fully negotiated between the Debtors and Imperial Capital at arm's length.

47.    Courts considering whether indemnification and similar provisions are "reasonable" under section 328(a) have concluded that, under the appropriate circumstances, such provisions may be approved; that is, there is not any categorical prohibition against such

///
///
///
///
///
///

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

1082947.1

17

provisions.[7] *United Artists Theatre Company*, 315 F.3d 217, 234 (3rd Cir. 2003), *LTV Steel*,

2001 U.S. Dist. Lexis 25338, at *8 ("The Court finds that provisions for indemnification of

professionals in bankruptcy cases are not prohibited if the terms are favorable or reasonable.");

*In re Joan and David Halpern Inc.*, 248 B.R. 43 (Bankr. S.D.N.Y. 2000); *In re Baltimore*

*Emergency Service II, LLC et al.*, 291 B.R. 382 (Bank. D. Md. 2003) ("The indemnification of

a financial advisor to a Chapter 11 debtor is not, *per se*, an unreasonable term of employment

under 11 U.S.C. Section 328(a)."); *In re Comdisco, Inc.*, 2002 U.S. Dist. LEXIS 17994, *7

(N.D. Ill. Sept. 25, 2002) ("Most of the courts addressing indemnity clauses for financial

advisors have expressed reservations about them but have almost uniformly declined to impose

a blanket prohibition against their use"); *In re Metricom*, 275 B.R. 364, 371 (Bankr. N.D. Cal.

2002) ("However, Houlihan is correct that the Code does not prohibit indemnity/contribution or

exculpation provisions, and that there is no statutory or binding bankruptcy case law basis upon

which to establish a *per se* rule against such protections for professionals in bankruptcy

cases."); *In re Aloha Airgroup, Inc.*, 2005 Bankr. LEXIS 883, at *4-*5 (Bankr. D. Haw. Feb.

24, 2005).  *See also In re Protocol Srvcs., Inc.*, Case No. 05-06782 (JWM) (Bankr. S.D. Cal.

Sept. 9, 2005) (approving debtors' retention of financial advisors, which retention agreement

included broad indemnification protection (§ 6.1), excluding only cases of gross negligence or

willful misconduct by financial advisors); *In re American Restaurant Group, Inc.*, Case No. 04-

30732 (TD) (Bankr. C.D. Cal. Nov. 19, 2004) (authorizing employment and indemnification of

financial advisors other than for willful misconduct, fraud, bad faith or gross negligence (§ 21

of agreement)); *In re Bugle Boy Industries, Inc.*, Case No. 01-10834 (GM) (Bankr. C.D. Cal.

March 7, 2001) (similar); *In re Liberate Technologies*, Case No. 04-31394 (TEC) (Bankr. N.D.

---

[7]  Many of the reported cases do not distinguish between indemnification provisions and exculpation and similar or related provisions in their opinions.  The *Metricom* court noted that "indemnity or contribution and exculpation are different methods of reaching similar, but not identical results." 275 B.R. at 368 n.4.  In general: indemnity means that if a third party sues a professional based on the professional's services to the client, the client will pay to defend the professional and will pay any judgment against the professional; contribution means that, if a third party sues both a professional and the professional's client based on the professional's services to the client, the client will contribute some or all of the professional's costs to defend and to satisfy any judgment against the professional; exculpation means that the client agrees not to sue the professional based on the professional's services to the client.  Under each of these arrangements, the client bears some or all of the financial consequences for the professional's actions.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

1   Cal. June 28. 2004) (similar); *In re RFB Cellular, Inc.*, Case No. 03-12187 (RR) (Bankr. C.D.

2   Cal. Oct. 28, 2003) (similar); *In re Aloha Airlines, Inc.*, Case No. 08-00337 (LK) (Bankr. D.

3   Haw. Apr. 7, 2008) (authorizing debtors to indemnify Imperial, with exclusions only bad faith,

4   self-dealing, gross negligence or willful misconduct).

