Ira D. Kharasch (CA Bar No. 109084)
Scotta E. McFarland (CA Bar No. 165391)
Victoria A. Newmark (CA Bar No. 183581)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email:  ikharasch@pszjlaw.com
          smcfarland@pszjlaw.com
        :  vnewmark@pszjlaw.com

*Attorneys for Debtor and
Debtor in Possession/Petitions to Practice
in Nevada are Pending*

Sallie B. Armstrong (NV Bar No. 1243)
Downey Brand LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone: 775/329-5900
Facsimile:  775/786-5443
Email:  sarmstrong@downeybrand.com

*Attorneys for Debtor and
Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>SPECIALTY TRUST, INC., et al.<br><br>☐ Affects this Debtor<br>☑ Affects all Debtors<br>☐ Affects Specialty Acquisition Corp.<br>☐ Affects SAC II<br>☐ Affects SAC D-1, LLC | Chapter 11<br><br>Case No. 10-51432-GWZ<br><br>Jointly Administered<br><br>**DECLARATION OF MARC A. BILBAO IN SUPPORT OF THE DEBTORS' APPLICATION FOR ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF IMPERIAL CAPITAL, LLC, AS FINANCIAL ADVISOR AND INVESTMENT BANKER TO THE DEBTOR, EFFECTIVE JUNE 14, 2010**<br><br>Hearing Date:     June 22, 2010<br>Hearing Time:    11:00 a.m.<br>Place:               300 Booth Street<br>                       Reno, NV 89509 |

I, Marc A. Bilbao, do state and declare as follows:

1.      I am a managing director of Imperial Capital, LLC ("Imperial") which maintains its principal offices at 2000 Avenue of the Stars, 9th Floor South, Los Angeles, California 90067. I am authorized to execute this declaration (the "Declaration") on behalf of Imperial.  Unless

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509

otherwise stated in this declaration, I have personal knowledge of the facts set forth herein. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

2.      This declaration is being submitted in connection with the *Debtors' Application for Order Authorizing the Employment and Retention of Imperial Capital, LLC, as Financial Advisor and Investment Banker to the Debtor, Effective June 14, 2010* (the "<u>Application</u>"). I submit this Declaration in compliance with sections 105, 327, 328 and 1107(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and to provide the disclosure required under Rules 2014(a), 2016 and 5002 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

3.      To the extent that any information disclosed herein requires amendment or modification as additional information becomes available to Imperial, I intend to submit, or cause to be submitted, a supplemental Declaration to the Court reflecting the same.

4.      The Debtors desire to retain and employ Imperial as investment banker and financial advisor for the Debtors, effective as of June 14, 2010, pursuant to the terms of an engagement letter, dated as of June 14, 2010 (the "<u>Engagement Letter</u>"). A true and correct copy of the Engagement Letter is attached hereto as **Exhibit 1**.

<u>**Imperial's Qualifications**</u>

5.      Imperial is a full-service investment bank offering sophisticated institutional sales and trading, a wide range of investment banking advisory, capital markets and restructuring services, and institutional research. Imperial's institutional sales and trading professionals service over 1,200 institutional accounts. Imperial's investment banking professionals provide advisory services to middle market corporations, institutional investors, and private equity funds. The Biographies of the employees of Imperial who will be primarily responsible for providing services to the Debtors are attached hereto as **Exhibit 2**.

6.      In particular, Imperial and its professionals have extensive experience working with financially troubled companies in complex financial restructurings both in chapter 11 cases and in out-of-court situations. Imperial is highly qualified to advise on strategic alternatives and

///

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5000    Fax: (775) 786-5443

1    its professionals have extensive experience in deals involving complex financial and operational

2    restructurings.

3          7.    As an active bankruptcy and restructuring advisor with significant experience in a

4    variety of industries, Imperial is well-qualified to serve as investment banker and financial

5    advisor to the Debtors.  Imperial specializes in assisting and advising debtors, creditors,

6    creditor's committees, shareholders, bondholders and other parties involved with financially

7    distressed companies, both during and outside of bankruptcy cases, and has served as investment

8    bankers, financial and strategic advisors for debtors, creditors, and other constituents in

9    numerous chapter 11 cases.  *See, e.g., In re Mesa Air Group, et al.,* No. 10-10018 (MG) (Bankr.

10   S.D.N.Y. March 1, 2010) [Dkt. No. 372], *In re MagnaChip Semiconductor Finance Co.,* No. 09-

11   12008 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Dkt No. 274], *In re Monaco Coach Corp.,* No. 09-

12   10750 (KJC) (Bankr. D. Del. April 9, 2009) [Dkt No. 132], *In re Qimonda Richmond LLC,* No.

13   09-10589 (MFW) (Bankr. D. Del. May 18, 2009) [Dkt No. 370], *In re Landsource Communities*

14   *Development LLC,* No. 08-11111 (KJC) (Bankr. D. Del. Aug. 27, 2008) [Dkt No. 504], *In re*

15   *Aloha Airlines Inc.,* No. 08-00337 (LK) (Bankr. D. Haw. April 8, 2008) [Dkt No. 203], *In re*

16   *Movie Galley Inc.,* No. 07-33849 (DOT) (Bankr. E.D. Va. Nov. 27, 2007) [Dkt No. 1016],  *In re*

17   *Custom Food Products, Inc.,* No. 07-10495 (PJW) (Bankr. D. Del. June 14, 2007) [Dkt No. 307],

18   and *In re Mesaba Aviation, Inc.,* No. 05-39258 (GFK) (Bankr. D. Minn. June 8, 2005) [Dkt No.

19   641].

20         8.    In light of the size and complexity of these chapter 11 cases, it is my opinion,

21   based upon my experience working with companies in chapter 11 cases, that the Debtors require

22   the service of a seasoned and experienced investment banker and financial advisor, and one that

23   is familiar with the chapter 11 process.  Additionally, by having a financial advisor and

24   investment banker provide the services to be provided by Imperial in these chapter 11 cases,

25   other professionals in these cases – and company officers who might otherwise handle complex

26   financial and financing matters – will be able to focus better on their respective competencies

27   and their core tasks and efficiently and effectively advise in the management of the Debtors'

28   businesses and operations and to facilitate a successful chapter 11 process.  Imperial is well-

**DOWNEY BRAND**
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900    Fax: (775) 786-5443

1  qualified to provide the services being sought by the Debtors, and the employment of Imperial

2  under the terms contained in the Engagement Letter will benefit the Debtors' estates and their

3  reorganization efforts.

