# Exhibit 2

# Exhibit 2

## Exhibit 2

**Purchase Agreement**

# PURCHASE AND SALE AGREEMENT

## TABLE OF CONTENTS

| | |
|---|---|
| Section 1. | Purchase and Sale of Property |
| Section 2. | Purchase Price |
| Section 3. | Purchaser's Due Diligence |
| Section 4. | Conditions Precedent |
| Section 5. | Closing Conditions |
| Section 6. | Close of Escrow |
| Section 7. | Closing Adjustments and Prorations |
| Section 8. | Covenants, Representations and Warranties |
| Section 9. | Casualty and Condemnation |
| Section 10. | Default |
| Section 11. | Miscellaneous |

## PURCHASE AND SALE AGREEMENT

### TABLE OF CONTENTS

| | |
|---|---|
| Section 1. | Purchase and Sale of Property |
| Section 2. | Purchase Price |
| Section 3. | Purchaser's Due Diligence |
| Section 4. | Conditions Precedent |
| Section 5. | Closing Conditions |
| Section 6. | Close of Escrow |
| Section 7. | Closing Adjustments and Prorations |
| Section 8. | Covenants, Representations and Warranties |
| Section 9. | Casualty and Condemnation |
| Section 10. | Default |
| Section 11. | Miscellaneous |



# PURCHASE AND SALE AGREEMENT

## DEFINED TERMS

| | |
|---|---|
| Effective Date: | Shall be the date on which the last signature of the parties is affixed to the Agreement |
| Purchaser: | SDMI Centennial Hills, LLC, a Nevada limited liability company ("SDMI") or its nominee |
| Purchaser's Address | c/o Jeffrey A. Bendavid, Esq., Moran Law Firm, LLC, 630 S. 4th Street, Las Vegas, NV 89101 |
| Purchaser's Representative: | Jeffrey A. Bendavid |
| Seller: | Specialty Trust, Inc. |
| Seller's Address: | 6160 Plumas, Reno, NV 89519 |
| Seller's Representative: | Nello Gonfiantini, III |
| Property: | Real property located in Clark County, NV, on Durango and Deer Springs, being APN 125-20-216-002 (as more particularly described in the Trustee's Deed Upon Sale, Exhibit A attached hereto and incorporated herein and as provided through escrow) together with any and all rights, interests, easements, hereditaments, appurtenances thereto, and all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104, and all buildings, improvements, and fixtures thereon. |
| Bankruptcy Court | Seller is a Debtor-in-Possession in a Chapter 11 Bankruptcy Case No. 10-51432-gwz, U. S. Bankruptcy Court for the District of Nevada, Reno, NV |
| Purchase Price: | $1,900,000.00 |
| Earnest Money Deposit: | $100,000.00 |
| Additional Deposit: | $1,800,000.00 due at Close of Escrow |
| Due Diligence Period: | Effective date through June 30, 2010 |
| Title Company and Escrow Holder: | Nevada Title, 2500 N. Buffalo #240, Las Vegas, NV 89128; Escrow Officer: Kristin Ravelo; Tel: 702-251-5106; Fax: 702-938-1802; email: kr@nevadatitle.com. |
| Closing Date: | On or before the later of July 30, 2010, or receipt of an Order approving the sale issued by the United States Bankruptcy Court as provided in Section 5(b) |

*Execution Copy*

2

# PURCHASE AND SALE AGREEMENT

## DEFINED TERMS

| | |
|---|---|
| Effective Date: | Shall be the date on which the last signature of the parties is affixed to the Agreement |
| Purchaser: | SDMI Centennial Hills, LLC, a Nevada limited liability company ("SDMI") or its nominee |
| Purchaser's Address | c/o Jeffrey A. Bendavid, Esq., Moran Law Firm, LLC, 630 S. 4th Street, Las Vegas, NV 89101 |
| Purchaser's Representative: | Jeffrey A. Bendavid |
| Seller: | Specialty Trust, Inc. |
| Seller's Address: | 6160 Plumas, Reno, NV 89519 |
| Seller's Representative: | Nello Gonfiantini, III |
| Property: | Real property located in Clark County, NV, on Durango and Deer Springs, being APN 125-20-216-002 (as more particularly described in the Trustee's Deed Upon Sale, Exhibit A attached hereto and incorporated herein and as provided through escrow) together with any and all rights, interests, easements, hereditaments, appurtenances thereto, and all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104, and all buildings, improvements, and fixtures thereon. |
| Bankruptcy Court | Seller is a Debtor-in-Possession in a Chapter 11 Bankruptcy Case No. 10-51432-gwz, U. S. Bankruptcy Court for the District of Nevada, Reno, NV |
| Purchase Price: | $1,900,000.00 |
| Earnest Money Deposit: | $100,000.00 |
| Additional Deposit: | $1,800,000.00 due at Close of Escrow |
| Due Diligence Period: | Effective date through June 30, 2010 |
| Title Company and Escrow Holder: | Nevada Title, 2500 N. Buffalo #240, Las Vegas, NV 89128; Escrow Officer: Kristin Ravelo; Tel: 702-251-5106; Fax: 702-938-1802; email: kr@nevadatitle.com. |
| Closing Date: | On or before the later of July 30, 2010, or receipt of an Order approving the sale issued by the United States Bankruptcy Court as provided in Section 5(b) |



| Closing Cost Allocations: | Title Insurance -CTLA Owners, to be paid by Seller.  SDMI may purchase ALTA title policy with endorsements it requests at its expense above the cost of the CLTA title insurance. |
|---|---|
| Escrow fees: | Shall be divided equally |
| Recording charges: | For the Deed shall be paid by Seller |
| Transfer taxes: | Shall be divided equally between the parties |

The foregoing Defined Terms are incorporated by reference into the attached Agreement.

| Closing Cost Allocations: | Title Insurance -CTLA Owners, to be paid by Seller. SDMI may purchase ALTA title policy with endorsements it requests at its expense above the cost of the CLTA title insurance. |
|---|---|
| Escrow fees: | Shall be divided equally |
| Recording charges: | For the Deed shall be paid by Seller |
| Transfer taxes: | Shall be divided equally between the parties |

The foregoing Defined Terms are incorporated by reference into the attached Agreement.

*Execution Copy*                    3                    

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement"), dated as of the Effective Date, is made by and between Seller and Purchaser, who for valuable consideration received, agree as follows:

## Section 1. Purchase and Sale of Property; Bankruptcy Court Approval

Seller agrees to sell and Purchaser agrees to purchase on the terms hereafter stated all of Seller's right, title, and interest in the Property free and clear of any and all encumbrances, liens, attachments, claims, or obligations, except Permitted Exceptions, together with any and all rights, interests, easements, hereditaments, appurtenances thereto, and all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104, and all buildings, improvements, and fixtures thereon. This Agreement is subject to the Bankruptcy Court's approval. Seller covenants that it will file a petition or motion for approval with the Bankruptcy Court upon execution of this Agreement by Purchaser seeking a hearing on or before July 15, 2010, if possible, and otherwise at the earliest possible date on the Bankruptcy Court's calendar and Seller shall diligently process the approval. Purchaser acknowledges that it understands the Bankruptcy Court approval process includes offering the Property for sale in open court for a price in excess of the Purchase Price but otherwise on the same terms and conditions set forth in this Agreement. In the event that one or more of the provisions of this Agreement are objected to in the Bankruptcy Court approval proceeding, Purchaser may either: (i) agree to strike the objectionable provision or provisions; or (ii) terminate this Agreement. In the event that Purchaser elects to terminate this Agreement instead of striking the provision or provisions in dispute, and Purchaser is not in default, the Earnest Money Deposit shall be returned to Purchaser. Upon termination of this Agreement pursuant to the provisions of this Section 1, this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end.

## Section 2. Purchase Price

On the Effective Date, the parties shall open an escrow with the Title and Escrow Holder and Purchaser shall deposit cash in the amount equal to the Earnest Money Deposit with Escrow Holder.

(a)     Earnest Money Deposit. Escrow Holder shall disburse the Earnest Money Deposit to Purchaser or Seller, as applicable, in accordance with the terms of this Agreement. In the event of a default by Purchaser hereunder, Section 10 hereof of this Agreement shall determine Seller's and Purchaser's rights to the Earnest Money Deposit. In the event that the conditions precedent set forth in Section 4(a)(i) below have not been satisfied or waived in writing by Purchaser prior to the end of the Due Diligence Period, and Purchaser is not then in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller. Notwithstanding the foregoing, in the event that one or more of the Closing Conditions (as set forth in Sections 5(a) and 5(b) hereof) have not been

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement"), dated as of the Effective Date, is made by and between Seller and Purchaser, who for valuable consideration received, agree as follows:

### Section 1. Purchase and Sale of Property; Bankruptcy Court Approval

Seller agrees to sell and Purchaser agrees to purchase on the terms hereafter stated all of Seller's right, title, and interest in the Property free and clear of any and all encumbrances, liens, attachments, claims, or obligations, except Permitted Exceptions, together with any and all rights, interests, easements, hereditaments, appurtenances thereto, and all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104, and all buildings, improvements, and fixtures thereon. This Agreement is subject to the Bankruptcy Court's approval. Seller covenants that it will file a petition or motion for approval with the Bankruptcy Court upon execution of this Agreement by Purchaser seeking a hearing on or before July 15, 2010, if possible, and otherwise at the earliest possible date on the Bankruptcy Court's calendar and Seller shall diligently process the approval. Purchaser acknowledges that it understands the Bankruptcy Court approval process includes offering the Property for sale in open court for a price in excess of the Purchase Price but otherwise on the same terms and conditions set forth in this Agreement. In the event that one or more of the provisions of this Agreement are objected to in the Bankruptcy Court approval proceeding, Purchaser may either: (i) agree to strike the objectionable provision or provisions; or (ii) terminate this Agreement. In the event that Purchaser elects to terminate this Agreement instead of striking the provision or provisions in dispute, and Purchaser is not in default, the Earnest Money Deposit shall be returned to Purchaser. Upon termination of this Agreement pursuant to the provisions of this Section 1, this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end.

