# EXHIBIT B

# EXHIBIT B

SUMMARY REPORT FORMAT

THE FEE SIMPLE  ESTATE
IN THE

**"AS IS" MARKET VALUE OF THE PROPOSED SUPERSTITION VIEWS
DEVELOPMENT
CONSISTING OF 640 ACRES OF
VACANT MIXED USE RESIDENTIAL/ COMMERCIAL/GOLF COURSE LAND
LOCATED SOUTHEAST OF US 60 AND NORTH MINERAL MOUNTAIN ROAD,
PINAL COUNTY, ARIZONA   85273**

**EFFECTIVE DATE OF THE APPRAISAL**

December 31, 2009

**DATE OF THE REPORT**

January 20, 2010

**DOZIER FILE NUMBER 09-124LHP**

PREPARED FOR

**SPECIALTY TRUST
ATTN: MR. NELLO GONFIANTINI III, PRESIDENT AND CEO
6160 PLUMAS STREET
RENO, NEVADA  89509**

BY

**Raymond L. Dozier, MAI
DOZIER APPRAISAL COMPANY
PALM DESERT, CA  92260**

# DOZIER APPRAISAL COMPANY
## Resort and Urban Property Appraisers
## Valuation and Financial Consultants

_____

73-350 EL PASEO, SUITE 206
PALM DESERT, CALIFORNIA 92260

RAYMOND L. DOZIER, MAI
CERTIFIED GENERAL APPRAISER
LICENSE # AG004590

TEL. (760) 776-4200
FAX (760) 776-4977
E-MAIL Dozierappraisal@dc.rr.com

January 20, 2010

Specialty Trust
Attn: Mr. Nello Gonfiantini III, President and CEO
6160 Plumas Street
Reno, Nevada 89509

RE:    *"As Is"  Market Value Appraisal  of  640 acres of vacant mixed use residential/commercial golf course land  located southeast of US 60 and North Mineral Mountain Road, Pinal County, AZ 85273*

Mr. Gonfiantini:

Enclosed is an appraisal I have made of the "As Is" Market Value of 640 acres of vacant mixed use residential/commercial/golf course land located southeast of US 60 and North Mineral Mountain Road Pinal County, AZ  85273.  This appraisal was made at the request and agreement between Specialty Trust and Dozier Appraisal Company.  Specialty Trust is the client and intended user of this report.

The purpose of this appraisal is to estimate the  "As Is"  Market Value  of 640 acres of vacant mixed use residential/commercial/golf course land if sold  to a single purchaser as of the effective date  December 31, 2009.  The total property will be appraised at whatever stage of development  as of the effective date of appraisal, December 31, 2009.  All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market.  Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal.  MARKET VALUE also assumes an open and competitive market of the property interest being appraised.  The function of the appraisal is for loan analysis purposes.

The property rights being appraised are the Fee Simple Interest of all future benefits that may be derived from the property's present or possible use, except for easements and rights-of-way of record.

To develop this appraisal, Raymond L. Dozier, MAI has made a personal inspection of the subject property.  In addition, he has reviewed sales of comparable properties, performed a highest and best use analysis and a land residual analysis and has weighed and compared the data to arrive at the estimated value of the subject property.  The effective date of this appraisal is December 31, 2009.

Page 2
Dozier Appraisal Company

This report is subject to the enclosed Assumptions and Limiting Conditions, the Certification and the Scope of the Appraisal on Page 16.  Otherwise there are no other extraordinary assumptions or hypothetical conditions regarding this appraisal.  Also, this letter of transmittal is not the completed appraisal report but a statement of value conclusions.  Users of this appraisal are encouraged to read the completed attached report to reach the appraiser's conclusions via the appraisal process.

The intention of this appraisal report is to comply fully with FIRREA appraisal guidelines, as well as the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.  The departure provision shall not apply.

The undersigned does not have any personal interest, either present or contemplated, in the subject property and certifies that fees, received or to be received, for the employment of my services are not contingent on the opinions reported herein.  In addition, the undersigned meets the Competency Provision Standard (1.1a,b, c) as required by USPAP and has the knowledge and experience to complete the assignment competently.

Therefore, based upon my investigation and analysis of the data gathered with respect to this assignment, I have formed the opinion that the "As Is" MARKET VALUE of the subject property, as of the retrospective date December 31, 2009, is measured in the amount of:

**$14,450,000 ($22,578/Acre)** [1]

**(FOURTEEN MILLION FOUR HUNDRED FIFTY THOUSAND DOLLARS)**

Reasonable exposure time necessary to sell this property to a single purchaser
prior to the date of this appraisal is estimated at 8 to 10 months.

_____

[1]  Later in this report the reader will note the appraiser estimated an exposure time to sell this property after the date of this appraisal at 10-12 months.  Consequently, due to current negative economic conditions, if the property must be sold prior to this 10-12 month exposure period after the date of this appraisal, the sales price would be considered a liquidation value which could be significantly less than the appraised market value.

Respectfully submitted,
DOZIER APPRAISAL COMPANY

Raymond L. Dozier, MAI
State Certified General Real Estate Appraiser
AZ. Cert. No. 31701
RLD/09-124 LHP

## TABLE OF CONTENTS

**CONTENTS**

**PART ONE – INTRODUCTION**                                             **PAGE**

      LETTER OF TRANSMITTAL
      TABLE OF CONTENTS
      CERTIFICATION ................................................................................ 1
      REGIONAL MAP ............................................................................... 2
      NEIGHBORHOOD MAP ...........……........................................……...3
      CONCEPTUAL PLAN .......................................................................... 4
      AERIAL PHOTO ................................................................................ 5
      SUBJECT PHOTOGRAPHS ................................................................ 6
      SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS ................ 8

**PART TWO – FACTUAL DATA**

      PURPOSE OF THE APPRAISAL .......................................................... 14
      USE OF THE APPRAISAL .................................................................. 14
      SCOPE AND EXTENT OF THE DATA COLLECTION PROCESS ......................... 14
      DATE OF VALUE ESTIMATE ............................................................. 14
      IDENTIFICATION OF PROPERTY RIGHTS APPRAISED ..................... 15
      DEFINITIONS OF VALUE AND RELATED TERMS .............................. 15
      LEGAL DESCRIPTION AND IDENTIFICATION OF SUBJECT PROPERTY ...................... 17
      HISTORY OF THE SUBJECT PROPERTY ........................................... 17
      REGIONAL AND CITY ANALYSIS .................................................... 18
      ZONING.......................................................................................... 26
      TAX ASSESSMENT DATA ................................................................ 27
      CONCEPTUAL PLAN ....................................................................... 28
      AERIAL MAP .................................................................................. 29
      SITE DATA...................................................................................... 30

**PART THREE – ANALYSIS AND CONCLUSIONS**

      HIGHEST AND BEST USE ANALYSIS................................................. 33
      APPRAISAL METHODOLOGY .......................................................... 36
      LAND SALES COMPARISON............................................................ 38
      COST OF PRODUCTION .................................................................. 55
      AGGREGATE RETAIL OF EACH PRODUCT ...................................... 56
      DISCOUNTED CASH FLOW ANALYSIS ............................................ 91
      RECONCILIATION........................................................................... 96

**PART FOUR – ADDENDUM**

      CURRICULUM VITAE OF THE APPRAISER
      ASSUMPTIONS AND LIMITING CONDITIONS

**CERTIFICATION**

I certify, that, to the best of my knowledge and belief . . .

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or to the parties Involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of stipulated result, or the occurrence of a subsequent event.

- My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

- I have made a personal inspection of the property that is the subject of this report.

- Ms. Lori Pabros, independent contractor, provided significant professional assistance to the person signing this report.  Mr. Raymond L. Dozier, MAI, performed final analysis of market data in determining indication of value.

- The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

- I certify that, to the best of my knowledge and belief, the reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

- I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report I, Raymond L. Dozier, MAI, have completed the requirements of the continuing education program of the Appraisal Institute.

_____
Raymond L. Dozier  MAI
State Certified General Real Estate Appraiser
AZ. Cert. No. 31701

# REGUSIONAL MAP



↑
N

# NEIGHBORHOOD MAP



SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

# CONCEPTUAL PLAN



SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

# AERIAL MAP





## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

### SUBJECT PHOTOGRAPHS



**Northeast View of Subject Property and N. Mineral Mountain Road**

**Southwest View of Subject Property**

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

### SUBJECT PHOTOGRAPHS



**North View of Subject Property**



**Southeast View of Subject Property**

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

| | |
|---|---|
| **Property Type:** | Vacant Mixed Use Residential/Commercial/Golf Course Land |
| **Location:** | Southeast of US 60 & N. Mineral Mountain Road, Pinal County, AZ 85273 |
| **Identification:** | Pinal County Tax Assessor Parcel Number 104-33-001 |
| **Census Tract Number:** | N/A |
| **Thomas Guide Map Page & Grid:** | N/A |
| **Purpose of the Appraisal:** | The purpose of this appraisal is to estimate the "As Is" Market Value of 640 acres of vacant mixed use residential/commercial/golf course land if sold to a single purchaser as of the effective date December 31, 2009. The total property will be appraised at whatever stage of development as of the effective date of appraisal, December 31, 2009. All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market. Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the property interest being appraised. |
| **Function of the Appraisal:** | The function of the appraisal is for loan analysis purposes. |
| **Scope of the Appraisal:** | Complete narrative format adhering to all FIRREA and USPAP Standards; Departure provisions shall not apply. |
| **Property Rights Appraised:** | The property rights being appraised are the Fee Simple Interest of all future benefits that may be derived from the property's present or possible use, except for easements, and rights-of-way of record. |
| **Street Frontage:** | N. Mineral Mountain Road |
| **Access:** | N. Mineral Mountain Road |

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

**Site Size:**                                          640 Acres vacant mixed use residential /commercial/golf courese land

**Site Shape:**                                         Rectangular

**Visibility:**                                         Property has visibility from N. Mineral Mountain Road

**Zoning Pinal County General Plan:**     Residential/Commercial/Resort/Golf Course

**Unavailability of Information:**     Information vital to the appraiser in connection with this property was made available from various sources.  The appraiser has not been provided a survey, exact boundary lines or acreage, a standard current title report, environment report, soil tests or other relevant data on the subject property.   However, estimated costs from the developers have been provided and verified by appraiser from National Costing Services.

**Topography:**     Varies, level to sloping up to 15% grade

**Containment in Floodplain:**     The subject is located in area shown as Flood Zone C Maps 0400770350C defined as follows:   "Areas outside of the flood plain dated August 15, 1983.

**Current Improvements:**     None

**Blowsand Area:**     No

**Utilities:**     Electricity and telephone and sewer appear to be available along US 60, no utilities warranted for the subject property, capacities are unknown.

**Easements:**     The subject property is being appraised assuming that there are no easements or encroachments that negatively affect the value to the subject property.

**Off Sites:**     No off-site improvements on the subject property.

**Toxic Waste:**     This report assumes this parcel is not now, nor has ever been contaminated with any form of toxic waste or hazardous substance.

**SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS**

---

**Adjacent Uses:**

| | |
|---|---|
| **North:** | Arizona State Land |
| **West:** | Arizona State Land |
| **South:** | Arizona State Land |
| **East:** | Tonto National Forest Land |

**Deductions and Discounts:**      No deductions or discounts were made in the valuation of the property.  Indicated Market Value has not been reduced by the cost of holding or selling the property.

**Highest and Best Use**

- **Vacant Land**      It was determined that the highest and best use for the subject property is to hold for near term development in phases of a mix of uses  (i.e. Commercial, Residential and Golf Course Development).

- **"As Proposed" Vacant Land**      It was determined that the highest and best use for the subject property "as proposed" is  to hold for near term development of a mix of uses (i.e. Commercial/ Residential/Golf Course Community) in Phases  similar to concept proposed.

**Reasonable Exposure: (Prior)**      8 to 10 months

**Marketing Time (After):**      10 to 12 months

**Most Probable Purchaser:**      Developer for Land Banking

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

**Trend Analysis:**

● **Regional/City:**              Pinal County has favorable environmental, economic, social and governmental forces which will contribute to a continued demand for real estate in the area in the long run.  This is primarily due to the relatively lower cost of housing compared to other areas in the Metropolitan Phoenix area.  Recently, the market conditions in the area and across the country have taken a down turn.  The following factors have had a negative effect on current market conditions:

- Sub Prime Mortgage lenders have tightened their qualifying requirements, making it very difficult to fund home buyers with less than perfect credit, causing slower absorption in the market.

- Retail activity has slowed in the last 12 months due to the lack of  consumer confidence over higher fuel prices, slow real estate markets and job losses in the construction and real estate sectors.

- Mortgage money crunch causing limited funds for purchases of  raw land and finished product.

- It is concluded that over the next 12 to 18 months, construction financing will continue to become difficult to obtain for residential developments that are economically feasible.  Market demand for these properties should stabilize over the next 18 months with a balancing of supply and demand  in the market expected in the next 24 to 30 months.

● **Neighborhood:**              The subject property is located east of the City of Mesa.   The immediate area consists of vacant rural land with picturesque mountain views .  The.  The subject property is a favorable location for a mixed use development including golf course, resort, commercial and residential development when supply and demand become balanced.  Demand for these properties should continue to decline for the next 6  to 12 months.

**Personal Property, Fixtures, and**
**Intangible Items:**              This report does not include any personal property, fixtures or intangible items.

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

### I. MARKET VALUE RESULTS BY APPROACH:

- **"As Is" Vacant Land Market Value 640 Acres (Sales Comparison Approach)**     **$14,630,000 ($22,859/Acre)**

- **"As Is"Vacant Land Market Value of 640 Acres (Land Residual Technique)**     **$14,279,000 ($22,311/Acre)**

    1. **Cost Approach (Bulk or Wholes Sale)**     **$56,111,000 (As of 12/31/09)**

    2. **Aggregate Retail of Real Property:**     **$67,051,000 (Prospective as of 12/31/14)**

    3. **Aggregate Retail of 500 Golf Course Memberships**     **$27,500,000 (As of 12/31/13)**

    4. **Bulk or Wholesale (DCF)**     **$36,868,000 (As of 12/31/09)**

    5. **Prospective Bulk or Wholesale (DCF)**     **$64,450,000 (Prospective as of 12/31/14)\***

    6. **Prospective Cost of Production as of 12/31/2014**     **$64,392,000 (Prospective as of 12/31/14)**

    - **Reconciled "As Is" Vacant Land Market Value of 640 Acres**     **$14,450,000 ($22,578/Acre)**

**Date of Last Inspection:**     **December 31, 2009**

**Effective date of Value Estimate:**     **December 31, 2009**

**Date of Report:**     **January 20, 2010**

\*Analysis indicates economic feasibility of delivering finished product to the market as of 12/31/14 (Bulk or Wholesale market value is equal to or greater than the cost of production).

## PART TWO – FACTUAL DATA

**PURPOSE OF THE APPRAISAL**

The purpose of this appraisal is to estimate the "As Is" Market Value of 640 acres of vacant mixed use residential/commercial/golf course land if sold to a single purchaser as of the effective date December 31, 2009. The total property will be appraised at whatever stage of development as of the effective date of appraisal, December 31, 2009. All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market. Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the property interest being appraised.

**THE FUNCTION OF THE APPRAISAL**

The function of the appraisal is for loan analysis purposes.

**THE SCOPE AND EXTENT OF THE DATA COLLECTION PROCESS**

The following steps were made in arriving at the final estimate of value in the appraisal report:

1. A preliminary search of available resources was made to determine market trends, influences, and other significant factors pertinent to the subject property.

2. A physical inspection of the property was performed. Although due diligence was exercised while at the property, the appraiser is not an expert in such matters as accident or tragic issues; crime issues; legal issues; suit or claim issues; government issues; land use issues; nuisance issues; building issues; repair issues; soil issues; geo-technical issues; hazardous issues; contamination issues; environmental agency issues; natural resource issues; historic or cultural issues; natural hazard issues; and all issues to those known – past, present or proposed. No warranty is given as to these elements. As needed, inspections by various professionals within these fields might be recommended, with the final estimate of value subject to their findings.

3. Research and collection of data from the subject's competing market area are sufficient in quantity to express an opinion of value as defined herein. Relevant data is contained in this report.

An analysis of the data was completed by applying customary appraisal techniques and following the USPAP standards. The report will be a complete appraisal summary report and will be expected to lead the reader to the same value conclusion as suggested by the appraiser.

**DATE OF VALUE ESTIMATE**

Site was inspected December 31, 2009 with this date being the effective date of the appraisal. The date of this report is January 20, 2010.

## PART TWO – FACTUAL DATA
_____

### IDENTIFICATION OF PROPERTY RIGHTS APPRAISED

The property rights being appraised are the Fee Simple Interest of all future benefits that may be derived from the property's present or possible use, except for easements, and rights-of-way of record.

### DEFINITIONS OF VALUE AND PROPERTY RIGHTS

"MARKET VALUE" means:  The most <u>probable</u> price which a property should bring in a <u>competitive and open market</u> under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeable and assuming the price is not affected by undue stimulus.[1] Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated

- Both parties are well informed or well advised, and each acting in what he considers his own best interest

- A reasonable time is allowed for exposure in the open market

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

MARKET VALUE is based on the concept of an open and competitive market in which typical transactions are free of the aspects of duress or forced liquidation.

