SUMMARY REPORT FORMAT

"AS IS" MARKET VALUE IN FEE SIMPLE ESTATE
OF

**PHASE TWO OF THE PROPOSED DESERT LAKES DEVELOPMENT
450-ACRES (+/-) OF RESIDENTIAL LAND LOCATED
ALONG THE NORTHSIDE OF INTERSTATE 10, EAST OF DILLON ROAD
IN THE CITY OF COACHELLA,
RIVERSIDE COUNTY, CALIFORNIA
92236**

**EFFECTIVE DATE OF THE APPRAISAL**

DECEMBER 7, 2009

**DATE OF THE REPORT**

DECEMBER 1, 2009

**DOZIER FILE NUMBER L-09-131 (B)- LHP**

PREPARED FOR

**SPECIALTY TRUST
ATTN:  MR. NELLO GONFIANTINI III, PRESIDENT & CEO
6160 PLUMAS STREET
RENO, NV 89509**

**BY**

**Raymond L. Dozier, MAI
DOZIER APPRAISAL COMPANY
PALM DESERT, CA  92260**

# DOZIER APPRAISAL COMPANY
### Resort and Urban Property Appraisers
### Valuation and Financial Consultants
_____

73-350 EL PASEO, SUITE 206
PALM DESERT, CALIFORNIA 92260

RAYMOND L. DOZIER, MAI                                                        TEL. (760) 776-4200
CERTIFIED GENERAL APPRAISER                                                   FAX (760) 776-4977
LICENSE # AG004590                                              E-MAIL Dozierappraisal@dc.rr.com

December 1, 2009

Specialty Trust
Attn: Mr. Nello Gonfiantini, President & CEO
6160 Plumas Street
Reno, NV 89509

*RE:*    *"As Is" Market Value Appraisal of 450 gross acres residential land located east of
Dillon Road along the north side of Interstate 10, Coachella, CA , California 92236.*

Mr. Gonfiantini:

Enclosed is an appraisal I have made of the "As Is" Market Value in 450 gross acres of and
residential land located east of Dillon Road along the north side of Interstate 10, Coachella, CA,
California 92236. This appraisal was made at the request and agreement between Specialty
Trust and Dozier Appraisal Company. Specialty Trust is the client and intended user
of this report.

The purpose of this appraisal is to estimate and report my opinion of the "As Is" MARKET
VALUE of the subject's 450 acres if sold for cash or its equivalent to a single buyer as of my last
visitation date of December 7, 2009. In the "As Is" scenario, the property will be appraised at
whatever stage of development as of the effective date of the appraisal. All elements of a
MARKET VALUE sale are to be present in terms of the price upon which a willing and well-
informed seller and a willing and well-informed buyer would agree, in the absence of any
unusual compulsion on either, and reasonable exposure on the open and competitive market.
Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective
date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the
property interest being appraised. The function or use of the appraisal is for loan analysis.

The property rights appraised establish the FEE SIMPLE Interest of all future benefits that may
be derived from the property's present or possible use, except for existing easements and rights-
of-way of record.

To make this appraisal, Raymond L. Dozier, MAI, has made a personal visitation of the subject
property. He has reviewed sales of comparable properties and has weighed and compared this
data to arrive at his estimate of value for the subject property. The effective date of this
valuation is December 7, 2009.

*Dozier Appraisal Company*
*Palm Desert, California*

Page 2 of 3
Dozier Appraisal Company

This report is subject to the enclosed Assumptions and Limiting Conditions and the Certification of Value and The Scope and Extent of the Data Collection Process on Page 16 of this report. The following pertain to extraordinary assumptions, hypothetical conditions, or major highest and best conclusions made regarding this appraisal:

- In the analysis and feasibility study of this report, the extraordinary assumption is being made that the proposed McNaughton exchange at Interstate 10 will be financed with a Community Facilities District Bond.  (Extraordinary Assumption).

Otherwise, there are no other extraordinary assumptions, hypothetical conditions, or major highest and best conclusions made regarding this appraisal.  This letter of transmittal is not the complete appraisal report but a statement of value conclusions.  Users of the appraisal are encouraged to read the completed attached report to reach appraiser's conclusions via the appraisal process.

The intention of this appraisal report is to comply fully with FIRREA appraisal guidelines, as well as the current Uniform Standards of Professional Appraisal practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; and the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.  The departure provision in USPAP shall not apply to this appraisal.

The undersigned does not have any personal interest, either present or contemplated, in the subject property and certifies that fees, received or to be received, for the employment of my services are not contingent on the opinions reported herein.  In addition, the undersigned meets the Competency Provision Standard (1.1a,b,c) as required by USPAP and has the knowledge and experience to complete the assignment competently.

Therefore, based upon my investigation and analysis of the data gathered with respect to this assignment, I have formed the opinion that the Fee Simple interest in the subject property has an "As Is" MARKET VALUE, as of the effective date December 1, 2009, measured in the amount as follows:

**$11,200,000[1] ($24,889/Acre)***

**(ELEVEN MILLION TWO HUNDRED THOUSAND DOLLARS)**

Reasonable exposure time necessary to sell this property to a single purchaser
prior to the date of this appraisal is estimated 10 to 12 months.

[1]The reader will note that the appraiser estimated a marketing time of 10 to 12  months after the date of this appraisal.  Consequently, due to current negative market conditions, if the property must be sold prior to this 10 to 12 month marketing period after the date of this appraisal, the sales price would be considered a liquidation value which could be significantly less than the appraised market value.

*Based on hypothetical conditions, extraordinary assumptions, and/or major highest and best use conclusions found in the letter of transmittal.  If any of these hypothetical conditions, extraordinary assumptions, and/or major highest and best use conclusions prove to be false, the estimated "As Is" market value of the subject property could be highly impacted.

Page 3 of 3
Dozier Appraisal Company

Respectfully submitted,
DOZIER APPRAISAL COMPANY

Raymond L. Dozier, MAI
State Certified General Real Estate Appraiser
CA. Cert. No. AG004590
RLD/ /lhp (Word\L-09-131 (B) - LHP_450 AC_Coachella.doc)

# TABLE OF CONTENTS

**PART ONE - INTRODUCTION**        **PAGE**

Letter of Transmittal

Table of Contents

Certification .................................................................................................... 1

Area & Neighborhood Maps ........................................................................ 2-3

Aerial Map ..................................................................................................... 4

Proposed Site Development .......................................................................... 5

Subject Photos ............................................................................................... 6

Summary of Important Facts and Conclusions .............................................. 8

**PART TWO - FACTUAL DATA**

Purpose and Use of the Appraisal ............................................................... 13

Scope of Appraisal ...................................................................................... 13

Date of Value Estimate ............................................................................... 14

Identification of Property Rights/Definitions .............................................. 14

Legal Description ........................................................................................ 16

History of the Subject ................................................................................. 17

Regional and City Analysis ......................................................................... 18

Neighborhood Description ........................................................................... 36

Site Data ...................................................................................................... 40

Zoning ......................................................................................................... 43

Tax & Assessment Data .............................................................................. 44

## TABLE OF CONTENTS (Cont'd)

**PART THREE - ANALYSIS AND CONCLUSION**                                        **PAGE**

Highest and Best Use ................................................................................. 45

Valuation Process..................................................................................... 48

Valuation Methodology .......................................................................... 51

Sales Comparison Technique ................................................................... 52

Land Residual Technique.......................................................................... 67

Cost of Production .................................................................................... 69

Aggregate Retail of 13 Super Pads ......................................................... 70

Discounted Cash Flow Analysis ............................................................ 105

Reconciliation and Final Estimate of Value ......................................... 115

**PART FOUR - ADDENDA** ................................................................... 116

Qualifications

Company Profile

Assumptions and Limiting Conditions

Seismic Map

Assessors Parcel Numbers

# **CERTIFICATION**

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting pre-determined results.

- My compensation for completing this assignment was not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the *Uniform Standards of Professional Appraisal Practice*.

- I have made a personal inspection of the property that is the subject of this report.

- Ms. Lori Pabros, independent contractor, provided significant professional assistance to the person signing this report.  Mr. Raymond L. Dozier, MAI, reviewed the research and performed the analysis of the market data in determining final indication of value

- The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

- I certify that, to the best of my knowledge and belief, the reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

- I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, I, Raymond L. Dozier, MAI, have completed the requirements of the continuing education program of the Appraisal Institute.

_____
Raymond L. Dozier,  MAI
State Certified General Real Estate Appraiser
CA. Cert. No.  AG004590

## AREA MAP



# NEIGHBORHOOD MAP



## AERIAL MAP



## CONCEPTUAL PLAN



**SUBJECT OUTLINED IN PINK**

## SUBJECT PHOTOGRAPHS



**View Northwest View of Subject from Interstate 10**

**Northeast View of Subject From Interstate 10**

## SUBJECT PHOTOGRAPHS



**East View of Subject's street frontage along Interstate 10**

**West View of Subject's frontage along Interstate 10**

**SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS**

<u>**GENERAL SUBJECT INFORMATION:**</u>

| | |
|---|---|
| **Property Type:** | Vacant Land |
| **Location:** | East of Dillon Road along the north side of Interstate 10, Coachella, California 92236. |
| **Identification:** | Riverside County Tax Assessor's Parcel Numbers: See Addendum |
| **Census Tract Number:** | 0456.03 |
| **Thomas Guide Map Page & Grid:** | Page 5411, Grid D/2 |
| **Purpose of the Appraisal:** | The purpose of this appraisal is to estimate and report my opinion of the "As Is" MARKET VALUE of the subject's 450 acres if sold for cash or its equivalent to a single buyer as of my last visitation date of December 7, 2009. In the "As Is" scenario, the property will be appraised at whatever stage of development as of the effective date of the appraisal. All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market. Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the property interest being appraised. |
| **Function of the Appraisal:** | The function or use of the appraisal is for loan analysis. |
| **Scope of the Appraisal:** | Complete narrative format adhering to all FIRREA and USPAP Standards; Departure provisions shall not apply. |
| **Property Rights Appraised:** | The property rights appraised establish the FEE SIMPLE Interest of all future benefits that may be derived from the property's present or possible use, except for existing easements and rights-of-way of record. |
| **Unavailability of Information:** | Information vital to the appraiser in connection with this property was made available from various sources. The appraiser has not been provided a survey, exact boundary lines or acreage, a standard current title report, environment report, soil tests or other relevant data on the subject property. |

