# EXHIBIT J

# EXHIBIT J

SUMMARY REPORT FORMAT


THE FEE SIMPLE  ESTATE
IN THE


**"AS IS" MARKET VALUE OF
TWO NON-CONTIGUOUS PARCELS TOTALING 103.93 ACRES
INCLUDING 201.65 ACRE FEET OF WATER RIGHTS
WITHIN THE PROPOSED GATEWAY MASTER PLANNED COMMUNITY
LOCATED AT THE SEC OF THOUSANDAIR BLVD. AND EBERHARD ROAD
AND THE SWC OF HIGHWAY 160 & HACKER STREET
IN THE TOWN OF PAHRUMP, NYE COUNTY, NEVADA**


**EFFECTIVE DATE OF THE APPRAISAL**

March 5, 2010


**DATE OF THE REPORT**

March 10, 2010

**DOZIER FILE NUMBER 10-019LHP**


PREPARED FOR

**SPECIALTY TRUST
ATTN: MR. NELLO GONFIANTINI III, PRESIDENT AND CEO
6160 PLUMAS STREET
RENO, NEVADA  89509**


**BY**


**Raymond L. Dozier, MAI
DOZIER APPRAISAL COMPANY
PALM DESERT, CA  92260**

# DOZIER APPRAISAL COMPANY
## Resort and Urban Property Appraisers
## Valuation and Financial Consultants

_____

73-350 EL PASEO, SUITE 206
PALM DESERT, CALIFORNIA 92260

RAYMOND L. DOZIER, MAI                                                    TEL. (760) 776-4200
CERTIFIED GENERAL APPRAISER                                          FAX (760) 776-4977
LICENSE # AG004590                                        E-MAIL Dozierappraisal@dc.rr.com

March 10,2010

Specialty Trust
Attn:  Mr. Nello Gonfiantini III, President and CEO
6160 Plumas Street
Reno, Nevada  89509

RE:    *"As Is"  Market Value Appraisal  of  two non-contiguous parcels totaling 103.93 acres including*
*201.65 acre feet of water rights located within the proposed Gateway Master Planned Community*
*located at the SWC of Highway 160 & Hacker Street and the  SEC of Thousandaire Blvd. and*
*Eberhard Rd. within the Town of Pahrump, Nye County, Nevada.*

Mr. Gonfiantini:

Enclosed is an appraisal I have made of the "As Is" Market Value of  two non-contiguous parcels totaling 103.93 acres including 201.65 acre feet of water rights located within the proposed Gateway Master Planned Community located at the SWC of Highway 160 & Hacker Street and the  SEC of Thousandaire Blvd. and Eberhard Rd. within the Town of Pahrump, Nye County, Nevada.    This appraisal was made at the request and agreement between Specialty Trust and Dozier Appraisal Company.  Specialty Trust is the client and intended user of this report.

The purpose of this appraisal is to estimate the  "As Is"  Market Value  of two non-contiguous vacant land parcels totaling 103.93 acres including 201.65 acre feet of water rights or wholesale) and 118.09 acres of vacant mixed use residential and commercial land if sold  to a single purchaser as of the effective date March 5, 2010.  The total property will be appraised at whatever stage of development  as of the effective date of appraisal, March 5, 2010.  All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market.  Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal.  MARKET VALUE also assumes an open and competitive market of the property interest being appraised.  The function of the appraisal is for loan analysis purposes.

The property rights being appraised are the Fee Simple Interest of all future benefits that may be derived from the property's present or possible use, except for easements and rights-of-way of record.

To develop this appraisal, Raymond L. Dozier, MAI has made a personal inspection of the subject property.  In addition, he has reviewed sales of comparable properties, performed a highest and best use analysis and a land residual analysis and has weighed and compared the data to arrive at the estimated value of the subject property.  The effective date of this appraisal is March 5, 2010.

*DOZIER APPRAISAL COMPANY*

Page 2
Dozier Appraisal Company

This report is subject to the enclosed Assumptions and Limiting Conditions, the Certification and the Scope of the Appraisal on Page 16. The following hypothetical conditions, extraordinary assumptions and major highest and best use conclusions are being made:

- The subject property's 103.93 acres and 201.65 acre feet of water rights are located within the Gateway Master Planned Community. The highest and best use analysis in this report indicated the highest value for the subject as part of the Gateway Master Planned Community. A knowledgeable seller and a knowledgeable buyer would agree to the highest and best use conclusion and would base the subject's value on the future benefits derived from the Master Planned Development. (Major Highest and Best Use Conclusion)

- Later in the appraisal the reader will note in the Highest and Best Use Analysis, it was concluded there would be a negative impact on the value of the subject property if the 201.65 acre feet of water rights were sold separate from the 103.93 acres of vacant land. Therefore, the major highest and best use conclusion is being the 201.65 acre feet of water rights should remain with the subject property and not be sold separately. (Major Highest and Best Use Conclusion)

Otherwise there are no other extraordinary assumptions or hypothetical conditions regarding this appraisal. Also, this letter of transmittal is not the completed appraisal report but a statement of value conclusions. Users of this appraisal are encouraged to read the completed attached report to reach the appraiser's conclusions via the appraisal process.

