Ira D. Kharasch (CA Bar No. 109084
Scotta E. McFarland (CA Bar No. 165391)
Victoria A. Newmark (CA Bar No. 183581)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email: ikharasch@pszjlaw.com
          smcfarland@pszjlaw.com
          vnewmark@pszjlaw.com

*Attorneys for Debtors and
Debtors in Possession*

Sallie B. Armstrong (NV Bar No. 1243)
Downey Brand LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone: 775/329-5900
Facsimile:  775/786-5443
Email: sarmstrong@downeybrand.com

*Attorneys for Debtors and
Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Chapter 11 |
| SPECIALTY TRUST, INC., et al.[1] | **Jointly Administered under Case No. 10-51432-GWZ** |
| ☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Specialty Acquisition Corp.<br>☐ Affects SAC II<br>☐ Affects SAC D-1, LLC | Case Nos.:<br>10-51432<br>10-51437<br>10-51440<br>10-51441 |
| | **DEBTORS' NOTICE OF POTENTIAL CHANGES TO DIP FINANCING UNDER DIP PRIMING MOTION** |
| | Hearing Date:    December 7, 2010<br>Hearing Time:    2:00 p.m.<br>Place:          300 Booth Street<br>              Reno, NV 89509 |

The Debtors[2] file this pleading as both a notice and a supplement to its Motion that sought, among other things, DIP Financing from the Term Loan Lenders, consisting of certain shareholders and noteholders, with a first priority lien on the prepetition collateral of U.S. Bank, as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Specialty Trust, Inc. (2463); Specialty Acquisition Corp. (3680); SAC II (2463); and SAC D-1, LLC (1858).

[2] Capitalized terms shall have the same definition as those set forth in the *Motion for Entry of Order (1) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105; 363(c) and 364(c) and (d); (2) Authorizing Use of Cash Collateral; (3) Granting Security Interests and Superpriority Claims; and (4) Granting Related Relief* that is set for hearing on December 7, 2010, at 2:00 p.m.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1.    The Motion specifically noted that although the Debtors were seeking Court authority for the proposed DIP Financing from the Term Loan Lenders, it also provided that the Debtors were requesting approval of any alternative DIP Financing that would be "on terms that are better for the estate." [Motion, p. 4, 10, and 23]

2.    U.S. Bank has informed the Debtors that it opposes the relief sought in the Motion, and is prepared to file its substantial Opposition to such Motion.[3]

3.    After engaging in discussions with U.S. Bank, the Debtors are close to finalizing an alternative DIP Facility with Northlight Real Estate Group LLC ("Northlight") that may provide the basis for a consensual resolution with U.S. Bank.  A copy of that term sheet (the "Northlight DIP Term Sheet") is attached hereto as Exhibit "A".  The Debtors and Northlight have also been negotiating an arrangement whereby Northlight would provide exit financing for a plan of reorganization, and a redacted version of that term sheet (the "Plan Exit Financing Term Sheet") is attached to the Northlight DIP Term Sheet.

4.    The Debtors believe that the Northlight DIP Facility consists of "terms that are better for the estate" pursuant to the Motion, for the following reasons:

a.    If the Northlight DIP Facility results in consensual resolution of the objection of U.S. Bank to the Motion, the estate will save substantial professional fees that would be incurred in a priming litigation battle with U.S. Bank that could be well over several hundreds of thousands of dollars.  Furthermore, by engaging in a DIP Facility with Northlight, the Debtors would be working with an entity that is quite likely to be the entity to provide for the exit financing for a plan of reorganization that would involve a consensual take-out of U.S. Bank, and thereby provide for a quick resolution of these cases.

b.    The Northlight DIP Facility provides for a substantially narrower priming of U.S. Bank than was originally sought in the Motion.  Instead of providing for a priming of all of the U.S. Bank Collateral, the Northlight DIP Facility would only prime two pieces of the U.S. Bank Collateral, consisting of Sierra Vista and Coolidge 70.

