1  Ira D. _____ No. 109084)
   Eller _____ No. 116987)
2  Victo _____ Bar No. 183581)
   Pach _____ ones LLP
3  1010 _____ evard, 11th Floor
   Los Angeles, California ____ **Entered on Docket**
4  Telephone: 310/277-69 **December 15, 2010**
   Facsimile: 310/201-0760
5  Email: *ikharasch@pszjlaw.com*
        *ebender@pszjlaw.com*
6        *vnewmark@pszjlaw.com*

   Sallie B. Armstrong (NV Bar No. 1243)
   Downey Brand
   427 West Plumb Lane
   Reno, Nevada 89509
   Telephone: 775/329-5900
   Fa _____
   Email: *sarmstrong@downeybrand.com*
        **United States Bankruptcy Judge**

   *Attorneys for Debtors and Debtors in Possession*

7  *Attorneys for Debtors and Debtors in Possession*

8

9                    **UNITED STATES BANKRUPTCY COURT**

10               **FOR THE DISTRICT OF NEVADA**

11  In re:                                    Chapter 11

12  SPECIALTY TRUST, INC., et al.            **Jointly Administered under**
                                             **Case No. 10-51432-GWZ**
13  ☐ Affects this Debtor
    ☒ Affects all Debtors                    Case Nos.
14  ☐ Affects Specialty Acquisition Corp.    10-51432
    ☐ Affects SAC II                         10-51437
15  ☐ Affects SAC D-1, LLC                   10-51440
                                             10-51441
16
                                             **FINAL ORDER (1) AUTHORIZING**
17                                           **POST-PETITION FINANCING**
                                             **PURSUANT TO 11 U.S.C. §§105, 361,**
18                                           **363(c), AND 364(c) AND (d);**
                                             **(2) AUTHORIZING THE USE OF**
19                                           **CASH COLLATERAL,**
                                             **(3) GRANTING SECURITY**
20                                           **INTERESTS AND SUPERPRIORITY**
                                             **CLAIMS, (4) MODIFYING THE**
21                                           **AUTOMATIC STAY, AND**
                                             **(5) GRANTING RELATED RELIEF**
22

23                                           **Date:**   **December 7, 2010**
                                             **Time:**   **2:00 p.m.**
24

25

26       Upon the motion (the "Motion")[1] of above captioned debtors and debtors in possession,

27  Specialty Trust, Inc. ("Specialty Trust"), Specialty Acquisition Corp. ("Specialty Acquisition"),

28

---

[1] Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Motion.

*(left margin, vertical text)* PACHULSKI STANG ZIEHL & JONES LLP / ATTORNEYS AT LAW / LOS ANGELES, CALIFORNIA

1  SAC II and SAC D-1, LLC (together, the "Debtors" or "Borrowers"), seeking this Court's

2  authorization pursuant to sections 105, 363(c) and 364(c) and (d) of title 11 of the United States

3  Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

4  Procedure (the "Bankruptcy Rules"), and Local Rules 4001 and 9006 to (a) incur postpetition

5  indebtedness (the "DIP Financing") in the amount of up to $3,500,000 substantially on the terms and

6  conditions set forth in the form of Debtor-in-Possession Term Credit and Security Agreement

7  attached to the Motion as Exhibit B, or on terms that are better for the estate; (b) use any and all cash

8  and cash equivalents which are currently and/or which will be in the Debtors' possession or control

9  during the cases (the "Cash") if and to the extent that such Cash constitutes cash collateral as defined

10  in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Term Loan Lenders (as defined

11  herein); (c) grant security interests and superpriority claims; and (d) grant related relief; and upon the

12  entire record made at the hearing on December 7, 2010 (the "Hearing"); and this Court having found

13  good and sufficient cause appearing therefor,

14  **IT IS HEREBY FOUND** that:

15      A.    On April 20, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for

16  relief with this Court under Chapter 11 of the Bankruptcy Code.  The Debtors are continuing to

17  manage their properties and operate their businesses as debtors in possession pursuant to Bankruptcy

18  Code §§ 1107 and 1108.

19      B.    This Court has jurisdiction over this case and the Motion pursuant to 28 U.S.C.

20  §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28

21  U.S.C. § 157(b)(2).

22      C.    Due and sufficient notice of the Motion and the Hearing have been given.

23      D.    The requirements of Rule 4001 of the Federal Rules of Bankruptcy Procedure and

24  Local Rule 4001 have been satisfied.

25      E.    The Debtors are seeking authorization to incur post-petition indebtedness (the "DIP

26  Financing") pursuant to the Debtor-in-Possession Term Credit and Security Agreement dated as of

27  December 17, 2010, among the Debtors and Northlight Real Estate Opportunity Fund I, LLC

28  ("Northlight" or the "DIP Lender"), as it may be modified, supplemented or amended from time to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    time, in the form attached hereto as Exhibit 1 (the "DIP Credit Agreement"), and to grant liens,

2    security interests and superpriority claims to the DIP Lender under the terms set forth in this Order.

3    The Debtors have also requested authorization to use cash collateral of the Term Loan Lenders on

4    the terms, and subject to the conditions, set forth in this Order.

5                    **Findings Regarding the DIP Financing**

6          F.       The Debtors have an immediate need to obtain DIP Financing in order to permit,

7    among other things, the orderly continuation of the operation of their businesses, the maintenance of

8    the loans and real properties that comprise the value of the estates, to pay insurance and costs of

9    administration.  The ability of the Debtors to obtain sufficient working capital and liquidity through

10   the incurrence of new indebtedness for borrowed money and other financial accommodations is vital

11   to the preservation and maintenance of the value of the estates and confirmation of a plan.

12         G.       The DIP Lender is willing to allow the Debtors to obtain financing under the DIP

13   Facility only upon the terms and conditions set forth in this Order.

14         H.       The Debtors are unable to obtain adequate unsecured credit allowable under section

15   503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

16   The Debtors are also unable to obtain secured credit allowable under section 364(c)(2) or 364(c)(3)

17   of the Bankruptcy Code, except under the terms and conditions set forth in this Order.

18         I.       The terms of the DIP Financing (a) have been negotiated in good faith and at arm's

19   length and without collusion between the Debtors and the DIP Lender, and (b) are fair and

20   reasonable under the circumstances and enforceable against the Debtors.

21         J.       Any credit extended and loans made to the Debtors by the DIP Lender pursuant to the

22   DIP Credit Agreement shall be deemed to have been extended in good faith, as that term is used in

23   section 364(e) of the Bankruptcy Code.  Based on the foregoing, the DIP Lender shall be given all

24   the protections provided by section 364(e) of the Bankruptcy Code to entities that have extended

25   credit in good faith.

26         K.       The relief requested in the Motion with respect to the DIP Financing is necessary,

27   essential and appropriate for the continued operations of the Debtors' businesses and the

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  management and preservation of their properties.  It is in the best interest of the Debtors' estates to

2  be allowed to enter into, and perform under, the DIP Credit Agreement.

3  **Findings Regarding Use of Cash Collateral**

4  **of the Prepetition Secured Lenders and the DIP Lender**

5  L.    The Debtors do not have sufficient available sources of working capital or funding to

6  carry on the operation of their business without use of the Cash Collateral.  The Debtors' ability to

7  fund postpetition operations is essential to the Debtors' continued viability and the maximization of

8  value for the estates.

9  M.    Subject to the provisions of this Order, to the extent that it is found to have an interest

10  in Cash Collateral as that term is defined in 11 U.S.C. § 363(a), U.S. Bank National Association (as

11  administrative agent under that certain Second Amended and Restated Credit Agreement dated as of

12  February 1, 2010 between the Debtors, the agent, and the lenders thereto (the "Term Loan

13  Lenders")) ("U.S. Bank") consents, under 11 U.S.C. § 363(c)(2), to the least extent necessary for

14  purposes of the relief granted in this Order, to the use of Cash Collateral and the liens granted to the

15  DIP Lender as set forth in this Order, and reserves all its rights pertaining to the value of its Cash

16  Collateral or the other collateral securing the Debtors' obligations to the Term Loan Lenders.

17  N.    Subject to the provisions of this Order, to the extent that it is found to have an interest

18  in Cash Collateral as that term is defined in 11 U.S.C. § 363(a), Deutsche Bank National Trust

19  Company, in its capacity as Indenture Trustee under those certain indentures dated July 1, 2005 and

20  March 1, 2009, (the "Indenture Trustee" or "Deutsche Bank" and, together with U.S. Bank, the

21  "Prepetition Secured Lenders") consents, under 11 U.S.C. § 363(c)(2), to the Debtors' use of Cash

22  Collateral that is subject to the Adequate Protection Liens (as defined in paragraphs 12 and 13) and

23  to the liens granted to the DIP Lender as set forth in the Order, subject to (i) the segregation of all

24  cash proceeds of estate assets in which the Indenture Trustee asserts a prepetition security interest, to

25  the extent received by the Debtors on and after September 3, 2010, into a separate, interest bearing

26  bank account and (ii) the Debtors' agreement not to use such segregated cash without further Order

27  of the Court, in accordance with paragraph 17 below.

28

O.      Subject to the provisions of this Order, to the extent that it is found to have an interest in Cash Collateral as that term is defined in 11 U.S.C. § 363(a), the DIP Lender consents, under 11 U.S.C. § 363(c)(2), to the Debtors' use of Cash Collateral that is subject to the DIP Liens (as defined in paragraphs 6, 7 and 8 below).

## Notice

P.      Notice of the Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) the Prepetition Secured Lenders, (iii) the creditors holding the twenty (20) largest unsecured claims against the Debtors, (iv) all other known secured creditors; (v) counsel to the Official Committee of Equity Holders (the "Committee"); and (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002.  Sufficient and adequate notice of the Hearing and the relief requested in the Motion has been given pursuant to all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.      The Motion is hereby granted on a final basis, subject to the terms and conditions set forth in this Order.

## DIP Financing

2.      The Debtors are hereby authorized to borrow, pursuant to the DIP Credit Agreement, up to an aggregate of $3.5 million, in accordance with the terms of the DIP Credit Agreement.

3.      The terms and conditions of the DIP Financing and of each Loan Document are hereby approved in all respects and made fully enforceable against the Debtors and the DIP Lender.

4.      In furtherance of the foregoing, the Debtors are authorized and directed to do and perform all acts, and to make, execute and deliver all instruments and documents that may be reasonably required or necessary for the Debtors' performance under the DIP Credit Agreement, including, without limitation:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(a) the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any and all schedules and exhibits attached thereto;

(b) the execution and delivery of one or more waiver, amendment, supplement or modification to the Loan Documents or instrument of security or perfection, in each case in such form as the Debtors and the DIP Lender may agree (to the extent such waiver, amendment, supplement or modification is permitted under the terms of the Loan Documents and is not material (in the good faith judgment of the Debtors and the DIP Lender) the Debtors and the DIP Lender may execute and deliver such instruments without further approval from the Court; provided that the Debtors or the DIP Lender shall provide a copy of any such waiver, amendment, supplement or modification to the Pre-Petition Secured Lenders within five (5) business days of the day upon which the Debtors agree to such waiver, amendment, supplement or modification;

(c) the nonrefundable payment to the DIP Lender, as the case may be, of all fees referred to in the DIP Credit Agreement, including, without limitation, the structuring fee and the due diligence fee (as provided by the DIP Credit Agreement), and the DIP Lender's reasonable costs and expenses as may be due from time to time, including, without limitation, fees and disbursements of professionals retained by the DIP Lender;

(d) the payment to the DIP Lender, of any Net Cash Proceeds (as defined in and contemplated by the DIP Credit Agreement); and

(e) performance of all other acts required under or in connection with the Loan Documents.

