| | |
|---|---|
| Ira D. Kharasch (CA Bar No. 109084)<br>Scotta E. McFarland (CA Bar No. 165391)<br>Victoria A. Newmark (CA Bar No. 183581)<br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard, 11th Floor<br>Los Angeles, California  90067-4100<br>Telephone: 310/277-6910<br>Facsimile: 310/201-0760<br>Email: *ikharasch@pszjlaw.com*<br>        *smcfarland@pszjlaw.com*<br>        vnewmark@pszjlaw.com | McDONALD CARANO WILSON LLP<br>Kaaran E. Thomas (NV Bar No. 7193)<br>Alvin J. Hicks (NV Bar No. 1178)<br>100 West Liberty Street, 10th Floor<br>Reno, Nevada 89501<br>Telephone:    (775)788-2000<br>Facsimile:    (775)788-2020<br>Email:  kthomas@mcdonaldcarano.com<br><br>*Counsel for Official Committee of Equity Security Holders* |

Sallie B. Armstrong (NV Bar No. 1243)
Michelle N. Kazmar (NV Bar No. 10098)
Downey Brand LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone: 775/329-5900
Facsimile: 775/786-5443
Email: *reno@downeybrand.com*

*Counsel for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>SPECIALTY TRUST, INC., et al.<br><br>☐ Affects this Debtor<br>☑ Affects all Debtors<br>☐ Affects Specialty Acquisition Corp.<br>☐ Affects SAC II<br>☐ Affects SAC D-1, LLC | Chapter 11<br><br>**Jointly Administered under Case No. 10-51432-GWZ**<br><br>Case Nos.<br>10-51432<br>10-51437<br>10-51440<br>10-51441<br><br>**JOINT DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS (DATED APRIL 27, 2011) AND CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS (DATED APRIL 27, 2011)** |

1155633.6

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................ 1

II. GENERAL DISCLAIMERS AND INFORMATION ...................................... 2

III. WHO MAY VOTE TO ACCEPT OR REJECT THE PLANS ....................... 4

    A.    Allowed Claims ................................................................................. 5

    B.    Allowed Interests .............................................................................. 5

    C.    Impaired Claims and Interests. ......................................................... 6

IV. VOTES NECESSARY TO CONFIRM THE PLANS .................................... 7

V. INFORMATION REGARDING VOTING IN THE CASE ............................. 8

VI. CRAMDOWN: TREATMENT OF NON-CONSENTING CLASSES ........... 10

VII. WHO MAY OBJECT TO PLAN CONFIRMATION .................................. 11

VIII.    BACKGROUND OF THE DEBTORS, THEIR BUSINESSES, EVENTS
        PRECIPITATING THEIR BANKRUPTCY FILINGS, AND SIGNIFICANT
        EVENTS IN THE CASE ................................................................... 12

    A.    Description and History of the Debtors' Businesses. ...................... 12

    B.    The Debtors' Current Management and Board of Directors. ........... 14

    C.    Description of the Debtors. .............................................................. 16

    D.    Debtors' Assets and Liabilities. ...................................................... 16

        1.    Claims Filed By Creditors .................................................... 16

            a.    The Schedules and the Bar Dates.............................. 16

            b.    Objections to Claims or Interests............................... 17

        2.    Secured Liabilities ................................................................ 18

        3.    Priority Tax Claims............................................................... 19

        4.    Unsecured Liabilities ............................................................ 19

        5.    Assets ................................................................................... 20

i

a.    Loans and Real Property ........................................................ 20

b.    Interests in Subsidiaries ........................................................ 32

c.    Potential Causes of Action..................................................... 32

E.    Significant Events of the Case. ................................................... 59

1.    Preliminary Motions and Other Early Activity in the Cases. ....................... 59

2.    Appointment of the Committee. ............................................... 60

3.    Debtor-in-Possession Financing and Use of Cash Collateral. ...................... 61

4.    Expiration of the Exclusivity Periods. ........................................... 62

5.    Existing Litigation. .......................................................... 63

a.    Pre-Petition Litigation......................................................... 63

b.    Post-Petition Litigation and FINRA Audit. ...................................... 63

c.    Retention of Claims, Causes of Action and Other Rights. ..................... 64

6.    Professionals Retained by the Estate. .......................................... 65

7.    Administrative Expenses ..................................................... 66

IX. FACTORS PERTAINING TO RECOVERY ON CLAIMS AND INTERESTS....................... 66

A.    Feasibility............................................................................ 66

B.    Liquidation Analysis / Best Interests Test ........................................ 67

C.    RISK FACTORS. ..................................................................... 70

1.    Bankruptcy Considerations................................................... 70

a.    Parties in Interest May Object to the  Classification of  Claims
and Interests. ................................................................. 70

b.    Failure to Satisfy Voting Requirements............................................. 70

c.    Failure to Secure Confirmation of Either of the Plans.......................... 71

d.   Non-Consensual Confirmation. ..................................... 71

e.   Objections to Amount or Classification of a Claim or Interest. ......... 72

f.   The Effective Date Might Not Occur. ............................... 72

2.   Other Risk Factors ........................................................... 72

a.   Recent Dislocation in the Financial Markets and Deterioration of the Mortgage Lending and Financing Industries. ........................... 72

b.   The Reorganized Debtors or the Liquidating Trust May Not be Able to Meet Post Reorganization Debt Obligations and Operational Needs. ................................................................. 72

D.   Securities Law Matters Under The Committee's Plan. ................................. 73

E.   Examination of Exit Financing Alternatives. ................................................ 78

X. SUMMARY OF DEBTORS' PLAN AND COMMITTEE'S PLAN ........................................... 78

A.   DEBTORS' PLAN OVERVIEW ...................................................... 78

B.   COMMITTEE'S PLAN OVERVIEW ................................................. 80

C.   The Post-Confirmation Business Plan Under the Plans. ............................ 80

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLANS .......... 81

XII. TAX CONSEQUENCES ............................................................... 82

A.   Tax Consequences of Debtors' Plan. .............................................. 82

B.   Tax Consequences of Committee's Plan. ....................................... 87

XIII. RECOMMENDATION AND CONCLUSION ...................................................... 91

1155633.6

# LIST OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION |
|:---:|:---|
| 1 | Debtors' Financial Projections |
| 2 | Committee's Financial Projections |
| 3 | Liquidation Analysis |
| 4 | Debtors' Plan Summary |
| 5 | Committee's Plan Summary |
| 6 | Comparison of Debtors' Plan and Committee's Plan |

**JOINT DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CHAPTER 11
PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS (DATED APRIL 27, 2011)
AND CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS
(DATED APRIL 27, 2011)[1]**

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE ADEQUATE INFORMATION TO ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF THE HOLDERS OF CLAIMS OR INTERESTS IN THE CASE TO MAKE AN INFORMED JUDGMENT ABOUT THE TWO PROPOSED PLANS.

[THIS DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED UNDER LOCAL RULE 3017 AS PROVIDING ADEQUATE INFORMATION PURSUANT TO BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PROPOSED PLANS OF REORGANIZATION DESCRIBED HEREIN. THE COURT HAS NOT YET DETERMINED WHETHER THE PLANS MEET THE LEGAL REQUIREMENTS FOR CONFIRMATION, AND THE FACT THAT THE COURT HAS APPROVED THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF THE PLANS BY THE COURT, OR A RECOMMENDATION THAT EITHER OF THE PLANS BE ACCEPTED. THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT IS SUBJECT TO FINAL APPROVAL AT THE HEARING ON CONFIRMATION OF THE PLANS. OBJECTIONS TO THE ADEQUACY OF THIS DISCLOSURE STATEMENT MAY BE FILED UNTIL MAY 23, 2011.]

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plans. Once confirmed, whichever Plan is confirmed is the legally binding document regarding the treatment of Claims and Interests and the terms and conditions of the Debtors' reorganization. Accordingly, to the extent that there is any inconsistency between the terms contained herein and those contained in the confirmed Plan, the terms of the confirmed Plan will govern.

1155633.6

## SUMMARY INFORMATION

| | |
|---|---|
| **Debtors:** | Specialty Trust Inc.; Specialty Acquisition Corp.; SAC II; and SAC D-1, LLC ("Debtors") |
| **Recommendation:** | **The Debtors recommend that you vote in favor of their Plan. The Committee recommends that you vote in favor of its Plan. However, you may vote to accept (or reject) both Plans. If you accept both Plans, you may indicate whether you prefer the Debtors' Plan or the Committee's Plan.** |
| **Vote Required to Accept the Plan:** | Acceptance of a plan by a Class of Creditors requires the affirmative vote of two-thirds in amount and a majority in number of the Allowed Claims actually voted in such Class. |
| | Generally, only entities that hold Allowed Claims in the Classes designated as impaired under a plan and that are to receive or retain property under a plan on account of their Allowed Claims are entitled to vote. |
| **Requirements for Shareholder vote:** | A class of interests has accepted a plan if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, that have accepted or rejected this plan. |
| | If any impaired Class votes to reject a plan, the Court nevertheless may confirm that plan if the "cramdown" requirements of Bankruptcy Code section 1129(b) are satisfied with respect to such Class, provided that the other requirements for confirmation under Bankruptcy Code section 1129 have been satisfied. |
| **Voting Information:** | If you are entitled to vote, you should have received a ballot with this Disclosure Statement ("Ballot"). After completing and signing your Ballot, you should return it to the following (the "Ballot Tabulator"): |
| | Lawrence Taylor<br>Specialty Trust Inc., Ballot Tabulator<br>Odyssey Capital Group<br>Two North Central Avenue, Suite 720<br>Phoenix, AZ 85004<br>Facsimile Number: (602) 257-8600<br>Email: ltaylor@odycap.com |
| | For your Ballot to be counted, the Ballot Tabulator must receive it no later than **6:00 p.m., Pacific Time, on Monday, May 23, 2011** (the "Ballot Deadline"). |
| **Confirmation Hearing:** | The Confirmation Hearing will be held on **June 3, 2011 at 2:00 p.m.** The Confirmation Hearing may be continued from time to time without further notice. |
| **Treatment of Claims and Interests:** | The treatment that Creditors and Shareholders will receive if the Court confirms the Debtors' Plan is set forth in the Debtors' Plan and summarized in Exhibit 4 attached to this Disclosure Statement. |
| | The treatment that Creditors and Shareholders will receive if the Court confirms the Committee's Plan is set forth in the Committee's Plan and summarized in Exhibit 5 attached to this Disclosure Statement. |

1155633.6

The terms of the Plans are controlling, and all Creditors, Shareholders and interested parties are urged to read the Plans in their entirety.

The Effective Date:

The Effective Date of the Debtors' Plan will be the first Business Day on which all of the conditions set forth in Section IV.I of the Debtors' Plan have been satisfied or waived in accordance with Debtors' Plan.

The Effective Date under the Committee's Plan will be the first Business Day on which all of the conditions set forth in the Committee's Plan have been satisfied or waived in accordance with Committee's Plan.

Questions:

All inquiries about the Plans and Disclosure Statement should be in writing, which includes written email communication, and should be sent to:

For questions regarding the Debtors' Plan:

Victoria A. Newmark, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067-4100
(310) 277-6910
vnewmark@pszjlaw.com

For questions regarding the Committee's Plan:

Kaaran E. Thomas, Esq.
McDonald Carano Wilson LLP
P.O. Box 2670
Reno, NV 89505-2670
(775) 788-2000
kthomas@mcdonaldcarano.com

IMPORTANT NOTICE:

**THE PLANS, DISCLOSURE STATEMENT, DEBTORS' PLAN SUPPLEMENT AND BALLOTS CONTAIN IMPORTANT INFORMATION THAT IS NOT INCLUDED IN THIS SUMMARY. THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS. YOU SHOULD THEREFORE READ THE PLANS, THE DISCLOSURE STATEMENT, THE DEBTORS' PLAN SUPPLEMENT AND BALLOTS IN THEIR ENTIRETY. YOU ALSO SHOULD CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLANS.**

1155633.6

**THE DEBTORS AND COMMITTEE URGE YOU TO READ THIS DOCUMENT CAREFULLY.**

## I.

## INTRODUCTION

The Debtors filed voluntary petitions for relief under the Bankruptcy Code on the Petition Date, thereby commencing the Cases.   The Cases are pending before the Court, and are being jointly administered under case number BK-N-10-51432-GWZ.   Pursuant to Bankruptcy Code sections 1107 and 1108, the Debtors are operating their respective businesses and managing their affairs as debtors in possession.

The Debtors are the proponents of the *First Amended Plan of Reorganization Proposed by the Debtors (Dated April 27, 2011)* (the "Debtors' Plan').  The Committee is the proponent of the *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders (Dated April 27, 2011)* (the "Committee's Plan," and together with Debtors' Plan, the "Plans"). **THE DOCUMENT THAT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ACCOMPANYING PLANS.**  The Plans set forth the alternative manners in which the Claims against, and Interests in, the Debtors will be treated following the Debtors' emergence from chapter 11.  This Disclosure Statement describes certain aspects of the Plans, the Debtors' current and future business operations, including, but not limited to, the proposed reorganization of the Debtors, and other related matters.  Under both Plans, ST will liquidate its assets to generate cash for distribution as provided in the Plans, rather than attempting to continue to operate indefinitely as a going concern.