5       48.    The court in *Joan and David Halpern Inc.* noted that the reluctance of several

6   reported decisions to approve indemnification agreements stemmed from the "presumed

7   inability of a fiduciary to limit his liability for ordinary negligence." 248 B.R. at 45. The court

8   noted, however, that "[t]his 'principle' is contrary to the common law of trusts to which we

9   may look for guidance. (citations omitted)". *Id.* The court went on to describe how a

10  fiduciary[8] may, in fact, be indemnified against its negligence under the common law of trusts

11  and statutory provisions governing the indemnification of corporate officers. In concluding, the

12  court reasoned:

13      "While the reaction of the courts in the few reported decisions are
        understandable, they are also visceral. They overlook the common law principles
14      permitting indemnity of fiduciaries, and the idea that a fiduciary cannot be
        indemnified for negligence, or that such indemnification is contrary to public
15      policy, is just plain wrong. The common law has carved out clear exceptions to
        indemnity, such as bad faith, breach of trust, dishonesty, self-dealing, and willful,
16      reckless, or grossly negligent misconduct, leaving the rest to the parties'
        agreement. In the context of this case, therefore, the appropriate inquiry is
17      whether taken as a whole, the terms of the retention are fair and reasonable, and
        the retention is in the best interests of the estate."
18

19  *Id.* at 47.

20      49.    The Northern District of Ohio's decision in *LTV Steel* is also instructive. In *LTV*

21  *Steel*, the debtors sought to retain Jay Alix and Associates ("JA&A") as their financial advisors

22  pursuant to an agreement which contained indemnification provisions. The bankruptcy court

23  overruled the U.S. Trustee's objection to the indemnification provisions and approved the

24  debtors' employment of JA&A. The District Court affirmed. In determining that the

25  indemnification provisions were reasonable under section 328(a) the court reasoned:

26      "The record shows that JA&A always seeks indemnification provisions in its
        engagements. The engagements are high risk and complex and JA&A chooses
27

28  ─────────────
    [8] The Debtors note that some courts have held that financial advisors like Imperial are not fiduciaries to the
    debtor. *See, e.g., United Artists*, 315 F.3d at 230 n. 14.

not to accept the risk, Trans. Pg. 38-39. Twenty-six engagements were listed on a hearing exhibit, indemnification was not included in five of them. Trans. Pg. 41-42. JA&A refused to waive the indemnification provision in this case. Trans. Pg. 42. Mr. Bonsell, a JA&A official, testified that similar indemnification provisions are typically used by other turnaround professionals. Trans. Pg. 40.... Without the indemnity provision the Debtors could not retain JA&A or would have to pay JA&A's larger professional insurance premiums through higher fees. JA&A is a highly experienced turnaround professional familiar with the Debtors' operations and whose employment would be beneficial. The indemnification provision in the Letter Agreement is fair and reasonable and retention of JA&A is in the best interest of the estate."

2001 U.S. Dist. Lexis 25338 at *10-11. *See also Aloha Airgroup*, 2005 Bankr. LEXIS 883, at *4-*5 ("[T]he Waiver [eliminating the financial advisor's potential liability to debtors other than for claims arising primarily from its gross negligence or willful misconduct] is a 'reasonable' term of GCA's retention. GCA and the Debtors have established that such provisions are standard in the market for financial advisors in restructuring situations, that GCA ordinarily insists on including such provisions in its retention agreements ... that GCA would not accept the Debtor's engagement without such provisions, that the Debtors probably could not retain a financial advisor without agreeing to terms like the Waiver, and that the Debtors absolutely require the assistance of a competent and experienced financial advisory firm such as GCA.").

50.    The Debtors submit that indemnifications provisions such as the one included in the Engagement Agreement are standard in the market for financial advisors in restructuring situations. The Ledgemont Agreement contains such a provision as did the engagement agreement of another financial advisor the Debtors interviewed for employment in these chapter 11 cases. The Debtors do not believe that the could retain a competent and experienced financial advisor/investment banker without including such a provision in the engagement agreement. Imperial has advised the Debtors that such provisions are standard in the industry and that it would not accept the engagement without such a provision in the Engagement Agreement. The Debtors believe that the value of the estates will be substantially enhanced and they could not successfully move forward with their reorganizations without the assistance of a skilled, highly respected national financial service firm such as Imperial.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

51.    The Debtors submit, therefore, that the fee structure and other terms and conditions in the Engagement Letter, including the indemnification related provisions, are fair and reasonable and satisfy the salient factors, and should accordingly be approved under section 328(a) of the Bankruptcy Code.