4  ### Services to Be Provided by Imperial

5      9.      Pursuant to the terms of the Engagement Letter, Imperial will provide such

6  consulting and advisory services as Imperial and the Debtors deem appropriate and feasible to

7  advise the Debtors in the course of these chapter 11 cases.  Specifically, Imperial will render

8  various services to the Debtors including, but not limited to, the following:

a.  analysis of the Debtors' business, operations, properties, financial condition, competition, forecast, prospects and management;

b.  financial valuation of the ongoing operations of the Debtors;

c.  assisting the Debtors in developing, evaluating, structuring and negotiating the terms and conditions of a potential restructuring of their debt or equity interests in the Debtors, including, but not limited to, the execution of any supplemental indenture, corporate bylaws, or amendments to the same or other agreements giving effect thereto; an offer to exchange, cancel, acquire or otherwise modify the terms of the debt against the Debtors; any modifications to, or suspensions of, the obligations to pay interest on any of the debt, or any amendments thereto;

d.  assisting the Debtors in the preparation of solicitation materials with respect to the Debtors' obligations, any securities to be issued in connection with the Restructuring and the Debtors (such solicitation materials, including, without limitation, all exhibits, amendments and supplements thereto, the "Restructuring Offering Materials");

e.  advising the Debtors on a proposed purchase price and form of consideration for a transaction, which transaction may include a merger, consolidation, or any other business combination, in one or a series of transactions, or a sale involving aggregate gross proceeds in excess of $10.0 million for the business, securities or assets of the Debtors, or one or more subsidiaries or divisions of the Debtors, or any transaction structured to substantially achieve the same result (each a "Transaction");

f.  assisting the Debtors in developing, evaluating, structuring and negotiating the terms and conditions of a potential Transaction;

g.  assisting the Debtors in the preparation of solicitation materials with respect to the Transaction and the Debtors (the "Transaction Offering Materials");

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900    Fax: (775) 786-5443

h.  identifying and contacting selected qualified buyers (the "Buyers") for the Transaction and furnishing the Buyers, on behalf of the Debtors, with copies of Transaction Offering Materials;

i.  assisting the Debtors in arranging for potential Buyers to conduct due diligence investigations;

j.  assisting the Debtors in developing, evaluating, structuring and negotiating the terms and conditions of a potential private placement, of such amount as may be agreed in writing between the parties, of debt or equity securities (the "Financing"), on a best efforts basis;

k.  assisting the Debtors in the preparation of solicitation materials with respect to the Financing, any securities to be issued in connection with the Financing and the Debtors (such solicitation materials, including, without limitation, all exhibits, amendments and supplements thereto, (the "Financing Offering Materials");

l.  identifying and contacting selected qualified purchasers (the "Purchasers") to participate in the Financing and furnishing the Purchasers, on behalf of the Debtors, with copies of Financing Offering Materials;

m.  rendering expert testimony, if needed, provided in support of a Restructuring, Transaction, or Financing; and

n.  providing such other financial advisory services with respect to the Debtors' financial issues as may from time to time be agreed upon between the Debtors and Imperial.

## Compensation of Imperial for Services Rendered

10.    Imperial's willingness to advise and assist the Debtors is contingent upon its ability to be retained in accordance with the terms and conditions of the Engagement Letter, including, without limitation, the indemnification provision contained in Schedule I to the Engagement Letter.

11.    The proposed overall compensation structure is comparable to compensation generally charged by financial advisors of similar stature for comparable engagements, both in and out of court and reflects a balance between a fixed fee, monthly fee and fees contingent on the consummation and closing of the transactions contemplated by the Engagement Letter.

12.    Except as described below, Imperial intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900    Fax: (775) 786-5443

the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the District of Nevada (the "Local Rules"), any applicable guidelines (the "Guidelines") established by the United States Trustee for the District of Nevada, and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter (the "Compensation Structure"), provided that Imperial and its professionals shall only be required to provide a summary of the services rendered.

13.    As compensation for the services rendered pursuant to the Engagement Letter, the Debtors have agreed to pay Imperial the fees set forth in the Engagement Agreement (the "Fee Structure") in cash.  The Fee Structure is summaried below:

> (a)    A monthly financial advisory fee of $50,000 (the "Monthly Advisory Fee"), payable in advance, beginning as of the date of the Engagement letter and continuing until the Debtors' emergence from chapter 11 proceedings or until the Engagement Agreement is earlier terminated pursuant to its terms.  All Monthly Advisory Fees paid shall be credited against the Financing Fee and the Transaction Fee, both as defined below.
>
> (b)    A cash fee (the "Financing Fee"), payable out of the proceeds of the Financing equal to:
> > a.    3.0% of the face amount of any senior debt sold or arranged as part of the Financing;
> > b.    4.0% of the face amount of any subordinated debt sold or arranged as part of the Financing;
> > c.    5.0% of the face amount of any equity securities sold or arranged as part of the Financing.
>
> No Financing Fee shall be payable for capital raised from the Company's existing shareholders or noteholders (current holders as of the date of this Agreement). The Financing Fee for any capital raised from Equifin, LLC[1] shall be reduced by 50%. The Financing Fee shall be credited against any Transaction Fee or Restructuring Fee, both as defined below.
>
> (c)    A transaction fee equal to 2.0% of the Transaction Consideration (defined below) received by the Company and/or its equity security holders pursuant to the Transaction (the "Transaction Fee").  The Transaction Fee shall be payable upon consummation of the Transaction.  For purposes of this Agreement, Transaction Consideration is the aggregate of all consideration received by the Company and/or its equity security holders, the amount of any debt assumed or repaid, or that remains outstanding after the transaction, any preferred stock redeemed, and

---

[1] The reduction of fees for transactions involving Equifin, LLC is explained in the below section titled Payment of Ledgemont Fees.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900    Fax: (775) 786-5443

consideration received with respect to the exercise or termination of options, warrants or other rights of conversion. Notwithstanding the foregoing, for any Transaction consummated with Equifin, LLC, the Transaction Fee shall be equal to 1.0% of Transaction Consideration received by the Company and/or its equity security holders. Any Transaction Fee will be credited against any Restructuring Fee, defined below.

(d)     A restructuring fee equal to 2.0% of the Enterprise Value (defined below) implied by a plan of reorganization approved by the Bankruptcy Court (the "Restructuring Fee"). The Restructuring Fee shall be payable on or prior to the effective date of a plan or reorganization and/or consummation of a Restructuring. The Restructuring Fee will be made payable pursuant to any proposed plan of reorganization without the need for further application to the Bankruptcy Court for its payment. For the purposes of calculating the Restructuring Fee, Enterprise Value shall mean the consolidated book value of total assets of the reorganized entity, as reflected in the Debtors' financial statements prepared by an outside audit firm on, or nearest to, the date of consummation of the Restructuring. To the extent that the plan of reorganization contemplates a Transaction post confirmation, then the Restructuring Fee shall be payable at the close of the Transaction and fully credited toward any Transaction Fee that would be due under the Transaction. Additionally, to the extent that there is a Financing that is closed with Equifin, LLC and Imperial has been paid the corresponding Financing Fees owed under (b) above, then the maximum fees payable shall be reduced by the amount paid. For the avoidance of doubt, this limitation solely applies to a transaction with Equifin, LLC.

(e)     The maximum Restructuring Fee or Transaction Fee payable under will be as follows:

   (i) $1,650,000 if a Restructuring or Transaction is consummated within six (6) months following the date of the Engagement Agreement;

   (ii) Between $1,650,000 and $2,650,000, calculated pro rata, if a Restructuring or Transaction is consummated after six (6) months but within eighteen (18) months following the date of the Engagement Agreement;

   (iii) $2,650,000 if a Restructuring or Transaction is consummated after eighteen (18) months following the date of the Engagement Agreement.