### Section 2. Purchase Price

On the Effective Date, the parties shall open an escrow with the Title and Escrow Holder and Purchaser shall deposit cash in the amount equal to the Earnest Money Deposit with Escrow Holder.

(a)    Earnest Money Deposit. Escrow Holder shall disburse the Earnest Money Deposit to Purchaser or Seller, as applicable, in accordance with the terms of this Agreement. In the event of a default by Purchaser hereunder, Section 10 hereof of this Agreement shall determine Seller's and Purchaser's rights to the Earnest Money Deposit. In the event that the conditions precedent set forth in Section 4(a)(i) below have not been satisfied or waived in writing by Purchaser prior to the end of the Due Diligence Period, and Purchaser is not then in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller. Notwithstanding the foregoing, in the event that one or more of the Closing Conditions (as set forth in Sections 5(a) and 5(b) hereof) have not been

*Execution Copy*                                    4                    

satisfied or waived in writing prior to the Close of Escrow, and Purchaser shall not then be in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset or the prior approval of Seller. Upon the Close of Escrow, the Earnest Money Deposit shall be applied against the Purchase Price or the Cash at Closing (as defined in Section 2(b) below).

(b)     Cash at Closing. On or before the Close of Escrow, Purchaser shall deposit with Escrow Holder by federal wire transfer or cashier's check, cash in the sum equal to the Purchase Price, together with all of Purchaser's closing costs and prorations, less the Earnest Money Deposit, and Additional Deposits ("Cash at Closing").

## Section 3. Purchaser's Due Diligence

(a)     <u>Due Diligence Deliveries by Seller</u>. Seller acquired title to the Property as a result of a foreclosure on the Deed of Trust, which foreclosure was completed by the recordation of the Trustee's Deed on June 2, 2010. Seller will make available to Purchaser, within two (2) business days after the Effective Date, any documents within the Seller's possession that relate to the Property that are available to the Seller ("Due Diligence Materials") as follows:

(i)     Improvement Plans for the Village at Centennial Hills, a commercial subdivision, marked Preliminary, prepared for Breslin Builders by JHR Associates, Ltd.

(b)     <u>Purchaser's Right to Conduct Due Diligence</u>. During the Due Diligence Period, Purchaser shall have the right to inspect and approve all Due Diligence Materials and all physical, environmental, legal and any other matters relating to the Property (including zoning, land use and similar public agency or governmental conditions or approvals with respect to the ownership, operation and use of the Property) as Purchaser may, in Purchaser's judgment, elect to investigate at Purchaser's cost; and, during the Due Diligence Period, Purchaser shall be permitted to make complete physical, environmental, legal, and other inspections of the Property (at Purchaser's cost) and to make and remove copies of any and all records and files regarding the Property; provided, however, neither Purchaser nor any agent or consultant acting on behalf of Purchaser shall conduct any Phase II environmental testing, boring, or other entry or disturbance of any sort on the Property without prior notice to and written consent from Seller. If Purchaser, in Purchaser's sole and absolute discretion, is satisfied with all of the Due Diligence Materials and all of the inspections or investigations Purchaser elects to undertake as described above, Purchaser shall give written notice of such satisfaction to Seller prior to the end of the Due Diligence Period ("Notice of Due Diligence Approval"). If Purchaser does not provide a Notice of Due Diligence Approval, the condition of the Property shall be disapproved and, except as otherwise provided, this Agreement shall terminate and the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller provided Purchaser shall not then be in default hereunder. Regardless, Purchaser, during the Due Diligence Period, may, at its sole discretion and for any

*Execution Copy*                                          5

satisfied or waived in writing prior to the Close of Escrow, and Purchaser shall not then be in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset or the prior approval of Seller. Upon the Close of Escrow, the Earnest Money Deposit shall be applied against the Purchase Price or the Cash at Closing (as defined in Section 2(b) below).

(b)    Cash at Closing. On or before the Close of Escrow, Purchaser shall deposit with Escrow Holder by federal wire transfer or cashier's check, cash in the sum equal to the Purchase Price, together with all of Purchaser's closing costs and prorations, less the Earnest Money Deposit, and Additional Deposits ("Cash at Closing").

### Section 3. Purchaser's Due Diligence

(a)    <u>Due Diligence Deliveries by Seller</u>. Seller acquired title to the Property as a result of a foreclosure on the Deed of Trust, which foreclosure was completed by the recordation of the Trustee's Deed on June 2, 2010.  Seller will make available to Purchaser, within two (2) business days after the Effective Date, any documents within the Seller's possession that relate to the Property that are available to the Seller ("Due Diligence Materials") as follows:

(i)    Improvement Plans for the Village at Centennial Hills, a commercial subdivision, marked Preliminary, prepared for Breslin Builders by JHR Associates, Ltd.

(b)    <u>Purchaser's Right to Conduct Due Diligence</u>. During the Due Diligence Period, Purchaser shall have the right to inspect and approve all Due Diligence Materials and all physical, environmental, legal and any other matters relating to the Property (including zoning, land use and similar public agency or governmental conditions or approvals with respect to the ownership, operation and use of the Property) as Purchaser may, in Purchaser's judgment, elect to investigate at Purchaser's cost; and, during the Due Diligence Period, Purchaser shall be permitted to make complete physical, environmental, legal, and other inspections of the Property (at Purchaser's cost) and to make and remove copies of any and all records and files regarding the Property; provided, however, neither Purchaser nor any agent or consultant acting on behalf of Purchaser shall conduct any Phase II environmental testing, boring, or other entry or disturbance of any sort on the Property without prior notice to and written consent from Seller. If Purchaser, in Purchaser's sole and absolute discretion, is satisfied with all of the Due Diligence Materials and all of the inspections or investigations Purchaser elects to undertake as described above, Purchaser shall give written notice of such satisfaction to Seller prior to the end of the Due Diligence Period ("Notice of Due Diligence Approval").  If Purchaser does not provide a Notice of Due Diligence Approval, the condition of the Property shall be disapproved and, except as otherwise provided, this Agreement shall terminate and the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller provided Purchaser shall not then be in default hereunder.  Regardless, Purchaser, during the Due Diligence Period, may, at its sole discretion and for any

*Execution Copy*                                    5                     

reason whatsoever, elect to terminate this Agreement and not proceed with the intended purchase and sale and the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller.

## Section 4. Conditions Precedent

(a)    _Purchaser's Conditions_. Purchaser's obligation to purchase the Property shall be subject to and contingent upon the satisfaction or written waiver of the following:

(i)    Purchaser shall have delivered the Notice of Due Diligence Approval to Seller prior to the end of the Due Diligence Period;

(ii)    Purchaser shall order a preliminary title report of the Property ("Title Report") on or before 5 p.m. the day after the Effective Date and shall have the opportunity to review and approve such Title Report, together with a copy of each of the documents noted as exceptions in the Title Report; provided, within seven (7) days after receipt of the Title Report, Purchaser shall notify Seller of any objections Purchaser may have thereto (the "Objections"). If, within five (5) days after such notice of Purchaser to Seller, Seller notifies Purchaser that Seller will not remove any of the Objections, then as to each such Objection Seller will not satisfy, Purchaser may elect to provide Seller with written notice of either acceptance of rejection of such Objections within 2 business days after receipt of notice from Seller. If Buyer elects to accept the Objections, this Escrow shall close without any claim, deduction or offset relating to such waived Objections. The title exceptions approved by Purchaser, and any other exceptions which Purchaser expressly approves in writing, shall be referred to hereinafter as the "Permitted Exceptions, " but specifically excluding any and all mortgages or Deeds of Trust, Loan Agreements, Promissory Notes, or any amendments or modifications thereto, which not be deemed or defined as "Permitted Exceptions," and which must be extinguished, removed, or reconveyed prior to the Closing and if not done so, or Purchaser rejects Seller's Objections, Purchaser has the absolute right to terminate this Agreement and the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller, and this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end;

(iii)    Purchaser's review and approval as being in compliance with this Agreement and the Non-Foreign Certificate.

(b)    _Seller's Conditions_. Seller's obligation to sell the Property shall be subject to and contingent upon, to Seller's sole satisfaction:

(i)    Purchaser's performance of each and every covenant required to be performed by Purchaser hereunder on or before the Close of Escrow; and

_Execution Copy_                                            6

reason whatsoever, elect to terminate this Agreement and not proceed with the intended purchase and sale and the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller.

### Section 4. Conditions Precedent

(a)    Purchaser's Conditions. Purchaser's obligation to purchase the Property shall be subject to and contingent upon the satisfaction or written waiver of the following:

(i)    Purchaser shall have delivered the Notice of Due Diligence Approval to Seller prior to the end of the Due Diligence Period;

(ii)    Purchaser shall order a preliminary title report of the Property ("Title Report") on or before 5 p.m. the day after the Effective Date and shall have the opportunity to review and approve such Title Report, together with a copy of each of the documents noted as exceptions in the Title Report; provided, within seven (7) days after receipt of the Title Report, Purchaser shall notify Seller of any objections Purchaser may have thereto (the "Objections"). If, within five (5) days after such notice of Purchaser to Seller, Seller notifies Purchaser that Seller will not remove any of the Objections, then as to each such Objection Seller will not satisfy, Purchaser may elect to provide Seller with written notice of either acceptance of rejection of such Objections within 2 business days after receipt of notice from Seller. If Buyer elects to accept the Objections, this Escrow shall close without any claim, deduction or offset relating to such waived Objections. The title exceptions approved by Purchaser, and any other exceptions which Purchaser expressly approves in writing, shall be referred to hereinafter as the "Permitted Exceptions, " but specifically excluding any and all mortgages or Deeds of Trust, Loan Agreements, Promissory Notes, or any amendments or modifications thereto, which not be deemed or defined as "Permitted Exceptions," and which must be extinguished, removed, or reconveyed prior to the Closing and if not done so, or Purchaser rejects Seller's Objections, Purchaser has the absolute right to terminate this Agreement and the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller, and this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end;

(iii)    Purchaser's review and approval as being in compliance with this Agreement and the Non-Foreign Certificate.