The REASONABLE EXPOSURE TIME inherent in the MARKET VALUE concept is always presumed to occur PRIOR to the effective date of the appraisal.

The REASONABLE MARKETING PERIOD is an estimate of the amount of time it might take to sell a property interest in the real estate at the estimated market value level during the period IMMEDIATELY AFTER the effective date of the appraisal.

To estimate "Market Value" during a period of very limited market activity is extremely difficult and challenging.  The key to the property analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of MARKET VALUE.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of MARKET VALUE.

During some periods of distressed market conditions, MARKET VALUE may imply a price at which a transaction will not occur until such time as conditions in the market match the definition of  MARKET VALUE.

_____

[1] (Title XI, FIRREA, 34.42 f)

## PART TWO – FACTUAL DATA

---

**DEFINITIONS OF VALUE AND PROPERTY RIGHTS** (continued)

The term "FEE SIMPLE ESTATE" means:  Absolute ownership unencumbered by any other interest or estate subject only to the four powers of government.[2]

The term "LEASED FEE ESTATE" means:  A Leased Fee Estate is an ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others; the rights of lessor  (the leased fee owner) and the lessee (leaseholder) are specified by contract terms contained within the lease.[3]

MARKET VALUE "As Is" means: "An estimate of market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date of inspection.  When an "As Is" valuation premise is used, the property is valued as of a specified date, assuming the property is in **precisely** the condition or status it actually was (is) in on the effective date of value.  This condition must be accurately described in the appraisal report.[4]

MARKET VALUE is based on the concept of an **open and competitive market** in which typical transactions are free of the aspects of duress or forced liquidation.

MARKET VALUE "as if complete" on the appraisal date means the market value of a property with all proposed construction, conversion, or rehabilitation hypothetically completed, or under other specified hypothetical conditions, as of the date of the appraisal.  With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of completion, this estimate of value shall reflect the market value of the property "as if complete and prepared for occupancy by tenants"  The as if complete premise assumes that all assumptions are in place as of the date of value.

PARCEL is a mass graded pad which was created in order to create earthwork balances within future subdivision parcels.  It would require additional grading and in-tract development prior to building vertical construction, and may require additional mapping and may even require additional entitlements.

BLUE TOP PAD is a lot or a pad which has been graded and certified and is ready for construction.  No additional grading is required to construct the building.  Streets and utilities are not necessarily constructed.

FULLY ENTITLED Approval of a final map or a parcel map does not in itself confer a vested right to develop.  *Avco Community Developers, Inc. v. South Coast Reg'l  Comm'n*, 17 Cal 3d785,739-94 (1976); *Oceanic Cal., Inc. v. North Cent.Coastal Reg'l Comm'n*, 63 Cal.App. 3d 57, 72-73 (1976); *Consaul v. City of Sand Diego*, 6 Cal. App. 4th 1781, 1793 (1992).  Zoning can still be changed, or other police ordinances can be adopted, after even final maps, conditional use permits, PUDs, zoning, rezoning, grading or other permits have been granted.  There is no vested right to develop until actual building or other permits for identifiable builds have been issued, and substantial work has been done thereafter in reliance on those permits.

---

[2]        Title XI, FIRREA, 34.42 {f}

[3]        The Appraisal of Real Estate, 12th Edition, Appraisal Institute, Page 83

[4]        Appraisal Policies and Practices of Insured Institutions and Service Corporatons, Federal Home Loan Bank Board, "Final Rule", 12 CFR Parts 563 and 571, Dec. 21, 1987

## PART TWO – FACTUAL DATA

_____

### LEGAL DESCRIPTION AND IDENTIFICATION OF PROPERTY

**Reference:**                    APN #104-33-001

**Common Address:**               Southeast of US 60 and N. Mineral Mountain Road

**Legal Description:**            SEE ADDENDUM

**Current Ownership:**            ECCO Holdings, LLC

**Condition of Title:**           No assessment of the condition of the title has been made by the appraiser; but as outlined in the Assumptions and Limiting Conditions, which are part of this report, the property is appraised as if free and clear of any liens and encumbrances.

### HISTORY OF THE SUBJECT PROPERTY

- The subject property was purchased in June 2005 by ECCO Holdings, LLC for $15,000 per acre or $9,600,000.  The subject property has not been listed or sold in the last 3 years.

-  Later in the appraisal the reader will note that the "As Is" vacant land market value of the subject property as of the effective date December 31, 2009 was estimated to be $14,450,000 or $22,578 per acre.  The difference between the June 2005 purchase price of $9,600,000 and the estimated market value of $14,450,000 is due to improvements to Highway 60 and some preliminary entitlements performed on the subject property (ie: conceptual plan, engineering work etc.).

- Dozier Appraisal Company previously appraised the subject property in December 2008 for $16,089,000 or $25,139/Acre.  The difference between the December 2008 appraised value of $16,089,000 and the current estimated market value of $14,450,000 is due to continued credit freeze which is keeping potential market participants out of this market.

**PART TWO – FACTUAL DATA**

# REGIONAL MAP



**PART TWO – FACTUAL DATA – (Continued)**
_____

**Regional, City, Neighborhood Overview**

The subject property is located approximately 30 miles east of  the  Mesa metropolitan area. Approximately 20 percent of the state population resides within Pinal County area.  Transportation into the area is accommodated by US Highway 60, Interstate 8 and Interstate 10.

To estimate value, an interpretation of how the market views the subject property is analyzed.  The scope of the investigation is not limited to static, current conditions.  Rather, I have examined trends in the forces that influence value to determine the <u>direction</u>, <u>speed</u>, <u>duration</u>, <u>strength</u>, and <u>limits</u> of these trends.

**A.  SOCIAL**

Social influences are reflected in the demographic composition of the population base, community preferences, socio-economic issues, availability of cultural and recreation amenities, and the impacts of anticipated change.  Pinal County has had an increase in population of approximately 12.2% since the census in 2000.  The total population of the county is approximately 201,000.

**B.  ECONOMIC**

The economic climate of  Pinal County will be analyzed as to the fundamental relationship between current and anticipated supply and demand for property types similar to the subject.

**Demand-side economic components include the following:**

    a.  ECONOMIC BASE OF THE REGION AND COMMUNITY:

Pinal County main industries that supply the region with cash from outside the state include construction, manufacturing, trade, transportation and utilities, financial services, professional and business services and government.

    b.  EMPLOYMENT AND UNEMPLOYMENT ACTIVITY AND REGIONAL SOURCES:

In years past, the unemployment rate has been less than the national average.  Due to current national economic conditions, the unemployment rate is expected to increase over the next year.

**Demand-side economic components include the following:**

    a.  COST AND AVAILABILITY OF MORTGAGE CREDIT:

Interest rates currently vary from 4.5% to 8.0% variable and fixed, 25-year amortization with 5 - 20 year due dates.  Interest rates vary with the viability of the borrower and the project And mortgage credit is difficult to obtain in the current economic climate.

**Supply-side economic components include the following**:

    a.  STOCK OF AVAILABLE LAND

Currently there is more supply than demand for vacant  commercial and residential land in the current market.

b. NEW DEVELOPMENTS UNDER CONSTRUCTION OR BEING PLANNED:
Rancho Del Oro and Superstition Golf Course and Country Club are the only nearby developments..

## C.  GOVERNMENTAL:

1. **Public services; fire and police protection, utilities, refuse collection, and transportation networks**:

   Services in Pinal County are considered adequate when compared to other  counties.

2. **Local zoning and building codes**:

   Each incorporated city has its own master plan and particular zoning regulations.  In addition, portions of the area not within the incorporated area are subject to county zoning.  Generally, county zoning regulations are less stringent than the city zoning in the area.

3. **National, state and local fiscal policy:**

   With current volatility in the housing market nationally, the Federal Reserve Board has reduced the interest rates eleven times over the last eleven months to try and ease the "credit crunch" in the housing market. This current financial imbalance has recently shifted to the commercial market as well as the housing mortgage market.  The local economy has slowed in growth along with the rest of the nation. The market for single family housing has dropped dramatically, and the forecasts are for continued decline in the residential and commercial market over the next 18 to 24 months.

## C.  ENVIRONMENTAL:

Both natural and man-made environmental forces influence real property values.

**Climatic conditions:**

The subject area has relatively mild winter and spring  seasons, with summer and fall seasons typically warmer than other states.

**Topography and soil:**

The area is mostly level with mountainous rock formations peaking to approximately 2,000 feet. Soil conditions are adequately stable.

**Natural barriers to future developments:**

The mountain ranges located to the northwest of the subject  area are the main barriers for future development.  Other barriers that would inhibit development would be the natural preserves designated for wild life.

PART TWO – FACTUAL DATA – (Continued)
_____

**Primary transportation systems-state and federal highways, railroads and airports:**

    a.  RAIL – Southern Pacific Railroad
    b.  TRUCK – Numerous local trucking companies.
    c.  OVERNIGHT DELIVERY – UPS, Federal Express, U.S. Postal Service and other carriers
    d.  AIR – Mesa Municipal Airport.  Phoenix International Airport
    e.  BUS – Pinal County; Greyhound provides national connections.
    f.  HIGHWAYS – Interstate 8, Interstate 10, US 60.

**Nature and desirability of the immediate area surrounding a property:**

    The spectacular mountain ranges and mild winter climates attract retirees and seasonal visitors to the area.

## E.  CONCLUSION:

Pinal County and the Florence Junction area has favorable environmental, economic, social and governmental forces which will contribute to a continued demand for real estate in the area in the long run.  This is primarily due to the relatively lower cost of housing compared to other areas in the Metropolitan Phoenix area.  Recently, the market conditions in the area and across the country have taken a down turn.  The following factors have had a negative effect on current market conditions:

- Sub Prime Mortgage lenders have tightened their qualifying requirements, making it very difficult to fund home buyers with less than perfect credit, causing slower absorption in the market.

- Retail activity has slowed in the last 12 months due to the lack of consumer confidence over higher fuel prices, slow real estate markets and job losses in the construction and real estate sectors.

- Mortgage money crunch causing limited funds for purchases of raw land and finished product.

- It is concluded that over the next 12 to 18 months, construction financing will continue to become difficult to obtain for residential developments that are economically feasible.  Market demand for these properties should stabilize over the next 18 months with a balancing of supply and demand in the market expected in the next 24 to 30 months.

# The Desert Sun        Nov.25, 2009

## New US home sales rise 6.2 percent

ALAN ZIBEL • The Associated Press • November 25, 2009

Sales of new homes rose last month to the highest level in more than a year as strong activity in the South offset weakness in the rest of the country.

The Commerce Department said Wednesday that sales rose 6.2 percent to a seasonally adjusted annual rate of 430,000 from an upwardly revised 405,000 in September. Economists surveyed by Thomson Reuters had expected a pace of 410,000.

There were 239,000 new homes for sale at the end of October, the lowest inventory level in nearly four decades. At the current sales pace, that's a 6.7 months of supply, down from last winter's peak of more than a year.

"If you're looking for a sign that builders will need to start swinging their hammers again soon, this is it," wrote Mike Larson, real estate analyst at Weiss Research.

The report tallies signed contracts to buy homes, rather than completed sales. Home shoppers in October were acting before lawmakers decided to extend a tax credit for first-time buyers and expand it to some existing homeowners. The credit now covers contracts signed by April 30, and analysts expect it to further the housing recovery in the coming months.

"It's all thanks to the government," said Jennifer Lee, an economist at BMO Capital Markets. Sales are up 31 percent from the bottom in January, but down 69 percent from their peak in July 2005.

The surge in sales was driven entirely by a 23 percent increase in the South. Sales fell about 5 percent in the West and Northeast, and fell 20 percent in the Midwest.

Despite the lack of certainty about the tax credit that buyers faced in October, sales were up 5.1 percent from a year ago, the first yearly increase since November 2005.

The median sales price of $212,200 was almost even with $213,200 a year earlier, but up almost 1 percent from September's level of $210,700.

Last month, Ryder Homes of Nevada Inc. resumed construction on houses at two of its communities around Reno. "We're finding people aren't coming in willing to wait six months," said Rob Dunbar, Ryder's land development manager.

The resale market is also strong. the National Association of Realtors said Monday home resales rose 10 percent from September to October, the biggest monthly increase in a decade. Along with the tax credit, buyers are being attracted by low prices and mortgage rates.

The average interest rate for a 30-year fixed mortgage was 4.78 percent this week, matching a record low set at the end of April, Freddie Mac said Wednesday.

AP Real Estate Writer Alex Veiga contributed to this report.

Page 1 of 3



Print   Close[x]

# How Commercial Real Estate Could Trigger a Double-Dip

CHARLES HUGH SMITH

Posted 2:00 PM 12/31/09  |  Economy, Morgan Stanley , Real Estate



Getty Images

Reports that commercial real estate (CRE) is suffering from a double whammy of soaring vacancies and declining valuations have been making news recently with sobering regularity. *DailyFinance* addressed the risks that CRE meltdowns pose to banks in early December. And in a stunning confirmation, just weeks later Morgan Stanley announced it was "walking away" from five San Francisco office towers, giving them back to the lenders. These accounts address the impacts on real estate investors, banks and hard-hit locales such as Southern California. But a bigger, often-overlooked, risk is the potential for CRE to remain a drag on the U.S. economy for years to come, or its potential to trigger a slide back into recession -- the so-called double dip that many fear.

Four primary factors are behind the tumble in CRE prices -- and they're eerily similar to those that powered the residential housing boom and bust:

<script type="text

- Overbuilding in marginal locales that lacked adequate jobs and services to support massive new commercial construction (malls, hotels, business parks, resorts, etc.)
- Excessive valuations fueled by low interest rates and easy credit
- Highly leveraged bets on future appreciation
- A banking sector that's extremely vulnerable to write-downs and losses from foreclosures

How much have prices tumbled? According to Moody's/REAL Commercial Property Price Index, CRE prices have plummeted 41% from the peak in 2007. Or in many cases, even more. For example, a hotel in Hawaii that sold for $250 million with a $230 million mortgage a few years ago is now only worth about half that amount.

http://www.dailyfinance.com/story/how-commercial-real-estate-could-trigger-a-double-dip...  1/13/2010

**It Starts With the Banks**

In a recent research report, Deutsche Bank analysts expect 75% of current CRE loans won't qualify for refinancing. With more than $2 trillion in CRE debt maturing from now until 2013, that suggests $1.5 trillion cannot be "rolled over" into new loans. Part of this crunch stems from the fact that commercial property loans are typically shorter-term than residential mortgages; most common are terms of five to seven years.

Of course, speculators aren't the only ones who are losing big. The banks that provided the mortgages are in trouble, too -- and that's where the problems in CRE can start weighing down the entire U.S. economy.

Over the next few years, the Deutsche Bank analysts estimate CRE losses to lenders of $200 billion to $300 billion. With banks already reeling from losses stemming from U.S. residential real estate's 30% decline from its 2006 peak of $20 trillion (a value set by Federal Reserve data), the analysts believe that "hundreds of banks, mainly smaller community and regional banks, are likely fail." These losses will hit vulnerable regional banks especially hard because they loaded up on commercial loans in recent years.

**Don't Bet on Another Bailout**

Will the banking sector once again require taxpayer bailouts as these huge losses start draining regional banks' reserves, pushing them toward insolvency? It's unlikely the public will support another TARP-type rescue. It's perhaps even more unlikely that politicians will risk their careers in an election year by supporting yet another massive bailout of lenders that knew -- or should have known -- the risks inherent in highly leveraged CRE loans.

What will happen as banks absorb billions of dollars in new losses, thanks to the meltdown of CRE? They'll have much less money to lend to other borrowers. And that contraction of credit in a fragile economy could trigger a double-dip recession. Anyone believing that banks are "on the road to recovery" hasn't factored in the hundreds of billions of dollars in CRE losses forecast by industry analysts.

Property values are another problem. In that area, CRE faces significant structural headwinds to a recovery. Perhaps the single most important one is the contraction of the consumer economy that supported seemingly endless expansion of malls and other retail space. Consumers' net worth has fallen by about $12 trillion, their incomes are either flat or declining, taxes are rising across the board (income, sales, property, etc.) and baby boomers face the generational task of saving far more for their retirement than seemed

Page 3 of 3

necessary at the top of the housing bubble.

That boils down to less money available to spend on discretionary goods and services, and hence less demand for retail space and for resorts and hotels.

**Cyberspace Means Less Commercial Space**

The steady growth of Internet shopping also saps the demand for bricks-and-mortar retail space. Web-based shopping has already reordered the bookselling industry and is well on the way to permanently reducing demand for other retail outlets.

Beyond retailing, the Net is also transforming demand for office space, as increasing numbers of knowledge workers telecommute from home, cafés or other decentralized locations. That means less need for office cubicles -- and for conference rooms, considering that teleconferencing and other Web-based communications are eroding the old model of business travel and meetings. This also means less demand for business-related hospitality services, such as hotels and restaurants.