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

| | |
|---|---|
| **Site Size :** | Approximate: 450 Acres (Gross) |
| **Site Shape:** | The subject parcel is rectangular shaped.  See Parcel Map. |

**Zoning:**

| | |
|---|---|
| • **General Plan:** | Residential – City of Coachella |
| • **Actual:** | Residential – City of Coachella |

| | |
|---|---|
| **Redevelopment Area:** | No |
| **Street Frontage:** | Property has street frontage along Interstate 10 |
| **Access:** | Property has access along Interstate 10. |
| **Topography:** | Level (Southern Portion) to Sloping (Northern Portion) 0% to 8% Grade estimated. |
| **Drainage:** | Appears adequate.  However, consideration will have to be given to water channeling from the northern parcels.  (See Scope and Extent of the Data Collection Process, Page 14) |
| **Containment in Floodplain:** | The subject appears to be located in area shown as Flood Zone D defined as follows:  "Areas of undetermined, but possible flood hazard". Designated by F.E.M.A. Flood Insurance Rate Map, revised August 28, 2008, in Community Panel Number 060245 06065.  Flood Insurance will probably be required in this area.  (See Scope and Extent of the Data Collection Process, Page 14) |

**Improvements:**

| | |
|---|---|
| • **Off-Sites:** | Interstate 10 is a four lane highway with no service road. |
| • **On-Sites:** | None |

| | |
|---|---|
| **Entitlements:** | None |
| **Utilities:** | Public utilities including water, electricity, and telephone appear to be installed at nearby sites, but are not warranted for the subject property and capacities are unknown.  See Scope and Extent of the Data Collection Process, Page 14) |
| **Within Assessment District:** | Does not appear to be in district.  No impact on value. |

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

**Easements:**                    Periphery utility easements encumbering subject property are assumed for this appraisal.  (See Scope and Extent of the Data Collection Process, Page 14)

**Toxic Waste:**              This report assumes this site is not nor has ever been contaminated with any form of toxic waste or hazardous substance.  (See Scope and Extent of the Data Collection Process, Page 14)

**Deductions and Discounts:**   No deductions or discounts were made in the valuation of the property.  Indicated Market Value has not been reduced by the cost of holding or selling the property.

## HIGHEST AND BEST USE:

- **"As Is":**                   The highest and best use of the subject property would be to delay the entitlement process (3 years) for a mixed use master planned development.  The first phase off-site construction will coincide with the development of the McNaughton Interstate 10 exchange expected to be complete in 3 to 5 years.  It was determined later in this report that the Bulk or Wholesale Market Value ($14,099,000) is less than the Cost of Production ($22,628,000).  Therefore, it is not financially feasible to develop the subject property at this time.

- **"As Proposed"**          An analysis of every possible use for the subject property that might be approved by local government during the site specific planning is beyond the scope of this report.  However, the existing conceptual plan that the appraiser is analyzing maximizes the existing zoning densities that are reasonably probable for the subject.  These densities would allow for the sale at optimal eventual price points that are commensurate to the demographics in the Coachella Valley and the immediate district.

## MARKETING TIMES & PROBABLE PURCHASER:

**Reasonable Exposure:**      10 to 12 months (Prior to the date of the appraisal.)

**Marketing Time:**           10 to 12 months (After the date of the appraisal.)

**Most Probable Purchaser:**    Land Speculator

**SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS**

## TREND ANALYSIS:

- **Regional/City:**

The Coachella Valley's favorable environmental, economic, social and governmental forces will contribute to a continued demand for real estate in the southern and southwestern area in the long run. This is primarily due to the relatively lower cost of housing compared to other counties in Southern California. Over the past 12 months market conditions in the area and across the country have taken a down turn. The following factors have had a negative effect on current market conditions:

- Sub Prime Mortgage lenders have tightened their qualifying requirements, making it very difficult to fund home buyers with less than perfect credit, causing slower absorption in the market.

- Retail activity has slowed in the last 12 months due to the lack of consumer confidence over higher fuel prices, slow real estate markets and job losses in the construction and real estate sectors.

- Mortgage money crunch causing limited funds for purchases of raw land and finished product.

- It is concluded that over the next 12 to 18 months, construction financing will continue to become more difficult to obtain for residential developments that are economically feasible. Consumer demand for these properties should continue to decrease over the next 18 months with a balancing of supply and demand in the market expected in the next 24 to 30 months.

**Neighborhood:**

The subject property is located within the City of Coachella. The neighborhood consists of primarily of single family residential developments, Spotlight 29 Casino and Fantasy Springs Casino to the west, vacant land to the north and east. The subject property would lend itself to a single family residential development when market conditions improve in approximately 3 years.

**SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS**

### MARKET VALUE INDICATION BY APPROACH (Fee Simple) (Unentitled):

**Sales Comparison Approach:**                    $11,664,000 ("As Is" Market Value)

**Land Residual Technique:**                     $11,109,000 ("As Is" Market Value)

1. **Cost of Production as of 12/1/2009:**       $22,628,000 (To Super Pad Status)

2. **Aggregate Retail:**                          $39,039,000 (Super Pads sold over time)

3. **Bulk or Wholesale as of 12/1/2009:**        $14,099,000 (Super Pads sold to one buyer)

4. **Prospective Bulk or Wholesale as of 12/1/2014:**   $30,344,000 (Super Pads sold to one buyer)

5. **Prospective Cost of Production as of 12/1/2014:**  $30,300,000 (To Super Pad Status)

### FINAL RECONCILED MARKET VALUE INDICATION (Fee Simple) (Unentitled):

**Final Market Value Indication:**               $11,200,000* ($24,889/Ac)[1]

**Date of Last Visitation:**      December 1, 2009

**Date of Report:**               December 7, 2009

**Effective Date of Value Estimate:**    December 1, 2009

---

[1]The reader will note that the appraiser estimated a marketing time of 10 to 12  months after the date of this appraisal.  Consequently, due to current negative market conditions, if the property must be sold prior to this 10 to 12 month marketing period after the date of this appraisal, the sales price would be considered a liquidation value which could be significantly less than the appraised market value.

*Based on hypothetical conditions, extraordinary assumptions, and/or major highest and best use conclusions found in the letter of transmittal.  If any of these hypothetical conditions, extraordinary assumptions, and/or major highest and best use conclusions prove to be false, the estimated "As Is" market value of the subject property could be highly impacted.

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to estimate and report my opinion of the "As Is" MARKET VALUE of the subject's 450 acres if sold for cash or its equivalent to a single buyer as of my last visitation date of December 1, 2009. In the "As Is" scenario, the property will be appraised at whatever stage of development as of the effective date of the appraisal. All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market. Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the property interest being appraised. The function or use of the appraisal is for loan analysis.

### USE OF THE APPRAISAL

The function or use of the appraisal is for loan analysis.

### THE SCOPE AND EXTENT OF THE DATA COLLECTION PROCESS

The following steps were made in arriving at the final estimate of value in the appraisal report:

1.  A preliminary search of available resources was made to determine market trends, influences, and other significant factors pertinent to the subject property.

2.  A physical inspection of the property was performed. Although due diligence was exercised while at the property, the appraiser is not an expert in such matters as accident or tragic issues; crime issues; legal issues; suit or claim issues; government issues; land use issues; nuisance issues; building issues; repair issues; soil issues; geo-technical issues; hazardous issues; contamination issues; environmental agency issues; natural resource issues; historic or cultural issues; natural hazard issues; and all issues to those known – past, present or proposed. No warranty is given as to these elements. As needed, inspections by various professionals within these fields might be recommended, with the final estimate of value subject to their findings.

3.  Research and collection of data from the subject's competing market area are sufficient in quantity to express an opinion of value as defined herein. Relevant data is contained in this report.

4.  An analysis of the data was completed by applying customary appraisal techniques and following the USPAP standards. The report will be self-contained narrative and will be expected to lead the reader to the same value conclusion as suggested by the appraiser.

## DATE OF VALUE ESTIMATE

Site was inspected December 1, 2009 with the effective date of the appraisal December 1, 2009. The date of this report is December 7, 2009.

## IDENTIFICATION OF PROPERTY RIGHTS APPRAISED

The property rights being appraised represent the FEE SIMPLE INTEREST of all future benefits that may be derived from the property's present or possible use, except for existing easements and rights-of-way of record.

## DEFINITIONS OF VALUE AND PROPERTY RIGHTS

"MARKET VALUE" means:  The most <u>probable</u> price which a property should bring in a <u>competitive and open market</u> under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeable and assuming the price is not affected by undue stimulus.[1] Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated

- Both parties are well-informed or well-advised, and each acting in what he considers his own best interest

- A reasonable time is allowed for exposure in the open market.

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements                 comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

MARKET VALUE is based on the concept of an open and competitive market in which typical transactions are free of the aspects of duress or forced liquidation.

The REASONABLE EXPOSURE TIME inherent in the MARKET VALUE concept is always presumed to occur PRIOR to the effective date of the appraisal.

The REASONABLE MARKETING PERIOD is an estimate of the amount of time it might take to sell a property interest in the real estate at the estimated market value level during the period IMMEDIATELY AFTER the effective date of the appraisal.

---

[1] (Title XI, FIRREA,34.42 f)

**DEFINITIONS OF VALUE AND PROPERTY RIGHTS** (Cont'd)

To estimate "Market Value" during a period of very limited market activity is extremely difficult and challenging. The key to the property analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of MARKET VALUE. To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of MARKET VALUE.

During some periods of distressed market conditions, MARKET VALUE may imply a price at which a transaction will not occur until such time as conditions in the market match the definition of MARKET VALUE.

"FEE SIMPLE ESTATE" means: Absolute ownership unencumbered by any other interest or estate subject only to the four powers of government.