The intention of this appraisal report is to comply fully with FIRREA appraisal guidelines, as well as the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. The departure provision shall not apply.

The undersigned does not have any personal interest, either present or contemplated, in the subject property and certifies that fees, received or to be received, for the employment of my services are not contingent on the opinions reported herein. In addition, the undersigned meets the Competency Provision Standard (1.1a,b, c) as required by USPAP and has the knowledge and experience to complete the assignment competently.

Therefore, based upon my investigation and analysis of the data gathered with respect to this assignment, I have formed the opinion that the "As Is" MARKET VALUE of the subject property, as of the effective date March 5, 2010, is measured in the amount of:

**$6,665,000 ($64,130/Acre)[1]**

**(SIX MILLION SIX HUNDRED SIXTY FIVE THOUSAND DOLLARS)**

Reasonable exposure time necessary to sell this property to a single purchaser
prior to the date of this appraisal is estimated at 8 to 10 months.

_____

Allocated:

| | |
|---|---|
| 103.93 Acres Vacant Land | $4,144,000 ($39,873/Acre) |
| 201.65 Acre Feet of Water Rights | $2,521,000 ($12,500/Acre Foot)* |
| Total | $6,665,000 ($64,130/Acre) |

*See Page 38 for water rights valuation.

*DOZIER APPRAISAL COMPANY*

Page 3
Dozier Appraisal Company

1. Based on the extraordinary assumptions and major highest and best use conclusions in the letter of transmittal.  If any of the extraordinary assumptions, hypothetical conditions or major highest and best use conclusion prove to be false the value could be highly impacted.

Respectfully submitted,
DOZIER APPRAISAL COMPANY

Raymond L. Dozier, MAI
State Certified General Real Estate Appraiser
NV Temporary License # ATMP.0011260.CG
Expires May 10, 2010
RLD/10-019- LHP

# TABLE OF CONTENTS

**CONTENTS**

**PART ONE – INTRODUCTION**                                                                                      **PAGE**

     LETTER OF TRANSMITTAL
     TABLE OF  CONTENTS
     CERTIFICATION ................................................................................................ 1
     REGIONAL MAP ............................................................................................... 2
     NEIGHBORHOOD MAP ...........……..............................................……............3
     CONCEPTUAL  PLAN ...................................................................................... 4
     AERIAL PHOTO ............................................................................................... 6
     SUBJECT PHOTOGRAPHS ............................................................................. 7
     SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS ................................ 8

**PART TWO – FACTUAL DATA**

     PURPOSE OF THE APPRAISAL ..................................................................... 13
     USE OF THE APPRAISAL ............................................................................. 13
     SCOPE AND EXTENT OF THE DATA COLLECTION PROCESS ........................ 13
     DATE OF VALUE ESTIMATE ....................................................................... 13
     IDENTIFICATION OF PROPERTY RIGHTS APPRAISED ................................. 14
     DEFINITIONS OF VALUE AND RELATED TERMS ......................................... 14
     LEGAL DESCRIPTION AND IDENTIFICATION OF SUBJECT PROPERTY ....... 16
     HISTORY OF THE SUBJECT PROPERTY ...................................................... 16
     REGIONAL AND CITY ANALYSIS ............................................................... 17
     ZONING ....................................................................................................... 23
     TAX ASSESSMENT DATA ............................................................................ 24
     CONCEPTUAL PLAN ................................................................................... 25
     AERIAL MAP ............................................................................................... 27
     SITE DATA .................................................................................................. 28

**PART THREE – ANALYSIS AND CONCLUSIONS**

     HIGHEST AND BEST USE ANALYSIS ............................................................ 31
     APPRAISAL METHODOLOGY ...................................................................... 34
     SALES COMPARISON APPROACH ............................................................... 37
     LAND RESIDUAL TECHNIQUE .................................................................... 50
     DISCOUNTED CASH FLOW ANALYSIS ....................................................... 91
     FINAL "As Is" MARKET VALUE RECONCILIATION ....................................... 99

**PART FOUR – ADDENDUM**

     CURRICULUM VITAE OF THE APPRAISER
     ASSUMPTIONS AND LIMITING CONDITIONS

*DOZIER APPRAISAL COMPANY*

**CERTIFICATION**

I certify, that, to the best of my knowledge and belief . . .

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or to the parties Involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of stipulated result, or the occurrence of a subsequent event.

- My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

- I have made a personal inspection of the property that is the subject of this report.

- Ms. Lori Pabros, independent contractor, provided significant professional assistance to the person signing this report.  Mr. Raymond L. Dozier, MAI, performed final analysis of market data in determining indication of value.

- The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

- I certify that, to the best of my knowledge and belief, the reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

- I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report I, Raymond L. Dozier, MAI, have completed the requirements of the continuing education program of the Appraisal Institute.