---

[3] The Debtors have agreed to extensions of the deadline for U.S. Bank to file its Opposition while the parties seek to work out a resolution of the Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1128618.1

c.     The Northlight DIP Facility allows for a loan of up to $3.5 million, as opposed to the $3 million in the original DIP Facility.  The higher amount provided by the Northlight DIP Facility gives the Debtors a greater cushion, and allows the Debtors to fund certain due diligence costs required under the Plan Exit Financing Term Sheet.

d.     Although the interest rate under the original DIP Facility is 7%, and is 12% under the Northlight DIP Facility, the total fees under the original DIP Facility amount to 5%, as opposed to only 2% for the Northlight DIP Facility.  What this means is that if the DIP Facility is taken out prior to June 30, 2011, which the Debtors certainly believe would occur under a plan that is based upon the Plan Exit Financing Term Sheet, then the pricing of the Northlight DIP Facility would be cheaper than the original DIP Facility.

e.     The Northlight DIP Facility provides for a one year maturity date, as opposed to a June 2011 maturity date under the original DIP Facility.

5.     If the Debtors reach final documentation with Northlight, the Debtors shall request approval of the terms of the Northlight DIP Facility as described herein.

Dated:     December 1, 2010

DOWNEY BRAND LLP

By _____
Sallie B. Armstrong (Bar No. 1243)

PACHULSKI STANG ZIEHL & JONES LLP
Ira D. Kharasch (CA Bar No. 109084)
Ellen M. Bender (CA Bar No. 116987)
Victoria A. Newmark (CA Bar No. 183581)
Attorneys for Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1128618.1

3

# Exhibit A

Exhibit A



## SPECIALTY TRUST, INC.
## CHAPTER 11 DEBTOR IN POSSESSION FINANCING DISCUSSION PROPOSAL

*This Discussion Proposal is solely an indication of general terms and is provided for discussion purposes only. This is not a commitment and it creates no binding obligation on either party hereto, as it has not been approved by the Lender under its normal approval procedures. This summary does not define all of the terms and conditions of a proposed financing, and is subject to completion of comprehensive due diligence, including review and approval of complete financial data.*

*This Discussion Proposal is based upon our present understanding of the Borrower's capital requirements. As additional facts and circumstances become known to us, we may impose additional terms and conditions. In addition, this outline is subject to, among other things, the absence of a material adverse change in the business, condition (financial or otherwise), operations, performance, properties and prospects of the Borrower.*

**Borrower:**          Specialty Trust, Inc. ( the "**Borrower**"),  a debtor and debtor in possession in a Chapter 11 case (the "**Bankruptcy Case**") filed in the Bankruptcy Court of the District of Nevada (the "**Bankruptcy Court**") is a mortgage finance company that acquired and held, in a tax-advantaged real estate investment trust or REIT structure, mortgage loans and mezzanine loans (together, the **"Portfolio")** secured by property located primarily in the States of Nevada, Arizona and California.

**Lender:**          Northlight Real Estate Group LLC ("**Northlight**" or the "Lender") or any of its affiliates and any other third party arranged by Northlight that agrees to participate in the transaction.

**Loan:**          A term loan of up to $3.5 million to be utilized by the Borrower and its affiliated entities in connection with the operations of the Borrower during the pendency of its bankruptcy.  The Loan is due and payable upon the exit of the company from bankruptcy (the "**Loan Amount**").

**Use of Proceeds:**          The proceeds of the Loan will (i) fund the   Reserve Account (as hereinafter defined); (ii) pay for such other working capital needs of the Borrower as may be approved by the Lender from time to time; and (iii) pay for other costs and expenses associated with the closing of the transactions contemplated hereunder, including the payment of the due diligence deposit and expenses outlined in the Exit Financing Discussion Proposal attached as Exhibit B annexed hereto (the "**Exit Financing Term Sheet**"), any origination fees and other fees due upon such closing.