**Superpriority Claim**

5. As security for the Debtors' obligations and indebtedness arising under or in respect of the DIP Financing and the Loan Documents (collectively, the "DIP Obligations"), the DIP Lender is hereby granted, effective as of the date of this Order, pursuant to section 364(c)(1) of the Bankruptcy Code, a claim (the "Superpriority Claim") with priority over any and all administrative expenses or other claims of the kind specified in, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), the "equity" exception in section 552(b), 726 or any other

1    provision of the Bankruptcy Code (whether incurred in these Cases or in any successor cases),

2    subject only, in the event of the occurrence of a DIP Event of Default, to the payment of the

3    Professional Carve-Out.

4                                       **DIP Liens**

5          6.      As further security for the DIP Obligations, effective as of the date of this Order,

6    pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the DIP Lender shall have, and

7    is hereby granted security interests as provided in Section 2.7(b) of the DIP Credit Agreement,

8    which security interests shall have the priority specified in Section 2.7(a) of the DIP Credit

9    Agreement (collectively, the "DIP Liens").

10         7.      The DIP Liens and the collateral pledged to the DIP Lender to secure the DIP Facility

11    pursuant to the DIP Credit Agreement (collectively, the "DIP Collateral") shall be subject to, in the

12    event of the occurrence of a DIP Event of Default, (i) the payment of the Professional Carve-Out,

13    and (ii) the compensation and expense reimbursement (other than for professional fees and

14    expenses) allowed to a trustee in any successor Chapter 7 case. Pursuant to Section 364(d)(1) of the

15    Bankruptcy Code, the DIP Liens that are granted on the SAC II Collateral that is prepetition

16    collateral of U.S. Bank as agent for the Term Loan Lenders shall be perfected first priority, senior

17    priming liens (the "Priming Liens"); and all of the liens on the SAC II Collateral (the "Primed

18    Liens") shall be primed by and made subject and subordinate to the Priming Liens, which, however,

19    shall not prime liens, if any, to which the Primed Liens are subject as of the Petition Date. The DIP

20    Liens granted in favor of the DIP Lender in all of the DIP Collateral shall be perfected without the

21    recordation of any Uniform Commercial Code financing statements, notices of lien or other

22    instruments of mortgage or assignment.

23         8.      The Debtors further agree that (i) subject to paragraph 26 and 27 below, the DIP

24    Lender shall have the rights and remedies set forth in Section 8 of the DIP Financing Agreement in

25    respect of the DIP Collateral and (ii) if requested by the DIP Lender, the Debtors shall enter into

26    separate security agreements, pledge agreements, and/or mortgages, deeds of trust or other security

27    instruments with respect to such DIP Collateral on terms reasonably satisfactory to the DIP Lender.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9.     The DIP Liens shall not be subject or subordinate to: (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board or court for any liability of the Debtors.

10.     Notwithstanding anything to the contrary in this Order, avoidance actions, other than avoidance actions under section 549 of the Bankruptcy Code to the extent any portion of the DIP Collateral is transferred in a manner not authorized by the Court or the Bankruptcy Code, do not constitute DIP Collateral.

### Adequate Protection

11.     As adequate protection for the Debtors' use of Specialty Trust's equity in SAC II to secure the DIP Facility, Deutsche Bank will receive the following additional lien positions to the extent that the DIP Liens cause any diminution in the value of Deutsche Bank's secured claims, subject to the limitations set forth below (the "Adequate Protection Liens"):

A.     A second priority lien behind the DIP Lender on all DIP Collateral listed on Exhibit B to the DIP Credit Agreement as "First Lien" (excluding the Reserve Account) (the "First Priority DIP Collateral"), to the extent of the lesser of (i) all of the Debtors' payment obligations under the DIP Facility, or (ii) any amounts received by the DIP Lender on account of the DIP Lender's realization of value from all or any portion of the SAC II Collateral; provided that if the DIP Facility is repaid in full from sources other than the realization of value from the SAC II Collateral, such lien shall be extinguished and be null and void; and

B.     A second priority lien on all DIP Collateral listed on Exhibit B to the DIP Credit Agreement as "Third Lien," to the extent of the lesser of (i) all of the Debtors' payment obligations the DIP Facility, or (ii) any amounts received by the DIP Lender on account of the DIP Lender's realization of value from all or any portion of the SAC II Collateral; provided that if the DIP Facility is repaid in full from sources other than the SAC II Collateral, such lien shall be extinguished and be null and void.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    12.    With respect to the First Priority DIP Collateral, until the DIP Facility is repaid in full

2  in cash, the DIP Lender shall have the exclusive right to take, continue, oppose, or otherwise

3  prosecute, defend, settle or consent to any disposition of such collateral pursuant to an exercise of

4  remedies by the DIP Lender, without any consultation with or consent of Deutsche Bank on account

5  of the Adequate Protection Liens or U.S. Bank, and Deutsche Bank and U.S. Bank shall not take any

6  position contrary to the DIP Lender, or support any other person who takes any position contrary to

7  the DIP Lender, with respect to such disposition.

8  **Use of Cash Collateral**

9    13.    The Debtors are authorized to use the Cash Collateral of the Prepetition Secured

10  Lenders (subject to paragraph 16 below) and the DIP Lender consistent with the budget attached as

11  Exhibit 2 to this Order (the "Budget") through April 30, 2011, subject to the following variances:

12    (a)    expenditures budgeted to be spent during a certain week, but not actually

13  spent in such week, may be spent in later weeks;

14    (b)    as to each line item in the Budget, total actual expenditures may exceed total

15  budgeted expenditures by up to 10%;

16    (c)    the variance between total actual and total budgeted expenditures may not

17  exceed 10% in the aggregate; and

18    (d)    notwithstanding sections b. and c. above, actual expenditures relating to

19  foreclosure costs and maintenance of the REO property in Sedona, Arizona may exceed

20  budgeted expenditures by a maximum amount of $250,000.

21    14.    The Debtors must timely file all reports, pleadings, and papers they are required to

22  file with this Court and the United States Trustee, including, without limitation, monthly operating

23  reports, and must provide counsel to the Prepetition Secured Lenders and the DIP Lender with

24  copies of all pleadings, papers, and reports the Debtors file in connection with these cases when

25  filed.  Without limiting the foregoing, the Debtors must prepare and deliver to the Prepetition

26  Secured Lenders and the DIP Lender:  (i) a weekly cash-on-cash reconciliation and comparison of

27  actual results versus the Budget (the "Weekly Cash Report"), which Weekly Cash Report shall be

28  delivered each Friday, by no later than 2:00 p.m. Pacific time, following the immediately-preceding

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    week for which the Weekly Cash Report pertains; (ii) the real estate reports described in Section B.3

2    of the Debtors' omnibus reply in support of the initial cash collateral motion filed in these Cases

3    (Docket No. 80 in Case No. 10-51432); and (iii) copies of minutes from any risk rating meetings

4    held by the Debtors which implicate the prepetition collateral of the Prepetition Secured Lenders or

5    the DIP Lender.

6         15.    The Debtors must also provide to the Prepetition Secured Lenders and R.W and A.R.

7    Capurro Family Trust (the "Capurro Family Trust") no later than May 21, 2010, an itemized list of

8    Specialty Financial Corp.'s actual out of pocket costs of rendering services to the Debtors pursuant

9    to its management agreement with the Debtors (the "Confidential Management Fee Information"),

10    subject to the conditions set forth herein. Only persons with a need to review the Confidential

11    Management Information in relation to the bankruptcy case shall be provided access to such

12    information, and only after executing a Confidentiality Agreement in a form that is reasonably

13    acceptable to the Debtors. Persons authorized to review the Confidential Management Information

14    on behalf of the Pre-Petition Lenders may include officers and employees of, and professional

15    advisors and/or expert witnesses retained by the Prepetition Secured Lenders, and/ or their legal

16    counsel. Only professional advisors and/or expert witnesses of the Capurro Family Trust, and/or

17    their legal counsel, shall be entitled to review the Confidential Management Fee Information. The

18    Debtors reserve the right to restrict access to the Confidential Management Information to those

19    persons whom the Debtors reasonably believe have a "need to know" basis for reviewing the same in

20    connection with the bankruptcy case. Any disputes regarding who shall have access to such

21    Confidential Management Fee Information which cannot be informally resolved between the parties

22    shall be determined by the Bankruptcy Court. Any party that intends to file such information with

23    any court must seek to do so under seal. The Indenture Trustee's request to be permitted to disclose

24    "Confidential Management Fee Information" to the noteholders for which it serves as Indenture

25    Trustee is denied without prejudice.

26         16.    Specialty Trust shall segregate all cash proceeds of: (i) loan numbers 48799533,

27    50999555, 53699522, 29499341 and 54999535 and associated deeds of trust; (ii) the two

28    intercompany notes and deeds of trust issued by Specialty Acquisition Corp. to Specialty Trust, Inc.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

("Specialty Trust") that are secured by those certain REOs referred to as Consolidated and Cotton Lane; (iii) the note and deed of trust issued by Oak Creek Condominiums,LLC to Specialty Trust in the face amount of $3,840,000; (iv) the note and deed of trust issued by Fifth & Lincoln, LLC to Specialty Trust in the face amount of $6,400,000; and (v) Specialty Trust's stock in SAC II (the "Asserted Deutsche Bank Cash Collateral"), to the extent that such cash proceeds are received by Specialty Trust on and after September 3, 2010 into a separate, interest-bearing debtor-in-possession bank account at First Independent Bank and Specialty Trust may not use any of such Asserted Deutsche Bank Cash Collateral without the Indenture Trustee's written consent or further order of this Court; provided, however, that the Debtors reserve all rights to seek authorization of the Court to use some or all of the Asserted Deutsche Bank Cash Collateral that comes into the possession of Specialty Trust on and after September 3, 2010, with or without Deutsche Bank's consent, in the future.

17.     Except as expressly provided herein with respect to the security interests securing the DIP Facility and the Adequate Protection Liens, nothing in this Order is intended to acknowledge, recognize or allow any putative prepetition security interest in Cash Collateral and/or any other assets of the Debtors.  The Debtors, their estates, and the Prepetition Secured Lenders expressly reserve all rights with respect to the validity, enforceability, and priority of any putative prepetition security interests in any property of the Debtors' estates.

18.     Nothing in this Order shall prejudice the rights of the Office of the United States Trustee, the Prepetition Secured Lenders, and the Equity Security Holders' Committee (the "Equity Committee") to (i) seek disgorgement with respect to the Debtors' payment of the management fee to Specialty Financial Corp. scheduled for mid-June 2010 (through set-off of future management fees or otherwise) as excessive; and/or (ii) contest any payment of future management fees, or the Debtors' rights to contest disgorgement and to support payment of future management fees, all of which rights are hereby reserved.

**Automatic Stay and Certain Remedies**

19.     The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit (i) the Debtors to grant the DIP Liens and the Adequate

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Protection Liens on a final basis and to perform the Debtors' obligations under the Loan Documents,

2    and (ii) the DIP Lender to deliver the Enforcement Notice (as defined herein). Upon the occurrence

3    of a DIP Event of Default and delivery of the Enforcement Notice, the DIP Lender shall be entitled

4    to an expedited hearing in this Court (as provided in paragraph 22 of this Order) for authority to

5    exercise all rights and remedies provided for in the Loan Documents.

6                                  **Professional Carve Out**

7         20.    The DIP Liens and the Superpriority Claim shall be subordinated to the payment of

8    the following (the "Professional Carve Out"): (i) the U.S. Trustee's Fees; and (ii) allowed fees and

9    expenses of the Debtors' and any statutory committee's professionals. Nothing herein shall be

10   construed to impair the ability of any party to object to any of the fees, expenses or other

11   disbursements described herein.