**FOR A COMPLETE UNDERSTANDING OF THE PLANS, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLANS, THE DEBTORS' PLAN SUPPLEMENT AND THE EXHIBITS TO ALL DOCUMENTS IN THEIR ENTIRETY.**

This Disclosure Statement sets forth the assumptions underlying the Plans, describes the process that the Court will follow when determining whether to confirm either of the Plans, and describes how the Plans will be implemented if one of the Plans is confirmed by the Court. Bankruptcy Code section 1125 requires that a disclosure statement contain "adequate information"

1  concerning a plan of reorganization.  11 U.S.C. § 1125(a).  This Disclosure Statement has been

2  conditionally approved by the Court.  However, the Court's approval of this Disclosure Statement is

3  subject to final approval at the hearing on confirmation of the Plans.  Objections to the adequacy of

4  this Disclosure Statement may be filed until May 23, 2011.  The Court's conditional approval of the

5  adequacy of this Disclosure Statement does not constitute a determination by the Court with respect

6  to the fairness or the merits of the Plans or the accuracy or completeness of the information

7  contained in the Plans or Disclosure Statement.

8    **THE COURT HAS NOT YET CONFIRMED EITHER OF THE PLANS DESCRIBED**

9  **IN THIS DISCLOSURE STATEMENT.  THEREFORE, NONE OF THE PLANS' TERMS**

10  **ARE BINDING ON ANYONE.  IF THE COURT LATER CONFIRMS EITHER OF THE**

11  **PLANS AND THE EFFECTIVE DATE OCCURS, THEN THE CONFIRMED PLAN WILL**

12  **BE BINDING ON THE DEBTORS AND ON ALL PARTIES IN INTEREST IN THESE**

13  **CASES, INCLUDING CREDITORS AND INTEREST HOLDERS OF THE DEBTORS.**

14    The Debtors believe that the Debtors' Plan provides, under the circumstances, the best

15  possible recoveries to the Creditors and that acceptance of the Debtors' Plan is in the best interests of

16  all parties in interest including the Shareholders.  The Debtors therefore recommend that all

17  Creditors and Shareholders entitled to vote cast their ballots to accept the Debtors' Plan.

18    The Committee believes that the Committee's Plan provides, under the circumstances, the

19  best possible recoveries to the Creditors and that acceptance of the Committee's Plan is in the best

20  interests of all parties in interest including the Shareholders.  The Committee therefore recommends

21  that all Creditors and Shareholders entitled to vote cast their ballots to accept the Committee's Plan.

22    Creditors and Shareholders entitled to vote are permitted to vote to accept or reject both

23  Plans.  If a Creditor or Shareholder votes to accept both Plans, the Creditor or Shareholder may

24  indicate whether the Debtors' Plan or the Committee's Plan is preferred.

25                                                    **II.**

26                        **GENERAL DISCLAIMERS AND INFORMATION**

27    Please carefully read this document and the exhibits to this document.  These documents

28  explain who is entitled to vote to accept or reject the Plans, who may object to confirmation of the

Plans, and the treatment that Creditors and Shareholders can expect to receive if the Court confirms one of the Plans. The Disclosure Statement also describes the history of the Debtors, the events precipitating the Cases, events in the Cases, the effect of confirmation of either of the Plans, and some of the issues the Court may consider in deciding whether to confirm either of the Plans. **The statements and information contained in the Plans and Disclosure Statement, however, do not constitute financial or legal advice. You should therefore consult your own advisors if you have questions about the impact of the Plans on your Claims or Interests.**

The financial information contained in the Plans and Disclosure Statement was prepared from information in the Debtors' books and records and is the sole responsibility of the Debtors and/or their affiliates. The Debtors' and the Committee's professionals and financial advisors have prepared the Plans and Disclosure Statement with information from, among other sources, Specialty Financial Corp. ("SFC"), a company that provides management and administrative services to the Debtors. The Debtors' and the Committee's professionals and financial advisors have not independently verified this information.

The statements and information that concern the Debtors set forth in this document constitute the only statements and information that the Court has conditionally approved for the purpose of soliciting votes to accept or reject the Plans. Therefore, no statements or information that are inconsistent with anything contained in this Disclosure Statement have been approved by the Court for the purpose of soliciting votes to accept or reject the Plans unless otherwise ordered by the Court.

**You may not rely on the Plans and Disclosure Statement for any purpose other than to determine whether to vote to accept or reject either of the Plans. Nothing contained in the Plans or Disclosure Statement constitutes an admission of any fact or liability by any party, or may be deemed to constitute evidence of, the tax or other legal effects that the reorganization set forth in the Plans may have on entities holding Claims or Interests.**

Unless another time is expressly specified in this Disclosure Statement, all statements contained in this document are made as of April 27, 2011. Under no circumstances will the delivery of this Disclosure Statement, or the exchange of any rights made in connection with the Plans, create an implication or representation that there has been no subsequent change in the information

1  included in this document.  Unless otherwise specifically stated herein, the Debtors and the

2  Committee assume no duty to update or supplement any of the information contained in this

3  document, and they do not intend to undertake any such update or supplement.

4       **CAUTIONARY STATEMENT:**  Some statements in this document may constitute

5  forward-looking statements within the meaning of the Securities Act of 1933 (as amended, the

6  "Securities Act") and the Securities Exchange Act of 1934 (as amended, the "Exchange Act").  Such

7  statements are based upon information available when the statements were made and are subject to

8  risks and uncertainties that could cause actual results to materially differ from those expressed in the

9  statements.  Neither the Securities and Exchange Commission (the "SEC") nor any state securities

10  commission has approved or disapproved the Disclosure Statement, the Plans, or any exhibits to any

11  of the documents.

12                                            **III.**

13                    **WHO MAY VOTE TO ACCEPT OR REJECT THE PLANS**

14       What follows in this Section III[2] is a general discussion of the rules governing the treatment

15  and satisfaction of Claims and equity interests (shares) under a plan of reorganization proposed

16  under the Bankruptcy Code.  Where a particular word (such as "Debtor") or term (such as "Allowed

17  Claim") is capitalized in this Disclosure Statement, and not otherwise defined herein, that word or

18  phrase has the meaning provided in Section I.A. of the Plans.  Where, however, a particular word

19  (such as "debtor") or phrase (such as "allowed claim") is not capitalized in this Disclosure Statement,

20  that word or phrase is not intended to refer to the definitions provided in Section I.A of the Plans, but

21  rather, the word or phrase is intended to have the general meaning ascribed to it.

22       Generally, to vote to accept or reject either of the Plans, your Claim or Interest must be:

23  (a) Impaired; (b) neither  Disputed nor Disallowed; and (c) entitled to receive or retain some value

24  under the Plans.  Holders of Unimpaired Claims are deemed to have accepted the Plans and do not

25  vote, though they may object to plan confirmation to the extent they otherwise have standing to do

26  so.  Holders of Claims and/or Interests that do not receive or retain any value under the Plans are

27

28  _____

[2]    Unless otherwise indicated, "Section" references are to sections of this Disclosure Statement.

deemed to reject the Plans.

**A.**    **Allowed Claims**

     With the exceptions explained below, under the Bankruptcy Code, a Claim generally is allowed only if a proof of the Claim is properly filed before any applicable bar date, and either no party in interest has objected to, or the Court has entered an order allowing the Claim.  Under certain circumstances a Creditor may have an allowed Claim even if a proof of Claim was not filed and the applicable bar date for filing a proof of Claim has passed.  For example, a Claim may be deemed allowed if the Claim is listed on a debtor's schedules of liabilities and is not scheduled as disputed, contingent, or unliquidated.

     A Claim must be an Allowed Claim for purposes of voting for the holder of such Claim to have the right to vote to accept or reject the Plans.  Generally, for voting purposes, a Claim is deemed Allowed to the extent that:  (a) with respect to a Claim arising prior to the Petition Date (1) either (i) a proof of Claim was timely filed; or (ii) a proof of Claim is deemed timely filed either under Bankruptcy Rule 3003(b) or by a Final Order; and (2) either (i) the Claim is neither a Disputed Claim nor a Disallowed Claim, or (ii) the Claim is allowed either by a Final Order or under the Plan, and (b) with respect to a Claim arising on or after the Petition Date, a Claim that has been allowed pursuant to Section II.B of the Debtors' Plan or Section II.B. of the Committee's Plan.

     Under the Plans, an entity whose Claim is subject to an objection is not eligible to vote to accept or reject the Plans unless that objection has been resolved in the entity's favor prior to the Ballot Deadline, or, after notice and a hearing under Bankruptcy Rule 3018(a), the Court temporarily allows the entity's Claim for the purpose of voting to accept or reject either or both of the Plans.  Any entity that seeks temporary allowance of its Claim for voting purposes must promptly File an appropriate motion and take the steps necessary to arrange an appropriate and timely hearing with the Court no later than seven (7) days prior to the Confirmation Hearing (*i.e.*, no later than May 27, 2011).  The Debtors and the Committee will consent to a hearing on such a motion on shortened time.

**B.**    **Allowed Interests**

     As of the date of filing this Disclosure Statement, the Court has not established a bar date for

1    Shareholders to file "Proofs of Interest" to verify their ownership of shares of ST. An Interest must

2    be an Allowed Interest for purposes of voting for the holder of such Interest to have the right to vote

3    to accept or reject either of the Plans. Generally, for voting purposes, an Interest is deemed Allowed

4    to the extent that: (a) either (1) a proof of Interest was timely filed; or (2) a proof of Interest is

5    deemed timely filed either under Bankruptcy Rule 3003(b) or by a Final Order; and (b) either (1) the

6    Interest is neither a Disputed Interest nor a Disallowed Interest, or (2) the Interest is allowed either

7    by a Final Order or under the Plan. If it is determined that Shareholders must file Proofs of Interest

8    in order to have "Allowed Interests" the Committee will mail notices of this requirement to the

9    shareholders listed in ST's records.

10         Under the Plans, an entity whose Interest is subject to an objection is not eligible to vote to

11    accept or reject the Plans unless that objection has been resolved in the entity's favor prior to the

12    Ballot Deadline, or, after notice and a hearing under Bankruptcy Rule 3018(a), the Court temporarily

13    allows the entity's Interest for the purpose of voting to accept or reject the Plans. Any entity that

14    seeks temporary allowance of its Interest for voting purposes must promptly File an appropriate

15    motion and take the steps necessary to arrange an appropriate and timely hearing with the Court no

16    later than seven (7) days prior to the Confirmation Hearing (*i.e.*, no later than May 27, 2011). The

17    Debtors and the Committee will consent to a hearing on such a motion on shortened time.

18    **C.**    **Impaired Claims and Interests**

19         Generally speaking, under the Bankruptcy Code, a class of Claims or Interests is impaired if

20    the plan alters the legal, equitable, or contractual rights of the members of the class, even if the

21    alteration is beneficial to the Creditors or Interest holders. A plan's failure to provide a Creditor with

22    an accelerated payment pursuant to a contract provision that entitles a Creditor to accelerated

23    payment upon default, however, does not necessarily render such Creditor's Claim impaired, even if

24    the debtor defaulted. Instead, the Claim is deemed unimpaired if, for example, the plan cures the

25    default, reinstates the maturity of the Claim as it existed before the default, and compensates the

26    creditor for any damages incurred as a result of reasonable reliance upon the acceleration provision.

27    Section II.C of the Debtors' Plan, and Section II.C of the Committee's Plan set forth a summary of

28    the classification of all Claims and Interests under the Plans and whether or not they are impaired.

## IV.

## **VOTES NECESSARY TO CONFIRM THE PLANS**

Under the Bankruptcy Code, impaired claims or interests are placed in classes under a plan, and each class must accept (or reject) that plan as a class. Certain types of claims are considered unimpaired and are not classified because the Bankruptcy Code requires that they be treated a specific way.

Under the Bankruptcy Code, the Court may confirm a plan if at least one class of impaired claims or interests has voted to accept that plan (for this purpose, without counting the votes of any insiders whose claims or interests are classified within that class) and if certain statutory requirements are met both as to any non-consenting members within a consenting class and as to any dissenting classes. A Class of Claims has accepted the plan only when at least a majority in number and at least two-thirds in amount of the Allowed Claims actually voting in that class vote to accept the plan. A Class of Interests has accepted the plan only when the holders of at least two-thirds in amount of the Allowed Interests actually voting in that class vote to accept the plan.

Even if the Debtors and/or Committee receive the requisite number of votes to confirm either of the proposed Plans, neither of those Plans will become binding unless and until, among other things, the Court makes an independent determination that confirmation is appropriate.[3] This determination will be the subject of the Confirmation Hearing. Also, even if only one Class of the Debtors' Creditors votes to accept either of the Plans, that Plan nonetheless may be confirmed if the dissenting Classes (and non-consenting members within a consenting Class) are treated in a manner prescribed by the Bankruptcy Code. The Plans contain mechanisms providing alternative treatment to certain Classes in the event that certain Classes reject the Plans in order to ensure that the Plans may nevertheless be confirmed.