## CONCLUSION

The Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, (a) authorizing the Debtors to retain Imperial as their financial advisor and investment banker effective as of June 14, 2010, pursuant to the terms of the Engagement Agreement, (b) authorizing, but not directing, the Debtors, under the circumstances and subject to the requirements set forth hereto, to pay Ledgemont the fee set forth in this Application, and (c) granting such other and further relief as the Court deems just and proper.

**DATED** this 14th day of June, 2010.

DOWNEY BRAND LLP

Sallie B. Armstrong, Bar No. 1243
427 West Plumb Lane
Reno, NV 89509
775/329-5900

Nevada Attorneys for
Debtor and Debtor in Possession

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

1082947.1

21

# Exhibit A

# Exhibit A

# LEDGEMONT CAPITAL GROUP LLC

November 19, 2009

Mr. Nello Gonfiantini III
Specialty Trust, Inc.
6160 Plumas Street
Reno, NV 89519-6060

Dear Mr. Gonfiantini:

Ledgemont Capital Group LLC ("We" or "Ledgemont") is pleased to act as the exclusive financial advisor for Specialty Trust, Inc. ("You" or the "Company") in connection with your proposed Private Placement (as defined below) of equity, equity-linked securities, debt or any combination thereof (the "Securities" and such offering the "Offering") with accredited investors pursuant to the terms and conditions set forth in this engagement letter (the "Agreement" and such engagement, the "Engagement"). Our services to the Company in connection with the Engagement will include services as described herein.

## 1. Services

Services to be provided by Ledgemont on behalf of the Company are allocated among Phase I Services and Phase II Services as outlined below:

    a.  Phase I Services.  Ledgemont will advise, consult with, and assist the Company in various matters which are expected to include, without limitation, the following services (collectively the "Phase I Advisory Services"):

- Review and analyze the Company's business, operations and financial condition;
- Assist the Company in developing a strategic plan to maximize the value of its businesses;
- Assist the Company in creating written business and financial plans and presentations;
- Advise the Company on capitalization structures and assist in structuring the Offering and its terms;
- Assist and advise the Company in drafting and preparing a private placement memorandum or other appropriate offering materials, with such exhibits and supplements as may from time to time be required (as the case may be, the "Offering Documents"); and

- Provide such other business and financial advice as may be mutually agreed.

b. <u>Phase II Services</u>.   Ledgemont will advise, consult with, and assist the Company in various matters which are expected to include, without limitation, the following services (collectively the "Phase II Placement Services"):

- Make introductions mutually agreed upon between Ledgemont and the Company to selected qualified purchasers (each an "<u>Investor</u>" and collectively, the "<u>Investors</u>") for the Offering;
- Assist in negotiating the financial aspects of the Offering; and
- Provide such other services in connection with the Offering as may be mutually agreed.

The actual size and terms of the Offering will depend on market conditions and will be subject to negotiation between the Company, Ledgemont and prospective Investors. Although we cannot guarantee that we will be able to raise new capital, we will conduct the Offering on a "best efforts" basis. For purposes of this Agreement, the term "<u>Private Placement</u>" means the proposed Offering and sale by private placement of the Securities to be made in accordance with the exemption from the registration requirements of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "<u>Act</u>") provided by Regulation D under the Act ("<u>Regulation D</u>") and the qualification and registration requirements of applicable state and foreign securities or blue sky laws and regulations pursuant to a private placement memorandum and/or other disclosure materials prepared by the Company. Any services provided hereunder that are required to be provided through a Financial Industry Regulatory Authority ("<u>FINRA</u>") registered broker-dealer will be provided by an appropriately registered affiliate of Ledgemont. Ledgemont reserves the right to retain other FINRA registered broker-dealers to act as sub-agents on Ledgemont's behalf and to retain foreign representatives to act on Ledgemont's behalf for offers of the Securities to non-United States persons (as defined for purposes of the Act).

## 2. *Fees and Expenses*

For Phase I Advisory Services, the Company agrees to pay Ledgemont $25,000 per month (the "<u>Retainer</u>"), in advance, beginning on the date hereof and continuing for two (2) months, representing a total minimum fee for Phase I Advisory Services of $50,000. Should the Company and Ledgemont not have moved solely to the provision of Phase II Placement Services after 2 months and the Company wishes Ledgemont to continue providing Phase I Services, the Retainer shall continue to be payable while Ledgemont continues to provide Phase I Advisory Services under this Agreement.