(f)     In addition, without regard to whether the Restructuring, Financing, or Transaction is consummated or the Engagement Agreement expires or is terminated, all fees, disbursements and out-of-pocket expenses (the "Expenses") incurred by Imperial Capital in connection with the services to be rendered under the Engagement Agreement (including, without limitation, reasonable attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses and other customary expenditures) shall be reimbursed to Imperial, or paid on behalf of Imperial, promptly as billed.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5000    Fax: (775) 786-5443

14.     As further consideration, the Debtors have agreed to the indemnification and other obligations set forth in Schedule I attached to the Engagement Agreement, which such Schedule is an integral part of the Engagement Agreement and is incorporated therein by reference.

15.     None of the fees payable to Imperial pursuant to the Engagement Letter constitute a "bonus" or "fee enhancement".

16.     Imperial was not employed by the Debtors prior to the Petition Date, therefore, it received no prepetition fees from the Debtors.

17.     Imperial does not customarily maintain detailed time records similar to those customarily maintained by attorneys, and Imperial's services would not be compensated by reference to the number of hours and the Engagement Letter provides that Imperial shall receive, among other things, certain fixed fees as described above.

18.     Further, given the nature of their work (among other things, their focus on beneficial transactions and their incentive to implement such transactions), financial advisors, investment bankers, and similar professionals do not customarily bill on an hourly basis (or other increment thereof).

19.     In my opinion, based on my experience working in this industry, the Fee Structure appropriately reflects the nature of the services to be provided by Imperial, is reasonable and comparable to compensation generally charged by financial advisors and investment banking firms of similar stature to Imperial and for comparable engagement, both in and out of bankruptcy proceedings, and reflects a balance between a fixed, monthly fee, and a deferred amount which is tied to the consummation and closing of the transactions and services contemplated by the Debtors and Imperial in the Engagement Letter.

20.     The hours worked, the results achieved, and the ultimate benefit to the Debtors for the work performed by Imperial in connection with its engagement may vary and the Debtors and Imperial have taken this into account in setting the above fees. The Compensation Structure is consistent with Imperial's normal and customary billing practices for cases of this size and complexity both in and out of bankruptcy proceedings which require the level of services to be provided. Imperial's restructuring capabilities, mergers and acquisitions expertise as well as its

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329.5000    Fax: (775) 786.5443

1082970.1

8

capital raising experience, some or all of which may be required by the Debtors during the term of Imperial's engagement hereunder, were important factors to the Debtors in determining the Compensation Structure. In my opinion based upon my experience in this industry, the ultimate benefit of Imperial's services to the Debtors cannot be measured by reference to the number of hours expended by Imperial's professionals in the performance of such services.

21.     In my opinion, based upon my experience in this industry, the fee arrangements in the Engagement Letter are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code, given (i) the numerous issues Imperial may be required to address in the performance of its services under the Engagement Letter, (ii) Imperial's commitment to the variable level of time and effort necessary to address all such issues as they arise and (iii) the market prices for Imperial's services for engagements of this nature in both out-of-court and chapter 11 contexts.  Accordingly, Imperial and, upon information and belief, the Debtors believe the Compensation structure is both reasonable and market-based and should be approved under section 328(a) of the Bankruptcy Code.

22.     Imperial will not share or agree to share any compensation to be paid by the Debtors, in connection with services to be performed after the Petition Date, with any other person, other than other principals and employees of Imperial, in accordance with section 504 of the Bankruptcy Code.

23.     As stated previously, as part of the overall compensation payable to Imperial under the terms of the Engagement Letter, the Debtors have agreed, among other things, to indemnify, and provide contribution and reimbursement to, Imperial and certain related parties in accordance with the provisions of the Indemnification Provision attached as Schedule I to the Engagement Agreement.  Such a provision is customary and reasonable for Imperial's engagement.  Unlike the market for other professionals that the Debtors may retain, such provisions are standard terms of the market for financial advisors and investment bankers. Imperial and, on information and belief, the Debtors, believe that such provisions are comparable to those generally obtained by investment banking and financial advisory firms of similar stature to Imperial and for comparable engagements, both in and out of court.

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900    Fax: (775) 786-5443

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900    Fax: (775) 786-5443

**Ledgemont Fees**

24.    In negotiating the Engagement Agreement, the Debtors negotiated a fifty percent (50%) reduction in the Transaction Fee and the Financing Fee to the extent Equifin, LLC is involved in a Transaction or a Financing.

**Imperial's Disinterestedness**

25.    In connection with the preparation of this Declaration, Imperial reviewed the list of potential parties in interest that Imperial received from the Debtors (the "Parties in Interest").

26.    To the best of my knowledge and belief, Imperial has not represented any of the Parties in Interest in connection with matters relating to the Debtors, their estates, assets or businesses and will not represent other entities which are creditors of, or have other relationships to, the Debtors in matters relating to the Debtors, their estates, assets or businesses.

27.    Imperial provides financial advisory services to an array of clients in the areas of restructuring and distressed debt. As a result, Imperial has represented, and may in the future represent, certain Parties in Interest in matters unrelated to these chapter 11 cases, either individually or as part of representation of a committee of creditors or interest holders.

28.    To the best of my knowledge and belief, neither Imperial nor I, nor any other employee of Imperial that will work on the Debtors' engagement has any connection with or holds any interest adverse to the Debtors, their estates or the Parties in Interest in the matters on which Imperial is proposed to be retained, except as otherwise set forth below:

a.    Various departments within Imperial have numerous clients, past and present, which are located throughout the world, in a variety of industries. Such clients may include certain of the equity holders of the Debtors and certain of the persons or entities that are identified as creditors of the Debtors. Imperial or its affiliates may have investments in certain of the Debtors' creditors and Imperial's research department may have issued research covering some of the Debtors' creditors, and may in the future issue research on additional creditors. The management of these investments and the direction of any Imperial research are not within my purview or the purview of Imperial's corporate finance department. Nevertheless, insofar as I have been able to ascertain based on the results of the foregoing, to the best of my knowledge, Imperial has not advised any party in interest in connection with these chapter 11 cases.

b.    Imperial is a large financial advisory firm and has likely provided services unrelated to the Debtors for companies and individuals that have conducted business in the past and/or currently conduct business with the Debtors, and who

may be creditors of the Debtors.  To the best of my knowledge, information and belief, Imperial's services to these parties were and are wholly unrelated to the Debtors, their estates or these chapter 11 cases.

c.  Imperial has current or prior banking or trading relationships with Bank of New York, Bank of the West, Deutsche Bank, Deutsche Bank-London, Umpqua Bank and US Bank, all entities involved in these cases, however, no current or prior relationship with these firms involves activity related to the Debtors or their affiliated companies.

d.  As part of its practice, Imperial appears in numerous cases, proceedings, and transactions involving many different professionals, some of which may represent claimants and parties in interest in the Debtors' chapter 11 cases.  Furthermore, Imperial has in the past and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to these cases. Based on my current knowledge of the professionals involved, and to the best of my knowledge and information, none of these business relationships represents an interest materially adverse to the Debtors herein in matters upon which Imperial is to be engaged.