(b)    Seller's Conditions. Seller's obligation to sell the Property shall be subject to and contingent upon, to Seller's sole satisfaction:

(i)    Purchaser's performance of each and every covenant required to be performed by Purchaser hereunder on or before the Close of Escrow; and



*Execution Copy*                                      6

(ii)    the truth and accurateness of each of Purchaser's representations, warranties and covenants, as set forth in Section 8 of this Agreement as of the Close of Escrow.

(c)    <u>Failure or Waiver of Conditions Precedent</u>. In the event any of the conditions set forth above in Section 4(a) hereof are not satisfied or waived in writing prior to the end of the Due Diligence Period, Purchaser may terminate this Agreement, whereby all rights and obligations hereunder of each party shall be at an end, and the Earnest Money Deposit shall be returned to Purchaser, without demand, deduction, offset, or the prior approval of Seller provided Purchaser shall not then be in default hereunder. In the event any of the conditions set forth above in Section 4(b) hereof is not satisfied or waived in writing prior to the Close of Escrow, Seller may (i) terminate this Agreement, whereby all rights and obligations hereunder of each party shall be at an end, and the Earnest Money Deposit shall be paid over to Seller as liquidated damages pursuant to Section 10 of this Agreement; or (ii) elect to close the transaction. Purchaser or Seller may elect, at any time or times on or before the date specified for the approval of the condition, to waive in writing the benefit of any of their respective conditions set forth in Section 4(a) or Section 4(b) above, as applicable. Purchaser's and Seller's consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either party to this Agreement).

## Section 5. Closing Conditions

(a)    The willingness of Title Company to issue, upon the sole condition of the payment of its regularly scheduled premium, a ALTA Owner's policy of title insurance, with such endorsements as Purchaser may reasonably require (collectively, the "Title Policy"), insuring Purchaser in the amount of the Purchase Price that fee simple title to the Real Property as vested in Purchaser as of the Close of Escrow, subject only to the standard printed conditions and exceptions and the Permitted Exceptions; and

(b)    The entry of an Order from the Bankruptcy Court approving the sale to Purchaser on the terms of this Agreement. If the Bankruptcy Court does not approve this Agreement and the sale to Purchaser, and Purchaser is not in default, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, or offset.

(c)    The transfer of all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104. If necessary, Seller shall provide a corrected Trustee's Deed to Purchaser prior to or at the Closing providing for the transfer of all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104.

(ii)    the truth and accurateness of each of Purchaser's representations, warranties and covenants, as set forth in Section 8 of this Agreement as of the Close of Escrow.

(c)    Failure or Waiver of Conditions Precedent. In the event any of the conditions set forth above in Section 4(a) hereof are not satisfied or waived in writing prior to the end of the Due Diligence Period, Purchaser may terminate this Agreement, whereby all rights and obligations hereunder of each party shall be at an end, and the Earnest Money Deposit shall be returned to Purchaser, without demand, deduction, offset, or the prior approval of Seller provided Purchaser shall not then be in default hereunder. In the event any of the conditions set forth above in Section 4(b) hereof is not satisfied or waived in writing prior to the Close of Escrow, Seller may (i) terminate this Agreement, whereby all rights and obligations hereunder of each party shall be at an end, and the Earnest Money Deposit shall be paid over to Seller as liquidated damages pursuant to Section 10 of this Agreement; or (ii) elect to close the transaction. Purchaser or Seller may elect, at any time or times on or before the date specified for the approval of the condition, to waive in writing the benefit of any of their respective conditions set forth in Section 4(a) or Section 4(b) above, as applicable. Purchaser's and Seller's consent to the Close of Escrow shall waive any remaining unfulfilled conditions (but such waiver shall not be deemed to waive any subsequently discovered breach of any representation, warranty or covenant made by either party to this Agreement).

## Section 5. Closing Conditions

(a)    The willingness of Title Company to issue, upon the sole condition of the payment of its regularly scheduled premium, a ALTA Owner's policy of title insurance, with such endorsements as Purchaser may reasonably require (collectively, the "Title Policy"), insuring Purchaser in the amount of the Purchase Price that fee simple title to the Real Property as vested in Purchaser as of the Close of Escrow, subject only to the standard printed conditions and exceptions and the Permitted Exceptions; and

(b)    The entry of an Order from the Bankruptcy Court approving the sale to Purchaser on the terms of this Agreement. If the Bankruptcy Court does not approve this Agreement and the sale to Purchaser, and Purchaser is not in default, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, or offset.

(c)    The transfer of all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104. If necessary, Seller shall provide a corrected Trustee's Deed to Purchaser prior to or at the Closing providing for the transfer of all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104.



*Execution Copy*                                    7

(c)    In the event that either of the Closing Conditions described above in Sections 5(a) or (b) hereof, has not been satisfied or waived in writing by Purchaser prior to the Close of Escrow, this Agreement shall terminate upon written notice of termination delivered by Purchaser to Seller, as appropriate, whereupon, provided Purchaser shall not then be in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller and, upon such written notice of termination, this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end.

### Section 6. Close of Escrow

Concurrently herewith, Seller and Purchaser shall open an escrow (the "Escrow") with Escrow Holder for the purchase and sale contemplated by this Agreement. Purchaser and Seller agree that such escrow shall be closed and the purchase and sale shall be consummated (the "Close of Escrow") on or before the Closing Date. Close of Escrow shall occur in the following manner:

(a)    Seller's Deliveries into Escrow. Prior to the Close of Escrow, Seller shall deliver to the Escrow the following (all documents shall be duly executed by Seller and shall be acknowledged where required):

(i)    a grant, bargain and sale deed to the Real Property providing, if necessary, for the transfer of all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104 (the "Deed");

(ii)    a certificate from Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code ("Non-Foreign Certificate");

(iii)    Seller's written escrow instructions to close Escrow in accordance with the terms of this Agreement.

(b)    Purchaser's Deliveries into Escrow. Prior to the Close of Escrow, Purchaser shall deliver to the Escrow the following:

(i)    all cash required by the terms of this Agreement to close Escrow, plus or minus closing adjustments and prorations;

(ii)    Purchaser's written instructions to close Escrow in accordance with the terms of this Agreement; and

(iii)    any other documents reasonably necessary to close the transactions contemplated under this Agreement.

(c)    In the event that either of the Closing Conditions described above in Sections 5(a) or (b) hereof, has not been satisfied or waived in writing by Purchaser prior to the Close of Escrow, this Agreement shall terminate upon written notice of termination delivered by Purchaser to Seller, as appropriate, whereupon, provided Purchaser shall not then be in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller and, upon such written notice of termination, this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end.

## Section 6. Close of Escrow

Concurrently herewith, Seller and Purchaser shall open an escrow (the "Escrow") with Escrow Holder for the purchase and sale contemplated by this Agreement. Purchaser and Seller agree that such escrow shall be closed and the purchase and sale shall be consummated (the "Close of Escrow") on or before the Closing Date. Close of Escrow shall occur in the following manner:

(a)    <u>Seller's Deliveries into Escrow</u>. Prior to the Close of Escrow, Seller shall deliver to the Escrow the following (all documents shall be duly executed by Seller and shall be acknowledged where required):

(i)    a grant, bargain and sale deed to the Real Property providing, if necessary, for the transfer of all Special Declarant's Rights pertaining to the Property under any Declaration of Covenants, Conditions, Restrictions, and Reservation of Easements pursuant to NRS 116.3104 (the "Deed");

(ii)    a certificate from Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code ("Non-Foreign Certificate");

(iii)    Seller's written escrow instructions to close Escrow in accordance with the terms of this Agreement.

(b)    <u>Purchaser's Deliveries into Escrow</u>. Prior to the Close of Escrow, Purchaser shall deliver to the Escrow the following:

(i)    all cash required by the terms of this Agreement to close Escrow, plus or minus closing adjustments and prorations;

(ii)    Purchaser's written instructions to close Escrow in accordance with the terms of this Agreement; and

(iii)    any other documents reasonably necessary to close the transactions contemplated under this Agreement.



(c)    Escrow Holder's Duties. On the Close of Escrow, Escrow Holder shall effect the same by:

(i)    recording all documents as may be necessary to clear title in accordance with the requirements of this Agreement;

(ii)    recording the Deed and instructing the county recorder not to affix the amount of any documentary or transfer taxes to the Deed but to attach a separate statement to the Deed after recording;

(iii)    paying all closing costs and making all prorations in accordance with the terms of this Agreement and a statement of adjustments and prorations as approved by Purchaser and Seller prior to the Close of Escrow;

(iv)    delivering to Purchaser the Title Policy, Escrow Holder's certified closing statement, a copy of the recorded Deed, Non-Foreign Certificate;

(v)    delivering to Seller the Purchase Price, plus or minus closing adjustments and prorations, Escrow Holder's certified closing statement, and a copy of the recorded Deed.

## Section 7. Closing Adjustments and Prorations

Except as set forth in this Section 7, the adjustments and prorations set forth below shall be made at the Close of Escrow. For the purposes of this Section 7, the term "Proration Date" shall be defined as 11:59 p.m. on the day preceding the Close of Escrow. All prorations shall be made on the basis of the actual number of days of the year and month which have elapsed as of the Proration Date.