Add these structural headwinds to the unavoidable heavy losses and write-downs facing CRE lenders, and you get a recipe for a major drag on lending, banking profits, property taxes, employment, construction and all the other sectors of the economy.

Whether these forces will tip the U.S. into a double-dip recession depends on many other factors, but they certainly have the potential to add to the contraction of credit that's bedeviling wide swaths of the economy. And we all know what happens when credit disappears.

http://www.dailyfinance.com/story/how-commercial-real-estate-could-trigger-a-double-dip...  1/13/2010



**PART TWO - FACTUAL DATA** (continued)

---

## ZONING

The property is located in the unincorporated area of Pinal County, Arizona east of Florence Junction. Current general plan land use designation is a mix of commercial/resort/residential and golf course uses.

## TAX AND ASSESSMENT DATA AND ANALYSIS

### ESTIMATED 2009-2010 PROPERTY TAX AT APPRAISED VALUE

| | |
|---|---|
| Estimated Full Value | $14,450,000 |
| X   Tax Rate/100 | 1.10 |
| Assessed Taxes | $158,950 |
| Special Assessments | Included |
| **TOTAL ESTIMATED PROPERTY TAXES** | **$158,950** |

The tax rate for 2009-2010 fiscal year is considered typical for comparable locations throughout the subject district and Pinal County.

# CONCEPTUAL PLAN



**PART TWO - FACTUAL DATA** (continued)

# AERIAL MAP

↑
**N**



## PART TWO - FACTUAL DATA (continued)

_____

## SITE DATA

| | |
|---|---|
| **Location:** | Southeast of US 60 & N. Mineral Mountain Road, Pinal County, AZ |
| **Census Tract Number:** | N/A |
| **Assessment District:** | No |
| **Access:** | Property has access from N. Mineral Mountain Road |
| **Zoning General Plan Pinal County:** | Commercial/Residential/Resort/Golf Course Uses. |
| **Cross Streets:** | US 60 & N. Mineral Mountain Road |
| **Accessibility / Visibility:** | The subject property has accessibility and excellent visibility from N. Mineral Mountain Road. |
| **Support Facilities:** | Good – The subject property is approximately 10 miles distance of goods and services. |
| **Topography:** | Varies level in some areas and sloping to 20% grade |
| **Surface Drainage:** | Appears adequate |
| **Soils:** | A soil analysis for the site has not been provided for the preparation of this appraisal.  In the absence of a soil report, it is a specific assumption that the site has adequate soils to support the highest and best use. |
| **Subsoil Conditions:** | It is assumed that there are no hidden or unapparent conditions to the property, soil, or subsoil, which would render them more or less valuable.  Subsurface oil, gas or mineral rights were not considered in this report unless otherwise stated. |
| **Archeological Site:** | No visual evidence of archaeological significance.  (See Scope and Extent of Data Collection Process in page 14 of this report.) |
| **Wetland Area:** | No |
| **Blowsand Area:** | The subject property is not located in a blowsand area. |
| **Noise:** | None noted |
| **Street Improvements:** | None, all access to the subject property is via dirt and rock roads. |

**PART TWO - FACTUAL DATA** (continued)

_____

| | |
|---|---|
| **Easements:** | There are no known nuisances, hazards, encroachments or easements that appear to have a negative effect on value. All existing utility easements are presumed to be in existence and within normal setback lines. |
| **Airport Sphere of Influence:** | No |
| **Utilities:** | Utilities appear to be available along US 60, but are not warranted for the subject property and capacities are unknown |
| **On – Site Improvements:** | None |
| **Off-Site Improvements:** | None |

**Adjacent Uses:**

| | |
|---|---|
| **North:** | Arizona State Land |
| **West:** | Arizona State Land |
| **South:** | Arizona State Land |
| **East:** | Tonto National Forest |

| | |
|---|---|
| **Flood Plain:** | The subject is located in area shown as Flood Zone 0400770350C defined as areas outside of the 100 and 500 year flood planes |
| **Unit of Comparison:** | Price Per Gross Acre |
| **Relationship to and conformity with surroundings:** | Good |
| **Functional adequacy:** | Good |
| **Allowable Uses in the District:** | Commercial/ Residential – Open Space Golf Course |
| **Major Flaws in the Site:** | The topography could be somewhat limiting to development, however adds scenic beauty and therefore, does not impact value. |
| **Environmental:** | It is assumed that there are no potentially hazardous materials (i.e. toxic waste) resulting from past use of the property, construction or maintenance of any of the buildings. Such a condition may or may not be present. The appraiser is not qualified to detect such substances. Therefore, if desired, the client should retain an expert in the field. |

**PART TWO - FACTUAL DATA** (continued)

**Comments:**                The physical and functional characteristics of the subject parcel
                             meet the desires and standards of typical purchasers in the market.
                             Overall the site has a somewhat inferior location, but superior
                             views compared to competing sites in the market.

# THE HIGHEST AND BEST USE

Highest and best use is defined as "that reasonable and probable use that supports the highest present value, as defined, as of the effective date of the appraisal." Alternatively, that use from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value.

"The definition immediately above applies specifically to the highest and best use of land. It is to be recognized that in cases where a site has existing improvements on it, the highest and best use may very well be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use..." "Implied within these definitions is recognition of the contribution of that specific use to community environment or to community development goals in addition to wealth maximization of individual property owners. Also implied is that the determination of highest and best use results form the appraiser's judgment and analytical skill, i.e., that the use determined from analysis represents an opinion, not fact to be found. In appraisal practice, the concept of highest and best use represents the premise upon which value is based."[1]

Highest and best use of a property is typically discussed as both vacant and as currently improved or proposed. In addition, there is discussion about the ideal improvement the property could support as indicated in the neighborhood analysis of this report. This ideal improvement can then be compared to the proposed buildings for differences that would affect value.

## A. HIGHEST AND BEST USE ANALYSIS (Vacant Land)

### 1. Legally Permissible:

The subject property is located in the unincorporated area of Pinal County, AZ, east of Florence Junction. The property is zoned for a mix of uses including residential, commercial, resort and golf course uses. Although the subject's zoning is in place, further entitlements are required before construction could begin.

### 2. Physically Possible:

The Site Data and Improvement Data sections of this report displayed detailed characteristics of the site. The subject property consists of 640 acres of vacant mixed use commercial/residential and golf course land. The subject's topography could be somewhat limiting to development, but also adds scenic beauty. There are many physically possible ways of configuring a mixed use commercial/residential/golf course development. The above mentioned legally permissible uses would also be physically possible.

---

[1] Byrl N. Boyce, Ed., Real Estate Appraisal Terminology (Cambridge, Mass: Ballinger Publishing Company, 1981), pp. 126-127.

## THE HIGHEST AND BEST USE

### A. HIGHEST AND BEST USE ANALYSIS (Vacant Land)

#### 3. Financially Feasible:

The Regional/City and Neighborhood Sections earlier in this report discussed current and expected supply and demand for commercial and mixed use parcels in the region and the immediate vicinity of the subject property. The current markets (commercial land and improved property) are unstable and may continue to remain unstable for the next 6 to 12 months.   The over supply of Residential lots and dwellings is expected to be absorbed in approximately 18-24 months.  Later in the appraisal the reader will note that the current Bulk or Wholesale Market Value ($36,868,000) is less than the cost of production ($56,111,000) making it financially infeasible to develop the subject property at this time.

#### 4. Maximally Productive:

In the final analysis, a determination must be made as to which physically possible and legally permissible use would produce a financially feasible use that generates the highest net return on the land for the longest period of time.  An analysis of every possible use for the subject property that might be approved by local government during the site specific planning is beyond the scope of this report.

The subject site is in the path of development and has good access and visibility. The maximally productive use would be hold the subject property  for near term  development (3 to 5 years).

#### 5. Conclusion:

Later in the report the reader will note that the test for economic feasibility to immediately start development is whether the bulk or wholesale market value is equal to or greater than the cost of production.  In the subject's case, it  proved to be infeasible to immediately start the development process (entitlements) at the present time.

### B. THE IDEAL IMPROVEMENT

The ideal improvement would be single family residential dwellings on individual lots which conform to the density requirement of  Pinal County and a mix of commercial/resort and golf course uses.

### C. HIGHEST AND BEST USE ANALYSIS (As Proposed)

#### 6. Legally Permissible:

The subject  property  is located  in  the unincorporated area of Pinal County, AZ, east of Florence Junction.  The property is zoned for a mix of uses including residential, commercial, resort and golf course uses.  Although the subject's zoning is in place, further entitlements are required before construction could begin.

**THE HIGHEST AND BEST USE**

_____

### C.  HIGHEST AND BEST USE ANALYSIS (As Proposed)

#### 7.  Physically Possible:

The Site Data and Improvement Data sections of this report displayed detailed characteristics of the site. The subject property consists of 640 acres of vacant mixed use commercial/residential and golf course land.   The subject's topography could be somewhat limiting to development, but also adds scenic beauty.  There are many physically possible ways of configuring a mixed use commercial/residential/golf course development.  The above mentioned legally permissible uses would also be physically possible.

#### 3. Financially Feasible:

The Regional/City and Neighborhood Sections earlier in this report discussed current and expected supply and demand for commercial and mixed use parcels in the region and the immediate vicinity of the subject property. The current markets (commercial land and improved property) are unstable and may continue to remain unstable for the next 6 to 12 months.  The over supply of Residential lots and dwellings is expected to be absorbed in approximately 18-24 months.  Later in the appraisal the reader will note that the prospective Bulk or Wholesale Market Value ($64,450,000) is greater than the prospective cost of production ($64,392,000) making it financially feasible to start the development process on the subject property in approximately 3 years.

#### 4. Maximally Productive:

In the final analysis, a determination must be made as to which physically possible and legally permissible use would produce a financially feasible use that generates the highest net return on the land for the longest period of time.  An analysis of every possible use for the subject property that might be approved by local government during the site specific planning is beyond the scope of this report.

The subject site is in the path of development and has good access and visibility. The maximally productive use would be hold the subject property  for near term  development (3 to 5 years).

#### 5. Conclusion:

Later in the report the reader will note that the test for economic feasibility to immediately start development is whether the bulk or wholesale market value is equal to or greater than the cost of production.  In the subject's case, it  proved to be infeasible to continue to develop the subject property at the present time.  Further analysis in the discounted cash flow indicated that development of the subject property will be economically feasible if the property were to be held for four years before continuing development (i.e. Prospective Bulk or Wholesale Market Value $64,450,000 as of 12/31/14 is greater than the Cost of Production $64,392,000) indicating the highest and best use is to hold for 3 years then start the development process bringing product on the market in 6 years.

**APPRAISAL METHODOLOGY**

---

**APPRAISAL METHODOLOGY**

Every real property is different and there are many types of value that can be estimated for any real property.  For this appraisal assignment, the  appraiser is estimating the market value of the subject property as of December 31, 2009.  The definition of Market Value has been defined in the Purpose of the Appraisal section of this report.  The subject property and type of value desired have been identified and so the appraisal problem has been defined.

In the appraisal process, it is my intention to present a properly supported value conclusion for the subject property.  The market data, analysis, and conclusions presented in the report guide a reader in reaching a similar value conclusion as the appraiser.

In the LAND VALUE SECTION of an appraisal report, market data and other information pertaining to land value are presented along with an analysis of the data and reasoning that lead to the land value estimate.  The factors that affect land value should be presented in a clear and precise manner.  The narrative should lead the reader to the land value estimate.

Depending on a specific appraisal assignment, any of the following six methods may be used to value land.

    1.    Sales Comparison
    2.    Allocation
    3.    Extraction
    4.    Subdivision Development
    5.    Land Residual
    6.    Ground Rent Capitalization

In the COST APPROACH, and estimated reproduction or replacement cost of the building and land improvements "as if completed" as of the date of the appraisal is developed, together with an estimate of the losses in value that have taken place due to design and plan on neighborhood influences.  To the depreciated building cost estimate, entrepreneurial profit and the estimated value of the land are added.  The total represents the value indicated by the cost approach.

In the SALES COMPARISON APPROACH, the subject property is compared to similar properties that have been so0ld recently or for which listing prices or offering figures are known. Data for generally comparable properties are used and comparisons are made to demonstrate a probable price at which the subject property would be sold if offered on the market.

In the INCOME CAPITALIZATION APPROACH, the "as if complete" rental income to the property is shown with deductions for vacancy and collection loss and expenses.  The prospective net operation income of the property is estimated.  To support this estimate, comparable properties may be reviewed along with available operation cost estimates.  An applicable capitalization method and appropriate capitalization rates are developed and used in computations that leads to value indications.

## APPRAISAL METHODOLOGY

**APPRAISAL METHODOLOGY** (continued)

In the LAND RESIDUAL METHOD  of land valuation is simply an extension of the previously indicated approaches and feasibility.  Subtracting the hard and soft costs of development, as well as the developer's profit, from the present value of the future benefits indicates a residual to raw vacant land.  The Land Residual Method is a good check of the results from previous value approaches.

1.  First, the Sales Comparison Approach will be used to estimate the "As Is" vacant land market value of the subject property.

2.   Next, the Land Residual Technique will be used to determine the "As Is" market  value of the  subject property.

3.   The bulk or wholesale discounted cash flow analysis will be used to determine economic feasibility for the development of the subject property.

4.  Lastly, the results of the Sales Comparison Approach and the Land Residual Technique will be reconciled into an indication of value.

## THE SALES COMPARISON APPROACH

---

**I.  "As Is" Vacant Land Market Value of 640 Acres (Fee Simple)**

I have searched the market for similar land sales and listings in the subject's district and have specifically researched those areas near the subject property.  Special emphasis was given to sales that were considered competitive with the subject property.  I have judged that the following sales will offer objective support for the value of the subject property.

Following is the physical data of these sales along with the comparison grid and the appraiser's analysis of adjustments made in the grid.



| LAND SALE COMPARISON #1 |
|---|

| | |
|---|---|
| **Location:** | Peters Road & Amarillo Valley Road, Pinal County, AZ |
| **Identification:** | Assessor's Parcel Numbers: #501-37-025 C & D<br>Pinal County, AZ |
| **Thomas Map Guide:** | N/A |
| **Date of Sale:** | January 2008 |
| **Documentation:** | Instrument No. 001466 Official Records,<br>Pinal County, AZ. |
| **Buyer:** | Christian Lee |
| **Seller:** | N/A |
| **Sale Price:** | $6,256,000 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $6,256,000 |
| **Conditions of Sale:** | Arms Length |
| **Market Conditions:** | Stable |
| **Site Size:** | 197.81 Acres |
| **Access:** | Good |
| **Topography:** | Mostly Level |
| **Building Improvements:** | None |
| **Utilities:** | Public utilities appear to be available to the site |
| **Zoning:** | General Rural |
| **Price Per Acre:** | $31,626/Acre |

| LAND SALE COMPARISON #1 CONT'D. |
|---|

**Present Use at Time
of Sale:**              Vacant Land

**Highest and Best Use:**    Hold for Near Term Development 3-5 Years

**Verification:**            Loopnet; RealQuest; Pinal County Records

**Comments:**               This property is smaller in size when compared to the
                            subject property but does not have specific zoning. This
                            property was  sold without entitlements.

## COMPARABLE LAND SALE #1 PARCEL MAP



| LAND SALE COMPARISON #2 |
| --- |

**Location:**                SEC Selma Highway & I10, Pinal County

**Identification:**          Assessor's Parcel Number N/A
                             Pinal County, Arizona.

**Thomas Map Guide:**        N/A

**Date of Sale:**            4/07

**Documentation:**           Documentation Number, N/A
                             Pinal County, AZ.

**Buyer:**                   Mathew Werner Vista Land Ventures

**Seller:**                  TWJ

**Sale Price:**              $13,967,000

**Property Rights
Conveyed:**                  Fee Simple Interest

**Financing:**               Cash

**Cash Equivalency:**        $13,967,000

**Conditions of Sale:**      Arms length transaction.

**Market Conditions:**       Stable

**Site Size:**               370 Acres

**Access:**                  Good

**Topography:**              Mostly Level

**Building Improvements:**   None

**Utilities:**               All public utilities appear to be available to the sight
                             But not warranted.

**Zoning:**                  Mixed Use

**Unit Price Per Acre:**     $37,750/Acre

**LAND SALE COMPARISON #2 CONT'D.**

**Present Use at Time
of Sale:**                      Vacant Land

**Highest and Best Use:**       Near Term Development 3-5 Years

**Verification:**               Loopnet; RealQuest; Pinal County Records

**Comments:**                   This property is smaller in size and has similar zoning
                                when compared to the subject property.  This property
                                was sold with entitlements.