The term "LEASE FEE ESTATE" means: A Leased Fee Estate is an ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others; the rights of lessor and the leased fee are specified by contract terms contained within the lease.[1]

The term "LEASEHOLD ESTATE" means: "The right to use and occupy real estate for a stated term and under certain conditions; conveyed by a lease.[2]

The term "GROUND LEASE" means: "A lease that grants the right to use and occupy land."[3]

The "AS IS" PREMISE on appraisal date means: "An estimate of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date the appraisal is prepared.[4]

The "AS IF" PREMISE on appraisal date means: "The market value of a property with all proposed construction, conversion, or rehabilitation hypothetically completed, or under other specified hypothetical conditions, as of the date of the appraisal."

The term "LIQUIDATION VALUE" means the most probable price that a specified interest in real property is likely to bring if the consummation of a sale will occur within a severely limited future marketing period specified by the client.

---

[1] The Appraisal of Real Estate, 11th Edition, Appraisal Institute, Page 138.
[2] The Dictionary of Real Estate Appraisal, 2nd ed. (Chicago: American Institute of Real Estate Appraisers, Chicago, 1989), p. 177
[3] Ibid., p. 144.
[4] Appraisal Policies and Practices of Insured Institutions and Service Corporations, Federal Home Loan Bank Board, "Final Rule", 12 CFR Parts 563 and 571, December 21, 1987.

## LEGAL DESCRIPTION AND IDENTIFICATION OF PROPERTY

| | |
|---|---|
| **Location:** | East side of Dillon Road along the north side of Interstate 10, Coachella , California 92236. |
| **Assessors Parcel Numbers:** | See Addendum |
| **Common Address:** | None |
| **Legal Description:** | See Addendum |
| **Current Ownership:** | Desert Lakes, LLC |
| **Condition of Title:** | No assessment of the condition of the title has been made by the appraiser, but as outlined in the Assumptions and Limiting Conditions which are part of this report, the property is appraised as if free and clear of any encumbrances. |

## LEGAL DESCRIPTION AND IDENTIFICATION OF PROPERTY

### HISTORY OF SUBJECT

- The subject property of this appraisal is an 450 acre portion of a total 2,300 acres purchased by Lennar Desert Lakes purchased in May 2005 for $61,500,000 or $26,739/Acre.  The allocated purchase price of the subject property was $12,033,000.

- Later in the appraisal the reader will note the estimated "As Is" Market Value of the subject property is $11,200,000 or $24,889/acre.  Market Value of the property continued to increase from the 2005 purchase date until December 2006.  At that point, the market began to forecast lower prospective price points in the future when compared to price points at the top of the market in 2006.  In addition, the timing of a future development was also going to be extended as opposed to 2006 development timing forecasts.  Therefore,  the current "As Is" Market Value is significantly lower than the top of the market in December 2006 and even lower than the 2005 acquisition price.  The market is anticipating that future price points of a potential development will be in the range of 2003 to 2004 price points which will keep the value of the land in the 2003/2004 market value range which is considered to be 30% to 50% below the top of the market.

## AREA MAP



## PART TWO – FACTUAL DATA

---

**REGIONAL AND CITY ANALYSIS – THE COACHELLA VALLEY**

**Riverside County Overview**

Riverside County, Southern California's seventh most populous county, encompasses about 7,300 square miles.  It extends 148 miles across southern California, from the Arizona border to within 20 miles of the Pacific Ocean. Riverside County is situated immediately east of Los Angeles and Orange Counties, south of San Bernardino County and north of San Diego County. Riverside County is considered to be the recipient of growth and urbanization demand that originates from Los Angeles, Orange, and San Diego Counties.

Riverside County is generally considered to be composed of two distinct geographic and economic regions.  Eastern Riverside County is primarily a desert, with an economy centered on tourism and agriculture.  Western Riverside County is a semi-arid region of urban, suburban and rural land uses.  This section of Riverside County is part of a larger, more diverse, economic base commonly referred to as "The Inland Empire" of Southern California.  Besides the immediate access to over 15 million people in Southern California, there are an additional nine million people one hour's flying time or an overnight driving trip away.

The subject is located within the incorporated City of Coachella within the Coachella Valley, Riverside County, CA.  This location is approximately 125 miles east of Los Angeles' metropolitan center, 100 miles east of Orange County's beaches, 90 miles southeast of Santa Ana (the County Seat of Orange County) and 75 miles southeast of San Bernardino (the County Seat of San Bernardino County), 70 miles east of Riverside (the County Seat of Riverside County), and 270 miles west of Phoenix, Arizona.

To estimate value, an interpretation of how the market views the subject property is analyzed.  The scope of the investigation is not limited to static, current conditions.  Rather, I have examined trends in the forces that influence value to determine the <u>direction</u>, <u>speed</u>, <u>duration</u>, <u>strength</u>, and <u>limits</u> of these trends.

Besides the immediate access to over 15 million people in Southern California, there are an additional 9 million people with one hour's flying time or an over-night trip away.  The valley is located in the center of the fastest growing county in California, Riverside County.  Surrounded by massive ranges of mountains with spectacular rock formations, this desert area is one of the most impressive and picturesque valleys in California.  The world-renowned City of Palm Springs is located on the western edge of the Coachella Valley, adjacent to the base of San Jacinto Mountain.  The other desert resort communities are located to the east:

>    Cathedral City, Rancho Mirage, Palm Desert, Indian Wells, LaQuinta, Indio, Coachella
>    And   the unincorporated areas of Bermuda Dunes, Thousand Palms, Thermal   and
>    Vista Santa Rosa.

Transportation into the Coachella Valley is accommodated by the expanding Palm Springs Airport and Interstate Freeway 10, which runs from  Los Angeles to Houston, Texas and east.  Further access will be provided by an approved $600 million road improvement program which includes construction of a Mid-Valley Parkway.  Because of the relative ease to commute from one end of the valley to the other, most local residents consider the whole valley as one market area.

**REGIONAL AND CITY ANALYSIS** (continued)

**PART TWO – FACTUAL DATA**

The scope of this regional investigation is not limited to static, current conditions. Rather, an analysis of trends and the forces that influence value to determine the direction, speed, duration, strength, and limits of these trends.

**A. SOCIAL**

Riverside County has been one of Southern California's fastest growing regions, with an estimated population of 2,031,000. This population estimate (which was provided by the State Department of Finance) represents an increase of 3.3% over the previous year. A summary chart of Riverside County and the Coachella Valley population estimates is represented below.

| COACHELLA VALLEY POPULATION FIGURES – 2008 | | | | | | |
|---|---|---|---|---|---|---|
| **CITY** | **CENSUS 2000** | **1/1/2006** | **1/1/2007** | **1/1/2008** | **One Year** | **Since '00 Census** |
| **Western Valley** | | | | | | |
| Cathedral City | 42,647 | 51,435 | 52,115 | 52,465 | 0.6% | 23.0% |
| Desert Hot Springs | 16,582 | 22,163 | 23,544 | 26,068 | 4.7% | 57.2% |
| Palm Springs | 42,807 | 46,754 | 46,858 | 47,251 | 0.8% | 10.4% |
| Unincorporated | 9,642 | 11,214 | 11,754 | N/A | N/A | N/A |
| Total Western Valley | 111,678 | 131,566 | 134,271 | 125,784* | 2.7% | 23.3% |
| **Central Valley** | | | | | | |
| Indian Wells | 3,816 | 4,899 | 4,942 | 5,025 | 1.6% | 31.7% |
| **La Quinta** | **23,694** | **38,604** | **41,092** | **42,958** | **4.5%** | **81.3%** |
| Palm Desert | 41,155 | 49,879 | 49,752 | 50,907 | 2.2% | 23.7% |
| Rancho Mirage | 13,249 | 16,783 | 16,944 | 17,057 | 0.6% | 28.7% |
| Unincorporated | 10,353 | 10,488 | 10,993 | N/A | N/A | N/A |
| Total Central Valley | 92,267 | 120,653 | 123,723 | 115,947* | 2.9% | 41.5% |
| **Eastern Valley** | | | | | | |
| Indio | 49,116 | 72,142 | 77,146 | 81,512 | 5.6% | 66.0% |
| Coachella | 22,724 | 35,449 | 38,486 | 40,517 | 5.2% | 78.3% |
| Unincorporated | 42,340 | 54,489 | 55,693 | N/A | N/A | N/A |
| Total Eastern Valley | 114,180 | 162,080 | 171,325 | 123,029* | 6.4% | 71.2% |
| Total Unincorporated | 62,335 | 76,191 | 78,440 | 79,852 | 1.8% | 28.1% |
| **Total Coachella Valley** | **318,125** | **414,299** | **429,319** | **443,612** | **2.9%** | **39.4%** |
| **Comparison (2007 Data):** | | | | | | |
| Riverside County | 1,545,000 | 1,808,000 | 1,966,000 | 2,031,000 | 3.3% | 31.5% |
| California | 33,872,000 | 36,271,000 | 37,172,000 | 37,662,000 | 1.3% | 11.2% |

- Numbers may not add up due to independent rounding.
- Does not include unincorporated areas

**B. ECONOMIC Cont'd:**

**PART TWO – FACTUAL DATA**

---

### JOBLESS RATE CONTINUES TO INCREASE. TOPS 15%
### THE DESERT SUN SATURDAY, NOV. 21, 2009

| COMMUNITY | UNEMPLOYMENT RATE |
|---|---|
| BERMUDA DUNES | 6.7% |
| CATHEDRAL CITY | 14.7% |
| COACHELLA | 23.3% |
| DESERT HOT SPRINGS | 19.9% |
| INDIAN WELLS | 5.4% |
| INDIO | 16.3% |
| LA QUINTA | 8.0% |
| MECCA | 27.7% |
| PALM DESERT | 9.1% |
| PALM SPRINGS | 11.8% |
| RANCHO MIRAGE | 13.3% |
| THOUSAND PALMS | 9.8% |

Riverside County's unemployment rate rose to 15.1% in October, making it among the worst in the state. Included in the Labor Department statistics released Friday are 22,300 Coachella Valley residents.