_____
Raymond L. Dozier  MAI
State Certified General Real Estate Appraiser
NV. Temporary License #ATMP.0011260.CG
Expires May 10, 2010

# REGISTRATION MAP



# NEIGHBORHOOD MAP



### SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

# GATE WAY MASTER PLANNED COMMUNITY CONCEPTUAL PLAN


N



**SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS**

# SUBJECT'S 103.93 ACRES WITHIN GATE WAY MASTER PLANNED COMMUNITY CONCEPTUAL PLAN


N



SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

# AERIAL MAP



## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

---

### SUBJECT PHOTOGRAPHS



**View of Subject Street Frontage along Highway 160**

**Southwest View of Subject Property**

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

| | |
|---|---|
| **Property Type:** | 103.93 Acres Vacant Residential Land including 201.65 Acre Feet of Water Rights. |
| **Location:** | SWC of Highway 160 & Hacker Street and SEC of Thousandaire Blvd. and Eberhard Road, within the Town of Pahrump, Nye County, Nevada |
| **Identification:** | Nye County Tax Assessor Parcel Number 47-041-06, 07 & 47-071-03 |
| **Census Tract Number:** | 58.17 |
| **Thomas Guide Map Page & Grid:** | N/A |
| **Purpose of the Appraisal:** | The purpose of this appraisal is to estimate the "As Is" Market Value of two non-contiguous vacant land parcels totaling 103.93 acres including 201.65 acre feet of water rights or wholesale) and 118.09 acres of vacant mixed use residential and commercial land if sold to a single purchaser as of the effective date March 5, 2010. The total property will be appraised at whatever stage of development as of the effective date of appraisal, March 5, 2010. All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market. Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the property interest being appraised. |
| **Function of the Appraisal:** | The function of the appraisal is for loan analysis purposes. |
| **Scope of the Appraisal:** | Complete narrative format adhering to all FIRREA and USPAP Standards; Departure provisions shall not apply. |
| **Property Rights Appraised:** | The property rights being appraised are the Fee Simple Interest of all future benefits that may be derived from the property's present or possible use, except for easements, and rights-of-way of record. |
| **Street Frontage:** | Highway 160, Thousandaire Blvd., Eberhard Road |
| **Access:** | Highway 160, Thousandaire Blvd., Eberhard Road |

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

| | |
|---|---|
| **Site Size:** | 103.93 Acres Vacant Land |
| **Site Shape:** | Two non-contiguous land parcels. Rectangular and triangular in shape |
| **Visibility:** | Property has visibility along Highway 160 |
| **Zoning Nye County General Plan:** | M-U (Mixed Use) |
| **Unavailability of Information:** | Information vital to the appraiser in connection with this property was made available from various sources.  The appraiser has not been provided a survey, exact boundary lines or acreage, a standard current title report, environment report, soil tests or other relevant data on the subject property.   However, estimated costs from the developers have been provided and verified by appraiser from National Costing Services. |
| **Topography:** | Mostly Level |
| **Containment in Floodplain:** | The subject is located in area shown as outside of the 100 and 500 Year Flood Plains. |
| **Current Improvements:** | None |
| **Blowsand Area:** | No |
| **Utilities:** | Public Utilities appear to be available to nearby sites and available along Highway 160, but capacities are unknown. |
| **Easements:** | The subject property is being appraised assuming that there are no easements or encroachments that negatively affect the value to the subject property. |
| **Off Sites:** | Highway 160 is a two lane paved road which is the main artery through the town of Pahrump.  All other roads are proposed. |
| **Toxic Waste:** | This report assumes this parcel is not now, nor has ever been contaminated with any form of toxic waste or hazardous substance. |

**SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS**

---

**Adjacent Uses:**

| | |
|---|---|
| **North:** | Vacant Mixed Use Land |
| **West:** | Vacant Mixed Use Land |
| **South:** | Vacant Mixed Use Land |
| **East:** | Vacant Mixed Use Land |

**Deductions and Discounts:**  No deductions or discounts were made in the valuation of the property.  Indicated Market Value has not been reduced by the cost of holding or selling the property.

**Highest and Best Use**

- **Vacant Land**  It was determined that the highest and best use for the subject property is to remain a part of the proposed Gateway Master Planned Community  and keep the 201.65 acre feet of water rights with the land.  The proposed Gateway Master Planned Community should be held for future development (4 years) in phases of a mix of uses  (i.e. Commercial and Residential Development).

**Reasonable Exposure: (Prior)**  10 to 12 months

**Marketing Time (After):**  10 to 12 months

**Most Probable Purchaser:**  Land Speculator or Developer for land banking.

**SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS**

**Trend Analysis:**

● **Regional/City:**

The Town of Pahrump has favorable environmental, economic, social and governmental forces which will contribute to a continued demand for real estate in the area in the long run.  This is primarily due to the relatively lower cost of housing compared to other areas in the surrounding Las Vegas area.  Recently, the market conditions in the area and across the country have taken a down turn.  The following factors have had a negative effect on current market conditions:

- Sub Prime Mortgage lenders have tightened their qualifying requirements, making it very difficult to fund home buyers with less than perfect credit, causing slower absorption in the market.