**Closing Date:**          On or about December 15, 2010 (the "**Closing Date**")

**Availability:**          Subject to the satisfaction of all of the Conditions Precedent (as hereinafter defined), $3.3 million will be drawn on the Closing Date with the remaining $200,000 to be held in a Reserve Account .

| | |
|---|---|
| **Term:** | The earlier of one (1) year from the Closing Date or the consummation of the transaction contemplated under the Exit Financing Term Sheet. |
| **Commitment Fee:** | A commitment fee equal to 2.0% of the Loan Amount (the "**Commitment Fee**") will be earned by Northlight and due and payable upon the Closing Date of the Northlight's binding commitment to provide the Loan. |
| Interest: | The Loan will bear interest equal to 12.0% per annum (the "**Interest Rate**") to be paid, in cash, monthly in arrears, on the last day of each month (each such date, an "**Interest Payment Date**") Interest will be calculated on an actual days elapsed and 360 day basis. |
| **Reserve Account:** | A reserve account will be established on the Closing Date at a bank approved by the Lender (the "**Reserve Account**") to cover a reserve for interest in the amount of $200,000. The Reserve Account shall be subject to a control agreement and shall be included as Loan Collateral. |
| **Default Rate:** | 4.0% in excess of the rate of interest otherwise in effect. |
| **Amortization:** | None. The Loan will be interest only (subject to pay downs from Mandatory Repayments). In all events the entire outstanding principal balance will become due and payable on the Final Maturity Date. |
| **Collateral:** | Subject to a further determination based upon due diligence, the Loan will be secured by the following (the "**Loan Collateral**"): |

    1. A perfected first lien security interest, and first mortgage security interest, as the case may be, in all currently unencumbered assets (excluding the assets of SAC II which constitute indirect collateral of Deutsche Bank through its pledge of the stock in SAC II) and in the Sierra Vista and Coolidge 70 assets.

    2. A blanket second lien on all other assets of the Borrower, excluding any collateral of Deutsche Bank.

    3. A perfected first lien security interest in the Reserve Account secured by a control agreement.

| | |
|---|---|
| **Subsequent Transaction Term Sheet:** | The Borrower and Lender will enter into the Exit Financing Term Sheet upon the closing of the DIP Loan and negotiate in good faith to come to terms on, enter into, and get the approval of the Bankruptcy Court of, an Exit Financing Commitment. Subsequent to the execution of this Debtor-In-Possession Financing Discussion Proposal (the "**DIP Term Sheet**"), the Borrower will seek Bankruptcy Court approval of the due diligence deposit and expenses outlined in the Exit Financing Term Sheet. For the avoidance of doubt, the Borrower will only seek court approval of breakup fees once the Lender has issued the Borrower a firm commitment under the Exit Financing. In the event the Due Diligence deposit is not |

approved by the Bankruptcy Court the Borrower will prepay a portion of the loan that relates to the due diligence deposit.

| | |
|---|---|
| **Prepayment Penalty:** | The Loan is fully repayable at any time without premium or penalty. |
| **Documentation:** | The loan documents evidencing the Loan, as contemplated hereunder, will include, inter alia, a Credit Agreement, Security Agreements, and Pledge Agreements incorporating the terms and conditions set forth in this Discussion Proposal and such other terms and conditions as the parties may otherwise agree upon and such other documents as are usual for facilities and transactions of this type and which will be acceptable to the Lender, the Borrower and their respective counsel (the "**Loan Documents**"). |
| **Insurance:** | Insurance coverage must be acceptable to the Lender. |
| **Additional Debt:** | No other Borrower debt permitted. |
| **Reporting:** | (a) Monthly Reports on the assets and liabilities as well as the operations and cash flow of the Borrower in a form mutually acceptable.<br>(b) Any other information the Lender reasonably requests. |
| **Representations and Warranties:** | Usual and customary for facilities and transactions of this type. |
| **Covenants:** | Usual and customary for facilities and transactions of this type. |
| **Events of Default:** | Usual and customary for facilities and transactions of this type |
| **Assumption Rights:** | The Borrower's rights and obligations are non assignable or assumable. |
| **Conditions Precedent:** | The obligation of the Lender to advance the amount of the Loan payable on the Closing Date or on any date subsequent thereto will be subject to customary conditions precedent, including without limitation, the following conditions precedent ("**Conditions Precedent**"): |

      (i)     Evidence of Borrower's good standing and qualification to do business satisfactory to the Lender;

      (ii)    All Loan Documentation in form and substance satisfactory to Lender;

      (iii)   The satisfactory completion of due diligence which, at the time of execution of this DIP Term Sheet, shall consist only of limited confirmatory items such as confirmation of title and insurance coverage and verification of non-delinquent property tax status;