12                                **DIP Financing Events of Default**

13        21.    Events of Default. Unless the DIP Lender shall have provided their prior written

14   consent, or all DIP Obligations shall have been indefeasibly paid in full in cash, each of the

15   following shall constitute a "DIP Event of Default":

16              (a)    issuance of an order staying, reversing, modifying or vacating this Order;

17              (b)    the dismissal of either of these Cases, conversion of any of these Cases to

18   chapter 7, or the appointment of a chapter 11 trustee or an examiner with expanded powers in

19   any of these Cases;

20              (c)    the breach by the Debtors of any term or provision of this Order;

21              (d)    the acquisition by any post-petition lender to the Debtors of a post-petition

22   security interest in, or lien upon, any property of the Debtors having parity with or priority

23   over the security interests and liens in such property held by the DIP Lender;

24              (e)    the entry of an order of any court that terminates the authority of the Debtors

25   to conduct business; and/or

26              (f)    the occurrence of any other "Event of Default" under the DIP Credit

27   Agreement.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

22.      Upon the occurrence of any DIP Event of Default and at any time thereafter during the continuance thereof, if the DIP Lender delivers written notice of any such occurrence (the "Enforcement Notice") (in each case given to the Debtors, counsel to any Committee, counsel to U.S. Bank, counsel to Deutsche Bank and the United States Trustee) then, immediately upon receipt of such Enforcement Notice, (a) the Debtors shall have no right, without further Court approval, to use any proceeds of the DIP Collateral other than towards (A) the satisfaction of the DIP Obligations, and (B) the Professional Carve-Out, and (b) any obligations imposed on the DIP Lender to provide any loan or advance under the DIP Facility shall be suspended.  Such Enforcement Notice shall also be filed with the Court.  Upon delivery of the Enforcement Notice, the DIP Lender shall be entitled to an expedited hearing on five (5) business days prior notice to the parties entitled to receive the Enforcement Notice for authority to exercise all rights and remedies provided for in the DIP Credit Agreement and ancillary Loan Documents.

23.      Notwithstanding any provision of this Final Order or the DIP Credit Agreement, the advance by the Term Loan Lenders of additional indebtedness solely for the Debtors' use to pay obligations that are necessary to avoid governmental liens on DIP Collateral shall not constitute an Event of Default under the DIP Facility.

## **Termination**

24.      All DIP Obligations shall be due and payable, without notice and demand, upon the earliest to occur of the following (the "Termination Date"):

      a.      December 16, 2011;

      b.      the effective date of any plan of reorganization for any of the Debtors;

      c.      the consummation of a sale of all or substantially all assets of the Debtors; or

      d.      the consummation of the transaction contemplated under the Exit Financing term sheet.

25.      Unless and until the DIP Obligations are unconditionally and indefeasibly repaid in full in cash, the protections afforded to the DIP Lender under this Order and under the Loan Documents, as applicable, shall survive the entry of any order confirming a plan or reorganization or converting any of the Cases into a case under chapter 7 of the Bankruptcy Code, and the DIP Liens

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   and the Superpriority Claim shall continue and shall maintain their priority as provided by this Order

2   until the DIP Obligations are unconditionally and indefeasibly repaid in full in cash.

3       26.    With respect to the DIP Collateral listed on Exhibit B to the DIP Credit Agreement

4   that is subject to first priority liens of the Term Loan Lenders (described as "Third Lien" on Exhibit

5   "B" to the DIP Credit Agreement), U.S. Bank as agent for the Term Loan Lenders shall have the

6   exclusive right to take, continue, oppose, or otherwise prosecute, defend, settle or consent to any

7   disposition of such collateral pursuant to an exercise of remedies by U.S. Bank, without any

8   consultation with or consent of the DIP Lender or Deutsche Bank (on account of the Adequate

9   Protection Liens), and:  (a) the DIP Lender shall not take any position contrary to U.S. Bank, or

10  support any other person who takes any position contrary to U.S. Bank, with respect to such

11  disposition and (b) Deutsche Bank shall not oppose any such action upon the basis that such action

12  may affect the Adequate Protection Liens.

13      27.    Until the Term Loan Lenders are paid in full, the DIP Lender shall seek repayment

14  from the DIP Collateral in the following order:

15          i.      First, from the First Priority DIP Collateral, excluding the SAC II Collateral;

16          ii.     Second, from the SAC II Collateral; and

17          iii.    Third, from the DIP Collateral listed on Exhibit B to the DIP Credit

18  Agreement as "Third Lien" (solely to the extent of any then-existing deficiency on the DIP Facility).

19                              **Miscellaneous**

20      28.    This Court shall retain jurisdiction with respect to all matters arising from or related

21  to the implementation of this Order.

22      29.    Notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3), 6004(h),

23  7062, 9014, or other rules, the terms and conditions of this Order shall be immediately effective and

24  enforceable upon its entry.

25      30.    Nothing contained in this Order prejudices any of the parties' rights to object to the

26  entry of an additional interim or final order on any grounds.

27  ///

28  ///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    31.    All time periods set forth in this Order shall be calculated in accordance with

2  Bankruptcy Rule 9006(a).

3                                    # # #

4

5    In accordance with LR 9021, counsel submitting this document certifies that the order
   accurately reflects the court's ruling and that (check one):

6    ☐    The court has waived the requirements set forth in LR 9021(b)(1).

7    ☐    No party appeared at the hearing or filed an objection to the motion.

8    ☒    I have delivered a copy of this proposed order to all counsel who appeared at the
   hearing, and any unrepresented parties who appeared at the hearing, and each has approved
9  or disapproved the order, or failed to respond, as indicated below [list each party and
   whether the party has approved, disapproved, or failed to respond to the document]:

10
11    US Bank:  **Approved**
   Deutsche Bank:  **Approved**
12  Northlight Real Estate Opportunity Fund I, LP:  **Approved**
   Committee of Equity Security Holders:  **Approved**

13  The Office of United States Trustee advised that it did not need to sign.

14    ☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this
15  order with the motion pursuant to LR 9014(g), and that no party has objected to the form or
   content of the order.

16
17
18  Respectfully submitted by:

19  DOWNEY BRAND LLP

20

21  By:

22    SALLIE B. ARMSTRONG (Bar No. 1243)
   *Attorneys for Debtors and Debtors in Possession*

23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# Exhibit 1

# Exhibit 1

DEBTOR-IN-POSSESSION
TERM CREDIT AND SECURITY AGREEMENT

This Debtor-In-Possession Term Credit and Security Agreement is dated as of December 17, 2010, and is among  Specialty Trust, Inc., a Maryland corporation ("Specialty") and Specialty Acquisition Corp. ("Acquisition"), a Delaware corporation, SAC II, a Nevada corporation and SAC D-1, LLC, a Nevada limited liability company (collectively, the "Borrower") debtors and debtors in possession in Chapter 11 bankruptcy cases jointly administered under case No. 10-51432-GWZ (collectively, the "Case") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court,") and Northlight Real Estate Opportunity Fund I, LP, a Delaware limited partnership ("Lender").

## INTRODUCTORY STATEMENT

On April 20, 2010 (the "Petition Date"), Specialty filed a voluntary petition with the Bankruptcy Court initiating its Case and has continued in the possession of its assets and in the management of its business pursuant to Bankruptcy Code §§ 1107 and 1108.

The Borrower applied to, and obtained from the Lender, a  term loan facility in an aggregate original principal amount not to exceed $3,500,000.

The proceeds of the Loan will be used for the purposes set forth below in this Agreement, subject to the terms of this Agreement and the Order.

To provide security for the repayment of the Loan and the payment of the other Obligations of the Borrower hereunder and under the other Loan Documents, the Borrower shall provide to Lender, pursuant to this Agreement and the Order, the following (each as more fully described herein):

(a)     an allowed administrative expense claim, entitled to the benefits of Bankruptcy Code § 364(c)(1), having a superpriority over any and all administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, §§ 503(b) or 507(b); and

(b)     pursuant to Bankruptcy Code § 364(c)(2) and Section 364(d)(1) (as to any collateral or assets of Borrower subject to existing security interests in favor of others), a first priority perfected Lien on, and security interest in, all present and after-acquired property of Borrower, subject to the exclusions set forth in Section 2 below.

All of the claims and the Liens granted to Lender hereunder and pursuant to the Order in the Case shall be subject to the Professional Carve-Out (as defined in Section 6 below) and the Permitted Liens.

Accordingly, the parties hereto hereby agree as follows:

SECTION 1

DEFINITIONS

1.1    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>Accounts</u>":  all of the accounts, instruments, documents, chattel paper and general intangibles of the Borrower, whether secured or unsecured, whether now existing or hereafter created or arising, and whether or not specifically assigned to the Lender, including, without limitation, all "accounts" as defined in Article 9 of the UCC.

"<u>Affiliate</u>":  as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>":  this Debtor-in-Possession Term Credit and Security Agreement, dated December 17, 2010, as amended, supplemented or otherwise modified from time to time.

"<u>Asset Sale</u>":  any sale, issuance, conveyance, transfer, lease or other disposition by any Borrower, in one or a series of related transactions, of any Property.

"<u>Avoidance Actions</u>" :  any claim or action under Bankruptcy Code §§ 506(c), 542-544, 547-550 and 724(a).

"<u>Bankruptcy Code</u>":  The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 - 1330.

"<u>Bankruptcy Court</u>": see the meaning set forth in preamble to this Agreement.

"<u>Borrower</u>":  see the meaning set forth in the preamble to this Agreement.

"<u>Borrower Agreements</u>":  all agreements and contracts to which a Borrower is a party as of the date hereof, or to which a Borrower becomes a party after the date hereof, as each such agreement may be amended, supplemented or otherwise modified from time to time.

"<u>Borrowing</u>":  the making of the Loan on a Closing Date.

"<u>Budget</u>":  is defined in Section 2.1.

"<u>Business Day</u>":  any day other than a Saturday, Sunday or other day on which banks in the State of New York are required or permitted to close.

"<u>Case</u>":  see the meaning set forth in the preamble to this Agreement.

2

"Cash Equivalents": (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies ("S&P"), or Moody's Investors Service, Inc. ("Moody's"); (c) commercial paper maturing no more than six months from the date of creation thereof and, at the time of acquisition, having a rating of A-2 or P-2 or better from either S&P or Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having combined capital and surplus of not less than $500,000,000 (any such commercial bank, an "Acceptable Bank"); (e) eurodollar time deposits having a maturity of less than six months purchased directly from any Acceptable Bank or any commercial bank having (or the parent of which has) a rating of A-1 or P-1 or better from either S&P or Moody's; (f) reverse repurchase agreements having a term of thirty days or less with any Acceptable Bank or any commercial bank having a rating of A-1 or P-1 or better from either S&P or Moody's relating to marketable direct obligations issued or unconditionally guaranteed by the United States but only if the securities collateralizing such reverse repurchase agreements are delivered to the Borrower or its custodian; (g) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (h) securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (d) of this definition; and (i) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (h) above.

"Chattel Paper": all "chattel paper" as defined in Article 9 of the UCC, including, without limitation, "electronic chattel paper" or "tangible chattel paper", as each term is defined in Article 9 of the UCC.

"Closing Date": the date on which the conditions precedent to the making of the Loan set forth in Section 4.1 have been satisfied or waived.

"Collateral": the meaning set forth in Section 2.7.

"Collateral Records": books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

3

"Collateral Support":  all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Confirmation Order": an order of the Bankruptcy Court confirming a Reorganization Plan in any Case.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of the Property owned or leased by it is bound.

"Default": any of the events specified in Section 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Default Interest Rate": four percent (4%) over the Interest Rate.

"Deutsche Bank":  Deutsche Bank National Trust Company, solely in its capacity as indenture trustee pursuant to that Second Amended and Restated Indenture dated as of March 1, 2009 related to Specialty Trust, Inc. Secured Investment Notes.

"DACA": an acceptable Deposit Account Control Agreement with the depositary bank holding the Reserve Account, in favor of Lender.

"DIP Term Sheet":    Exhibit A to Docket No. 535, detailing the terms of the DIP Financing (therein called the Northlight DIP Term Sheet) and potential Exit Financing (therein called the Plan Exit Financing Term Sheet).

"Docket No. 535": That certain Docket entry No. 535 in the Case, captioned Debtors' Notice of Potential Changes to DIP Financing Under DIP Priming Motion, entered on December 1, 2010 with the Bankruptcy Court.

"Documents":  all "documents" as defined in Article 9 of the UCC.

"Dollars" and "$": lawful money of the United States of America.

 "Event of Default": the meaning set forth in Section 7.

"Excluded Claims":  any and all commercial tort claims.

"Exit Financing": consummation of exit financing of Borrower pursuant to its Plan of Reorganization.