In the event that the Court determines that both the Debtors' Plan and the Committee's Plan satisfy the requirements of confirmation, the Court will determine which of the two Plans it wishes

---

[3] *See* Section IV.I of the Debtors' Plan for a discussion of the various other conditions to confirmation and effectiveness of the Debtors' Plan. *See* Section V.E. of the Committee's Plan for a discussion of the various other conditions to confirmation and effectiveness of the Committee's Plan.

1  to confirm. Among other things, the Court may consider the wishes of parties voting upon the Plans

2  in making that determination. Accordingly, the plan ballot that accompanies this Disclosure

3  Statement contains a section in which you may express your preference for the Debtors' Plan or the

4  Committee's Plan, and you are urged to complete that section of the ballot, in addition to voting on

5  whether to accept one or both of the Plans.

6  **V.**

7  **INFORMATION REGARDING VOTING IN THE CASES**

8  The Debtors believe that the Classes designated as "Impaired" in Section II.C of the Debtors'

9  Plan are impaired pursuant to Bankruptcy Code section 1124. The Committee believes that the

10  Classes designated as "Impaired" in Section II.C. of the Committee's Plan are impaired pursuant to

11  Bankruptcy Code section 1124. If the holders of Claims or Interests in these Classes are to receive

12  or retain property under the Plans on account of their Claims or Interests, then the holders of such

13  Claims or Interests are entitled to vote to accept or reject the Plans except to the extent such holders

14  hold Disputed Claims or Interests (unless their Claims or Interests are temporarily allowed for

15  voting), or Disallowed Claims or Interests. If the holders of Claims or Interests in these Classes are

16  not entitled to receive or retain property under the Plans on account of their Claims, then the holders

17  of such Claims or Interests are not entitled to vote as a matter of law.

18  The Debtors believe that the Classes designated as "Unimpaired" in the Debtors' Plan are

19  unimpaired pursuant to Bankruptcy Code section 1124. The Committee believes that the Classes

20  designated as "Unimpaired" in the Committee's Plan are unimpaired pursuant to Bankruptcy Code

21  section 1124. The holders of Claims or Interests in these Classes are not entitled to vote.

22  In addition to the foregoing Classes, entities holding Administrative Claims and Priority Tax

23  Claims are not classified and are not entitled to vote to accept or reject the Plans.

24  Any party that disputes the characterization of its Claim or Interest as unimpaired may

25  request a finding of impairment from the Court to obtain the right to vote, but such party must

26  promptly take action to request such a finding and arrange for the Court to hold a hearing and

27  adjudicate such request no later than seven (7) days prior to the Confirmation Hearing (*i.e.*, no later

28  than May 27, 2011). The Debtors and the Committee will consent to a hearing on such a motion on

shortened time.

Please use only the Ballot sent to you with this Disclosure Statement when you vote, and carefully read the voting instructions on the Ballot for an explanation of the applicable voting procedures and deadlines. If, after reviewing this Disclosure Statement, you believe that you hold an impaired Claim or Interest and that you are entitled to vote to accept or reject the Plans but you did not receive a Ballot, you did not receive the correct Ballot, or your Ballot is damaged or lost, please send a written request for a Ballot to the Ballot Tabulator at the following address:

Lawrence Taylor
Specialty Trust Inc.,  Ballot Tabulator
Odyssey Capital Group
Two North Central Avenue, Suite 720
Phoenix, AZ 85004
Facsimile Number:  (602) 257-8600
Email:  ltaylor@odycap.com

**If you wish to vote to accept or reject the Plans, your Ballot must be received by the Ballot Tabulator, at the address listed above, no later than the date set by the Court in the Notice that accompanies this Disclosure Statement, which is 6:00 p.m., Pacific Time, on Monday, May 23, 2011.** If your Ballot is not **timely received** by the Ballot Tabulator, it will not be counted. Ballots must be provided to the Ballot Tabulator by mail, overnight delivery, messenger, facsimile or e-mail.

Any interested party desiring further information with respect to the Plans, or seeking additional copies of this document, should contact in writing, which includes written email communication, the following:

For questions concerning the Debtors' Plan:

Victoria A. Newmark, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067-4100
vnewmark@pszjlaw.com

///

///

///

For questions concerning the Committee's Plan:

Kaaran E. Thomas, Esq.
McDonald Carano Wilson LLP
PO Box 2670
Reno, NV 89505-2670
kthomas@mcdonaldcarano.com

The cost of additional copies must be paid by the person ordering them. Alternatively, all pleadings and other papers filed in the Case may be obtained for a fee by accessing the Court's PACER system through the website of the United States Court for the District of Nevada (http://www.nvb.uscourts.gov). Copies of certain material pleadings are also available for free by accessing the Committee's webpage which is maintained by its counsel, McDonald Carano Wilson LLP. The Committee's webpage is accessible by going to the "Specialty Trust" link on the law firm's home page which is accessible at http:www.mcdonaldcarano.com.

## VI.

## CRAMDOWN: TREATMENT OF NON-CONSENTING CLASSES

Even if only one class consents to the proposed treatment in that class under a plan, that plan nonetheless may be confirmed if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code. The process by which a dissenting class is forced to abide by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Code allows a dissenting class to be crammed down if the plan does not "discriminate unfairly" and is "fair and equitable." The Bankruptcy Code does not define unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment. For a class of Secured Claims, "fair and equitable" can mean that the secured claimants retain their liens and receive deferred cash payments, the present value of which equals the value of their Interests in collateral. For a class of unsecured Claims, a plan is fair and equitable if the Claims in that class receive value equal to the allowed amount of the Claims, or, if the unsecured Claims are not fully satisfied, no Claims or Interests that are junior to such Claims receive or retain anything under the plan. Accordingly, if a class of unsecured Claims rejects a plan under which a junior class (*e.g.*, a class of Interest holders) will receive or retain any property under the plan, the plan generally cannot be confirmed unless the plan provides that the dissenting class of unsecured Creditors

1    receives value equal to the allowed amount of the Claims in that class.[4]

## VII.

## WHO MAY OBJECT TO PLAN CONFIRMATION

A hearing has been scheduled for **June 3, 2011** at **2:00 p.m.** (Pacific time) at the United States Bankruptcy Court, 300 Booth Street, Reno, Nevada 89509, to determine whether the Court will confirm either of the Plans.  If, after tabulating the Ballots, it appears that entities holding a sufficient number and amount of Claims and Interests have voted to accept either of the Plans, the Debtors and/or the Committee, as applicable, will file a memorandum of points and authorities supporting the entry of the Confirmation Order.  This memorandum will be served on Debtors and their counsel, the U.S. Trustee, counsel for the Committee, all entities that have requested special notice in the Cases, and all parties that have timely objected to confirmation of the Plans.

Any party in interest in the Cases—including any Creditor or Shareholder that voted (or was deemed to have voted) to accept or reject the Plan—may file an objection to confirmation of the Plans assuming such party has standing to do so.  Any such objection must be filed and served on the Debtors and their counsel; the U.S. Trustee; and counsel for the Committee by the date set by the Court in the Notice that accompanies this Disclosure Statement, which is May 23, 2011.  **If you fail to properly and timely file an objection to confirmation, you may be deemed to have consented to confirmation.**  If you wish to obtain more information, you should contact in writing, which includes written email communication:

For information regarding the Debtors' Plan:

Victoria A. Newmark, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067-4100
vnewmark@pszjlaw.com

///

///

---

[4]    This paragraph does not purport to explain fully the applicable statutes or case law, which are complex.

For information regarding the Committee's Plan:

Kaaran Thomas, Esq.
McDonald Carano Wilson LLP
PO Box 2670
Reno, NV 89505-2670
kthomas@mcdonaldcarano.com

**VIII.**

## BACKGROUND OF THE DEBTORS, THEIR BUSINESSES, EVENTS PRECIPITATING THEIR BANKRUPTCY FILINGS, AND SIGNIFICANT EVENTS IN THE CASE

**A.    Description and History of the Debtors' Businesses**

ST is a privately held Maryland corporation that acquires and holds, in a tax-advantaged real estate investment trust structure (a "REIT"), mortgage loans and mezzanine loans secured by real property located primarily in Nevada, Arizona and California, and interests in entities owning real estate that was acquired through foreclosure of mortgage loans made by ST and mezzanine loans. Mezzanine loans are loans secured by pledges of the stock or membership interests of entities, which in the case of the mezzanine loans held by ST, own or have the right to own real estate.   Nello Gonfiantini III ("Mr. Gonfiantini") founded ST in 1997. The stock of ST is held by approximately 435 Shareholders, most of whom are individuals, family trusts, or local businesses' pension and profit sharing plans. The total capital invested by the Shareholders in ST is approximately $170 million.

Loans were generally made by ST at what ST believed to be low loan-to-value ratios, usually 50% or less. Most values were based upon appraisals by certified appraisers. Most loans have terms of one to three years. The majority of ST's mortgage loan balances are secured by first deeds of trust on the underlying real property, with the remaining mortgage loan balances secured by junior liens. ST's mortgage loans may be secured by mortgages on unimproved as well as improved real property and non-income producing as well as income producing real property. ST's mezzanine  loans  are generally  secured by pledges of the stock or membership interests of a borrowing entity whose primary asset consists of real estate.

ST currently holds loans with a total amount owing from its borrowers of approximately

$167 million, but expects that its actual recoveries on those loans will be substantially less than that amount. ST also owns outright or through its subsidiaries REO property (property obtained through foreclosures or similar actions from its loan portfolio). Approximately 94% of these REO properties are held by one of the three debtor subsidiaries of ST, which are SAC, SAC II, and SAC D-1. SAC and SAC II are wholly owned subsidiaries of ST, and SAC D-1 is a wholly owned subsidiary of SAC. The Debtors' appraisals of the real estate securing its loans (directly, or, in the case of the mezzanine loans, indirectly) are dated. The Debtors' projections of the results of its liquidation are attached as Exhibit 1 to this Disclosure Statement. The valuations used in those projections were arrived at by management with consultation from its investment banker, based on its views of the marketplace, a number of assumptions with regard to the future performance of the Debtors, the real estate markets generally in which the Debtors operate, certain third party appraisals, and recent broker's opinion of value. The valuations used to prepare each of the Debtors' base case projections do not exceed the values set forth in any appraisals that were consulted for the purpose of arriving at those valuations, but do exceed most of the broker's opinion of value, which opinions were provided by Northlight, so the Debtors do not give those much credibility.

ST works in conjunction with three non-debtor affiliated entities that provide primary management, operational, and administrative services to ST. These entities include SFC, which is responsible for ST's day-to-day management and operations, Specialty Mortgage Corp. ("Specialty Mortgage"), which originates and services certain of ST's real estate loans, and Specialty Capital, LLC ("Specialty Capital"), a registered broker/dealer providing brokerage services to individual and institutional customers. Mr. Gonfiantini owns and controls, directly or indirectly, 100% of the ownership interest in each of these entities.

In return for various management fees, SFC manages and runs Debtors' day-to-day business operations, including the retention and payment of the individuals that manage and operate Debtors' business operations and the payment of the rent and utilities on the building occupied by Debtors. As part of its general management duties, SFC evaluates prospective real estate loans, generates loan originations, and manages the loan and asset portfolio of Debtors. This general management arrangement is fairly typical in a REIT structure, and has been in place between ST and SFC, or

SFC's predecessor, for approximately 12 years.

The real estate finance industry experienced a sharp contraction commencing in 2007, when the national real estate market essentially collapsed. Overall, there have been escalating rates of foreclosures on properties and many REITs, mortgage finance companies, and real estate lenders have been forced to curtail or close operations. All players within ST's target regions have been adversely affected by the economic crisis, leaving a considerable void in these markets.

ST experienced a significant decline in the value of its real estate loan portfolios in 2008 and 2009, while Debtors' REO portfolio increased by a significant amount due to the addition of a number of REO properties acquired through foreclosure.

Despite extensive and long-term negotiations with ST's primary lenders ( US Bank, as agent for three participating banks), ST was unable to negotiate a restructuring of its financial obligations to these lenders in a fashion that would provide the flexibility and requisite liquidity needed to get through the difficult economic environment. In light of a pending default under the US Bank loan that would have occurred on April 20, 2010 and which would have given US Bank the ability to sweep all of ST's cash,  Debtors were forced to file these Cases.

**B.**   **The Debtors' Current Management and Board of Directors**

The following individuals currently manage the Debtors:

ST

- Chief Restructuring Officer:
  - G. Grant Lyon,  as approved by this Court's October 4, 2010, *Order Authorizing Employment and Retention of G. Grant Lyon as Chief Restructuring Officer* [Docket No. 419].
- Directors:
  - Nello Gonfiantini, III;
  - Stephen V. Novacek;
  - Ernest Martinelli;
  - Nazir Ansari;
  - Harvey Fennell; and

1          o  Mike Mines.

2  • Officers:

3          o  Nello Gonfiantini III, President and Treasurer; and

4          o  Grace C. Caudill, Secretary.