At each closing of the Offering, Ledgemont will receive a cash fee equal to a percent of the aggregate purchase price of the Securities sold at such closing (the "Cash Fee"). The Cash Fee shall be five percent (5%) for equity, four percent (4%) for convertible debt, and three percent (3%) for non-convertible debt. All Retainers will be credited against the Cash Fee payable upon the closing of the Offering. In addition, upon each closing of the Offering, the Company will issue warrants to Ledgemont (the "Placement Agent Warrants") for the purchase of three percent (3%) of the number of shares of common stock (on an as converted basis if convertible securities are sold) sold in the Offering. The Placement Agent Warrants will have standard provisions for such warrants and terms to be negotiated in good faith between the Company and Ledgemont. The shares issuable upon exercise of the Placement Agent Warrant will be entitled to the same registration rights as those granted to the Investors in connection with Offering. To that end, you agree that Ledgemont will be afforded the indemnification protections granted to the Investors as part of the agreement governing the registration of the Investor securities sold in the Offering, as a third party beneficiary to such provisions. The Cash Fee and Placement Agents Warrants for Securities sold to Home Fed Corporation, current common stockholders or current investors in the Company's collateralized note program (each a "Specialty Investor" and collectively, the "Specialty Investors") will be reduced by seventy-five percent (75%) if Ledgemont is not involved in material discussions with the Specialty Investors or reduced by twenty-five percent (25%) if Ledgemont is involved in material discussions with the Specialty Investors.

The Company agrees to reimburse Ledgemont upon request for its out of pocket expenses, including the fees and disbursements of Ledgemont's legal counsel. Such expenses shall be payable regardless of whether or not a Private Placement is closed, and shall not exceed $10,000 without prior approval from the Company. Reasonable post-closing expenses of Ledgemont and Ledgemont's legal counsel shall be paid promptly upon request of Ledgemont. The Company hereby agrees to bear all of its own expenses in connection with the Offering.

### 3. Term of Engagement

The Engagement will terminate on the earlier of (i) 180 days from the date hereof, (ii) written notification of termination by either party upon 5 days notice, or (iii) upon the closing of the Offering (the "Term"). Upon termination or expiration, Ledgemont shall be entitled to collect all fees earned and expenses incurred (provided such expenses are reimbursable pursuant to Section 2 above) through the date of termination. If the Offering is not consummated during the Term, for reasons other than termination of this Agreement by us, and during the eighteen (18) months following termination of this Agreement, any prospective Investor which we introduced to the Company or with which we have discussions or negotiations during the Term on behalf of the Company, purchases securities from the Company (other than through a underwritten public offering), you agree to pay us upon the closing a Cash Fee and Placement Agent Warrants equal to the amount that would otherwise have been payable to Ledgemont had such transaction occurred during the Term.

### 4. *Offering Documents*

You hereby authorize Ledgemont to transmit the Offering Documents to the prospective Investors. The Offering Documents will be reviewed by, and subject to the approval of, Ledgemont and its counsel prior to their use in making offers or sales of the Securities. The Company will advise Ledgemont immediately of the occurrence of any material event or any other change known to the Company. You agree that you will enter into subscription, registration rights and other customary agreements, and that your counsel will supply a customary opinion letter acceptable to Ledgemont and its counsel in connection with the Offering, all of which will be in form and substance reasonably acceptable to, and addressed to, Ledgemont and the Investors. You further agree that we may rely upon, and are a third party beneficiary of, the representations and warranties, and applicable covenants, set forth in any agreements with Investors in the Offering.

### 5. *Representations and Warranties*

The Company hereby represents, warrants and agrees, in addition to any representations, warranties and agreements to be made by the Company to the Investors, that:

(i)     The Securities will be offered and sold in compliance with the requirements for the exemption from the registration requirements of the Act contained in Regulation D and with all other state and foreign securities or blue sky laws and regulations.

(ii)     The Company will file appropriate notices on Form D with the Securities and Exchange Commission, as well as all filings required to be made with respect to state and foreign securities or blue sky laws and regulations.