29.     If the Court approves Imperial's retention, Imperial will not accept any engagement or perform any service for any entity or person other than the Debtors in these chapter 11 cases.  Imperial will, however, continue to provide professional services to entities or persons that may be creditors or equity security holders of the Debtors or Parties in Interest in these chapter 11 cases; provided that such services do not relate to, or have any direct connection with, these chapter 11 cases or the Debtors.

30.     Imperial and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Debtors pursuant to which Imperial may acquire information of interest to the Debtors.  Imperial shall have no obligation to disclose such information to the Debtors, or to use such information in connection with the matters set forth in Section 1 of the Engagement Letter.

31.     If any new relevant facts or relationships are discovered or arise during the pendency of these chapter 11 cases, Imperial will use reasonable efforts to identify such further developments and will promptly file a supplemental affidavit as required by Bankruptcy Rule 2014.

32.     Accordingly, except as otherwise set forth herein, insofar as I have been able to determine, none of Imperial, I, nor any employee of Imperial who will work on the engagement

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900    Fax: (775) 786-5443

holds or represents any interest adverse to the Debtors or their estates, and Imperial is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that Imperial, and its professionals and employees who will work on the engagement:

      a.    are not creditors, equity security holders, or insiders of the Debtors;

      b.    were not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and

      c.    do not have an interest materially adverse to the interest of the Debtors' estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtors, or for any other reason.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

**DATED** this 14th day of June, 2010.

IMPERIAL CAPITAL, LLC

By: _____

Marc A. Bilbao,
Title: Managing Director

DOWNEY BRAND
427 West Plumb Lane
Reno, Nevada 89509
Tel: (775) 329-5900   Fax: (775) 786-5443

80662-002\DOCS_LA:221232.1

# Exhibit 1

# Exhibit 1



Imperial Capital

2000 Avenue of the Stars, 9ᵗʰ Floor South    Los Angeles, California 90067    TEL 310 246 3700    800 929 2299    FAX 310 246 3714

June 14, 2010

Specialty Trust, Inc.
6160 Plumas St
Reno, NV 89519
Attention: Nello Gonfiantini III
        Founder, Chairman, Chief Executive Officer and President

Dear Mr. Gonfiantini:

Pursuant to this letter agreement (this "***Agreement***") Specialty Trust, Inc. (together with its debtor and non-debtor subsidiaries and affiliates, the "***Company***") hereby engages Imperial Capital, LLC ("***Imperial Capital***") as the exclusive financial advisor and investment banker to the Company in connection with the Chapter 11 bankruptcy cases of the Company which are now pending in the United States Bankruptcy Court for the District of Nevada (the "***Bankruptcy Court***") to provide advisory services to the Company in connection with: (i) the analysis, formulation and consummation of a restructuring (including, without limitation, a proposal by the Company or any of its subsidiaries or affiliates with respect to the treatment of a) claims against the Company (the "Debt") and b) equity interests in the Company; a solicitation of votes, approvals or consents giving effect thereto; the execution of any supplemental indenture, corporate bylaws, or amendments to the same or other agreements giving effect thereto; an offer to exchange, cancel, acquire or otherwise modify the terms of the Debt; any modifications to, or suspensions of, the obligations to pay interest on any of the Debt, or any amendments thereto) (a "***Restructuring***"); (ii) a potential private placement of such amount as may be agreed in writing between the parties, of debt or equity securities (the "***Financing***"), on a best efforts basis on terms satisfactory to the Company and in compliance with Section 4(2) of the Securities Act of 1933, as amended (the "***Securities Act***"), and all other applicable federal and state securities laws; and/or (iii) a potential transaction, which transaction may include a merger, consolidation, or any other business combination, in one or a series of transactions, or a sale involving aggregate gross proceeds in excess of $10.0 million for the business, securities or assets of the Company, or one or more subsidiaries or divisions of the Company, or any transaction structured to substantially achieve the same result (each a "***Transaction***").

    Section 1.  Services to be Rendered.  As advisor to the Company, Imperial Capital may perform the following services as may be requested by the Company: (i) analysis of the Company's business, operations, properties, financial condition, competition, forecast, prospects and management; (ii) financial valuation of the ongoing operations of the Company; (iii) assisting the Company in developing, evaluating, structuring and negotiating the terms and conditions of a potential Restructuring plan; (iv) assisting the Company in the preparation of solicitation materials with respect to the Company's obligations, any securities to be issued in connection with the Restructuring and the Company (such solicitation materials, including, without limitation, all exhibits, amendments and supplements thereto, the "***Restructuring Offering Materials***"); (v) advising the Company on a proposed purchase price and form of consideration for the Transaction; (vi) assisting the Company in developing, evaluating, structuring and negotiating the terms and conditions of a potential Transaction; (vii) assisting the Company in the preparation of solicitation materials with respect to the Transaction and the Company (the "***Transaction Offering Materials***") (viii) identification of and contacting selected qualified buyers ("***Buyers***") for the Transaction and furnishing them, on behalf of the Company, with copies of Transaction Offering Materials; (ix) assisting the Company in arranging for potential Buyers to conduct due diligence investigations; (x) assisting the Company in developing, evaluating, structuring and negotiating the terms and conditions of a potential Financing; (xi) assisting the Company in the preparation of solicitation materials with respect to the Financing, any securities to be issued in connection with the Financing and the Company (such solicitation materials, including, without

Imperial Capital, LLC

Specialty Trust, Inc.
June 14, 2010
Page 2 of 8

limitation, all exhibits, amendments and supplements thereto, the *"Financing Offering Materials"*); (xii) identification of and contacting selected qualified purchasers (*"Purchasers"*) to participate in the Financing and furnishing them, on behalf of the Company, with copies of Financing Offering Materials; (xiii) expert testimony services, if needed, provided in support of a Restructuring, Financing or Transaction; and (xiv) providing such other financial advisory services with respect to the Company's financial issues as may from time to time be agreed upon between the Company and Imperial Capital.

Section 2.  Compensation.  In consideration for the services to be provided under this Agreement, Imperial Capital shall be paid:

(i)  A financial advisory fee of $50,000 per month (the *"Monthly Advisory Fee"*), payable monthly in advance during the term of this Agreement. The first Monthly Advisory Fee shall be payable upon execution of this Agreement and each subsequent Monthly Advisory Fee shall be payable in advance on the first day of each month. Payments will be made by the Company to Imperial as promptly as permitted by the Bankruptcy Court. If the first Monthly Advisory Fee is payable for a partial month, such first Monthly Advisory Fee shall be pro rated from the date hereof to the end of the month. All Monthly Advisory Fees payable pursuant to this subparagraph (i) shall be credited against the Financing Fee and Transaction Fee, both as hereinafter defined.

(ii)  A cash fee (the *"Financing Fee"*), payable out of the proceeds of the Financing by wire directly from the Financing source at closing, equal to:
    a.  3.0% of the face amount of any senior debt sold or arranged as part of the Financing;
    b.  4.0% of the face amount of any subordinated debt sold or arranged as part of the Financing;
    c.  5.0% of the face amount of any equity securities sold or arranged as part of the Financing.

No Financing Fee shall be payable for capital raised from the Company's existing shareholders or noteholders (current holders as of the date of this Agreement). The Financing Fee for any capital raised from Equifin, LLC shall be reduced by 50%. The Financing Fee shall be credited against any fees earned and payable pursuant to Sections 2(iii) and 2(iv) below.