(a)    Closing Costs. Seller and Purchaser shall pay the Closing Costs identified and allocated above. All other closing costs incurred in connection with this transaction shall be apportioned in accordance with local custom.

(b)    Real Estate Taxes. All real estate taxes and assessments and personal property taxes levied or assessed against the Property shall be prorated between Purchaser and Seller as of the Proration Date, according to the current tax year based on the most recent tax bills for the Property, Seller being charged and credited for the same up to the Proration Date, and Purchaser being charged and credited for the same thereafter. Seller shall pay any assessments which are secured by a lien against the Real Property, provided, however, Seller shall not be obligated to pay assessments which are payable in installments over time. Seller will pay installments of assessments prorated through the Proration Date and Purchaser shall be responsible for payment of all installments thereafter. If at any time after the Proration Date additional or supplemental real estate taxes are assessed against the Property by reason of any event occurring prior to the Proration Date, or there is any rebate of such taxes,

(c)    <u>Escrow Holder's Duties</u>. On the Close of Escrow, Escrow Holder shall effect the same by:

(i)    recording all documents as may be necessary to clear title in accordance with the requirements of this Agreement;

(ii)    recording the Deed and instructing the county recorder not to affix the amount of any documentary or transfer taxes to the Deed but to attach a separate statement to the Deed after recording;

(iii)    paying all closing costs and making all prorations in accordance with the terms of this Agreement and a statement of adjustments and prorations as approved by Purchaser and Seller prior to the Close of Escrow;

(iv)    delivering to Purchaser the Title Policy, Escrow Holder's certified closing statement, a copy of the recorded Deed, Non-Foreign Certificate;

(v)    delivering to Seller the Purchase Price, plus or minus closing adjustments and prorations, Escrow Holder's certified closing statement, and a copy of the recorded Deed.

## Section 7. Closing Adjustments and Prorations

Except as set forth in this Section 7, the adjustments and prorations set forth below shall be made at the Close of Escrow. For the purposes of this Section 7, the term "Proration Date" shall be defined as 11:59 p.m. on the day preceding the Close of Escrow. All prorations shall be made on the basis of the actual number of days of the year and month which have elapsed as of the Proration Date.

(a)    <u>Closing Costs</u>. Seller and Purchaser shall pay the Closing Costs identified and allocated above. All other closing costs incurred in connection with this transaction shall be apportioned in accordance with local custom.

(b)    <u>Real Estate Taxes</u>. All real estate taxes and assessments and personal property taxes levied or assessed against the Property shall be prorated between Purchaser and Seller as of the Proration Date, according to the current tax year based on the most recent tax bills for the Property, Seller being charged and credited for the same up to the Proration Date, and Purchaser being charged and credited for the same thereafter. Seller shall pay any assessments which are secured by a lien against the Real Property, provided, however, Seller shall not be obligated to pay assessments which are payable in installments over time. Seller will pay installments of assessments prorated through the Proration Date and Purchaser shall be responsible for payment of all installments thereafter. If at any time after the Proration Date additional or supplemental real estate taxes are assessed against the Property by reason of any event occurring prior to the Proration Date, or there is any rebate of such taxes,

*Execution Copy*                                         9                            

Purchaser and Seller shall promptly re-prorate such taxes, and any amounts due from one party to the other shall be paid in cash at that time.

(c)    <u>Calculations for Closing</u>. Escrow Holder shall make a preliminary calculation of prorations no later than three (3) days prior to the Proration Date and a final calculation no later than one (1) day prior to the Proration Date. The final calculation shall be executed by each party and may be relied upon by Escrow Holder in completing the closing adjustments and prorations. In the event incomplete information is available, or estimates have been utilized to calculate prorations as of the Proration Date, any prorations relating thereto shall be further adjusted and completed outside of Escrow within sixty (60) days after the Proration Date or as and when complete information becomes available to Purchaser and Seller.  Any adjustments to initial estimated prorations which are required upon review of such complete information shall be made by Purchaser and Seller, with due diligence and cooperation, by prompt cash payment to the party entitled to a credit as a result of such adjustments. Any errors or adjustments in calculations of the foregoing adjustments shall be corrected or adjusted as soon as practicable after the Close of Escrow; provided, however, the provisions hereof shall survive the Close of Escrow for not more than twelve (12) months after the Close of Escrow.

## Section 8. Covenants, Representations and Warranties

(a)    <u>Seller's Representations, Warranties and Covenants</u>.  Seller hereby represents and warrants to Purchaser as of the Effective Date (which representations and warranties shall be deemed remade by Seller as of the Close of Escrow) the following, and such representations, warranties and covenants shall survive the Close of Escrow for a period of one (1) year.

(i)    Subject to the approval of this Agreement and the transaction contemplated hereby by the Bankruptcy Court, Seller has full power and authority to enter into this Agreement and any other documents contemplated by this Agreement and to assume and perform all of Seller's obligations hereunder; the persons executing this Agreement and any other documents contemplated by this Agreement on behalf of Seller have been authorized and empowered to bind Seller thereto; and this Agreement is, and each instrument and document to be executed by Seller hereunder shall be, a valid, legally binding obligation of Seller enforceable against Seller in accordance with its terms;

(ii)    Seller, within five (5) days following the Effective Date, shall deliver to Purchaser such documentation as Purchaser requests in writing to evidence the matters set forth in Section 8(a)(i) above, including without limitation as applicable (a) corporate or other resolutions authorizing the transactions contemplated herein, and (b) formation documents, including without limitation, articles of incorporation, and by-laws;

(iii)    To the best of Seller's knowledge, there are no Hazardous Materials in, on, about, under or affecting the Property. For purposes of this Agreement,

Purchaser and Seller shall promptly re-prorate such taxes, and any amounts due from one party to the other shall be paid in cash at that time.

(c)    Calculations for Closing. Escrow Holder shall make a preliminary calculation of prorations no later than three (3) days prior to the Proration Date and a final calculation no later than one (1) day prior to the Proration Date. The final calculation shall be executed by each party and may be relied upon by Escrow Holder in completing the closing adjustments and prorations. In the event incomplete information is available, or estimates have been utilized to calculate prorations as of the Proration Date, any prorations relating thereto shall be further adjusted and completed outside of Escrow within sixty (60) days after the Proration Date or as and when complete information becomes available to Purchaser and Seller. Any adjustments to initial estimated prorations which are required upon review of such complete information shall be made by Purchaser and Seller, with due diligence and cooperation, by prompt cash payment to the party entitled to a credit as a result of such adjustments. Any errors or adjustments in calculations of the foregoing adjustments shall be corrected or adjusted as soon as practicable after the Close of Escrow; provided, however, the provisions hereof shall survive the Close of Escrow for not more than twelve (12) months after the Close of Escrow.

## Section 8. Covenants, Representations and Warranties

(a)    Seller's Representations, Warranties and Covenants. Seller hereby represents and warrants to Purchaser as of the Effective Date (which representations and warranties shall be deemed remade by Seller as of the Close of Escrow) the following, and such representations, warranties and covenants shall survive the Close of Escrow for a period of one (1) year.

(i)    Subject to the approval of this Agreement and the transaction contemplated hereby by the Bankruptcy Court, Seller has full power and authority to enter into this Agreement and any other documents contemplated by this Agreement and to assume and perform all of Seller's obligations hereunder; the persons executing this Agreement and any other documents contemplated by this Agreement on behalf of Seller have been authorized and empowered to bind Seller thereto; and this Agreement is, and each instrument and document to be executed by Seller hereunder shall be, a valid, legally binding obligation of Seller enforceable against Seller in accordance with its terms;

(ii)    Seller, within five (5) days following the Effective Date, shall deliver to Purchaser such documentation as Purchaser requests in writing to evidence the matters set forth in Section 8(a)(i) above, including without limitation as applicable (a) corporate or other resolutions authorizing the transactions contemplated herein, and (b) formation documents, including without limitation, articles of incorporation, and by-laws;

(iii)    To the best of Seller's knowledge, there are no Hazardous Materials in, on, about, under or affecting the Property. For purposes of this Agreement,

*Execution Copy*                          10                          

the term "Hazardous Materials" shall mean any toxic or hazardous materials or any other substance which constitutes, or is regulated as, a hazardous, extremely hazardous, toxic, extremely toxic or similarly dangerous material, substance or waste under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. §§9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C.A. §§6901 et seq,;

(iv)    To the best of Seller's knowledge there are no claims, suits, other proceedings, or actions (other than the Bankruptcy action), including without limitation any condemnation proceedings, and Seller is not aware of any state of facts which, with the passage of time, may reasonably result in the development of such claims, suits, actions, or other proceedings, pending or threatened against the Property or which would have a material effect on Seller's ownership of the Property;

(v)    To the best of Seller's knowledge, there are no leases involving or concerning the Property;

(vi)    To the best of Seller's knowledge, Seller has not incurred any obligation or liability of any nature whatsoever, contingent or otherwise, which is or shall become a lien or other encumbrance on the Property, nor has Seller engaged in any action with respect to the Property which could give rise to a claim against the Property, other than the Bankruptcy action. Also, to the best of Seller's knowledge, all work that has been performed in, on or about the Property and materials furnished in connection therewith which might, in any circumstance, give rise to a mechanic's or materialman's lien either have been paid for, or as to work presently in progress or contemplated hereunder by Seller, Seller shall promptly pay for such work as payment becomes due and all waivers of rights to a mechanic's or materialman's lien have been obtained or, as to work presently in progress, Seller shall promptly obtain releases, waivers of lien rights as to any such work and shall fully indemnify Purchaser and hold Purchaser harmless from and against all mechanic's and materialman's liens resulting from any actions of Seller. Purchaser shall promptly pay for any and all work performed in, on or about the Property as a result of any undertakings by Purchaser during the escrow period, which undertakings might give rise to a mechanic's or materialman's lien, and Purchaser shall promptly obtain the appropriate releases/waivers of rights to mechanics'/materialman's liens as to any work undertaken or contemplated by Purchaser hereunder, and shall fully indemnify Seller and hold Seller harmless from and against any mechanics' or materialman's liens resulting from the actions of Purchaser;