## COMPARABLE LAND SALE #2 PARCEL MAP



## LAND SALE COMPARISON #3

| | |
|---|---|
| **Location:** | Litchfield Road, Goodyear, AZ |
| **Identification:** | Assessor's Parcel Number 501-58-001C<br>Pinal County, AZ |
| **Thomas Map Guide:** | N/A |
| **Date of Sale:** | 11/09 |
| **Documentation:** | Grant Deed recorded as Instrument 1475403 in Official Records, Pinal County, AZ. |
| **Buyer:** | Southwest Solar |
| **Seller:** | Suncor Development |
| **Sale Price:** | $2,652,000 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Cash |
| **Cash Equivalency:** | $2,652,000 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Negative |
| **Site Size:** | 69.36 Acres |
| **Access:** | Good |
| **Topography:** | Mostly Level |
| **Building Improvements:** | None |
| **Utilities:** | All public utilities appear to be available to the site |
| **Zoning:** | Mixed Use |
| **Unit Price Per Acre:** | $38,320/Acre |

**LAND SALE COMPARISON #3 CONT'D.**

**Present Use at Time
of Sale:**                          Vacant Land

**Highest and Best Use:**           Hold Near Term 3-5 Years

**Verification:**                    Loopnet; RealQuest; Pinal County Records

**Comments:**                        This property is smaller in size when compared to the
                                     subject property.  This property was sold with entitlements.

# COMPARABLE LAND SALE #3 PARCEL MAP



## LAND SALES COMPARISON GRID (FEE SIMPLE ) 640 Acres as of 12/31/09

| FACTOR | SUBJECT | NO. 1 | | NO. 2 | | NO. 3 | |
|---|---|---|---|---|---|---|---|
| Location | N. Mineral Mountain Road | Peters Road Pinal County | | Selma Highway Casa Grande | | Litchfield Road Goodyear | |
| Date of Sale | 12/31/09 | 1/08 | | 4/07 | | 11/09 | |
| Sale Price | $14,629,760 | $6,256,000 | | $13,967,000 | | $2,652,000 | |
| Size (Acres) | 640 Acres | 197. 81 Acres | | 370 Acres | | 69.36 Acres | |
| Price Per Acre | $22,859 | $31,626 | | $37,750 | | $38,230 | |
| CHARACTERISTIC SUBJECT | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing Terms | Cash | Cash | | Cash | | Cash | |
| Conditions of Sale | Arm's Length | Arm's Length | | Arm's Length | | Arm's Length | |
| Market Conditions | Negative | Less Negative | (10%) | Less Negative | (15%) | Negative | -0- |
| Adjusted Price Per Acre | $22,859 | $28,463 | | $32,087 | | $38,230 | |
| PHYSICAL ADJUSTMENTS | | | | | | | |
| Size | 640 Acres | 197.81 Acres | (500) | 370 Acres | (250) | 69.36 Acres | (1,000) |
| Shape | Rectangular | Rectangular | -0- | Rectangular | -0- | Rectangular | -0- |
| Location | Average | Good | (5,693) | Good | (6,417) | Good | (7,646) |
| Zoning | Mixed Use | Agricultural | +2,000 | Mixed Use | -0- | Similar | -0- |
| View | Good | Inferior | +2,000 | Inferior | +2,000 | Inferior | +2,000 |
| Off-Sites/Utilities | No | Yes | (1,000) | Yes | (1,000) | Yes | (1,000) |
| Access | Average | Good | (1,000) | Good | (1,000) | Good | (1,000) |
| Highest & Best Use | Hold Near Term Development 3 Years | Similar | -0- | Similar | -0- | Similar | -0- |
| Entitlements | No | No | -0- | Yes | (5,314) | Yes | (5,314) |
| ADJUSTMENTS | | | | | | | |
| Size | (250, 500, 1,000) | 27,963 | | 31,837 | | 37,230 | |
| Location | (20%) | 22,270 | | 25,420 | | 29,584 | |
| Off-Site Improvements | (1,000) | 21,270 | | 24,420 | | 28,584 | |
| Access | (1,000) | 20,270 | | 23,420 | | 27,584 | |
| View | +2,000 | 22,270 | | 25,420 | | 29,584 | |
| Zoning | +2,000 | 24,270 | | 25,420 | | 29,584 | |
| Entitlements 1 & 3 | (5,314) | 24,270 | | 20,106 | | 24,270 | |
| Net Adjustment | | ($4,193) | | ($11,981) | | ($13,960) | |
| Adjusted Unit Price | $22,859 | $24,270 | | $20,106 | | $24,270 | |
| WEIGHTED VALUES | | | | | | | |
| Reliability (1-10) | | 8 | | 8 | | 8 | |
| Contribution (%) | | 0.333 | | 0.333 | | 0.333 | |
| Contribution ($) | $22,859 | $8,082 | | $6,695 | | $8,082 | |

# THE SALES COMPARISON APPROACH

---

**I.    Comparable Land Sales Analysis (continued)**

"The sales comparison approach may be used to value land that is actually vacant or land that is being considered as though vacant for appraisal purposes.  Sales comparison is the most common technique for valuing land and it is the preferred method when comparable sales are available.  To apply this method, sales of similar parcels of land are analyzed, compared and adjusted to provide a value indication for the land being appraised.   In the comparison process the similarity or dissimilarity of the parcels is considered."[2]

Adjustments to each of the sales is required for significant differences which effect value.  "The order in which quantitative adjustments are applied to the sale prices of comparable properties" is called the sequence of adjustments.  "The sequence of adjustments is determined by the market and through analysis of the data."[3]  Using the sequence, the appraiser obtains intermediate price figures and applies succeeding adjustments to each previously adjusted price.  The adjustments applied to the price of a comparable property reflect the sale's superiority or inferiority in regard to the real property rights conveyed, financing, conditions of sale, market conditions, location, and physical characteristics.

There are "basic elements of comparison that should always be considered in Sales Comparison Analysis"[4] and other physical differences.  All of the sales sold as fee simple estates as arm's length transactions and therefore, adjustments were not required for these aspects.

**1.    Property Rights, Financing Terms and Conditions of Sale:**

All comparable site sales were sold or listed as Fee Simple Estates.  Financing terms for the sales represented cash or its equivalent to the sellers.  Lastly, Conditions of Sale were based on an arm's length basis.  These three characteristics of the sale properties are equal to the assumptions being applied to the subject property.  Consequently, no adjustments were necessary for these three characteristics of the sale properties.

**2.    Time and Market Conditions:**

Market Value estimates assume an open and competitive marketplace.  Current market conditions leading up to the date of appraisal have been a period of increasing market activity.  Proper analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of Market Value.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of Market Value.
The subject property is being appraised during negative market conditions. Two Comparable Land Sales were also sold during less negative market conditions.  Therefore, adjustments were made according to dates of sale.

---

[2] The Appraisal of Real Estate, 12th Edition, (Chicago: Appraisal Institute, 2001), Page 337

[3] The Appraisal of Real Estate, 12th Edition, (Chicago: Appraisal Institute, 2001), Page 443

[4] The Appraisal of Real Estate, 12th Edition, (Chicago: Appraisal Institute, 2001), Page 426

## THE SALES COMPARISON APPROACH

---

**I. Comparable Land Sales Analysis** (continued)

### 3. Size Adjustment:

All three Comparable Land Sales are smaller than the subject property.  Therefore, adjustments were made according to size.

### 4. Location Adjustment:

All three Comparable Land Sales have superior locations.  Therefore, a downward adjustment of 20% per acre was made to all three Comparable Land Sales.

### 4. Zoning Adjustment:

Comparable Land Sale #1 has inferior zoning when compared to the subject property.  Therefore, an upward adjustment of $2,000 per acre was made to Comparable Land Sale #1.

### 5. Off-Site Improvements Adjustment:

All three Comparable Land Sales have superior off-site improvements.  Therefore, a downward adjustment of $1,000 per acre was made to all three Comparable Land Sales.

### 6. Access Adjustment:

All three Comparable Land Sales have superior access.  Therefore, a downward adjustment of $1,000 per acre was made to all three Comparable Land Sales.  .

### 7. View Adjustment:

All three Comparable Land Sales have inferior views.  Therefore, an upward adjustment of $2,000 per acre was made to all three Comparable Land Sales.

### 8. Entitlements Adjustment:

A matched pair was found between Comparable Land Sale #1 & #3.  They are exactly alike except Comparable Land Sale #3 is entitled.  Comparable Land Sale #2 is also entitled.  Therefore, a downward adjustment of $5,314 per acre was made to Comparable Land Sale #3.

**Vacant Land  Conclusion for 640 Acres ( Fee Simple):**

The land sales described in this report were representative of the current market in the subject's neighborhood.  These sales allowed for derivation of market adjustments to be applied for differences between the sales and subject property.  The results from the grid indicated a range of $20,106 to $24,470 per acre with an adjusted price per acre of $22,859 for the subject property.

Reliability factors from 1 to 10, 10 being the most comparable, were assigned to the comparable sales.  The sales were rated for reliability on the basis of size and number of adjustments.  Adding these factors together and dividing individually indicated a percent contribution for each sale.  Multiplying these contributions by the adjusted sale value indications per acre indicated a dollar contribution per sale.  Adding these dollar contributions together indicated a dollar per acre value for the subject site.  The market value indication of the site can therefore, be calculated as follows:

## THE SALES COMPARISON APPROACH

| | | | | |
|---|---|---|---|---|
| **640 Acres Vacant Land** | **X** | **$22,859 per acre** | **=** | **$14,629,760** |
| **""As Is" "Vacant Land Market Value – Fee Simple (rounded)** | | | **=** | **$14,630,000** |

# LAND RESIDUAL TECHNIQUE

## II. Land Residual Technique ( Fee Simple) –640 Acres
### (634 Finished Residential Lots, 3 Commercial Super Pads and 18 Hole Golf Course and Clubhouse)

### A.    Cost of Production Analysis

Production cost is the cost of construction at current prices of an exact duplicate, or replica, using the same materials, construction standards design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies, and obsolescence of the proposed subject Parcel improvements. In the analysis of the cost to develop subdivision Parcels (as if complete and ready for sale), the following have been recognized:

**1. The ""As Is"" market value of the land by Direct Sales Comparison.**

**2. Construction Costs:**

    a.  Hard costs:  Direct development costs associated with labor and materials of construction of streets, utilities (on and off site) and any other physical improvements.
    b.  Soft costs:  Indirect development costs associated with non-construction items such as land planning, engineering, marketing, municipal fees, appraisal, financing fees, interest and other entitlement costs.

**3.  Developer's Profit:** That profit level necessary to induce a typical developer to undertake the necessary approval, planning and construction to the point of completion of the Parcel subdivision of a given type.

**4.  Cost Data Source:**

Typical developer's cost estimates, as determined by local contractor bids and developer quotes and are utilized with reference to the "Marshall Valuation Service", published by Marshall and Swift Publication Company, is a nationally recognized cost estimating company located in Los Angeles, California. The costs calculated by this method represent a typical bidding target range. These costs are updated regularly to reflect changes and differences in construction costs by class of construction and location. This method estimates direct and indirect costs associated with construction development as noted below.

The cost of replacing a property is generally estimated on a square foot basis. The value of the land is then added to the replacement cost estimate. **This cost estimate includes <u>the average architect's and engineers fees, including plans, plan check, building permits and survey to establish building lines and grades;</u> also, normal interest on building funds during the period of construction and processing fees or service charges are included as well as sales tax on materials, normal site preparation, including excavation for foundation and back-fill, as well as, utilities from structure to lot line are figured for typical set-backs. <u>The contractor's overhead and profit, including job supervision, workmen's compensation, fire and liability insurance, unemployment insurance and so forth are all included.</u>**

**LAND RESIDUAL TECHNIQUE**

**II. Land Residual Technique ( Fee Simple)**

    **A. Cost of Production Analysis (continued)**

        **4.  Cost Data Source: (continued)**

        All other hard and soft costs to develop the land from its "vacant land" status will be taken into consideration in the cost of production.  Additional costs, not included in the Valuation Service, such as entrepreneurial profit, are estimated and are being included as additional indirect costs."

        **5.  Improvement Valuation**

        The developer's cost estimates will be utilized to develop the cost of production cost estimate as cross-referenced by "The Marshall Valuation Service."

## II. Land Residual Technique (Fee Simple - continued)

### A. Cost of Production Analysis Calculations for 634 Residential Lots, 3 Commercial Super Pads and 18 hole golf course and clubhouse

**Developer's Cost of Production Analysis (To Completion but Prior to Sell Off)**

| Hard Cost | | Subtotal | Total |
|---|---|---|---|
| **Off-Site Street Improvements** | **Included** | | |
| **On-Site** (cost to produce 634 Finished Lots) | **$21,180,000** | | |
| **On-Site (cost to produce 18 hole golf course and clubhouse)** | 14,000,000 | | |
| **Subtotal On-Site Costs** | $35,180,000 | | |
| **Total of Hard Costs** | | **35,180,000** | |
| **Soft Costs** (not already included in hard costs) | $1,200,000 | | |
| **Total Soft Cost** | $1,200,000 | **$1,200,000** | |
| **Total Hard & Soft Costs** | | | **$36,380,000** |
| Developer's Incentive (10% of Hard and Soft Costs) | | **$3,638,000** | |
| **Total Development Costs** | | | **$40,018,000** |
| Plus: Land Value (640 Acres)* | $14,630,000 | | |
| Plus: Developer's Incentive (10% of Land Value) | $1,463,000 | | |
| Market Value Indication Via Cost of Production for Superstition Views | | | $56,111,000 |
| **Rounded Bulk or Wholesale Value Indication for Superstition** | | | **$56,111,000** |

It is concluded that the wholesale or bulk market value indication by the cost approach "as if complete" is as follows:

| | |
|---|---|
| **TOTAL WHOLESALE OR BULK VALUE BY COST** | $56,111,000 |
| **TOTAL VALUE INDICATION FOR SUBJECT** (rounded) | **$56,111,000** |

**\*The reader will note the prospective cost of production as of 12/31/2014 is estimated at $64,392,000. The difference between the current cost of production and the prospective cost of production is due to mark up of the land over the 5 year holding period.**

## LAND RESIDUAL TECHNIQUE

---

**I.  Sales Comparison Approach for the Aggregate Retail of  71 Finished Lots (33,375 SF Average) (Fee Simple)**

I have searched the market for similar land sales and listings in the subject's district and have specifically researched those areas near the subject property.  Special emphasis was given to sales that were considered competitive with the subject property.  I have judged that the following sales will offer objective support for the value of the subject property.

Following is the physical data of these sales along with the comparison grid and the appraiser's analysis of adjustments made in the grid.

# COMPARABLE LOT SALES MAP



| FINISHED LOT SALE COMPARISON #1 |
|---|



| | |
|---|---|
| **Location:** | 8889 E. Canyon Creek Drive, Gold Canyon, AZ 85118 |
| **Date of Sale:** | **4/12/05** |
| **Documentation:** | Doc #N/A |
| **Parcel Number:** | 107-17-006 |
| **Buyer:** | **N/A** |
| **Seller:** | Superstition Mountain |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $277,000 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 24,394 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $277,000 |
| **Comments:** | This property is smaller in size to the subject property with Similar  amenities and a similar location within the subdivision. |

## FINISHED LOT SALE COMPARISON #2



| | |
|---|---|
| **Location:** | 4339 S. Slow Pony Circle,  Gold Canyon, AZ  85118 |
| **Date of Sale:** | **2/14/07** |
| **Documentation:** | Doc #19356 |
| **Parcel Number:** | 108-7-010 |
| **Buyer:** | **David Grisamore** |
| **Seller:** | John & Jane Christman |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $268,000 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 26,572 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $268,000 |
| **Comments:** | This property is smaller  in size compared to the subject property with similar amenities and a superior location.. |

| FINISHED LOT SALE COMPARISON #3 |
|---|



| | |
|---|---|
| **Location:** | 7390 E. Wildflower Lane, Gold Canyon, AZ  85118 |
| **Date of Sale:** | **3/09/05** |
| **Documentation:** | Doc # N/A |
| **Parcel Number:** | 107-11-009 |
| **Buyer:** | **N/A** |
| **Seller:** | Superstition Mountain |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $310,500 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 25,700 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $310,500 |
| **Comments:** | This property is smaller in size compared to the subject property with a superior location. |

## THE SALES COMPARISON APPROACH

### FINISHED LOT SALES COMPARISON GRID (As of 12/31/14)

| FACTOR | SUBJECT | NO. 1 | | NO. 2 | | NO. 3 | |
|---|---|---|---|---|---|---|---|
| Location | Superstition Views | 8889 E. Canyon Creek Dr. Gold Canyon | | 4339 S. Slow Pony Circle Gold Canyon | | 7390 E. Wildflower Lane Gold Canyon | |
| Date of Sale | 12/31/14 | 4/12/05 | | 2/9/07 | | 3/09/05 | |
| Sale Price | $239,760 | $277,000 | | $268,000 | | $310,500 | |
| Lot Size | 33,375 SF | 24,394 SF | | 26,572 SF | | 25,700 SF | |
| Price per Lot | $239,760 | $277,000 | | $268,000 | | $310,500 | |
| **CHARACTERISTIC SUBJECT** | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing Terms | Cash | Cash | | Cash | | Cash | |
| Conditions of Sale | Arm's Length | Arm's Length | | Arm's Length | | Arm's Length | |
| Market Conditions | Prospective- Stable | Similar | -0- | Less Stable | +10% | Similar | -0- |
| Adjusted Price/Lot | $239,760 | $277,000 | | $294,000 | | $310,500 | |
| **PHYSICAL ADJUSTMENTS** | | | | | | | |
| Size | 33,375 SF | 24,394 SF | +10,000 | 26,572 SF | +10,000 | 25,700 SF | +10,000 |
| Location | Good | Superior | (25,000) | Superior | (25,000) | Superior | (25,000) |
| View | Good | Superior | (20,000) | Similar | -0- | Superior | (20,000) |
| Location within the subdivision | Average | Similar | -0- | Superior | (33,000) | Superior | (33,000) |
| Amenities | Yes | Similar | -0- | Similar | -0- | Similar | -0- |
| **ADJUSTMENTS** | | | | | | | |
| Size | +10,000 | 287,000 | | 304,000 | | 320,500 | |
| Location | (25,000) | 262,000 | | 269,000 | | 295,000 | |
| View | +20,000 | 242,000 | | 269,000 | | 275,000 | |
| Location within Subdivision 1 & 3 | (33,000) | 242,000 | | 236,000 | | 242,000 | |
| Net Adjustment | | (35,000) | | (48.000) | | (68,000) | |
| Adjusted Unit Price | $239,760 | $242,000 | | $236,000 | | $242,000 | |
| **WEIGHTED VALUES** | | | | | | | |
| Reliability (1-10) | | 8 | | 8 | | 8 | |
| Contribution (%) | | 0.3333 | | 0.3333 | | 0.3333 | |
| Contribution ($) | $239,760 | $80,586 | | $78,588 | | $80,586 | |

_____

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

A.    **Typical Finished Lot Value Analysis** (continued)

    **1. Sales Comparison Analysis**

      **a.    Property Rights, Financing Terms and Conditions of Sale:**

        All comparable site sales were sold or listed as Fee Simple Estates.  Financing    terms for the sales represented cash or its equivalent to the sellers.  Lastly, Conditions of Sale were based on an arm's length basis.  These three characteristics of the sale properties are equal to the assumptions being applied to the subject property.  Consequently, no adjustments were necessary for these three characteristics of the sale properties.