**B.    ECONOMIC Cont'd:**

**PART TWO – FACTUAL DATA**

---





Senior Editor/News: James Meier • (760) 778-4623 • business@thedesertsun.com

DOW 9,096.72 | S&P 500 979.62 | NASDAQ 1,975.51 | AMEX 1,673.16 | NYSE 6,328.67

# Job worries persist; confidence dips

**Despite stock market gains, Americans gloomy on economy, limiting spending**

BY ANNE D'INNOCENZIO
The Associated Press

NEW YORK — Americans are looking past the stock market surge and focusing on job worries.

Consumer confidence fell this month, the Conference Board said Tuesday, presenting a big obstacle for already hammered stores as they head into the critical back-to-school shopping season.

The confidence index fell to 46.6, down from 49.3 in June and weaker than what

economists were expecting. It takes a reading above 90 to signal Americans believe the economy is solid.

The second straight month of declining confidence followed an upbeat report offering more evidence that the real estate market is showing signs of life. According to a widely watched index, home prices in May posted their first monthly increase since the summer of 2006.

But vanishing job security and reduced work hours continue to plague shoppers,

who are relying more on their paychecks as two previous sources of money — credit cards and home equity loans — have shrunk.

When the Labor Department releases its monthly jobs report next week, economists expect it to show unemployment climbed to 9.7 percent in July, up from 9.5 percent in June and within shouting distance of its post-World War II high.

And the job cuts keep coming. Just Monday, Verizon Communications Inc. announced plans to slash more than 8,000 employee and contractor jobs before the end of the year.

Irma Sanches of Milwaukee was once a big spender. But now the 25-year-old single mother is having trouble finding a job that offers her flexibility to take care of her infant daughter. She was looking at toys at T.J Maxx on Tuesday but trying not to spend money.

"I'm a shopper, and right now I'm restricted to what I need," said Sanches.

The weak consumer-confidence reading also pushed stocks lower. The Dow Jones industrial average finished down about 12 points at 9,096.72. Over the past two weeks, better-than-expected earnings reports have reignited the stock market rally. The average topped 9,000

Thursday for the first time since early January, but worries about the economy are putting the rally on hold again.

Americans' lack of confidence presents a big hurdle for retailers because consumer spending accounts for more than 70 percent of economic activity.

"Even though we have seen an improvement in economic indicators, there hasn't been any meaningful improvement in household finances," said Mark Vitner, senior economist at Wells Fargo. "Consumers are not in the position to step up their spending in a major way. This doesn't bode well for the back-to-school season."

**C.   GOVERNMENTAL:**

## PART TWO – FACTUAL DATA

Incorporated and unincorporated cities in the valley are pro-growth. The area is progressive and adequately competent in their approach to maintaining a quality environment conducive to preserving the existing base industries. All desert communities maintain their own police and fire protection (whether direct or through contracts with Riverside County. Conventional utilities and services are available in the incorporated cities, including water, gas, sanitary sewer, electricity, refuse collection and cable television).

### D.  ENVIRONMENTAL:

Mild winter temperatures attract tourists, business conventions and second home dwellers to the resort communities during the non-summer months. Because the mild winter weather is responsible for the majority of the region's tourism, the character of the local tourist economy is seasonal. However, with the influx of Indian Casinos, many of the would-be seasonal residents are staying permanently.

The primary mechanism of transportation in Southern California, Riverside County and the Coachella Valley is the private automobile. The major freeway in the region is Interstate Highway 10. Other state highways include 111, 62, 74 and 86. The Highway and road systems are in good condition and generally have ample capacity for current traffic levels.

### E. CONCLUSION:

The Coachella Valley's favorable environmental, economic, social and governmental forces will contribute to a continued demand for real estate in the southern and southwestern area in the long run. This is primarily due to the relatively lower cost of housing compared to other counties in Southern California. Over the past 12 months market conditions in the area and across the country have taken a down turn. The following factors have had a negative effect on current market conditions:

- Sub Prime Mortgage lenders have tightened their qualifying requirements, making it very difficult to fund home buyers with less than perfect credit, causing slower absorption in the market.

- Retail activity has slowed in the last 12 months due to the lack of consumer confidence over higher fuel prices, slow real estate markets and job losses in the construction and real estate sectors.

- Mortgage money crunch causing limited funds for purchases of raw land and finished product.

- It is concluded that over the next 12 to 18 months, construction financing will continue to become more difficult to obtain for residential developments that are economically feasible. Consumer demand for these properties should continue to decrease over the next 18 months with a balancing of supply and demand in the market expected in the next 24 to 30 months.

**PART TWO – FACTUAL DATA**

---

### COACHELLA VALLEY ECONOMIC RECOVERY
### BY 2012 – MAYBE
### <u>THE DESERT SUN</u>, OCTOBER 24, 2009

| Target sector | Total sector employment projections | | Average wage | Net increase, blueprint implementation | |
|---|---|---|---|---|---|
| | 2012 | 2016 | | Job growth | Wage growth, 2007 $ |
| Heath care/Life sciences | 12,380 | 15,615 | $52,947 | 3,235 | $171,288,238 |
| Clean technology/energy | 1,481 | 3,156 | $69,683 | 1,675 | $116,705,346 |
| Supply chain management/logistics | 2,491 | 3,466 | $42,575 | 975 | $41,524,901 |
| Creative arts/design | 5,337 | 8,391 | $51,158 | 3,054 | $156,234,740 |
| Total over five-year cycle | | | | 8,939 | $485,753,225 |

THE DESERT SUN

# Recovery by 2012? Hopefully

## Expert: Economic diversification key to Coachella Valley's future

**BY DEBRA GRUSZECKI**
The Desert Sun

INDIAN WELLS — When will there be true economic recovery in the Coachella Valley?

Try 2012.

And that's only if everything's done right.

That's the prediction from John Husing, an economist who has studied the Riverside and San Bernardino counties region for more than 40 years, and recently that of the Coachella Valley.

During his 2009 Coachella Valley economic report before about 650 business, government and local leaders gathered at the Renaissance Esmeralda Resort & Spa in Indian Wells on Friday, Husing used one word to express what the valley's been through:

"Arrggh!"

Fueling that frustration, Husing said, is the fact that the valley has suffered unprecedented job losses in the recession.

"We've lost 130,000 jobs" in this area and in two surrounding counties, he said. The unemployment rate has topped 14 percent, and is rising to levels close to those recorded in Detroit.

"That's not pretty," Husing said. "It's a rate that is somewhat comparable to what was going on in the middle years of the Great Depression."

The good news is the valley's median home prices likely hit the bottom in the third quarter, he said.

In a comprehensive assessment, Husing said the
**Please see HUSING, A12**

**PART TWO – FACTUAL DATA**

---

**THE PUBLIC RECORD**                    **AUGUST 18, 2009**

# Coachella Valley property values fall

BY BOB MARRA

The assessed value of taxable real property in the Coachella Valley underwent a substantial decrease during the past year as the effects of the global recession continue to impact local real estate markets.

Taxable real property values declined in Coachella Valley cities from $66.7 billion in 2008-09 to $62.2 billion in 2009-10 – a decrease of $4.5 billion. A similar decline occurred in the unincorporated territory in the Valley, with assessed values dropping by $859 million in the past year. Overall, the Valley went from an assessed value of $75 billion last year to $69.6 billion this year, a 7.1% decline.

While the short-term impact of the recession has clearly had a major effect on property values, it remains unclear how long the bad economy will derail the Valley's steady growth over the past ten years.

Every city in the Coachella Valley experienced declines in property values over the past year but some have weathered the recession much better than others. Rancho Mirage experienced a slight decline of 2.3%, dropping from $8.5 billion to $8.3 billion in assessed property values. Similarly, Indian Wells fell only 3.5%, from $5.1 billion to $4.9 billion, and Palm Desert fell 3.6%, from $13.9 billion to end at $13.6 billion. These cities have experienced slower development and housing growth over the past five years than other cities in the Valley, but their property values appear to have withstood the recession better than other communities with many new housing developments.

Palm Springs experienced a sharper drop in real property values, falling from $10.4 billion to $9.8 billion, a decline of 5.5%. La Quinta saw a similar decrease, falling 5.3% from $12.5 billion to $11.9 billion.

Several Coachella Valley cities suffered sharp declines in their assessed property values, however, with Desert Hot Springs hit hardest as assessed values fell from $2.1 billion to $1.4 billion – a precipitous 33.3% decline. Coachella property values fell by $300 million, down 14.2% at $1.8 billion. Likewise, property values in Cathedral City were down by 12%, falling from $4.5 billion to $3.9 billion, while property in Indio fell from $7.5 billion to $6.7 billion, a decrease of 11.1%.

Overall, property values in the Valley's incorporated areas fell by 6.7%, a decrease from $66.7 billion to $62.3 billion. Property values in the unincorporated areas of the Valley fell even more sharply, from $8.3 billion to $7.4 billion, a 10.4% decrease.

With the country still mired in recession, it remains unclear how soon property values will recover. Cities that had previously experienced rapid growth in new housing developments may struggle with foreclosures for the foreseeable future as the next round of sub-prime mortgages come due. Yet the strong growth in Coachella Valley property values over the past five to ten years suggest that generally the market should bounce back strongly. On average, property values in the Valley have increased by 177% over the past decade, and in Coachella, La Quinta, and Indio, they have more than tripled. Such strong, steady growth suggests that while property values may have taken a hard hit during this recession, they will likely regain much of their value when the overall economy begins to improve.

*Dozier Appraisal Company*
*Palm Desert, California*

**PART TWO – FACTUAL DATA**



W.S.J.
10/06/09

# Apartment Glut Expands

### Vacancy Rate Rises to 7.8% as Unemployment Dents Demand; Monthly Rents Slip

BY NICK TIMIRAOS

Apartment vacancies hit their highest point since 1986, surging in cities from Raleigh, N.C., to Tacoma, Wash., as rising unemployment continued to chip away at demand during the traditionally strong summer rental months.

The U.S. vacancy rate reached 7.8%, a 23-year high, according to Reis, Inc., a New York real-estate research firm that tracks vacancies and rents in the top 79 U.S. markets. The rate is expected to climb further in the fall and winter, when rental demand is weaker, pushing vacancies to the highest levels since Reis began its count in 1980.