- Retail activity has slowed in the last 12 months due to the lack of  consumer confidence over higher fuel prices, slow real estate markets and job losses in the construction and real estate sectors.

- Mortgage money crunch causing limited funds for purchases of  raw land and finished product.

- It is concluded that over the next 12 to 18 months, construction financing will continue to become difficult to obtain for residential developments that are economically feasible.  Market demand for these properties should stabilize over the next 18 months with a balancing of supply and demand  in the market expected in the next 24 to 30 months.

● **Neighborhood:**

The subject property is located southern area of the Town of Pahrump.  The immediate area consists of vacant mixed use land .  The subject has some frontage along Highway 160. The subject property is located within the proposed Gateway Master Planned Community. This is a favorable location for a mixed use development including commercial/retail and residential development when supply an demand become balanced.  Demand for these properties should continue to decline for the next 6  to 12 months.

**Personal Property, Fixtures, and Intangible Items:**

This report does not include any personal property, fixtures or intangible items.

## SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

### I. MARKET VALUE RESULTS
### (FOR ENTIRE GATEWAY MASTER PLANNED COMMUNITY:

- "As Is" Market Value of 920 Acres via Sales Comparison Approach — $60,270,000 ($65,511/Acre)

- "As Is" Market Value of 920 Acres via Land Residual Technique — $58,459,000 ($63,542/Acre)

  1. Cost of Production (Bulk or Wholes Sale as of 3/5/2010) — $186,020,000 (As of 3/5/2010)

  2. Prospective Cost of Production as of 3/5/2015 — $199,009,000 (Prospective as of 3/5/2015)

  3. Prospective Aggregate Retail as of 3/5/2015 — $353,241,000 (Prospective as of 3/5/2015)

  4. Bulk or Wholesale (DCF) as of 3/5/2010 — $111,713,000 (As of 3/5/2010)

  5. Prospective Bulk or Wholesale (DCF) as of 3/5/2015 — $200,305,000 (Prospective as of 3/5/2015)

- Reconciled Market Value of 920 Acres Residential Land — $59,000,000 ($64,130/Acre)

---

- Reconciled "As Is" Market Value of the subject's 103.93 Acres of Vacant Land including 201.65 acre feet of water rights — $6,665,000 ($64,130/acre)

  Allocated:

  1. 103.93 Acres Vacant Land — $4,144,000 ($39,873/Acre)

  2. 201.65 Acre Feet Water Rights — $2,521,000 ($12,500/Acre Foot)

  Total — $6,665,000 ($64,130/Acre)

Date of Last Inspection: — March 5, 2010

Effective date of Value Estimate: — March 5, 2010

Date of Report: — March 10, 2010

## PART TWO – FACTUAL DATA
_____

**PURPOSE OF THE APPRAISAL**

The purpose of this appraisal is to estimate the "As Is" Market Value of two non-contiguous vacant land parcels totaling 103.93 acres including 201.65 acre feet of water rights or wholesale) and 118.09 acres of vacant mixed use residential and commercial land if sold to a single purchaser as of the effective date March 5, 2010. The total property will be appraised at whatever stage of development as of the effective date of appraisal, March 5, 2010. All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market. Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the property interest being appraised.

**THE FUNCTION OF THE APPRAISAL**

The function of the appraisal is for loan analysis purposes.

**THE SCOPE AND EXTENT OF THE DATA COLLECTION PROCESS**

The following steps were made in arriving at the final estimate of value in the appraisal report:

1.  A preliminary search of available resources was made to determine market trends, influences, and other significant factors pertinent to the subject property.

2.  A physical inspection of the property was performed. Although due diligence was exercised while at the property, the appraiser is not an expert in such matters as accident or tragic issues; crime issues; legal issues; suit or claim issues; government issues; land use issues; nuisance issues; building issues; repair issues; soil issues; geo-technical issues; hazardous issues; contamination issues; environmental agency issues; natural resource issues; historic or cultural issues; natural hazard issues; and all issues to those known – past, present or proposed. No warranty is given as to these elements. As needed, inspections by various professionals within these fields might be recommended, with the final estimate of value subject to their findings.

3.  Research and collection of data from the subject's competing market area are sufficient in quantity to express an opinion of value as defined herein. Relevant data is contained in this report.

An analysis of the data was completed by applying customary appraisal techniques and following the USPAP standards. The report will be a complete appraisal summary report and will be expected to lead the reader to the same value conclusion as suggested by the appraiser.

**DATE OF VALUE ESTIMATE**

Site was inspected March 5, 2010 with this date being the effective date of the appraisal. The date of this report is March 10, 2010.

## PART TWO – FACTUAL DATA

---

### IDENTIFICATION OF PROPERTY RIGHTS APPRAISED

The property rights being appraised are the Fee Simple Interest of all future benefits that may be derived from the property's present or possible use, except for easements, and rights-of-way of record.