      (iv)   The Lender will have been granted a perfected priority security interest in all the Loan Collateral in form and substance satisfactory to the Lender;

(v)    Representations, warranties, resolutions, opinions of counsel, certificates, certified corporate documents, good standing certificates, and other supporting documents as the Lender may reasonably require, including without limitation, information and opinions related to the ownership structure of the Borrower, all in form and substance acceptable to the Lender;

(vi)    No material adverse change in the financial market, the business of the Borrower or the Loan Collateral shall have occurred;

(vii)    Payment of all closing costs and fees and all unpaid expenses of the Lender for which the Lender has not previously received;

(viii)    Formal Credit Committee Approval; and

(ix)    Approval of the Bankruptcy Court.

**Brokerage:**    Borrower will indemnify, defend and hold the Lender and its officers, directors and members and their affiliates harmless from and against any losses in any way relating to or arising from any claim by any person or entity that such person or entity acted on behalf of the Borrower in connection with the Loan.

**Indemnification:**    The Borrower will indemnify Northlight, the Lender and their affiliates and hold each of them harmless from and against all costs, expenses (including reasonable fees and disbursements of counsel) and liabilities arising out of or relating to any litigation or other proceedings (regardless of whether such indemnified Person is a party thereto) which relate to the proposed transactions, including the financing contemplated hereby or any transactions connected therewith, provided that such indemnified Person will not be indemnified for its gross negligence or willful misconduct.

**Due Diligence Deposit:**    Upon acceptance of the terms of this Discussion Proposal, the Borrower will be obligated to reimburse the Lender any and all third party expenses associated with the closing of the loan up to $10,000. For the avoidance of doubt this $10,000 limitation does not include Lender's third party legal costs related to review of existing documentation and preparation and negotiation closing documentation. Northlight will remit invoices of all expenses incurred. These expenses may include, but are not limited to, travel and living expenses, 3rd party appraisals and other technical consultants which may be engaged and legal costs of reviewing the asset documentation and preparing the Loan Documentation for final closing.

**Expiration Date:**    If not executed by Borrower and returned to Northlight by 5 PM EST on December 3, 2010, this Letter of Interest and Discussion Proposal will terminate on such date, without further notice or act of any kind by Northlight or any other party.

**Miscellaneous:**    New York law to govern.

Waiver of trial by jury.

Consent to jurisdiction of state and federal courts located in the State of New York.

**[Signatures on Following Page]**

Submitted by:

NORTHLIGHT REAL ESTATE GROUP LLC

By:_____

        Robert B. Woods
        Manager

Accepted by:

SPECIALTY TRUST, INC.

By_____

Name: _____

Title:_____

Date:_____

# EXHIBIT A

## THE BORROWER PORTFOLIO

To be provided by Borrower including outstanding principal balance, carrying value and assigned debt.

EXHIBIT B

EXIT FINANCING DISCUSSION PROPOSAL

FOR DISCUSSION PURPOSES ONLY



SPECIALTY TRUST, INC.
CHAPTER 11 EXIT FINANCING DISCUSSION PROPOSAL

---

*This Discussion Proposal is solely an indication of general terms and is provided for discussion purposes only. This is not a commitment and it creates no binding obligation on either party hereto, as it has not been approved by Lender under its normal approval procedures. This summary does not define all of the terms and conditions of a proposed financing, and is subject to completion of comprehensive due diligence, including review and approval of complete financial data.*

*This Discussion Proposal is based upon our present understanding of the Borrower's capital requirements. As additional facts and circumstances become known to us, we may impose additional terms and conditions. In addition, this outline is subject to among other things, the absence of a material adverse change in the business, condition (financial or otherwise), operations, performance, properties and prospects of the Borrower..*

---

**Borrower:**  Specialty Trust, Inc. ( the "**Borrower**"),  a debtor and debtor in possession in a Chapter 11 case (the "**Bankruptcy Case**") filed in the Bankruptcy Court of the District of Nevada (the "**Bankruptcy Court**") is a mortgage finance company that acquired and held, in a tax-advantaged real estate investment trust or REIT structure, mortgage loans and mezzanine loans (together, the "**Portfolio**") secured by property located primarily in the States of Nevada, Arizona and California.