 "GAAP":  generally accepted accounting principles in the United States of America as consistently and historically applied buy Borrower.

"Governmental Authority": any Federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality or any court, in each case whether of the United States or a foreign country.

4

"Indebtedness": at any time and with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for the deferred purchase price of property or services (other than property, including inventory, and services purchased, and trade payables, other expense accruals and deferred compensation items arising, in the ordinary course of business, including negotiated trade terms and Chapter 11 expense accruals), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business), (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all capital lease obligations of such Person, (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, (g) all Guaranty Obligations of such Person in respect of Indebtedness of others referred to in clauses (a) through (f) above, and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Insurance" shall mean insurance policies covering Collateral (regardless of whether the Lender is the loss payee thereof).

"Intellectual Property": has the meaning set forth in Section 3.6.

"Interest Payment Date": (a) the last day of each calendar month, and (b) the date of any repayment or prepayment made in respect thereof.

"Interest Rate": an interest rate of twelve percent (12%) per annum.

"Investment": the meaning set forth in Section 6.4.

"Lender": see the meaning set forth in the preamble to this Agreement.

"Lien": with respect to any Property, any mortgage, lien (statutory or other), pledge, charge, hypothecation, assignment, deposit arrangement, security interest, encumbrance or other security agreement or preferential arrangement of any kind or nature in respect of such Property.

"Loan": see the meaning set forth in the preamble to this Agreement.

"Loan Amount": means $3,500,000.

"Loan Documents": this Agreement, the Note(s) and any other instrument or agreement executed and delivered in connection herewith.

"Material Adverse Effect": a material adverse effect on (a) the Property, business, operations and/or financial condition of the Borrower taken as a whole other than such

effects as result solely (i) from the commencement of the Case or (ii) from the existence of pre-petition claims or pre-petition defaults arising from or related to any pre-petition contracts, (b) the validity or enforceability of the Order or any of the Loan Documents, (c) the rights and remedies of Lender under the Order and the Loan Documents or (d) timely payment of the principal of or interest on the Loan or other amounts payable in connection therewith.

"Maturity Date": The earlier of (a) December 16, 2011, or (b) the date of refinancing pursuant to the Plan of Reorganization of Borrower and any attendant Exit Financing.

"Money" shall mean "money" as defined in the UCC.

"Net Cash Proceeds":  in connection with any Asset Sale, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale net of (a) the Professional Carve-Out, (b)  any amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale (other than any Lien pursuant hereto), (c) any bona fide direct, actual and reasonable costs incurred by the Borrower or its employees or agents in connection with such Asset Sale and (d) any amounts earmarked to cure defaults under executory contracts or unexpired leases in connection with such Asset Sale.

"Non-Excluded Taxes": See the meaning set forth in Section 2.6.

"Note": the meaning set forth in Section 2.2.

"Obligations":  (a) the principal of and interest on the Loan and (b) all other present and future, fixed or contingent, obligations and liabilities (monetary or otherwise) of the Borrower to Lender under the Loan Documents, including, without limitation, all costs and expenses payable under this Agreement.

"Order":  an order or orders of the Bankruptcy Court entered in the Cases, after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c), authorizing and approving the transactions contemplated by this Agreement and the other Loan Documents and granting the Liens and Superpriority Claims described in the Introductory Statement and Section 2.7 hereof in favor of Lender in form and substance satisfactory to Lender.

"Permitted Liens" means and refers to those Liens which are permitted to exist pursuant to Section 3.3 below.

"Person": any natural person, corporation, division of a corporation, partnership, trust, joint venture, association, company, estate, unincorporated organization or government or any agency or political subdivision thereof.

6

"Petition Date": see the meaning set forth in the Introductory Statement hereto.

"Proceeds": (i) all "proceeds" as defined in Article 9 of the UCC, and (ii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Professional Carve-Out":  the meaning set forth in Section 6.

"Property": any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Requirements of Law": as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitration or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Reserve Account": $200,000 of the Loan Amount to cover Interest during the Loan term; which shall be pledged to Lender pursuant to Section 2.7 below.

"Responsible Officer":  as to any Person, the president, the chief executive officer, the chief restructuring officer, the chief financial officer, the treasurer, the secretary, the assistant secretary or any officer at the level of vice president or higher but with respect to financial matters, the chief financial officer, treasurer or comptroller.

"SAC II Collateral": SAC II's projects commonly referred to as Sierra Vista and Coolidge 70, as listed on Exhibit "B".

"Section 365":  the meaning set forth in Section 3.8.

"Subsidiary": with respect to any Person (herein referred to as the "parent"), any corporation, association or other business entity (whether now existing or hereafter organized) of which at least a majority of the securities or other ownership interests having ordinary voting power for the election of directors is, at the time as of which any determination is being made, owned or controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Superpriority Claim": a claim against the Borrower in the Case which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"USB": is defined in Section 2.7.

1.2    Terms Generally  The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections and subsections of, and

7

Exhibits and Schedules to, this Agreement unless the context shall otherwise require. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

      1.3    <u>Accounting Terms</u>  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time.

      1.4    <u>Computation of Time</u>  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

SECTION 2

AMOUNT AND TERMS OF LOAN

      2.1    <u>Loan</u>  Subject to the provisions hereof, including satisfaction of all conditions precedent set forth in Sections 4.1, Lender agrees, on the terms and conditions hereinafter set forth, to make the Loan to the Borrower on the Closing Date. The Loan shall be disbursed (i) to fund the Reserve Account, (ii) to pay for working capital needs of Borrower as expressly set forth in the budget approved by the Bankruptcy Court or as may be approved by Lender in writing from time to time ("Budget"), (iii) to pay for costs and expenses incurred in closing the Loan, and (iv) for due diligence costs and expenses of Lender related to any Exit Financing. $3,300,000 of the Loan Amount shall be funded on the Closing Date, with $200,000 being held in the Reserve Account and secured by Lender under the DACA.

      2.2    <u>Repayment of Loan; Evidence of Debt</u>  Each Borrower hereby, unconditionally promises to pay the then unpaid principal amount of each Loan on the Maturity Date. Each Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loan from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.5.

      Borrower will execute and deliver to Lender a promissory note, dated as of the Closing Date evidencing the Loan, substantially in the form of <u>Exhibit A</u> with appropriate insertions as to date and principal amount (the "<u>Note</u>").

      2.3    <u>Interest Rate and Payment Dates</u>

          (a)    The Loan shall bear interest for each day outstanding at the Interest Rate.

          (b)    If all or a portion of (i) any principal of the Loan, (ii) any interest payable thereon, or (iii) any other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), the principal of the Loan and any such overdue

8

interest or other amount shall bear interest at the Default Interest Rate, in each case from the date of such non-payment until such overdue principal, interest or other amount is paid in full (as well after as before judgment).

(c)    Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (b) of this subsection shall be payable from time to time on demand.

(d)    The Loan shall be interest only, with no principal amortization, with a balloon payment equal to the Loan Amount, plus accrued Interest and expenses due in one lump sum on the Maturity Date.

2.4    Computation of Interest  Interest shall be calculated on the basis of the actual number of days in a year for the actual days elapsed, based upon a 360 day year.

2.5    Optional Prepayment  The Borrower may at any time, without premium or penalty, prepay the Loan in whole or in part.  Accrued interest on any principal amount prepaid shall be due on the prepayment date.  Once repaid, no portion of the Loan may be reborrowed.

2.6    Taxes  All payments made by the Borrower under this Agreement and the Note shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any Note).

2.7    Priority and Liens

(a)    The Borrower hereby covenants, represents and warrants that, upon entry of the Order, the Obligations of the Borrower hereunder and under the other Loan Documents and the Order, (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected first priority Lien on and security interest in all previously unencumbered Collateral, Sierra Vista and Coolidge 70 , and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected third priority Lien on and security interest in the collateral securing the Borrower's existing Indebtedness to U.S. Bank National Association ("USB"), as administrative agent in connection with the loan facility(ies) provided for in that certain Second Amended and Restated Credit Agreement, dated as of February 1, 2010, among, on the one hand, the agent and certain lenders thereto (the "Term Loan Lenders") and, on the other hand, debtor Specialty, as borrower, and certain debtor and non-debtor affiliates as guarantors, which perfected third priority Lien in favor of Lender shall be subordinate to the first Lien and security interests of USB and be subject and subordinate in all cases to the

Professional Carve-Out, and subordinate and subject to the second priority adequate protection Lien in favor of Deutsche Bank provided for in the Order;

        (b)     In furtherance of Section 2.7(a) above, to secure the Borrower's Obligations, the Borrower hereby grants to Lender a security interest and continuing perfected first Lien (or third Lien, as applicable) on all of the Borrower's right, title and interest in, to and under the following, and only the following (all of which being herein collectively referred to as the "Collateral"):

        (i)     the secured loans of Specialty described in Exhibit "B" attached hereto and incorporated herein by this reference, including, without limitation, all Collateral Support therefor (collectively, the "Third Party Loans Receivable");

        (ii)     the real property described in Exhibit "B" attached hereto and incorporated herein by this reference, title to which is held by SAC II (as to Coolidge 70 and Sierra Vista) and Specialty (as to Central & Buchanan) (collectively, the "Owned Real Property");

        (iii)     Insurance to the extent applicable to the Owned Real Property;

        (iv)     to the extent not otherwise included above, all Collateral Records relating to any of the foregoing;

        (v)     the Reserve Account (and attendant DACA); and

        (vi)     to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

For avoidance of doubt, such Exhibit "B" specifies the relative lien position of Lender being granted in each element of the Collateral.

        (c)     The Borrower acknowledges that, pursuant to the Order, the Liens granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment. The Borrower further agrees that (i) Lender shall have the rights and remedies set forth in Section 8 in respect of the Collateral and (ii) if requested by Lender, the Borrower shall enter into separate security agreements, pledge agreements, and/or mortgages, deeds of trust or other security instruments with respect to such Collateral on terms reasonably satisfactory to Lender.

    2.8    Required Partial Prepayment    Borrowers, upon execution of the Exit Financing term sheet, shall deliver to Lender a $25,000 due diligence deposit. As fees and expenses are incurred thereafter, Borrowers shall remit to Lender up to an additional $50,000 (for an aggregate of up to $75,000) as Exit Financing due diligence expense reimbursement. Such $75,000 shall be earmarked for such payment in the Budget, and if the Exit Financing term sheet is not executed by Borrowers with Lender by January 15, 2011, $75,000 of the Loan shall be repaid to Lender.

2.9    No Discharge; Survival of Claims  The Borrower agrees that to the extent its Obligations hereunder are not satisfied in full, (a) its Obligations arising hereunder shall not be discharged by the entry of a Confirmation Order (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to Lender pursuant to the Order and described in Section 2.7 and the Liens granted to Lender pursuant to the Order and described in Section 2.7 shall not be affected in any manner by the entry of a Confirmation Order.

2.10    Structuring Fee  A structuring fee equal to two percent (2%) of the Loan Amount shall be due and payable on the Closing Date, with an additional fee of two percent (2%) of the Loan Amount becoming due and payable (a) upon the occurrence and Continuance of an Event of Default, or (b) consummation of the Exit Financing with a third party other than Lender or its Affiliates (collectively, the "Structuring Fee").

2.11    SAC II Limited Recourse  SAC II is a maker of the Note and forms a part of Borrower for purposes of this Agreement solely to the extent of its interest in the SAC II Collateral.  Lender shall not enforce the liability and obligation of SAC II under this Agreement or the Note by any action or proceeding wherein a monetary recovery shall be sought against SAC II, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon the SAC II Collateral; provided, however, that, any judgment in any such action or proceeding shall be enforceable against SAC II only to the extent of SAC II's interest in the SAC II Collateral, and Lender shall not sue for, seek or demand any deficiency judgment against SAC II in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement or the other Loan Documents.