5  <u>SAC</u>

6  • Chief Restructuring Officer:

7          o  G. Grant Lyon,  as approved by this Court's October 4, 2010, *Order Authorizing*

8             *Employment and Retention of G. Grant Lyon as Chief Restructuring Officer*

9             [Docket No. 419].

10  • Directors:

11          o  Nello Gonfiantini III; and

12          o  Stephen V. Novacek.

13  • Officers:

14          o  Nello Gonfiantini III, President and Treasurer.

15  <u>SAC II</u>

16  • Chief Restructuring Officer:

17          o  G. Grant Lyon,  as approved by this Court's October 4, 2010, *Order Authorizing*

18             *Employment and Retention of G. Grant Lyon as Chief Restructuring Officer* [Docket

19             No. 419].

20  • Directors:

21          o  Nello Gonfiantini III; and

22          o  Stephen V. Novacek.

23  • Officers:

24          o  Nello Gonfiantini III, President and Treasurer.

25  <u>SAC D-1</u>

26  • Chief Restructuring Officer:

27          o  G. Grant Lyon,  as approved by this Court's October 4, 2010, *Order Authorizing*

28             *Employment and Retention of G. Grant Lyon as Chief Restructuring Officer* [Docket

No. 419].

- Manager:  Specialty Acquisition Corp.

**C.    Description of the Debtors**

Debtors' executive officers are presently located at 8700 Technology Way, Reno, Nevada. ST was formed on October 21, 1997, as a Maryland corporation.  SAC was formed on May 2, 2002, as a Delaware corporation.  SAC is a non-REIT subsidiary for purposes of holding REO for development.  SAC II was formed on January 17, 2003, as a Nevada corporation.  It is an REIT subsidiary for the purposes of holding REO with potential contamination or mechanics liens in order to keep such properties separate from ST.  SAC D-1 was formed on April 29, 2008, as a Nevada limited liability company.  It is a wholly owned subsidiary of ST.  SAC and SAC II are wholly owned subsidiaries of ST, and SAC D-1 is a wholly owned subsidiary of SAC.

**D.    Debtors' Assets and Liabilities**

**1.    Claims Filed By Creditors**

**a.    The Schedules and the Bar Dates**

On July 15, 2010, the Debtors filed their Schedules of Assets and Liabilities (as amended, the "Schedules") and Statements of Financial Affairs.  The Schedules have been amended several times. The Court established August 23, 2011 as the bar date for filing proofs of Claims.  The Court has not established a bar date for Shareholders to file "Proofs of Interest" to verify their ownership of shares of ST.  If it is determined that Shareholders must file Proofs of Interest in order to have "Allowed Interests" the Committee will mail notices of this requirement to the Shareholders listed in ST's records.

The following chart sets forth the total amount of Claims filed against each of the Estates as of April 22, 2011, but not including the non-contingent, liquidated and undisputed Claims set forth in the Schedules for which no proofs of Claim or Interest have been filed.

| Debtor | Secured Claims | Priority Claims | General Unsecured Claims | Total Claims |
|---|---|---|---|---|
| Specialty Trust | $68,857,394.60 | $177,560.37 | $30,973,883.31 | $100,008,838.20 |

| Debtor | Secured Claims | Priority Claims | General Unsecured Claims | Total Claims |
|--------|----------------|-----------------|--------------------------|--------------|
| SAC II | $6,830,817.67 | | $29,250,000.00 | $36,080,817.67 |
| SAC | | $5,000.00 | $29,250,000.00 | $29,255,000.00 |
| SAC D-1 | | | $29,250,000.00 | $29,250,000.00 |

The Schedules and proofs of Claim may be obtained by accessing the Court's PACER system through the website of the United States Court for the District of Nevada (http://www.nvb.uscourts.gov).

**THE DEBTORS, THE COMMITTEE, THE REORGANIZED DEBTORS AND THE LIQUIDATING TRUST, AS APPLICABLE, RESERVE ANY AND ALL RIGHTS EXCEPT AS EXPRESSLY STATED IN THE PLAN TO OBJECT TO, DEFEND AGAINST, AND REQUEST DISALLOWANCE, REDUCTION, SUBORDINATION AND/OR RECHARACTERIZATION OF ANY CLAIM OR INTEREST ASSERTED AGAINST, OR IN, THE DEBTORS OR THEIR RESPECTIVE ESTATES. THE DEBTORS AND THE COMMITTEE ANTICIPATE THAT NUMEROUS OBJECTIONS TO CLAIMS AND INTERESTS MAY BE FILED AFTER CONFIRMATION OF THE PLAN.**

> b.    **Objections to Claims or Interests**

The Plans provide that objections to Claims and Interests (other than Administrative Claims, which are separately governed in the Plans) shall be filed and served upon the holders of the affected Claims or Interests no later than the date that is the later of (a) six (6) months after the Effective Date, unless extended by the Court, and (b) six (6) months after the date on which the affected proof of Claim or Interest has been filed, unless extended by the Court.

Except as to Claims and Interests allowed under the Plans, holders of Claims of Interests should assume that the Debtors, the Committee, the Reorganized Debtors or the Liquidating Trust, as applicable, may file an objection to any proof of Claim or Interest that differs in amount or priority from the amount or priority of such holder's Claim or Interest as listed in the Schedules, or if such holder's Claim or Interest is listed in the Schedules as disputed, contingent, or unliquidated. **Therefore, in voting to accept or reject either of the Plans, no Creditor or Shareholder may**

rely on the absence of an objection to its proof of Claim or Interest as any indication that the Debtors, the Committee, the Reorganized Debtors and/or the Liquidating Trust, as applicable, ultimately will not object to the amount, priority, secured status, or allowability of its Claim or Interest.   Moreover, the Debtors, the Committee, the Reorganized Debtors and/or the Liquidating Trust, as applicable, reserve their rights with respect to all objections to Claims and Interests, and all counterclaims they may have with respect to Claims or Interests, and, except as specifically set forth in the Plans, further reserve their rights to prosecute Claims or Interests of the Debtors and their Estates (including rights to affirmative recoveries, rights to subordinate Claims, setoff rights, as well as other rights).

### 2.       Secured Liabilities

ST currently maintains a $29.25 million term loan (the "Term Loan") which includes three participating commercial banks for which US Bank is the agent bank. The Term Loan is secured by liens in certain qualified real estate and loans and by pledges of the stock and membership interests of the subsidiaries shortly before the Petition Date.  The non-default rate of interest under the Term Loan is the sum of (i) LIBOR plus 3%, plus (ii) 5% per annum of PIK interest. The Term Loan is secured by qualified real estate loans and REOs.  The Committee is presently investigating the validity of the equity pledges of its subsidiaries' stock or membership interests and security interests granted to US Bank relating to the Term Loan that were given shortly before the Petition Date. ST subsidiaries SAC, SAC D-1, and SAC II, and non-debtor subsidiaries JFP 1330, LLC, 5th & Lincoln, LLC, Oak Creek Condominiums, LLC are also guarantors of the Term Loan.  The Committee also investigated the guarantees.  Under the Debtors' Plan, the US Bank loan will be repaid at a discount, in an amount that the Debtors' believe to be less than the value of the collateral securing the US Bank loan, excluding the collateral granted to US Bank shortly before the Petition Date.  Thus, Debtors' do not plan on initiating any avoidance action against US Bank.  In addition, the Debtors believe that in any Chapter 7 liquidation, there would not be any equity in the US Bank junior lien in the SAC II stock.  The Committee's position regarding potential causes of action related to the restructuring of US Bank's debt is described in paragraph 5.c.(1)(h) below.

Additionally, ST has $36.9 million outstanding under a secured and collateralized investment note program for which Deutsche Bank acts as Indenture Trustee. Many of the holders of the notes are also shareholders of ST. This note program contains individual notes (the "Notes") with maturities ranging from 1 month to 10 years and annual interest rates varying from 4.5% to 8.5%. The Notes are comprised of two series of notes issued under two separate indentures, in aggregate amounts outstanding of $1.46 million (the "Old Notes") and $35.44 million (the "New Notes"). The Old Notes and the New Notes are secured separately by eligible assets comprised of real estate, loans, and other collateral that are pledged separately from the Term Loan Collateral. The amount owed to holders of the Old Notes is secured by an intercompany loan of ST to its subsidiary Fifth & Lincoln, LLC ("Fifth & Lincoln"), which intercompany loan is secured by a junior lien on REO property owned by Fifth & Lincoln. The Fifth & Lincoln REO property is encumbered with a senior lien in favor of La Jolla Bank. The La Jolla Bank debt exceeds the appraised value of the Fifth & Lincoln REO and thus the estimated value of the collateral securing the Old Notes is $0. The amount owed to the holders of the New Notes is secured by (i) real estate loans and (ii) ST's pledge of stock in its subsidiary, SAC II, which owns REO properties. Certain of SAC II's REO properties are encumbered by the Term Loan and other encumbrances as set forth herein below. As set forth in the Debtors' projections attached as Exhibit 1to this Disclosure Statement, the Debtors believe that the value of the collateral securing the New Notes is substantially less than the amount owed to the holders of the New Notes.

In addition to the Secured Claims discussed above, the Debtors have further Secured Claims as described in Section II.C. of the Debtors' Plan and in Section II.C. of the Committee's Plan.

### 3.    Priority Tax Claims

These claims include an IRS Claim against ST for $177,560.37 and an IRS claim against SAC for $5,000.00.

### 4.    Unsecured Liabilities

Debtors' unsecured liabilities consist of those Claims described in Section II.C. of the Debtors' Plan and in Section II.C. of the Committee's Plan.

5.    **Assets**

    a.    **Loans and Real Property**

        (1)    **Loans**

      (a)

| | |
|---|---|
| Borrower: | CIC & S, LLC |
| Guarantor: | F.R. Hallahan |
| | John C. Hallahan |
| Loan Number: | 521-99567 & 566-99552 |
| Pledged to Secure: | Term Loan (US Bank) |
| | Adequate Protection Lien (Notes – Deutsche Bank) |
| | Debtor in Possession Loan (Northlight) |
| Principal Balance 3/31/2011 | $4,870,000 |
| Total Interest Due 3/31/2011 | $ 955,709 |
| Collateral: | 232 West Street, Reno, NV 89501 |
| | 54 unit apartment complex |
| Date of Default: | Not in default (interest accrues to maturity) |
| Maturity: | 1/1/12 |
| Senior Liens: | None |
| Collectability of Guaranty: | Improbable |

      (b)

| | |
|---|---|
| Borrower: | Lester A. Conklin and Wanda A. Conklin |
| Guarantor: | Lester A. Conklin and Wanda A. Conklin |
| Loan Number: | 550-99536 |
| Pledged to Secure: | Debtor in Possession Financing (Northlight) |
| Principal Balance 3/31/2011 | $60,000 |
| Total Interest Due 3/31/2011 | $ .00 |
| Collateral: | Single Family Residence |
| | 1608 Wheatgrass Drive |
| | Reno, NV 89509 |
| Date of Default: | Not in Default |
| Maturity: | 12/1/13 |
| Senior Liens: | $225,000 |
| Collectability of Guaranty: | Possible |

      (c)

| | |
|---|---|
| Borrower: | Denver I-25, LLC |
| Guarantor | N/A |
| Loan Number: | 470-99516 |
| Pledged to Secure: | Term Loan (US Bank) |
| | Adequate Protection Lien (Notes – Deutsche Bank) |
| | Debtor in Possession Loan (Northlight) |
| Principal Balance 3/31/2011 | $4,300,000 |
| Total Interest Due 3/31/2011 | $ 935,250 (interest accrues to maturity) |
| Collateral: | 71.62 acres of commercial land in Broomfield, CO |
| Date of Default: | Not in default |
| Maturity: | 4/1/12 |

|  | | Senior Liens: | None |
|---|---|---|---|
| (d) | | Borrower: | Vero Lytle Creek, LLC |
| | | | Vero Desert Lakes, LLC |
| | | Loan Number: | 487-99533, 556-99542 |
| | | Pledged to Secure: | $7,500,000 pledged to secure New Notes (Deutsche Bank) |
| | | | $8,021,263 pledged to secure Debtor in Possession Financing (Northlight) |
| | | Principal Balance 3/31/2011 | $15,521,263 |
| | | Total Interest Due 3/31/2011 | $ 2,704,416 (interest accrues to maturity) |
| | | Collateral: | The loans are not directly secured by real property, but rather are secured by the borrower's 50% member interests in Vero Desert Lakes, LLC, which owns 2300 gross acres of mixed use commercial and residential land east of Dillon Road, off I-10, Coachella, CA5 |
| | | Date of Default: | 2-1-11 |
| | | Type of Default: | Loan matured. Restructure is in process. |
| | | Maturity: | 2-1-11 |
| | | Senior Liens: | $7,500,000 loan pledged to secure New Notes is senior to all other liens on member interest collateral. However, there is secured indebtedness (not an ST loan) at the real property level. |
| (e) | | Borrower: | Desert Land, LLC |
| | | Guarantor: | Howard and Christi Bullock and David and Margit Gaffin |
| | | Loan Number: | 294-99341 |
| | | Pledged to Secure: | New Notes (Deutsche Bank) |
| | | Principal Balance 3/31/2011 | $5,000,000 |
| | | | $ 871,000 (ST portion @ 17.42%) |
| | | Total Interest Due 3/31/2011 | $ -0- |
| | | Collateral: | 3.35 acres of commercial land on Las Vegas Blvd., Las Vegas, NV. |
| | | Date of Default: | Not in default |
| | | Maturity: | 8/1/11 |
| | | Senior Liens: | None |
| | | Collectability of Guaranty: | Possible, based on real estate holdings of guarantors |
| (f) | | Borrower: | Desert Quail Air, LLC |
| | | Guarantor: | Howard and Cristi Bullock |
| | | | David and Margit Gaffin |
| | | Loan Number: | 528-99574 |
| | | Pledged to Secure: | Term Loan (US Bank) |
| | | | Adequate Protection Lien (Notes – Deutsche Bank) |
| | | | Debtor in Possession Loan (Northlight) |