(iii)     The Offering Documents provided to Investors will contain all information required to be furnished to Investors under Regulation D and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated in the Offering Documents or necessary to make the statements therein not misleading. The Company will update the Offering Documents in the event that there has been any Material Adverse Change, or a development has occurred which would be reasonably likely to result in a Material Adverse Change. "Material Adverse Change" means a material adverse change in or any event, occurrence, fact or circumstance which has had, or is reasonably expected to have, a material adverse effect on the business, assets, condition (financial or otherwise), liabilities, or results of operations or prospects of the Company and its subsidiaries taken as a whole.

(iv)     The Company has all requisite corporate power and authority to execute and perform this Agreement; all corporate action necessary for the authorization, execution, delivery and performance of this Agreement has been taken; this Agreement constitutes a valid and binding obligation of the Company; the execution and performance of this Agreement by the Company and the offer and sale of the Securities in the Private Placement will not violate any provision of the Company's charter or bylaws or any agreement or other instrument to which the Company is a party or by which it is bound;

and any necessary approvals, governmental and private, will be obtained by the Company before the closing of the Private Placement.

Ledgemont represents, warrants and agrees that Ledgemont or an affiliate is (i) duly registered as a broker dealer pursuant to the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder and (ii) a member in good standing of the FINRA.

## 6. Indemnification

The Company agrees to indemnify and hold harmless Ledgemont, its members, employees and agents pursuant to the terms set forth in the indemnification provision attached as Exhibit A hereto.

## 7. Exclusivity

During the Term, you agree not to use any other investment banking firm or financial advisor to raise capital in an offering of Securities on behalf of the Company. In addition, the Company hereby irrevocably agrees not to circumvent, avoid, bypass, or obviate, directly or indirectly, the intent of this Agreement through any transaction, transfer, pledge, agreement, recapitalization, loan, lease, assignment or otherwise. The Company (including affiliates of such parties) agrees that it will not attempt, directly or indirectly, to contact parties introduced to the Company by Ledgemont on matters described in this Agreement or contact or negotiate with any confidential source provided by Ledgemont, except through Ledgemont or with the express written consent of Ledgemont as to each such contact. The Company shall not contact, deal with, or otherwise become involved in any transaction during the Term of the Agreement with any corporation, partnership, individual, any banks, trust or lending institutions which have been introduced by Ledgemont without the permission of Ledgemont. Any violation of this provision shall be deemed an attempt to circumvent this provision, and the Company shall be liable for damages in favor of the circumvented party. We acknowledge that the Company may be pursuing funding from Specialty Investors and that the pursuit or receipt of funding from Specialty Investors shall not be considered an attempt to circumvent this Agreement or a violation of Ledgemont's rights hereunder.

## 8. Confidentiality

Each party hereto acknowledges and agrees that in connection with its evaluation of the Offering, the parties may have access to information that is deemed to be confidential by the disclosing party ("Confidential Information"). In order to facilitate the exchange of Confidential Information (as defined below) relating to the Offering, each party agrees as follows:

i.      The parties may make Confidential Information concerning themselves available to one another exclusively for the purpose of evaluating the Offering. Such Confidential Information may be provided directly by a party or on behalf of a

party by one of its Representatives (as defined below). "Confidential Information" means any and all proprietary information (such as information relating to products, processes, technologies, inventions, know-how, design specifications, databases, software, patent applications, financial information, budgets, projections, business prospects and business relationships) that a party or its Representatives furnish or otherwise make available to the other party directly or indirectly whether or not such information is marked as "confidential," together with all analyses, compilations, studies or other documents prepared by the receiving party or its Representatives which contain or otherwise reflect or are derived from such information.

ii.  Notwithstanding the foregoing, the term "Confidential Information" does not include information which (i) is already in the receiving party's possession or control prior to the date of disclosure (provided that if such information is known by the receiving party to be subject to another confidentiality agreement with, or other contractual, legal or fiduciary obligation of secrecy to, the providing party or any of its Representatives, nothing in this Agreement shall abrogate such other agreement or obligation), (ii) was or becomes generally available to the public other than as a result of a disclosure by the receiving party or any of its Representatives by reason of any default with respect to a confidentiality obligation under this Agreement or (iii) becomes available to the receiving party on a non-confidential basis from a source other than the providing party or any of its Representatives, provided that such source is not prohibited by a confidentiality agreement with or other contractual, legal or fiduciary obligation of nondisclosure to the providing party or any of its Representatives.