(iii)  A transaction fee equal to 2.0% of the Transaction Consideration (as hereinafter defined) received by the Company and/or its equity security holders pursuant to the Transaction (the *"Transaction Fee"*), payable in cash by wire transfer at closing. The Transaction Fee shall be payable upon consummation of the Transaction. For purposes of this Agreement, *"Transaction Consideration"* shall mean the aggregate of all consideration received by the Company and/or its equity security holders, the amount of any debt assumed or repaid, or that remains outstanding after the transaction, any preferred stock redeemed, and consideration received with respect to the exercise or termination of options, warrants or other rights of conversion. A Transaction shall be deemed to have been consummated upon the earliest of any of the following events to occur: (a) the acquisition of a majority of the outstanding common stock of the Company by the Buyer; (b) a merger or consolidation of the Company with or into the Buyer; (c) the acquisition by a Buyer of the Company's securities or assets; or (d) in the case of any other Transaction, the consummation thereof. In the event that the consideration in a Transaction is paid in whole or in part in the form of securities or other assets, the value of such securities or other assets, for the purposes of calculating the Transaction Fee, shall be the fair market value thereof, as the parties hereto shall mutually agree, on the day prior to the consummation of the Transaction; provided, however, that, if such consideration includes securities with an existing public trading market, the value thereof shall be determined by average closing price for such securities over the last ten (10) trading days immediately prior to such consummation. Notwithstanding the foregoing, for any Transaction consummated with Equifin, LLC, the Transaction Fee shall be equal to 1.0% of Transaction Consideration received by the Company and/or its equity security holders pursuant to the Transaction, payable to Imperial Capital in cash by wire transfer at closing. Any Transaction Fee payable pursuant to this subparagraph (iii) will be credited against any Restructuring Fee earned and payable under 2(iv) below.

(iv)  A restructuring fee equal to 2.0% of the Enterprise Value (as hereinafter defined) implied by a plan of reorganization approved by the Bankruptcy Court (the *"Restructuring Fee"*). The Restructuring Fee shall be payable on or prior to the effective date of a plan or reorganization and/or consummation of a Restructuring. The Restructuring Fee will be made payable pursuant to any proposed plan of reorganization without the need for further

Specialty Trust, Inc.
June 14, 2010
Page 3 of 8

application to the Bankruptcy Court for its payment. For the purposes of calculating the Restructuring Fee, Enterprise Value shall mean the consolidated book value of total assets of the reorganized entity, as reflected in the Company's financial statements prepared on, or nearest to, the date of consummation of the Restructuring. The Company will engage an outside audit firm and cause them to prepare financial statements prior to the effective date of the Restructuring, in part to determine Enterprise Value and the Restructuring Fee. To the extent that the plan of reorganization contemplates a Transaction post confirmation of the plan of reorganization then the Restructuring Fee shall be payable at the close of the Transaction and fully credited toward any Transaction Fee that would be due under the Transaction. Additionally, to the extent that there is a Financing that is closed with Equifin, LLC and Imperial Capital has been paid the corresponding Financing Fees owed under 2(ii), then the maximum fees payable under subparagraphs (i), (ii), (iii) and (iv) listed below shall be reduced by the amount paid. For the avoidance of doubt this limitation solely applies to a transaction with Equifinn LLC.

The maximum fees payable under subparagraphs (i), (ii), (iii) and (iv) of this Section 2 will be determined by the following schedule:

a. $1,650,000 if a Restructuring or Transaction is consummated within six (6) months following the date of this Agreement;

b. Between $1,650,000 and $2,650,000, calculated pro rata, if a Restructuring or Transaction is consummated after six (6) months but within eighteen (18) months following the date of this Agreement;

c. $2,650,000 if a Restructuring or Transaction is consummated after eighteen (18) months following the date of this Agreement.

In addition, without regard to whether the Restructuring, Financing, or Transaction is consummated or this Agreement expires or is terminated, all fees, disbursements and out-of-pocket expenses (the "*Expenses*") incurred by Imperial Capital in connection with the services to be rendered hereunder (including, without limitation, reasonable attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses and other customary expenditures) shall be reimbursed to Imperial Capital, or paid on behalf of Imperial Capital, promptly as billed. Further, the Company shall be responsible for all other expenses associated with the Restructuring, Financing, or Transaction including, without limitation, its own accounting and attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses, printing costs and other expenditures. .

As further consideration, the Company agrees to the indemnification and other obligations set forth in Schedule I attached hereto, which such schedule is an integral part hereof and incorporated herein by reference.

The Company shall promptly apply to the Bankruptcy Court for the approval of this Agreement and Imperial Capital's retention hereunder pursuant to sections 327 and 328 of the Bankruptcy Code and not subject to any other standard of review under Section 330 of the Bankruptcy Code. The Company shall supply Imperial Capital with a draft of such application and any proposed order authorizing Imperial Capital's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of its filing, to provide Imperial Capital with a reasonable opportunity to review and comment thereon. Imperial Capital shall have no obligation to provide any services under this Agreement unless Imperial Capital's retention is approved under Section 328(a) of the Bankruptcy Code, by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Imperial Capital. If Imperial Capital's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Imperial Capital hereunder as promptly as practicable in accordance with the terms hereof.

Imperial Capital shall invoice the Company for fees and expenses under this Agreement in accordance with the fee procedures order entered by the Bankruptcy Court in the Chapter 11 bankruptcy cases of the Company. If the Company fails to pay Imperial Capital within thirty (30) days after receipt of any of Imperial Capital's invoices, in addition to other remedies that may be available at law or equity, Imperial Capital may stop work. All fees and expenses payable to Imperial Capital pursuant to this Section 2 shall be payable in cash via wire transfer to an account designated by Imperial Capital. Except as set forth in subparagraphs (i) of this Section 2, no fee paid or payable to Imperial Capital or any of its affiliates shall be credited against any other fee paid or payable to Imperial Capital or any of its affiliates.

Imperial Capital, LLC

Specialty Trust, Inc.
June 14, 2010
Page 4 of 8

Section 3.  Term and Scope of Engagement.  The advisory services and compensation arrangements set forth herein do not encompass other investment banking services such as the raising of capital other than the Financing, the issuance of "fairness opinions", or any other specific services not set forth in Section 1 hereof.  The compensation arrangements pursuant to Section 2(i) hereof shall commence effective as of the date hereof and shall continue thereafter on a month-to-month basis pursuant to the terms hereof until the consummation of the Restructuring.  This Agreement may be terminated by either the Company or Imperial Capital upon thirty (30) days prior written notice.  Upon any termination or expiration of this Agreement, Imperial Capital shall be entitled to receive prompt payment of all unpaid fees and expenses accrued pursuant to Section 2 hereof up to and including the date of such termination or expiration.  Sections 3, 5, 6, 9, 10 and 11 of this Agreement and the indemnity and other provisions contained in Schedule I shall remain operative and in full force and effect regardless of any termination or expiration of this Agreement.