(vii)    except as disclosed in the Due Diligence Materials and to the report, Seller does not have actual knowledge of any condition of or relating to the Property, including conditions of adjacent or proximate properties and governmental actions which would materially impact Purchaser's development of the Property;

(viii)    Should Purchaser or Seller become aware of any information prior to Closing that renders any of Seller's representations and warranties in Sections 8(a)(i) through (vii) untrue, Seller shall provide written notice to the other of same. Seller shall,

*Execution Copy*                                11

the term "Hazardous Materials" shall mean any toxic or hazardous materials or any other substance which constitutes, or is regulated as, a hazardous, extremely hazardous, toxic, extremely toxic or similarly dangerous material, substance or waste under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. §§9601 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C.A. §§6901 et seq,;

        (iv)    To the best of Seller's knowledge there are no claims, suits, other proceedings, or actions (other than the Bankruptcy action), including without limitation any condemnation proceedings, and Seller is not aware of any state of facts which, with the passage of time, may reasonably result in the development of such claims, suits, actions, or other proceedings, pending or threatened against the Property or which would have a material effect on Seller's ownership of the Property;

        (v)    To the best of Seller's knowledge, there are no leases involving or concerning the Property;

        (vi)    To the best of Seller's knowledge, Seller has not incurred any obligation or liability of any nature whatsoever, contingent or otherwise, which is or shall become a lien or other encumbrance on the Property, nor has Seller engaged in any action with respect to the Property which could give rise to a claim against the Property, other than the Bankruptcy action. Also, to the best of Seller's knowledge, all work that has been performed in, on or about the Property and materials furnished in connection therewith which might, in any circumstance, give rise to a mechanic's or materialman's lien either have been paid for, or as to work presently in progress or contemplated hereunder by Seller, Seller shall promptly pay for such work as payment becomes due and all waivers of rights to a mechanic's or materialman's lien have been obtained or, as to work presently in progress, Seller shall promptly obtain releases, waivers of lien rights as to any such work and shall fully indemnify Purchaser and hold Purchaser harmless from and against all mechanic's and materialman's liens resulting from any actions of Seller. Purchaser shall promptly pay for any and all work performed in, on or about the Property as a result of any undertakings by Purchaser during the escrow period, which undertakings might give rise to a mechanic's or materialman's lien, and Purchaser shall promptly obtain the appropriate releases/waivers of rights to mechanics'/materialman's liens as to any work undertaken or contemplated by Purchaser hereunder, and shall fully indemnify Seller and hold Seller harmless from and against any mechanics' or materialman's liens resulting from the actions of Purchaser;

        (vii)    except as disclosed in the Due Diligence Materials and to the report, Seller does not have actual knowledge of any condition of or relating to the Property, including conditions of adjacent or proximate properties and governmental actions which would materially impact Purchaser's development of the Property;

        (viii)    Should Purchaser or Seller become aware of any information prior to Closing that renders any of Seller's representations and warranties in Sections 8(a)(i) through (vii) untrue, Seller shall provide written notice to the other of same. Seller shall,

at Closing, certify to Purchaser that all representations and warranties Sections 8(a)(i) through (vii) remain true, complete and accurate as of the Closing, or if either Purchaser or Seller has provided notice to the other per the preceding sentence, that the remaining representations and warranties in Sections 8(a)(i) through (vii) remain true, complete and accurate as of the Closing. If either party provides the notice contemplated in the first sentence of this Section 8(a)(viii), and Seller is unable or unwilling to undertake such actions as are necessary to rectify the conflict and allow Seller to certify to Purchaser that all representations and warranties in Sections 8(a)(i) through (vii) remain true, complete and accurate as of the Closing, or Purchaser and Seller disagree that Seller's certification of its representations and warranties is complete and accurate, Purchaser shall have the right, exercisable by Purchaser, in Purchaser's absolute and unrestricted discretion, to terminate this Agreement and all funds and documents which have been deposited or delivered to the Title Company in accordance with this Agreement shall be returned to the party having deposited same, within two (2) days of notice of termination of this Agreement and this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end;

(ix)    Seller shall also indemnify, defend by counsel reasonably acceptable to Seller and hold Purchaser harmless from and against any and all losses, claims, causes of action, damages and expenses (including reasonable attorney's fees and court costs) caused by, incident to, resulting from, or in any way arising out of the Property beginning from the date that Seller became the owner of the Property pursuant to the terms and conditions of a Trustee's Deed and continuing until the Closing, this Agreement, or the intended purchase and sale contemplated herein. Such indemnity shall survive termination of this Agreement and the Close of Escrow for one (1) year and not be merged therein;

(b)    Purchaser's Representations, Warranties and Covenants. Purchaser hereby represents and warrants to Seller as of the Effective Date (which representations and warranties shall be deemed remade by Purchaser as of the Close of Escrow) the following, and such representations, warranties and covenants shall survive the Close of Escrow for a period of one (1) year:

(i)    Purchaser has full power and authority to enter into this Agreement and any other documents contemplated by this Agreement and to assume and perform all of Purchaser's obligations hereunder; the persons executing this Agreement and any other documents contemplated by this Agreement on behalf of Purchaser have been authorized and empowered to bind Purchaser thereto; and this Agreement is, and each instrument and document to be executed by Purchaser hereunder shall be, a valid, legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

(ii)    Purchaser shall retain all necessary professionals and other consultants as Purchaser deems necessary and Purchaser shall make and conduct all such physical and other investigations (including title, zoning, and property entitlements, if any), whether through its own employees or through contractors, engineers, or other

*Execution Copy*                                    12

at Closing, certify to Purchaser that all representations and warranties Sections 8(a)(i) through (vii) remain true, complete and accurate as of the Closing, or if either Purchaser or Seller has provided notice to the other per the preceding sentence, that the remaining representations and warranties in Sections 8(a)(i) through (vii) remain true, complete and accurate as of the Closing. If either party provides the notice contemplated in the first sentence of this Section 8(a)(viii), and Seller is unable or unwilling to undertake such actions as are necessary to rectify the conflict and allow Seller to certify to Purchaser that all representations and warranties in Sections 8(a)(i) through (vii) remain true, complete and accurate as of the Closing, or Purchaser and Seller disagree that Seller's certification of its representations and warranties is complete and accurate, Purchaser shall have the right, exercisable by Purchaser, in Purchaser's absolute and unrestricted discretion, to terminate this Agreement and all funds and documents which have been deposited or delivered to the Title Company in accordance with this Agreement shall be returned to the party having deposited same, within two (2) days of notice of termination of this Agreement and this Agreement and all rights and obligations of Purchaser and Seller under this Agreement shall be at an end;

(ix)    Seller shall also indemnify, defend by counsel reasonably acceptable to Seller and hold Purchaser harmless from and against any and all losses, claims, causes of action, damages and expenses (including reasonable attorney's fees and court costs) caused by, incident to, resulting from, or in any way arising out of the Property beginning from the date that Seller became the owner of the Property pursuant to the terms and conditions of a Trustee's Deed and continuing until the Closing, this Agreement, or the intended purchase and sale contemplated herein. Such indemnity shall survive termination of this Agreement and the Close of Escrow for one (1) year and not be merged therein;

(b)    <u>Purchaser's Representations, Warranties and Covenants</u>. Purchaser hereby represents and warrants to Seller as of the Effective Date (which representations and warranties shall be deemed remade by Purchaser as of the Close of Escrow) the following, and such representations, warranties and covenants shall survive the Close of Escrow for a period of one (1) year:

(i)    Purchaser has full power and authority to enter into this Agreement and any other documents contemplated by this Agreement and to assume and perform all of Purchaser's obligations hereunder; the persons executing this Agreement and any other documents contemplated by this Agreement on behalf of Purchaser have been authorized and empowered to bind Purchaser thereto; and this Agreement is, and each instrument and document to be executed by Purchaser hereunder shall be, a valid, legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

(ii)    Purchaser shall retain all necessary professionals and other consultants as Purchaser deems necessary and Purchaser shall make and conduct all such physical and other investigations (including title, zoning, and property entitlements, if any), whether through its own employees or through contractors, engineers, or other

*Execution Copy*                                    12                         

experts, as Purchaser deems necessary to make Purchaser fully informed as to all conditions, physical or otherwise, of the Property;

(iii)    Purchaser covenants and agrees with Seller that (a) the costs and expenses of Purchaser's investigations made pursuant to the terms of this Agreement shall be borne solely by Purchaser, and (b) Purchaser shall provide to Seller, prior to the making of any inspection or investigation, such evidence of insurance of Purchaser or Purchaser's agents, employees or contractors as Seller may reasonably require.  In the event that the transaction contemplated by this Agreement does not close for any reason, Purchaser shall restore the Property to its condition prior to Purchaser's entry. Purchaser shall indemnify, defend by counsel reasonably acceptable to Seller and hold Seller harmless from and against any and all losses, claims, causes of action, damages and expenses (including reasonable attorney's fees and court costs) caused by, incident to, resulting from, or in any way arising out of any such presence by Purchaser, its agents or representatives on the Property or any test or inspection conducted by any of them with respect to the Property.  Such indemnity shall survive termination of this Agreement and the Close of Escrow for six (6) months and not be merged therein; and

(iv)    Except as expressly otherwise provided for in this Agreement, Purchaser represents, warrants and acknowledges that; (a)Purchaser is buying the Property in its present "AS-IS," "WHERE-IS," and "WITH-ALL FAULTS-AND-VIRTUES" condition, and Purchaser assumes responsibility for ensuring that Purchaser's inspections and evaluations conducted during the Due Diligence Period will enable Purchaser to adequately assess, among other things, the physical condition of the Property, its suitability for Purchaser's purposes, the income and expenses thereof, any and all governmental restrictions and regulations applicable thereto, the existence or absence of all Hazardous Substances thereon, and  the condition, fitness, suitability, valuation and/or utility of the Property for Purchaser's purposes.   Purchaser is purchasing the Property in reliance upon its own investigations and upon only those representations, warranties and covenants of Seller set forth in this Agreement.  Except as otherwise specifically set forth in this Agreement, Purchaser has not relied on and will not rely on any implied warranties, guarantees, statements, representations, or information about the Property, whether made by Seller, Seller's broker, or other individual representing or purporting to represent the Seller.