      **b.    Time and Market Conditions:**

        Market Value estimates assume an open and competitive marketplace.  Current market conditions leading up to the date of appraisal have been a period of increasing market activity.  Proper analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of Market Value.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of Market Value.  The subject property is being appraised during prospective stable market conditions.   Comparable Sale #2 was sold during less stable market conditions.  Therefore, an upward adjustment of 10% per lot was made to Comparable Sale #2.

      **c.    Size Adjustment:**

        All three Comparable Lot Sales are smaller than the subject property.  Therefore,  an upward adjustment of  $10,000 per lot was made to all three Comparable Lot Sales.

      **d.    Location Adjustment:**

        All three Comparable Lot Sales have superior locations when compared to the subject property.   Therefore, a downward adjustment of $25,000  per lot was made to all three Comparable Lot Sales.

      **e.    View Adjustment:**

        Comparable Lot Sale #1 and  #3 have inferior views when compared to the subject property.  Therefore, a downward adjustment of $20,000 per lot was made to Comparable Lot Sale #1 & #3.

      **f.    Location with the Subdivision Adjustment:**

        A matched pair was found between Comparable Sale #1 & #3.  They are exactly alike Except Comparable Sale #3 has a superior location within the subdivision.  Comparable Lot Sale #2 also has a superior location within the subdivision.   Therefore, a downward Adjustment of $33,000 per lot was made to Comparable Sale #2 & #3.

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

**A.**    **Average Finished Lot Value Analysis** (continued)

    **2.  Finished Lot Value Conclusion**

The lot sales described in this report were representative of the current market in the subject's neighborhood.  These sales allowed for derivation of market adjustments to be applied for differences between the sales and subject property.  The results from the grid indicated a range of $236,000 to $242,000 per lot with  an adjusted price per lot of $239,760 for the subject site.

Reliability factors from 1 to 10, 10 being the most comparable, were assigned to the comparable sales.  The sales were rated for reliability on the basis of size and number of adjustments.  Adding these factors together and dividing individually indicated a percent contribution for each sale.  Multiplying these contributions by the adjusted sale value indications per acre indicated a dollar contribution per sale.  Adding these dollar contributions together indicated a dollar per lot value for the subject site.  The market value indication of the typical finished lot can therefore, be calculated as follows:

| Lot Value Indication by Comparable Sales Analysis | = | $239,760 |
|---|---|---|
| **FINISHED LOT MARKET VALUE INDICATION BY COMPARABLE SALES (Rounded)** | = | $239,760 |

Therefore, it is my opinion that the aggregate "retail" market value of the fee simple interest for the subject's 71 lots if sold to individual purchasers, as of December 31, 2013, is as follows:

| **AGGREGATE RETAIL OF 71 LOTS** | X | $239,760 | = | $17,023,000 |
|---|---|---|---|---|

**$17,023,000 ($239,760/Finished Lot)**

**(SEVENTEEN MILLION TWENTY THREE THOUSAND DOLLARS)**

## LAND RESIDUAL TECHNIQUE

---

**I.  Sales Comparison Approach for the Aggregate Retail of  129 Finished Lots  (11,050 SF – Average) (Fee Simple)**

I have searched the market for similar land sales and listings in the subject's district and have specifically researched those areas near the subject property.  Special emphasis was given to sales that were considered competitive with the subject property.  I have judged that the following sales will offer objective support for the value of the subject property.

Following is the physical data of these sales along with the comparison grid and the appraiser's analysis of adjustments made in the grid.

# COMPARABLE LOT SALES MAP



**FINISHED LOT SALE COMPARISON #1 (Allocation)**



| | |
|---|---|
| **Location:** | 18110 E. San Luis Drive, Gold Canyon, AZ  85118 |
| **Date of Sale:** | **1/25/07** |
| **Documentation:** | Doc #N/A |
| **Parcel Number:** | 104-17-352 |
| **Buyer:** | **Troy Henley** |
| **Seller:** | Engle Homes |
| **Allocated:** | |
| **Sale Price:** | $305,000 (4BR/ 2BA  3,242 SF SFD) |
| **Contributory Value of Lot:** | **X     25%** |
| **Total Lot Value** | **$76,650** |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $76,650 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 8,276 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $76,650 |
| **Comments:** | This property is smaller in size and has inferior amenities when compared to the subject property. |

| FINISHED LOT SALE COMPARISON #2 (Allocation) |
|---|



| | |
|---|---|
| **Location:** | 18082 E. Via Margarita, Gold Canyon, AZ  85118 |
| **Date of Sale:** | **12/20/06** |
| **Documentation:** | Doc #173607 |
| **Parcel Number:** | 104-17-378 |
| **Buyer:** | **Elizabeth Wendt** |
| **Seller:** | Engle Homes |
| **Allocated:** | |
| **Sale Price:** | $299,990 (4BR/ 2BA  3,272 SF SFD) |
| **Contributory Value of Lot:** | **X     25%** |
| **Total Lot Value** | **$74,975** |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $74,975 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 9,583 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $74,975 |
| **Comments:** | This property is smaller in size and has inferior amenities when compared to the subject property. |

**FINISHED LOT SALE COMPARISON #3 (Allocated)**



| | |
|---|---|
| **Location:** | 18154 E. Via Margarita, Gold Canyon, AZ  85118 |
| **Date of Sale:** | **12/26/06** |
| **Documentation:** | Doc #174976 |
| **Parcel Number:** | 104-17-382 |
| **Buyer:** | **Clary Roberts** |
| **Seller:** | Engle Homes |
| **Allocated:** | |
| **Sale Price:** | $259,331 (4BR/ 2BA  2,790 SF SFD) |
| **Contributory Value of Lot:** | **X     25%** |
| **Total Lot Value** | **$64,832** |
| **Property Rights** | |
| **Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $64,832 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 7,405 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $64,832 |
| **Comments:** | This property is smaller in size and has inferior amenities when compared to the subject property. |

## LAND RESIDUAL TECHNIQUE

### 11,050 SF FINISHED LOT SALES COMPARISON GRID (As of 12/31/14)

| FACTOR | SUBJECT | NO. 1 | | NO. 2 | | NO. 3 | |
|--------|---------|-------|--|-------|--|-------|--|
| Location | N. Mineral Mountain Road | 18110 E. San Luis Ray | | 18082 E. Via Margarita | | 18154 E. Via Margarita | |
| Date of Sale | 12/31/14 | 1/17/07 | | 12/20/06 | | 12/22/06 | |
| Sale Price | $80,161 | $76,250 | | $74,975 | | $64,832 | |
| Lot Size | 11,050 SF | 8,276 SF | | 9,583 SF | | 7,405 SF | |
| Price per Lot | $80,161 | $76,250 | | $74,975 | | $64,832 | |
| **CHARACTERISTIC SUBJECT** | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing Terms | Cash | Cash | | Cash | | Cash | |
| Conditions of Sale | Arm's Length | Arm's Length | | Arm's Length | | Arm's Length | |
| Market Conditions | Prospective- Stable | Similar | -0- | Similar | -0- | Similar | -0- |
| Adjusted Price/Lot | $80,161 | $76,250 | | $74,975 | | $64,832 | |
| **PHYSICAL ADJUSTMENTS** | | | | | | | |
| Size | 11,050 SF | 8,276 SF | +10,000 | 9,583 SF | +5,000 | 7,405 SF | +12,500 |
| Location | Good | Superior | (10,000) | Superior | (10,000) | Superior | (10,000) |
| View | Good | Inferior | +5,000 | Inferior | +5,000 | Inferior | +5,000 |
| Location within the subdivision | Average | Superior | (8,918) | Superior | (8,918) | Similar | -0- |
| Amenities | Yes | No | +10,000 | No | +10,000 | No | +10,000 |
| **ADJUSTMENTS** | | | | | | | |
| Size | +5,000, +10,000, +12,500 | 86,250 | | 79,975 | | 77,332 | |
| Amenities | +10,000 | 96,250 | | 89,975 | | 87,332 | |
| View | +5,000 | 101,250 | | 94,975 | | 92,332 | |
| Location | (10,000) | 91,250 | | 84,975 | | 82,332 | |
| Location within the subdivision | (8,918) | 82,332 | | 76,057 | | 82,332 | |
| Net Adjustment | | +6,082 | | +1,082 | | +17,500 | |
| Adjusted Unit Price | $80,161 | $82,332 | | $76,057 | | $82,332 | |
| **WEIGHTED VALUES** | | | | | | | |
| Reliability (1-10) | | 8 | | 8 | | 8 | |
| Contribution (%) | | 0.3333 | | 0.3333 | | 0.3333 | |
| Contribution ($) | $80,161 | $27,417 | | $25,327 | | $27,417 | |

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

A.    **Typical Finished Lot Value Analysis** (continued)

   **1. Sales Comparison Analysis**

   **a.    Property Rights, Financing Terms and Conditions of Sale:**

   All comparable site sales were sold or listed as Fee Simple Estates.  Financing    terms for the sales represented cash or its equivalent to the sellers.  Lastly, Conditions of Sale were based on an arm's length basis.  These three characteristics of the sale properties are equal to the assumptions being applied to the subject property.  Consequently, no adjustments were necessary for these three characteristics of the sale properties.

   **b.    Time and Market Conditions:**

   Market Value estimates assume an open and competitive marketplace.  Current market conditions leading up to the date of appraisal have been a period of increasing market activity.  Proper analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of Market Value.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of Market Value.  The subject property is being appraised during prospective stable market conditions.   All three comparable lot sales  were also sold during  similar  market conditions.  Therefore, no adjustments were made.

   **c.    Size Adjustment:**

   All three Comparable Lot Sales are smaller than the subject property.  Therefore, upward adjustments were made according to size to all three Comparable Lot Sales.

   **d.    Amenities Adjustment:**

   All three Comparable Lot Sales have inferior amenities when compared to the subject property.   Therefore, an upward adjustment of $10,000  per lot was made to all three Comparable Lot Sales.

   **e.    View Adjustment:**

   All three Comparable Lot Sales have inferior views when compared to the subject property.  Therefore, an upward adjustment of $5,000 per lot was made to all three Comparable Lot Sales.

   **f.    Location Adjustment:**

   All three Comparable Lot Sales have superior locations when compared to the subject property.  Therefore, a downward adjustment of $10,000 per lot was made to all three Comparable Lot Sales.

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

**A.    Typical Finished Lot Value Analysis** (continued)

    **g.    Specific Location Within the Subdivision Adjustment:**

        A matched pair was found between Comparable Sale #1 & #3.  They are exactly alike except

        Comparable sale #1 has a superior location within the subdivision.  Comparable Sale #2 also

        has a superior specific location.  Therefore, a downward adjustment of $8,918 per lot was made to Comparable Sale #1 & #2.

    **2.  Finished Lot Value Conclusion**

        The lot sales described in this report were representative of the current market in the subject's neighborhood.  These sales allowed for derivation of market adjustments to be applied for differences between the sales and subject property.  The results from the grid indicated a range of $76,057 per lot to $82,332 per lot with  an adjusted price per lot of $80,161 for the subject site.

        Reliability factors from 1 to 10, 10 being the most comparable, were assigned to the comparable sales.  The sales were rated for reliability on the basis of size and number of adjustments.  Adding these factors together and dividing individually indicated a percent contribution for each sale.  Multiplying these contributions by the adjusted sale value indications per acre indicated a dollar contribution per sale.  Adding these dollar contributions together indicated a dollar per lot value for the subject site.  The market value indication of the typical finished lot can therefore, be calculated as follows:

| Lot Value Indication by Comparable Sales Analysis | = | $80,161 |
|---|---|---|
| **FINISHED LOT MARKET VALUE INDICATION BY COMPARABLE SALES (Rounded)** | = | **$80,161** |

        Therefore, it is my opinion that the aggregate "retail" market value of the fee simple interest for the subject's 129 finished lots if sold to individual purchasers, as of the prospective date December 31, 2014, is as follows:

| **AGGREGATE RETAIL OF 129 LOTS (Rounded)** | X | $80,161 | = | $10,341,000 |
|---|---|---|---|---|

**$10,341,000 ($80,163/Finished Lot)**

**(TEN MILLION THREE HUNDRED FORTY ONE THOUSAND DOLLARS)**

**LAND RESIDUAL TECHNIQUE**

_____

## 8,172 SF FINISHED LOT SALES COMPARISON GRID (As of 12/31/14)

| FACTOR | SUBJECT | NO. 1 | | NO. 2 | | NO. 3 | |
|---|---|---|---|---|---|---|---|
| Location | N. Mineral Mountain Road | 18110 E. San Luis Ray | | 18082 E. Via Margarita | | 18154 E. Via Margarita | |
| Date of Sale | 12/31/14 | 1/17/07 | | 12/20/06 | | 12/22/06 | |
| Sale Price | $80,161 | $76,250 | | $74,975 | | $64,832 | |
| Lot Size | 8,172 SF | 8,276 SF | | 9,583 SF | | 7,405 SF | |
| Price per Lot | $80,161 | $76,250 | | $74,975 | | $64,832 | |
| **CHARACTERISTIC SUBJECT** | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing Terms | Cash | Cash | | Cash | | Cash | |
| Conditions of Sale | Arm's Length | Arm's Length | | Arm's Length | | Arm's Length | |
| Market Conditions | Prospective- Stable | Similar | -0- | Similar | -0- | Similar | -0- |
| Adjusted Price/Lot | $80,161 | $76,250 | | $74,975 | | $64,832 | |
| **PHYSICAL ADJUSTMENTS** | | | | | | | |
| Size | 11,050 SF | 8,276 SF | -0- | 9,583 SF | (5,000) | 7,405 SF | +2,000 |
| Location | Good | Superior | (10,000) | Superior | (10,000) | Superior | (10,000) |
| View | Good | Inferior | +5,000 | Inferior | +5,000 | Inferior | +5,000 |
| Location within the subdivision | Average | Superior | (9,418) | Superior | (9,418) | Similar | -0- |
| Amenities | Yes | No | +10,000 | No | +10,000 | No | +10,000 |
| **ADJUSTMENTS** | | | | | | | |
| Size | (5,000); +2,000 | 76,250 | | 69,975 | | 66,832 | |
| Amenities | +10,000 | 86,250 | | 79,975 | | 76,832 | |
| View | +5,000 | 91,250 | | 84,975 | | 81,832 | |
| Location | (10,000) | 81,250 | | 74,975 | | 71,832 | |
| Location within the subdivision | (9,418) | 71,832 | | 65,557 | | 71,832 | |
| Net Adjustment | | (4,418) | | (9,418) | | +7,000 | |
| Adjusted Unit Price | $80,161 | $71,832 | | $65,557 | | $71,832 | |
| **WEIGHTED VALUES** | | | | | | | |
| Reliability (1-10) | | 8 | | 8 | | 8 | |
| Contribution (%) | | 0.3333 | | 0.3333 | | 0.3333 | |
| Contribution ($) | $69,670 | $23,920 | | $21,830 | | $23,920 | |

See Pages 67-69 for Comparable Lot Sales

## LAND RESIDUAL TECHNIQUE

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

**A.    Typical Finished Lot Value Analysis** (continued)

**1. Sales Comparison Analysis**

**a.    Property Rights, Financing Terms and Conditions of Sale:**

All comparable site sales were sold or listed as Fee Simple Estates.  Financing    terms for the sales represented cash or its equivalent to the sellers.  Lastly, Conditions of Sale were based on an arm's length basis.  These three characteristics of the sale properties are equal to the assumptions being applied to the subject property.  Consequently, no adjustments were necessary for these three characteristics of the sale properties.