Meanwhile, the air leaving the market is driving rents down, most sharply in markets that had been chugging along until a year ago, when unemployment accelerated, including Tacoma; San Jose, Calif.; and Orange County, Calif.

In New York, Jennifer Hyman rented a one-bedroom apartment in July at a monthly rate of $1,950—down from $2,450 for the previous tenant—when she returned to the city after graduating from Harvard Business School. Her first month's rent was free—and her landlord painted the apartment, scrubbed the floors and added window coverings.

"The experience was night-and-day different from before," says Ms. Hyman, who had rented other Manhattan apartments between 2002 and 2007, each time paying a brokers' fee and feeling pressured to sign a lease the minute she found an apartment. Now, she says, "Renters are the ones with the power."

Driving the change is the troubled employment market, which is closely tied to rentals. With unemployment at 9.8%—a 26-year high—more would-be renters are doubling up or moving in with family and friends during periods of job loss. Landlords have been particularly battered because unemployment has been higher among workers under 35 years old, who are more likely to rent. Nationally, effective rents have fallen by 2.7% over the past year, to around $972.

"When job losses stop, rents will firm and occupancies will firm," says Richard Campo, chief executive of Camden Property

Trust, a Houston-based real-estate company.

The second and third quarters typically are the strongest periods for rental landlords because they are popular times for people to move. But this year, "vacancies just continued rising."

> More would-be renters are doubling up or moving in with family and friends amid job losses.

says Victor Calanog, director of research for Reis.

During the third quarter, vacancies increased in 42 markets, improved in 26 markets and remained unchanged in 11 markets. Omaha, Neb., saw the largest rise in vacancies, with the rate rising 1.1 percentage points to 7.4%. Other big rises were seen in Memphis, Tenn., Indianapolis, Raleigh and Tacoma.

The deteriorating rental mar-

ket comes amid some signs of stabilization in the housing sales market. An $8,000 tax credit for first-time home buyers and investor demand helped to boost sales of low- and moderately priced homes this summer. But some analysts warn demand could fall with the expiration of the tax credit and supply could increase with more foreclosed homes hitting the market.

While a housing recovery could lead the best quality renters to move out and purchase homes, the move-out rate isn't expected to surpass levels seen during the housing boom earlier this decade. Mortgage credit standards have tightened considerably since then, which should keep more renters in place.

Apartment owners ultimately could gain from the housing bust because the U.S. homeownership rate has fallen as foreclosures rise. But the housing bust has also flooded some of the most overbuilt housing markets with new apartment inventory as developers have converted unsold condominium developments into rentals.

Reis projects that the vacancy rate will peak at well above 8% in mid-2010.

**PART TWO – FACTUAL DATA**

---

C16  *Wednesday, October 14, 2009*                                THE WALL STREET JOURNAL.

# HEARD ON THE STREET

*Email: heard@wsj.com*              *Financial Analysis and Commentary*              *More at WSJ.com/Heard*

## Builders Grounded by Land Prices

Glimmers of a home-price recovery mean that some home builders may soon return to the black. But, with prime land plots tough to find, investors shouldn't set their sights on healthy profit margins.

Over the past few years, many builders have shed some of their best land holdings and hoarded cash to strengthen balance sheets. Many expected to be able to restock at low prices when competitors fold, conscious that the last big property bust in the early 1990s led to plenty of cheap land sales.

It hasn't yet worked out that way. Even with many private builders going bankrupt, the supply of desirable lots has run dry.

That's partly because many lenders who have taken possession of land are wary of selling while the market is soft. So land costs are rising in locations where builders are most keen to invest.

Take California, where the likes of **D.R. Horton** and **KB Home** have a sizable presence. In prime locations, prices of finished lots have



**Lay of the Land**
Builders' land supply at June 30, in years
*Source: Barclays Capital*

risen 10% to 30% in the last four months, according to Jeff Spindler of land brokerage Park Place Land Advisors.

Publicly listed builders have accounted for the majority of bidders at auctions of such finished lots, Mr. Spindler says. While land prices in remote areas have been more stable, major builders have been focused on densely populated areas where homes are expected to sell quickly.

The risk is that builders are betting on higher housing prices to justify paying up for land. But if home prices

don't keep pace, builders could see margin growth stifled. Citigroup's Josh Levin says the median gross margin for public builders is around 13%, compared with roughly 20% before the bubble.

Builders with the least land could be expected to buy most aggressively. KB Home, for instance, has land sufficient for only 3.3 years worth of building needs based on construction rates over the past year, according to Barclays Capital's Megan McGrath. That compares with an industry average of about 5.1 years.

And those estimates could exaggerate the true supply, since they include both finished lots and raw land. The latter requires thousands of dollars in additional investment per lot, so it's unlikely to be used until home prices increase substantially.

Horton may also feel pressure to refill its land bank. The company still has 5.4 years of supply, but the number of owned lots has fallen 32% in the year through June, Ms. McGrath estimates.

And yet, stock valuations suggest hopes for a smooth return to profitability. Ms. McGrath says Horton trades at 1.5 times tangible book value, while KB Home is at 1.9 times.

Those are roughly in-line with the industry's long-term average of 1.6 times. But that long-term average mostly reflects years when retained earnings were causing book values to grow.

With major builders still bleeding red, their stocks are dependent on a swift home-price rebound.

—*John Jannarone*

PART TWO – FACTUAL DATA

## NEIGHBORHOOD MAP



**NEIGHBORHOOD DESCRIPTION**

**Overview:**

The neighborhood or district is defined as the physical area that influences the value of the subject property. The neighborhood analysis provides a bridge between the analysis of general influences on all property values and the study of a particular subject property. The goal of the neighborhood analysis is to determine how the operation of social, economic, governmental and environmental forces influence property values in the specific area in which the subject is located. Neighborhood analysis is designed so that the reader can make meaningful conclusions about the neighborhood's relative desirability, value trend, and impact on the subject property's future desirability and present value. The analysis provides a basis for determining the stage that properties may be at in a neighborhood's life cycle and may indicate future land uses and value trends for the properties.

The subject's district is located northeast side of Dillon Road and Avenue 42 in the City of Coachella.  The following are major characteristics of the district that will influence the value of the subject property:

**A.    SOCIAL:**

Social characteristics relate to the occupants' motivations for developing or working in district.

**1.  Population characteristics and growth statistics, percent built-up, and what is the impact on value:**

The subject area consists primarily of raw vacant desert land.  Land is still relatively inexpensive and allows for affordable housing to be built in planned communities. There are several developments planned for the area in the future.  Two Indian Casino's are just south of the area for resident recreation.  The Coachella Valley is growing at a rapid pace allowing for job opportunities throughout the valley.

**2.  Occupancy, including owners and tenants:**

Approximately 10% of the land is built-up.  Most owners are developers or speculators.

**3.  Availability of labor:**

There is a good labor supply available in the area.  The southern Coachella Valley has some of the lowest housing cost in the area, which has attracted workers for local employment.

**4.  Proximity and character of surrounding development:**

The subject neighborhood consists primarily of raw vacant desert land. Speculators/Developers bought up parcels in the area to assemble for future planned developments.  There are several large master planned communities in the subject's neighborhood planned for development in the next 3 to 5 years.

**B.    ECONOMIC:**

## NEIGHBORHOOD DESCRIPTION

Economic characteristics of a district refer to the occupants' financial capacity to rent or own property and to maintain and rehabilitate it.

**1. Consider the price range of sales, marketing time periods, number of properties currently on the market:**

The average price for gross land parcels in the district is from $25,000 to $65,000/Ac. For residential and commercial land.  Most land owners are holding their property for future development.    Many would be sellers are holding their properties off the market until the current conditions rebound as anticipated by 2010.  Typical marketing times for parcels within the total district are between nine to twelve months.

**2. Amount of development.    What are the current and potential competition identified and its impact on the subject property:**

Development in the area is on hold until the current market slow down rebounds. Future developments will build residential and commercial retail in the area.

**3. Available financing, mortgage ratios and rates:**

Financing for vacant land parcels has come to an almost complete stand still due to the current economic crisis.

**C.    GOVERNMENTAL:**

Governmental characteristics considered in the district pertain to the regulations and taxes imposed on property and the administrative machinery needed to enforce legal compliance.

**1. Tax burden relative to services provided, compared with other districts in the community:**

The tax burden is considered average when compared to competing neighborhoods.

**2. Quality of fire and police protection and other governmental services:**

The quality of these services is considered average and adequate when compared to competing neighborhoods.

**D.    ENVIRONMENTAL:**

## NEIGHBORHOOD DESCRIPTION

Environmental characteristics identify any natural or man-made features that are contained in, or exert and effect on, a district.

**1.    Land-use patterns and homogeneity, and their effects on value:**

Most of the present land use in the area is zoned residential/commercial and open space rural by the county.

**2.    Land size and shape:**

The subject is an 450 acre rectangular shaped parcel.

**3.    Topography and soil:**

The topography of the southern portion is mostly level at near street grade; the northern portion is sloped with approximately 8% grade.

**4.    Street patterns, widths and condition:**

The subject property is located on the east of Dillon Road on the north side of interstate 10. Interstate 10 is a four lane paved highway with no service road on the subject's street frontage.

**5.    Nuisance and hazards (e.g. odors, noise, vibrations, fog, smoke, smog, etc.):**

Interstate 10 traffic noise was noted on the subject's northern portion. This portion of the subject property is zoned commercial and therefore has no negative impact on value.

**6.    Availability, cost and quality of utilities as compared with competing districts:**

Similar to competing areas.

**E.    TREND ANALYSIS:**

**Conclusion:**

The subject property is located within the City of Coachella. The neighborhood consists of primarily of single family residential developments, Spotlight 29 Casino and Fantasy Springs Casino to the west, vacant land to the north and east. The subject property would lend itself to a single family residential development when market conditions improve in approximately 5 years.