### DEFINITIONS OF VALUE AND PROPERTY RIGHTS

"MARKET VALUE" means:  The most <u>probable</u> price which a property should bring in a <u>competitive and open market</u> under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeable and assuming the price is not affected by undue stimulus.[1]  Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated

- Both parties are well informed or well advised, and each acting in what he considers his own best interest

- A reasonable time is allowed for exposure in the open market

- Payment is made in terms of cash in U.S. dollars or in terms of financial  arrangements comparable thereto; and

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

MARKET VALUE is based on the concept of an open and competitive market in which typical transactions are free of the aspects of duress or forced liquidation.

The REASONABLE EXPOSURE TIME inherent in the MARKET VALUE concept is always presumed to occur PRIOR to the effective date of the appraisal.

The REASONABLE MARKETING PERIOD is an estimate of the amount of time it might take to sell a property interest in the real estate at the estimated market value level during the period IMMEDIATELY AFTER the effective date of the appraisal.

To estimate "Market Value" during a period of very limited market activity is extremely difficult and challenging.  The key to the property analysis of sales transactions in comparison to the subject is for circumstances to parallel the definition of MARKET VALUE.  To the extent that any of the conditions of a sale differ substantially from the elements in the definition, without appropriate adjustment, the transaction fails as evidence of MARKET VALUE.

During some periods of distressed market conditions, MARKET VALUE may imply a price at which a transaction will not occur until such time as conditions in the market match the definition of  MARKET VALUE.

---

[1] (Title XI, FIRREA,34.42 f)

## PART TWO – FACTUAL DATA

---

**DEFINITIONS OF VALUE AND PROPERTY RIGHTS** (continued)

The term "FEE SIMPLE ESTATE" means:  Absolute ownership unencumbered by any other interest or estate subject only to the four powers of government.[2]

The term "LEASED FEE ESTATE" means:  A Leased Fee Estate is an ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others; the rights of lessor  (the leased fee owner) and the lessee (leaseholder) are specified by contract terms contained within the lease.[3]

MARKET VALUE March 5, 2010 means: "An estimate of market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date of inspection.  When an March 5, 2010 valuation premise is used, the property is valued as of a specified date, assuming the property is in **precisely** the condition or status it actually was (is) in on the effective date of value.  This condition must be accurately described in the appraisal report.[4]

MARKET VALUE is based on the concept of an **open and competitive market** in which typical transactions are free of the aspects of duress or forced liquidation.

MARKET VALUE "as if complete" on the appraisal date means the market value of a property with all proposed construction, conversion, or rehabilitation hypothetically completed, or under other specified hypothetical conditions, as of the date of the appraisal.  With regard to properties wherein anticipated market conditions indicate that stabilized occupancy is not likely as of the date of completion, this estimate of value shall reflect the market value of the property "as if complete and prepared for occupancy by tenants"  The as if complete premise assumes that all assumptions are in place as of the date of value.

PARCEL is a mass graded pad which was created in order to create earthwork balances within future subdivision parcels.  It would require additional grading and in-tract development prior to building vertical construction, and may require additional mapping and may even require additional entitlements.

BLUE TOP PAD is a lot or a pad which has been graded and certified and is ready for construction.  No additional grading is required to construct the building.  Streets and utilities are not necessarily constructed.

FULLY ENTITLED Approval of a final map or a parcel map does not in itself confer a vested right to develop.  *Avco Community Developers, Inc. v. South Coast Reg'l  Comm'n*, 17 Cal 3d785,739-94 (1976); *Oceanic Cal., Inc. v. North Cent.Coastal Reg'l Comm'n*, 63 Cal.App. 3d 57, 72-73 (1976); *Consaul v. City of Sand Diego*, 6 Cal. App. 4th 1781, 1793 (1992).  Zoning can still be changed, or other police ordinances can be adopted, after even final maps, conditional use permits, PUDs, zoning, rezoning, grading or other permits have been granted.  There is no vested right to develop until actual building or other permits for identifiable builds have been issued, and substantial work has been done thereafter in reliance on those permits.

---

2        Title XI, FIRREA, 34.42 {f}

3        The Appraisal of Real Estate, 12th Edition, Appraisal Institute, Page 83

4        Appraisal Policies and Practices of Insured Institutions and Service Corporatons, Federal Home Loan Bank Board, "Final Rule", 12 CFR Parts 563 and 571, Dec. 21, 1987

## PART TWO – FACTUAL DATA
_____

### LEGAL DESCRIPTION AND IDENTIFICATION OF PROPERTY

| | |
|---|---|
| **Reference:** | APN # 047-041-06 & 07; 047-071-03 |
| **Common Address:** | Highway 160 & Hacker Street; Thousandaire Blvd. & Eberhard Rd. |
| **Legal Description:** | 103.93 ACRES |
| **Current Ownership:** | PV Land Investments, LLC |
| **Condition of Title:** | No assessment of the condition of the title has been made by the appraiser; but as outlined in the Assumptions and Limiting Conditions, which are part of this report, the property is appraised as if free and clear of any liens and encumbrances. |

### HISTORY OF THE SUBJECT PROPERTY

- APN #047-041-06 was purchased August 4, 2004 for $705,692 or $74,994 per acre.