**The Portfolio:**  The Portfolio includes a mix of REO and real estate loans whose current carrying value is approximately $213 million, which include $122 million of real estate loans, $60 million of REO property and $31 million of unpledged assets, all as more fully described in Exhibit A of this Discussion Proposal.

**Lender:**  Northlight Real Estate Group LLC ("**Northlight**") or any of its affiliates and any other third party arranged by Northlight that agrees to participate in the Loan provided that shareholders of the Borrower shall have the option of participating in the Loan for a maximum amount equal to 49% of the Loan Amount   (collectively, the "**Lender**"), the election to avail themselves of such option will be disclosed to Northlight no later than twenty (20) days prior to the scheduled close of the loan.

| | |
|---|---|
| **Loan:** | A senior secured facility (the "**Loan**") consisting of: |
| | up to $_____million to be utilized to (i) repurchase the Existing Bank Debt at a discount and (ii) with the balance to be used by the Borrower and its affiliated entities in connection with the operations under its proposed Plan of Reorganization as further detailed below (the "**Loan Amount**"). |
| | The Loan Amount shall not exceed 50% of the Northlight estimated value of the collateral in the Portfolio. |
| **Purpose:** | The Loan will provide exit financing to the Borrower and its affiliated entities in connection with its proposed Plan of Reorganization and the proceeds thereof will be used to (i) repurchase US Bank's existing bank loan (the "**Existing Bank Debt**") at a discount; (ii) pay professional expenses as it relates to the Bankruptcy Case; (iii) pay for operating expenses during the liquidation of the Portfolio, including the payment of Asset Management Fees and  Servicing Fees (as hereinafter defined); (iv) pay for carrying costs associated with REO property in the Portfolio; (v) fund the  Reserve Account; (vi) pay for such other working capital needs of the Borrower as may be approved by the Lender from time to time; and (vii) pay for other costs and expenses associated with the closing the transactions contemplated hereunder, including the payment of any origination fees and other fees due upon such closing. |
| **Closing Date:** | On or about February 15, 2011 (the "**Closing Date**"). |
| **Term:** | _____ years from the Closing Date, provided, however, that  at the request of the Borrower, upon not less than 120 days prior written notice, the term may be extended for  up to  two additional one  (1) year renewal terms (the "**Final Maturity Date**") provided that at the time Borrower seeks to exercise each such extension (a) there are no Events of Default existing and (b) there is no outstanding accrued interest and (c) the principal balance has been reduced to a mutually agreed upon level based on a maximum loan amount and LTV test, to be determined following the due diligence process. |
| **Recourse:** | The recourse obligations of the Borrower for the repayment of the Loan will be limited to environmental matters, intentional misrepresentation, misappropriation of funds (including proceeds paid under any insurance policies or condemnation proceedings, rents and security deposits), fraud, intentional waste, an unauthorized transfer, voluntary and involuntary bankruptcy and any other similar matters as may be required by Lender. |
| **Commitment Fee:** | A commitment fee equal to _____% of the total Loan Amount (the "**Commitment Fee**") will be earned by Northlight and due and payable upon funding of the Loan. |
| **Extension Fee:** | An extension fee of _____% of the outstanding Loan Amount (the "**Extension Fee**") will be due and payable to the Lender on or prior to the granting of each of the two one (1) year extensions. |

| | |
|---|---|
| **Undrawn Loan Fee:** | _____% per annum payable monthly on the undrawn Loan Amount |

**Interest:**  The Loan will bear interest equal to _____% per annum (the "**Interest Rate**") to be paid, in cash, monthly in arrears, on the last day of each month (each such date, an "**Interest Payment Date**").

Interest will be calculated on an actual days elapsed and 360 day basis.

**Reserve Account:**  A reserve account will be established on the Closing Date at a bank approved by the Lender (the "**Reserve Account**") to cover (i) a reserve for interest in an amount determined by the Lender and (ii) an operating reserve in amounts to be determined by the Servicer (as defined below), and agreed to by the Lender and Borrower. The Reserve Account will be pledged to Lender and subject to a Control Account Agreement in form and substance satisfactory to Lender.