SECTION 3

REPRESENTATIONS AND WARRANTIES

In order to induce Lender to make Loan hereunder, each Borrower represents and warrants to Lender as follows:

3.1    Organization and Authority  Each Borrower (a) is duly organized and validly existing under the laws of the jurisdiction of its incorporation/formation; (b) subject to the entry by the Bankruptcy Court of the Order, has the requisite corporate power and authority to effect the transactions contemplated hereby and by the other Loan Documents, and (c) subject to the entry by the Bankruptcy Court of the Order, has all requisite corporate/limited liability company power and authority and the legal right to own, pledge, mortgage and operate its Properties, to lease the Properties it operates as lessee and to conduct its business as now or currently proposed to be conducted; provided, that the Borrower makes no representation or warranty relating to whether any licenses, franchises, authorizations or permits granted to it by a Governmental Authority under applicable non-bankruptcy law can be encumbered by a Lien pursuant Bankruptcy Code § 364 without also obtaining approval of such Lien from the relevant public utilities commission or other applicable Governmental Authority.

3.2     Due Execution; Binding Obligation  Upon entry by the Bankruptcy Court of the Order, the execution, delivery and performance by the Borrower of each of the Loan Documents to which it is a party, and the commencement of its Case (i) are within the corporate/limited liability company power of the Borrower, have been duly authorized by all necessary corporate/limited liability company action, including the consent of shareholders where required, and do not (A) contravene the charter or by-laws/operating agreement of such Borrower (B) violate any law or any order or decree of any Governmental Authority, in each case, which could reasonably be expected to have a Material Adverse Effect, (C) conflict with or result in a breach of, or constitute a default under, any material indenture, mortgage or deed of trust entered into after the Petition Date, any material provision of any security issued by the Borrower after the Petition Date or any material lease, agreement, instrument or other undertaking entered into after the Petition Date binding on the Borrower or any of its Properties, or (D) result in or require the creation or imposition of any Lien upon any of the Property of such Borrower other than the Liens granted pursuant to this Agreement, the other Loan Documents or the Order; and (ii) do not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority (other than the entry of the Order).  This Agreement is, and each of the other Loan Documents to which the Borrower is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms and the Order.  Notwithstanding any of the foregoing, the Borrower makes no representation or warranty relating to whether any licenses, franchises, authorizations or permits granted to it by a Governmental Authority under applicable non-bankruptcy law can be encumbered by a Lien pursuant Bankruptcy Code § 364 without also obtaining approval of such Lien from the relevant public utilities commission or other applicable Governmental Authority.

3.3     Title to Assets; Liens  There are no Liens of any nature whatsoever on any Collateral other than: (i) Liens granted pursuant to the Order and this Agreement; and (ii) other Liens in existence on the Petition Date as reflected on Schedule 3.3; and (iii) other Permitted Liens.  Schedule 3.3 hereto is a complete and correct list, as of the date of this Agreement, of each Lien (and the Collateral covered by each such Lien) securing Indebtedness of any Person and covering any Collateral ("Permitted Liens").

3.4     The Order  As of the date of the making of the Loan hereunder, the  Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect.

3.5     Intellectual Property  The Borrower owns, or, subject to Bankruptcy Code §365(c)(1)(B) (hereinafter, "Section 365") is licensed to use, all trademarks, tradenames, copyrights, technology, know-how and processes (the "Intellectual Property") which are necessary for the conduct of its business as currently conducted except for those the failure to own or license which could not be reasonably expected to have a Material Adverse Effect.  No claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower know of any valid basis for any such claim, and the use of such Intellectual Property by the Borrower does, subject to Section 365, not infringe on the rights of any Person.

3.6    <u>Depositary, Custodial and Brokerage Accounts</u>  Schedule 3.6 sets forth a true and complete list of all bank accounts, custodial accounts and brokerage accounts maintained by the Borrower as of the date hereof.

SECTION 4

CONDITIONS PRECEDENT

4.1    <u>Conditions to Borrowing</u>  The obligations of Lender to make the Loan are subject to the satisfaction, immediately prior to or currently with the making of such Loan of the following conditions precedent, unless Lender has previously waived any such condition precedent in writing:

(a)    <u>Loan Documents</u>.  (i) Lender shall have received this Agreement, executed and delivered by a duly authorized officer of the Borrower; (ii) Lender shall have received the Note conforming to the requirements hereof and executed by a Responsible Officer of the Borrower; and (iii)  Lender shall have received such other documents, including security agreements, pledge agreements and other relative collateral documents, that are customary in such transactions, in form and substance satisfactory to Lender.

(b)    <u>Corporate Documents and Proceedings</u>. Lender shall have received from the Borrower a certificate of the Secretary or an Assistant Secretary or a duly authorized officer of the Borrower dated the Closing Date, substantially in the form of <u>Exhibit C</u>.

(c)    <u>Order</u>. Before the time of the making of the Loan, Lender shall have received a copy of the Order approving the Loan Documents and granting the Superpriority Claim status and Liens described in Section 2.7 and finding that Lender is extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code, which Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to Lender, (iii) shall be in full force and effect and (iv) shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect and, if the Order is the subject of a pending appeal in any respect, none of the making of such Loan, the grant of Liens and Superpriority Claims pursuant to Section 2.7 or the performance by the Borrower of any of its Obligations hereunder or under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)    <u>Payment of Expenses</u>. All expenses of Lender for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel and other advisors to Lender on or before the Closing Date) shall be deducted from the funding of the Loan; provided, however, that third party expenses shall be limited to a maximum of $10,000. For the avoidance of doubt, this $10,000 limitation does not include Lender's third party legal fees related to review of existing documentation, local bankruptcy counsel (and its travel expenses to attend hearings) and preparation and negotiation of closing documentation.

13

(e)    No Injunction.  No law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the judgment of Lender would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loans.

(f)    Payment of Structuring Fee.  The non-contingent portion of the Structuring Fee (i.e., two percent (2%) of the Loan Amount) shall be deducted from the funding of the Loan and shall be deemed fully-earned by the Lender and nonrefundable upon payment.

(g)    Additional Matters.  All corporate/limited liability company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement and the other Loan Documents shall be reasonably satisfactory in form and substance to Lender, and Lender shall have received such other documents and legal opinions in respect of any aspect or consequence of the transactions contemplated hereby or thereby as it shall reasonably request.

## SECTION 5

## AFFIRMATIVE COVENANTS

Each Borrower hereby agrees that, so long as any Loan remains outstanding and unpaid or any other amount is owing to Lender hereunder or under any other Loan Document, each Borrower shall:

5.1    Certain Information  Furnish  to counsel to Lender, promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower with the Bankruptcy Court or the United States Trustee in the Case, or distributed by or on behalf of the Borrower to any official committee appointed in the Case; provided, that nothing in this Section 5.1 shall be, or be deemed to be, a waiver of any evidentiary privilege (whether between the Borrower and its attorneys or otherwise).

5.2    Maintenance of Property: Insurance  Keep all of its Property useful and necessary in its business in good working order and condition subject to ordinary wear and tear, except where failure to do so could not reasonably be expected to have a Material Adverse Effect and use commercially reasonable efforts to maintain its pre-petition insurance policies.

5.3    Inspection of Property: Books and Records; Discussions  Keep proper books or records and accounts in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and permit representatives of Lender to visit and inspect any of its Properties and examine and make abstracts from any of its books and records at any reasonable time or times and with reasonable notice and to discuss the business, operations, Properties and financial and other condition of the Borrower with officers and employees of the Borrower and with its independent certified public accountants; provided, that nothing in this Section 5.3 shall be, or be

deemed to be, a waiver of any evidentiary privilege (whether between the Borrower and its attorneys or otherwise).

5.4    Notices  Promptly, and in any event within three (3) Business Days after a Responsible Officer becomes aware thereof, give notice to Lender of:

(a)    the occurrence of any Default or Event of Default

(b)    any (i) default or event of default under any post-petition Contractual Obligation of the Borrower that could reasonably be expected to have a Material Adverse Effect or (ii) litigation, investigation or proceeding which may exist at any time between any Borrower and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)    any post-petition litigation or proceeding affecting any Borrower (i) an adverse determination in which could reasonably be expected to have a Material Adverse Effect or (ii) in which injunctive or similar relief is sought; and

(d)    any development or event which has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this subsection shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower has taken or propose to take with respect thereto.

5.5    Payment of Taxes  Except as set forth on Schedule 5.5 to this Agreement, unless not required by the Bankruptcy Code, pay and discharge all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its Properties, prior to the date on which penalties attach thereto, and all lawful claims for sums that have become due and payable which, if unpaid, might become a Lien not otherwise permitted under Section 6.2.

5.6    Approval of Exit Financing Term Sheet  Use its commercially reasonable, diligent efforts to obtain approval from the Bankruptcy Court of the Exit Financing term sheet (and related provisions referenced therein) contained as an exhibit to the DIP Term Sheet in Docket No. 535.

5.7    Cooperation with Consultants  Assist and cooperate, in all reasonable respects, with representatives of such consulting firm as may be retained by Lender (or its counsel from time to time), acting on behalf of Lender, in their review of the preparation and presentation of the financial statements and other information of the Borrower delivered to Lender pursuant hereto, and in their performance of such other tasks as directed by Lender or its counsel.

5.8    Reporting Requirements  Borrower shall provide to Lender:

(a)      Monthly operating and cash flow reports within twenty (20) days of the end of the prior month in form reasonably acceptable to Lender; and

(b)      Such additional financial or reporting information as Lender may reasonably request.

## SECTION 6

## NEGATIVE COVENANTS

For the avoidance of doubt, nothing in this Agreement shall be deemed to limit or restrict in any way Borrower's obligation to pay, or Borrower's counsel's and other professionals' rights to collect and receive, amounts paid to such counsel and/or other professionals in accordance with the terms and provisions of Borrower's budget heretofore approved by the Bankruptcy Court, as such budgeted amounts may be increased or decreased pursuant to order(s) of the Bankruptcy Court allowing fees and expenses of estate professionals (such amounts for Borrower's counsel and other professionals are collectively referred to herein as the "Professional Carve Out") and the Borrower's counsel's and other professionals' right to payment of the Professional Carve Out shall have priority in right of payment over Lender's right to payment of the Obligations hereunder and Lender's right to payment of the Obligations shall be unconditionally subordinate to Borrower's counsel's and other professionals' right to payment of the Professional Carve-Out.

6.1     Chapter 11 Claims; Payment of Pre-Petition Date Claims  Borrowers shall not incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is pari passu with or senior to the claims of Lender granted pursuant to this Agreement and the Order, except for the Carve-Out and Permitted Liens.

6.2     Use of Proceeds  Borrowers shall not (a)     use the proceeds of the Loan for purposes other than those described or contemplated herein, or (b) use any portion of the Loan, the Professional Carve-Out or the Collateral to commence or prosecute any action or objection with respect to the Superpriority Claims or Liens granted to Lender pursuant to this Agreement and the Order.

6.3     No Additional Debt  Borrower shall not occur any additional debt outside the ordinary course of business, which shall mean solely items identified in the Budget approved by the Bankruptcy Court; provided, however, any such additional debt shall be unsecured and subordinate to the DIP Loan and related liens.  Notwithstanding this provision, any advance by USB of additional indebtedness solely for Borrower's use to pay obligations that are necessary to avoid governmental liens on Collateral shall not constitute an Event of Default under this Agreement.