---

[5]  Desert Lakes, LLC has title to approximately 1850 acres. The remaining 425 acres is subject to an option in favor of Desert Lakes, LLC. Settlement negotiations are ongoing regarding the exercise of the option.

|  |  |  |
|---|---|---|
| | Principal Balance 3/31/2011 | $20,000,000 |
| | Total Interest Due 3/31/2011 | $ 4,828,149 (interest accrues to maturity) |
| | Collateral: | Quail Air Site105 E. Reno Ave. 3.35 acres Las Vegas Strip Desert Oasis Investment Site 1.79 acres of commercial land on Las Vegas Blvd, Las Vegas, NV |
| | Date of Default: | Not in default |
| | Maturity: | 8/1/11 |
| | Senior Liens: | None |
| | Collectability of Guaranty: | Possible, based on real estate holdings of guarantors |

(g)
| | | |
|---|---|---|
| | Borrower: | ECCO Holdings, LLC |
| | Guarantor: | Eric and Julie Capranica Brad and Suzanne Ipsen |
| | Loan Number: | 504-99550 |
| | Pledged to Secure: | Term Loan (US Bank) Adequate Protection Lien (Notes – Deutsche Bank) Debtor in Possession Loan (Northlight) |
| | Principal Balance 3/31/2011 | $13,800,000 |
| | Total Interest Due 3/31/2011 | $2,176,133 (interest accrues to maturity) |
| | Collateral: | 640 acres of mixed use res/com/golf course land located in the proposed "Superstition Views" project |
| | Date of Default: | 2-1-11 |
| | Type of Default: | Borrower unable to make scheduled payment |
| | Maturity: | 2-1-12 |
| | Senior Liens: | None |
| | Collectability of Guaranty: | Improbable |

(h)
| | | |
|---|---|---|
| | Borrower: | Esperanza Development, LLC |
| | Guarantor: | Stephen Patterson |
| | Loan Number: | 373-99419 |
| | Pledged to Secure: | Term Loan (US Bank) Adequate Protection Lien (Notes – Deutsche Bank) Debtor in Possession Loan (Northlight) |
| | Principal Balance 3/31/2011 | $12,789,459 |
| | Total Interest Due 3/31/2011 | $ 1,970,419 (interest accrues to maturity) |
| | Collateral: | 223 finished residential lots and 118.09 acres of vacant mixed use residential/commercial within Phase 1 of Esperanza Development |
| | Date of Default: | 4-1-11 |
| | Type of Default: | Loan matured and borrower unable to payoff |
| | Maturity: | 4-1-11 |
| | Senior Liens: | None |
| | Collectability of Guaranty: | Improbable |

| (i) | Borrower: | 5th & Lincoln, LLC and JFP 1331, LLC6 |
|---|---|---|
| | Guarantor | N/A |
| | Loan Number: | 553-99539 |
| | Pledged to Secure: | Old Notes (Deutsche Bank) |
| | Principal Balance 3/31/2011 | $3,148,937 |
| | Total Interest Due 3/31/2011 | $  713,521 (interest accrues to maturity) |
| | Collateral: | 1.60 acres of vacant multifamily land located on the Northeast corner of Fifth Street and Lincoln Street, Maricopa County, AZ  85004 |
| | Date of Default: | 3-1-11 |
| | Type of Default: | Loan matured and borrower unable to payoff |
| | Maturity: | 3-1-11 |
| | Senior Liens: | $6,400,000 |

| (j) | Borrower: | Fontana Fitness, LLC and Marina Commercial Offices, LLC |
|---|---|---|
| | Guarantor: | Darren Proulx and Troy Fontana (one loan has a guarantee the other two do not) |
| | Loan Number: | 543-99529, 544-99530, 560-99546 |
| | Pledged to Secure: | Term Loan (US Bank) Adequate Protection Lien (Notes – Deutsche Bank) Debtor in Possession Loan (Northlight) |
| | Principal Balance 3/31/2011 | $  734,266 |
| | Total Interest Due 3/31/2011 | $   11,006 |
| | Collateral: | 3 loans on (3) Commercial condominiums in three story building located at 325 Harbour Cove Drive Units 113, 115, and 119, Sparks, NV |
| | Date of Default: | Not in default |
| | Maturity: | 11/1/19 for 543-99529 and 544-99530 3/1/20 for 560-99546 |
| | Senior Liens: | None |
| | Collectability of Guaranty | Possible |

| (k) | Borrower: | JFP 1330, LLC7 |
|---|---|---|
| | Guarantor: | N/A |
| | Loan Number: | 555-99541 |
| | Pledged to Secure: | None |
| | Principal Balance 3/31/2011 | $3,953,282 |
| | Total Interest Due 3/31/2011 | $895,799 (interest accrues to maturity) |
| | Collateral: | 1.04 acres of vacant multi-family land at 1st Street and Buchanan Street, Phoenix, AZ |
| | Date of Default: | 3-1-11 |

---

6 SAC holds 100% interest in each of 5th & Lincoln, LLC and JFP 1331, LLC.

7 SAC holds 100% interest in JFP 1330, LLC.

| | | | |
|---|---|---|---|
| | | Type of Default: | Loan matured and borrower unable to payoff |
| | | Maturity: | 3-1-11 |
| | | Senior Liens: | $3,020,000 |
| | (l) | Borrower: | Steven M. Johnson |
| | | Guarantor: | Steven M. Johnson |
| | | Loan Number: | 559-99545 |
| | | Pledged to Secure: | Debtor in Possession Financing (Northlight) |
| | | Principal Balance 3/31/2011 | $30,000 |
| | | Total Interest Due 3/31/2011 | -0- |
| | | Collateral: | Single Family Residence 7725 Pronto Court, Sparks, NV  89436 |
| | | Date of Default: | Not in default |
| | | Senior Liens: | $10,200 |
| | | Maturity: | 9/1/14 |
| | (m) | Borrower: | Nevada Acquisitions, LLC[8] |
| | | Guarantor: | John Ritter and Vincent Schettler |
| | | Loan Number: | 481-99527 |
| | | Pledged to Secure: | Term Loan (US Bank) Adequate Protection Lien (Notes – Deutsche Bank) Debtor in Possession Loan (Northlight) |
| | | Principal Balance 3/31/2011 | $4,225,000 |
| | | Total Interest Due 3/31/2011 | $ 853,802 (interest accrues to maturity) |
| | | Collateral: | 10 acres of vacant commercial land, Windmill Lane, Las Vegas, NV |
| | | Date of Default: | Not in default |
| | | Maturity: | 8/1/11 |
| | | Senior Liens: | None |
| | | Collectability of Guaranty: | Possible |
| | (n) | Borrower: | William D. Long |
| | | Principal Balance 3/31/2011 | $-0- |
| | | Loan Number: | 564-99550 |
| | | Pledged to Secure: | Term Loan (US Bank) Adequate Protection Lien (Notes – Deutsche Bank) Debtor in Possession Loan (Northlight) |
| | | Total Interest Due 3/31/2011 | $ -0- |
| | | Collateral: | Residential Lot 233 Sierra Country Circle, Gardnerville, Nevada |
| | | Appraised Value of Collateral: | $325,000 as of December 5, 2009 |
| | | Date of Default: | Loan paid off 3/30/11 |
| | (o) | Borrower: | Marina Commercial Offices |

---

[8] Joshua Tree, LLC fka NV Acquisitions, LLC transferred title of property to a new LLC, owned by the same principles.

| | | | |
|---|---|---|---|
| | | Guarantor: | Darren Proulx |
| | | Loan Number: | 561-99547, 562-99548 |
| | | Pledged to Secure: | One loan pledged to secure Term Loan (US Bank) Adequate Protection Lien (Notes – Deutsche Bank)) Debtor in Possession Loan (Northlight); the other is pledged only to secure the Debtor in Possession Loan (Northlight) |
| | | Principal Balance 3/31/2011 | $637,986 |
| | | Total Interest Due 3/31/2011 | $ -0- |
| | | Collateral: | Unit 201 of a Commercial condominium on the second floor of a three story building located at 325 Harbour Cove Drive, Sparks, Nevada |
| | | Date of Default: | Not in default |
| | | Maturity: | 3/1/20 for 561-99547 2/1/17 for 562-99548 |
| | | Senior Liens: | The loan pledged to secure the Term Loan is senior to the unpledged loan. There are no senior encumbrances. |
| | | Collectability of Guaranty: | Possible |
| | (p) | Borrower: | Marina Village, LLC |
| | | Guarantor | David Dahl |
| | | Loan Number: | 398-99444 |
| | | Pledged to Secure: | Term Loan (US Bank) Adequate Protection Lien (Notes – Deutsche Bank) Debtor in Possession Loan (Northlight) |
| | | Principal Balance 3/31/2011 | $3,462.056 |
| | | Total Interest Due 3/31/2011 | $1,016,055 (interest accrues to maturity) |
| | | Collateral: | Mixed use building (10 units) located in Marina Village at 325 Harbour Cove Drive, Sparks, NV |
| | | Date of Default: | 4-1-11 |
| | | Type of Default: | Loan matured and borrower unable to payoff |
| | | Maturity: | 4-1-11 |
| | | Senior Liens: | None |
| | | Collectability of Guaranty | Improbable |
| | (q) | Borrower: | Nadador, LLC Loans |
| | | Guarantor | N/A |
| | | Loan Number: | 509-99555, 535-99521, 536-99522, 551-99537 |
| | | Pledged to Secure: | $14,800,000 first lien loan pledged to secure Term Loan (US Bank); Adequate Protection Lien (Notes – Deutsche Bank); Debtor in Possession Loan (Northlight); $4,857,318 second lien loan and $5,200,000 mezzanine loan pledged to secure New Notes (Deutsche Bank); and $7,410,650 third lien loan pledged to secure Debtor in Possession Financing (Northlight) |
| | | Principal Balance 3/31/2011 | $32,267,968 |

|   |   |   |   |
|---|---|---|---|
| 1 |     | Total Interest Due 3/31/2011 | $10,427,352 (interest accrues to maturity) |
| 2 |     | Collateral | 27 existing fractional interests, 2 dwellings partially complete, 4 finished residential lots, 9 vacant finished residential lots, 135 proposed fractional units, 162 proposed fractional units located with The Residence Club, within the PGA Golf Resort located in the City of LaQuinta, CA |
| 5 |     | Date of Default: | 3-1-11 |
|   |     | Type of Default: | Loan matured and borrower is unable to pay off |
| 6 |     | Maturity: | 3-1-11 |
|   |     | Senior Liens: | None (see above regarding relative priority of ST loans) |

|   |   |   |   |
|---|---|---|---|
| 8 | (r) | Borrower: | Oak Creek Condominiums, LLC[9] |
|   |     | Guarantor: | N/A |
| 9 |     | Loan Number: | 554-99540 |
|   |     | Pledged to Secure: | New Notes (Deutsche Bank) |
| 10 |    | Principal Balance 3/31/2011 | $2,518,064 |
| 11 |    | Total Interest Due 3/31/2011 | $ 570,623 (interest accrues to maturity) |
| 12 |    | Collateral: | The subject collateral is .98 acres of multifamily vacant land located on 7th and Buchanan Streets, Phoenix, AZ. |
|    |    | Date of Default: | 3-1-11 |
| 14 |    | Type of Default: | Loan matured and borrower is unable to payoff |
|    |    | Maturity: | 3-1-11 |
| 15 |    | Senior Liens: | $3,840,000 |

|   |   |   |   |
|---|---|---|---|
| 16 | (s) | Borrower: | WHM Paloma, Inc. LLC (Originally Section 25, LLC) |
| 17 |    | Guarantor: | W. Harrison Merrill Trust |
|    |    | Loan Number: | 468-99514 |
| 18 |    | Pledged to Secure: | Term Loan (US Bank) |
|    |    |    | Adequate Protection Lien (Notes – Deutsche Bank) |
| 19 |    |    | Debtor in Possession Loan (Northlight) |
|    |    | Principal Balance 3/31/2011 | $6,105,000 |
| 21 |    | Total Interest Due 3/31/2011 | $1,513,628 |
|    |    | Collateral: | 855 acres of vacant land located in Gila Bend, Maricopa County, AZ |
| 22 |    | Appraised Value of Collateral: | $10,260,000 as of January 15, 2010 |
| 23 |    | Date of Default: | 2-1-11 |
| 24 |    | Type of Default: | Unable to make scheduled payments |
|    |    | Maturity: | 1-1-12 |
| 25 |    | Senior Liens: | None |
|    |    | Collectability of Guaranty: | Improbable |