iii.  Each party hereby agrees that Confidential Information received pursuant to this Agreement will be used exclusively for the purpose of evaluating the Offering, and that such information will be kept confidential by the receiving party for a period of one year from the date of this Agreement, provided that any such Confidential Information may be disclosed by the receiving party to its directors, officers, employees, consultants, attorneys, accountants, advisors, affiliates and agents and other parties who need to know such Confidential Information in order for the receiving party to evaluate any such possible Offering (each a "Representative").

iv.  Each party shall inform each of its Representatives that receives any Confidential Information of the confidential nature of such information and shall direct each Representative to treat such information in accordance with the terms of this Agreement. Each party agrees, at its sole cost and expense, to take all reasonable measures, including but not limited to court proceedings, to restrain its Representatives from unauthorized disclosure or use of the Confidential Information.

v.  In the event that the receiving party of any Confidential Information pursuant to this Agreement does not proceed with a proposed Offering, or upon written notice

by the providing party, such receiving party shall promptly redeliver to such party, or, if requested by the providing party, promptly destroy all written Confidential Information and any other written material containing any information included in the Confidential Information (whether prepared by Ledgemont, the Company, any Representative or a third party), and will not retain any copies, extracts or other reproductions in whole or in part of such written Confidential Information or written material (and upon request certify such redelivery or destruction to the providing party in a written instrument reasonable acceptable to the providing party and its counsel). Upon request of a providing party, all documents, memoranda, notes and other writings or analyses prepared by the receiving party or its Representatives based on the Confidential Information shall be destroyed, and such destruction shall be certified to the disclosing party in a written instrument reasonably acceptable to the providing party and its counsel.

vi.　In the event that any receiving party or any of its Representatives is requested or required (by oral questions, deposition, interrogatories, requests for information or documents, subpoena, civil investigative demand or other process) to disclose all or any part of any Confidential Information, such receiving party will provide the party that provided such information with written notice of such request or requirement as promptly as is reasonably practicable so that such party may seek an appropriate protective order or waive compliance with the provisions of this Agreement. In such case, the parties will consult with each other on the advisability of pursuing any such order or other legal action or available steps to resist or narrow such request or requirement. In the event such a protective order is not obtained prior to the date the receiving party is required to make such disclosure, such receiving party may disclose that portion of the Confidential Information which such receiving party is legally compelled to disclose. In any event, such receiving party will not oppose action by the providing party to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the disclosure of such information.

vii.　It is understood and agreed that any and all proprietary rights, including, but not limited to, patent rights, trademarks and other intellectual property or proprietary rights, in and to the Confidential Information disclosed by one party to the other party shall be and remain in the possession of the providing party and the receiving party shall have no right, title or interest in or to any of such Confidential Information. The Confidential Information will be disclosed with the express understanding that neither party will be obligated to enter into any further agreement relating to the Confidential Information.

*9. Entire Agreement*

This Agreement constitutes the entire Agreement between the parties and supersedes and cancels any and all prior or contemporaneous arrangements, understandings and agreements, written or oral, between them relating to the subject matter hereof.

### 10. Relationship of Parties

The parties agree that their relationship under this Agreement is an advisory relationship only, and nothing herein shall cause Ledgemont to be partners, agents or fiduciaries of, or joint venturers with, the Company or with each other.

### 11. Notices

All notices required or permitted herein must be in writing and shall be deemed to have been duly given the first business day following the date of service if served personally, on the first business day following the date of actual receipt if delivered by telecopier, telex or other similar communication to the party or parties to whom notice is to be given, or on the third business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, to Ledgemont and to the Company at the addresses set forth on the signature page hereto, or to such other addresses as either party hereto may designate to the other by notice from time to time for this purpose.

### 12. Governing Law

This Agreement shall be interpreted in accordance with the laws of the State of New York, without regard to principles of conflicts of laws, and shall inure to the benefit of our successors and assigns.

### 13. Announcement of Offering

If the Offering is consummated, Ledgemont may, at its expense, place a standard announcement in such newspapers and periodicals as Ledgemont may desire.