Notwithstanding the foregoing paragraph, if at any time prior to 24 months after the termination or expiration of this Agreement for any reason, the Company (a) enters into any transaction or transactions similar to the Restructuring transaction contemplated by this Agreement (or any formal or informal agreement to consummate such transaction or transactions) and the Company consummates any such transaction or transactions, or any understanding, statement or letter of intent or agreement, whether binding or non-binding, and whether explicit or implicit, is entered into during such period which subsequently results in a consummated transaction, whether or not such consummated transaction occurs within such 24 month period, or (b) enters into any transaction or transactions similar to the Transaction contemplated by this Agreement (or any formal or informal agreement to consummate such transaction or transactions) and the Company consummates any such transaction or transactions, or any understanding, statement or letter of intent or agreement, whether binding or non-binding, and whether explicit or implicit, is entered into during such period which subsequently results in a consummated transaction, whether or not such consummated transaction occurs within such 24 month period, or (c) enters into a financing transaction or transactions similar to the Financing contemplated by this Agreement and the Company completes any such financing transaction or transactions, or any understanding, statement or letter of intent or agreement, whether binding or non-binding, and whether explicit or implicit, is entered into during such period which subsequently results in a completed Financing transaction (whether or not such completed transaction occurs within such 24 month period), Imperial Capital shall, in each case, in addition to any expense reimbursement due, be entitled to payment in full of the compensation described in Section 2 of this Agreement with respect to such transaction or transactions if such transaction or transactions involve a counter-party with which Imperial Capital has engaged in substantive discussions.

Provided, however, that if Imperial unilaterally terminates this Agreement without a prior breach of the Agreement by the Company, then no further compensation will be payable to Imperial pursuant to section 2 of this Agreement beyond the date of such termination.

Section 4.  Cooperation.  To the extent possible, the Company shall: (i) furnish Imperial Capital with all current and historical financial and other information and data regarding the business and financial condition of the Company ("**Information**") as Imperial Capital reasonably believes appropriate in connection with its services hereunder; (ii) provide Imperial Capital with access to the officers, directors, employees and professional advisors of the Company as Imperial Capital reasonably believes appropriate in connection with its services hereunder; and (iii) as applicable, furnish Imperial Capital with the Restructuring Offering Materials, Financing Offering Materials or Transaction Offering Materials.  The Company agrees that it and its counsel will be solely responsible for ensuring that any Restructuring Offering Materials, Financing Offering Materials and Transaction Offering Materials comply in all respects with applicable law.  The Company agrees that neither the Information nor Restructuring Offering Materials, Financing Offering Materials or Transaction Offering Materials will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made.  The Company will promptly notify Imperial Capital if it learns of any material inaccuracy or misstatement in, or material omission from, any Information or Restructuring Offering Materials, Financing Offering Materials or Transaction Offering Materials theretofore delivered to Imperial Capital.  The Company will also cause to be furnished to Imperial Capital at any closing of the Restructuring, Financing or Transaction, copies of such agreements, opinions, certificates and other documents delivered at the closing as Imperial Capital may reasonably request.

The Company recognizes and confirms that Imperial Capital, in connection with performing its services hereunder: (i) will be relying without investigation upon information that is available from public sources and upon the Information and Restructuring Offering Materials, Financing Offering Materials and Transaction Offering Materials supplied to

Specialty Trust, Inc.
June 14, 2010
Page 5 of 8

it by or on behalf of the Company; (ii) shall not in any respect be responsible for the accuracy or completeness of such public information, Information or and Restructuring Offering Materials, Financing Offering Materials or Transaction Offering Materials or have any obligation to verify the same; (iii) shall not conduct any appraisal of any assets of the Company; and (iv) may require that any and Restructuring Offering Materials, Financing Offering Materials and Transaction Offering Materials contain appropriate disclaimers consistent with the foregoing.

Section 5. <u>Confidentiality</u>. The Company agrees that any reference to Imperial Capital in any release, communication, or other material is subject to Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion. Any advice, written or oral, provided by Imperial Capital pursuant to this Agreement shall be treated by the Company as confidential, shall be solely for the information and assistance of the Company in connection with its consideration of the matters set forth in Section 1 hereof and shall not be used, circulated, quoted or otherwise referred to for any other purpose, nor shall it be filed with, included in or referred to, in whole or in part, in any registration statement, proxy statement, offering materials or other communication, whether written or oral, prepared, issued or transmitted by the Company or any of their affiliates, directors, officers, employees, agents or representatives, without, in each instance, Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion; *provided, however,* that the foregoing shall not apply to any information which becomes publicly available other than as a result of the breach by the Company of the undertakings hereunder, or that which the Company is required to disclose by judicial or administrative process in connection with any action, suit, proceeding or claim.

Section 6. <u>Conflicts</u>. The Company acknowledges that Imperial Capital and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Company pursuant to which Imperial Capital may acquire information of interest to the Company. Imperial Capital shall have no obligation to disclose such information to the Company, or to use such information in connection with the matters set forth in Section 1 hereof. Notwithstanding the Company's obligation to pay the fees and expenses of Imperial Capital hereunder, to indemnify Imperial Capital and to provide Imperial Capital with Information, the Company recognizes that Imperial Capital is being engaged hereunder to provide the services described above only to the Company and is not acting as an agent or fiduciary of, and shall have no duties or liability to, the equity holders of the Company or any third party in connection with its engagement hereunder, all of which are hereby expressly waived. No one other than the Company is authorized to rely upon the engagement of Imperial Capital hereunder or any statements, advice or conduct by Imperial Capital.

The Company acknowledges that Imperial Capital or its affiliates may, from time to time, quote a market in or make purchases or sales for their own accounts or the accounts of its brokerage customers in debt or equity securities of or claims against the Company and Imperial Capital's research department may express views or opinions with respect thereto. Imperial Capital has, and agrees to maintain, information barriers between Imperial Capital's corporate finance department and its sales and trading department and research department, pursuant to which Imperial Capital's corporate finance employees are prohibited from disclosing confidential information to Imperial Capital's sales and trading or research employees.

Section 7. <u>Public Announcements</u>. Imperial Capital shall have the right to place announcements and advertisements in financial and other newspapers and journals, at its own expense, describing its services in connection with the Restructuring, Financing or Transaction and other services rendered pursuant to this Agreement.

Section 8. <u>Exclusivity</u>. The Company agrees that no other financial advisor is or will be authorized by it during the term of this Agreement to perform the same services on its behalf of the type which Imperial Capital is authorized to perform hereunder. No fee payable to any other financial advisor either by the Company or any other entity shall reduce or otherwise affect the fees payable hereunder to Imperial Capital.

Section 9. <u>Entire Agreement; Severability; Amendments; Assignments.</u> This Agreement constitutes the entire agreement among the parties hereto related to the subject matter hereof and supersedes all prior agreements or understandings related to the subject matter hereof. If any provision of this Agreement is determined to be invalid, unlawful or unenforceable in any respect, such determination shall not affect such provision in any other respect or any other provision of this Agreement, which shall remain in full force and effect. This Agreement may not be amended or otherwise modified or waived except by an instrument in writing duly executed by both Imperial Capital and the Company. No waiver by either party of any provision hereof shall be taken or held to be a waiver of any subsequent breach thereof.