### Section 9. Casualty and Condemnation

(a)    <u>Material Condemnation</u>. If prior to Close of Escrow, a taking or condemnation of all or a material portion of the Property has occurred or is threatened, Purchaser or Seller may, at their respective option, terminate this Agreement within five (5) days after receipt of notice of such event (and, if necessary, the Close of Escrow shall be extended by the number of days necessary to give Purchaser or Seller, as applicable, this full five (5) day period). For purposes hereof, a material portion shall mean any portion in excess of ten percent (10%) of the total square footage or any lesser portion which, in Purchaser's reasonable discretion, materially impacts the development potential of the Property. If neither party terminates this Agreement, the

experts, as Purchaser deems necessary to make Purchaser fully informed as to all conditions, physical or otherwise, of the Property;

(iii)    Purchaser covenants and agrees with Seller that (a) the costs and expenses of Purchaser's investigations made pursuant to the terms of this Agreement shall be borne solely by Purchaser, and (b) Purchaser shall provide to Seller, prior to the making of any inspection or investigation, such evidence of insurance of Purchaser or Purchaser's agents, employees or contractors as Seller may reasonably require. In the event that the transaction contemplated by this Agreement does not close for any reason, Purchaser shall restore the Property to its condition prior to Purchaser's entry. Purchaser shall indemnify, defend by counsel reasonably acceptable to Seller and hold Seller harmless from and against any and all losses, claims, causes of action, damages and expenses (including reasonable attorney's fees and court costs) caused by, incident to, resulting from, or in any way arising out of any such presence by Purchaser, its agents or representatives on the Property or any test or inspection conducted by any of them with respect to the Property. Such indemnity shall survive termination of this Agreement and the Close of Escrow for six (6) months and not be merged therein; and

(iv)    Except as expressly otherwise provided for in this Agreement, Purchaser represents, warrants and acknowledges that; (a)Purchaser is buying the Property in its present "AS-IS," "WHERE-IS," and "WITH-ALL FAULTS-AND-VIRTUES" condition, and Purchaser assumes responsibility for ensuring that Purchaser's inspections and evaluations conducted during the Due Diligence Period will enable Purchaser to adequately assess, among other things, the physical condition of the Property, its suitability for Purchaser's purposes, the income and expenses thereof, any and all governmental restrictions and regulations applicable thereto, the existence or absence of all Hazardous Substances thereon, and  the condition, fitness, suitability, valuation and/or utility of the Property for Purchaser's purposes.   Purchaser is purchasing the Property in reliance upon its own investigations and upon only those representations, warranties and covenants of Seller set forth in this Agreement. Except as otherwise specifically set forth in this Agreement, Purchaser has not relied on and will not rely on any implied warranties, guarantees, statements, representations, or information about the Property, whether made by Seller, Seller's broker, or other individual representing or purporting to represent the Seller.

### Section 9. Casualty and Condemnation

(a)    <u>Material Condemnation</u>. If prior to Close of Escrow, a taking or condemnation of all or a material portion of the Property has occurred or is threatened, Purchaser or Seller may, at their respective option, terminate this Agreement within five (5) days after receipt of notice of such event (and, if necessary, the Close of Escrow shall be extended by the number of days necessary to give Purchaser or Seller, as applicable, this full five (5) day period). For purposes hereof, a material portion shall mean any portion in excess of ten percent (10%) of the total square footage or any lesser portion which, in Purchaser's reasonable discretion, materially impacts the development potential of the Property. If neither party terminates this Agreement, the



Close of Escrow shall occur as scheduled, provided that (i) Purchaser shall receive a credit against the Purchase Price in an amount equal to the condemnation award actually collected by Seller prior to the Close of Escrow, and (ii) Seller shall assign to Purchaser at the Close of Escrow all of Seller's interest in and to any condemnation award which may be due but unpaid to Seller on account of such occurrence.

(b)    Immaterial Condemnation. If prior to the Close of Escrow, a taking or condemnation of any portion of the Property has occurred or is threatened which is not described in Section 9(a) hereof, neither Purchaser nor Seller may terminate this Agreement, provided that (i) Purchaser shall receive a credit against the Purchase Price in an amount equal to the condemnation award actually collected by Seller prior to the Close of Escrow, and (ii) Seller shall assign to Purchaser at the Close of Escrow all of Seller's interest in and to any condemnation award which may be due but unpaid to Seller on account of such occurrence.

### Section 10. Default

If this transaction should fail to close as provided herein, the following shall occur, as applicable:

(a)    Failure to Close. If this transaction should fail to close as provided herein for any reason whatsoever, except Purchaser's default, this Agreement shall terminate, and upon such termination, all obligations and liabilities of Purchaser and Seller under this Agreement shall terminate; provided, however that any right of Purchaser to damages shall be preserved if failure to close occurred as a result of Seller's willful or intentional default, and whereupon, provided Purchaser shall not then be in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller.

(b)    Purchaser's Default. If this transaction should fail to close as provided herein as a result of Purchaser's default, this Agreement shall terminate upon written notice to Purchaser, and upon such written notice of termination, all obligations of Purchaser and Seller under this Agreement shall terminate, except that Seller shall have a right to liquidated damages as set forth below as Seller's sole remedy.

(c)    LIQUIDATED DAMAGES. IN THE EVENT OF THE FAILURE TO CLOSE ESCROW DUE TO DEFAULT BY PURCHASER IN THE PERFORMANCE OF ITS OBLIGATIONS HEREUNDER, SELLER SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT FORTHWITH AND NEITHER PARTY SHALL HAVE FURTHER OBLIGATIONS TO THE OTHER HEREUNDER EXCEPT SELLER'S RIGHT TO OBTAIN IMMEDIATE DISBURSEMENT OF AND TO RETAIN THE EARNEST MONEY DEPOSIT (OR AS MUCH THEREOF AS HAS BEEN DEPOSITED WITH ESCROW HOLDER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT). SUCH RETENTION OF THE EARNEST MONEY DEPOSIT (OR AS MUCH THEREOF AS HAS BEEN DEPOSITED WITH ESCROW HOLDER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT) IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. SAID AMOUNT SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY PURCHASER, ALL OTHER CLAIMS TO DAMAGES OR OTHER REMEDIES AT LAW OR EQUITY BEING HEREIN EXPRESSLY WAIVED BY SELLER. THE PARTIES ACKNOWLEDGE THAT THE ACTUAL DAMAGES WHICH WOULD RESULT TO

*Execution Copy*

Close of Escrow shall occur as scheduled, provided that (i) Purchaser shall receive a credit against the Purchase Price in an amount equal to the condemnation award actually collected by Seller prior to the Close of Escrow, and (ii) Seller shall assign to Purchaser at the Close of Escrow all of Seller's interest in and to any condemnation award which may be due but unpaid to Seller on account of such occurrence.

(b)    Immaterial Condemnation. If prior to the Close of Escrow, a taking or condemnation of any portion of the Property has occurred or is threatened which is not described in Section 9(a) hereof, neither Purchaser nor Seller may terminate this Agreement, provided that (i) Purchaser shall receive a credit against the Purchase Price in an amount equal to the condemnation award actually collected by Seller prior to the Close of Escrow, and (ii) Seller shall assign to Purchaser at the Close of Escrow all of Seller's interest in and to any condemnation award which may be due but unpaid to Seller on account of such occurrence.

### Section 10. Default

If this transaction should fail to close as provided herein, the following shall occur, as applicable:

(a)    Failure to Close. If this transaction should fail to close as provided herein for any reason whatsoever, except Purchaser's default, this Agreement shall terminate, and upon such termination, all obligations and liabilities of Purchaser and Seller under this Agreement shall terminate; provided, however that any right of Purchaser to damages shall be preserved if failure to close occurred as a result of Seller's willful or intentional default, and whereupon, provided Purchaser shall not then be in default hereunder, the Earnest Money Deposit shall be returned to Purchaser without demand, deduction, offset, or the prior approval of Seller.

(b)    Purchaser's Default. If this transaction should fail to close as provided herein as a result of Purchaser's default, this Agreement shall terminate upon written notice to Purchaser, and upon such written notice of termination, all obligations of Purchaser and Seller under this Agreement shall terminate, except that Seller shall have a right to liquidated damages as set forth below as Seller's sole remedy.