**b.    Time and Market Conditions:**

Market Value estimates assume an open and competitive marketplace.  Current market conditions leading up to the date of appraisal have been a period of increasing market activity.  Proper analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of Market Value.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of Market Value.  The subject property is being appraised during prospective stable market conditions.   All three comparable lot sales  were also sold during  similar  market conditions.  Therefore, no adjustments were made.

**c.    Size Adjustment:**

Comparable Lot Sales #2 is larger and Comparable Lot Sale #3 is smaller than the subject property.  Therefore, adjustments were made according to size.

**d.    Amenities Adjustment:**

All three Comparable Lot Sales have inferior amenities when compared to the subject property.   Therefore, an upward adjustment of $10,000  per lot was made to all three Comparable Lot Sales.

**e.    View Adjustment:**

All three Comparable Lot Sales have inferior views when compared to the subject property.  Therefore, an upward adjustment of $5,000 per lot was made to all three Comparable Lot Sales.

**f.    Location Adjustment:**

All three Comparable Lot Sales have superior locations when compared to the subject property.  Therefore, a downward adjustment of $10,000 per lot was made to all three Comparable Lot Sales.

**LAND RESIDUAL TECHNIQUE**

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

**A.     Typical Finished Lot Value Analysis** (continued)

>    **g.     Specific Location within the subdivision Adjustment:**

>    A matched pair was found between Comparable Sale #1 & #3.  They are exactly alike except Comparable Sale #1 has a superior location within the subdivision.  Comparable Sale #2 also has a superior location.  Therefore, a downward adjustment of $9,418 per lot was made to Comparable Sale #1 & #2.

>    **2.   Finished Lot Value Conclusion**

>    The lot sales described in this report were representative of the current market in the subject's neighborhood.  These sales allowed for derivation of market adjustments to be applied for differences between the sales and subject property.  The results from the grid indicated a range of $65,557 per lot to $71,832 per lot with  an adjusted price per lot of $69,670 for the subject site.

>    Reliability factors from 1 to 10, 10 being the most comparable, were assigned to the comparable sales.  The sales were rated for reliability on the basis of size and number of adjustments.  Adding these factors together and dividing individually indicated a percent contribution for each sale.  Multiplying these contributions by the adjusted sale value indications per acre indicated a dollar contribution per sale.  Adding these dollar contributions together indicated a dollar per lot value for the subject site.  The market value indication of the typical finished lot can therefore, be calculated as follows:

| Lot Value Indication by Comparable Sales Analysis | = | $69,669 |
|---|---|---|
| FINISHED LOT MARKET VALUE INDICATION BY COMPARABLE SALES (Rounded) | = | $69,670 |

>    Therefore, it is my opinion that the aggregate "retail" market value of the fee simple interest for the subject's 305 finished lots if sold to individual purchasers, as of the prospective date December 31, 2013, is as follows:

| AGGREGATE RETAIL OF 305 LOTS | X | $69,670 | = | $21,249,000 |
|---|---|---|---|---|

**$21,240,000 ($69,670/Finished Lot)**

**(TWENTY ONE MILLION TWO HUNDRED FORTY THOUSAND DOLLARS)**

**LAND RESIDUAL TECHNIQUE**

---

**I. Sales Comparison Approach for the Aggregate Retail of  200 Finished Lots  (5,445 SF – Average)
(Fee Simple)**

   I have searched the market for similar land sales and listings in the subject's district and have specifically researched those areas near the subject property.  Special emphasis was given to sales that were considered competitive with the subject property.  I have judged that the following sales will offer objective support for the value of the subject property.

   Following is the physical data of these sales along with the comparison grid and the appraiser's analysis of adjustments made in the grid.

# COMPARABLE LOT SALES MAP



## FINISHED LOT SALE COMPARISON #1 (Allocation)



| | |
|---|---|
| **Location:** | 18434 El Buho Pequeno, Gold Canyon, AZ  85218 |
| **Date of Sale:** | **7/30/07** |
| **Documentation:** | Doc #43568 |
| **Parcel Number:** | 104-17-216 |
| **Buyer:** | **Delores Stalcup** |
| **Seller:** | Great Western Homes |
| **Allocated:** | |
| **Sale Price:** | $210,000 (3BR/ 2BA  1,772 SF SFD) |
| **Contributory Value of Lot:** | **X     25%** |
| **Total Lot Value** | **$52,500** |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $52,500 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 6,098 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $52,500 |
| **Comments:** | This property is larger in size and has inferior amenities when compared to the subject property. |

## FINISHED LOT SALE COMPARISON #2 (Allocation)



| | |
|---|---|
| **Location:** | 48059 N. La Soledad, Gold Canyon, AZ  85218 |
| **Date of Sale:** | **10/10/06** |
| **Documentation:** | Doc #86081 |
| **Parcel Number:** | 104-17-166 |
| **Buyer:** | **Dale Metz** |
| **Seller:** | Great Western Homes |
| **Allocated:** | |
| **Sale Price:** | $209,649 (3BR/ 2BA  1,630 SF SFD) |
| **Contributory Value of Lot:** | **X    25%** |
| **Total Lot Value** | **$52,412** |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $52,412 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 5,663 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $52,412 |
| **Comments:** | This property is larger in size and has inferior amenities when compared to the subject property. |

**FINISHED LOT SALE COMPARISON #3 (Allocated)**



| | |
|---|---|
| **Location:** | 18281 E. El Amancer, Gold Canyon, AZ  85218 |
| **Date of Sale:** | **10/13/06** |
| **Documentation:** | Doc #129516 |
| **Parcel Number:** | 104-17-243 |
| **Buyer:** | **David Henly** |
| **Seller:** | Great Western Homes |
| **Allocated:** | |
| **Sale Price:** | $205,485 (3BR/ 2BA  1,630 SF SFD) |
| **Contributory Value of Lot:** | **X      25%** |
| **Total Lot Value** | **$51,371** |
| **Property Rights** | |
| **Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $56,250 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 7,405 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Residential |
| **Unit Price Per/Lot:** | $51,371 |
| **Comments:** | This property is larger in size and has inferior amenities when compared to the subject property. |

## 5,445 SF FINISHED LOT SALES COMPARISON GRID (As of 12/31/14)

| FACTOR | SUBJECT | NO. 1 | | NO. 2 | | NO. 3 | |
|---|---|---|---|---|---|---|---|
| Location | N. Mineral Mountain Road | 18434 El Buho Pequeno | | 48059 N. La Soledad | | 18281 E. El Amancer | |
| Date of Sale | 12/31/14 | 7/25/07 | | 10/10/06 | | 10/13/06 | |
| Sale Price | $61,007 | $52,500 | | $52,412 | | $51,371 | |
| Lot Size | 5,445 SF | 6,098 SF | | 5,663 SF | | 7,405 SF | |
| Price per Lot | $61,007 | $52,500 | | $52,412 | | $51,371 | |
| **CHARACTERISTIC SUBJECT** | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing Terms | Cash | Cash | | Cash | | Cash | |
| Conditions of Sale | Arm's Length | Arm's Length | | Arm's Length | | Arm's Length | |
| Market Conditions | Prospective- Stable | Similar | -0- | Similar | -0- | Similar | -0- |
| Adjusted Price/Lot | $61,007 | $52,500 | | $52,412 | | $51,371 | |
| **PHYSICAL ADJUSTMENTS** | | | | | | | |
| Size | 5,445 SF | 6,098 SF | (1,000) | 5,663 SF | -0- | 7,405 SF | (5,000) |
| Location | Good | Superior | (10,000) | Superior | (10,000) | Superior | (10,000) |
| View | Good | Inferior | +15,000 | Inferior | +15,000 | Inferior | +15,000 |
| Location within the subdivision | Average | Superior | (6,041) | Superior | (6,041) | Similar | -0- |
| Amenities | Yes | No | +10,000 | No | +10,000 | No | +10,000 |
| **ADJUSTMENTS** | | | | | | | |
| Size | (1,000); (5,000) | 51,500 | | 52,412 | | 46,371 | |
| Amenities | +10,000 | 61,500 | | 62,412 | | 56,371 | |
| View | +15,000 | 76,500 | | 77,412 | | 71,371 | |
| Location | (10,000) | 66,500 | | 67,412 | | 61,371 | |
| Specific Location within Subdivision | (6,292) | 60,459 | | 61,371 | | 61,371 | |
| Net Adjustment | | +7,959 | | +8,959 | | +10,000 | |
| Adjusted Unit Price | $61,007 | 60,459 | | 61,371 | | 61,371 | |
| **WEIGHTED VALUES** | | | | | | | |
| Reliability (1-10) | | 8 | | 8 | | 8 | |
| Contribution (%) | | 0.3333 | | 0.3333 | | 0.3333 | |
| Contribution ($) | $61,007 | $20,133 | | $20,437 | | $20,437 | |

## LAND RESIDUAL TECHNIQUE

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

**A.    Typical Finished Lot Value Analysis** (continued)

    **1. Sales Comparison Analysis**

        **a.    Property Rights, Financing Terms and Conditions of Sale:**

            All comparable site sales were sold or listed as Fee Simple Estates.  Financing    terms for the sales represented cash or its equivalent to the sellers.  Lastly, Conditions of Sale were based on an arm's length basis.  These three characteristics of the sale properties are equal to the assumptions being applied to the subject property.  Consequently, no adjustments were necessary for these three characteristics of the sale properties.

        **b.    Time and Market Conditions:**

            Market Value estimates assume an open and competitive marketplace.  Current market conditions leading up to the date of appraisal have been a period of increasing market activity.  Proper analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of Market Value.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of Market Value.  The subject property is being appraised during prospective stable market conditions.   All three comparable lot sales  were also sold during  similar  market conditions.  Therefore, no adjustments were made.

        **c.    Size Adjustment:**

            Comparable Lot Sales #1 & #3 are either larger or smaller than the subject property.  Therefore, adjustments were made according to size.

        **d.    Amenities Adjustment:**

            All three Comparable Lot Sales have inferior amenities when compared to the subject property.   Therefore, an upward adjustment of $10,000  per lot was made to all three Comparable Lot Sales.

        **e.    View Adjustment:**

            All three Comparable Lot Sales have inferior views when compared to the subject property.  Therefore, an upward adjustment of $15,000 per lot was made to all three Comparable Lot Sales.

        **f.    Location Adjustment:**

            All three Comparable Lot Sales have superior locations when compared to the subject property.  Therefore, a downward adjustment of $10,000 per lot was made to all three Comparable Lot Sales.

**LAND RESIDUAL TECHNIQUE**

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

A.    **Typical Finished Lot Value Analysis** (continued)

g.    **Specific Location within Subdivision Adjustment:**

A matched pair was found between Comparable Sale #2 & #3.  They are exactly alike except Comparable Sale #2 has a superior location within the subdivision.  Comparable Sale #1 also has a superior location.  Therefore, a downward adjustment of $6,041 per lot was made to Comparable Sale #1 & #2.

2.    **Finished Lot Value Conclusion**

The lot sales described in this report were representative of the current market in the subject's neighborhood.  These sales allowed for derivation of market adjustments to be applied for differences between the sales and subject property.  The results from the grid indicated a range of $60,459 per lot to $61,371 per lot with an adjusted price per lot of $61,007 for the subject site.

Reliability factors from 1 to 10, 10 being the most comparable, were assigned to the comparable sales.  The sales were rated for reliability on the basis of size and number of adjustments.  Adding these factors together and dividing individually indicated a percent contribution for each sale.  Multiplying these contributions by the adjusted sale value indications per acre indicated a dollar contribution per sale.  Adding these dollar contributions together indicated a dollar per lot value for the subject site.  The market value indication of the typical finished lot can therefore, be calculated as follows:

| Lot Value Indication by Comparable Sales Analysis | = | $61,007 |
|---|---|---|
| **FINISHED LOT MARKET VALUE INDICATION BY COMPARABLE SALES (Rounded)** | = | **$61,000** |

Therefore, it is my opinion that the aggregate "retail" market value of the fee simple interest for the subject's 200 finished lots if sold to individual purchasers, as of the prospective date December 31, 2013, is as follows:

| **AGGREGATE RETAIL OF 200 LOTS** | X | $61,000 | = | $12,200,000 |
|---|---|---|---|---|

**$12,200,000 ($61,000/Finished Lot)**

**(TWELVE MILLION TWO HUNDRED THOUSAND DOLLARS)**

## LAND RESIDUAL TECHNIQUE

### COMPARABLE COMMERCIAL SUPER PAD SALES MAP



## LAND RESIDUAL TECHNIQUE

### COMMERCIAL SUPER PAD SALE COMPARISON #1



| | |
|---|---|
| **Location:** | **NEC Pecos Road, Mesa, AZ** |
| **Date of Sale:** | **12/08** |
| **Documentation:** | Doc #1030437 |
| **Parcel Number:** | 304-34-928 |
| **Buyer:** | **Allied Waste** |
| **Seller:** | **Jerome Stehly** |
| **Sale Price:** | $3,115,000 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $3,115,000 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 9.52 Acres (414,691 SF) |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Commercial |
| **Unit Price Per/SF** | $7.51/SF |
| **Comments:** | This property is smaller in size and has a superor location  when compared to the subject property. |

## COMMERCIAL SUPER PAD SALE COMPARISON #2



| | |
|---|---|
| **Location:** | 4215 N. 91st Street, Phoenix, AZ |
| **Date of Sale:** | **8/08** |
| **Documentation:** | Doc #080720971 |
| **Parcel Number:** | 102-19-007N |
| **Buyer:** | **NEC 91st & Indian School, LLC** |
| **Seller:** | **91st & Indian School, LLC** |
| **Sale Price:** | $3,819,697 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $3,819,697 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 9 Acres (392,040 SF) |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Commercial |
| **Unit Price Per/SF** | $9.74/SF |
| **Comments:** | This property is slightly smaller in size and has a superior location when compared to the subject property. |

## COMMERCIAL SUPER PAD SALE COMPARISON #3



| | |
|---|---|
| **Location:** | **Pecos Road & Ranch House Road, Gilbert**, AZ |
| **Date of Sale:** | **2/08** |
| **Documentation:** | Doc #N/A |
| **Parcel Number:** | 304-60-960 |
| **Buyer:** | **N/A** |
| **Seller:** | **Depot at Power Center** |
| **Sale Price:** | $1,798,000 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Conventional |
| **Cash Equivalency:** | $1,798,000 |
| **Conditions of Sale:** | Arms length transaction. |
| **Market Conditions:** | Stable |
| **Lot Size:** | 196,891 SF |
| **Topography:** | Mostly Level |
| **Utilities:** | All public utilities appear to available to the site. |
| **Zoning:** | Commercial |
| **Unit Price Per/SF** | $9.00/SF |
| **Comments:** | This property is smaller in size and has a superior location when compared to the subject property. |

## THE SALES COMPARISON APPROACH

## 10.56 ACRE – 451,282 SF COMMERCIAL SUPER PAD SALES COMPARISON GRID (As of 12/31/14)

| FACTOR | SUBJECT | NO. 1 | | NO. 2 | | NO. 3 | |
|---|---|---|---|---|---|---|---|
| Location | N. Mineral Mountain Road | NEC Pecos Road Mesa | | 4215 N. 91st Street Phoenix | | Pecos Road & Ranch House Road Gilbert | |
| Date of Sale | 12/31/14 | 12/08 | | 8/08 | | 2/08 | |
| Sale Price | $4,404,512 | $3,115,000 | | $3,880,000 | | $1,798,000 | |
| Lot Size | 451,282 SF | 414,691 SF | | 392,040 SF | | 196,891 SF | |
| Price per SF | $9.76 | $7.51 | | $9.74 | | $9.13 | |
| **CHARACTERISTIC SUBJECT** | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Financing Terms | Cash | Cash | | Cash | | Cash | |
| Conditions of Sale | Arm's Length | Arm's Length | | Arm's Length | | Arm's Length | |
| Market Conditions | Prospective- Stable | Less Stable | +10% | Less Stable | +10% | Less Stable | +10% |
| Adjusted Price/Lot | $9.76 | $8.26 | | $10.71 | | $10.04 | |
| **PHYSICAL ADJUSTMENTS** | | | | | | | |
| Size | 451,282 SF | 414,691 SF | ($0.50) | 392,040 SF | ($0.50) | 196,891 SF | ($1.00) |
| Location | Good | Superior | ($0.50) | Superior | ($0.50) | Superior | ($0.50) |
| Access/Visibility | Average | Superior | ($0.50) | Superior | ($0.50) | Superior | ($0.50) |
| Zoning | Commercial Resort | Commercial Office | +1.28 | Similar | -0- | Similar | -0- |
| Specific Location | Good | Inferior | +1.50 | Inferior | +1.50 | Inferior | +1.50 |
| Off-Site Improvements | To Super Pad Status | Similar | -0- | Similar | -0- | Similar | -0- |
| **ADJUSTMENTS** | | | | | | | |
| Size (Lg – Sm) | (0.50), (1.00), | 7.76 | | 10.21 | | 9.04 | |
| Location | (0.50) | 7.26 | | 9.71 | | 8.54 | |
| Access | (0.50) | 6.76 | | 8.71 | | 8.04 | |
| Specific Location | +1.50 | 8.26 | | 10.21 | | 9.54 | |
| Zoning 1 & 3 | +1.28 | 9.54 | | 10.21 | | 9.54 | |
| Net Adjustment | | +1.28 | | ($0.50) | | ($0.50) | |
| Adjusted Unit Price | $9.76 | $9.54 | | $10.21 | | $9.54 | |
| **WEIGHTED VALUES** | | | | | | | |
| Reliability (1-10) | | 8 | | 8 | | 8 | |
| Contribution (%) | | 0.3333 | | 0.3333 | | 0.3333 | |
| Contribution ($) | $9.76 | $3.18 | | $3.40 | | $3.18 | |

_____

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

**B.    Commercial Super Pad Value Analysis** (continued)

**1. Sales Comparison Analysis**

**a.    Property Rights, Financing Terms and Conditions of Sale:**

All comparable site sales were sold or listed as Fee Simple Estates.  Financing     terms for the sales represented cash or its equivalent to the sellers.  Lastly, Conditions of Sale were based on an arm's length basis.  These three characteristics of the sale properties are equal to the assumptions being applied to the subject property.  Consequently, no adjustments were necessary for these three characteristics of the sale properties.