## SITE DATA

| | |
|---|---|
| **Location:** | East of Dillon Road, north side of Interstate 10, Coachella, CA 92236 |
| **Assessors Parcel Numbers:** | See Addendum |
| **Census Tract Number:** | 0456.03 |
| **Site Size:** | Approximate: 450 Acres (Gross) |
| **Site Shape, Dimensions:** | The subject parcel is a rectangular shaped parcel. |

<u>**ZONING:**</u>

| | |
|---|---|
| • **General Plan:** | Commercial/Residential – City of Coachella |
| • **Actual:** | Commercial/Residential – City of Coachella |
| **Entitlements:** | None |
| **Redevelopment Area:** | No |
| **Easements, Encroachments:** | Periphery utility easements encumbering subject property are assumed for this appraisal. (See Scope and Extent of the Data Collection Process, Page 14) |
| **Street Frontage:** | Property has street frontage along Interstate 10 |
| **Access:** | Property has access along Interstate 10 |
| **Soil and Subsoil Conditions:** | There are no known negative soil or subsoil conditions, as evidenced by the existence of building improvements on other sites in the district. (See Scope and Extent of the Data Collection Process, Page 14) |
| **Archeological Site:** | No visual evidence of archaeological significance. (See Limiting Conditions in the Addendum of this report.) |
| **Drainage:** | Appears adequate. However, consideration will have to be given to water channeling from the northern parcels. (See Scope and Extent of the Data Collection Process, Page 14) |

## SITE DATA

| | |
|---|---|
| **Containment in Floodplain:** | The subject appears to be located in area shown as Flood Zone D defined as follows: "Areas of undetermined, but possible flood hazard". Designated by F.E.M.A. Flood Insurance Rate Map, revised August 28, 2008, in Community Panel Number 060245 06065. Flood Insurance will probably be required in this area. (See Scope and Extent of the Data Collection Process, Page 14) |
| **Environmental Issues:** | It is assumed that there are no potentially hazardous materials (i.e. toxic waste) resulting from past use of the property, construction or maintenance of any buildings. Such a condition may or may not be present. The appraiser is not qualified to detect such substances. Therefore, if desired, the client should retain an expert in the field. (See Scope and Extent of the Data Collection Process, Page 14) |
| **Seismic Data:** | Subject property does not appear to be located within the Alquist-Priolo Special Study Zone according to Riverside County comprehensive General Plan Seismic-Geographic Map, revised April, 1988. However, subject is located within the V boundary of Groundshaking Zone based on distance to causative faults. Earthquake fault lines are common in the area. These are relatively inactive fault lines and any major damage due to an earthquake is not considered more likely for the subject property than for other properties in the area. |
| **Blow Sand:** | The site is not located in a blow sand area according Riverside County comprehensive General Plan Seismic-Geographic Map, revised April, 1988. (See Scope and Extent of the Data Collection Process, Page 14) |
| **Noise:** | No adverse noise that would impact value was noted. (See Scope and Extent of the Data Collection Process, Page 14) |
| **Liquefaction Hazard Area:** | No, according to Riverside County comprehensive General Plan Seismic-Geologic Map, revised April, 1988. (See Scope and Extent of the Data Collection Process, Page 14) |
| **Wildlife & MSHCP:** | The subject site is not located within a conservation area. (See Scope and Extent of the Data Collection Process, Page 14) |

## IMPROVEMENTS:

## SITE DATA

|  |  |  |
|---|---|---|
| • | **Off-Sites:** | Interstate 10 is a four lane paved highway with no service road along the subject's street frontage |
| • | **On-Sites:** | None |

**Utilities:**            Public utilities including water, electricity, and telephone appear to be installed along Dillon Road boarding the property. Gas and sewer are to the south along Dillon Road. (See Scope and Extent of the Data Collection Process, Page 14)

**Support Facilities:**       Average

**ADJACENT USES:**

    **North:**            Vacant Desert Land

    **South:**            Interstate 10 and Vacant Land

    **East:**            Vacant Desert Land

    **West:**            Vacant Desert Land

**Units of Comparison:**       According to area brokers, gross vacant land in the district is generally sold on a price per acre.

**CONCLUSIONS:**          The physical and functional characteristics of the subject will meet the desires and standards of typical purchasers in the market. Overall, the site is considered average for subdivision land when compared to competing sites in the market for development in the district. Due to the current economic conditions, vacant land in the area is held for long term development.

## ZONING MAP



## ZONING

The subject is located within the City of Coachella, CA.  The General Plan and the Zoning Map shows the property designated Residential development.


## TAX AND ASSESSMENT DATA AND ANALYSIS

In California, the law provides that real property is to be assessed at 100% of the property's appraised value.  The 2007-2008 assessed valuation, tax rate and taxes for the subject property are as follows:

### SUBJECT PROPERTY 2007-2008 ASSESSED VALUE
### (450 GROSS ACRES)


Real property taxation in the State of California is governed by Proposition 13, which was passed by the voters in June, 1978.  The basic elements of Proposition 13 are as follows:

1.   The tax rate was limited to 1% of the assessed value plus an additional 1/4% to cover the payment of debts previously approved by voters.

2.   The assessed value of a property purchased prior to March 1, 1975 was fixed at that property's market value as of March 1, 1975.  For a property purchased after March 1, 1975, the law requires the assessment to be based on the market value at the time of sale.

3.   All assessed values can increase no more than 2% per year for inflation and/or appreciation.

Proposition 13 negated the concept of equalization whereby similar properties have similar property tax liabilities.  Since there may be variance in the amount of property taxes being paid by otherwise similar properties, the appraiser used the final value conclusion of this report.

### ESTIMATED REAL PROPERTY TAX AT APPRAISED VALUE
### (450 GROSS ACRES)

| | |
|---|---|
| Estimated Value | $11,200,000 |
| X   Tax Rate/100 | 1.13556 |
| Assessed Taxes | $127,182 |
| Special Assessments | N/A |
| **TOTAL ESTIMATED PROPERTY TAXES** | **$127,182** |

The tax rate for 2009-2010 fiscal year is considered typical for comparable locations throughout the subject district and Riverside County.

## THE VALUATION PROCESS

Highest and best use is defined as "that reasonable and probable use that supports the highest present value, as defined, as of the effective date of the appraisal."

Alternatively, that use from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value.

"The definition immediately above applies specifically to the highest and best use of land. It is to be recognized that in cases where a site has existing improvements on it, the highest and best use may very well be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its existing use..."

"Implied within these definitions is recognition of the contribution of that specific use to community environment or to community development goals in addition to wealth maximization of individual property owners. Also implied is that the determination of highest and best use results form the appraiser's judgment and analytical skill, i.e., that the use determined from analysis represents an opinion, not fact to be found. In appraisal practice, the concept of highest and best use represents the premise upon which value is based..."[1]

Highest and best use of a property is typically discussed as both vacant and as currently improved.  In addition, there is discussion about the ideal improvement the property could support as indicated in the neighborhood analysis of this report. This ideal improvement can then be compared to the existing building for differences that would affect value.

### <u>HIGHEST AND BEST USE ("As Is" No Improvements):</u>

**1.  Legally Permissible:**

The subject is located in the City of Coachella.  The current zoning and general plan designation for the subject property is residential uses.  Some of the legally permissible uses include residential (high, medium and low density) uses.

**2.  Physically Possible:**

The site section of this report indicates that the subject is a rectangular shaped parcel totaling 450 acres of vacant land.  The parcel is large enough to develop a  residential development.

**3.  Financially Feasible:**

The Regional and Neighborhood analysis of this report indicated that the developing surrounding areas will quickly reach the subject's area once residential demand resumes. Since the path of development is in the subject's direction it would appear that the proposed residential subdivision would be the most financially feasible use of the land.

---

[1]  Byrl N. Boyce, Ed., Real Estate Appraisal Terminology (Cambridge, Mass: Ballinger Publishing Company, 1981), pp. 126-127.

**THE VALUATION PROCESS**

**4. Maximally Productive:**

In the final analysis, a determination must be made as to which physically possible and legally permissible use would produce a financially feasible use that generates the highest net return on the land for the longest period of time. An analysis of every possible use for the subject property that might be approved by local government during the site specific planning is beyond the scope of this report.

It was determined in the Neighborhood analysis that the subject is in the path of development of residential homes with complimentary neighborhood commercial. The maximally productive use of the subject property would be to hold for 3 years and then start the 2 year entitlement process and then begin grading for finished super pads which would bring the product on the market in approximately 5 years, when the market becomes back in balance.

**5. Conclusion:**

The highest and best use of the subject property would be to delay the entitlement process (3years) for a mixed use master planned development. The first phase off-site construction will coincide with the development of the McNaughton Interstate 10 exchange expected to be complete in 3 to 5 years. It was determined later in this report that the current Bulk or Wholesale Market Value($14,099,000) is less than the Cost of Production ($22,628,000) making it financially infeasible to develop or start entitlements for the subject property at the present time.

## HIGHEST AND BEST USE ("As Proposed"):

**1. Legally Permissible:**

The subject is located in the City of Coachella. The current zoning and general plan designation for the subject property is residential uses. Some of the legally permissible uses include residential (high, medium and low density) uses. It would be legally permissible to subdivide the property into 13 mixed use super pads, similar to the conceptual plan proposed.

**2. Physically Possible:**

The site section of this report indicates that the subject is a rectangular shaped parcel totaling 450 acres of vacant land. The parcel is large enough to develop a residential development. The above mentioned legally permissible uses would also be physically possible.

**3. Financially Feasible:**

The Regional and Neighborhood analysis of this report indicated that the developing surrounding areas will quickly reach the subject's area once residential demand resumes. Since the path of development is in the subject's direction it would appear that the proposed residential subdivision would be the most financially feasible use of the land as proposed.

**THE VALUATION PROCESS**

4.  **Maximally Productive:**

It was determined later in this appraisal that the highest and best use for the subject property as proposed is to wait three years and then start the 2 year entitlement process for a medium to high density residential development with complimentary retail commercial. Concluding analysis found later in this report will show that the Prospective bulk or wholesale market value ($30,344,000) is greater than the prospective cost of production ($30,300,000), indicating that the proposed development will be financially feasible in approximately 5 years.