- APN #047-041-07 & 047-071-03 were purchased as part of a larger parcel transaction (108.10 Acres) on August 4, 2004 for $2,949,619 or $27,286 per acre.

- PV Land Investments purchased 1,816 acre feet of water rights on November 10, 2005 for $31,500,000 or $17,346 per acre foot. This water right transaction was for the entire 920 acre Gateway Community project. The subject property being appraised includes 201.65 acre feet of water rights. The estimated value of the subject's water rights is $2,521,000 or $12,500 per acre foot. The difference between the November 2005 purchase price of $17,500/acre foot and the current appraised value of $12,500/per acre foot is due to declining market conditions.

- Later in the appraisal the reader will note that the "as is" market value of the subject property as of the effective date of March 5, 2010 was estimated at $6,665,000 or $64,130/acre  The difference between the collective purchase price of $3,285,000 or $31,605 per acre and the current appraised value  is due to added value of the water rights.

- The subject property has not been listed or sold in the past 3 years.

**PART TWO – FACTUAL DATA**



# REGULAR MAP

**PART TWO – FACTUAL DATA – (Continued)**

_____

**Regional, City, Neighborhood Overview**

The subject property is located approximately 65 miles northwest of the Las Vegas metropolitan area. Approximately 80 percent of the county population resides within Nye County area. Transportation into the area is accommodated by Highway 160, Interstate 15 and Interstate 215.

To estimate value, an interpretation of how the market views the subject property is analyzed. The scope of the investigation is not limited to static, current conditions. Rather, I have examined trends in the forces that influence value to determine the <u>direction</u>, <u>speed</u>, <u>duration</u>, <u>strength</u>, and <u>limits</u> of these trends.

**A. SOCIAL**

Social influences are reflected in the demographic composition of the population base, community preferences, socio-economic issues, availability of cultural and recreation amenities, and the impacts of anticipated change. The U.S. Census Bureau estimated the population of Pahrump to be approximately 33,000. Residents in Pahrump make up approximately 80% of the population of Nye County.

**B. ECONOMIC**

The economic climate of Nye County will be analyzed as to the fundamental relationship between current and anticipated supply and demand for property types similar to the subject.

**Demand-side economic components include the following:**

    a. ECONOMIC BASE OF THE REGION AND COMMUNITY:

        Nye County has five main industries contributing to the economic base of Pahrump. These industries include construction, mining, gaming and hospitality, business services and government agencies.

    b. EMPLOYMENT AND UNEMPLOYMENT ACTIVITY AND REGIONAL SOURCES:

        In years past, the unemployment rate has been less than the national average. Due to current national economic conditions, the unemployment rate is expected to increase slightly over the next year.

**Demand-side economic components include the following:**

    a. COST AND AVAILABILITY OF MORTGAGE CREDIT:

        Interest rates currently vary from 4.5% to 8.0% variable and fixed, 25-year amortization with 5 - 20 year due dates. Interest rates vary with the viability of the borrower and the project And mortgage credit is difficult to obtain in the current economic climate.

**PART TWO – FACTUAL DATA – (Continued)**

_____

**Supply-side economic components include the following**:

    a.  STOCK OF AVAILABLE LAND

Currently there is more supply than demand for vacant commercial and residential land in the current market.

    b.  NEW DEVELOPMENTS UNDER CONSTRUCTION OR BEING PLANNED:

Currently, there are a few developments in the planning stage. There are finished lots in existing developments being absorbed at the present time. The closest development to the subject is Mountain Falls Country Club.

## C. GOVERNMENTAL:

1. **Public services; fire and police protection, utilities, refuse collection, and transportation networks**:

Services in Pahrump and Nye County are considered adequate when compared to other counties.

2. **Local zoning and building codes**:

Each incorporated city has its own master plan and particular zoning regulations. In addition, portions of the area not within the incorporated area are subject to county zoning. Generally, county zoning regulations are less stringent than the city zoning in the area.

3. **National, state and local fiscal policy:**

With current volatility in the housing market nationally, the Federal Reserve Board has reduced the interest rates eleven times over the last eleven months to try and ease the "credit crunch" in the housing market. This current financial imbalance has recently shifted to the commercial market as well as the housing mortgage market. The local economy has slowed in growth along with the rest of the nation. The market for single family housing has dropped dramatically, and the forecasts are for continued decline in the residential and commercial market over the next 18 to 24 months.

## C. ENVIRONMENTAL:

Both natural and man-made environmental forces influence real property values.

**Climatic conditions:**

The subject area has relatively mild winter and spring seasons, with summer and fall seasons typically warmer than other states.

**Topography and soil:**

The area is mostly level with mountainous rock formations peaking to approximately 12,000 feet. Soil conditions are adequately stable.