**Default Rate:**  4.0% in excess of the rate of interest otherwise in effect.

**Amortization:**  None. The Loan will be interest only (subject to pay downs from Mandatory Repayments). In all events the entire outstanding principal balance will become due and payable on the Final Maturity Date.

**Cash Waterfall:**  All proceeds derived from the sale, disposition or use of the [U.S. Bank or currently unpledged Collateral] will be applied as follows:

    (i)      First, to the payment of any costs and expenses due the Lender;
    (ii)    Second, to pay the Asset Management Fees and Servicing Fees (as hereinafter defined);
    (iii)   Third, to the top up of the Reserve Account;
    (iv)   Fourth, to the payment of any interest;
    (v)    Fifth, to the repayment of any then outstanding principal;
    (vi)   Sixth, to the Lender;
    (vii)   Seventh, to the unsecured creditors and the Lender through its participation in the Incentive Payment plan as defined in Exhibit C; and
    (viii)  Eighth, to the shareholders and the Lender through its participation in the Incentive Payment plan as defined in Exhibit C.

All proceeds derived from the sale, disposition or use of Deutsche Bank Collateral will be applied as follows:

    (ix)    First, to Deutsche Bank;
    (x)     Second to payment of any costs and expenses due the Lender; and
    (xi)    Third, to pay the Asset Management Fees and Servicing Fees;
    (xii)   Fourth, to the top up of the Reserve Account;
    (xiii)  Fifth, to the payment of any Interest;
    (xiv)  Sixth, to the repayment of any then outstanding principal;
    (xv)   Seventh, to the Lender;

| | |
|---|---|
| (xvi) | Eighth, to the unsecured creditors and the Lender through its participation in the Incentive Payment plan as defined in Exhibit C; |
| (xvii) | Ninth, to the shareholders and the Lender through its participation in the Incentive Payment plan as defined in Exhibit C; |

**Collateral:**

Subject to a further determination based upon due diligence, the Loan will be secured by the following (the "**Loan Collateral**"):

(i)    A perfected first lien security interest, and first mortgage security interest, as the case may be, in all assets, including, but not limited to, the proceeds of such assets, and the Reserve Account, held by the Borrower and its subsidiaries and affiliated entities, except for those assets that are directly pledged to Deutsche Bank, or the assets of SAC II that are indirectly pledged to Deutsche Bank.

(ii)    Perfected lien positions on par with the existing US Bank position on all other assets, including those pledged to Deutsche Bank, to the extent held by US Bank prior to the closing, it being the intent of the parties that Lender shall succeed to the collateral position of US Bank on such competing assets.

**Asset Management and Servicing Agreement:**

The Borrower will enter into an Asset Management Agreement and Servicing Agreement (the "**Asset Management Agreement**") with Northlight Asset Management LLC or an affiliate thereof (hererinafter sometimes referred to as either "**NAM**" or the "**Servicer**") to provide asset management services for the Portfolio on substantially the terms and condition set forth in Exhibit B annexed hereto

**Management and Servicing Fees:**

The Servicer will be paid the Asset Management Fees and Servicing Fees as contemplated and defined in Exhibit B and provided for in the Asset Management Agreement. To the extent that Lender approves any other third party manager to manage assets of the Borrower, such third party management fees payable thereunder will be subordinate to the Loan.

**Prepayment Penalty:**

Fully prepayable.

**Documentation:**

The loan documents evidencing the Loan, as contemplated hereunder, will include, inter alia, a Credit Agreement, Security Agreements, Pledge Agreements, and other ancillary loan documents incorporating the terms and conditions set forth in this Discussion Proposal and such other terms and conditions as the parties may otherwise agree upon and such other documents as are usual for facilities and transactions of this type and which will be acceptable to the Lender, the Borrower and their respective counsel (the "**Loan Documents**").