16

SECTION 7

EVENTS OF DEFAULT

If one or more of the following events (herein called "Events of Default") shall occur and be continuing:

(a)    The Borrower shall fail to (i) pay any principal under any Note or under this Agreement, including without limitation, pursuant to Section 2.6 hereof, when due in accordance with the terms thereof or hereof or (ii) pay any interest on any Note or under this Agreement, or any other amount payable hereunder or under any other Loan Document, within three (3) Business Days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

(b)    Any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement famished at any time under or in connection with this Agreement or any other Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)    The Borrower shall default in the observance or performance of any covenant or other agreement contained in Section 5 or Section 6 hereof and such default shall not be cured within ten (10) Business Days; or

(d)    The Borrower shall default in the observance or performance of any covenant or other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 7), and such default shall continue unremedied for a period of fifteen (15) Business Days; or

(e)    The Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a trustee or other responsible officer under Chapter 11 of the Bankruptcy Code shall be appointed in any Case; or

(f)    (i) An order of the Bankruptcy Court shall be entered granting another Superpriority Claim or Lien pari passu with or senior to that granted to Lender pursuant to this Agreement and the Order, (ii) an order of a court of competent jurisdiction shall be entered reversing, staying, vacating or rescinding the Order or (iii) an order of a court of competent jurisdiction shall be entered amending, supplementing or otherwise modifying the Order without the consent of Lender; or

(g)    The filing of any pleading by any Borrower seeking, or otherwise consenting to, any of the matters set forth in paragraphs (e) or (f); or

(h)    Any proceeding shall be commenced by the Borrower or any official committee appointed in the Case seeking, or otherwise consenting to, (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the

Obligations, or (ii) any relief under Section 506(c) of the Bankruptcy Code with respect to any Collateral; or

(i)    The Loan Documents and the Order shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to Section 364 of the Bankruptcy Code against the Borrower, or the Borrower shall so allege in any pleading filed in any court, or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower or the Borrower shall so state;

then, and in every such event and at any time thereafter during the continuance of such event and subject to the Order, Lender shall, by notice to the Borrower (with a copy to counsel for any statutory committee appointed in the Case, Deutsche Bank, USB and to the United States Trustee), take one or more of the following actions, at the same or different times: (i) declare the Loan then outstanding to be forthwith due and payable, whereupon the principal of the Loan together with accrued interest thereon and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (ii) exercise any and all remedies under this Agreement, the Order, and applicable law available to Lender.

## SECTION 8

### REMEDIES; APPLICATION OF PROCEEDS

8.1    <u>Remedies</u>  Upon the occurrence of an Event of Default arising by reason of Borrower's failure to pay in full the amounts due hereunder when such amounts become due and payable, Lender hereby acknowledges and agrees that their remedies shall be and Borrower shall proceed, as follows:

(a)    Immediately following written notice from Lender making demand upon Borrower to do so, Borrower shall commence and during the 60-day period thereafter use commercially reasonable, diligent efforts to sell to third parties those assets of Borrower described as the "First Lien " assets, other than the SAC II Collateral, on Exhibit "B" attached hereto and incorporated herein by this reference (collectively, the "<u>Unencumbered Assets</u>").  In the event that Borrower has not succeeded in selling certain of the Unencumbered Assets (collectively, the "<u>Unsold Unencumbered Assets</u>") to third parties during such 60-day period, Borrower shall expeditiously following the end of such 60-day period seek the Bankruptcy Court's agreement to oversee an auction process for the sale of any Unsold Unencumbered Assets and, if allowed by the Bankruptcy Court, pursue such auction process and conduct such auction in accordance with terms and procedures as are ordered by the Bankruptcy Court.  All Net Cash Proceeds of the Borrower's efforts to sell the Unencumbered Assets shall be credited and applied to payment of amounts outstanding under the Loan and any other outstanding Obligations until the same have been paid and satisfied in full.

(b) Immediately following written notice from Lender making demand upon Borrower to do so, Borrower shall commence and during the 60-day period thereafter use commercially reasonable, diligent efforts to sell to third parties the SAC II Collateral. In the event that Borrower has not succeeded in selling one or both of the properties constituting the SAC II Collateral (the "Unsold SAC II Collateral") to third parties during such 60-day period, Borrower shall expeditiously following the end of such 60-day period seek the Bankruptcy Court's agreement to oversee an auction process for the sale of any Unsold SAC II Collateral and, if allowed by the Bankruptcy Court, pursue such auction process and conduct such auction in accordance with terms and procedures as are ordered by the Bankruptcy Court. All Net Cash Proceeds of the Borrower's efforts to sell the SAC II Collateral shall be credited and applied to payment of amounts outstanding under the Loan and any other outstanding Obligations until the same have been paid and satisfied in full.

(c) Subject to Section 8.1(e) below, in the event that Borrower's efforts and activities pursuant to Sections 8.1(a) and (b) above yield insufficient Net Cash Proceeds to pay and satisfy in full all amounts outstanding under the Loan and any other outstanding Obligations, promptly following the conclusion of the auctions contemplated therein (or, if the Bankruptcy Court for any reason refuses to allow Borrower to conduct an auction as requested, then promptly following such date on which the Bankruptcy Court so refuses), Borrower shall make a motion to the Bankruptcy Court seeking approval of an expedited process for the sale of the real property and secured loans described as the "Third Lien" assets on Exhibit B (collectively, the "Encumbered Assets"). If such approval is granted by the Bankruptcy Court, Borrower shall use commercially reasonable efforts to conduct such sale process to conclusion in accordance with terms and procedures as are ordered by the Bankruptcy Court. All Net Cash Proceeds of the Borrower's efforts to sell the Encumbered Assets shall be credited and applied to payment of amounts outstanding under the Loan and any other outstanding Obligations until the same have been paid and satisfied in full.

(d) In the event that Borrower's efforts and activities pursuant to Sections 8.1(a) and (b) above yield insufficient Net Cash Proceeds to pay and satisfy all amounts outstanding under the Loan and any other outstanding Obligations by February 28, 2012, the Lender shall be allowed to take any actions as a secured creditor to enforce its rights under applicable non-bankruptcy law. In furtherance hereof, Borrower shall execute such further documentation as may be requested by Lender to facilitate such state law enforcement actions, and perfection of such Liens granted hereunder. The Bankruptcy Court shall maintain jurisdiction to enforce the rights and remedies contained in the Order and this Agreement.

(e) Notwithstanding the foregoing, such enforcement/application shall be subject to the terms of the Order as the same relates to (i) competing Liens on the USB Collateral, and (ii) the interrelationship of Lender's Lien and Detusche Bank's adequate protection Lien.

8.2    Application of Proceeds

(a) Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, upon the occurrence and during the continuance of an Event of

Default, any payment by the Borrower on account of principal of and interest on the Loan and any proceeds arising out of any realization (including after foreclosure or pursuant to Section 8.2 above) upon the Collateral shall be applied as follows: first, to the payment of professional fees and the payment of unpaid fees pursuant to 28 U.S.C. § 1930 and any fees payable to the Clerk of the Bankruptcy Court pursuant to the Professional Carve-Out, second, to the payment in full of all costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) paid or incurred by Lender in connection with any such realization upon the Collateral, and third, to the payment in full of the Loan (including any accrued and unpaid interest thereon, and any fees and other Obligations in respect thereof).

(b)    It is understood that the Borrower (other than as limited to SAC II and the SAC II Collateral) shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the amount of the Obligations (as a Superpriority Claim).

8.3    Remedies Cumulative  Each and every right, power and remedy hereby specifically given to Lender shall be in addition to every other right, power and remedy specifically given under this Agreement, the Order or the other Loan Documents now or hereafter existing at law or in equity, or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or, so long as not inconsistent with Lender's exercise of another remedy, simultaneously and as often and in such order as may be deemed expedient by Lender.  All such rights, powers and remedies shall be cumulative and, so long as not inconsistent with Lender's exercise of another remedy, the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others.  No delay or omission of Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein. In the event that the Lender shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Lender may recover reasonable expenses, including attorney's fees, and the amounts thereof shall be included in such judgment.

SECTION 9

RESERVED

SECTION 10

MISCELLANEOUS

10.1    Amendments and Waivers  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower shall be effective unless the same shall be in writing and signed Lender and each Borrower, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by Lender and Borrower.

20

10.2   Notices  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission or similar writing) and shall be given to such party at its address or facsimile number set forth in Schedule 10.2, or at such other address or facsimile number as such party may specify from time to time.  Each such notice, request or other communication shall be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in Schedule 10.2 and the appropriate answer-back is received, (b) if given by mail, 48 hours after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid or (c) if given by any other means, when delivered at the address specified in Schedule 10.2.

10.3   No Waiver; Remedies Cumulative  No failure or delay on the part of Lender in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between the Borrower and Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof of the exercise of any other right, power or privilege hereunder or thereunder. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which Lender would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

10.4   Survival of Representations and Warranties  All representations and warranties made herein and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Notes.

10.5   Payment of Expenses and Taxes  Each Borrower agrees (a) to pay or reimburse Lender for all its reasonable out-of-pocket costs and reasonable expenses incurred in connection with the development, preparation and execution of, any amendment, supplement or modification to, and the enforcement or preservation of any rights under, this Agreement, the Notes, the other Loan Documents, the Order and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, internal collateral auditing and monitoring expenses, the reasonable fees and disbursements of counsel to Lender  and other professionals engaged by Lender, (b) to pay or reimburse Lender for all its costs and expenses reasonably incurred in connection with the enforcement or preservation of any rights under this Agreement, the Note, the other Loan Documents, the Order and any such other documents following the occurrence and during the continuance of a Default or an Event of Default, including, without limitation, the reasonable fees and disbursements of counsel to Lender and other professionals engaged by the Lender, (c) to pay, and indemnify and hold harmless Lender from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the Notes, the other Loan Documents, the Order and any such other documents and (d) to pay, and indemnify and hold harmless Lender (and its directors, officers, employees and agents) from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits,

21

costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of this Agreement, the Notes, the other Loan Documents, the orders or the use of the proceeds of the Loan (all the foregoing in this clause (e), collectively, the "indemnified liabilities"), provided, that the Borrower shall have no obligation hereunder to Lender with respect to indemnified liabilities determined by the final judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of Lender.

10.6    Successors and Assigns  This Agreement shall be binding upon and inure to the benefit of the Borrower and Lender and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Lender.

10.7    Right of Setoff  Subject to (i) the Professional Carve-Out, and (ii) the giving of the notice as described in Section 7, notwithstanding the provisions of Section 362 of the Bankruptcy Code and any other rights and remedies of Lender now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrower or to any other Person, any such notice being hereby expressly waived, to set off any other indebtedness or other obligation at any time held or owing by Lender to or for the credit or the account of the Borrower against and on account of the Obligations of the Borrower to Lender under this Agreement or under any of the other Loan Documents, and all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

10.8    Counterparts  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

**10.9    GOVERNING LAW  THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

**10.10    SUBMISSION TO JURISDICTION; WAIVERS**

**(a)    EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM)**

JURISDICTION, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN NEW YORK, NEW YORK.

(b)    EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN CLAUSE (A) ABOVE AND ANY COUNTERCLAIM THEREIN.

10.11    _Effectiveness_  This Agreement shall become effective once (i) Lender and each Borrower shall have each signed a counterpart hereof and (ii) the Bankruptcy Court shall have entered the Order.

10.12    _Headings Descriptive_  The headings of the several Sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

10.13    _Marshalling; Recapture_  Subject to Section 8.1 above, Lender shall not be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations.  To the extent Lender receives any payment by or on behalf of the Borrower, which payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to the Borrower or its estate, trustee, receiver, custodian or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof which has been paid, reduced or satisfied by the amount so repaid shall be reinstated by the amount so repaid and shall be included within the liabilities of the Borrower to Lender as of the date such initial payment, reduction or satisfaction occurred.

10.14    _Severability_  In case any provision in or obligation under this Agreement, the Notes or the other Loan Documents shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.15    _Joint and Several Liability_  The liability of each entity comprising Borrower shall be joint and several, and, except as the context otherwise requires, each reference herein and in any other Loan Document to "Borrower" shall mean and be a reference to each Borrower.  Each entity comprising Borrower agrees that any and all of the Obligations shall be the joint and several liability of each of them notwithstanding any absence herein or in any other Loan Document of a reference such as "jointly and severally" with respect to such Obligation.