---

[9] SAC holds 100% interest in Oak Creek Condominiums, LLC.

| | | | |
|---|---|---|---|
| (t) | Borrower: | PV Land Investments, LLC | |
| | Guarantor: | John Ritter: | |
| | Loan Number: | 518-99564 | |
| | Pledged to Secure: | Debtor in Possession Financing (Northlight) | |
| | Principal Balance 3/31/2011 | $12,570,300 | |
| | Total Interest Due 3/31/2011 | $ 2,639,763 (interest accrues to maturity) | |
| | Collateral: | 103 +/- acres of vacant mixed use land including 201.65 acre feet of water.  Located within the proposed "Gateway Master Planned Development", Pahrump, NV | |
| | Date of Default: | Not in default | |
| | Maturity: | 8/1/11 | |
| | Senior Liens: | None | |
| | Collectability of Guaranty: | Possible | |
| (u) | Borrower: | Quarterhorse Trust | |
| | Guarantor: | Edward T. Manley | |
| | Loan Number: | 503-99549 | |
| | Pledged to Secure: | Debtor in Possession Financing (Northlight) | |
| | Principal Balance 3/31/2011 | $395,568 | |
| | Total Interest Due 3/31/2011 | $ -0- | |
| | Collateral: | Assigned Specialty Trust stock and pledge interest in Vero Oxford LLC | |
| | Date of Default: | Not in default | |
| | Maturity: | 12/1/11 | |
| | Senior Liens: | N/A | |
| | Collectability of Guaranty: | Improbable | |
| (v) | Borrower: | Sedona Development Partners LLC | |
| | Loan Number: | 229-99257, 280-99327, 357-99403, 358-99404, 359-99405, 530-99516 | |
| | Pledged to Secure: | Debtor in Possession Financing (Northlight) | |
| | Principal Balance 3/31/2011 | $54,384,007 (ST owns 37.46% = $20,373,723) | |
| | Total Interest Due 3/31/2011 | $24,598,644 (ST interest due @ 37.46 % = $ 9,214,652) (interest accrues to maturity) | |
| | Collateral: | High-end fractional residences in golf community, Sedona, AZ | |
| | Date of Default: | 1-1-08 | |
| | Type of Default: | Loan matured.  Notice of default filed on April 12, 2010.  Borrower filed bankruptcy petition on May 27, 2010. | |
| | Maturity: | 1-1-08 | |
| | Senior Liens: | N/A | |
| (w) | Borrower: | S & T Ranch, LLC | |
| | Guarantor: | N/A | |
| | Loan Number: | 546-99532 | |

|     |     | Pledged to Secure: | Debtor in Possession Financing (Northlight) |
|-----|-----|--------------------|---------------------------------------------|
|     |     | Principal Balance 3/31/2011 | $221,116 |
|     |     | Total Interest Due 3/31/2011 | -0- |
|     |     | Collateral: | 1/9th fractional interest in The Residence Club at PGA West, LaQuinta, CA |
|     |     | Date of Default: | Not in default |
|     |     | Maturity: | 11/1/12 |
|     |     | Senior Liens: | None |
| (x) |     | Borrower: | Waterfront Partners, LLC |
|     |     | Guarantor: | N/A |
|     |     | Loan Number: | 549-99535 |
|     |     | Pledged to Secure: | New Notes (Deutsche Bank) |
|     |     | Principal Balance 3/31/2011 | $6,860,000 |
|     |     | Total Interest Due 3/31/2011 | $1,668,660 (interest accrues to maturity) |
|     |     | Collateral: | 3.35 acres of mixed use vacant land, East Second Street, Reno, Nevada |
|     |     | Date of Default: |  |
|     |     | Type of Default: | 1ST MORTGAGE WITH CITY NATIONAL HAS FILED NOD/Deed in Lieu from Waterfront to Specialty Trust expected COE April 2011 |
|     |     | Maturity: | 6/1/11 |
| (y) |     | Borrower: | Caviata 184, LLC |
|     |     | Guarantor: | WM Pennington and Dane Hillyard |
|     |     | Loan Number: | 552-99538 |
|     |     | Pledged to Secure: | N/A |
|     |     | Principal Balance 3/31/2011: | $5,670,284 |
|     |     | Total Interest Due 3/31/2011 | $2,495,246 (interest accrues to maturity) |
|     |     | Collateral: | Reno, Nevada |
|     |     | Type of Default: | Subject to Chapter 11 bankruptcy. Confirmation date of April 12, 2010. Third party interested in purchasing note for $125,000.00. |
|     |     | Maturity: | 12/1/11 |
|     |     | Senior Liens | $27,476,633 |
|     |     | Collectability of Guaranty: | Improbable |
| (z) |     | Borrower: | Lang, Thomas and Linda |
|     |     | Loan Number: | 578-99564 |
|     |     | Pledged to Secure: | N/A |
|     |     | Balance: | $100,000.00 |
|     |     | Total Interest Due: | N/A |
|     |     | Collateral: | 1/9th fractional in and to the Residence Club located at 80-225 North Residence Club Drive, LaQuinta, CA 92253 |
|     |     | Maturity: | 12/20/12 |
| (aa) |    | Borrower: | Leeper, George C. and Judy Ann |

| | |
|---|---|
| Loan Number: | 579-99565 |
| Pledged to Secure: | N/A |
| Balance: | $75,000.00 |
| Total Interest Due: | N/A |
| Collateral | 1/9th fractional in and to Residence Club Drive, LaQuinta, CA 92253 |
| Maturity: | 1/31/12 |

**(2)    REO Properties**

(a)

| | | |
|---|---|---|
| Owner: | | **SAC II/ST** |
| Borrower: | | **2522 Properties, LLC** |
| Original loan amount: | | $2,000.000.00 |
| Collateral: | | 24965 Estribos, Mission Viejo, CA |
| | | Single Family Residence |
| | | 28.5 acres in Mission Viejo, CA |
| Appraised Value: | | $496,500 as of April 27, 2010 |
| | | $615,000 as of February 17, 2010 |
| Encumbrances: | | First Deed of Trust on 28.5 acres securing intercompany note to ST in the amount of $841,050, which includes accrued interest to March 31, 2011. |
| Summary of Sales Efforts: | | Estribos has a 1st & 2nd on the property, originated by the original owner, who has filed bankruptcy.  We obtained a lift stay in order to gain possession, although the lenders of record will not communicate due to the bankruptcy not being finalized for them. Property is rented @ $2,100 per month 28.5 acres listed with Greg Hughes @ $1.2 million, 2/5/10 – 6/9/10, @ $999,000, 6/10/10 – 2/3/11, @ $799,900, 2/4/11 – 3/10/11, @ $699,900, 3/11/11 – 12/31/11 |

(b)

| | | |
|---|---|---|
| Owner: | | **ST** |
| Borrower: | | **Central and Buchanan, LLC** |
| Guarantor: | | Joe Pinsonneault |
| Original loan amount: | | $7,150,000 plus advances = $8,062,750 (ST owns 11.321% = $912,750) |
| Collateral: | | Proposed 387 unit condominium project in Phoenix Business District, Maricopa County, Arizona. |
| Appraised Value of Collateral: | | $6,500,000 as of February 23, 2010 |
| Encumbrances: | | Property taxes |
| Summary of Sales Efforts: | | Not listed at this time, investors coming together on plan for payment of property taxes.  Offer received 4/8/11 at $4.0 million. |

(c)

| | | |
|---|---|---|
| Owner: | | **SAC** |
| Borrower: | | **Consolidated Pacific Development, Inc.** |
| Original loan amount: | | $6,985,000.00 |
| Collateral: | | 54 partially improved residential lots in Sparks, Nevada |
| Appraised Value of Collateral: | | $2,430,000 as of December 17, 2009 |
| Encumbrances: | | First deed of trust securing intercompany note to ST |

in amount of $2,508,185, which includes accrued interest to March 31, 2011; pledged to secure the New Notes

| | | Summary of Sales Efforts: | Listed with Harvey Fennel @ $2.9 on 11/1/09, cancelled due to conflict of interest, Harvey is on our Board. Quiet type of listing and showing being done, although not formally listed. Waiting for feed back on 3/7/11 showing to Vegas investor. |
| --- | --- | --- | --- |
| (d) | | Owner: | **SAC II** |
| | | Borrower: | **Coolidge 70, LLC** |
| | | Original amount: | $2,000,000 and $540,000 advance |
| | | Collateral: | 69.718 acres of agricultural land in Coolidge Crossroads, a planned residential community, Coolidge, AZ |
| | | Appraised Value of Collateral: | $2,090,000 as of October 29, 2009 |
| | | Encumbrances: | Term Loan |
| | | Summary of Sales Efforts: | Listed with Nate Nathan & Assoc. @ $1,045,500 from 3/11/10 to 3/10/12. |
| (e) | | Owner: | **SAC II** |
| | | Borrower: | **Coolidge 140, LLC** |
| | | Original loan amount: | $5,000,000 and $600,000 advance |
| | | Collateral: | 140 acres of agricultural land located on the corner of Arizona Blvd. and Martin Road in Coolidge, AZ |
| | | Appraised Value of Collateral: | $3,500,000 as of October 29, 2009 |
| | | Encumbrances: | First deed of trust securing intercompany note to ST in amount of $2,295,300 |
| | | Summary of Sales Efforts: | Listed with Nate Nathan & Assoc. @ $2.1 from 3/11/10 to 3/10/12. |
| (f) | | Owner: | **SAC** |
| | | Borrower: | **Cotton Lane Village Center LLC** |
| | | Original loan amount: | $5,500,000.00 |
| | | Collateral: | First Deed of Trust on 15.46 acre parcel located at southwest corner of Camelback Road and Cotton Lane in Goodyear, AZ; additional collateral, Second Deed of Trust on 99.75 acres farmland in Casa Grande, AZ |
| | | Appraised Value of Collateral: | $1,350,000 as of December 2, 2009 |
| | | Encumbrances: | First deed of trust securing intercompany note to ST in amount of $2,941,415, which includes interest to March 31, 2011; pledged to secure the New Notes |
| | | Summary of Sales Efforts: | Listed with Nate Nathan & Assoc. @ $1,677,060 from 3/11/10 to 3/10/12. |
| (g) | | Owner: | **SAC II/ST** |
| | | Borrower: | **The Village in Duck Creek Estates, LLC** |
| | | Original loan amount: | $23,500,000.00 |
| | | Collateral: | Approx. 115.27 acres of residential land, corner of Pock Lane and Carpenter Road known as Duck Creek Estates Subdivision in Stockton, CA |

|  | Appraised Value of Collateral: | $9,450,000 as of January 7, 2010 |
|---|---|---|
|  | Encumbrances: | None |
|  | Summary of Sales Efforts: | None |

(h) Owner: **SAC II**
Borrower: **Mohave Vista, LLC**
Original loan amount: $1,200,000.00
Collateral: 73.64 acres of vacant, unimproved land located at 14111 South Oatman Highway in Topock, AZ
Appraised Value of Collateral: $1,690,000 as of August 20, 2009
Encumbrances: None
Summary of Sales Efforts: Listed with Suzanna Ballard @ $1.850 7/09-12/09, dropped to $1.795 as of 1/1/10 to 9/30/11.

(i) Owner: **SAC II**
Borrower: **Prime West Jordanelle, LLC**
Original loan amount: $6,000,000
Collateral: 352 acres of vacant unimproved land located in Wasatch County, Utah, SE of the Jordanelle Reservoir and part of the Jordanelle Recreation area.
Appraised Value of Collateral: $15,350,000 as of February 10, 2010
Encumbrances: $5,820,925 plus interest of assessment lien by the Jordanelle Water Authority
Summary of Sales Efforts: None.

(j) Owner: **SAC II**
Borrower: **Sierra Vista Partners, LLC**
Guarantor: Ronald J. Johnson
Original loan amount: $7,840,000.00
Collateral: 1811 acres of undeveloped land with potential for residential development in Sierra Vista, Cochise County, AZ
Appraised Value of Collateral: $8,150,000 as of March 11, 2010
Encumbrances: Term Loan
Summary of Sales Efforts: Listed with Dick Johnson @ $8,900,000 starting 12/15/09 to 12/16/11. Nature Conservancy offer of $3.85 million was accompanied by an appraisal of $3.5 million and is being negotiated.

(k) Owner: **SAC II**
Borrower: **Symphony Builders LLC**
Original loan amount: $6,230,000
Collateral: 99.75 acres of agricultural land in Casa Grande, AZ
Appraised Value of Collateral: $1,800,000 as of January 19, 2010
Encumbrances: None
Summary of Sales Efforts: Listed with Nate Nathan & Associates @ $1,496,250 starting 3/11/10 to 3/31/12. Rejected offer of $997,500 on 3/31/11.