### 14. Counterparts

This Agreement may be executed in counterparts, each of which shall be deemed an original agreement, but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement by facsimile transmission (including the delivery of documents in Adobe PDF format) shall constitute execution and delivery of this Agreement for all purposes, with the same force and effect as execution and delivery of an original manually signed copy hereof.

[SIGNATURE PAGE TO FOLLOW]

T-155  P0002/0002 F-433

We look forward to working with you on this Engagement and on other matters as requested by you from time to time.

Very truly yours,

LEDGEMONT CAPITAL GROUP LLC

By:

Name: Eric Brachfeld
Title: Managing Director

SPECIALTY TRUST, INC.

Confirmed and accepted as of
This 27th day of November , 2009:

By:

Name: Nello Gonfiantini III
Title: President

Exhibit A

Indemnification Provision

The Company agrees to indemnify Ledgemont, any controlling person of Ledgemont and each of their respective directors, officers, employees, agents, FINRA-member sub-agents retained by Ledgemont, affiliates and representatives (each, an "Indemnified Party") and hold each of them harmless against any and all losses, claims, damages, expenses, liabilities, joint or several (collectively, "Liabilities") to which the Indemnified Parties may become liable, directly or indirectly, arising out of, or relating to, the letter agreement to which this Exhibit A is attached (the "Letter Agreement") or Ledgemont's services thereunder, unless it is finally judicially determined that the Liabilities resulted from the gross negligence or willful misconduct of any such Indemnified Party. The Company further agrees to reimburse each Indemnified Party immediately upon request for all expenses (including reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation of, preparation for, defense of, or providing evidence in, any action, claim, suit, proceeding or investigation (each and collectively, an "Action"), directly or indirectly, arising out of, or relating to, the Letter Agreement or Ledgemont's services thereunder, whether or not pending or threatened and whether or not any Indemnified Party is a party to such Action. The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or any person asserting claims on behalf of or in right of the Company, directly or indirectly, arising out of, or relating to, the Letter Agreement or Ledgemont's services thereunder, unless it is finally judicially determined that such liability resulted from the gross negligence or willful misconduct of such Indemnified Party. Moreover, in no event, regardless of the legal theory advanced, shall any Indemnified Party be liable to the Company or any person asserting claims on behalf of or in the right of the Company for any consequential, indirect, incidental or special damages of any nature.

The Company agrees that, without Ledgemont's prior written consent, it will not agree to any settlement of, compromise or consent to the entry of any judgment in or other termination of (each and collectively, a "Settlement") any Action in respect of which indemnification could be sought hereunder (whether or not Ledgemont or any other Indemnified Party is an actual or potential party to such Action), unless (a) such Settlement includes an unconditional release of each Indemnified Party from any liabilities arising out of such Action and (b) the parties agree that the terms of such Settlement shall remain confidential.

The Company and Ledgemont agree that if any indemnification or reimbursement sought pursuant to the first paragraph of this Exhibit A is for any reason unavailable or insufficient to hold any Indemnified Party harmless (except by reason of the gross negligence or willful misconduct of an Indemnified Party) then, whether or not Ledgemont is the person entitled to indemnification or reimbursement, the Company and Ledgemont shall contribute to the Liabilities for which such indemnification or

reimbursement is held unavailable in such proportion as is appropriate to reflect (a) the relative benefits to the Company on the one hand and Ledgemont on the other hand, in connection with the transaction to which such indemnification or reimbursement relates or (b) if the allocation provided by clause (a) above is not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (a), but also the relative fault of the parties as well as any other relevant equitable considerations; provided, however, that in no event shall the amount to be contributed by Ledgemont exceed the fees actually received by Ledgemont under the Letter Agreement. The Company agrees that, for the purposes of this paragraph, the relative benefits to the Company and Ledgemont of the contemplated transaction (whether or not such transaction is consummated) shall be deemed to be in the same proportion that the aggregate consideration payable, exchangeable or transferable (or contemplated to be payable, exchangeable or transferable) in such transaction bears to the fees paid or payable to Ledgemont as financial advisor under the Letter Agreement.

The rights of the Indemnified Parties referred to above shall be in addition to any rights that any Indemnified Party may otherwise have.