Specialty Trust, Inc.
June 14, 2010
Page 6 of 8

This Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of the Company, Imperial Capital, each Indemnified Person (as defined in Schedule I hereto) and their respective permitted successors and assigns, and no other person or persons shall have the right to enforce the provisions hereof.

. Section 10.  Governing Law; Forum.  This Agreement shall be construed, interpreted, governed and applied in all respects in accordance with the internal laws of the State of New York, without giving effect to principles of conflicts of laws. Except for Indemnification claims under schedule I any controversy, claim or dispute relating to this Agreement shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association pursuant to arbitration conducted in New York County, New York. Judgment upon such arbitration may be entered in any court having jurisdiction thereof. With respect to claims for Indemnification under schedule I the parties hereby consent to the jurisdiction of any State or Federal Court located within the New York County, State of New York. The parties further acknowledge that they waive any right they have or may have to a trial by jury with regard to the claims of Indemnification provided under Schedule I. If any litigation or arbitration shall ensue among the parties in connection with this Agreement or arising out of Imperial Capital's engagement hereunder, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable attorneys' fees and other costs and expenses in connection therewith.

Section 11.  Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile), each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Imperial Capital the enclosed original copy of this Agreement.

Very truly yours,

IMPERIAL CAPITAL, LLC

By: _____
        Name:  Marc Bilbao
        Title: Managing Director

Accepted and agreed as of the date first above written:

SPECIALTY TRUST, INC.

By: _____
        Name: Nello Gonfiantini III
        Title: Founder, Chairman, Chief Executive Officer and President

Imperial Capital, LLC

Specialty Trust, Inc.
June 14, 2010
Page 6 of 8

This Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement shall be binding upon and inure to the benefit of the Company, Imperial Capital, each Indemnified Person (as defined in Schedule I hereto) and their respective permitted successors and assigns, and no other person or persons shall have the right to enforce the provisions hereof.

. Section 10. <u>Governing Law; Forum.</u> This Agreement shall be construed, interpreted, governed and applied in all respects in accordance with the internal laws of the State of New York, without giving effect to principles of conflicts of laws. Except for Indemnification claims under schedule I any controversy, claim or dispute relating to this Agreement shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association pursuant to arbitration conducted in New York County, New York. Judgment upon such arbitration may be entered in any court having jurisdiction thereof. With respect to claims for Indemnification under schedule I the parties hereby consent to the jurisdiction of any State or Federal Court located within the New York County, State of New York. The parties further acknowledge that they waive any right they have or may have to a trial by jury with regard to the claims of Indemnification provided under Schedule I. If any litigation or arbitration shall ensue among the parties in connection with this Agreement or arising out of Imperial Capital's engagement hereunder, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable attorneys' fees and other costs and expenses in connection therewith.

Section 11. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts (including by facsimile), each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Imperial Capital the enclosed original copy of this Agreement.

Very truly yours,

**IMPERIAL CAPITAL, LLC**

By: _____
        Name: Marc Bilbao
        Title: Managing Director

Accepted and agreed as of the date first above written:

**SPECIALTY TRUST, INC.**

By: _____
        Name: Nello Gonflantini III
        Title: Founder, Chairman, Chief Executive Officer and President

Imperial Capital, LLC

Specialty Trust, Inc.
June 14, 2010
Page 7 of 8

## Schedule I

This Schedule I is a part of and is incorporated into that certain letter agreement (the "*Agreement*") dated June 14, 2010 by and among Specialty Trust, Inc. (together with its debtor and non-debtor subsidiaries and affiliates, the "*Company*") and Imperial Capital, LLC ("*Imperial Capital*").

Any and all obligations and agreements of the Company under this Schedule I shall be equally applicable to, and binding upon, each of the Company's bankruptcy estates and any chapter 7 trustee appointed in the Company's bankruptcy cases, in each such case to the extent applicable.

Because Imperial Capital will be acting on behalf of the Company in connection with the services contemplated by the Agreement, and as part of the consideration for the agreement of Imperial Capital to furnish its services pursuant to the Agreement, the Company (the "*Indemnifying Party*") agrees, jointly and severally, to indemnify and hold harmless Imperial Capital and its affiliates, and their respective officers, directors, partners, members, shareholders, employees, representatives, consultants, advisors and agents and each person, if any, who controls Imperial Capital or any of its affiliates within the meaning of the Securities Act of 1933, as amended, (Imperial Capital and each such other person being referred to as an "*Indemnified Person*"), to the full extent lawful, from and against all claims, liabilities, losses, damages and expenses, or actions in respect thereof, as incurred, based upon, related to, arising out of, or in connection with (i) actions taken or omitted to be taken by the Company and their affiliates, officers, directors, counsel, employees or agents, (ii) actions taken or omitted to be taken by any Indemnified Person pursuant to the terms of, or in connection with, the services rendered pursuant to the Agreement or in connection with any Restructuring, Financing or Transaction, or proposed transaction contemplated thereby or any Indemnified Person's role in connection therewith, and (iii) any untrue statement or alleged untrue statement of a material fact contained in any of the Information or Restructuring Offering Materials, Financing Offering Materials or Transaction Offering Materials (each as defined in the Agreement) or omission or alleged omission to state a material fact required to be stated therein to make the statements therein not misleading in light of the circumstances under which they were made, and shall reimburse each Indemnified Person promptly upon demand for any legal or other expenses (including, without limitation, fees and expenses of counsel) reasonably incurred by that Indemnified Person in connection with investigating, preparing to defend, defending against, or appearing as a third party witness, in connection with any such claims, liabilities, losses, damages, expenses or actions; *provided, however*, that the Indemnifying Party shall not be responsible for any claims, liabilities, losses, damages, expenses or actions of any Indemnified Person to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person. No Indemnified Person shall have any liability to the Company, or any of their respective affiliates, officers, directors, partners, members, shareholders, employees, representatives, consultants, advisors and agents in connection with the services rendered pursuant to the Agreement except to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person.

Promptly upon receipt by an Indemnified Person of notice of any claim or the commencement of any action, if an indemnification claim in respect thereof is to be made against the Indemnifying Party, the Indemnified Person shall notify the Indemnifying Party in writing of the claim or commencement of such action; *provided, however*, that the failure to so notify shall not relieve the Indemnifying Party from any liability which it may have pursuant to this Schedule I except to the extent, and only to the extent, that it has been materially prejudiced by such failure to so notify; and, *provided, further*, that the failure to so notify shall not relieve the Indemnifying Party from any liability it may have to an Indemnified Person otherwise than pursuant to this Schedule I. If any such claim or action shall be brought against an Indemnified Person, the Indemnifying Party shall be entitled to participate therein and to assume the defense thereof at its expense with counsel reasonably satisfactory to the Indemnified Person. After notice from the Indemnifying Party to the Indemnified Person of its election to assume the defense of such claim or action, the Indemnifying Party shall not be liable to the Indemnified Person under this Schedule I for any legal or other expenses subsequently incurred by the Indemnified Person in connection with the defense thereof other than reasonable costs of investigation; *provided, however*, that any Indemnified Person shall have the right to employ separate counsel in any such action and to participate in the defense thereof; and, *provided, further*, that Indemnifying Party shall continue to be liable for the legal or other expenses incurred by the Indemnified Person in connection with the defense of such

Specialty Trust, Inc.
June 14, 2010
Page 8 of 8

action if (i) the employment of such separate counsel has been specifically authorized by the Indemnifying Party in writing, (ii) such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Indemnifying Party and in the reasonable judgment of such counsel it is advisable for the Indemnified Person to employ separate counsel (in which case the Indemnifying Party shall not have the right to assume the defense of such action on behalf of the Indemnified Person), (iii) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Person would, in the reasonable judgment of the Indemnified Person, present such counsel with a conflict of interest, or (iv) the Indemnifying Party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the Indemnified Person, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Persons. The Indemnifying Party shall not settle or compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action or claim in which any Indemnified Person is or could be a party and as to which indemnification or contribution has or could have been sought by such Indemnified Person pursuant to this Schedule I, unless such Indemnified Person has given its prior written consent to the settlement, compromise, consent or termination or such settlement, compromise, consent or termination includes an express complete and unconditional release of such Indemnified Person.