(c)    LIQUIDATED DAMAGES. IN THE EVENT OF THE FAILURE TO CLOSE ESCROW DUE TO DEFAULT BY PURCHASER IN THE PERFORMANCE OF ITS OBLIGATIONS HEREUNDER, SELLER SHALL HAVE THE RIGHT TO TERMINATE THIS AGREEMENT FORTHWITH AND NEITHER PARTY SHALL HAVE FURTHER OBLIGATIONS TO THE OTHER HEREUNDER EXCEPT SELLER'S RIGHT TO OBTAIN IMMEDIATE DISBURSEMENT OF AND TO RETAIN THE EARNEST MONEY DEPOSIT (OR AS MUCH THEREOF AS HAS BEEN DEPOSITED WITH ESCROW HOLDER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT). SUCH RETENTION OF THE EARNEST MONEY DEPOSIT (OR AS MUCH THEREOF AS HAS BEEN DEPOSITED WITH ESCROW HOLDER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT) IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER. SAID AMOUNT SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY PURCHASER, ALL OTHER CLAIMS TO DAMAGES OR OTHER REMEDIES AT LAW OR EQUITY BEING HEREIN EXPRESSLY WAIVED BY SELLER. THE PARTIES ACKNOWLEDGE THAT THE ACTUAL DAMAGES WHICH WOULD RESULT TO

SELLER AS A RESULT OF SUCH FAILURE WOULD BE EXTREMELY DIFFICULT TO ESTABLISH. IN ADDITION, PURCHASER DESIRES TO HAVE A LIMITATION PUT UPON ITS POTENTIAL LIABILITY TO SELLER IN THE EVENT THAT THIS TRANSACTION SHALL FAIL TO CLOSE. BY PLACING THEIR RESPECTIVE INITIALS IN THE SPACES HEREINAFTER PROVIDED, THE PARTIES ACKNOWLEDGE THAT UPON A DEFAULT BY PURCHASER UNDER THE TERMS OF THIS AGREEMENT, SELLER SHALL ONLY BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF THE EARNEST MONEY DEPOSIT (OR AS MUCH THEREOF AS HAS BEEN DEPOSITED WITH ESCROW HOLDER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT).

PURCHASER _____ and SELLER _____ AGREE.

### Section 11. Miscellaneous

(a)     <u>Brokerage Commission</u>. Each party to this Agreement warrants to the other that except as hereinafter provided, no person or entity can properly claim a right to a real estate commission, finder's fee, or other real estate brokerage-type compensation (collectively, "Real Estate Compensation") based upon the acts of that party with respect to the transaction contemplated by this Agreement. Each party hereby agrees to indemnify and defend the other (by counsel acceptable to the party seeking indemnification) against and hold the other harmless from and against any and all loss, damage, liability or expense, including costs and reasonable attorney's fees, resulting from any claims for Real Estate Compensation by any person or entity based upon such acts, and such indemnification obligations shall survive the Close of Escrow. Notwithstanding the foregoing, a brokerage commission in the amount of six percent (6%) of the Purchase Price payable by Seller on the proceeds of sale shall be divided equally between Michael Stuart of Colliers International and Nevada Gateway Realty.

(b)     <u>Time of Essence</u>. Time is of the essence of every provision of this Agreement.

(c)     <u>Notices</u>. Whenever Escrow Holder or any party hereto shall desire to give or serve upon the other any notice, demand, request or other communication, each such notice, demand, request or other communication shall be in writing and shall be given or served upon the other party with the appropriate copies, and each parties' representatives, by personal service or by certified, registered or Express United States Mail, or Federal Express or other nationally recognized commercial courier, postage prepaid, addressed as set forth above. Any such notice, demand, request or other communication shall be deemed to have been received upon the earlier of personal delivery thereof or attempted personal delivery, as the case may be. Any notice, demand, request or other communication sent by any of the methods set forth above shall, when sent, also be sent by facsimile transmission; provided, however, notice by facsimile transmission shall be in addition to, and not in lieu of, notice by any of the methods set forth above.

SELLER AS A RESULT OF SUCH FAILURE WOULD BE EXTREMELY DIFFICULT TO ESTABLISH. IN ADDITION, PURCHASER DESIRES TO HAVE A LIMITATION PUT UPON ITS POTENTIAL LIABILITY TO SELLER IN THE EVENT THAT THIS TRANSACTION SHALL FAIL TO CLOSE. BY PLACING THEIR RESPECTIVE INITIALS IN THE SPACES HEREINAFTER PROVIDED, THE PARTIES ACKNOWLEDGE THAT UPON A DEFAULT BY PURCHASER UNDER THE TERMS OF THIS AGREEMENT, SELLER SHALL ONLY BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF THE EARNEST MONEY DEPOSIT (OR AS MUCH THEREOF AS HAS BEEN DEPOSITED WITH ESCROW HOLDER IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT).

PURCHASER _____ and SELLER _____ AGREE.

### Section 11. Miscellaneous

(a)    <u>Brokerage Commission</u>. Each party to this Agreement warrants to the other that except as hereinafter provided, no person or entity can properly claim a right to a real estate commission, finder's fee, or other real estate brokerage-type compensation (collectively, "Real Estate Compensation") based upon the acts of that party with respect to the transaction contemplated by this Agreement. Each party hereby agrees to indemnify and defend the other (by counsel acceptable to the party seeking indemnification) against and hold the other harmless from and against any and all loss, damage, liability or expense, including costs and reasonable attorney's fees, resulting from any claims for Real Estate Compensation by any person or entity based upon such acts, and such indemnification obligations shall survive the Close of Escrow. Notwithstanding the foregoing, a brokerage commission in the amount of six percent (6%) of the Purchase Price payable by Seller on the proceeds of sale shall be divided equally between Michael Stuart of Colliers International and Nevada Gateway Realty.

(b)    <u>Time of Essence</u>. Time is of the essence of every provision of this Agreement.

(c)    <u>Notices</u>. Whenever Escrow Holder or any party hereto shall desire to give or serve upon the other any notice, demand, request or other communication, each such notice, demand, request or other communication shall be in writing and shall be given or served upon the other party with the appropriate copies, and each parties' representatives, by personal service or by certified, registered or Express United States Mail, or Federal Express or other nationally recognized commercial courier, postage prepaid, addressed as set forth above. Any such notice, demand, request or other communication shall be deemed to have been received upon the earlier of personal delivery thereof or attempted personal delivery, as the case may be. Any notice, demand, request or other communication sent by any of the methods set forth above shall, when sent, also be sent by facsimile transmission; provided, however, notice by facsimile transmission shall be in addition to, and not in lieu of, notice by any of the methods set forth above.



(d) <u>Attorney's Fees</u>. If any legal action or other action is commenced to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and court costs incurred.

(e) <u>Successors and Assigns</u>. This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of Seller and Purchaser. Purchaser may assign its rights hereunder to any entity, provided, however, that such assignment shall not relieve Purchaser of any of its obligations hereunder.

(f) <u>Captions</u>. Section titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement.

(g) <u>Exhibits</u>. All exhibits attached hereto shall be incorporated herein by reference as if set out herein in full.

(h) <u>Binding Effect</u>. Regardless of which party prepared or communicated this Agreement, this Agreement shall be of binding effect between Purchaser and Seller only upon its execution by an authorized representative of each such party.

(i) <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendment or exhibits hereto.

(j) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Duplicate unexecuted pages of each counterpart may be discarded and the remaining pages assembled as one document. Counterparts bearing a party's signature which are transmitted by facsimile and received by the other parties hereto shall be deemed executed original counterparts. The party transmitting an executed counterpart via facsimile shall deliver an ink signed counterpart within a reasonable time thereafter.

(k) <u>Further Assurances</u>. Purchaser and Seller shall make, execute, and deliver such documents and undertake such other and further acts as may be reasonably necessary to carry out the intent of the parties hereto.

(l) <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada without regard to the conflicts of law provisions thereof.

(m) <u>Entire Agreement</u>. This Agreement embodies the entire agreement between Purchaser and Seller in connection with this transaction. This Agreement cannot be modified except in writing signed by all parties.

*Execution Copy*                                         16

(d)    <u>Attorney's Fees</u>. If any legal action or other action is commenced to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and court costs incurred.

(e)    <u>Successors and Assigns</u>. This Agreement shall be binding upon the heirs, executors, administrators, successors and assigns of Seller and Purchaser. Purchaser may assign its rights hereunder to any entity, provided, however, that such assignment shall not relieve Purchaser of any of its obligations hereunder.

(f)    <u>Captions</u>. Section titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement.

(g)    <u>Exhibits</u>. All exhibits attached hereto shall be incorporated herein by reference as if set out herein in full.

(h)    <u>Binding Effect</u>. Regardless of which party prepared or communicated this Agreement, this Agreement shall be of binding effect between Purchaser and Seller only upon its execution by an authorized representative of each such party.

(i)    <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendment or exhibits hereto.

(j)    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Duplicate unexecuted pages of each counterpart may be discarded and the remaining pages assembled as one document. Counterparts bearing a party's signature which are transmitted by facsimile and received by the other parties hereto shall be deemed executed original counterparts. The party transmitting an executed counterpart via facsimile shall deliver an ink signed counterpart within a reasonable time thereafter.

(k)    <u>Further Assurances</u>. Purchaser and Seller shall make, execute, and deliver such documents and undertake such other and further acts as may be reasonably necessary to carry out the intent of the parties hereto.

(l)    <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada without regard to the conflicts of law provisions thereof.

(m)    <u>Entire Agreement</u>. This Agreement embodies the entire agreement between Purchaser and Seller in connection with this transaction. This Agreement cannot be modified except in writing signed by all parties.

*Execution Copy*                    16

(n)  <u>Confidentiality</u>. All information furnished by Seller to Purchaser or by Purchaser to Seller, as applicable, in accordance with the provisions of this Agreement or obtained by Purchaser in the course of its investigations shall be treated as confidential information by the party receiving the information and each party agrees not to disclose such information to any third party, except to the agents, attorneys, consultants or employees of such receiving party.  If the purchase and sale of the Property is not consummated as contemplated under this Agreement, the party receiving such confidential information shall promptly return such information to the party that provided such information.