**b.    Time and Market Conditions:**

Market Value estimates assume an open and competitive marketplace.  Current market conditions leading up to the date of appraisal have been a period of increasing market activity.  Proper analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of Market Value.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of Market Value.  The subject property is being appraised during prospective stable market conditions.   All three comparable site sales  were also sold during  similar  market conditions.  Therefore, no adjustments were made.

**c.    Size Adjustment:**

All three Comparable Super Pad Sales are smaller than the subject property.  Therefore, a adjustments were made according to size.

**d.    Location Adjustment:**

All three Comparable Super Pad Sales have superior locations when compared to the subject property.   Therefore, a downward adjustment of $0.50 per square foot was made to all three Comparable Super Pad Sales.

**e.    Access Adjustment:**

All three Comparable Lot Sales have superior access/visibility when compared to the subject property.  Therefore, a downward adjustment of $0.50 per square foot  was made to all three Comparable Lot Sales.

**f.    Specific Location Adjustment:**

All three Comparable Super Pad Sales have inferior specific locations when compared to the subject property.  Therefore, an upward adjustment of 1.50 per square foot was made to all three Comparable Super Pad Sales.

## THE SALES COMPARISON APPROACH

---

**THE SALES COMPARISON APPROACH TO VALUE** (continued)

**B.    Commercial Super Pad Value Analysis** (continued)

    **g.    Zoning Adjustment:**

        A matched pair was found between Comparable Sale #1 & #3. They are exactly alike except Comparable Sale #1 is considered to have inferior zoning. Therefore, an upward adjustment of $1.28 per square foot was made to Comparable Sale #1.

    **1.    Commercial Super Pad Value Conclusion**

        The lot sales described in this report were representative of the current market in the subject's neighborhood. These sales allowed for derivation of market adjustments to be applied for differences between the sales and subject property. The results from the grid indicated a range of $9.54, per SF to $10.21 per SF with an adjusted price per SF of $9.76 for the subject site.

        Reliability factors from 1 to 10, 10 being the most comparable, were assigned to the comparable sales. The sales were rated for reliability on the basis of size and number of adjustments. Adding these factors together and dividing individually indicated a percent contribution for each sale. Multiplying these contributions by the adjusted sale value indications per acre indicated a dollar contribution per sale. Adding these dollar contributions together indicated a dollar per SF value for the subject site. The market value indication of the 10.36 acre 451,282 SF commercial super pad can therefore, be calculated as follows:

| 471,160 SF Commercial Super Pad | X | $9.76/SF | = | $4,404,512 |
|---|---|---|---|---|
| **471,160 SF Commercial Super Pad (Rounded)** | | | | **$4,405,000** |

        The subject property consists of 3 Commercial Super Pads. The previous grid was used to determine the value of the 10.36 Acre commercial super pad. The other two commercial super pads are 1.56 Acres (67,954 SF) and 2.32 Acres (101,059 SF). Adjustments were made for site size and indicated the aggregate retail of all three commercial super pads as of the prospective date of 12/31/14, as follows:

| 67,954 SF Commercial Super Pad | X | $11.00/SF | = | $  747,000 |
|---|---|---|---|---|
| 101,059 SF Commercial Super Pad | X | $10.76/SF | = | $1,087.000 |
| 471,160 SF Commercial Super Pad | X | $9.76/SF | = | $4,405,000 |
| **Total Aggregate Retail (Rounded)** | | | | **$6,239,000** |

## THE INCOME APPROACH

**C.  Golf Course Membership Sales Analysis:**

For the purposes of this appraisal the development of the golf course and clubhouse were assumed to be marketed as a private equity club of 250 members per nine holes or a total of 500 equity members.  Once all memberships are sold, the golf course improvements and the underlying land become the possession of the equity members without a further reversionary value to the developers.

Based on the price points of the proposed development, it is economically feasible to build a golf course, clubhouse and related amenities whereby the initiation fee to join the club would be $55,000 with monthly dues of $500 per month.

The developer of the master planned community is responsible for initially building the golf course and clubhouse as not only an amenity to the overall development, but to add value to view lots overlooking fairways, greens and tee boxes.  Also, the developer will be responsible for maintaining the golf course development until all equity memberships are sold and the golf course development is formally transferred to the equity member ownership entity.  Consequently, the initial membership initiation fees and monthly dues as well as the golf course development  expenses will be included in the discounted cash flow in determining the "As Is" market value of the land as vacant.  Therefore, intrinsic in the "As Is" market value of the land as vacant will be the benefit of the proposed golf course.

---

**Discounted Cash Flow Analysis to solve for the Bulk or Wholesale Market Value of the proposed Superstition Views Development:**

The method is referred to as yield capitalization because it analyzes whether an investment property will produce the particular level of profit or yield required. The discounted cash flow assumptions are contained below.

**Discounted Cash Flow and Land Residual Assumptions**

| Date of Appraisal: | | December 31, 2009 |
|---|---|---|
| Holding Period: | | 11 Years ; From Completion to Sell-Out |
| Number of Estate Lots | 71 | |
| Average Lot Value | $239,760 | |
| Total Aggregate Retail | $17,023,000 | |
| Number 11,050 SF Lots | 129 | |
| Average Lot Value | $80,163 | |
| Total Aggregate Retail | $10,341,000 | |
| Number 8,700 SF Lots | 305 | |
| Average Lot Value | $69,669 | |
| Total Aggregate Retail | $21,249,000 | |
| Number of Casita Lots (5,445 SF) | 200 | |
| Average Lot Value | $61,000 | |
| Total Aggregate Retail | $12,200,000 | |
| 10.36 Acre Commercial Super Pad | $4,405,000 | |
| 1.56 Acre Commercial Super Pad | $747,000 | |
| 2.32 Acre Commercial Super Pad | $1,087,000 | |
| Total Absorption Per Year for all residential product | 94 | (7.83/month average) |
| Total Absorption Per Year for Commercial Super Pads | 1 | |
| Number of Private Golf Course Memberships | 500 | 125 memberships per year |
| Value Per Membership | $55,000 | |
| Total Aggregate Retail of Golf Course Memberships | $27,500,000 | |
| | | |
| Total Aggregate Retail of Development | $94,551,000 | Aggregate Retail Value |
| Annual Appreciation | -0- | CPI & Inflation as offset |
| Appreciation Rate | -0- | CPI & Inflation as offset |
| Present Value Factor | | 11% Bulk; 9% Land Residual |

## THE INCOME APPROACH

### 1. Discounted Cash Flow Calculations

The following pages contain discounted cash flow income and expense calculations related to the subject's 634 Lots, 3 Commercial Super Pads, 18 hole golf course and clubhouse and 500 private golf course memberships "as if complete" and ready for sale upon the retrospective date of the appraisal.

## THE INCOME APPROACH

**B.** **"As If Complete" Bulk or Wholesale Market Value of the entire project**
**As of 12/31/09   (continued).**

**THE INCOME APPROACH**

**C.  "As Is" Vacant Land  Market Value of 640 Acres as of 12/31/09 (continued)**

## THE INCOME APPROACH

**D.    "Prospective As If Complete"  Bulk or Wholesale Market Value of  entire project as of 12/31/14**

**RECONCILIATION**

_____

### III. RECONCILIATION AND FINAL ESTIMATE OF VALUE (Fee Simple)

- **"As Is" Market Value Land Residual Technique**            **$14,630,000**
- **"As Is" Market Value Sales Comparison Approach**       **$14,279,000**

Reconciliation involves analysis of the quantity and quality of all data in the report. The advantages, relevance, and market support for each of the approaches to value was considered. Conclusions were derived throughout the report explaining any discrepancies using reasonable judgment, tying it all together and relating the results to the subject property. Because the real estate market is imperfect, complete agreement of the approaches in not necessary. However, reasonable conclusions were reached using the groundwork established in the appraisal report.

The purpose of this appraisal is to estimate and report my opinion of the subject property's "As Is" MARKET VALUE of the 640 acres  if it were sold to an individual buyer.

A thorough search was conducted in the local Multiple Listings Service, First American Title Loopnet, and Real Quest for any evidence of vacant residential land market value during the past 18 months.

Therefore, based upon my investigation and analysis of the data gathered with respect to this assignment, I have formed the opinion that the "As Is" MARKET VALUE of the subject property, as of the retrospective date December 31, 2009, is measured in the amount of:

**$14,450,000 ($22,578/Acre)**

**(FOURTEEN MILLION FOUR HUNDRED FIFTY THOUSAND DOLLARS)**

Reasonable exposure time necessary to sell this property to a single purchaser prior to the date of this appraisal is estimated to be 8 to 10 months.

_____

[1] Later in this report the reader will note the appraiser estimated an exposure time to sell this property after the date of this appraisal at 10-12 months. Consequently, due to current negative economic conditions, if the property must be sold prior to this 10-12 month exposure period after the date of this appraisal, the sales price would be considered a liquidation value which could be significantly less than the appraised market value.

**ADDENDA**

**CURRICULUM VITAE OF THE APPRAISER**
_____

**RAYMOND L. DOZIER, MAI**
DOZIER APPRAISAL COMPANY
Resort and Urban Property Appraisers
73-350 El Paseo, Suite 206
Palm Desert, California 92260
Telephone (760) 776-4200
Fax  (760)  776-4977
E-Mail dozierappraisal@dc.rr.com

| | | |
|---|---|---|
| **Education:** | University of Kentucky, B.A., | 1974 |
| | Business Administration and Economics | |
| | | |
| | Law Student, JD Candidate, | |
| | Saratoga University | |
| | | |
| **Professional:** | MAI Member, Appraisal Institute | |
| | Committee Member, Experience Review for MAI Designation | |
| | Member, International Council of Shopping Centers (ICSC) | |
| | Member, National Association of Realtors | |
| | Member, California Association of Realtors | |
| | Member, Certified Divorce Planners | |
| **Expert Witness:** | Superior Court of California | |
| | U.S. District Court | |
| | Federal Bankruptcy Court | |
| | | |
| **Licenses:** | State of California Certified General Real Estate Appraiser #AG004590 | |
| | State of California Real Estate Broker #01173680 | |
| | | |
| **Experience:** | Commercial Appraiser - Associate with | 1972-1980 |
| | R.W.  Karlee, MAI | |
| | Dozier Appraisal Company, Resort & Urban | 1980 - |
| | Property Appraiser - Owner | |
| | | |
| **Faculty:** | Guest Instructor: University of Kentucky; Courses Taught Corporate Finance and The Time Value of Money. | |

**Continuing Education:** Subdivision Analysis; Litigation Valuation; Discounted Cash Flow; Economy and Local Trends; Architecture and Construction; FIRREA Law; Current Issues in Appraising; Summary and Restricted Reports; Special Purpose Property Appraisals – Going-Concern & Business Value; Subdivision Analysis; Fast Food Restaurant Valuation; "Benefits" in Eminent Domain Property Valuations; Attacking & Defending an Appraisal in Litigation; Master Planned Communities Skilled Nursing Facilities; Valuation of Detrimental Conditions; Real Estate Fraud and Appraiser's Role.

Page 2 - Curriculum Vitae of the Appraiser

**Partial List of Clients:**

**Legal and Accounting Firms:**

Pillsbury, Madison & Sutro - L.A.        Schlecht, Shevlin & Shoenberger
Rutan & Tucker - Costa Mesa, CA      Murphy, Pearson, Bradley & Feeney - San Francisco
Scott J. Zundel                                    Best, Best & Krieger

**Lending Institutions:**

El Dorado Bank                             Union Bank
American Commerce Bank               Valley National Bank of Arizona
Home Savings of America                Manufacture's Bank
First Security Mortgage                   PFF Bank & Trust
  Salt Lake City, Utah                       (Formerly Pomona First Federal)
Wells Fargo Bank                           First Security Bank
Palm Springs Savings Bank             Farmer's Merchant Bank - Long Beach
First Community Bank                     Riverside National Bank
Palm Desert National Bank             San Diego National Bank
Bank of the Desert                        Mitsubishi Bank, LTD
Bank of California                          Midland Financial - Clearwater, FL
Transco Mortgage Company            First Interstate Bank
Bank of Los Angeles                      Mitsubishi Bank, LTD

**Government Agencies:**

Bureau of Indian Affairs                  City of Cathedral City
Bureau of Land Management ( BLM )    RTC - Contract
Palm Springs California Edison         City of Palm Desert
Southern California Edison              City of Moreno Valley
Southern California Gas                  FDIC
City of Rancho Mirage                   Department of Indian Affairs
City of Coachella                          Sacramento, CA
City of Indio                                 City Indian wells
City of Palm Springs                     Farmer Home Administration
County of Riverside                      State of California Department of Ins.
U.S. Department of Agricultural       SBA Regional Office
City of La Quinta                          Federal Aviation Administration (FAA)
Riverside County Housing              Riverside County Flood Control

**Schools:**                                    **Utilities:**

Desert Sands Unified School District      Coachella Valley Water District
Morongo Unified School District           Morongo Water District
Palm Springs Unified School District      Cal - Trans
                                                       Desert Water Agency

Page 3 - Curriculum Vitae of the Appraiser

| **Hospitals:** | **Corporations:** |
|---|---|
| | |
| Eisenhower Medical Center | Bechtel Corporation |
| JFK Memorial Hospital | Motion Picture & TV Fund |
| Riverside General Hospital | |
| Desert Hospital | |

| **Non-Profit Organizations:** | **Insurance Companies:** |
|---|---|
| | |
| Berger Foundation | Republic Western, Scottsdale, AZ |
| Joseph Drown Foundation | |

**Real Estate Development & Engineering:**

| | |
|---|---|
| Wessman Construction Company | Strother Construction Company |
| American Properties Funding | Regency Homes - Peter Soloman |
| Del Webb California Corporation | Orr Construction |
| Lowe Development | Aqua Caliente Band of Cahuilla Indians |
| Ocean Properties - San Diego | Ruby Broadcasting Company |
| Oliphant & Lizza, Development Group | |

**Appraisal Functions Include:**

Acquisitions, Bankruptcy, Bond Financing, Condemnation, Construction Defect, Disposition and Liquidation Decision Making, Abundance of Caution for Federally Related Transaction, Donation, Estate Tax Appeal, Exchange, Excess Land, Determination of Economic Feasibility and Market Absorption, Foreclosures, Litigation, Real Property Tax Appeal, Negotiation, Partnership Dissolution, Portfolio Review for Non-Profits, Redevelopment, Lending for Real Property and Going Concern, Group Rental for Long Term Leases, Determining Highest and Best Use of Undeveloped Acreage, Claims of Damage to Real Estate Caused by Other Party, USPAP Compliance Appraisal Review.

**Typical Appraisal Assignments:**

**Public:**

Airport Expansions, Assessment Districts, Electrical & Access R/W's, Flood Control Projects, Park Sites, Subterranean Pipeline Easements, Golf Courses, Proposed Prison Sites, Public Right -of - Way Dedications, Railroad R/W's,  School Sites, Temporary Easements, Urban and Rural Mountainous Land, Indian and Leaseholds and    Lease Fees,   Mountainous Communication Tower Sites, IRS seizes on Questionable Properties, Desert Lands, Accretion Interests Caused By Changing River Courses, and RTC Deposition for Auctions.