5.  **Conclusion:**

An analysis of every possible use for the subject property that might be approved by local government during the site specific planning is beyond the scope of this report. However, the existing conceptual plan that the appraiser is analyzing maximizes the existing zoning densities that are reasonably probable for the subject. These densities would allow for the sale at adequate eventual price points that are commensurate to the demographics in the Coachella Valley.

## THE VALUATION PROCESS

The Valuation Process is a "systematic procedure employed to provide the answer to a client's question about real property value."[1]  The first step in this procedure is defining the appraisal problem:  Defining the problem involves identifying the real estate, the property rights, the date of the value estimate, the use of the appraisal, the definition of value, and determining limiting conditions.  For the subject, the problem was set forth as follows:

| | |
|---|---|
| **Real Estate:** | East of Dillon Road on the north side of Interstate 10, Coachella California 92236. |
| **Property Rights:** | The property rights appraised establish the FEE SIMPLE Interest of all future benefits that may be derived from the property's present or possible use, except for existing easements and rights-of-way of record. |
| **Date of Value:** | December 1, 2009 |
| **Purpose:** | The purpose of this appraisal is to estimate and report my opinion of the "As Is" MARKET VALUE of the subject's 450 acres  if sold for cash or its equivalent to a single buyer as of my last visitation date of December 1, 2009.  In the "As Is" scenario, the property will be appraised at whatever stage of development as of the effective date of the appraisal.  All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market.  Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal.  MARKET VALUE also assumes an open and competitive market of the property interest being appraised. |
| **Use:** | The function or use of the appraisal is for loan analysis. |
| **Limiting Conditions:** | Standard limiting conditions.   (See Limiting Conditions in the Addendum Section of this report) and Scope and Extent of the Data Collection Process on Page 14 of this report. |

---

[1] American Institute of Real Estate Appraisers, <u>The Appraisal of Real Estate,</u>  (11th edition, Chicago, 1996), Page 79.

## THE VALUATION PROCESS

**Conditions:**

This report is subject to the enclosed Assumptions and Limiting Conditions and the Certification of Value and The Scope and Extent of the Data Collection Process on Page 16 of this report. The following pertain to extraordinary assumptions, hypothetical conditions, or major highest and best conclusions made regarding this appraisal:

- In the analysis and feasibility study of this report, the extraordinary assumption is being made that the proposed McNaughton exchange at Interstate 10 will be financed with a Community Facilities District Bond.   (Extraordinary Assumption).

## VALUATION METHODOLOGY

Every real property is different and there are many types of value that can be estimated for any real property. For this appraisal assignment, the appraiser is estimating the subject's MARKET VALUE at FEE SIMPLE interest. The definition of Market Value has been defined in the Purpose of the Appraisal section of this report. The subject property and type of value desired have been identified and so the appraisal problem has been defined.

In the appraisal process, it is my intention to present a properly supported value conclusion for the subject property. The market data, analysis, and conclusions presented in the report guide a reader in reaching a similar value conclusion as the appraiser.

In the LAND VALUE SECTION of an appraisal report, market data and other information pertaining to land value are presented along with an analysis of the data and reasoning that lead to the land value estimate. The factors that affect land value should be presented in a clear and precise manner. The narrative should lead the reader to the land value estimate.

Depending on a specific appraisal assignment, any of the following six methods may be used to value land.

1. Sales comparison technique
2. Allocation
3. Extraction
4. Subdivision development
5. Land residual
6. Ground rent capitalization

In the COST APPROACH, an estimated reproduction or replacement cost of the building and land improvements "as if completed" as of the date of appraisal is developed, together with an estimate of the losses in value that have taken place due to design and plan on neighborhood influences. To the depreciated building cost estimate, entrepreneurial profit and the estimated value of the land are added. The total represents the value indicated by the cost approach.

In the SALES COMPARISON APPROACH, the subject property is compared to similar properties that have been sold recently or for which listing prices or offering figures are known. Data for generally comparable properties is used and comparisons are made to demonstrate a probable price at which the subject property would be sold if offered on the market.

In the INCOME CAPITALIZATION APPROACH, the current rental income to the property is shown with deductions for vacancy and collection loss and expenses. The prospective net operation income of the property is estimated. To support this estimate, comparable properties may be reviewed along with available operation cost estimates. An applicable capitalization method and appropriate capitalization rates are developed and used in computations that led to value indications.

## VALUATION METHODOLOGY

**APPRAISAL METHODOLOGY** (continued)

In the LAND RESIDUAL METHOD of land valuation is simply an extension of the previously indicated approaches and feasibility. Subtracting the hard and soft costs of development, as well as the developer's profit, from the present value of the future benefits indicates a residual to raw vacant land. The Land Residual Method is a good check of the results from previous value approaches.

1. The Sales Comparison Approach will be used to estimate the "As Is" Market Value (Fee Simple) of the subject property.

2. The Land Residual Technique will be used as a check for the value results from the Sales Comparison Approach.

   • The cost of production technique will be used to determine the bulk or wholesale market value of the entire project if sold to a single purchaser.

   • The sales comparison technique will be used to determine the aggregate retail of each super pad if all 13 super pads were sold to individual buyers.

   • Next, a discounted cash flow analysis will be used to determine the bulk or wholesale market value of all 13 Super Pads as if sold to a single purchaser.

3. The value from the Sales Comparison Technique and the Land Residual Technique will be reconciled into a final indication of value.

## LAND SALES COMPARISON MAP



| LAND SALE COMPARISON #1 |
|:---:|

| | |
|---|---|
| **Location:** | Dillon Road, N. of Interstate 10, Indio |
| **Identification:** | Assessor's Parcel Numbers 601-150-029, 601-270-026, 039, 055; 601-310-031, 032, 035-038, 045-051, 601-780-005, 008 |
| **Thomas Map Guide:** | Page 5411 C/6, Riverside County, California |
| **Date of Sale:** | 4/20/09 |
| **Documentation:** | Grant deed recorded as Instrument No. (0193004) in Official Records, Riverside County, California |
| **Grantor:** | Fidelity National |
| **Grantee:** | RB Indio Holdings, LLC |
| **Sales Price:** | $4,000,000 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Cash Equivalent to Seller |
| **Cash Equivalency:** | $4,000,000 |
| **Conditions of Sale:** | Non-Arm's Length (Foreclosure) |
| **Market Conditions:** | Negative |
| **Site Size:** | 185.13 Ac |
| **Unit Price Per Ac:** | $21,606/Ac |
| **Topography:** | Level to Rolling. |
| **Utilities:** | To nearby sites |
| **Corner Parcel:** | Yes |
| **Street Improvements:** | Paved |
| **Shape:** | Irregular |

## LAND SALE COMPARISON #1 CONT'D

**Zoning:**                    W-2 Controlled Development

**Present Use at Time
of Sale:**                     Vacant Land

**Highest and Best Use:**      Hold for Development

**Verification:**              CoStar Comps, Metroscan, and County Records.

**Comments:**                  The property is smaller than the subject.  This property is zoned
                               for controlled development which includes a mix of commercial
                               and residential uses.

**LAND SALE #1 MAP**



| LAND SALE COMPARISON #2 |
|---|

| | |
|---|---|
| **Location:** | Airport Blvd. at Jackson Street, Vista Santa Rosa, CA |
| **Identification:** | Assessor's Parcel Numbers 767-360-011 & 012, Riverside County, California |
| **Thomas Map Guide:** | Page 5530, Grid G/4, Riverside County, California |
| **Date of Sale:** | 12/14/07 |
| **Documentation:** | Grant deed recorded as Instrument No. (0771565) in Official Records, Riverside County, California |
| **Grantor:** | Corman Leigh Communities |
| **Grantee:** | McAdams Land Investments |
| **Sales Price:** | $3,200,000 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Cash Equivalent to Seller |
| **Cash Equivalency:** | $3,200,000 |
| **Conditions of Sale:** | Arms length transaction |
| **Market Conditions:** | Less Negative |
| **Site Size:** | 77.30 Ac |
| **Unit Price Per Ac:** | $41,397/Ac |
| **Topography:** | At street grade. |
| **Utilities:** | Utilities appear to be available near the site. |
| **Corner Parcel:** | Yes |
| **Street Improvements:** | Paved |
| **Shape:** | Irregular |

## LAND SALE COMPARISON #2 CONT'D

**Building Improvements:**    None

**Zoning:**    Ag, County of Riverside Low Density Residential Overlay

**Present Use at Time
of Sale:**    Vacant Land

**Highest and Best Use:**    Hold for Development

**Verification:**    CoStar Group, Metroscan, and County Records.

**Comments:**    This property is located in Riverside County.  The site is much smaller than the subject with residential development potential.

**LAND SALE #2 MAP**



| LAND SALE COMPARISON #3 | |
|---|---|
| **Location:** | Avenue 62 & Jefferson Street, La Quinta |
| **Identification:** | Assessor's Parcel Number 753-040-010, Riverside County, California |
| **Thomas Map Guide:** | Page 5470, Grid B/5, Riverside County, California |
| **Date of Sale:** | 11/01/07 |
| **Documentation:** | Grant deed recorded as Instrument No. (669318) in Official Records, Riverside County, California |
| **Grantor:** | David Chapman |
| **Grantee:** | State of California |
| **Sales Price:** | $1,620,000 |
| **Property Rights Conveyed:** | Fee Simple Interest |
| **Financing:** | Cash Equivalent to Seller |
| **Cash Equivalency:** | $1,620,000 |
| **Conditions of Sale:** | Arms length transaction |
| **Market Conditions:** | Less Negative |
| **Site Size** | 49.70 Ac (Gross) |
| **Price Per Ac:** | $32,596/Ac |
| **Topography:** | Level at street grade. |
| **Utilities:** | To nearby sites |
| **Corner Parcel:** | No |
| **Street Improvements:** | None |
| **Shape:** | Rectangular |
| **Building Improvements:** | None |

## LAND SALE COMPARISON #3 CONT'D

**Zoning:**                     Low Density Residential

**Present Use at Time**         Vacant Land
**of Sale:**

**Highest and Best Use:**       Hold for future development

**Verification:**               MLS, Metroscan Inc., County Records

**Comments:**                   The property is smaller than the subject, and has residential
                                uses.