*DOZIER APPRAISAL COMPANY*

**PART TWO – FACTUAL DATA – (Continued)**

_____

**Natural barriers to future developments:**

The mountain ranges located to the northwest of the subject area are the main barriers for future development. Other barriers that would inhibit development would be the natural preserves designated for wild life.

**Primary transportation systems-state and federal highways, railroads and airports:**

  a.  RAIL – Southern Pacific Railroad
  b.  TRUCK – Numerous local trucking companies.
  c.  OVERNIGHT DELIVERY – UPS, Federal Express, U.S. Postal Service and other carriers
  d.  AIR – Pahrump Municipal Airport.
  e.  BUS –Greyhound provides national connections.
  f.  HIGHWAYS – Highway 160; Interstate 15 and Interstate 215.

**Nature and desirability of the immediate area surrounding a property:**

The spectacular mountain ranges and mild winter climates attract retirees and seasonal visitors to the area.

**E.  CONCLUSION:**

The Town of Pahrump has favorable environmental, economic, social and governmental forces which will contribute to a continued demand for real estate in the area in the long run. This is primarily due to the relatively lower cost of housing compared to other areas in the surrounding Las Vegas area. Recently, the market conditions in the area and across the country have taken a down turn. The following factors have had a negative effect on current market conditions:

• Sub Prime Mortgage lenders have tightened their qualifying requirements, making it very difficult to fund home buyers with less than perfect credit, causing slower absorption in the market.

• Retail activity has slowed in the last 12 months due to the lack of consumer confidence over higher fuel prices, slow real estate markets and job losses in the construction and real estate sectors.

• Mortgage money crunch causing limited funds for purchases of raw land and finished product.

• It is concluded that over the next 12 to 18 months, construction financing will continue to become difficult to obtain for residential developments that are economically feasible. Market demand for these properties should stabilize over the next 18 months with a balancing of supply and demand in the market expected in the next 24 to 30 months.

Wall Street Journal 3/3/2010

# Builders Get Back in Game

## Construction of Multifamily Units Expected to Soar in 2010

BY DAWN WOTAPKA

In St. Petersburg, Fla., close by Tropicana Field, an unusual structure is emerging from a construction site: a rental apartment building.

The work in progress on the Fusion 1560, a 325-unit upscale project in one of the states hit hardest by the housing crisis, is a sign that developers of multifamily housing are tiptoeing back into the business. This year, real-estate investment trusts, or REITs, are expected to start close to $1 billion in new multifamily projects, according to real-estate research firm Green Street Advisors. While that still is less than average, it is a significant increase over the $100 million of development starts in 2009.

**REAL-ESTATE FINANCE**

Analysts caution that the increase in construction doesn't mean there has been an improvement in the business. Apartment vacancy is at a record and unemployment, essential to the sector's health, remains elevated.

But operators are betting that limited new supply, combined with an improving economy, will lead to ideal market conditions nationwide starting in 2011 or 2012. From then until 2015, "apartment REITs may generate the best property net operating income growth that they've seen in a very long time, maybe ever," said Haendel St. Juste, a REIT analyst with Keefe, Bruyette & Woods Inc.

To be sure, there are risks. Given the multiyear construction window, companies have to start now to be ready in time. If the economy weakens further and recovery is delayed, landlords may be forced to keep rents low or offer free rent to get leases signed.

"There's an element of risk," said Andrew McCulloch, an analyst with Green Street. "But if you were to go back a year, the outlook is much more clear today. Their confidence level in that eventual recovery is much higher."

Owners said the rent declines

### Falling Supply
After scaling back on construction, apartment developers plot next move.

Construction completions, in thousands of units



Apartment vacancy rate



appear to have bottomed out in some areas and concessions are moderating. In New York, **Equity Residential** said it has stopped paying broker fees for certain unit types.

The gap between new and renewal leases has narrowed from about 10% nine months ago to about 5% today, a sign of confidence as landlords have to give up less to sign new tenants, Mr. St. Juste said.

> 'Their confidence level in that eventual recovery is much higher,' said Andrew McCulloch.

Landlords also are excited about demand. The 20-to-34 age group, prime renting age, is expected to increase by five million in the next decade, according to Hessam Nadji, managing director of Marcus & Millichap, a real-state-investment brokerage firm. People who moved home or who bunked with roommates during the downturn also might ink leases as the economy improves.

Moreover, construction costs "have fallen rapidly in the last two years," said Tom Toomey, chief executive of apartment owner UDR Inc. A unit that would have cost $300,000 to build two years ago could now

be built for as little as $220,000, Mr. Toomey said.

Lumber prices have been cut 15%, while concrete prices are down 10%, he said. Labor costs have fallen as much as 15%.

The sector's optimism was apparent in January's housing starts. Construction of multifamily dwellings rose 9.2%, the Commerce Department said.

At **Humphreys & Partners Architects** LP in Dallas, which designs apartments, inquires and job counts have more than doubled from a year earlier, said Chief Executive Mark Humphreys. "This time last year the financial world had come to an end," Mr. Humphreys said. "Everybody was frozen in time; they were just stunned. The phone was not ringing. Well, the phone is ringing now."