| | |
|---|---|
| **Insurance:** | Insurance coverage must be acceptable to the Lender. |
| **Additional Debt:** | No other Borrower debt permitted. |
| **Reporting:** | Annual audited financials from the Borrower. Other quarterly and monthly unaudited schedules will be required, to be determined during due diligence. |
| **Representations and Warranties:** | Usual and customary for facilities and transactions of this type. |
| **Covenants:** | Usual and customary for facilities and transactions of this type. |
| **Events of Default:** | Usual and customary for facilities and transactions of this type |
| **Assumption Rights:** | The Borrower's rights and obligations are non assignable or assumable. |
| **Conditions Precedent:** | The obligation of the Lender to advance the amount of the Loan payable on the Closing Date or on any date subsequent thereto will be subject to customary conditions precedent, including without limitation, the following conditions precedent (**"Conditions Precedent"**): |

      i.   Evidence of Borrower's good standing and qualification to do business satisfactory to the Lender;

      ii.   Approval and confirmation from the Bankruptcy Court of the Borrower's Plan of Reorganization and approval of the Loan in connection therewith;

      iii.   Resolution of all related-party contracts and other potential conflicts of interests to the satisfaction of the Lender;

      iv.   All Loan Documentation in form and substance satisfactory to Lender;

      v.   The satisfactory completion of due diligence:

      vi.   The Lender will have been granted a perfected priority security interest in all the Loan Collateral in form and substance satisfactory to the Lender;

      vii.   Representations, warranties, resolutions, opinions of counsel, certificates, certified corporate documents, good standing certificates, and other supporting documents as the Lender may reasonably require, including without limitation, information and opinions related to the ownership structure of the Borrower, all in form and substance acceptable to the Lender;

      viii.   Borrower will have delivered to Lender evidence satisfactory to Lender and its counsel that any management fees payable to any third party manager during the term of the Loan will be subordinate to the interests of Lender;

      ix.   Agreement with US Bank for the purchase or repayment of the Existing Bank Debt for a discounted amount satisfactory to the Lender;

    x.  Review of an appraisal and completion of market confirmation of value to the Lender's satisfaction;

    xi.  An environmental report acceptable to Lender;

    xii.  Satisfactory survey and title policy and customary due diligence by the Lender;

    xiii.  Satisfactory review of plans, specifications, soil reports, and engineering studies and satisfactory review of the Construction Budget and construction contract by construction consultant;

    xiv.  Formal Credit Committee approval by the Lender;

    xv.  Evidence that insurance coverage in the amounts and of the types satisfactory to the Lender are in effect and for which premiums have been fully prepaid and naming the Lender, as loss payee;

    xvi.  No material adverse change in the financial market, the business of the Borrower, the Portfolio or the Exit Loan Collateral, Repurchased Loan Collateral or the Sponsors shall have occurred;

    xvii.  Payment of all closing costs and fees and all unpaid expenses of the Lender for which the Lender has not previously received and the Expense Deposit; and

    xviii.  Execution of the Asset Management and Servicing Agreement containing substantially the terms and conditions set forth in Exhibit B annexed hereto and otherwise acceptable to the Lender .

**Brokerage:** Borrower will indemnify, defend and hold the Lender and its officers, directors and members and their affiliates harmless from and against any losses in any way relating to or arising from any claim by any person or entity that such person or entity acted on behalf of the Borrower in connection with the Loan.

**Indemnification:** The Borrower will indemnify Northlight, the Lender and their affiliates and hold each of them harmless from and against all costs, expenses (including reasonable fees and disbursements of counsel) and liabilities arising out of or relating to any litigation or other proceedings (regardless of whether such indemnified Person is a party thereto) which relate to the proposed transactions, including the financing contemplated hereby or any transactions connected therewith, provided that such indemnified Person will not be indemnified for its gross negligence or willful misconduct.

**Expenses,**
**Due Diligence Deposit**
**And Break Up Fee:** Upon acceptance of the terms of this Discussion Proposal, the Borrower will be obligated to reimburse the Lender any and all third party due diligence expenses associated with the underwriting of the business and valuation of the Portfolio up to a maximum of $75,000. A due diligence deposit of $25,000 will be remitted to Northlight upon the acceptance of

the terms of this Discussion Proposal. Northlight will remit invoices of all expenses incurred during the business due diligence. These due diligence expenses may include, but are not limited to, travel and living expenses, 3rd party appraisals and other technical consultants which may be engaged during the Business Due Diligence Period.