*[Remainder of page intentionally left blank]*

23

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

BORROWERS:

SPECIALTY TRUST, INC., Chapter 11
Debtor and Debtor in Possession

By:_____
    Name:
    Title:

SPECIALTY ACQUISITION CORP., Chapter 11 Debtor and Debtor in Possession

By:_____
    Name:
    Title:

SAC II, Chapter 11
Debtor and Debtor in Possession

By:_____
    Name:
    Title:

SAC D-1, LLC, Chapter 11
Debtor and Debtor in Possession

By:_____
    Name:
    Title:

<u>LENDER</u>:

NORTHLIGHT REAL ESTATE
OPPORTUNITY FUND I, LP


By:_____
    Name:
    Title:

SCHEDULE 3.3

**Prepetition Liens/Permitted Liens**

1.    Liens and security interests granted to U.S. Bank to secure the Debtors' obligations under that certain *Second Amended and Restated Credit Agreement dated as of February 1, 2010* with respect to the following Collateral:

| | |
|---|---|
| Sierra Vista | (REO) |
| Coolidge 70 | (REO) |
| Desert Quail | (1st lien loan) |
| Nadador | (1st lien loan) |
| Ecco Holdings | (1st lien loan) |
| WHM Paloma | (1st lien loan) |
| Esperanza | (1st lien loan) |
| Marina Village | (1st lien loan) |
| William Long | (1st lien loan) |
| Denver 125 | (1st lien loan) |
| Joshua Tree | (1st lien loan) |
| CIC&S | (1st lien loan) |

2.    The adequate protection liens granted to Deutsche Bank pursuant to the *Final Order (1) Authorizing Post-Petition Financing Pursuant to 11 U.S.C. sects. 105, 361, 363(c), 346(c) and (d); (2) Authorizing the Use of Cash Collateral; (3) Granting Security Interests and Superpriority Claims; (4) Modifying the Automatic Stay; and (5) Granting Related Relief* with respect to the following Collateral:

| | |
|---|---|
| Desert Quail | (1st lien loan) |
| Nadador | (1st lien loan) |
| Ecco Holdings | (1st lien loan) |
| WHM Paloma | (1st lien loan) |
| Esperanza | (1st lien loan) |
| Marina Village | (1st lien loan) |
| William Long | (1st lien loan) |
| Denver 125 | (1st lien loan) |
| Joshua Tree | (1st lien loan) |
| CIC&S | (1st lien loan) |

3.    Tax lien of the County of Maricopa, Arizona on the Central & Buchannan REO property partially owned by Specialty Trust, Inc. as joint tenant, in the amount of $270,622.26. Specialty Trust, Inc.'s portion of the tax lien is approximately ten percent (10%).

<u>SCHEDULE 3.6</u>

**Depository, Custodial and Brokerage Accounts**

| Company | Bank | Account Number |
|---|---|---|
| **TRUST ACCOUNTS** | | |
| Specialty Trust Inc Note Escrow | BANK OF THE WEST | 247028152 |
| Specialty Trust Inc Trust Acct | BANK OF THE WEST | 247027444 |
| ST - Servicing Trust Acct | BANK OF THE WEST | 247102627 |
| Specialty Trust Inc | Deutsche Bank National Trust Company | Held in Trust |
| **DIP ACCOUNTS** | | |
| Specialty Trust Inc General Account | FIRST INDEPENDENT BANK | 71023634 |
| Specialty Trust Inc Payroll Account | FIRST INDEPENDENT BANK | 71023659 |
| Specialty Trust Inc Tax Account | FIRST INDEPENDENT BANK | 71023642 |
| Specialty Acquisition Corp General Account | FIRST INDEPENDENT BANK | 71023550 |
| Specialty Acquisition Corp Payroll Account | FIRST INDEPENDENT BANK | 71023576 |
| Specialty Acquisition Corp Tax Account | FIRST INDEPENDENT BANK | 71023568 |
| Specialty Trust Inc Pledged Collateral | FIRST INDEPENDENT BANK | 71030746 |
| **(not debtors but subsidiaries of Specialty Acquisition Corp. )** | | |
| 5th and Lincoln, LLC | FIRST INDEPENDENT BANK | 71026850 |
| JFP 1330, LLC | FIRST INDEPENDENT BANK | 71026884 |
| Oak Creek Condominiums, LLC | FIRST INDEPENDENT BANK | 71026637 |

SCHEDULE 5.5

**Tax Exceptions**

**Tax lien of the County of Maricopa, Arizona, on the Central & Buchannan REO property partially owned by Specialty Trust, Inc. as joint tenant, in the amount of $270,622.26. Specialty Trust, Inc.'s portion of the tax lien is approximately ten percent (10%).**

SCHEDULE 10.2

**Notices**

If to Borrower:

Specialty Trust, Inc.
6160 Plumas Street, Suite 200
Reno, NV 89519
Attn: Nello Gonfiantini III
         Grant Lyon

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Attn: Ira Kharasch, Esq.

If to Lender:

Northlight Real Estate Opportunity Fund I, LP
c/o Northlight Financial LLC
24 West 40th Street
12th Floor
New York, New York 10018
Attn: Robert Woods

With a copy to:

Baker & Hostetler LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
Attn:   Harlan W. Robins, Esq.

With copies to Deutsche Bank:

Morgan, Lewis & Bockius LLP
300 South Grand Avenue, Suite 2200
Los Angeles, California 90071
Attn: Richard W. Esterkin, Esq.


With copies to UBS:

Squire, Sanders & Dempsey, L.L.P.
One E. Washington St., Suite 2700
Phoenix, Arizona 85004
Attn:  Jordan A. Kroop, Esq.

## FORM OF NOTE

$3,500,000.00

New York, New York
December __, 2010

FOR VALUE RECEIVED, the undersigned, Specialty Trust, Inc., a Maryland corporation ("Specialty") and Specialty Acquisition Corp. ("Acquisition"), a Delaware corporation, SAC II, a Nevada corporation and SAC D-1, LLC, a Nevada limited liability company (collectively, the "Borrower") debtors and debtors in possession in Chapter 11 bankruptcy cases jointly administered under Case No. 10-51432-GWZ in the United Stated Bankruptcy Court for the District of Nevada (collectively, the "Borrower") hereby unconditionally promises to pay to the order of Northlight Real Estate Group, LLC, a Delaware limited liability company (the "Lender") in lawful money of the United States of America and in immediately available funds on the Maturity Date, the principal amount of (a) Three Million Five Hundred Thousand and No/100 Dollars ($3,500,000), or, if less, (b) the aggregate unpaid principal portion of the Loan made by the Lender to the Borrower pursuant to Section 2.1 of the Credit Agreement, as hereinafter defined.  The Borrower further agrees to pay interest in like money on the unpaid principal amount hereof from time to time outstanding at the rates and on the dates specified in Section 2.5 of the Credit Agreement.

This Note (a) is one of the Notes referred to in the Debtor-in-Possession Term Credit and Security Agreement, dated as of December 17, 2010 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower and Lender, (b) is subject to the provisions of the Credit Agreement and is subject to optional and mandatory prepayment in whole or in part as provided in the Credit Agreement. This Note is secured as provided in the Loan Documents and the Order.  Reference is hereby made to the Loan Documents and the Order for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and the rights of the holder of this Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Credit Agreement and the Order and notwithstanding the stated Maturity Date.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

Unless otherwise defined herein, capitalized terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Lender shall not enforce the liability and obligation of SAC II under this Note by any action or proceeding wherein a monetary recovery shall be sought against SAC II, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon the SAC II Collateral (as defined in the Credit Agreement); provided, however, that, any judgment in any such action or proceeding shall be enforceable against SAC II only to the extent of SAC II's interest in the SAC II Collateral, and Lender, by accepting this Note, agrees that it shall not sue for, seek or demand any deficiency judgment against SAC II in any such action or proceeding under or by reason of or under or in connection with this Note or the other Loan Documents.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE CREDIT AGREEMENT, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AND IN ACCORDANCE WITH THE PROVISIONS OF SECTION 10.6 OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

BORROWER:

SPECIALTY TRUST, INC., Chapter 11
Debtor and Debtor in Possession


By:_____
    Name:
    Title:


SPECIALTY ACQUISITION CORP., Chapter
11 Debtor and Debtor in Possession


By:_____
    Name:
    Title:

SAC II, Chapter 11
Debtor and Debtor in Possession


By:_____
    Name:
    Title:

SAC D-1, LLC, Chapter 11
Debtor and Debtor in Possession


By:_____
    Name:
    Title:

<u>EXHIBIT B</u>

<u>DESCRIPTION OF COLLATERAL</u>

<u>SEE EXCEL SPREAD SHEET OF LENDER</u>

**EXHIBIT B - Schedule of Debtor in Possession Financing Collateral**

| Asset Name | Lien Position | Type | Collateral Description |
|---|---|---|---|
| **First Lien** | | | |
| Sedona Partners | Various | Loan | Multiple Loans securing Golf Course, Land, Fractional Interests, Clubhouse of property known as Seven Canyons in Sedona, AZ |
| Nadador LLC | Third | Loan | Fractional Interests, Partially built homes and lots located at the Residence Club within PGA West Golf Resort within the city of La Quinta, CA |
| PV Land Investments | First | Loan | 103.93 Acres located at the SEC of Thousandair Blvd. and Eberhard Rd. and the SWC of Hwy 160 and Hacker Street in the town of Pahrump, NV |
| Central & Buchanan | First/REO | Loan | 76,753 SF parcel located at the NWC Central Ave and Buchanan Street, Phoenix, AZ |
| CIC&S | Second | Loan | Apartment complex located at 232 West Street, Reno, NV doing business as Colonial Garden Apartments |
| Marina Commercial Offices | Second | Loan | Commercial condominium units and raw land located at Harbor Cove Drive, Sparks, NV |
| Conklin | Second | Loan | Single family residence located at 1608 Wheatgrass Dr., Reno, NV |
| Quarterhorse Trust | Pledge | Loan | Loan secured by 38,822 shares of Quarterhorse Trust |
| Johnson Steve | Second | Loan | Single family residence located at 7725 Portici Court, Reno, NV |
| S&T Ranch | First | Loan | Fractional interest in home located at the Residence Club within PGA West Golf Resort within the city of La Quinta, CA |
| Doug Moreau | | Loan | Commercial condominium unit located at Harbor Cove Drive, Sparks, NV |
| Vero Desert Lakes* | Mezzanine | Loan | ~1,850 acres located along the northside of Interstate 10, East of Dillon Road in the City of Coachella, CA |
| Sierra Vista | REO | REO | ~1,811 acres of vacant desert land located east of Moson Rd, north of Canada Dr and west of the San Pedro River, Sierra Vista, AZ |
| Coolidge 70 | REO | REO | ~70 acres of vacant land located at the SWC of Hwy 87 and Martin Road along the southern edge of downtown Coolidge, AZ |
| | | | |
| **Third Lien behind DB Adequate Protection Lien** | | | |
| Desert Quail | First | Loan | 4.18 acres located at 105 Reno Avenue, Las Vegas, NV and 1.79 acres located on the E/S of Las Vegas Blvd South, South of Mandalay Bay Rd, Las Vegas, NV |
| | | | |
| Nadador | First | Loan | Fractional Interests, Partially built homes and lots located at the Residence Club within PGA West Golf Resort within the city of La Quinta, CA |
| Ecco Holdings | First | Loan | 640 acres of vacant land located southeast of US 60 and North Mineral Mountain Rd, Pinal County, AZ |
| WHM Paloma | First | Loan | 855 acres of vacant land located north and south of Interstate 8 and Citrus Valley Rd, Gila Bend, AZ |
| Esperanza | First | Loan | 233 finished residential lots and 118 acres of vacant land located at Battaglia Dr and Sunshine Rd within the city of Eloy, AZ |
| Marina Village | First | Loan | Commercial condominium units and raw land located at Harbor Cove Drive, Sparks, NV |
| William Long | First | Loan | Residential lot located at 233 Sierra County Circle, Gardenville, NV |
| Denver 125 | First | Loan | ~72 acres located at 4185 Weld County Road 2, Broomfield, CO |
| Joshua Tree | First | Loan | 10 acres located on Windmill Ln, west of Edmond St., Las Vegas NV |
| CIC&S | First | Loan | Apartment complex located at 232 West Street, Reno, NV doing business as Colonial Garden Apartments |

* This lien attaches solely to that certain Subordinate Secured Non-Recourse Promissory Note dated February 1, 2009 made by Vero Desert Lakes, LLC in favor of Specialty Trust, Inc. in the original principal amount of $8,021,263.34 and does not attached to that certain Senior Secured Non-Recourse Promissory Note dated February 1, 2009 made by Vero Desert Lakes, LLC in favor of Specialty Trust, Inc. in the original principal sum of $7,500,000.00.