(l)  Owner:                  **ST**
     Borrower:               **Doug Moreau, Inc.**
     Original loan amount:   $170,000
     Collateral:             Unit C-111, Marina Waterfront Com'l Condo in Sparks, Nevada
     Appraised Value of Collateral:   $214,000 as of June 30, 2008
     Encumbrances:           None
     Summary of Sales Efforts:   Leased as of 4/1/11 – 36 month lease on a graduated scale.
                             Total rents for 36 months = $32,024.70

As indicated by the Summary of Sales Efforts with respect to the foregoing properties, the Debtors believe that the current values of the properties listed above are substantially less than the values indicated by the appraisals of those properties listed above. The Debtors' projections which are attached to this Disclosure Statement as Exhibit 1 present the Debtors' forecast of the expected results of the Debtors' sale of these properties.

### b.    Interests in Subsidiaries

ST has a one hundred percent (100%) membership interest in SAC II, and owns all of the common stock issued by SAC. SAC has a one hundred percent (100%) membership interest in SAC D-1, 5th and Lincoln, LLC, Oak Creek Condominiums, LLC, and JFP 1330, LLC. The Debtors do not believe that their interests in 5th and Lincoln, LLC, Oak Creek Condominiums, LLC and JFP 1330, LLC have any value. The value of ST's interest in the remaining entities is currently unknown.

### c.    Potential Causes of Action

The Committee has investigated what it believes may be claims against the current and former members of the Board of Directors (the "Board") and others, including SFC. The information regarding those claims provided in this Disclosure Statement summarizes the information the Committee has provided to the Debtors. The Debtors do not necessarily agree with the Committee's analysis, and the Board strongly disagrees that there are claims against it, because it believes that it has properly exercised its business judgment. In addition, as set forth herein, the Board believes its claims to indemnification under Maryland law would reduce or eliminate any

potential recovery on the claims against the Board.  Without regard to the merits of those claims, both the Debtors' Plan and the Committee's Plan preserve any claims that may exist for later assertion by the Reorganized Debtors or the Liquidating Trust, respectively.

### (1)    Committee Position

THE INFORMATION AND LEGAL ANALYSIS CONTAINED IN THIS PARAGRAPH (1) HAS BEEN PREPARED BY THE COMMITTEE AND DOES NOT NECESSARILY REFLECT HOW THE COURT WILL RULE.

The Committee contends that the conduct of the officers and directors of ST and of companies owned and controlled by Mr. Gonfiantini who performed services for ST (including SFC, Specialty Mortgage and Specialty Capital Corp., jointly referred to as the "Specialty Companies"), which is described below, may form the basis for several claims including, without limitation, damage claims for breach of contract and breach of fiduciary duty.  Some of the transfers of property and obligations described below may also be "avoidable" under state law (the "Uniform Fraudulent Transfers Act") or under bankruptcy law (for example, Bankruptcy Code section 548 "Fraudulent Transfers").  A transfer is "fraudulent" under state law and bankruptcy law if it was made for less than "reasonably equivalent value" at a time when the transferee was either insolvent or without sufficient cash to pay its obligations as they came due.  A transfer is also fraudulent if it rendered the transferee insolvent or with insufficient cash.  Finally, a transfer is also fraudulent if it is made with actual intent to hinder, delay or defraud creditors to whom the transferee either is or will be indebted.

Other causes of action may exist against professionals (attorneys, auditors, appraisers) who were employed by ST and SFC on behalf of ST.  These causes of action may arise from the conflict of interest of a professional who represented both ST and other individuals and companies with competing interests, or who failed to provide an unbiased professional opinion regarding the assets and business dealings of ST, as required by the rules of their professions, or were negligent in connection with the professional services they rendered.

The Debtors' Board of Directors has responded to certain of the causes of action described below.  The response is set forth below.  The Board response relates only to potential claims against the Board members for breach of fiduciary duty and not to other causes of action or actions against

other parties.

The Board members have not been asked to provide personal financial statements, since the Committee's investigation into causes of action was stopped at the request of Mr. Lyon, acting on behalf of the Board. The Board members have not filed proofs of claim asserting their indemnity rights. The failure to file proofs of claim may prohibit the Board from asserting indemnity rights.

Finally, since the Liquidating Trust under the Committee's Plan is a separate legal entity from the pre-petition debtor, the Committee's Plan may eliminate the ability of the Directors to offset their claims against any potential damage claims.

Since ST is a Maryland corporation, the duties of ST directors are governed by Maryland law.

In Maryland, corporate directors must perform their duties (1) in good faith, (2) in a manner the director reasonably believes to be in the best interests of the corporation, and (3) with the care than an ordinarily prudent person in a like position would use under similar circumstances. Md. Code. Ann. Corps. & Ass'ns § 2-405.1(a) (1999). Under section 2-405.1(c), directors who fulfill these duties enjoy the immunity from liability defined in sections 5-417 of the Courts and Judicial Proceedings Article. Maryland has codified the "business judgment rule" at section 2-405.1(e), which provides, "[a]n act of a director of a corporation is presumed to satisfy the standards" imposed by section 2-405.1(a).

In Maryland and other jurisdictions the protection afforded by the business judgment rule is not available to the extent directors engage in "self-dealing" (using their position with one company to obtain a benefit for themselves or for another company in which they have a substantial interest).

The Committee was not permitted to investigate all of the conduct of the Debtors or the Specialty Companies. They were requested to cease their investigation by the CRO. However, all Causes of Action under state or federal or Bankruptcy law will be either transferred to the Liquidating Trust under the Committee Plan or retained by the Reorganized Debtors under the Debtors' Plan.

The facts below may form the basis for one or more causes of action discussed above, based upon the legal principles stated above. Other causes of action may also be available. The list of

1    potential causes of action is not intended to be exclusive.  All causes of action will be preserved,

2    regardless of whether they are discussed or described in this Disclosure Statement.

3                                    **(a)      Fees Paid to SFC**

4           SFC is a company owned and controlled by Mr. Gonfiantini.  Mr. Gonfiantini also serves as

5    an officer, director, or manager of each of ST's subsidiaries.  At all times relevant to the transactions

6    (as described below), and until recently, Mr. Gonfiantini also served as President, Chief Executive

7    Officer, and Chairman of the Board of Directors of ST. Mr. Gonfiantini's company, SFC, manages

8    and runs the Debtors' day to day operations; it was also responsible for evaluating prospective

9    business loans, generating loan originations, and managing the loan and asset portfolio.

10          At the time these Chapter 11 cases were filed, the management services between SFC and ST

11   were governed by a *Seventh Amended and Restated Management Agreement* dated April 1, 2009

12   (the "Management Agreement"). The Management Agreement provides that SFC is entitled to the

13   following fees: (i) a monthly base asset management fee in the amount of one percent (1%) per

14   annum of the total consolidated assets of ST and its subsidiaries as of the prior calendar quarter after

15   adding back any allowances for loan losses, and (ii) a quarterly incentive compensation fee equal to

16   forty-five percent (45%) of the amount by which ST's (including its subsidiaries) adjusted net

17   income for such quarter exceeds a pre-set "Threshold Return" times the "Net  Worth" of the

18   consolidated companies. The Management Agreement further provides that "The incentive fee

19   payments to the Manager (SFC) are made before any income distributions are made to the

20   stockholders . . ." of ST.

21          The Management Agreement requires SFC to render its duties in good faith; it also gives

22   SFC substantial discretion in its ability to calculate its fees subject only to adjustments pursuant to

23   unaudited quarterly financial statements prepared by SFC.   The formula for calculating SFC's

24   management fee was modified in 2009 to include allowances for loan losses in the base calculation

25   of the fee. It is the Committee's opinion that one result of this modification to the prior management

26   agreement's financial terms was to modify SFC's fees so they would not be decreased from past

27   levels and, most likely, would be increased, at a time when ST was giving loan extensions and

28   material loan modifications to its borrowers which reduced its cash flows.

1    According to Debtors' financial statements, SFC and other companies owned or controlled

2    by Mr. Gonfiantini received fees of approximately $25 million from ST between 2006 and 2009

3    pursuant to the Management Agreement and its predecessor versions, and other agreements. A

4    substantial portion of these fees were based upon loans ST made to borrowers in which Mr.

5    Gonfiantini had substantial equity interests and which were controlled by Mr. Gonfiantini. Most of

6    these loans are now on interest accrual status and enjoying extensions to their dates of maturity.

7    Schedules filed in the case by ST on May 21, 2010 reflect in excess of $58,000,000 in loans to

8    borrowers owned or controlled by Mr. Gonfiantini (the "Related Party Loans") including the

9    following:

10         ■ Nadador LLC ("Nadador") - $35,623,318.00

11         ■ Vero Desert Lakes, LLC ("Vero Desert Lakes") - $15,521,263.00

12         ■ Waterfront Partners, LLC ("Waterfront Partners") - $7,799,405.00

13    (Nadador, Vero Desert Lakes, and Waterfront Partners are collectively referred to as

14    "Related Parties").

15    None of these Related Party Loans are currently paying debt service to ST, although interest

16    on these loans is being allowed to be accrued. Under the current Management Agreement,

17    nonpayment of debt service and accruals of interest result in increases to the management fees paid

18    to SFC because the fee is based in part upon accrued and unpaid interest. In addition, ST has

19    advanced significant additional funds to Nadador and Waterfront Partners to pay expenses that the

20    Committee believes should have been borne by these entities. ST has also advanced funds to

21    Waterfront Partners to pay debt service on a senior loan owed by Waterfront Partners to the

22    successor of its primary secured lender. Similarly, ST has advanced monies to Nadador to pay for

23    fees and services the Committee believes Nadador is obligated to pay. These advances have been

24    made despite the fact that none of these borrowers are currently making payments on their respective

25    loans. The Committee also contends that the Related Party Loans were modified shortly before the

26    filing of bankruptcy to provide the borrowers with lengthy payment holidays. The modifications

27    included delay of all payments to maturity on the Vero Desert Lakes loans to February 1, 2011;

28    delay of payments on the loan to Waterfront Partners to  June 1, 2011; and delay of payments on

1    three of the Nadador loans to March 1, 2011, and on one of the Nadador loans to March 1, 2013.  It

2    is the Committee's position that these loan extensions deprived ST of critically needed cash to pay

3    its debts, and, further, that none of the Related Party borrowers offered to pay or paid any

4    consideration to ST for these concessions.  These loan extensions and interest deferrals also cause

5    the amounts owing to ST to increase, thereby increasing the management fees paid to SFC by ST.

### (b)    Payments to Specialty Mortgage

7        ST's Statement of Financial Affairs indicates payments of $637,687 to Specialty Mortgage in

8    the year prior to bankruptcy.   Specialty Mortgage is also owned and controlled by Mr. Gonfiantini.

### (c)    Duck Creek Loan Transaction

10        The Committee believes that SFC received a fee for structuring a loan made by ST to Village

11    of Duck Creek Estates, LLC ("Duck Creek") in a manner that resulted in an unnecessary loss of $5

12    million to ST that could have been avoided. Specifically, the Committee contends that at SFC's

13    recommendation, ST advanced $23.5 million to Duck Creek secured by real property in San Joaquin

14    County, California. Of this loan, $5 million was subject to repayment within six months if certain

15    conditions were not met.  The most important of these conditions was the release of an existing

16    senior lien on the Duck Creek property in the amount of $1 million for the benefit of Ryland Homes.

17    The obligation to Ryland Homes was never paid off by the borrower, and the borrower made no

18    payments on the loan advanced by ST. As a result, the Duck Creek property, which is now owned by

19    SAC II following foreclosure by ST, is encumbered by a $1 million senior lien for the benefit of

20    Ryland Homes and Debtor's entire loan of $23.5 million is in jeopardy due to the decline in the

21    value of the property. The Committee believes, at the least, ST should have advanced only $17.5

22    million of the loan, with the remaining $5 million either held in escrow subject to the release of the

23    Ryland Home lien, or with a payment made directly to Ryland Homes in exchange for a release of

24    the lien. The Committee also contends that, by including the $5 million with the other $17.5 million

25    loaned to the borrower, the fee paid to SFC for structuring and placing the loan was increased by

26    approximately $100,000.

### (d)    Claims Arising from Loans to Waterfront Partners

28        The Committee also believes that Waterfront Partners did not properly use certain of the City

National Bank loan proceeds (to which ST subordinated) to pay down the then-outstanding ST loan. Of the $963,000 that was not used to pay down the ST loan, the Committee believes that approximately $330,000 was used for general operating purposes by Waterfront Partners, approximately $30,000 was used to pay escrow costs for the benefit of Waterfront Partners, and $600,000 was used to pay off a prior loan to Waterfront Partners from Sun West Bank. Then, according to the Committee, after the City National Bank loan was put in place, Waterfront Partners converted its loan with ST to a "Construction Loan" for the purpose of funding construction on the property and to convince the City of Reno that the project was proceeding to the construction phase so that the City would abandon a right of way across the Waterfront property that enhanced the value of the property. The "Construction Loan" for this purpose was put in place in October 2008, and the loan commitment by ST was increased to $10 million. The modifications to the loan specifically provide that any further advances made under the terms of the Construction Loan Note would be made only to fund construction costs incurred by the borrower.