In order to provide for just and equitable contribution, if any claim for indemnification with respect to claims, liabilities, losses, damages, expenses or actions in respect thereof covered by this Schedule I is found to be unenforceable in a final judgment (not subject to further appeal) by a court of competent jurisdiction or is otherwise unavailable or insufficient to hold harmless an Indemnified Person (except directly due to the fraud, willful misconduct or gross negligence of the Indemnified Person), then the Indemnifying Party shall, in lieu of indemnifying such Indemnified Person, contribute to the amount paid or payable by such Indemnified Person as a result of such claims, liabilities, losses, damages, expenses or actions in respect thereof, in such proportion as shall be appropriate to reflect the relative benefits received and relative fault of the Indemnifying Party on the one hand and the Indemnified Person on the other, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnifying Party agrees that it would not be just and equitable if contributions pursuant to this Schedule I were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein. No person found liable for a fraudulent misrepresentation or omission shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation or omission. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Persons with respect to such claims, liabilities, losses, damages, expenses or actions in respect thereof shall not exceed the amount of fees actually received by Imperial Capital for its services pursuant to the Agreement.

The foregoing indemnity, contribution and expense reimbursement provisions are not exclusive and shall be in addition to any liability which the Indemnifying Party might otherwise have and shall not limit any rights or remedies which may otherwise be available at law or in equity to the Indemnified Persons. These indemnification provisions shall (i) remain operative and in full force and effect regardless of any termination or expiration of the Agreement; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Indemnified Person, and (iv) shall be binding on any successor or assign of the Indemnifying Party and each of its successors or assigns.

Imperial Capital, LLC

# Exhibit 2

# Exhibit 2

**SPECIALTY TRUST**

# Deal Team

## Team Biographies

**Chris Shepard**
Managing Director
Los Angeles

- Chris Shepard is Executive Vice President, Co-Head of Investment Banking and Head of Capital Markets at Imperial Capital.

- Based in Los Angeles, Mr. Shepard has over 15 years experience in financings, mergers and acquisitions, and restructurings. He has advised on over $5 billion in transactions in a wide range of industries, including healthcare, telecom, industrial, consumer, media, technology, energy, gaming and transportation. Prior to joining Imperial Capital, Mr. Shepard was an Associate at the Los Angeles office of Milbank, Tweed, Hadley & McCloy, a New York-based corporate law firm, where he specialized in public securities and mergers and acquisitions transactions.

- Mr. Shepard received his B.S. with a concentration in Accounting, an M.B.A. and his J.D. from the University of Michigan.

**Marc Bilbao**
Managing Director
Los Angeles

- Marc Bilbao serves as Co-Head of the Restructuring Group and Managing Director in the Los Angeles office of Imperial Capital.

- Prior to joining Imperial Capital, Mr. Bilbao was a Managing Director in the Los Angeles office of Giuliani Capital Advisors and was a member of Giuliani Capital's Board of Managers and its Commitment Committee. Mr. Bilbao focused on representing companies, senior lenders and creditors in all phases of workouts and restructuring transactions including the development of turnaround business strategies, debt and equity restructurings, and M&A transactions. Prior to joining Giuliani Capital, Mr. Bilbao served as Executive Director in the Debt Restructuring and Workout Group of CIBC World Markets in New York. While in that capacity he played an integral role in the assessment, valuation and management of various distressed assets. Mr. Bilbao has had significant experience in various out-of-court related restructurings including: M&A transactions, debt restructurings, debt for equity swaps, and partnership negotiations. Preceding Mr. Bilbao's involvement in distressed and troubled situations, he held various positions in Leverage Finance Departments of both domestic and foreign banks.

- Mr. Bilbao received his B.S. in Business Administration from Seattle University and is a Chartered Financial Analyst. He is a member of the New York and Los Angeles Societies of Security Analysts, the Turnaround Management Association, and the American Bankruptcy Institute, and is a frequent speaker and panelist on turnaround issues.



**Imperial Capital**®

1

SPECIALTY TRUST

# Deal Team

## Team Biographies

**Eric Carlson**
Managing Director
San Francisco

- Eric R. Carlson is Managing Director, Investment Banking, and Manager of Imperial Capital's San Francisco Investment Banking Group.

- Prior to joining Imperial Capital, Mr. Carlson held Managing Director positions at Giuliani Capital Advisors LLC and Ernst & Young Corporate Finance. Mr. Carlson has 20 years experience working with boards of directors, management teams and creditors facing financial challenges. He has been involved in restructuring transactions impacting more than $30 billion of debt. He has assisted clients in a wide variety of situations and has directed numerous assignments including: the sale of distressed assets; debt and equity financing transactions; the development of strategic restructuring alternatives; preparation, critique and negotiation of business plans and plans of reorganization; crisis advisory and numerous capitalization issues. Mr. Carlson has also acted as an interim CFO and Chief Restructuring Officer. His experience covers a wide variety of industries including: various manufacturing sectors, construction and engineering, telecommunications, leasing, bio-fuels, building materials and real estate.

- Mr. Carlson received his B.S. degree in Accounting from Pace University in New York and is a member of the Turnaround Management Association, the American Bankruptcy Institute, and is a frequent speaker and panelist on restructuring issues.

**Scott Farnsworth**
Senior Vice President
Los Angeles

- Mr. Farnsworth is a Senior Vice President in the Los Angeles office of Imperial Capital focused exclusively on providing restructuring advisory services.

- Mr. Farnsworth has extensive experience working with debtors, creditors and other parties in interest to develop, refine, present and negotiate business and strategic plans. He also has experience in consulting large domestic corporations on the issues of cash and working capital management, focusing on opportunities to eliminate or reduce non-earning assets and accelerate cash flow.

- Prior to joining Imperial Capital in April 2006, Scott held the position of Director at Giuliani Capital Advisors (f/k/a Ernst & Young Corporate Finance) where he worked since 1997.

- Mr. Farnsworth holds a B.S. in Business Administration with Highest Honors from the University of Texas at Austin and an M.B.A. from The University of California at Los Angeles. He is a Certified Insolvency and Restructuring Advisor and was the recipient of the AIRA's 2004 Bronze Medal for the Kroll Zolfo Cooper / Randy Watts Award.

 Imperial Capital®

2