(o)  <u>1031 Exchange</u>.  If either Purchase or Seller desires to effectuate an IRS tax deferred exchange in connection with this transaction, the parties agree to cooperate with one another to accommodate the exchange.  However, each party shall bear its own respective expenses in connection with such exchange and there shall be no delay of closing.

IN WITNESS WHEREOF, Purchaser and Seller have executed and delivered this Agreement as of the Effective Date.

**SELLER:**                                    **PURCHASER:**

SPECIALTY TRUST, INC.                    SDMI CENTENNIAL HILLS, LLC

By                                          By: _____
Name:  Nello Gonfiantini, III            Name: _____
Its:       President                       Its: _____

*Execution Copy*                                    17

(n)    <u>Confidentiality</u>. All information furnished by Seller to Purchaser or by Purchaser to Seller, as applicable, in accordance with the provisions of this Agreement or obtained by Purchaser in the course of its investigations shall be treated as confidential information by the party receiving the information and each party agrees not to disclose such information to any third party, except to the agents, attorneys, consultants or employees of such receiving party. If the purchase and sale of the Property is not consummated as contemplated under this Agreement, the party receiving such confidential information shall promptly return such information to the party that provided such information.

(o)    <u>1031 Exchange</u>. If either Purchase or Seller desires to effectuate an IRS tax deferred exchange in connection with this transaction, the parties agree to cooperate with one another to accommodate the exchange. However, each party shall bear its own respective expenses in connection with such exchange and there shall be no delay of closing.

IN WITNESS WHEREOF, Purchaser and Seller have executed and delivered this Agreement as of the Effective Date.

**SELLER:**

SPECIALTY TRUST, INC.

By_____
Name: Nello Gonfiantini, III
Its:    President

**PURCHASER:**

SDMI CENTENNIAL HILLS, LLC

By: _____
Name:    DAVID L. STEINBERG
Its:    MANAGER

# EXHIBIT A

## TRUSTEE'S DEED UPON SALE
## (LEGAL DESCRIPTION)

**EXHIBIT A**

**TRUSTEE'S DEED UPON SALE
(LEGAL DESCRIPTION)**

Inst #: 201006020003834
Fees: $16.00 N/C Fee: $0.00
RPTT: $9210.60 Ex: #
06/02/2010 03:44:26 PM
Receipt #: 374014
Requestor:
NATIONAL TITLE COMPANY
Recorded By: EAH  Pgs: 4
DEBBIE CONWAY
CLARK COUNTY RECORDER

A.P. 125-20-201-016 & 125-20201-025 (former)
125-20-216-002 (new)

MAIT TAX STATEMENTS TO:
WHEN RECORDED MAIL TO:
Specialty Trust, Inc.
6160 Plumas Street
Reno, NV 89519
Order No: 283373FCL



# TRUSTEE'S DEED UPON SALE

Transfer Tax $9,210.60
The Grantee herein was the foreclosing beneficiary.
The amount of the unpaid debt was $2,975,592.22
The amount paid by the Grantee was $1,805,700.00
Said property is in the City of Las Vegas, County of Clark

NATIONAL TITLE COMPANY., a Nevada corporation, (herein called Trustee) does hereby grant and convey, both without covenant or warranty, express or implied to Specialty Trust, Inc. (herein called Grantee) the real property in the City of Las Vegas County of Clark, State of Nevada, described as follows:

PARCEL ONE (1):

A portion of Lot One (1) of FINAL MAP THE VILLAGE AT CENTENNIAL HILLS, as shown by map thereof on file in Book 142 of Plats, Page 9, in the Office of the County Recorder of Clark County, Nevada and also being a portion of the Southeast Quarter (SE ¼) of the Southeast Quarter (SE ¼) of the of the Northwest Quarter (NW ¼) of Section 20, Township 19 South, Range 60 East, M.D.M., described as follows:

COMMENCING at the Southeast corner of the Northwest Quarter (NW ¼) of aforementioned Section 20, same point being at the intersection point of the centerline of Durango Drive, and the centerline of Deer Springs Way;

THENCE South 89° 54' 17" West, 333.72 feet along the centerline of Deer Springs Way;

THENCE departing said centerline, North 00° 07' 02" West, 266.99 feet to the POINT OF BEGINNING;

THENCE North 00° 07' 02" West, 62.61 feet;

THENCE South 89° 57' 10" West, 166.95 feet;

THENCE North 00° 07' 59" West, 299.74 feet;

THENCE South 89° 59' 58" East, 416.14 feet to a point of tangency of a 25.00 foot radius curve concave to the Southwest;

THENCE curving right an arc distance of 39.23 feet through a central angle of 89° 54' 51" to a point of tangency, said point being on the West right-of-way line of Durango Drive;

THENCE along the West right-of-way line of Durango Drive, South 00° 05' 07 East 12.79 feet; thence South 01°11'16" West 225.06 feet; thence South 00°05'07" East 87.55 feet to a point of tangency of a 100.00 foot radius curve concave to the West;

THENCE curving right an arc distance of 31.76 feet through a central angle of 18° 11' 42" to a point on a 100.00 foot radius reverse curve;

THENCE curving left an arc distance of 22.68 feet through a central angle of 12° 59' 51" to a point where the radius point bears South 84° 53' 16" East;

THENCE departing the Wet right-of-way line of Durango Drive, South 89° 54' 53" West, 224.79 feet;

THENCE North 00° 05' 07" West, 41.91 feet;

THENCE South 89° 52' 58" West, 34.49 feet to the POINT OF BEGINNING.

BEING further described as Lot "B" of that certain Record of Survey in File 179 of Surveys, Page 12, in the Office of the County Recorder, Clark County, Nevada. recorded August 5, 2009 in Book 20090805 as Document No. 03130, Official Records

PARCEL TWO (2):

Non-exclusive, perpetual and reciprocal easements for ingress, egress by pedestrian and vehicular traffic on, over and across paved areas including, but not limited to, driveways, entrances and exits as set forth by and subject to that certain Declaration of Reciprocal Easements and Covenants, Conditions and Restrictions recorded August 6, 2009 in Book 20090806 as Document No. 00380, and rerecorded August 13, 2009 in Book 20090813 as Document No. 04604, Official Records, Clark County, Nevada..

This conveyance is made pursuant to the authority and powers vested in said Trustee, as Trustee or Successor Trustee or Substituted Trustee, under that certain Deed of Trust executed by William D. Hitt, an unmarried man, as Trustor, recorded June 8, 2007 as Document No. 3903 in Book No. 20070608 of official records in the Office of the County Recorder of Clark County, Nevada. The Trustee having complied with all applicable statutory requirements of the State of Nevada and performed all duties required by said Deed of Trust.

A Notice of Trustee's Sale was published one a week for three consecutive weeks in a legal newspaper, and at least twenty days before the date fixed therein for sale, a copy of said Notice of Trustee's Sale was posted by the Trustee or its authorized representative of said County in three public places.

At the time and place fixed in the Notice of Trustee's Sale, said Trustee did sell said property above described at public auction on April 20, 2010 to said Grantee, being the highest bidder therefore, for $1,805,700.00 cash, lawful money of the United States, in satisfaction pro tanto of the indebtedness then secured by said Deed of Trust.

IN WITNESS WHEREOF, NATIONAL TITLE COMPANY, as Trustee, has this day, caused its corporate name to be hereto affixed hereto and this instrument to be executed by its authorized officer, thereunto duly authorized.

Dated April 20, 2010

NATIONAL TITLE COMPANY

By: Tracy Bouchard, President

---

| | |
|---|---|
| State of Nevada | } |
| | } ss. |
| County of Clark | } |

This instrument was acknowledged before me on June 2, 2010

Tracy Bouchard

Signature: _____
                    Notary Public

TRICIA BEAUDRY
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 97-3960-1
MY APPT. EXPIRES JULY 13, 2013

**STATE OF NEVADA**
**DECLARATION OF VALUE FORM**

1. Assessor Parcel Number(s)
   a. 125-20-216-002
   b. _____
   c. _____
   d. _____

2. Type of Property:
   a. ☒ Vacant Land    b. ☐ Single Fam. Res.
   c. ☐ Condo/Twnhse   d. ☐ 2-4 Plex
   e. ☐ Apt. Bldg      f. ☐ Comm'l/Ind'l
   g. ☐ Agricultural   h. ☐ Mobile Home
      ☐ Other _____

   **FOR RECORDER'S OPTIONAL USE ONLY**
   Book: _____ Page: _____
   Date of Recording: _____
   Notes:

3. a. Total Value/Sales Price of Property            $ 1,805,700.00
   b. Deed in Lieu of Foreclosure Only (value of property)  ( _____ )
   c. Transfer Tax Value:                            $ 1,805,700.00
   d. Real Property Transfer Tax Due                 $ 9,210.60

4. **If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section _____
   b. Explain Reason for Exemption: _____
   _____

5. Partial Interest: Percentage being transferred: 100         %
   The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein. Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month. Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

   Signature: _(signature)_                    Capacity: Trustee Officer
   Signature: TRICIA BEAUDRY                    Capacity: _____

   **SELLER (GRANTOR) INFORMATION**          **BUYER (GRANTEE) INFORMATION**
   **(REQUIRED)**                              **(REQUIRED)**

   Print Name: National Title Company         Print Name: Specialty Trust
   Address: 2780 W. Lake Mead Blvd, 350       Address: 6160 Plumas Street
   City: Las Vegas                            City: Reno
   State: Nevada      Zip: 89128              State: Nevada      Zip: 89519

   **COMPANY REQUESTION RECORDING**
   Print Name: National Title Company         Escrow #: 283373
   Address: 2780 W. Lake Mead Blvd., #350
   City: Las Vegas                            State: NV      Zip: 89128

As a public record this form may be recorded/microfilmed