**Private:**

Drug Rehab Centers, Cold Storage Facilities, Mobile Home Parks, Day Care Centers, Mini-Storage, Newspaper Buildings, Proposed Service Station, Car-washes, Apartment Complexes, Medical Office Buildings, Neighborhood & Community Shopping Centers, Residential and Commercial Subdivisions, Restaurant Going - Concern, Undeveloped Acreage, Highest and Best Used Studies, Highway Patrol Facilities, Churches, Special Purpose Properties, Trucking, Distribution Facilities, Golf Course Properties, Proposed Time-Share Developments, Aggregate Retail and Bulk or Wholesale Values of proposed           Subdivision Developments, Retrospective Real Property Valuations, Motels, Parking Lots,   Gypsum   Mine Acres,   Clothing   Optional Resorts, R & D Industrial   Facilities, Historical Buildings, Agricultural Going - Concern, Riverfront Properties, Ranch's and Equestrian Centers, Thoroughbred Racehorse Farms, Sports Clubs, Multi -Screen Movie       Theaters, High-rise Office Buildings, Planned Unit Developments (PUD's), to Estimate Liquidation Value for Forced Sale or Auction Proceedings, Recreation Properties, Campgrounds, and Cemeteries.

Page 4 - Curriculum Vitae of the Appraiser

**Interest and Value Types Appraised:**

Fee Simple Estate
Leased Fee Estate
Lease Hold Estate
Sandwich Leasehold Estate
Life Estates
Vertical Estates (Subsurface & Air Rights)
Easements
Partnership Interests
- Joint Tenancy Value
- Tenancy by the Entirety Value
- Tenancy in Common Value
Market Rental Value
Specialized Fractional Ownership
- Condominium Interest
- Cooperative Interest
- Timeshare Interest
Legal Entities Affecting Ownership
- Stock Corporation Market Value
- Land Trust Beneficiary's Partial Interest
- Fixed Assets
  - Tangible Assets Value
  - Intangible Assets Value
  - Financial Assets Value
- General and Limited Partnership Interests
- Equity Syndications
- Closely Held Business
  - Going Concern Value (Real Property & Business Value)
  - Business Value only
- Liquidation Value vs Continued Operation of Business
- Use Value (as opposed to Value in Exchange)
Investment Value (individual's Investment Return Objectives)
Highest and Best Use Analysis Impacting Value
  - Economic Feasibility Studies
Eminent Domain (State and Federal Rule)
  - Just Compensation Estimates for Public Takings of Private Property Interests
  - Determination of the " Larger Parcel"
  - Other Legal Matters
    - Valuation of Detrimental Conditions, Construction Defects, etc.
    - Diminution of Value ( Before and After )

# DOZIER APPRAISAL COMPANY
### Resort and Urban Property Appraisers
### Valuation and financial Consultants
_____

73-350 EL PASEO, SUITE 206
PALM DESERT, CALIFORNIA 92260

RAYMOND L. DOZIER, MAI                                          TEL. (760) 776-4200
CERTIFIED GENERAL APPRAISER                                    FAX (760) 776-4977
LICENSE # AG004590                                  E-MAIL dozierappraisal@dc.rr.
STATE TAX ID # 61-1063795

# COMPANY PROFILE

Dozier Appraisal Company is a real property and financial consulting firm specializing in litigation consulting and real property/business valuation services. Founded in 1980 as a real property /business valuation firm, Dozier Appraisal Company consists of a team of dedicated professionals with experience in financial and economic analysis, real property valuation, business valuation, condemnation, damage analysis and related disciplines.

## REAL PROPERTY AND BUSINESS VALUATIONS SERVICES

Dozier Appraisal Company has extensive expertise in valuation of all types of complex real property interests and of close-held businesses. The firm provides assistance in valuation matters for:

Real Property

- Estates; Private Lending
- Commercial Lending
- Eminent Domain Proceedings
- Highest and Best Use Analysis
- Partial Interest Valuation
- Economic Feasibility
- Market Rental and Absorption

Businesses

- Marital Dissolution
- Community Property Settlement
- Partnership or Corporate Dissolution
- Estate, Gift and Other Tax Matters
- Stock Contributions to Charitable Organizations
- General Business Litigation

The firm has completed more than two thousand valuation assignments covering wide spectrum of industries including:

- Resorts
- Agriculture
- Contracting
- Distribution
- Financial Services
- Public Agencies

- Hospitality
- Manufacturing
- Professional Practice
- Retail
- Sports & Leisure
- Services

Page 2 – Company Profile

In addition, Dozier Appraisal Company has expertise in valuing intangible business assets, including:

- Going Concern Value
- Goodwill
- Existing Contracts
- Brand Names & Registered Trademarks
- Affiliation Agreements
- Franchises
- Firm Rights

- Copyrights
- Leasehold Interests
- Licenses
- Patents
- Employment Contracts
- Mailing Lists
- Water Rights
- Tax Credits for Past Losses

The Philosophy of Dozier Appraisal Company is to provide thoroughly, objective valuation analysis of real property interest and closely-held companies.  The firm accepts many of its valuation assignments by stipulation of the parties to a legal proceeding in which the value of real property or business interests are at issue.  Appraisals prepared by Dozier Appraisal Company have been successfully defended in the courts many times.

## **Community Property Matters**

The valuation of a going business or professional practice in a community property division is a complicated process requiring a broad-based knowledge of the laws pertaining to community property business valuations.  Although Dozier Appraisal Company does not render legal services, the firm has significant expertise in community property assignments, including the valuation of non-salable professional goodwill and calculations relating to the allocation of business appreciation between community and separate property (Pereira and Van Camp analysis).

## **Eminent Domain Matters**

Dozier Appraisal Company has extensive experience in just Compensation estimates for public takings of private property interests.  One of the most critical factors in determining the taking's "before" and "after" market value is the estimation of "what is the Larger Parcel"? Damages to the remainder due to a partial taking can be significant.  Consequently, it is critical that the "Larger Parcel" be accurately determined.  Dozier Appraisal Company can be instrumental in providing legal counsel consultation in review of opposition's appraisal; suggested line of questioning in valuation matters regarding depositions and trials; and a fair and though explanation of all influences that impact market value.

Page 3 – Company Profile

**LITIGATION CONSULTING SERVICES**

Dozier Appraisal Company provides a full spectrum of litigation support services to the legal community.  The firm's area of expertise includes evaluation of economic damage resulting from business torts, breach of contract, personal injury, wrongful termination and other causes of action.  Litigation support services range from document review and preliminary damage calculations to complete financial analysis and research culminating in a formal, written report or expert testimony.

## Financial and Economic Analysis

Dozier Appraisal Company provides financial and economic analysis to a estimate damages in civil litigation matters.  The professional staff of Dozier Appraisal Company has expertise in damage analysis and computing lost profits for many types of cases, including:

- Antitrust
- Breach of Contract
- Business Interruption
- Business Torts
- Copyright Infringement
- Fraud and Embezzlement
- Lender Liability
- Patent Infringement
- Personal Injury
- Professional Liability
- Wrongful Death
- Wrongful Termination

## Forensic Appraising Services

The firm performs investigative services in the areas of:

- Tracing separate and community funds
- Searching for unrecorded income
- Analyzing expenses and expenditures
- Reconstruction of incomplete or inaccessible records

## Other Consulting Services

In addition to our other services, Dozier Appraisal Company can facilitate discovery, settlement negotiation and trial preparation by:

- Providing economic research
- Reviewing financial documents and selecting key items to be analyzed
- Conducting quantitative analysis for settlement negotiations

Page 4 – Company Profile

## **Other Consulting Services** (Cont'd)

- Locating outside information sources
- Preparing questions for and interpreting responses of other financial witnesses
- Assisting in cross examination preparation
- Critiquing opinion and providing rebuttal testimony

## **Expert Testimony**

The senior associates at Dozier Appraisal Company have significant litigation experience.   The firm's philosophy is to present credible, defensible solutions to financial and economic issues in concise reports or though expert testimony, if required.  The use of courtroom quality graphics helps to illustrate our findings in a readily understandable format.

## ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report has been made with the following general and specific assumptions:

1.  No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management is assumed.

4.  The information furnished by others is believed to be reliable. However, no warranty is given for its accuracy.

5.  All engineering is assumed to be correct. The plot plans and illustrative material in the report are included only to assist the reader in visualizing the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or in arranging for engineering studies that may be required to discover them.

7.  It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

8.  It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined, and considered in the appraisal report.

9.  It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report is based.

10. The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

11. Possession of this report, or a copy thereof, does not carry with it the right of publication.

12. The appraiser, by reason of this appraisal, is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.

Page 2
Assumptions and Limiting Conditions

13.    Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm, with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser.

14.    Any value estimates provided in the report apply to the entire property, and any proration or division of the total into fractional interests will invalidate the value estimated, unless such proration or divisions of interests have been set forth in the report.

15.    No legal description or survey was furnished so the appraiser utilized the county tax plat to ascertain the physical dimensions and acreage of the property. Should a survey prove these characteristics inaccurate, it may be necessary for this appraisal to be adjusted.

16.    The forecasts, projections, or operation estimates contained herein are based upon current market conditions, anticipated short-term supply and demand factor, and a continued state economy. These forecasts are, therefore, subject to changes in future conditions.

17.    The term "Market Value", as used in this report, as agreed upon by federal financial institutions in the United States of America is:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeable, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated.

- Both parties are well informed or well advised, and acting in what they consider their best interests.

- A reasonable time is allowed for exposure in the open market.

- Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto.

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Page 3
Assumptions and Limiting Conditions

18.    The appraiser assumes no responsibility for economic, physical of demographic factors which may affect or alter the opinions in this report if said economic, physical or demographic factors were not present as of the date of the letter of transmittal accompanying this report. The appraiser is not obligated to predict future political, economic or social trends.

19.    In preparing this report, the appraiser was required to rely on information furnished by other individuals or found in previously existing records and /or documents. Unless otherwise indicated, such information is presumed to be reliable. However, no warranty, either expressed implied, is given by the appraiser for the accuracy of such information and the appraiser assumes no responsibility for information relied upon later found to have been inaccurate. The appraiser reserves the right to make such adjustments to the analyses, opinions and conclusions set forth in this report as may be required by consideration of additional or more reliable data that may become available.

20.    No opinion as to the title of the subject properties rendered. Data related to ownership and legal description was obtained from public records and is considered reliable. Title is assumed to be marketable and free and clear of all liens, encumbrances, easements, and restrictions except those specifically discussed in the report. The property is appraised assuming it to be under responsible ownership and competent management.

21.    The appraiser assumes no responsibility for hidden or unapparent conditions of the property, subsoil, ground water or structures that render the subject property more or less valuable. No responsibility is assumed in arranging for engineering, geological, or environmental studies that may be required to discover such hidden or unapparent conditions.

22.    The appraiser has not been provided any information regarding the presence of any material or substance on or in any portion of the subject property or improvements thereon, which material or substance possesses or may possess toxic, hazardous and/or other harmful and/or dangerous characteristics.   Unless otherwise stated in the report, the appraiser did not become aware of the presence of any such material or substance during the appraiser's inspection of the subject property. However, the appraiser is not qualified to investigate or test for the presence of such materials or substances. The presence of such materials or substances may adversely affect the value of the subject property.  The value estimate in this report is predicated on the assumption that no such material or substance is present on or in the subject property or in such property or in such proximity thereto that it would cause a loss in value. The appraiser assumes no responsibility for the presence of any such substances or materials on or in the subject property, nor for any expertise or engineering knowledge required to discover the presence of such substance or material.  Unless otherwise stated, this report assumes the subject property is in compliance with all federal, state and local environmental laws, regulations and rules.

Page 4
Assumptions and Limiting Conditions

23.    Unless otherwise stated, the subject property is appraised assuming it to be in full compliance with all applicable zoning and land use regulations and restrictions.

24.    Unless otherwise stated, the property is appraised assuming that all required licensees, permits, certificates, consents or other legislative and/or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

25.    No engineering survey has been made by the appraiser. Except as specifically stated, data relative to size and area of the subject property was taken from sources considered reliable and no encroachment of the subject property is considered to exist.

26.    No opinion is expressed as to the value of subsidiaries oil, gas, or mineral rights or whether the property is subject to surface entry for the exploration or removal of such materials, except as expressly stated.

27.    Maps, plats and exhibits included in this report are for illustration only to serve as an aid in visualizing matters discussed within the report. They should not be considered as survey or relied upon for any other purpose, nor should they be removed from, reproduced or used apart from the report.

28.    No opinions are intended to be expressed for matters which require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate appraisers.

29.    Where the discounted cash flow analysis is utilized, it has been prepared on the basis of the information and assumptions stipulated in this appraisal report. The achievement of any financial projections or forecasts will be affected by fluctuating economic conditions and is dependent upon the occurrence of other future events that cannot be assured. Therefore, the actual results achieved may vary from the projections and such variation may be material.

30.    Property values are influenced by a large number of external factors. The information contained in the report comprised the pertinent data considered necessary to support the value estimate.  We have not knowingly withheld any pertinent facts, but we do not guarantee that we have knowledge of all factors which might influence the value of the subject property. Due to rapid changes in external factors, the value estimate is considered reliable only as of the effect date of the appraisal.

Page 5
Assumptions and Limiting Conditions

31.     The liability of Dozier Appraisal Company, its owner and staff is limited to the Client only and to the amount of fees actually paid for the services rendered, as liquidated damages, if any related dispute arises. Further, there is no accountability, obligation, or liability to any third party.  If this report is placed in the hands of anyone other than the Client, the Client shall make such party aware of all Limiting Conditions and Assumptions of the assignment and related discussions. The Appraiser is in no way responsible for any cost incurred to discover or correct any deficiencies of any type present in the property, physically, financially and/or legally. The Client also agrees that in case of a lawsuit (brought by lender, partner or part owner in any form or ownership, tenancy or any other party), Client will hold appraisers completely harmless for and against any liability, loss, cost or expense incurred or suffered by appraiser in such action, regardless of its outcome.

**Competency Provision**

32.     The appraiser undertaking this assignment warrants that he is competent in properly identifying the appraisal problem and has the necessary knowledge and experience to complete the assignment.

**Entire Fee Appraised**

33.     At the request of the Client, the valuation reported in the appraisal report relates to the value of the entire fee simple estate considered as whole. This valuation opinion is not divisible into portions of the subject property representing less than the entire fee simple estate.  For example, it may not be assumed that half of the fee simple estate has a market value of half of the market value for the entire fee simple estate.

**Appraisal Without Title Policy**

34.     A title policy was made available to the appraiser, although the appraiser assumes no responsibility for such items of record not disclosed by the appraiser's customary investigation.

**Soils/Geologic Studies**

35.     No detailed soils or geological studies or reports were made available to the appraiser. Premises employed in this report regarding soils and geologic qualities of the subject property have been discussed with the Client and are consistent with the information made available to the appraiser. However, such premises are not conclusive and the appraiser assumes no responsibility for soils or geological conditions discovered to be different form the conditions assumed in this report.

Page 6
Assumptions and Limiting Conditions

**Earthquake Potential**

36.    The property which is the subject of this appraisal is within a geographic area prone to earthquakes and other seismic disturbances. Except as specifically indicated in the report, no seismic or geological studies have been provided to the appraiser concerning the geologic and/or seismic conditions of the subject property. The appraiser assumes no responsibility for the possible effect on the subject property of seismic activity and/or earthquakes.

**Testimony in Court**

37.    Testimony or attendance in Court or at any hearing is not required by the reason of this appraisal unless further authorization to fully appraise the property involved is granted to the appraiser at a fee to be determined prior to the commencement of such additional work.

**Structural Deficiencies**

38.    The appraiser has personally inspected the subject property, and except as noted in this report, finds no obvious evidence of structural deficiencies in any improvements located on the subject property.  However, the appraiser assumes no responsibility for hidden defects or non-conformity with specific governmental requirements, such as fire, building and safety, earthquake or occupancy codes, unless inspections by qualified independent professionals or governmental agencies were provided to the appraiser. Further, the appraiser is not a licensed engineer or architect and assumes no responsibility for structural deficiencies not apparent to the appraiser at the time of his inspection.

39.    American with Disabilities Act of 1990 ("ADA") became effective January 26, 1992.  I have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property. Since I have no direct evidence relating to this issue, I did not consider possible non-compliance with the requirements of ADA in estimating the value of the property.

**Termite/Pest Inspection**

40.    No termite or pest infestation report was made available to the appraiser.  It is assumed that there is no significant termite pest damage or infestation, unless otherwise stated.

Page 7
Assumptions and Limiting Conditions

**Personal Property Not Appraised**

41.    No consideration has been given in this appraisal as to the value of the property located on the premises considered by the appraiser to be personal property, nor has the appraiser given consideration to the costs of moving or relocating such personal property; only the real property has been considered in this appraisal.

**Asbestos**

42.    The appraiser is not aware of the existence of asbestos in any improvement on the subject property.  However, the appraiser is not trained to discover the presence of asbestos and assumes no responsibility should asbestos be found in or at the subject property. For the purposes of this report, the appraiser assumes the subject property is free of asbestos and that the subject property meets all federal, state, and local laws regarding asbestos abatement.

**Archaeological Significance**

43.    No investigation has been made by the appraiser and no information has been provided to the appraiser regarding potential archaeological significance of the subject property or any portion thereof. This report assumes no portion of the subject property has archaeological or historical significance

44.    The value stated herein is not considered appropriate for a broad based ownership such as a syndication. It is understood and agreed that the appraisal report of valuation stated herein shall not be relied upon or utilized in any syndication or real estate security registration document.