## LAND SALE #3 MAP



## LAND SALES COMPARISON GRID ("AS IS") (UNENTITLED)

| SALE NUMBER | SUBJECT | NO. 1 | NO. 2 | NO. 3 |
|---|---|---|---|---|
| LOCATION | E. of Dillon Road & I -10 | Dillon Road & Ave. 44 | Airport Blvd. & Jackson Street | Avenue 62 & Jefferson |
| City | Coachella, Ca. | Indio, Ca. | Thermal, Ca. | La Quinta, Ca. |
| Date of Sale | 12/1/2009 | 4/20/09 | 12/14/07 | 11/01/07 |
| **Sale Price** | **$11,664,000** | $4,000,000 | $3,200,000 | $1,620,000 |
| Site Size Ac (Gross) | 450 Ac | 185.13 Ac | 77.30 Ac | 49.70Ac |
| **Price/Ac** | **$25,920/Ac** | $21,606/Ac | $41,397/Ac | $32,595/Ac |
| CHARACTERISTIC SUBJECT | | | | |
| Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Financing Terms | Conv. | Similar | Similar | Similar |
| Conditions of Sale | Arms Length | Foreclosure +20% | Arms Length | Arms Length |
| Market Conditions | Negative | Negative | Less Negative (15%) | Less Negative (15%) |
| Adjusted Price/Ac | $25,920 | $25,927 | $35,187 | $27,706 |
| PHYSICAL ADJUSTMENTS | | | | |
| Location | Avg. | Superior (2,593) | Similar (3,519) | Similar (2,771) |
| Site Size | 450 Ac | Sm. (3,889) | Sm. ($5,278) | Sm.(4,156) |
| Entitlements | No | Similar | Similar | Similar |
| On-Site | None | Similar | Similar | Similar |
| Off-Site Improvements | Yes | Similar | Similar | Similar |
| Zoning | Residential | W2 Controlled Development -0- | Agriculture/ Residential Overlay -0- | Residential -0- |
| Access | Good | Inferior +5,611 | Similar -0- | Inferior +5,611 |
| Highest & Best Use | Develop in Stages | Similar | Similar | Similar |
| ADJUSTMENTS | | | | |
| Size | (15%) | 22,038 | 29,909 | 23,550 |
| Location | (10%) | 19,445 | 26,390 | 20,779 |
| Access 1 & 2 | +5,611 | 25,056 | 26,390 | 26,390 |
| Net Adjusted Factor | | (871) | (8,797) | (1,316) |
| Indicated Value | $25,920 | $25,056 | $26,390 | $26,390 |
| WEIGHTED VALUES | | | | |
| Reliability (1-10) | | 9 | 9 | 9 |
| Contribution (%) | 100% | 33% | 33% | 33% |
| Contribution ($) | $25,920 | $8,344 | $8,788 | $8,788 |

**CURRENT PROPERTY LISTINGS (Unadjusted)**

| Property Location | Size | Listing Price | Price per Acre | Cumulative Days on Market |
|---|---|---|---|---|
| Avenue 51 Coachella | 20.27 Acres | $1,300,000 | $64,134 | 607 Days |
| Avenue 50 Coachella | 90.79 Acres | $2,723,000 | $30,000 | 183 Days |
| Tyler Street Thermal | 34.08 Acres | $2,004,000 | $58,805 | 293 Days |
| Avenue 66 Thermal | 40.20 Acres | $2,100,000 | $52,238 | 336 Days |

## SALES COMPARISON TECHNIQUE ("AS IS")

Adjustments to each of the sales are required for significant differences which effect value. "Appraisers adhere to a sequence of adjustments in all sales comparison analyses.  Using the sequence, the appraiser obtains intermediate price figures and applies succeeding adjustments to each previously adjusted price."  The adjustments applied to the price of a comparable property "reflects the comparable superiority or inferiority in regard to the real property rights conveyed, financing, conditions of sale, market conditions, location, and physical characteristics."[1]

Subject adjustments are discussed as follows:

There are ten basic elements of comparison that should always be considered in Sales Comparison analysis:[2]

|     |     |
| --- | --- |
| 1.  | Real property rights conveyed |
| 2.  | Financing terms |
| 3.  | Conditions of sale |
| 4.  | Expenditures made immediately after purchase |
| 5.  | Market conditions |
| 6.  | Location |
| 7.  | Physical characteristics |
| 8.  | Economic characteristics |
| 9.  | Use |
| 10. | Non-realty components of value |

## SUBJECT ADJUSTMENTS ARE DISCUSSED AS FOLLOWS:

### Property Rights, Financing Terms, and Conditions of Sale:

All comparable site sales were sold or listed as Fee Simple Estates.  Financing terms for the sales represented cash or its equivalent to the sellers.  Lastly, Conditions of Sale were based on an arm's length basis.  Comparable Sale #1 was a foreclosure sale and not considered an arm's length transaction.  Therefore, an upward adjustment of 20% per acre was made to Comparable Sale #1

### Time and Market Conditions:

Market Value estimates assume an open and competitive marketplace.  Current market conditions leading up to the date of appraisal have been a period of average market activity.  Proper analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of Market Value.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of Market Value.

---

[1]  American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 11th Edition (Chicago: American Institute of Real Estate Appraisers, 1996), Page 420.

[2]  Ibid., Page 403-404.

**SALES COMPARISON TECHNIQUE ("AS IS")**

**Time and Market Conditions (cont'd):**

During some periods of distressed market conditions, Market Value may imply a price at which a transaction will not occur until such time as conditions in the market match the definition of Market Value. In addition, market sale dates are not always a valid date for value.

Market conditions and buyers forecasts for the future at the time of comparable sales were less negative compared to the unstable market conditions as of the effective date of appraisal. Therefore, a downward adjustment of 15% per acre was made to Comparable Land Sale #2 & #3.

**Size:**

All three Comparable Land Sales are smaller than the subject property. Therefore, a downward adjustment of 15% per acre was made to all three Comparable Land Sales.

**Location:**

All three Comparable Land Sales have superior locations. Therefore, a downward adjustment of 10% per acre was made to all three Comparable Land Sales.

**Zoning Adjustment:**

All three Comparable Sales have similar zoning. Therefore, no adjustments were made.

**Access:**

A matched pair was found between Comparable Land Sale #2 & #3. They are exactly alike except Comparable Sale #3 has inferior access. Comparable Sale #1 also has inferior access. Therefore, an upward adjustment of $5,611 per acre was made to Comparable Land Sale #1 & #3.

**Off-Site Improvements:**

All three Comparable Sales have similar off-site improvements. Therefore, no adjustments were made.

**Conclusion:**

Applying the above adjustments to each sale, where site characteristics were different than the subject, indicated an adjusted value of $25,920 per Ac. Weighted values from 1 to 10, 10 being the most comparable, were allotted to each sale property. Weighted averages were derived as a percentage for each sale by adding together all the weighted values and dividing individual values by the sum of the total. Multiplying each sales adjusted price per Ac by its weighted percentage average indicated a dollar contribution for each sale. Adding these contributions together indicated a $25,920 evidence of value for the subject's unit price per Ac. Multiplying this unit price by the subject's 1,850 acres indicated the following value indication calculated as follows:

**SALES COMPARISON TECHNIQUE ("AS IS")**

**450 Ac**    x   **$25,920**    =    **$11,664,000**

**R/O**    =    **$11,664,000**

Based upon my investigation and analysis of the data gathered with respect to this assignment, I have formed the opinion that the "As Is" Market Value (Unentitled) of the Fee Simple interest in the subject's 1,850 acres, as of the effective date December 1, 2009, is measured in the amount of:

**$11,664,000 ($25,920/Ac)**

**(ELEVEN MILLION SIX HUNDRED SIXTY FOUR THOUSAND DOLLARS)**

Reasonable exposure time necessary to sell this property to a single purchaser prior to the date of this appraisal is estimated 10 to 12 months.

## LAND RESIDUAL TECHNIQUE ("AS IS")

**II.  Land Residual Technique ( Fee Simple) – 13 Residential Super Pads**

   **A.**   **Cost of Production Analysis**

Production cost is the cost of construction at current prices of an exact duplicate, or replica, using the same materials, construction standards design, layout, and quality of workmanship, and embodying all the deficiencies, superadequacies, and obsolescence of the proposed subject Parcel improvements.  In the analysis of the cost to develop subdivision Parcels (as if complete and ready for sale), the following have been recognized:

   **1. The "As Is" market value of the land by Direct Sales Comparison .**

   **2. Construction Costs:**

      a.  Hard costs:  Direct development costs associated with labor and materials of construction of streets, utilities (on and off site) and any other physical improvements.

      b.  Soft costs:  Indirect development costs associated with non-construction items such as land planning, engineering, marketing, municipal fees, appraisal, financing fees, interest and other entitlement costs.

   **3.**  **Developer's Profit:**  That profit level necessary to induce a typical developer to undertake the necessary approval, planning and construction to the point of completion of the Parcel subdivision of a given type.

   **4.**  **Cost Data Source:**

Typical developer's cost estimates, as determined by local contractor bids and developer quotes and are utilized with reference to the "Marshall Valuation Service", published by Marshall and Swift Publication Company, is a nationally recognized cost estimating company located in Los Angeles, California.  The costs calculated by this method represent a typical bidding target range.  These costs are updated regularly to reflect changes and differences in construction costs by class of construction and location.  This method estimates direct and indirect costs associated with construction development as noted below.

The cost of replacing a property is generally estimated on a square foot basis.  The value of the land is then added to the replacement cost estimate.  **This cost estimate includes** **the average architect's and engineers fees, including plans, plan check, building permits and survey to establish building lines and grades;** **also, normal interest on building funds during the period of construction and processing fees or service charges are included as well as sales tax on materials, normal site preparation, including excavation for foundation and back-fill, as well as, utilities from structure to lot line are figured for typical set-backs.** **The contractor's overhead and profit, including job supervision, workmen's compensation, fire and liability insurance, unemployment insurance and so forth are all included.**

**II.  Land Residual Technique ( Fee Simple)**