Developers said they are avoiding Las Vegas and Phoenix, which were overbuilt during the housing frenzy, in favor of more stable markets, including Washington, Boston and San Francisco.

In 2011, **AvalonBay Communities** Inc. plans to complete six projects with more than 2,100 units in locations including Walnut Creek, Calif., New York and West Long Branch, N.J. The rents will average more than $2,000 a month, according to securities filings.

Equity Residential, meanwhile, plans to deliver 111 units in New York's Chelsea neighborhood in late 2011.

*Wall Street Journal 2/24/2010*

# Commercial Sales Jump

### Debate Over Reaching Bottom Follows Two Months of Gains

By Christina S.N. Lewis

The number of commercial real-estate sales rose sharply in December, triggering fresh debate about whether the sector has reached bottom.

Property sales, a gauge of market health, rose 75% in December from the prior month, according to Real Capital Analytics. The end of the year traditionally sees an increase in volume. But the recent increase is significant even after adjusting for that, says Neal Elkin, president of REAL, a research firm that analyzed the data.

The Moody's/REAL All Commercial Property Price Indices, or CPPI, which track values, measured a 4.1% increase in December. This followed an increase of 1% in November, which was the first time since 2007 that there were two consecutive months of rising values.

But Moody's and REAL agreed that it is too soon to conclude that the market has hit bottom.

"It makes me feel very confident that the dramatic violent price movement that we saw in the first part of 2009 is over," says Mr. Elkin of REAL. "But I would never be so bold to say that we are going straight up from here."

There were 716 transactions in December, according to the CPPI. That compares with more than 1,600 deals in December 2007.

Sales activity has been in the doldrums for months because of a dearth of financings and sellers' unwillingness to put property on the block when prices are down sharply from a few years ago. That means competition can be fierce when prime buildings are put up for sale.

Earlier this month, an institutional real-estate fund run by J.P. Morgan Asset Management bid on a large $100 million-plus rental-apartment property in Washington. Seventeen other buyers submitted offers, says Kevin Faxon, head of U.S. Real Estate for J.P. Morgan Asset Management.

"We are actively in the market seeking to acquire properties," Mr. Faxon says. "We are not on the sidelines. We're not taking a view that prices are going to be cheaper tomorrow than they are today."

Also, some healthy properties are still commanding decent prices. In Boston, a nearly 200,000-square-foot office and retail property called One Brigham Circle is in contract to sell for $97 million to **AEW Capital Management**, according to a person with knowledge of the deal. Brokers for Cushman & Wakefield are representing the seller, the Rappaport family's New Boston Fund.

The cap rate, an industry term for the buyer's nonleveraged yield on the property at current net rents, is less than 6.5%, a return that is comparable to property prices in 2005 and 2006, according to local brokers. The building is fully leased.

The conflicting market signals come at a time when the commercial real-estate sector faces significant challenges. The economic fundamentals, such as anemic hiring, mean that office rents are likely to continue falling while vacancies continue to rise. Meanwhile, apartment rents also are low, driven down by record low home prices and increased supply from investors who have put them on the rental market.

In addition, many top-of-the-market real-estate deals are still expected to go bad, like Peter Cooper Village and Stuyvesant Town, a sprawling Manhattan residential complex that is in default on $4.4 billion in debt.

Market bulls agree that the sector continues to perform badly. But they argue it is doing better than people thought it would. Therefore, real-estate assets are undervalued and prices are going up, they say.

"No one believed me that values were going to go up so soon," says Dan Fasulo, head of research for Real Capital Analytics. "But there's enough anecdotal evidence now that we've come well up off the bottom already."

## Reason for Hope

Number of U.S. properties sold for more than $5 million, monthly data



Source: Real Capital Analytics

---

## In Brief

### Continued Declines Start a Third Year

The Architecture Billings Index began its third year of negative conditions. The index was 42.5 in January, down sharply from a revised reading of 45.4 in December. The latest reading indicates a continued decline in demand for design services. Any reading above 50 indicates an increase in billings. The index is derived from a monthly survey of architectural firms by the American Institute of Architects.

Architecture Billings Index, monthly data



Source: American Institute of Architects



**PART TWO - FACTUAL DATA** (continued)

---

## ZONING

The property is located in the Town of Pahrump, Nye County, Nevada. Current general plan land use designation is mixed use residential and commercial uses.

## TAX AND ASSESSMENT DATA AND ANALYSIS

### ESTIMATED 2009-2010 PROPERTY TAX AT APPRAISED VALUE

| | |
|---|---|
| Estimated Value | $6,665,000 |
| X   Tax Rate/100 | 1.13 |
| Assessed Taxes | $75,314 |
| Special Assessments | Included |
| **TOTAL ESTIMATED PROPERTY TAXES** | **$75,314** |

The tax rate for 2009-2010 fiscal year is considered typical for comparable locations throughout the subject district and Nye County.