The Lender will have 21 calendar days to complete its business diligence review. Assuming the business due diligence review is satisfactory to the Lender, the Lender will submit a binding commitment letter, subject to legal due diligence and documentation which will be submitted to the Bankruptcy Court for its approval. Upon the approval by the Bankruptcy Court of the Lender as the Stalking Horse, including approval a break-up fee in the amount of $1.5 million, the Borrower will be responsible for all of the Lender's expenses up to a maximum to be determined following business due diligence.

**Expiration Date:**    If not executed by Borrower and returned to Northlight by 5 PM EST on December ___, 2010, this Letter of Interest will terminate on such date, without further notice or act of any kind by Northlight or any other party.

**Miscellaneous:**    New York law to govern

Waiver of trial by jury

Consent to jurisdiction of state and federal courts located in the State of New York

**[Signatures on Following Page]**

Submitted by:

NORTHLIGHT REAL ESTATE GROUP LLC

By:_____

       M. Benjamin Gerig
       Chief Investment Officer

Accepted by:

SPECIALTY TRUST, INC.

By_____

Name: _____

Title:_____

Date:_____

**EXHIBIT A**

**THE BORROWER PORTFOLIO**

To be provided by Borrower including outstanding principal balance, carrying value and assigned debt.

EXHIBIT B

ASSET MANAGEMENT AND SERVICING AGREEMENT

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Asset Management and Servicing** | NAM will be engaged as a traditional, third-party asset manager (the "**Asset Manager**") for the day-to-day activities and managing the assets to the plan created during the due diligence process. In addition, NAM will be responsible for Loan Servicing (the "Servicer") utilizing either NAM's internal servicing system or the Borrowers servicing system at NAM's election.   NAM will be responsible for reporting to the Board of Directors of Borrower ("BOD") and the Lender collection activities on a regular basis. |
| **BOD Roles and Responsibilities** | Borrower entity decisions, including, but not limited to, the sale of the Borrower, issuance of common stock by the Borrower, acquiring additional assets and incurring entity-level debt will be made by the BOD. |
| **Due Diligence** | Upon completing due diligence, NAM will prepare a special servicing business plan for each loan being serviced by NAM based on status, location, future funding requirements, and asset type.  For loans that are non-performing, the business plan will include:<br><br>1)  Resolution Strategy – Discounted Payout, Loan Restructuring, Foreclosure.<br>2)  Expected Proceeds from the Resolution.<br>3)  Expenses associated with the resolution including foreclosure, construction completion, asset management and disposition expenses. |
| **Reporting** | NAM will be responsible for providing monthly (unaudited), quarterly (unaudited) and annual (audited) reports to the BOD.  Reporting requirements, include, but is not limited to:<br><br>1)  Asset level reports – Status of each loan and how it compares favorably or unfavorably to the business plan.<br>2)  Portfolio level reports – Including a mark-to-market for both the portfolio and individual assets.<br>3)  Financial Statements for the Borrower |
| **Loan Servicing Fees** | |

| | |
|---|---|
| **Property Management** | For income producing properties or development opportunities that are owned by the Borrower, NAM may elect to either engage a third-party property manager or manage the properties themselves. Should NAM choose to manage the property themselves, it will be entitled to charge a standard, arms-length property management fee approved by both the Lender and the BOD |
| **Removal of NAM** | Following the full repayment of the Loan, the BOD may elect to terminate the Asset Management and Servicing Agreement with NAM upon six (6) months prior written notice. |
| **Servicing Advances** | Although the amount of the Loan to the Borrower should be enough to manage the assets, NAM will agree to provide Servicing Advances ("**Servicing Advances**"). Any Servicing Advances incurred by NAM will be repayable to the Servicer pari-passu with Accrued Fees earned by NAM. Servicing Advances will accrue interest at a rate of ___% annualized. |
| | |
| | |
| **Indemnification** | The Borrower and the BOD will indemnify NAM for all actions pertaining to asset management, with the exception of gross negligence and willful misconduct. |

SOLICITORS, 042327, 000002, 103622262.2, Redacted version clean