86662-002/DOCS_LA:223925v3

EXHIBIT C

## FORM OF CLOSING CERTIFICATE

Pursuant to Section 4.1(b) of the Debtor-in-Possession Term Credit and Security Agreement dated as of December 17, 2010 (as amended supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized termed used herein but not defined shall have the meanings assigned to them in the Credit Agreement), among Specialty Trust, Inc., a Maryland corporation, Specialty Acquisition Corp., a Delaware corporation, SAC II, a Nevada corporation and SAC D-1, LLC, a Nevada limited liability company, all debtors and debtors in possession in Chapter 11 bankruptcy cases jointly administered under Case No. 10-51432-GWZ in the United Stated Bankruptcy Court for the District of Nevada, as borrowers (collectively, the "Company") and Northlight Real Estate Group, LLC (the "Lender"), the undersigned [Secretary/Assistant Secretary/Responsible Officer] of the Company hereby certifies as follows:

1.      The representations and warranties of the Company set forth in each of the Loan Documents to which it is a party or which are contained in any certificate furnished by or on behalf of the Company pursuant to any of the Loan Documents to which it is a party are true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

2.      _____ is the duly elected and qualified Corporate Secretary/Assistant Secretary of the Company and the signature set forth for such officer below is such officer's true and genuine signature.

3.      No Default or Event of Default has occurred and is continuing as of the date hereof or after giving effect to the Loan to be made on the date hereof.

4.      The conditions precedent set forth in Section 4.1 of the Credit Agreement were satisfied as of the Closing Date. [schedule any waived conditions]

The undersigned Corporate Secretary/Assistant Secretary of the Company certifies as follows:

5.      Each entity comprising the Company is a an entity duly incorporated and validly existing under the laws of the jurisdiction of its organization.

6.      The following persons are now duly elected and qualified officers of the Company holding the offices indicated next to their respective names below, and such officers have held such offices with the Company at all times since the date indicated next to their respective titles to and including the date hereof, and the signatures appearing opposite their respective names below are the true and genuine signatures of such officers, and each of such officers is duly authorized to execute and deliver on behalf of the Company each of the Loan Documents to which it is a party and any certificate or other document to be delivered by the Company pursuant to the Loan Documents to which it is a party:

1

| Name | Office | Date | Signature |
|------|--------|------|-----------|

IN WITNESS WHEREOF, the undersigned have hereunto set our names as of the date set forth below.

| | |
|---|---|
| Name: | Name: |
| Title: | Title: |

Date: December ___, 2010

SOLICITORS, 042327, 000002, 103641733.2, CA Clean for use on order and closing

# Exhibit 2

# Exhibit 2

**Specialty Trust, Inc.**
**DIP Operating Budget**

## SPECIALTY TRUST, INC.

| | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | 7-Feb | 14-Feb | 21-Feb |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning** | | | | | | | | | | | |
| Beginning Cash Balance with BK Professional Fee Payments | $909,470 | $3,743,561 | $3,115,946 | $2,991,452 | $2,949,870 | $2,440,610 | $2,383,135 | $2,173,135 | $2,030,547 | $1,648,965 | $1,522,965 |
| Beginning Cash Balance without BK Professional Fee Payments | $909,470 | $3,987,707 | $3,852,707 | $3,778,213 | $3,736,631 | $3,610,631 | $3,560,631 | $3,350,631 | $3,259,043 | $3,266,461 | $3,140,461 |
| **Cash Receipts** | | | | | | | | | | | |
| Interest Revenue | 25,352 | | | 41,935 | | | | | 41,935 | | |
| Principal Repayments on Mortgage Loans Held for Investment | | | | 1,483 | | | | | 1,483 | | |
| Sale of Real Estate Owned | | | | | | | | | | | |
| Other Cash Receipts | 3,500,000 (1) | | | | | | | | | | |
| Total Cash Receipts | $3,525,352 | $ - | $ - | $43,418 | $ - | $ - | $ - | $ - | $43,418 | $ - | $ - |
| **Cash Disbursements** | | | | | | | | | | | |
| Payroll, Servicing Dept. | 1,000 | | 1,000 | | 1,000 | | | | 1,000 | 1,000 | |
| Management Fees paid to Specialty Financial | 150,000 (2) | | | | 125,000 (2) | | | | | | 125,000 (2) |
| Traditional Legal | 28,115 | | | | | | | | | | |
| Accounting and Tax Services | | | | | | | | | | | |
| Real Estate & Related Professionals | 42,859 (9) | | | | | | | | | | |
| Other REO & Foreclosure Expense | 105,000 (10) | | 73,494 (4) | | | | | | 35,000 (4) | | |
| Investment in Real Estate Owned and Loan fundings | | | | | | | | | | | |
| Financing Provided for Sale of REO | | | | | | | | | | | |
| Directors Fees | 96,287 (8) | | | | | | | | | | |
| DIP Interest Reserve | 200,000 (11) | | | | | | | | | | |
| DIP Lender Commitment Fee | 70,000 (12) | | | | | | | | | | |
| Interest on DIP Facility | | | | | | | | | | | |
| **Interest Expense** | | | | | | | | | | | |
| Ending Cash Balance without BK Professional Fee Payments | $3,987,707 | $3,852,707 | $3,778,213 | $3,736,631 | $3,610,631 | $3,560,631 | $3,350,631 | $3,259,043 | $3,266,461 | $3,140,461 | $3,100,461 |
| **Bankruptcy Related Expenses** | | | | | | | | | | | |
| Pachulski, Stang, Ziehl & Jones | | 210,621 (5) | | | 200,000 | | | | 200,000 | | |
| Downey Brand | | 128,398 (3) | | | 28,281 | | | | 35,000 | | |
| Imperial Capital | | | | | 55,000 | | | | 55,000 | | |
| Imperial Capital - DIP Financing Fee | | | | | | | | | | | |
| McDonald Carano & Wilson | | 153,996 (5) | | | 50,000 | | | | 50,000 | | |
| FTI | | | | | | | | | | | |
| Grant Lyon, Chief Restructuring Officer | | | 50,000 | | 50,000 | | | 50,000 | 50,000 | | |
| US Trustee Fees | | | | | | 7,475 | | | | | |
| Total Disbursements | $691,261 | $627,615 | $124,494 | $85,000 | $509,261 | $57,475 | $210,000 | $142,588 | $425,000 | $126,000 | $40,000 |
| Ending Cash Balance with BK Professional Fee's | $3,743,561 | $3,115,946 | $2,991,452 | $2,949,870 | $2,440,610 | $2,383,135 | $2,173,135 | $2,030,547 | $1,648,965 | $1,522,965 | $1,482,965 |

Notes:
(1) Gross proceeds from Debtor in Possession financing
(2) Reduced cash pay management fee.
(3) Invoiced, not yet paid.
(4) Known REO expenses and estimated Bedona expenses.
(5) Payments of 20% holdbacks on fee applications submitted through 11/3 and outstanding applications.
(6) Direct Cash Loan extension fee
(7) Anticipated due diligence fees (DIP and Exit financing).
(8) DIP interest at 7.0% paid quarterly.
(9) Appraisal and related services.
(10) Financing (fee of the largest DIP proceeds to Imperial Capital
(11) Funding of interest reserve of $200,000 per DIP Term Sheet
(12) Funding of 2.0% commitment fee to DIP Lender per DIP Term Sheet
Deferred management fee's, deferred attorney's fees and supplemental investment banker fees are not included.

No further loan advances are included.
These are expected to be in excess of $1mm by May 2011.

**Specialty Trust, Inc.**
**DIP Operating Budget**

## SPECIALTY TRUST, INC.

| | 28-Feb | 7-Mar | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr |
|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning** | | | | | | | | | |
| Beginning Cash Balance with BK Professional Fee Payments | $1,482,965 | $1,330,991 | $1,339,241 | $873,241 | $863,241 | $797,298 | $722,298 | $299,548 | $292,073 |
| Beginning Cash Balance without BK Professional Fee Payment | $3,100,461 | $2,986,487 | $3,006,737 | $2,880,737 | $2,870,737 | $2,804,794 | $2,779,794 | $2,697,044 | $2,697,044 |
| **Cash Receipts** | | | | | | | | | |
| Interest Revenue | | 41,767 | | | | | 41,767 | | |
| Principal Repayments on Mortgage Loans Held for Investment | | 1,483 | | | | | 1,483 | | |
| Sale of Real Estate Owned | | | | | | | | | |
| Other Cash Receipts | 25,974 (4) | 35,000 (4) | | | 30,000 (9) | | | | 228 (4) |
| **Total Cash Receipts** | $ - | $ 43,250 | $ - | $ - | $ - | $ - | $ 43,250 | $ - | $ - |
| **Cash Disbursements** | | | | | | | | | |
| Payroll, Servicing Dept. | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 |
| Management Fees paid to Specialty Financial | 25,000 | | 125,000 (2) | | | 25,000 | 125,000 (2) | | |
| Traditional Legal | 50,000 | | | 10,000 | | | | | |
| Accounting and Tax Services | | | | | | | | | |
| Real Estate & Related Professionals | | | | | | | | | |
| Other REO & Foreclosure Expense | | | | | 34,943 (4) | | | | |
| Investment in Real Estate Owned and Loan fundings | | | | | | | | | |
| Financing Provided for Sale of REO | | | | | | | | | |
| Directors Fees | | | | | | | | | |
| DIP Interest Reserve | | | | | | | | | |
| DIP Lender Commitment Fee | | | | | | | | | |
| Interest on DIP Facility | | | | | | | | | |
| **Interest Expense** | | | | | | | | | |
| **Ending Cash Balance without BK Professional Fee Payments** | $2,986,487 | $3,006,737 | $2,880,737 | $2,870,737 | $2,804,794 | $2,779,794 | $2,697,044 | $2,697,044 | $2,695,816 |
| **Bankruptcy Related Expenses** | | | | | | | | | |
| Pachulski, Stang, Ziehl & Jones | | | 150,000 | | | | 150,000 | | |
| Conway Brand | | | 35,000 | | | | 35,000 | | |
| Imperial Capital | | | 55,000 | | | | 55,000 | | |
| Imperial Capital - DIP Financing Fee | | | | | | | | | |
| McDonald Carano & Wilson | | 50,000 | 50,000 | | 50,000 | | 50,000 | | |
| FTI | | | 50,000 | | 50,000 | | 50,000 | | |
| Grant Lyon, Chief Restructuring Officer | 50,000 | | | | | 50,000 | | | |
| US Trustee Fees | | | | | | | | 7,475 | |
| **Total Disbursements** | $ 151,974 | $ 35,000 | $ 466,000 | $ 10,000 | $ 65,943 | $ 75,000 | $ 466,000 | $ 7,475 | $ 1,228 |
| **Ending Cash Balance with BK Professional Fee's** | $1,330,991 | $1,339,241 | $873,241 | $863,241 | $797,298 | $722,298 | $299,548 | $292,073 | $290,845 |

Notes:
(1) Gross proceeds from Debtor in Possession financing
(2) Reduced cash pay management fee
(3) Invoiced, not yet paid
(4) Known REO expenses and estimated Sedona expenses.
(5) Payments of 20% holdbacks on fee applications submitted through 11/3 and outstanding applications.
(6) Direct Costar Loan extension fee
(7) Anticipated due diligence form (DP and Exit financing)
(8) DIP Interest at 9.7% paid quarterly.
(9) Appraisals and related services
(10) Financing fee of 2.0% gross DIP proceeds to Imperial Capital
(11) Funding of interest reserve of $200,000 per DIP Term Sheet
(12) Funding of 2.0% commitment fee to DIP Lender per DIP Term Sheet
Deferred management fee & deferred attorney fees and deferred and supplemental
There are expected to be in excess of $1mm by May 2011.
No further loan advances are included.

8f589201DOCS_LA-21622v2

DIP Operating Budget.xls