The advances were not used to fund construction on the property. Instead, the funds were used to make monthly payments on the City National Bank loan. To the best information available to the Committee, none or very little of the funds advanced under the Construction Loan were used for construction purposes.

### (e)    Claims Arising from Loans to Nadador

Mr. Gonfiantini was a principal in and served in a controlling position with Nadador LLC at all relevant times while it was borrowing money from ST. Nadador's property is pledged to secure three loans made by ST and a fourth loan made by ST to Nadador LLC is a mezzanine loan secured by a pledge of Nadador's membership interests. The mezzanine loan was put in place to pay off initial investors (Class 2 investors) of Nadador. When the Class 2 investors' loans were retired, Mr. Gonfiantini and/or his affiliates received a 25-30% interest in Nadador, stepping up in the place of the Class 2 investors.

The Committee has identified what it believes are several problems with the Nadador loan as follows:

- In December 2007, ST approved a modification of the mezzanine loan. As a

1155633.6

condition to the approval of the modification, ST's Loan Committee required joint and several guaranties of the loan by Mr. Gonfiantini among others. The guaranties executed by Mr. Gonfiantini and by the other guarantors, however, are not triggered until the completion by Nadador project known as The Residence Club at PGA West and the failure of the borrower to pay the loan in full upon completion of the project. Under present circumstances, the Nadador project may never be completed, or may not be completed for a substantial period of time, greatly reducing or eliminating the value of Mr. Gonfiantini's guaranty.

- In consideration for the conditional guaranties, the interest rates on the loans to Nadador were reduced from 18% to 12.5% on the mezzanine loan and to 10.5% on certain loans secured by Nadador's real property.

- Loan payments were modified to provide for a payment holiday and ST also agreed to loan up to $2 million additional funds secured by unencumbered real estate.

- The terms of Mr. Gonfiantini's actual loan guaranty may differ considerably from the terms that were presented to and approved by ST's Loan Committee. The guaranty itself is very limited. Mr. Gonfiantini's obligation under the guaranty cannot exceed the lesser of $5.2 million or the market value of the shares of Specialty Trust stock additional pledged by Mr. Gonfiantini to assure payment under the guaranty.

- On March 10, 2010, shortly before the Petition Date, the maturity date of the mezzanine loan was extended to March 1, 2013. It appears that ST did not receive any consideration for this extension of the due date of the loan.

- In 2008, it appears one of ST's independent auditors raised a concern with SFC and ST regarding the relationship of Mr. Gonfiantini with ST, SFC, and Nadador, and suggested that due to this relationship, Nadador and ST should be consolidated for financial reporting purposes.

- Advances to Nadador were continued to be made by ST even though the current loan to value ratio, in the aggregate for all of the loans to Nadador, exceeded 100%.

### (f)    Claims Arising from Loans to Vero Desert Lakes and Predecessors

ST originated a $5 million mezzanine loan to Vero Lytle Creek, LLC in July 2006 that was funded with an initial advance of $2,717,158. A subsequent advance of $2,282,842 was made in August 2006. The Committee contends that Vero Lytle Creek, LLC was a venture controlled by Mr. Gonfiantini's company, Gonzo Investor, LLC, and was an investment vehicle for a number of private investors including Mr. Gonfiantini and, it is believed, some other insiders. Vero Lytle Creek, LLC was formed in June 2005 for the specific purpose of partnering with Lennar Homes in the purchase and development of approximately 387 acres in residential property located in the unincorporated area of San Bernardino County, CA ("Lytle Creek Project"). Lennar Lytle Holdings, LLC was formed by Vero Lytle Creek, LLC and Lennar Homes for the development of the Lytle Creek Project.

The Committee contends that in December 2006 and May 2007 ST amended the loan documents and made further advances of $3,050,000 and $3,873,000 to Vero Lytle Creek, LLC bringing the total advances to $11,923,000. Of this amount, the sum of approximately $2.7 million was paid to Mr. Gonfiantini's company, Gonzo Investor, LLC, to repay a note due to it from Lennar Lytle Holdings, LLC, and approximately $8.9 million was paid to Lennar Lytle Holdings, LLC, to fund equity capital calls after the primary lender to Lennar Lytle Holdings, LLC, refused to fund further construction advances on the project.

The Committee further contends that after disputes arose among the members of Lennar Lytle Holdings, LLC regarding the project, the principals of the project, including Vero Lytle Creek, LLC, entered into a "Global Settlement" in January 2008 whereby Vero Lytle Creek, LLC agreed to swap its ownership interest in Lennar Lytle Holdings, LLC, for an ownership interest in Lennar Desert Lakes, LLC, a principal in a real estate project consisting of 2400 undeveloped acres in Coachella, California ("Desert Lakes Project"). The Desert Lakes Project was, and remains to this

day, early in the process of development, and final governmental permits and approvals critical to the development remain to be obtained. As part of the Global Settlement, the limited liability company in which Vero Lytle Creek, LLC, obtained an interest changed its name to Specialty Desert Lakes, LLC and ST's borrower became a new entity called Vero Desert Lakes LLC. Additionally, at the same time, the loan documents with ST were amended to change the borrower, the interest rate on the loan was reduced from 18% to 8%, additional accrued interest of $2,077,000 was added to the principal balance, and the note was modified to stop the accrual of interest on the loan after the total principal and interest due was $20,000,000. In each of April and May, 2008, the loan agreements were again amended to add outstanding interest to the balance owed. In August, 2008, the maturity date of the loan was extended to November 1, 2008, and then extended again to February 2009.

In February 2009, the loan was restructured into a Senior Note and a Subordinate Note of $7,500,000 and $8,021,263, respectively. As part of this restructuring, additional outstanding interest of $1,256,702 was added to the principal balance due and the maturity date was again extended to February 1, 2011. In total, the amount of accrued and unpaid interest added to the principal balance of the loan was $3,598,263, resulting in a total principal balance of $15,521,263 ($3,598,263 + $11,923,000).

The Committee contends that throughout the various amendments to the loan to add accrued interest to the principal balance of the outstanding loan, the management fees paid to SFC were increased as a result of the increased principal balances reflected on the loans. In addition, the Committee contends that the loans were never secured by the pledge of real property. During the period when the borrower was Vero Lytle Creek, LLC, the loan was secured by Vero Lytle Creek's interest in the Lytle Creek Project. In January 2008 when the borrower became Vero Desert Lakes, LLC, the collateral for the loan became Vero Desert Lakes 50% membership interest in the Specialty Desert Lakes LLC's (formerly known as Lennar Desert Lakes, LLC) interest in the Desert Lakes Project. The remaining 50% interest in the Desert Lakes Project is owned by another entity controlled by Mr. Gonfiantini.

**(g)    Transfers of Specialty Trust Property to Sac II for No**

### Consideration

The Committee contends that the Williams Canyon loan was transferred to SAC II for no consideration on August 26, 2009, and further, that the Coolidge 140 loan was transferred to SAC II in February 2009 for no consideration.

**(h)    Modifications of Agreements with US Bank and Affiliated Lenders and Related Transfers**

On February 1, 2010, shortly before the Petition Date, ST entered into a Second Amended and Restated Credit Agreement with US Bank as representative for the for the lender banks (the "US Bank Agreement") to restructure the outstanding indebtedness represented by the Term Loan. SAC II, SAC D-1 and SAC (the "Affiliates") executed guarantees of the Term Loan. SAC II granted deeds of trust on the Coolidge 70 and Sierra Vista properties to secure payment of its guaranty of the Term Loan. These deeds of trust were filed March 24, 2010 and March 29, 2010, respectively. These guarantees and pledges may be avoidable as "fraudulent transfers" under Bankruptcy Code section 548.

**(i)    Fifth and Lincoln and Related Transactions**

5th & Lincoln, LLC and JFP 1331 (collectively, "5th & Lincoln"), and Oak Creek Condominiums, LLC ("Oak Creek") were two of a number of special purpose entities that were controlled by Joseph Pinsonneault ("Pinsonneault"), each of which owned a single parcel of real property.        In July 2006, ST loaned 5th & Lincoln $6,325,000.00 and Oak Creek $3,872,000.00. Each of those loans was secured by a first trust deed on real property owned by the borrower. Between July 2006 and January 2009, the loans were each modified three times so as to extend the maturity dates of the loans and increase the amount of the loans as a result of ST advancing additional funds to the borrowers to create interest reserves for the loans.  Upon each of those occasions, the loan modification agreements required the borrower to pay a "financial planning fee" to SFC, Mr. Gonfiantini's wholly owned company. In January 2009, each of the loans was modified to eliminate the requirement that the borrowers pay interest on a current basis and to provide that

interest on the loans would accrue and be paid at maturity. As of February 2009, 5th & Lincoln owed ST approximately $7,879,948.25 and Oak Creek owed ST approximately $4,827,003.06. In February 2009, Pinsonneault arranged a transaction with his bank, La Jolla Bank, pursuant to which, among other things: (1) The equity interests in 5th & Lincoln and Oak Creek were transferred to ST and ST reconveyed its trust deeds securing its loans; (2) Pinsonneault's entities (5th & Lincoln, Oak Creek and JFP 1330, LLC) borrowed a total of $13,260,000 from La Jolla Bank, which was allocated $6,400,000 to 5th & Lincoln, $3,840,000 to Oak Creek and $3,020,000 to JFP 1330. Each of those loans was secured by a first trust deed on the real property owned by the borrower entity; (3) $1,260,000 of the La Jolla Bank loan proceeds were disbursed to Mr. Pinsonneault; (4) $359,799.96 was paid to the holder of a trust deed secured by the Oak Creek property that had been junior to the trust deed securing ST's loan; (5) $4,740,439.01 was paid to ST by 5th & Lincoln, reducing its loan balance to $3,139,507.24, which was secured by a second deed of trust on 5th & Lincoln's real property (junior to the new La Jolla Bank trust deed) and (6) $2,311,839.36 was paid to ST by Oak Creek, reducing its loan balance to $2,515,163.70, which was secured by a second deed of trust on Oak Creek's real property (junior to the new La Jolla Bank trust deed).

The effect of this series of transactions was to subordinate ST's liens on the 5th & Lincoln, Oak Creek and JFP 1330 properties; to require ST to guaranty the $13,269,000 La Jolla Bank loan in exchange for receiving $8,990,231.65 in payments on loans totaling $18,583,190.74, while at the same time allowing its borrowers' principal Mr. Pinsonneault to receive $1,260,000 and a junior lien holder to receive $359,799.96.

According to Mr. Gonfiantini, this transaction was approved by both ST's Loan Committee and its Board of Directors.

At present, the amount owed on the La Jolla Bank loans exceeds the value of the three properties, rendering ST unsecured for the balance of the monies that it is owed and the equity interests that ST received from Pinsonneault worthless.

///

///

### (2) Debtors' Position

As discussed above, the Debtors' Plan anticipates that the US Bank loan will be repaid at a discount, rendering the pursuit of any avoidance claims against US Bank moot. Thus, Debtors do not presently plan on initiating any avoidance action against US Bank. The Committee, however, has initiated discovery regarding the US Bank collateral, and the Liquidating Trust or the Committee may initiate these avoidance actions. Debtors are investigating whether to dispute the validity of the claim and/or the lien securing that claim related to the Jordanelle Property by JSSD. Debtors and the Committee are reserving any and all causes of action arising out of this transaction, including any action against First American Title Company, which is the title company that issued the title insurance to the Debtors, for providing a possibly deficient/inadequate exception for the lien in favor of JSSD, as well as any and all clams against Debtors' prior Utah counsel that advised Debtors in this transaction. Nevertheless, Debtors will be stipulating to allow JSSD relief from the stay to pursue its state law rights and any other rights provided by law, including foreclosure proceedings. A hearing will be set at a later time regarding approval of this stipulation.

In addition, as set forth above, the Debtors have not formed an opinion regarding the claims discussed herein or identified by the Committee. However, in order to comply with its duties and responsibilities, the Debtors are preserving all possible causes of action for the benefit of Creditors.

### (3) Board Position

**THE INFORMATION AND LEGAL ANALYSIS CONTAINED IN THIS PARAGRAPH (3) HAS BEEN PREPARED BY THE BOARD AND DOES NOT NECESSARILY REFLECT HOW THE COURT WILL RULE.**

The Board of Directors of Specialty Trust, Inc. submits the following in response to the description provided by the Official Committee of Equity Security Holders (the "Committee") of certain alleged "Causes of Action." This response is limited to discrete legal issues arising from the proposed prosecution of the Causes of Action under the Committee's Plan and the potential prosecution of such Causes of Action under the Debtor's Plan, and is not to be construed as an admission of any of the allegations of "fact" or liability, which the Board emphatically disputes.

In summary, the Board believes that, even if the allegations the Committee has described