1  were true – which the Board vehemently disputes – pursuit of the Causes of Action is not in the best

2  interest of creditors.  Indeed, the Board believes that pursuit of the Causes of Action will expend

3  limited resources with little if any commensurate benefit to creditors.  For example, the description

4  of the Causes of Action contains no analysis of the alleged breaches of trust, fiduciary duty or care

5  by the Board.  The description of the Causes of Action contains no analysis of the probability of

6  success in litigation, or how applicable law applied to the allegations will lead to recovery of a

7  judgment against the Board members.  The description of the Causes of Action contains no analysis

8  of the ability of the Board members to satisfy a judgment, or any analysis of the effect on the Causes

9  of Action of existing insurance, the rights of indemnity by contract and the Board members' rights to

10  indemnity by state law.

11          In short, the Committee's description of the Causes of Action paints a superficially beguiling

12  story, but one that fails to provide any factual, legal or practical analysis that will allow creditors

13  voting on the Plans to determine if pursuit of the Causes of Action will produce actual, tangible

14  results for creditors.  In this section of the Disclosure Statement, the Board will explain the reasons

15  why it believes that pursuit of the Causes of Action – even if all of the allegations made by the

16  Committee are true, which the Board vehemently disputes - will producing little, if anything, for the

17  benefit of creditors.

18
                    **(a)      Comparison of the Board of Directors**
19
          The Board of Directors of the Debtor consists of Stephen V. Novacek, Esq., Harvey Fennell,
20
    Michael Mines, Ernest Martinelli, Dr. Nazir Ansari and Nello Gonfiantini.  The Board members are
21
    accomplished and respected professionals and people of business in Nevada.  Most of them have
22
    spent their adult lives in northern Nevada.  They represent a wide range of experience from the law,
23
    real estate, development, banking and finance.  All members of the Board are personally invested as
24
    equity shareholders of the Debtor.
25
          The members of the Board are active and engaged directors.  The Board has historically
26
    conducted its business through regularly scheduled meetings and through properly formed
27
    committees, including a Loan Committee and a Compensation Committee.  The Board has followed
28

1  proper corporate governance. The Board has sought advice from a number of professionals on

2  various issues.

3          After the Debtor filed its Chapter 11 Petition, all of the Board members remained as

4  directors. After Chief Restructuring Officer Grant Lyon was appointed, all of the Board members

5  remained as directors. Many of the Board members have offered to remain as members of the

6  governing body of the Restructured Debtor under the Debtor's proposed Plan.

7

8                    **(b)     General Comments About the Committee's Allegations**

9          The Committee has set forth various allegations of "fact" that it appears to give rise to

10  liability on the part of the Board members. The Board strenuously disputes the Committee's

11  allegations. The Board vigorously denies any form of liability arising out of the Committee's

12  allegations. The Board further contends that, even if these allegations were true (which we dispute),

13  impressing liability on Board members and actually collecting any sum of money is highly

14  problematic based on the application of the business judgment rule, the Board's appropriate reliance

15  on proper corporate governance in the conduct of its duties, including the approval of related-party

16  transactions, and the Board's entitlement to indemnification from the Debtor pursuant to contract

17  with the Debtor, the Debtor's insurance and state law.

18          The purpose of the Board's statement of position in this Joint Disclosure Statement is to

19  explain to creditors why the Board has concluded that pursuit of the Causes of Action is not in the

20  best interests of creditors. In summary, even assuming that the Committee's allegations are true

21  (which the Board vehemently disputes), prevailing on those allegations against Board members will

22  be highly problematic and, even if successful, will not produce money to be paid to creditors because

23  of the Board's contractual and state law rights to indemnification.

24                    **(c)     Pre-petition Indemnification Agreements**

25          The Debtor entered into a pre-petition Indemnification Agreement (the "Indemnification

26  Agreement") with each Board member. In general, the Indemnification Agreements provide that "as

27  an inducement to [the Board member] to continue to serve as such director, the Company has agreed

28  to indemnify and to advance expenses and costs incurred by [the Board member] in connection with

any such claims, suits or proceedings, to the fullest extent permitted by law[.]"  The Indemnification Agreements provide for indemnity to each Board member who

> "is, or is threatened to be, made a party to or a witness in any threatened, pending or completed Proceeding brought by or in the right of the Company to procure a judgment in its favor. …..  [The Board member] shall be indemnified against all amounts paid in settlement and all Expenses actually and reasonably incurred by him or on his behalf in connection with such Proceeding unless it is established that (i) the act or omission of [the Board Member] was material to the matter giving rise to such a Proceeding and (a) was committed in bad faith or (b) was the result of active and deliberate dishonesty or (ii) [the Board member] actually received an improper personal benefit in money, property or services."

As set forth in a subsequent section, if the Committee contends that the Board members' conduct was material and in bad faith or dishonest, such an allegation may eliminate the right to indemnity by the Debtor, but it would almost certainly jeopardize any obligation of the Debtor's insurer to provide indemnity, as well.

The Indemnification Agreement further provides that even if the Board member is determined to be liable for receipt of an improper personal benefit, he may still obtain indemnification by court order.  The Indemnification Agreement obligates the Debtor to

> "advance all reasonable Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding to which Indemnitee is, or is threatened to be, made a party or a witness, within ten days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance[.]"

> * * *

> "[i]n any judicial proceeding or arbitration pursuant to this Section 11 the Company shall have the burden of proving that Indemnitee is not entitled to indemnification or advance of Expenses, as the case may be."  Section 11(a).

The Indemnification Agreements have a term of ten years after the date the Board member ceases to serve as a director.  Section 16.  In addition,

> "the Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part, of the business and/or assets of

the Company, by written agreement in form and substance satisfactory to [the Board member], expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place." Section 16(c).

The Board continued in existence and continued to act on behalf of the Debtor after the Chapter 11 petition was filed, and after Chief Restructuring Officer Grant Lyons was appointed by Court order. The inducement of providing indemnity pursuant to the Indemnity Agreements thus remains as significant today as when the agreements were entered into.

The Debtor is a Maryland corporation and, similar to the law in virtually all 50 states, Maryland law contains broad rights of indemnification for directors and executive officers. The policy that supports these laws throughout the United States is similar to the recital in the Indemnification Agreement: it is an inducement to attract competent board members to serve.

### (d)    State Law Rights of Indemnification

Even if the Debtor's contractual obligation to indemnify the Board did not exist or was eliminated, the Debtor's obligation to indemnify the Board members is further set forth in Maryland law and, to the extent it were deemed applicable, in Nevada law. In addition, state law provides immunity for exercising reasonable care and good faith, and further entitles the board member to rely on information and opinions prepared by officers and professionals. The relevant Maryland and Nevada state law, set forth below, is yet another basis on which the Board concludes that pursuit of the Causes of Action is not in the best interest of creditors because a Board member will be entitled in nearly all circumstances to offset any potential judgment against the obligation of the Debtor to indemnify.

### (i)    Maryland Standard of Care and Director Liability

A director must perform his duties as a director, including his duties as a member of a committee of the board on which he serves, "(1) in good faith; (2) in a manner he reasonably

1  believes to be in the best interests of the corporation; and (3) with the care that an ordinarily prudent

2  person in a like position would use under similar circumstances." Md. Code Ann., Corps. & Ass'ns

3  § 2-405.1(a).  There exists a presumption that an act of a director satisfies the standards of

4  subsection (a). Md. Code Ann., Corps. & Ass'ns § 2-405.1(e).

5        In performing his duties, a director is entitled to rely on "any information, opinion, report, or

6  statement, including any financial statement or other financial data, prepared or presented by:

7        (i)    An officer or employee of the corporation whom the director
8               reasonably believes to be reliable and competent in the matters
               presented;
9        (ii)   A lawyer, certified public accountant, or other person, as to a
               matter which the director reasonably believes to be within the
10              person's professional or expert competence; or
11       (iii)  A committee of the board on which the director does not serve,
               as to a matter within its designated authority, if the director
12              reasonably believes the committee to merit confidence.

13  Md. Code Ann., Corps. & Ass'ns § 2-405.1(b)(1).  However, the director does not act in good faith

14  if "he has any knowledge concerning the matter in question which would cause such reliance to be

15  unwarranted." Md. Code Ann., Corps. & Ass'ns § 2-405.1(b)(2).

16        "It is well established that an officer/director of a corporation occupies a fiduciary

17  relationship with the corporation and owes the corporation a duty of utmost care and loyalty."

18  Pitman v. Aran, 935 F. Supp. 637, 645-46 (D. Md. 1996).  Maryland courts have set out the

19  "business judgment rule" as follows:

20        The conduct of the corporation's affairs are placed in the hands of the
21        board of directors and if the majority of the board properly exercises
         its business judgment, the directors are not ordinarily liable. This
22        sound general rule, however, is subject to the important exception that
         directors will be held liable if they permit the funds of the corporation
23        or the corporate property to be lost or wasted by their gross or culpable
         negligence.
24

25  Parish v. Maryland & Virginia Milk Producers Ass'n, 250 Md. 24, 74, 242 A.2d 512, 540 (1968).

26
                    (ii)    Maryland Immunity from Liability
27
     Notably, a person who performs his duties in accordance with the standard set out in section
28

2-405.1 "shall have the immunity from liability described under § 5-417 of the Courts and Judicial Proceedings Article."  Md. Code Ann., Corps. & Ass'ns § 2-405.1(c).  That article states that "A person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."  Md. Code Ann., Cts. & Jud. Proc. § 5-417.

### a)    Directors

Directors are shielded from personal liability so long as they act in "good faith," "in the best interests of the corporation," and "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." Edenbaum v. Schwarcz-Osztreicherne, 165 Md. App. 233, 252-53, 885 A.2d 365, 376 (Md. Ct. Spec. App. 2005).

### b)    Officers

"In the absence of fraud, "a corporate officer is not personally liable on a corporate contract with a third person." Edenbaum v. Schwarcz-Osztreicherne, 165 Md. App. 233, 252, 885 A.2d 365, 375-76 (Md. Ct. Spec. App. 2005) (citing A.B. Corporation v. Futrovsky, 259 Md. 65, 79, 267 A.2d 130 (1970)).

### (iii)    Maryland Indemnification

Section 2-418 governs corporate indemnification.  A corporation "may" indemnify a director made party to any proceeding unless:

1. The act or omission of the director was material to the matter giving rise to the proceeding; and

   a. Was committed in bad faith; or

   b. Was the result of active and deliberate dishonesty; or

2. The director actually received an improper personal benefit in money, property, or services; or

3. In the case of any criminal proceeding, the director had reasonable cause to believe that the act or omission was unlawful.

50

1155633.6

Md. Code Ann., Corps. & Ass'ns § 2-418(b)(1).

Indemnification "may be against judgments, penalties, fines, settlements, and reasonable expenses actually incurred by the director in connection with the proceeding," indemnification "may not be made in respect of any proceeding in which the director shall have been adjudged to be liable to the corporation." Md. Code Ann., Corps. & Ass'ns § 2-418(b)(2). Further, the corporation may not indemnify a director with respect to "any proceeding charging improper personal benefit to the director, whether or not involving action in the director's official capacity, in which the director was adjudged to be liable on the basis that personal benefit was improperly received." Md. Code Ann., Corps. & Ass'ns § 2-418(c).

Unless limited by the charter, a court may order indemnification of a successful director pursuant to certain requirements and under certain circumstances. See Md. Code Ann., Corps. & Ass'ns § 2-418(d). Further requirements exist as to determining the reasonableness of expenses and when those expenses may be paid. Md. Code Ann., Corps. & Ass'ns § 2-418(e)(3) – (4) and (f).

Importantly, the indemnification and advancement of expenses authorized by section 2-18 are not "exclusive of any other rights, by indemnification or otherwise, to which a director may be entitled under the charter, the bylaws, a resolution of stockholders or directors, an agreement or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office." Md. Code Ann., Corps. & Ass'ns § 2-418(g).

(iv)    Nevada Standard of Care

In Nevada, directors and officers must exercise their powers in "good faith and with a view to the interests of the corporation." Nev. Rev. Stat. Ann. § 78.138(1). There exists a presumption that the acts of the director or officer are "in good faith, on an informed basis and with a view to the interests of the corporation." Nev. Rev. Stat. Ann. § 78.138(3).

In performing their duties, directors and officers are entitled to rely on information, opinions, reports, books of account or statements, including financial statements and other financial data prepared or presented by the following:

> (a) One or more directors, officers or employees of the corporation reasonably believed to be reliable and competent in the matters

1    prepared or presented;

2    (b) Counsel, public accountants, financial advisers, valuation advisers,
     investment bankers or other persons as to matters reasonably believed
3    to be within the preparer's or presenter's professional or expert
4    competence; or

5    (c) A committee on which the director or officer relying thereon does
     not serve, established in accordance with NRS 78.125, as to matters
6    within the committee's designated authority and matters on which the
7    committee is reasonably believed to merit confidence.

8    Nev. Rev. Stat. Ann. § 78.138(2).  However, "a director or officer is not entitled to rely on such

9    information, opinions, reports, books of account or statements if the director or officer has

10   knowledge concerning the matter in question that would cause reliance thereon to be unwarranted."

11   Id.

12        Further, directors and officers may consider the interests of the corporation's employees,

13   suppliers, creditors and customers; the economy of the State and the Nation, the interests of the

14   community and of society and "the long-term as well as short-term interests of the corporation and

15   its stockholders, including the possibility that these interests may be best served by the continued

16   independence of the corporation."  Nev. Rev. Stat. Ann. § 78.138(4).  "Directors and officers are not

17   required to consider the effect of a proposed corporate action upon any particular group having an

18   interest in the corporation as a dominant factor."  Nev. Rev. Stat. Ann. § 78.138(5).

19        Directors owe the corporation the duty of care and the duty of loyalty.  Horwitz v. Sw. Forest

20   Indus., Inc., 604 F. Supp. 1130, 1134 (D. Nev. 1985).  "The duty of care requires the director to

21   exercise the care that a reasonably prudent person in a similar position would use under similar

22   circumstances."  Id.  "The duty of loyalty requires the director to act in good faith and, where he is

23   shown to have a self-interest in a transaction, the burden shifts to him to demonstrate that the

24   transaction is fair and serves the best interests of the corporation and its shareholders."  Id.

25        Courts have expressed the "business judgment rule" as prohibiting judicial inquiry into the

26   actions of corporate directors taken in good faith and in the exercise of honest judgment in lawful

27   furtherance of corporate purposes.  Horwitz v. Sw. Forest Indus., Inc., 604 F. Supp. 1130, 1134 (D.

28   Nev. 1985).  It serves as a defense where directors have (1) acted in a good faith belief that their

52

conduct was in the corporation's best interests; (2) exercised due care in ascertaining the relevant facts and law before acting; and (3) did not act in self-interest. Id.

### (v)    Nevada Liability

Pursuant to exceptions that do not appear to apply or unless the articles of incorporation provides otherwise, a director or officer is not individually liable to the corporation or its stockholders or creditors for damages as a result of any act or failure to act in his or her capacity as a director or officer unless it is proven that:

> (a) The director's or officer's act or failure to act constituted a breach of his or her fiduciary duties as a director or officer; and

> (b) The breach of those duties involved intentional misconduct, fraud or a knowing violation of law.

Nev. Rev. Stat. Ann. § 78.138(7). Further, "except as otherwise provided by specific statute, no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation." Nev. Rev. Stat. Ann. § 78.747(1).

### (vi)    Nevada Indemnification

A Nevada corporation "may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action ... except an action by or in the right of the corporation, by reason of the fact that the person is or was a director, officer, employee or agent of the corporation ... against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding if the person:

> (a) Is not liable pursuant to NRS 78.138; or

> (b) Acted in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the conduct was unlawful.

Nev. Rev. Stat. Ann. § 78.7502(1).

1    Similarly, a corporation may indemnify a person where there is an action "in the right of the

2    corporation to procure a judgment in its favor by reason of the fact that the person is or was a

3    director, officer, employee or agent of the corporation … against expenses, including amounts paid

4    in settlement and attorneys' fees actually and reasonably incurred by the person in connection with

5    the defense or settlement of the action or suit if the person:

6        (a) Is not liable pursuant to NRS 78.138; or

7        (b) Acted in good faith and in a manner which he or she reasonably

8            believed to be in or not opposed to the best interests of the corporation.

9

10   Nev. Rev. Stat. Ann. § 78.7502(2).  However, "indemnification may not be made" where the "person

11   has been adjudged by a court of competent jurisdiction … to be liable to the corporation or for

12   amounts paid in settlement to the corporation, unless and only to the extent that the court …

13   determines upon application that in view of all the circumstances of the case, the person is fairly and

14   reasonably entitled to indemnity for such expenses as the court deems proper."  Id.

15   Finally, to the extent that "a director, officer, employee or agent of a corporation has been

16   successful on the merits or otherwise in defense of any action … the corporation shall indemnify him

17   or her against expenses, including attorneys' fees, actually and reasonably incurred by him or her in

18   connection with the defense."  Nev. Rev. Stat. Ann. § 78.7502(3).

19

            **(e)    Pre-petition Directors and Officers Insurance**

20
            The Debtor procured a directors and officers policy of insurance from Philadelphia

21   Indemnity Insurance Company, Policy No. PHSD490913.  The Policy is a claims made policy that

22   expired February 12, 2011.  The Debtor obtained "tail" coverage and reported the alleged "Causes of

23   Action" within the policy period to the insurer.

24   
            The Policy limit is $1 million for all losses on account of all claims made during the Policy

25   period.  Part 6(A).  The Policy is a "wasting" policy because defense costs are part of the limit of

26   liability.  The Policy excludes the obligation to pay on any loss in connection with a claim

27

28           "arising out of, based upon or attributable to such Insured gaining any
             profit, remuneration or advantage to which they were not legally

entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the Insured committed such act or omission;

"arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such Insured; however, shall only apply if a final and non-appealable judgment or adjudication establishes the Insured committed such act or omission[.]"  Part 5 A and B.

Thus, to the extent the Causes of Action seek to impress liability on the Board members by virtue of illegal profit, fraud or dishonesty, the applicability of these exclusions under the Policy will undoubtedly become an issue.

### (f)    Rights to Administrative Expense Claims

The Board further contends that its members have the right to indemnity as an administrative expense of the Debtor's estate.  For example, in In re Santa Monica Beach Hotel, Inc., 209 B.R. 722 (9th Cir. BAP 1997), a creditor with a pre-petition contract with the debtor continued to provide services to the debtor post-petition.  The contract contained an indemnification clause.  The creditor was sued for pre-petition and post-petition claims by a subcontractor, and sought to have the post-petition indemnity paid by the debtor as an administrative expense claim.  The Ninth Circuit Bankruptcy Appellate Panel allowed the administrative expense claim.

In order to receive an administrative expense claim, which has priority in payment over other creditors, the claimant must show that the debt arose from a transaction with the Debtor that directly and substantially benefitted the estate.  In re DAK Industries, 66 F.3d 1091, 1094 (9th Cir. 1995).  In Santa Monica Beach Hotel, the Court held that even though the contract had not been assumed by the debtor, the creditor who provided the services was entitled to rely on the terms of the contract and to obtain its benefit.  209 B.R. at 727 (citing In re Tucson Yellow Cab Co., Inc., 789 F.2d 701 (9th Cir. 1986).

The Board anticipates that applications for administrative expenses will result in costly and protracted legal battles, which both sides have the risk of losing.  If the Board is correct and the Court allows its rights to obtain indemnification as administrative expenses of the Debtors, those

1    expenses must be paid in full on the Effective Date of the Plan as a condition of confirmation of

2    either Plan. 11 U.S.C. §1129(a)(9)(A). The Debtor may lack the funds to satisfy such expenses.

3         If the Board is incorrect and its members do not have the right to indemnification as an

4    administrative expense, the Board believes that the existence of the contractual and state law right of

5    indemnification entitles the Board members to offset their defense costs and expenses against any

6    judgment that may be entered against them. If the Board is correct, under any set of circumstances,

7    the right of the Board members to indemnification strongly indicates that pursuit of the Causes of

8    Action will not yield commensurate benefit to creditors.

9         The Board has become aware that the Committee takes the position that the Debtors'

10    obligation to indemnify the Board members is subject to the Board members having filed proofs of

11    claim, which they did not do. There may be a number of grounds on which the Committee's

12    position is inaccurate, including the legal authority which holds that the right to indemnification may

13    be an administrative obligation of the Debtors and hence not subject to any requirement to file proofs

14    of claim. This legal authority is set forth above.

15         In addition, the Debtor has the obligation to comply with state law in the management and

16    operation of its business. 28 U.S.C. § 959(b). The Board believes that this requirement includes the

17    Maryland statutes requiring indemnification set forth above. Courts have held that this statute stands

18    for the "uncontroversial proposition that a trustee must carry out his duties in conformity with state

19    law." Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 593 (9th Cir. 1993) (citing

20    Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Protection, 474 U.S. 494, 106 S.Ct. 755, 88

21    L.Ed.2d 859 (1986) aff'g In re Quanta Resources Corp., 739 F.2d 912 (3rd Cir. 1984) (trustee may

22    not abandon property in violation of state environmental laws); Robinson v. Michigan Consol. Gas

23    Co., 918 F.2d 579 (6th Cir. 1990) (state law landlord duties not preempted by Bankruptcy Code);

24    Saravia v. 1736 18th Street, N.W., Ltd. Partnership, 844 F.2d 823, 826-27 (D.C. Cir. 1988) (local

25    housing code applies to debtor in possession).

26         In State of California v. Gillis, the District Court permitted the receiver of Western Oil &

27    Refining Company to continue to operate the business without posting a bond required by the state

28    of California guaranteeing the payment of all license taxes, penalties, and other obligations and

1155633.6                                           56

1    without securing an operating license from California. <u>State of California v. Gillis</u>, 69 F.2d 746, 747

2    (9th Cir. 1934) aff'd, 293 U.S. 62, 55 S.Ct. 4, 79 L.Ed. 199 (1934).  The Ninth Circuit held that the

3    District Court lacked the power to order the receiver to conduct the affairs of the estate contrary to

4    state law. <u>Id.</u>; see also <u>Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n</u>, 997 F.2d 581, 593 (9th

5    Cir. 1993) (citing <u>Gillis</u>).

6         The Board is also aware that the Committee's Plan seeks to eliminate or affect the rights of

7    indemnification created under Maryland state law, and hence any right to offset against potential

8    damages that may be awarded against them, by the creation of the Liquidating Trust.  The Board

9    submits that the Committee's Plan that proposes to eliminate statutory rights of indemnification may

10   violate numerous provisions of the Bankruptcy Code.

11        For example, Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only

12   provisions that are consistent with the interests of creditors and equity security holders and with

13   public policy with respect to the manner of selection of any officer, director, or trustee under the

14   plan and any successor to such officer, director, or trustee[.]"  This section has been interpreted as

15   prohibiting confirmation of a plan that violates state corporate governance statutes or state corporate

16   law public policy.  <u>In re Mahoney</u>, 80 B.R. 197, 201 (Bankr. S.D. Cal. 1987); see also <u>In re Acequia,</u>

17   <u>Inc.</u>, 787 F.2d 1352, 1361 (9th Cir. 1986) (Section 1123(a)(6) and (a)(7) must be read together and

18   require that the court scrutinize any plan that alters the voting rights or establishes management in

19   connection with a plan, regardless of whether the plan provides for the issuance of new securities).

20   Moreover, one of the tests for confirmation of a plan is contained in Section 1129(a)(3), which

21   requires that the plan is proposed in good faith and "not by any means forbidden by law."  One court

22   has applied Section 1129(a)(3) to its analysis of whether violation of a state constitution was grounds

23   for denying confirmation.  <u>In re General Development Corporation</u>, 135 B.R. 1002 (Bankr. S.D. Fla.

24   1991) (court concluded that the state constitution was not violated).

25

26              **(g)    Effect of Assumption or Rejection of the Indemnification**

27                              **Agreements**

28   Neither of the competing Plans of Reorganization sets forth the intention to assume or reject

1155633.6

57

1  the Indemnification Agreements.  In this portion of the discussion, the Board does not take a position

2  whether the Indemnification Agreements are executory, which is a condition to assumption or

3  rejection.  Rather, for purposes of this discussion only, the Board assumes that the Indemnification

4  Agreements are executory and thus subject to either assumption or rejection under Section 365 of the

5  Bankruptcy Code.

6          If these agreements are assumed in either Plan, the Directors' rights to indemnification

7  become administrative expenses of the Debtor and contractual obligations of the successor to the

8  Debtor under either Plan.  If these agreements are rejected in either Plan, the rejection is deemed a

9  pre-petition breach of the agreements.  11 U.S.C. §365(g).  However, because the Board provided

10  value to the Debtor post-petition, the Indemnification Agreements may still be enforced against the

11  Debtor in accordance with the terms of the agreements.  Santa Monica Beach Hotel, 209 B.R. at 726;

12  Tucson Yellow Cab, 853 F.2d at 703-704; see also In re World Sales, Inc., 183 B.R. 872, 877 (9th

13  Cir. BAP 1995) ("[t]he teaching of *Tucson Yellow Cab*, then, is that we must look not only to the

14  benefit to the estate, but also to the consideration due the creditor for providing such benefit.  Such

15  consideration must encompass the entire bargain between the parties, including performance due

16  under foreseen and bargained for contingencies.").

17          Moreover, neither of the competing Plans addresses the effect of Maryland state law (or

18  Nevada state law, to the extent it were deemed to apply) on the Board members' rights to

19  indemnification.  Even in the absence of the Indemnification Agreements, the Board submits that the

20  statutory right to indemnification and the state law limitations on a director's potential liability

21  render pursuit of the Causes of Action a zero-sum endeavor for creditors.

### (h)     Conclusion

22

23          The assumption that someone must be at fault when an investment goes bad is probably a

24  natural product of the human condition, but it is a temptation that should be yielded to cautiously and

25  only if there is some commensurate benefit.  The Board of Directors of the Debtor contests the

26  Committee's version of facts and its allegations, but even if those allegations are assumed to be true,

27  pursuit of the Causes of Action is not in the best interests of creditors.  What is glaringly missing

28

from the Committee's discussion of its Causes of Action is:

(1) the application of the law to the Board's decisions that are challenged. The law holds that the Board is immune when decisions are made in good faith and that the Board is entitled to rely on advice from officers and professionals and has no liability as a result thereof. These considerations strongly suggest that the Board has no liability;

(2) the effect of contractual and state law rights of indemnification on any judgment that could be obtained. As set forth at length above, these considerations indicate that the Board is entitled to be indemnified by the Debtor before creditors will receive anything; and

(3) the existing Policy of insurance that is depleted by defense costs and should not be regarded as a "deep pocket" for creditors.

These considerations lead the Board to conclude that pursuit of the Causes of Action is not in the best interests of creditors.

**NO PERSON SHOULD VOTE TO ACCEPT OR REJECT THE PLANS WITH THE EXPECTATION THAT THE REORGANIZED DEBTORS AND/OR LIQUIDATING TRUST WILL REFRAIN FROM PURSUING ANY ACTION WHETHER OR NOT THAT ACTION WAS COMMENCED PRE-PETITION OR POST-PETITION. EXCEPT AS EXPRESSLY SET FORTH IN THE PLANS, THE PLANS DO NOT RELEASE ANY CLAIMS HELD BY THE DEBTORS OR THE ESTATES. INSTEAD, ALL OF THE RIGHTS OF THE DEBTORS AND THEIR ESTATES TO PURSUE THESE ACTIONS ARE PRESERVED, AS APPLICABLE.**

**E.    Significant Events of the Case**

**1.    Preliminary Motions and Other Early Activity in the Cases**

At the outset of these cases, Debtors filed a number of motions. On May 3, 2010, Debtors filed their *Motion For Order Directing Joint Administration Of Related Chapter 11 Cases Pursuant To Fed. Rule Bankr. P. 1015(B) And Local Rule 1015(B)* [Docket No. 31]. By Order of the Court dated May 14, 2010, the Cases have been jointly administered. [Docket No. 89].

On May 3, 2010, a *Motion Of Specialty Trust, Inc. For Order Limiting Scope Of Notice* was

1    filed [Docket No. 32], whereby ST sought to limit the scope of notice to be provided for certain

2    matters as delineated in the Motion. This Motion was granted by Order of the Court on May 18,

3    2010. [Docket No. 98]. This Order was modified by the *Motion For Order Further Limiting Scope*

4    *of Notice* filed on August 5, 2010. [Docket No. 308]. The modifications sought by that Motion were

5    granted by Order of the Court on September 10, 2010. [Docket No. 386].

6         Debtors also filed a *Motion for Order Granting Extension to File Schedules of Assets and*

7    *Liabilities and Statement of Financial Affairs* on May 4, 2010. [Docket No. 43]. Debtors filed their

8    Schedules and Statements of Financial Affairs on May 21, 2010. Pursuant to an Order of this Court

9    entered on June 17, 2010, these Schedules and Statements of Financial Affairs were deemed timely

10   filed. [Docket No. 214].

11        The 341 Meeting was held on May 24, 2010, and was further continued to June 14, 2010.

12   The 341 Meeting was concluded on June 14, 2010.

13   **2.    Appointment of the Committee**

14        Shortly after the Petition Date, the U.S. Trustee appointed the Committee in the Case. The

15   following are the current members of the Committee:

16        • Raymond J. Poncia, Jr.

17        • Ballardini Family Trust / James R. Cavilia, Esq.

18        • Peter Cladianos, Jr.

19        • Art and Cindy Hinckley Family Trust / Steven S. Johnson

20        • Warren W. & Carol A. Tripp Family Trust / Deric Debenedetti

21        The Debtors' management and its professionals have been working closely and cooperatively

22   with the Committee, the CRO and their representatives during the Cases to (i) provide the

23   Committee and CRO with current and historical information regarding the Debtors' operations,

24   finances, and other affairs and (ii) obtain input regarding various matters, including matters for

25   which the Debtors has sought Court approval during the Cases.

26        Pursuant to the Court's *Order Pursuant to 11 U.S.C. § 105(a), § 1102(b)(3), and § 1103(c),*

27   *Clarifying Requirements to (1) Provide Access to Information, and (2) Solicit and Receive*

28   *Comments from Shareholders* (the "Information Order"), absent further order from the Court, the

1155633.6                                                   60

Committee is prohibited from disseminating (i) non-public information concerning the Debtors or the Committee, and (ii) any other information if the effect of such disclosure would constitute a general waiver of the attorney-client, work-product, or other applicable privilege possessed by the Debtors or the Committee.

Notwithstanding the foregoing, pursuant to the Information Order, Shareholders may submit requests for information to the Committee. Upon receipt of such a request, the Committee must provide a written response as soon as practicable, by no later than ten (10) business days after receipt of the information request. The Committee may provide the Shareholder requesting information with any non-confidential, non-proprietary, and non-privileged information in the Committee's possession that is responsive to its information request, unless the Committee determines, in its sole discretion, that such request is unduly burdensome. Pursuant to the Information Order, the Committee is also authorized to hold periodic meetings open to all Shareholders represented by the Committee. The Committee provides notice of these periodic meetings by posting the date and the time of such meetings, along with dial-in information, on the website maintained by McDonald Carano Wilson, LLP (http://www.mcdonaldcarano.com) at least fifteen (15) days before each meeting.

Contact information for counsel to the Committee is as follows:

Kaaran E. Thomas, Esq.
McDonald Carano Wilson LLP
P.O. Box 2670
Reno, NV 89505-2670
(775) 788-2000
kthomas@mcdonaldcarano.com

### 3.    Debtor-in-Possession Financing and Use of Cash Collateral

Debtors sought permission to use cash collateral during the pendency of these Cases. On May 3, 2010, Debtors filed a *Motion for Interim and Final Orders (A) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001.* [Docket No. 36]. Through this Motion, Debtors sought the use of the cash collateral of US Bank and Deutsche Bank. Various objections were filed to this Motion and the Court conducted numerous hearings and status conferences with regard to Debtors' use of cash

collaterals.  Various interim orders have been entered allowing the Debtors' to use Cash Collateral. [Docket Nos. 113, 174, 272, 439].  A final order granting the use of cash collateral was entered by the Court on December 15, 2010.  [Docket No. 573].

On March 2, 2011, the Court heard *Debtors' Motion for Entry of Order Authorizing (A) Amendments to the Budget, and (B) Modification of Terms of Loans to C.I.C. & S, LLC* [Docket No. 656].  Subject to the *Stipulation Regarding Debtors' Motion for Entry of Order Authorizing (A) Amendments to the Budget, and (B) Modification of Terms of Loans to C.I.C. & S, LLC* [Docket No. 683], the relief requested by the Debtors was approved.

Debtors also filed a *Motion For Entry Of Order (1) Authorizing Postpetition Financing Pursuant To 11 U.S.C. §§ 105; 363(C) And 364(C) And (D); (2) Authorizing Use Of Cash Collateral; (3) Granting Security Interests And Superpriority Claims; And (4) Granting Related Relief,* on November 16, 2010.  [Docket No. 495].  Debtors sought permission to obtain debtor in possession financing from Northlight.  Pursuant to a final order of the Court, Debtors were granted authority to enter in the DIP Facility with Northlight, Northlight was granted a superpriority claim and further liens, and Debtors were authorized to use cash collateral.  [Docket No. 573].  The DIP Facility was granted in the amount of $3,500,000.00.  The DIP Facility was intended to permit the Debtor to fund its operations, bankruptcy-related expenses (including U.S. Trustee fees and professional fees, which are discussed in further detail below), and critical expenses.

### 4.    Expiration of the Exclusivity Periods

The period during which the Debtors have the exclusive right to file a plan (or plans) of reorganization was first extended to and including October 18, 2010.  Debtors' further requested an extension of the period of exclusivity through December 17, 2010.  That request was considered at a hearing held on December 7, 2010.  Debtors' request for a further extension was granted and the period of exclusivity was extended to and including January 18, 2011.  Subsequently, Debtors' sought a further extension of the period of exclusivity and the exclusivity period was extended to March 25, 2011, however, the Committee has been permitted to file a plan notwithstanding the existence of this "exclusive period."  The exclusivity periods may be further extended by order of the Court for cause.

### 5. Existing Litigation

#### a. Pre-Petition Litigation

SAC II was involved in pre-petition litigation with Ryland Homes of California. The case was commenced in the Superior Court for San Joaquin County, California. The case involves issues of judicial foreclosure and declaratory relief. The case was stayed as to SAC II, but continued against other parties named therein. Ryland contends it is the holder of a first priority lien securing a note for approximately $1 million on property owned by SAC II, and commenced an action to judicially foreclose. The Debtors have tendered the defense of that action to First American Title company, which issued the title insurance to the Debtors, and First American is funding the defense of the Ryland action. The Debtors believe First American will pay off the Ryland claim in the event Ryland is successful.

#### b. Post-Petition Litigation and FINRA Audit

##### (1) *Tom Gonzales v. Desert Land, LLC, et. al.*

This action was instituted in Clark County, Nevada against ST, in violation of the automatic stay, and other defendants. The action seeks, in part, judicial foreclosure on a piece of property on which ST holds a first deed of trust, which is better known as the Desert Land, LLC Loan. Gonzales apparently has an agreement with Desert Land and Desert Oasis related to payment required upon transfer or sale of the property. Gonzales initiated the lawsuit to have the parties' rights determined, including a determination that ST's interest in the Desert Land, LLC loan is subordinate to Gonzales' interest and that Gonzales should be permitted to foreclose on the land. ST removed the action to the Court. There is currently a motion to withdraw reference pending.

##### (2) *Paula Billau v. Specialty Trust, et. al.*

This action was instituted in the Central District of California against ST, SFC, Nello Gonfiantini, Robert E. Lawless, Renee Wagner and others. [10] The initiation of this lawsuit against ST after the Petition Date violates the automatic stay. The action seeks a monetary judgment against

---

[10] The following individual defendants are also named in the action: Lance Wagner, Sandra Wagner, Bruce Tebbutt, and Susan Tebbutt, the individuals whose shares Plaintiff allegedly acquired.

1    ST, and the other defendants, in amount not less than $382,590.00 for damages resulting from

2    alleged breach of contract, insider trading, fraud and misrepresentation.  ST filed a notice of

3    bankruptcy and is considering transferring this case to the Court.  As the case is already in federal

4    court, the time periods set forth in Federal Rule of Bankruptcy Procedure 9027 do not govern.

5    However, should it be determined that such time periods govern, those time periods have not begun

6    to run as the action was instituted in violation of the automatic stay and no relief from the automatic

7    stay has been granted.  In addition, this litigation may be subject to dismissal as any claim asserted

8    by Plaintiff in this action is time barred as against ST because Plaintiff has not filed a proof of

9    claim.[11]

10                        **(3)    *Financial Industry Regulatory Authority ("FINRA") Audit***

11           FINRA is the largest independent regulator for all securities firms doing business in the

12    United States.  In September 2010, Specialty Capital, LLC ("Specialty Capital"), a registered broker-

13    dealer and wholly owned subsidiary of SFC, was notified by FINRA that it was going to conduct a

14    Financial/Operational and Sales Practice examination (the "Examination") of Specialty Capital.

15    During the course of the Examination, FINRA requested SFC to produce certain information relating

16    to ST, including accounting records and loan-related documents.  SFC, on behalf of ST, requested

17    FINRA to sign a confidentiality and nondisclosure agreement prior to receiving ST's documents.

18    FINRA declined to do so, and accordingly SFC refused to furnish certain of the requested

19    documents.  In April 2011, Specialty Capital received from FINRA its Examination Report with

20    respect to the Examination.  Specialty Capital has provided to FINRA its responses to the exceptions

21    in the Examination Report and is awaiting FINRA's disposition related to the Examination.

22                        **c.      Retention of Claims, Causes of Action and Other Rights**

23           Except where expressly released or except as otherwise provided in the Plans, pursuant to

24    Bankruptcy Code section 1123(b), the Reorganized Debtors and/or the Liquidating Trust shall be

25    vested with and retain and may enforce any Claims, rights, and causes of action that the Debtors or the

26    Estates may hold or have against any entity, all of which are hereby preserved, including rights of

27    _____

28    [11] Plaintiff may argue that the claim cannot be time barred as they did not receive notice of the bankruptcy.

disallowance, offset, recharacterization and/or equitable subordination with respect to Claims, and causes of action that have been or may be brought by or on behalf of the Debtors or the Estates.

**6.    Professionals Retained by the Estate**

During the Case, the Debtors and the Committee have retained numerous professionals to assist them during the pendency of the Case.  The Court has specifically approved the employment of each of the following professionals in the following capacities:

| Professionals | Capacity |
|---|---|
| Pachulski Stang Ziehl & Jones | General Bankruptcy Counsel for Debtors |
| Downey Brand LLP | Nevada Bankruptcy Counsel for Debtors |
| Tobin & Tobin | Special Counsel for Debtors |
| Robison Belaustegui Sharp & Low | Special Counsel for Debtors |
| Downey Brand LLP | Nevada Bankruptcy Counsel for Debtors |
| Cobalt Real Estate, Inc. | Real Estate Brokers for Debtors |
| Colliers International | Real Estate Brokers for Debtors |
| Imperial Capital, LLC | Financial Advisor and Investment Banker for Debtors |
| Moss Adams LLP | Accountants, Auditors and Tax Return Preparers for Debtors |
| Shumway Van & Hansen | Special Counsel for Specialty Trust |
| G. Grant Lyon | Chief Restructuring Officer for Debtors |
| McDonald Carano Wilson LLP | Counsel for the Committee |
| FTI Consulting, Inc. | Financial Advisors for the Committee |

The Court has approved interim fee procedures for professionals seeking compensation from the Estates.  Generally, subject to the Debtors' cash availability and absent a timely objection, such professionals are eligible to receive payment of 80% of their monthly fees and 100% of their monthly costs upon passage, without objection, of an objection period following submission and service of a monthly fee statement.  Such professionals have the opportunity to request and obtain any "hold back" amounts (*i.e.*, any fees or expenses not paid pursuant to the foregoing procedures or otherwise) upon the filing, and Court approval of, interim and final fee applications.  Interim fee

applications are filed for the approval of fees and expenses for the preceding approximately four-month period; final fee applications are filed at the end of a professional's representation of the Debtor for the approval of fees and expenses incurred during the entirety of the representation.

### 7. Administrative Expenses

Administrative Expenses include expenses incurred by the Debtors in the ordinary course of their businesses, fees owed to the Office of the United States Trustee and fees incurred by professionals employed by the estate. A list of these professionals is described above.

The Debtors file periodic budgets indicating their actual and projected expenses, including attorneys' fees. The actual amount of Administrative Expenses cannot be determined. However, the bankruptcy related legal and accounting fees incurred by the Debtors through January 31, 2011 were approximately $3,605,994.00. The Debtors estimate incurring an additional $2,550,000 in bankruptcy related legal and accounting fees through June 30, 2011.

Of these two amounts, approximately $4,350,000 is expected to remain unpaid on the Effective Date, but the final amount of Administrative Expenses to be paid will depend on the amount the Court allows for the estate professionals and the amount of the US Trustee fee, as well as the amount of expenses Debtors incur in the ordinary course of business. Professionals may be required to disgorge monies they have already received if the Court finds (usually in final hearings at the conclusion of the case) that their fees should not be allowed or if fees are allowed in an amount less than the payments already received by the professional.

### IX.

### FACTORS PERTAINING TO RECOVERY ON CLAIMS AND INTERESTS

**A.    Feasibility**

The Bankruptcy Code provides that a plan may only be confirmed if confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless such liquidation or reorganization is proposed in the Plan. 11 U.S.C. § 1129(a)(11). This is referred to as the "feasibility" requirement. The Plans are liquidating Plans, each of which satisfies the feasibility requirement.

1   This Disclosure Statement includes as **Exhibit 1** and **Exhibit 2** financial projections for

2   Debtors' Plan and the Committee's Plan (collectively the "Projections").  The Projections show

3   financial information for the terms of the Plans following the anticipated Effective Dates.

4   **B.    Liquidation Analysis / Best Interests Test**

5   Bankruptcy Code section 1129(a)(7) requires that each holder of a Claim or Interest in an

6   Impaired Class either (i) vote to accept the plan, or (ii) receive or retain under the plan cash or

7   property of a value, as of the effective date of the plan, that is not less than the value such holder

8   would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

9   This is commonly referred to as the "Best Interests Test."  The Court will determine whether the

10  value received under either of  the Plans by the holders of claims in each class equals or exceeds the

11  value that would be allowed to such holders in liquidation under chapter 7.

12  In a chapter 7 case, a trustee or trustees would be elected or appointed to liquidate the

13  Debtors' assets and make distributions to Creditors in accordance with the priorities set forth in the

14  Bankruptcy Code.  Secured Creditors generally are paid from the proceeds of sale of the properties

15  securing their liens.   If any assets are remaining after the satisfaction of Secured Claims,

16  administrative expenses generally are next to receive payments.  Unsecured Claims are paid from

17  any remaining sales proceeds or other estate assets, according to their rights to priority.  Unsecured

18  Claims with the same right to priority receive a *pro rata* distribution based on the amount of their

19  allowed Claim in relation to the total amount of allowed unsecured Claims with the same right to

20  priority.  Subordinated unsecured Claims would be paid after unsecured Claims in a similar *pro rata*

21  process. Finally, Interest holders, including Shareholders, receive the balance that remains, if any,

22  after all Creditors are paid.

23  Thus, for the Court to confirm either of the Plans, the Court must find that all Creditors and

24  Shareholders in Impaired Classes who do not accept the plan will receive at least as much under the

25  plan as such holders would receive under a hypothetical chapter 7 liquidation.

26  The Debtors and Committee believe that confirmation of their respective Plans is the best

27  way for Creditors to receive the maximum amount of money.

28

1155633.6

1    Absent confirmation of either of the Plans, the likely alternative is the conversion of the

2    Cases to cases under chapter 7 of the Bankruptcy Code.    In chapter 7, the Cases would be

3    administered by a trustee, and the assets in which the Debtors have equity would be liquidated as

4    quickly as possible.    The Debtors and the Committee believe that conversion to chapter 7 would be

5    detrimental to any remaining businesses of the Debtors, to virtually all of the Creditors, and would,

6    in all likelihood, wipe out the interests of ST's Shareholders.    The consequences of such a

7    conversion may include:

8    • Foreclosure or execution upon some or all of the Debtors' assets by the DIP Lender.

9    • Reduced distributions to Creditors due to the lack of funding and the likelihood that

10    distressed sales by a chapter 7 trustee would yield fewer gross proceeds than a controlled liquidation

11    under either the Debtors' Plan or the Committee's Plan.

12    • Additional administrative costs to pay a chapter 7 trustee and any professionals that

13    the chapter 7 Trustee may retain.

14    Attached to the Disclosure Statement as **Exhibit 3** is a Liquidation Analysis with an analysis

15    of the estimated recoveries and expenses were the Debtors' cases converted to cases under chapter 7.

16    The Debtors' Plan provides for an orderly liquidation of the Reorganized Debtors' assets

17    over time.    The Reorganized Debtors will not be permitted to engage in any business other than the

18    protection and maintenance of their existing assets until they can be liquidated in an orderly fashion

19    and payments can be made to existing creditors from the proceeds derived from such activities, and,

20    if there is any excess, to the shareholders.    The Committee's Plan provides for an orderly liquidation

21    of the Debtors' assets through a Liquidating Trust which will operate like a Chapter 7 Trustee.    The

22    Liquidating Trust will protect and maintain its assets to provide the best possible chance, within the

23    Trust's financial capabilities, to provide meaningful returns to existing creditors and shareholders.

24    The Liquidating Trustee, unlike a Chapter 7 trustee, will consult with a Board of Advisors consisting

25    of the various classes of trust beneficiaries.

26    In light of the fact that both Plans are liquidating plans designed to reduce all Debtors' assets

27    to cash for distribution to the Creditors and Shareholders, any liquidation analysis is not as

28    significant as it would be for a debtor in a chapter 11 case which reorganizes and continues with

1155633.6

business as usual. However, the Debtors and the Committee believe that an orderly liquidation will allow more recovery for the Creditors and Shareholders.

Further, the major issues are resolved in the Plans, which are issues that would otherwise increase administrative expenses in a chapter 7. For example, the Plans resolve potential disputes with pre-petition lenders regarding security interests and rights of offset or recoupment of the Debtors. The Plans also resolve any potential disputes between the Debtors' estates. In a chapter 7, the resolution of potential disputes could be time consuming and costly.

Both the Debtors and the Committee believe that resolutions under their respective Plans will be more cost effective and efficient than the chapter 7 liquidation. Therefore, they favor confirmation of either Plan over a chapter 7 liquidation. The Debtors and the Committee believe their Plans meet the Best Interest Test and provide value that is not less than the value that would be recovered by each holder in a proceeding under Chapter 7 of the Bankruptcy Code.

THE LIQUIDATION ANALYSIS WAS PREPARED SOLELY TO ASSIST THE COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) OF THE BANKRUPTCY CODE AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTORS AND THE COMMITTEE BELIEVE ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS, THE COMMITTEE OR A CHAPTER 7 TRUSTEE.

THE LIQUIDATION ANALYSIS AND THE FINANCIAL INFORMATION ON WHICH IT IS BASED HAVE NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS

REPRESENTED IN THE LIQUIDATION ANALYSIS.

**C.    RISK FACTORS**

The Reorganized Debtors' and/or the Liquidating Trustee's ability to perform their respective obligations under the respective Plans is subject to various factors and contingencies, some of which are described in this section.    The following discussion summarizes only some material risks associated with the Plans and the Liquidating Trust, and is not exhaustive.    Moreover, this section should be read in connection with the Plans and the other disclosures contained in this Disclosure Statement.

> **PRIOR TO VOTING TO ACCEPT OR REJECT THE PLANS, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD, WITH THEIR ADVISORS, READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT AND THE PLANS.**

**1.    Bankruptcy Considerations**

    **a.    Parties in Interest May Object to the  Classification of  Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an equity interest in a particular class only if the Claim or equity interest is substantially similar to the other Claims or equity interests in that class.    The Debtors and the Committee believe that the classifications of holders of Claims against the Debtors and of the holders of Interests in the Debtors under the Plans comply with the requirements set forth in the Bankruptcy Code because the classes established under the Plans each encompass Claims or Interests that are substantially similar to similarly classified Claims or Interests.    Nevertheless, there can be no assurance that the Court will reach the same conclusion.

    **b.    Failure to Satisfy Voting Requirements**

If either of the Plans receives the votes in number and amount sufficient to enable the Court to confirm either of the Plans, the Debtors or the Committee, as applicable, intend to seek, as

promptly as practicable thereafter, confirmation of that Plan by the Court. **A confirmation hearing has been set for June 3, 2011 at 2:00 p.m.** In the event either of the Plans do not receive sufficient votes, the Debtors or the Committee, or any of them, may seek to accomplish an alternative chapter 11 plan. There can be no assurance, however, that the terms of any such alternative chapter 11 plan would be similar to, or as favorable to the holders of Allowed Claims as, those proposed in the current proposed Plans.

        c.      **Failure to Secure Confirmation of Either of the Plans**

Bankruptcy Code section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and requires the Court to make a series of specified, independent findings.

Even if either of the Plans receive the required votes accepting such Plan, there can be no assurance that the Court will confirm that Plan. A non-accepting holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Court could still decline to confirm either of the Plans if it finds that any of the statutory requirements for confirmation of the Plans are not met, including the requirement that the terms of the Plans do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If either of the Plans is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Plans may be modified as necessary for confirmation of either of the Plans. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plans. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plans or no distribution of property whatsoever under the Plans.

        d.      **Non-Consensual Confirmation**

In the event that any impaired class of Claims does not accept a chapter 11 plan, a Court may nevertheless confirm the plan under the procedure for non-consensual confirmation described in

Section VI of this Disclosure Statement.  The Debtors and Committee believe their respective Plans satisfy the requirements for non-consensual confirmation, although each reserve the right to assert that the other's Plan fails to meet these requirements.  There can be no assurance that the Court will rule that either plan meets these requirements.

### e.    Objections to Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plans, the Debtors, the Committee, the Reorganized Debtors and the Liquidating Trust, as applicable, reserve the right to object to the amount or classification of any Claim or Interest.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest against the Debtors.

### f.    The Effective Date Might Not Occur

Even if the Court confirms one of the Plans, that Plan shall not become binding until the Effective Date occurs.  The Effective Date of each of the Plans is set forth in Section I.A. of that plan.  While there can be no assurances as to when exactly the Effective Date will occur, based on the current circumstances of the Cases, the Debtors and the Committee will both work diligently to facilitate as early an Effective Date as possible.  However, it is unlikely that under either Plan the Effective Date will occur earlier than thirty (30) days following the Confirmation Date.

### 2.    Other Risk Factors

#### a.    Recent Dislocation in the Financial Markets and Deterioration of the Mortgage Lending and Financing Industries

The recent disruption within the financial markets has produced dramatic risks for the economy. The real estate market and the Reorganized Debtors' or the Liquidating Trust's, as applicable, ability to liquidate Debtors' assets and to obtain any needed financing will continue to be profoundly affected by the economic crisis in ways that cannot be estimated or predicted.

#### b.    The Reorganized Debtors or the Liquidating Trust May Not be Able to Meet Post Reorganization Debt Obligations and Operational Needs

The Reorganized Debtors' or the Liquidating Trust's, as applicable, ability to service its debt obligations as they come due and meet operational needs after the Effective Date will depend, in part, on future performance and market conditions.  If the Reorganized Debtors' or the Liquidating

Trust, as applicable, is unable to service their debt obligations and operational needs, this may preclude the Reorganized Debtors or the Liquidating Trust, as applicable from fulfilling its post-reorganization liquidation plan, which could adversely affect creditor recoveries.

**D.    Securities Law Matters Under The Committee's Plan**

The securities law considerations detailed below pertain to the issuance of the Trust Certificates under the Committee's Plan. The following discussion relates to certain securities laws that restrict transfers of the Trust Certificates and that may be applicable to transfers of the Trust Certificates subsequent to their issuance under the Committee's Plan.

The Liquidating Trust does not intend to file a registration statement under the Securities Act or any other federal or state securities laws with respect to the issuance or resale of any of the Trust Certificates. To the extent set forth herein, the Liquidating Trust will rely on Bankruptcy Code section 1145(a) to exempt the offer, sale and issuance of the Trust Certificates pursuant to the Committee's Plan from registration under the Securities Act and any applicable state securities law. Generally, Bankruptcy Code section 1145(a)(1) exempts the offer and sale of securities pursuant to a plan of reorganization from such registration requirements if the following conditions are satisfied: (i) the securities are issued by a debtor (or its affiliate or successor) under a plan of reorganization, (ii) the recipients of the securities hold a Claim against, an Interest in, or a Claim for an administrative expense against, the Debtor, and (iii) the securities are issued entirely in exchange for the recipient's Claim against, or Interest in, the Debtor, or are issued "principally" in such exchange and "partly for cash or property." Here, pursuant to the Committee's Plan, (i) the Trust Certificates and other securities are being issued by the Liquidating Trust under the Committee's Plan, (ii) the recipients of these securities hold Claims against or Interests in the Debtor, and (iii) these securities are being issued entirely in exchange for the recipients' Claims against the Debtor.

There is no public market for the Trust Certificates, and none is expected to develop in the foreseeable future. Recipients of the Trust Certificates should be prepared to hold the Trust Certificates for an indefinite period of time and must be able to afford the complete loss of their investment.

1    In principal, *in the event that a public market for the Trust Certificates develops,* the Trust

2  Certificates distributed under the Committee's Plan may be eligible for resale by the holders thereof

3  pursuant to an exemption provided under Bankruptcy Code section 1145, except for holders of such

4  certificates that may be deemed to be an "underwriter" (as defined in Bankruptcy Code

5  section 1145(b)(1)) with respect to the Trust Certificates.    Generally, Bankruptcy Code

6  section 1145(b)(1) defines an "underwriter" as any person who (i) purchases a Claim against, or an

7  Interest in, a Debtor with a view toward distribution of any security to be received in exchange for

8  such Claim or interest, (ii) offers to sell securities issued pursuant to a bankruptcy plan for the

9  holders of such securities, (iii) offers to buy securities issued pursuant to a bankruptcy plan from

10  persons receiving such securities, if the offer to buy is made with a view toward distribution of such

11  securities, or (iv) is an issuer within the meaning of Section 2(11) of the Securities Act.

12  Section 2(11) of the Securities Act provides that the term "issuer" includes all persons who, directly

13  or indirectly, through one or more intermediaries, control, or are controlled by, or are under common

14  control with, an issuer of securities.  Under Rule 405 of Regulation C under the Securities Act, the

15  term "control" means the possession, direct or indirect, of the power to direct or cause the direction

16  of the management and policies of a person, whether through the ownership of voting securities, by

17  contract, or otherwise.  Accordingly, the Liquidating Trustee, or any member of the Board of

18  Advisors of the Liquidating Trust may be deemed to "control" the Trust (and therefore be an

19  underwriter for purposes of Bankruptcy Code section 1145), particularly if such management

20  position is coupled with the ownership of a significant percentage of the Trust's voting securities.

21    Holders of the Trust Certificates who are deemed to be "underwriters" within the meaning of

22  Bankruptcy Code section 1145(b)(1) or who may otherwise be deemed to be "underwriters" of, or to

23  exercise "control" over, the Liquidating Trust within the meaning of Rule 405 of Regulation C under

24  the Securities Act should, assuming all other conditions of Rule 144A are met, be entitled to avail

25  themselves of the safe harbor resale provisions thereof.  Rule 144A, promulgated under the

26  Securities Act, provides a non-exclusive safe harbor exemption from the registration requirements of

27  the Securities Act for resale to certain "qualified institutional buyers" of securities which are not

28  securities of the same class of securities then listed on a national securities exchange (registered as

such under Section 6 of the Exchange Act) or quoted in a U.S. automated inter-dealer quotation system (*e.g.*, NASDAQ). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons (*e.g.*, "dealers" registered as such pursuant to Section 15 of the Exchange Act and "banks" as defined in Section 3(a)(2) of the Securities Act), any entity which purchases securities for its own account or for the account of another qualified institutional buyer and which (in the aggregate) owns and invests on a discretionary basis at least $100,000,000 in the securities of unaffiliated issuers.

At the Confirmation Hearing, the Committee will request that the exemption provided under Bankruptcy Code section 1145 from the requirements of Section 5 of the Securities Act, 15 U.S.C. § 77e, and any state or local law requiring registration or qualification for the offer or sale of a security, apply to the issuance by the Liquidating Trust of the Trust Certificates and the distribution of such Trust Certificates pursuant to the Committee's Plan.

Because no public market will initially exist for the Trust Certificates and may never be developed, and because of the complex, subjective nature of the question of whether a particular person may be an underwriter, the Committee makes no representation concerning the ability of any person to dispose of the Trust Certificates. Therefore, a recipient of Trust Certificates should consult with legal counsel concerning the eventual disposition of the Trust Certificates.

**E.    Securities Law Matters Under Debtors' Plan**

There are several securities law considerations detailed pertaining to the Debtors' Plan. The first is with regard to the cancellation of equity interests in ST held by the Shareholders under the Debtors' Plan. The second is with regard to issuance of new shares under the Debtors' Plan.

On the Effective Date under Debtors' Plan, all equity interests in ST held by the Shareholders will be cancelled. Shareholders will retain a contract right to receive their residual distributions, if any, under Debtors' Plan. This contractual right may be subject to being transferred by the Shareholder. This contractual right may qualify as a security. ST, as a Reorganized Debtor, will not be a reporting corporation under the Securities Exchange Act on the Effective Date, and the contractual right will not be registered or listed as a national securities exchange. There will be no

1    public market for this contractual interest and there can be no assurances that trading markets for this

2    interest will develop.  In addition, even if a market develops and this interest is transferred by a

3    Shareholder, such transfer will not be eligible for the exemption provided by Bankruptcy Code

4    section 1145 discussed above.

5         The Debtors' Plan also contemplates the issuance of new shares in ST.  The Reorganized

6    Debtors do not intend to file a registration statement under the Securities Act or any other federal or

7    state securities laws with respect to the issuance or resale of any of the issued shares.  To the extent

8    set forth herein, the Reorganized Debtors will rely on Bankruptcy Code section 1145(a) to exempt

9    them from registration under the Securities Act and any applicable state securities laws the offer,

10   sale or issuance of the shares pursuant to the Debtors' Plan.  Generally Bankruptcy Code section

11   1145(a)(1) exempts the offer and sale of securities pursuant to a plan of reorganization from such

12   registration requirements if the following conditions are satisfied:  (i) the securities are issued by a

13   debtor (or its affiliate or successor) under a plan of reorganization, (ii) the recipients of the securities

14   hold a Claim against, an Interest in, or a Claim for an administrative expense against, the Debtor,

15   and (iii) the securities are issued entirely in exchange for the recipient's Claim against, or Interest in,

16   the Debtor, or are issued "principally" in such exchange and "partly for cash or property."  Here,

17   pursuant to the Debtors' Plan, (i) the shares are being issued by the reorganized ST under the

18   Debtors' Plan, (ii) the recipients of these securities hold Claims against or Interests in the Debtor,

19   and (iii) these securities are being issued entirely in exchange for the recipients' Claims against the

20   Debtors.

21        There is no public market for these shares, and none is expected to develop in the foreseeable

22   future.  Recipients of the shares should be prepared to hold the shares for an indefinite period of

23   time.  In principal, in the event that a public market for the shares develops, the shares distributed

24   under the Debtors' Plan may be eligible for resale by the holders thereof pursuant to an exemption

25   provided under Bankruptcy Code section 1145, except for holders of such certificates that may be

26   deemed to be an "underwriter" with respect to such shares.  Generally, Bankruptcy Code section

27   1145(b)(1) defines an "underwriter" as any person who (i) purchases a Claim against, or an Interest

28   in, a Debtor with a view toward distribution of any security to be received in exchange for such

Claim or Interest, (ii) offers to sell securities issued pursuant to a bankruptcy plan for the holders of such securities, (iii) offers to buy securities issued pursuant to a bankruptcy plan from persons receiving such securities, if the offer to buy is made with a view toward distribution of such securities, or (iv) is an issuer within the meaning of Section 2(11) of the Securities Act. Section 2(11) of the Securities Act provides that the term "issuer" includes all persons who, directly or indirectly, through one or more intermediaries, control, or are controlled by, or are under common control with, an issuer of securities. Under Rule 405 of Regulation C under the Securities Act, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, the Reorganized Debtors, or any member of the Supervisory Board of the Reorganized Debtors may be deemed to "control" the Reorganized Debtors (and therefore be an underwriter for purposes of Bankruptcy Code section 1145), particularly if such management position is coupled with the ownership of a significant percentage of the reorganized ST's voting securities.

Holders of shares that are deemed "underwriters" within the meaning of Bankruptcy Code section 1145(b)(1) or who may otherwise be deemed to be "underwriters" of, or to exercise "control" over," the reorganized ST within the meaning of Rule 405 of Regulations C under the Securities Act should, assuming all other conditions of Rule 144A are met, be entitled to avail themselves under the safe harbor resale provisions thereof. Rule 144A, promulgated under the Securities Act, provides a non-exclusive safe harbor exemption form the registration requirements of the Securities Act for resale of "qualified institutional buyers" Of securities which are not securities of the same class of securities then listed on a national securities exchange (registered as such under Section 6 of the Exchange Act) or quoted in the U.S. automated inter-dealer quotation system (e.g., NASDAQ). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, any entity which purchases securities for its own account or for the account of another qualified institutional buyer and which (in the aggregate) owns and invests on a discretionary basis at least $100,000,000 in the securities of unaffiliated issuers.

At the Confirmation Hearing, Debtors will request that the exemption provided under

Bankruptcy Code section 1145 from the requirements of Section 5 of the Securities Exchange Act, 15 U.S.C. § 77e, and any state or local law requiring registration or qualification for the offer or sale of a security, apply to the issuance by the Reorganized Debtors of the shares and the distribution of such shares pursuant to the Debtors' Plan.

Because no public market will initially exist for the shares and may never be developed, and because of the complex, subjective nature of the questions of whether a particular person may be an underwriter, the Debtors make no representation concerning the ability of any person to dispose of the shares. Therefore, the recipient of shares should consult with legal counsel concerning the eventual disposition of the shares.

**F.    Examination of Exit Financing Alternatives**

In order to fund their respective Plans, Debtors and the Committee expect to obtain exit financing.

The Debtors plan to enter into the Northlight Exit Facility (unless a higher and better proposal is submitted by another entity pursuant to the Plan Bid Procedures) upon the Effective Date. Under the Northlight Exit Facility, up to $28 million of new senior secured indebtedness will be incurred to pay off US Bank's Claims at a discount, as well as the DIP Lender's interest in the DIP Facility, with the balance to be used by Debtors to pay administrative expenses incurred during the Cases and in connection with operations under the Debtors' Plan.

The Committee's Plan proposes exit financing of up to $12 million, plus an additional $16.5 million to payoff US Bank. The Committee has not yet obtained financing for either of these components of the Committee's Plan. If the Committee cannot obtain financing on terms more favorable than the Debtor's Northlight proposal, the Committee will withdraw its plan.

**X.**
**OVERVIEW OF DEBTORS' PLAN AND COMMITTEE'S PLAN**

**A.    Debtors' Plan Overview**

This summary describes the groundwork for the orderly liquidation of the businesses under Debtors' Plan. Debtors propose to remain in business and conduct their liquidation through a

reorganized corporate structure.  The four Debtors In Possession will remain separate entities.  ST will become a Maryland C corporation.  The other three Debtors will retain their current corporate status.

In connection with the Debtors' Plan, the ST Articles of Incorporation and Bylaws are being amended to provide the two Creditor groups with the greatest dollar amount of unsatisfied Claims following Confirmation ((a) holders of Old Secured Notes and New Secured Notes, collectively, "Secured Noteholders" and (b) holders of Unsecured Notes) with voting control of ST and hence control of the Reorganized Debtors.  New Class A shares will be issued to the Secured Noteholders and new Class B shares will be issued to the Unsecured Notes.  The holders of the Class A and Class B shares will not be entitled to distributions from ST on account of those shares, separate from the distributions to which they are entitled by reason of their status as creditors.

The Board of Directors shall be initially composed of five (5) members designated in the amended Articles who shall hold office until their successors are duly chosen and qualified.  The directors shall be divided into five Classes, designated Class 1A, Class 1B, Class 2A, Class 2B and Class 3.  The Class 1A and 2A directors shall be elected by the holders of the Class A Shares.  The Class 1B and 2B directors shall be elected by the holders of the Class B shares.  The Class 3 director shall be elected by a vote of all stockholders.  The term of the initial Class 1 directors shall terminate on the date of the annual meeting of stockholders held in 2012.  The term of the initial Class 2 and Class 3 directors shall terminate on the date of the annual meeting of stockholders held in 2013.  At each annual meeting of the stockholders beginning in 2012, successors to the class of directors whose term expires at that annual meeting shall be elected for a two-year term.  At such time as all Claims of the Secured Noteholders have been paid or otherwise settled, the Class A shares will be cancelled and the Class 1A and 2A directors will resign from the Board of Directors.

Upon the Effective Date of the Debtors' Plan, all of the current outstanding shares of common stock of ST will be canceled.  However, under the Debtors' Plan the holders of common stock will retain the right to any residual distributions from liquidation of assets after the Creditors' Claims have been paid or otherwise settled, and the Northlight Exit Facility has been repaid in full.  Such holders' right will be according to their pro rata interest in the outstanding common stock as of

1   the date of the Effective Date.

2

3   **B.    Committee's Plan Overview**

4           This summary describes the groundwork for the orderly liquidation of the business under the
    Committee's Plan.  The Committee's Plan transfers substantially all of the Debtors' assets (the

5   "Trust Assets") to a liquidating trust.  The Liquidating Trust will be managed by a Trustee advised

6   by a Board of Advisors selected by creditors.  The Board will include one advisor selected by the

7   shareholders.  Critical decisions regarding the disposition of Trust assets must be approved by a vote

8   or sixty per cent (60%) of the Board (for assets other than Causes of Action) and by seventy-five per

9   cent (75%) of the Board (for the abandonment or settlement of Causes of Action). A draft of the

10  Liquidation Trust Agreement (subject to final approval by the Trustee and Board of Advisors) is

11  attached as Exhibit C to the Committee Plan.

12

13  **C.    The Post-Confirmation Business Plan Under the Plans**

14          The Plans contemplates that the Reorganized Debtors or the Liquidating Trustee will market

15  and sell the Debtors' assets over a period of at least four (4) years for the Debtors' Plan and five (5)

16  years for the Committee Plan or more if reasonably necessary to maximize the return to the Creditors

17  and, ultimately, to ST's Shareholders.  If the Debtors' Plan is confirmed, the Reorganized Debtors

18  will not be permitted to engage in any business other than the protection and maintenance of their

19  existing assets until they can be liquidated in an orderly fashion and payments can be made to

20  existing creditors and shareholders from the proceeds derived from such activities.  The Committee's

21  Plan contemplates that the Debtors' and the Estates' assets, including Causes of Action, will be

22  transferred to the Liquidating Trust for orderly liquidation over a period of five years or more if

23  reasonably necessary.  The Trust, with the assistance of a Board of Advisors representing the various

24  classes of creditors and interest holders, will market and sell the Trust Assets, using funds provided

25  by an Exit Facility and sale of Trust Assets, in a prudent and businesslike manner in order to

26  maximize the return to the Creditors and, ultimately, perhaps, to ST's Shareholders.

27  ///

28  ///

ATTACHED HERETO AS EXHIBIT 4 AND EXHIBIT 5 ARE DESCRIPTIONS OF CERTAIN OF THE PROVISIONS OF THE DEBTORS' PLAN AND THE COMMITTEE'S PLAN.    THESE SUMMARIES SHOULD BE READ IN CONJUNCTION WITH THE REMAINDER OF THE DISCLOSURE STATEMENT. THE ATTACHED SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE ACTUAL TERMS OF THE PLANS.  IN THE EVENT OF ANY CONFLICT, THE TERMS OF THE RESPECTIVE PLANS WILL CONTROL OVER ANY SUMMARY ATTACHED HERETO.

THE PLANS CONTAIN SEPARATE CLASSES FOR EACH HOLDER OF A CLAIM.    HOWEVER, CERTAIN CLASSES MAY BE TREATED THE SAME UNDER THE PLANS.  FOR INSTANCE, THE CLASSES OF UNSECURED CREDITORS ARE TREATED THE SAME UNDER THE PLANS. THE HOLDERS OF ANY CLAIM SHOULD CONSULT EACH PLAN TO DETERMINE THEIR TREATMENT.  A COMPARISON OF THE DEBTORS' PLAN AND THE COMMITTEE'S PLAN IS ATTACHED HERETO AS EXHIBIT 6.

THIS DISCLOSURE STATEMENT DISCUSSES THE PLANS, INCLUDING THE TAX CONSEQUENCES OF EACH OF THE PLANS IN GREATER DETAIL.    THIS SUMMARY IS QUALIFIED BY THE EXPRESS TERMS OF EACH  PLAN.

## XI.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLANS

IF EITHER OF THE PLANS DESCRIBED IN THIS DISCLOSURE STATEMENT IS NOT CONFIRMED OR THE EFFECTIVE DATE DOES NOT OCCUR, THE DEBTORS OR THE COMMITTEE (OR ANY OTHER PARTY IN INTEREST) COULD ATTEMPT TO FORMULATE A DIFFERENT PLAN.  SUCH A PLAN COULD POTENTIALLY INVOLVE A REORGANIZATION AND CONTINUATION OF THE DEBTORS' BUSINESSES, OR AN ORDERLY LIQUIDATION OF THE ASSETS OF THE ESTATES.  DURING THE CASE, THE DEBTORS AND THE COMMITTEE EXPLORED VARIOUS ALTERNATIVES IN CONNECTION WITH THE FORMULATION AND DEVELOPMENT OF THE PLANS

1  DESCRIBED HEREIN.    IN ADDITION, IF EITHER OF THE PLANS IS NOT

2  CONFIRMED OR THE EFFECTIVE DATE DOES NOT OCCUR, THE CASES MAY BE

3  CONVERTED TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

4                                        XII.

5                            TAX CONSEQUENCES

6          The following are summaries of certain United States federal income tax consequences

7  expected to result from the implementation of the Plans.[12]  These discussions do not apply to

8  Creditors or Shareholders that are not "United States persons" (as such term is defined in the Internal

9  Revenue Code) or that are otherwise subject to special treatment under United States federal income

10 tax laws.  These discussions are based on the Tax Code, as in effect on the date of this Disclosure

11 Statement and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of

12 this Disclosure Statement, as well as judicial and administrative interpretations thereof available on

13 or before such date.    All of the discussion is subject to change, which change could apply

14 retroactively and could affect the tax consequences described below.  There can be no assurance that

15 the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of

16 the issues discussed below, and no opinion of counsel or ruling from the IRS has been or will be

17 sought with respect to any issues which may arise under the Plan.

18         THE FOLLOWING SUMMARIES ARE FOR INFORMATIONAL PURPOSES

19 ONLY AND ARE NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE

20 BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A CREDITOR

21 OR SHAREHOLDER.  BECAUSE NO OPINION OF COUNSEL OR RULING FROM THE

22 IRS HAS BEEN OR WILL BE SOUGHT, THERE COULD BE ADVERSE TAX

23 CONSEQUENCES NOT DISCLOSED OR DISCUSSED HEREIN.  ALL CREDITORS AND

24 _____

25 [12]This discussion is not intended to and does not address state law tax issues.  ST, like the vast majority of REITs, was
   incorporated in Maryland due to that state's favorable corporation laws as applied to REIT operations.  ST would remain
26 a Maryland corporation after confirmation under the Debtors' Plan.  There would be no apparent reason to change the
   state of incorporation.  ST does not pay tax in Maryland (just a nominal annual report filing fee) because it has no
27 property in that state.   State taxation generally depends on the source of income.  States can vary regarding how they
   determine income source and the extent to which they adopt federal tax laws in calculating taxable income.
28

1155633.6                                        82

SHAREHOLDERS ARE, THEREFORE, URGED TO CONSULT WITH THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLANS.

<u>INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE</u>

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. TAX CODE. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    <u>Tax Consequences of Debtors' Plan</u>

The Debtors' Plan does not involve a current liquidation of ST for income tax purposes even through it provides for selling assets as part of an orderly liquidation. For income tax purposes, ST would continue its operations, through (as discussed below) probably as a "C corporation" rather than a real estate investment trust ("REIT").    For federal income tax purposes, ST has filed tax returns as a REIT and SAC II has been treated as a Qualified REIT Subsidiary, the assets of which are considered ST assets for income tax purposes. It its assumed for purposes of this discussion that ST continues to be a REIT and SAC II continues to be a REIT subsidiary. If ST were not a REIT, it would be taxed as a C corporation and it would likely file a consolidated return with SAC II. REIT classification for income tax purposes does not affect corporate status for state corporate law

1   purposes, but deals solely with income tax matters (even though ST's articles of incorporation and
2   bylaws include REIT-related restrictions and requirements).

3       A REIT is generally taxed as a C corporation, except that it is a modified conduit with
4   respect to its taxable income.  C corporations do not receive a tax deduction for dividends they pay
5   to shareholders.  In contrast, REITs receive a deduction for certain qualifying dividends they pay.
6   The deduction reduces the potential for double taxation on the REIT's income.  This special tax
7   treatment can be valuable for a profitable REIT but less valuable (or even irrelevant) for a REIT that
8   operates at a loss or can offset income against net operating losses ("NOL") or capital losses.  As
9   with a C corporation, the NOLs or capital losses of a REIT do not flow through to shareholders but
10  remain at the company level and are subject to certain carry forward and carry back rules.  ST had a
11  NOLs in 2009 and 2010 for income tax purposes.  ST management estimates that no asset is
12  currently expected to produce a net sales price in excess of its tax basis.  Because income tax gain or
13  loss generally equals the amount realized from an asset sale minus the asset's adjusted tax basis, ST
14  management believes that no asset sales pursuant to the Debtors' Plan would generate taxable gain.

15      The reduction of the US Bank claim by $12,815,000 (from $29,315,000 to $16,500,000)
16  would normally produce $12,815,000 of cancellation of debt ("COD") income that would be gross
17  income for income tax purposes.  A chapter 11 debtor may exclude COD income from gross income,
18  but this comes at the cost of reducing certain tax attributes, such as NOLs carry forward amounts and
19  tax basis.  Because it is anticipated that the ST NOL carry forward amount will exceed the COD
20  income that would result from the US Bank debt reduction, that debt reduction is still projected to
21  leave NOL carry forward amounts that would not be used except to the extent required to offset an
22  unexpected gain on an asset sale.

23      If there were a potential for ultimate gains and distributions to shareholders, that would
24  otherwise be one reason for ST to maintain its REIT status if possible.  But maintaining that election
25  might not be possible, or at least not feasible.  In order to retain its REIT status, ST must meet
26  certain requirements regarding the nature of its assets, the nature of its gross income, and the
27  distribution of its taxable income.  During the course of liquidating assets as part of the Debtors'
28  Plan, ST could become what is commonly known as a "dealer" with respect to the assets sold.

1    Those assets would then be considered inventory held for sale rather than assets held for investment

2    or use in the trade or business.  A REIT's sale of dealer property can cause the REIT to fail the gross

3    income percentage requirements and in some cases can result in an excise tax.  These potential

4    problems can often be avoided with a special election with respect to property a REIT acquires in a

5    foreclosure (or pursuant to a deed in lieu of foreclosure), but not with respect to property it acquired

6    in other ways.  ST could avoid the potential excise tax by revoking its REIT election and becoming a

7    C corporation for income tax purposes effective January 1, 2012.  The disadvantage to the

8    revocation is that in the event asset values rebound sufficiently that ST can both pay off Claims and

9    make distributions to shareholders, it could not elect to again become a REIT during Debtors' Plan

10    period.  Because it is not likely that ST will ultimately be able to sell assets at a taxable gain or make

11    significant shareholder distributions, and to eliminate the potential excise tax on dealer sales, it is

12    likely that ST will revoke its REIT election.

13         The revocation of REIT status would not be projected to have a material impact on ST's

14    federal tax liability.   It would cause SAC II to lose its status as a disregarded entity for income tax

15    purposes (even though it would remain a legal subsidiary under applicable state law).  For income

16    tax purposes, ST would then be deemed to have contributed the SAC II assets to SAC II  (and thus a

17    separate subsidiary corporation would then exist for both state law and tax law purposes).  As a

18    general rule, such a contribution of assts to a wholly-owned corporation is a tax-free transaction.

19    However, the transferor will recognize gain to the extent the liabilities to which the transferred assets

20    are subject exceed the aggregate tax basis of those assets.  ST's basis in its SAC II stock would equal

21    its basis in the transferred assets, increased by any such gain recognized.  Even if there were such

22    gain in this instance, ST should be able to trigger a loss through an actual liquidation of SAC II.

23    That loss should equal or exceed any such gain from the deemed incorporation.  The loss would

24    equal the market value of the SAC II assets ST receives in the liquidation, minus ST's basis in its

25    SAC II's stock (after adjustment for the gain recognition transaction).  Because it is believed and

26    assumed that all ST assets (including the assets of SAC II it is deemed to own for income tax

27    purposes) currently have basis and are subject to liabilities in excess of value,  the loss on liquidation

28    should be no less than the prior gain on deemed incorporation.  Although the liquidation of a wholly-

owned corporate subsidiary normally does not result in tax loss recognition, IRS rulings have concluded that the normal tax-free liquidation provisions do not apply when the liabilities of the subsidiary exceed the market value of its assets.

If the Debtors' Plan as currently proposed is confirmed, the stock currently held by Shareholders will be cancelled and new stock will be issued to the Creditors. This process will occur in order to vest management of ST in the hands of the Creditors - those most likely to be impacted by future management decisions. In other words, this process is intended to resolve corporate governance issues rather than impact the economic situations of the Creditors and Shareholders. The debt would remain in place rather than be exchanged for equity. Also, in the unlikely event asset sales produce sufficient proceeds to pay off all debts, the existing Shareholders rather than the Creditors would receive the residual proceeds. Because the Debtors' Plan would not involve an exchange of debt for equity from a economic perspective, it should not be considered a true recapitalization under the tax free reorganization provisions. Also, it should not produce a change in ownership that limits the future use of NOL carry forward amounts. It is useful, however, to analyze the likely tax results under different potential ways of viewing the plan of reorganization.

ST's issuance of stock to Creditors would not be a taxable event to ST within or outside the tax-free reorganization context. Similarly, whether the existing Shareholders claim a loss on stock they deem worthless (or whether they should already have done so) would not turn on whether the transaction is a tax-free reorganization but would depend on the facts and circumstances to be addressed by their tax advisors. For instance, the cancellation of stock and issuance of new stock done for corporate governance purposes and which does not have economic significance is not an event triggering a loss; instead, whether or when a loss occurs turns on all of the facts and circumstances, and a loss can be proper even in a year before a bankruptcy filing. The basic rule is that the taxpayer has the burden of proving that securities became worthless during the year (but the taxpayer cannot simply ignore worthlessness and can later be foreclosed from claiming a deduction

due to the statute of limitations).  The taxpayer can carry this burden by showing (1) there is no liquidation value and (2) that there is no reasonable hope and expectation there will be value in the future.[13]

From the Creditors' perspective, in a tax-free reorganization no gain or loss would be recognized on an exchange of debt securities for stock, but gain or loss could be recognized on an exchange of non-securities debt for stock.  Outside the reorganization context (i.e., assuming there is no true issuance of new equity), whether the Creditors could claim a deduction for a partially worthless security or debt would depend on the facts and circumstances to be addressed by their tax advisors.

A corporation's NOL carryforward amounts can be greatly limited after a change of equity control.  As indicated above, the cancellation of existing stock and issuance of new stock for corporate governance purposes should not be considered a true change of control in terms of equity ownership.  If it were, however, the transaction could limit ST's future use of existing NOL carryforward amounts.  The Internal Revenue Code exempts certain bankruptcy changes of control from these NOL limitations, but the exemption is very narrow and subject to limitations.  Even without the exemption, however, it is still likely ST could elect to close its books for tax purposes as of the change in control and, through that process, preserve then existing NOL carryforward amounts to offset COD income.

**B.    Tax Consequences of Committee's Plan**

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Committee's Plan.  This discussion is based on the

---

[13] *Delk v. Commissioner*, 113 F. 3rd 984 (9th Cir. 1997) (Securities may not be considered worthless, even when they have no liquidating value, if there is a reasonable hope and expectation that they will become valuable in the future).

Tax Code, as in effect on the date of this Disclosure Statement and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the discussion is subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no opinion of counsel or ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

Upon the liquidation of ST (transfer of assets to a liquidating trust) all of its tax attributes will be lost. Thus, any net operating loss carry forwards (approximately $10 million at the end of 2009) will no longer be available to offset any gain on the sale of assets by the Liquidating Trust if values recover.

Upon the liquidation of ST, any gain or loss with respect to its assets will be recognized based on "current" fair market value. Thus, for example, if there are loan reserves or impairment losses for financial accounting purposes, these "built in losses" which have yet to be recognized for tax purposes by ST will be recognized as a consequence of the liquidation of ST.

For federal income tax purposes, a transfer of assets to the Liquidating Trust for the benefit of holders of Allowed Claims is treated as a transfer of assets to such holders to the extent that such holders are beneficiaries of the Liquidating Trust. The transfer will be treated as a deemed transfer to such holders followed by a deemed transfer by such holders to the Liquidating Trust. Such holders will be treated as the grantors and deemed owners of the Liquidating Trust. The Debtors and Liquidating Trustee shall jointly determine the valuations of the transferred property by the Liquidating Trustee. Such valuations shall be binding on the beneficiaries of the Liquidating Trust, and must be used for all federal income tax purposes.

While it would appear that ST's secured creditors will not be deemed to have received the encumbered property in satisfaction of their indebtedness, the tax treatment of the under- secured and unsecured creditors of ST is unclear. There is a risk that the transfer of assets to the Liquidating Trust may be treated as a transfer of the non-encumbered assets of ST to its under-secured or

unsecured creditors in satisfaction of their indebtedness and a transfer of such assets to the liquidating trust in exchange for interests in the trust. Thus, the transfer of assets to the Liquidating Trust will require these creditors to recognize a gain or loss upon the formation of the trust. A creditor who acquired the indebtedness after the date of issuance could, depending on the price paid, recognize a gain.

To the extent the transfer of assets to the Liquidating Trust is treated as a transfer of non-encumbered assets to under-secured or unsecured creditors, such assets will take a tax basis equal to their fair market value.

If the fair market value of ST's assets exceeds the amount of its indebtedness, ST's shareholders will be treated as having received such excess value in redemption of their stock. Thus, the shareholders will recognize capital gain or loss. If the fair market value of such assets is less than ST's indebtedness, ST's shareholders would only be entitled to claim a loss with respect to their stock if such stock is "worthless" under applicable tax law which generally denies a loss if there is a possibility that the shareholders will receive anything for their stock.

Under applicable tax law, the Liquidating Trust will be treated as a grantor trust. As such, the trust will not be a tax paying entity and taxable income of the Liquidating Trust may have to be reported by the under-secured or unsecured creditor and shareholder beneficiaries of the trust. It is unclear whether the Liquidating Trust can elect the cash or accrual method of accounting since it is not technically a "taxpayer." If the Liquidating Trust cannot select a method of accounting, taxable income of the trust may have to be reported by each beneficiary under their own method of accounting. Thus, it is possible that beneficiaries of the Liquidating Trust that use the accrual method of accounting may be required to report taxable income without cash to pay any resulting tax where cash is used in whole or in part for payment on the secured indebtedness.

If the Liquidating Trust were to buy secured indebtedness at less than its face amount, the beneficiaries of the trust would have to report any cancellation of indebtedness upon the buy back as taxable income.

The preceding summary is for general information only and discusses certain U.S. federal income tax consequences of a Plan to the Debtor, the "U.S. Holders" of Allowed Claims, and the

U.S. Holders of Trust Certificates and the notes (the "Notes") issued as a result of the Plan. For purposes of this summary, a "U.S. Holder" is a beneficial owner of the Allowed Claims, Trust Certificates or Notes that, for U.S. federal income tax purposes, is: (a) an individual who is a citizen or resident of the United States; (b) a corporation (or other business entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust.

This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The tax treatment of a U.S. Holder of Allowed Claims and U.S. Holders of the Trust Certificates and Notes, as the case may be, may vary depending upon such holder's particular situation. The discussion does not address state, local or foreign tax considerations that may be applicable to a Debtor and the U.S. Holders of Allowed Claims, Trust Certificates or Notes. The discussion also does not address tax considerations as a result of entering into the Exit Facility. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services and persons who are not U.S. Holders.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, Trust Certificates or Notes, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Any such partner should consult its tax advisor as to its tax consequences.

C.    **Consultation with Tax Advisors**

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLANS ARE COMPLEX.  THE ABOVE SUMMARIES HAVE BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DO NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CREDITOR OR SHAREHOLDER IN LIGHT OF SUCH CREDITOR OR SHAREHOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF ALLOWED CLAIMS, TRUST CERTIFICATES OR NOTES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLANS.

## XIII.

### RECOMMENDATION AND CONCLUSION

The Debtors and the CRO believe that confirmation and implementation of Debtors' Plan are preferable to any alternatives available to Creditors and Shareholders and results in the greatest recovery for the greatest number of constituents under the circumstances.  Accordingly, the Debtors and CRO submit that confirmation of the Debtors' Plan should be supported by Creditors and Shareholders as the most favorable alternative.

The Committee believes that confirmation and implementation of the Committee's Plan are preferable to any alternatives available to Creditors and Shareholders and results in the greatest recovery for the greatest number of constituents under the circumstances.  Accordingly, the Committee submits that confirmation of the Committee's Plan should be supported by Creditors as the most favorable alternative.

///

///

///

///

1155633.6

1         Creditors and Shareholders entitled to vote on the Plans may vote to accept (or reject) both

2    Plans.  If a Creditor or Shareholder votes to accept both the Debtors' Plan and the Committee's

3    Plan, the Creditor or Shareholder may indicate whether it prefers the Debtors' Plan or the

4    Committee's Plan.

5    Dated:  April 27, 2011          PACHULSKI STANG ZIEHL & JONES LLP
                                Ira D. Kharasch (CA Bar No. 109084)

6                                    Victoria A. Newmark (CA Bar No. 183581)

7                                    and

8                                    DOWNEY BRAND LLP

9                                    By: /s/ Sallie B. Armstrong

10                                       Sallie B. Armstrong (NV Bar No. 1243)
                                    Michelle N. Kazmar (NV Bar No. 10098)

11

12                                   *Attorneys for Debtors and Debtors in Possession*

13   Dated:  April 27, 2011          MCDONALD CARANO WILSON LLP

14                                   By: /s/ Kaaran E. Thomas
                                    Kaaran E. Thomas (NV Bar No. )

15

16                                   *Attorneys for the Committee*

17

18

19

20

21

22

23

24

25

26

27

28

1  Approved by:

2  DATED: _____, 2011

3  Specialty Trust, Inc.

4

5  By: _____

6  Its: _____

7

8

9  DATED: _____, 2011

10  Specialty Acquisition Corp.

11

12  By: _____

13  Its: _____

14

15

16  DATED: _____, 2011

17

18  SAC II

19

20  By: _____

21  Its: _____

22

23

24

25

26

27

28

DATED: _____, 2011

SAC D-1, LLC

By: _____

Its: _____

DATED: _____, 2011

By:  Grant Lyons, Chief Restructuring Officer

_____

DATED: _____, 2011

OFFICIAL COMMITTEE OF EQUITY

SECURITY HOLDERS

By: _____

Its: _____

# Exhibit 1

# Exhibit 1

## FINANCIAL PROJECTIONS

**UNDERLYING THE PROJECTIONS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT AND ADVISORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE PROJECTIONS WILL BE REALIZED AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN. FURTHERMORE, THE PLAN CONTEMPLATES THE UTILIZATION OF A NEW ASSET MANAGER TO OVERSEE THE MANAGEMENT AND RESOLUTION OF THE DEBTOR'S ASSETS THAT MAY RESULT IN MATERIAL DEVIATIONS FROM THE PROJECTIONS AND ASSUMPTIONS PROVIDED BELOW.**

## Methodology & Key Assumptions

1. *Methodology.* Management has developed financial projections (the "Projections") for the Debtors' continued business operations upon emergence from chapter 11 through the fiscal year ending December 31, 2015. "Upside Case," "Base Case" and "Downside Case" versions of the Projections were prepared by management, with consultation from its investment banker, based on its views of the marketplace, as well as based on a number of assumptions with regard to the future performance of the Debtors, the real estate markets generally in which the Debtors operate, and based upon certain third party appraisals , as well as recent broker's opinion of value. The valuations used to prepare each of the Debtors' base case projections do not exceed the values set forth in any appraisals that were consulted for the purpose of arriving at those valuations, but do exceed most of the broker's opinion of value, which opinions were provided by Northlight, so the Debtors do not give those much credibility. In addition, management has created "Upside Case," "Base Case" and "Downside Case" Projections which reflect a scenario in which the collateral of the Secured Noteholders (Deutsche Bank) is not included. Management prepared the Projections in good faith and believes the assumptions are reasonable.

   The Projections were not prepared with a view toward compliance with the guidelines established by The American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the SEC regarding projections. Furthermore, the Projections have not been audited by the Debtors' independent accountants or tax advisors. Rather, the Projections reflect the forecasted cash flows of the business as such receipts and disbursements are projected to be realized by the Company.

2. *Projection Period.* The Projections were prepared by management for the fiscal years 2011 through 2015 (the "Projection Period"). The Debtors operate on a fiscal year ending December 31st.

3. *Plan Consummation.* The Projections assume the Plan will be confirmed and consummated and that the Debtors will emerge from chapter 11 on or about June 1, 2011.

4. *Macroeconomic and Market Conditions.* The Projections assume an increasingly stable to slowly improving macroeconomic environment and similar conditions within the markets in which the Debtors operate. The Projections contemplate a modest recovery in land and related real estate asset values in the Debtors' markets over the Projection Period.

5. *Loan Repayments and Asset Sales.* The Projections assume that, except where Secured Noteholders (Deutsche Bank) collateral is explicitly excluded, the repayment of all loans and the sale of all real estate owned ("REO") in the Debtors' portfolio occurs over the Projection Period. It is assumed that the Debtors will incur selling expenses equal to 10% of gross proceeds realized from REO assets to account for commissions, closing costs and other expenses typically borne by sellers. Net proceeds from loan repayments and asset sales, after all applicable costs, are utilized to repay the exit facility.

6. *Other Income.* Other income generated from the portfolio includes rental and farm income from certain REO properties.

7. *Interest Income.* Includes cash interest and fees received from certain performing or partially performing loans.

8. *Cash Interest Expense.* The Projections include payment of partial cash interest on the Exit Facility at a rate of 12.0% during the first 18 months following exit per the terms outlined in the exit term sheet.

9. *Management Fee.* The Projections include estimates of management fees required per the terms outlined in the exit term sheet.

10. *REO Carry Costs.* The Projections include certain carry costs associated with REO properties during the course of the Projection Period. These include tax, insurance, maintenance, legal, utilities, professional and appraisal expenses.

11. *General and Administrative Costs.* The Projections assume that there will be certain monthly costs necessary for the Debtors to continue limited operations. These include payroll, legal, accounting, foreclosure, and director fees and expenses.

12. *Chapter 11 Administrative Fees & Expenses.* Approximately $1.5 million of bankruptcy fees and expenses will be paid at the Plan effective date. Pursuant to the Waterfall described below, the balance will be paid over time as assets are sold in an amount equal to the net proceeds generated from each asset sale less the reserve price of the sold asset. The Debtors believe that these costs will be paid in full prior to December 31, 2012.

13. *Incentive Fees.* The Projections include estimates of incentive fees paid to the exit lender as outlined in the exit financing term sheet. For presentation purposes, the projections split incentive fees between Northlight, as the primary lender, and, for the portion of the proposed Exit Facility that Northlight has made available for participation, to other parties interested in the facility (the "Estate Option"). In addition, for projection purposes, no distributions are made to pay incentive fees until all assets are sold.

14. *Waterfall.* The Projections assume that the proceeds from the sale of assets will be applied as follows:

    i. to fund any costs and expenses due to Exit Facility lenders;
    ii. to fund working capital of the Debtors;
    iii. to fund the operating reserve pursuant to the Exit Facility term sheet;
    iv. to fund the payment of any interest due to the Exit Facility lenders;

     v.  to the extent proceeds from the sale of an asset are in excess of the corresponding release price, to fund any remaining accrued chapter 11 administrative fees and expenses not paid at exit;

    vi.  to repay any outstanding Exit Facility principal;

   vii.  to distribute proceeds from litigation pursued by the litigation trust, if any;

  viii.  to fund the Incentive Fees; and

    ix.  to distribute funds pursuant to the Plan.

15. *Tax.* Management believes that, based upon several factors including the current carrying values of assets in the Debtors' portfolio relative to projected sale prices for those assets, that it is unlikely that the Debtors will have significant tax liabilities during the Projection Period.

16. *Recovery.* Following the repayment of the Exit Facility and the sale or repayment of all assets in the Debtors' portfolio, estimates are made as to the amount of net proceeds distributable to satisfy the secured claims of the Secured Noteholders (Deutsche Bank) by aggregating proceeds which resulted from the sale or repayment of Secured Noteholder (Deutsche Bank) collateral less an estimate of the costs associated with the resolution of these assets and incentive payments due to the Exit Lender. Following the distribution of net proceeds to satisfy the secured portion of the Secured Noteholders (Deutsche Bank) claims, the remaining distributable proceeds are applied to estimated aggregate unsecured claims. Aggregate unsecured claims include Unsecured Noteholder claims, Secured Noteholder (Deutsche Bank) deficiency claims and an estimate of other unsecured claims. For the scenarios in which Secured Noteholder (Deutsche Bank) collateral is excluded from the Projections, estimates of aggregate unsecured claims include a deficiency claim from Secured Noteholders (Deutsche Bank) equal to their par claim less an assumption of proceeds received from the liquidation of their collateral. For projection purposes, no distributions are made to Secured Noteholders (Deutsche Bank) or to pay incentive fees until all assets in the Debtor's portfolio have been sold. The Projections assume repayment of US Bank claims and the DIP Facility at exit as outlined in the Plan.

# Upside Case Projections

**Specialty Trust, Inc.**
**(Debtor-in-Possession)**
**Summary of Projected Cash Flows for the Reorganized Debtors**

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 4,306,000 | $ 36,308,935 | $ 22,096,375 | $ 14,580,000 | $ 27,149,457 | $ 104,440,767 |
| Interest Income | 276,941 | 399,543 | 120,459 | 67,224 | - | 864,168 |
| Other Income | 12,140 | 43,540 | 18,333 | - | - | 74,013 |
| Cash Interest Expense | (1,558,128) | (3,156,501) | - | - | - | (4,714,629) |
| Management & Servicing Fees | (691,211) | (1,090,588) | (767,190) | (675,833) | (551,379) | (3,776,202) |
| REO Carry Costs | (872,794) | (730,845) | (452,589) | (316,600) | (99,092) | (2,471,919) |
| General and Administrative | (676,834) | (184,720) | (188,795) | (192,994) | (197,320) | (1,440,662) |
| Chapter 11 Fees & Expenses | (3,556,192) | - | - | - | - | (3,556,192) |
| **Cash Available / (Required) for Debt Repayment** | $ (2,760,078) | $ 31,589,365 | $ 20,826,593 | $ 13,461,797 | $ 26,301,666 | $ 89,419,344 |
| | | | | | | |
| Secured Lender Repayments at Exit | (20,000,000) | | | | | (20,000,000) |
| Exit Facility Draws / (Repayments) | 22,760,078 | (25,099,892) | - | - | - | (2,339,815) |
| Incentive Fees - Exit Lender | - | - | - | - | (17,657,006) | (17,657,006) |
| Incentive Fees - Exit Lender (Estate Option) | - | - | - | - | (17,657,006) | (17,657,006) |
| Secured Noteholder (Deutsche Bank) Repayments | - | - | - | - | (6,318,918) | (6,318,918) |
| **Total Change in Cash** | $ (0) | $ 6,489,473 | $ 20,826,593 | $ 13,461,797 | $ (15,331,264) | $ 25,446,600 |
| | | | | | | |
| Beginning Cash | $ - | $ (0) | $ 6,489,473 | $ 27,316,066 | $ 40,777,863 | |
| Change in Cash | (0) | 6,489,473 | 20,826,593 | 13,461,797 | (15,331,264) | 25,446,600 |
| Ending Cash | $ (0) | $ 6,489,473 | $ 27,316,066 | $ 40,777,863 | $ 25,446,600 | $ 25,446,600 |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | $ 29,315,000 | $ 16,500,000 | 56.3% |
| Deutsche Bank Secured Claim | NA | $ 6,318,918 | NA |
| Unsecured Claims | $ 71,647,259 | $ 25,446,600 | 35.5% |

# Base Case Projections

**Specialty Trust, Inc.**
(Debtor-in-Possession)
Summary of Projected Cash Flows for the Reorganized Debtors

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 4,306,000 | $ 8,228,935 | $ 20,490,000 | $ 9,730,000 | $ 32,230,832 | $ 74,985,767 |
| Interest Income | 276,941 | 404,493 | 179,543 | 122,828 | - | 983,804 |
| Other Income | 12,140 | 43,540 | 20,000 | 19,167 | 9,167 | 104,013 |
| Cash Interest Expense | (1,558,128) | (3,152,271) | - | - | - | (4,710,399) |
| Management & Servicing Fees | (686,081) | (1,046,524) | (904,193) | (690,630) | (598,763) | (3,926,191) |
| REO Carry Costs | (872,794) | (730,845) | (458,506) | (378,455) | (152,307) | (2,592,906) |
| General and Administrative | (676,834) | (184,720) | (188,795) | (192,994) | (197,320) | (1,440,662) |
| Chapter 11 Fees & Expenses | (3,556,192) | - | - | - | - | (3,556,192) |
| **Cash Available / (Required) for Debt Repayment** | $ (2,754,947) | $ 3,562,609 | $ 19,138,049 | $ 8,609,916 | $ 31,291,608 | $ 59,847,235 |
| | | | | | | |
| Secured Lender Repayments at Exit | (20,000,000) | | | | | (20,000,000) |
| Exit Facility Draws / (Repayments) | 22,754,947 | (3,562,609) | (19,138,049) | (8,126,644) | (17,244) | (8,089,599) |
| Incentive Fees - Exit Lender | - | - | - | - | (8,377,030) | (8,377,030) |
| Incentive Fees - Exit Lender (Estate Option) | - | - | - | - | (8,377,030) | (8,377,030) |
| Secured Noteholder (Deutsche Bank) Repayments | - | - | - | - | (2,850,561) | (2,850,561) |
| **Total Change in Cash** | $ (0) | $ 0 | $ - | $ 483,271 | $ 11,669,744 | $ 12,153,015 |
| | | | | | | |
| Beginning Cash | $ - | $ (0) | $ (0) | $ (0) | $ 483,271 | $ 483,271 |
| Change in Cash | (0) | 0 | (0) | 483,271 | 11,669,744 | 11,669,744 |
| **Ending Cash** | $ (0) | $ (0) | $ (0) | $ 483,271 | $ 12,153,015 | $ 12,153,015 |

**Recovery:**

| | Claim ($) | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | 29,315,000 | 16,500,000 | 56.3% |
| Deutsche Bank Secured Claim | NA | 2,850,561 | NA |
| Unsecured Claims | 75,115,615 | 12,153,015 | 16.2% |

# Downside Case Projections

**Specialty Trust, Inc.**
**(Debtor-in-Possession)**
Summary of Projected Cash Flows for the Reorganized Debtors

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 3,229,500 | $ 6,171,701 | $ 15,367,500 | $ 7,297,500 | $ 24,173,124 | $ 56,239,325 |
| Interest Income | 276,941 | 404,493 | 179,543 | 122,828 | | 983,804 |
| Other Income | 12,140 | 43,540 | 20,000 | 19,167 | 9,167 | 104,013 |
| Cash Interest Expense | (1,558,128) | (3,293,691) | | | | (4,851,818) |
| Management & Servicing Fees | (687,331) | (1,063,191) | (940,860) | (746,463) | (666,263) | (4,104,108) |
| REO Carry Costs | (872,794) | (730,845) | (458,506) | (378,455) | (152,307) | (2,592,906) |
| General and Administrative | (676,834) | (184,720) | (188,795) | (192,994) | (197,320) | (1,440,662) |
| Chapter 11 Fees & Expenses | (3,556,192) | | | | | (3,556,192) |
| **Cash Available / (Required) for Debt Repayment** | $ (3,832,697) | $ 1,347,289 | $ 13,978,882 | $ 6,121,582 | $ 23,166,400 | $ 40,781,457 |
| | | | | | | |
| Secured Lender Repayments at Exit | (20,000,000) | | | | | (20,000,000) |
| Exit Facility Draws / (Repayments) | 23,832,697 | (1,347,289) | (13,978,882) | (6,121,582) | (15,620,255) | (13,235,312) |
| Incentive Fees - Exit Lender | - | - | - | - | (1,934,792) | (1,934,792) |
| Incentive Fees - Exit Lender (Estate Option) | - | - | - | - | (1,934,792) | (1,934,792) |
| Secured Noteholder (Deutsche Bank) Repayments | - | - | - | - | (1,123,184) | (1,123,184) |
| **Total Change in Cash** | $ - | $ 0 | $ - | $ - | $ 2,553,377 | $ 2,553,377 |
| | | | | | | |
| Beginning Cash | $ - | $ - | $ (0) | $ (0) | $ (0) | $ - |
| Change in Cash | (0) | 0 | - | - | 2,553,377 | 2,553,377 |
| **Ending Cash** | $ (0) | $ (0) | $ (0) | $ (0) | $ 2,553,377 | $ 2,553,377 |

| Recovery: | Claim | | Recovery ($) | Recovery (%) |
|---|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ | 3,500,000 | 100.0% |
| US Bank Claim | $ 29,315,000 | $ | 16,500,000 | 56.3% |
| Deutsche Bank Secured Claim | $ NA | $ | 1,123,184 | NA. |
| Unsecured Claims | $ 76,842,992 | $ | 2,553,377 | 3.3% |

# Upside Case Projections – Excluding Secured Noteholder (Deutsche Bank) Collateral

**Specialty Trust, Inc.**
(Debtor-in-Possession)
Summary of Projected Cash Flows for the Reorganized Debtors

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 3,435,000 | $ 31,650,000 | $ 10,871,375 | $ 8,580,000 | $ 30,149,457 | $ 84,685,832 |
| Interest Income | 255,407 | 341,731 | 120,459 | 67,224 | - | 784,822 |
| Other Income | 3,640 | 26,540 | 2,750 | - | - | 32,930 |
| Cash Interest Expense | (1,554,085) | (3,229,515) | - | - | - | (4,783,600) |
| Management & Servicing Fees | (591,806) | (935,111) | (636,761) | (619,270) | (499,529) | (3,282,477) |
| REO Carry Costs | (775,995) | (498,576) | (373,284) | (316,600) | (99,092) | (2,063,546) |
| General and Administrative | (676,834) | (184,720) | (188,795) | (192,994) | (197,320) | (1,440,662) |
| Chapter 11 Fees & Expenses | (3,556,192) | - | - | - | - | (3,556,192) |
| Cash Available / (Required) for Debt Repayment | $ (3,460,865) | $ 27,170,350 | $ 9,795,744 | $ 7,518,361 | $ 29,353,516 | $ 70,377,106 |
| | | | | | | |
| Secured Lender Repayments at Exit | (20,000,000) | - | - | - | - | (20,000,000) |
| Exit Facility Draws / (Repayments) | 23,460,865 | (25,835,165) | - | - | - | (2,374,300) |
| Incentive Fees - Exit Lender | - | - | - | - | (21,601,263) | (21,601,263) |
| Incentive Fees - Exit Lender (Estate Option) | - | - | - | - | (21,601,263) | (21,601,263) |
| Total Change in Cash | $ - | $ 1,335,185 | $ 9,795,744 | $ 7,518,361 | $ (13,849,009) | $ 4,800,281 |
| | | | | | | |
| Beginning Cash | $ - | $ - | $ 1,335,185 | $ 11,130,929 | $ 18,649,290 | $ 4,800,281 |
| Change in Cash | - | 1,335,185 | 9,795,744 | 7,518,361 | (13,849,009) | 4,800,281 |
| Ending Cash | $ - | $ 1,335,185 | $ 11,130,929 | $ 18,649,290 | $ 4,800,281 | $ 4,800,281 |

**Recovery:**

| | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | $ 29,315,000 | $ 16,500,000 | 56.3% |
| Unsecured Claims | $ 73,515,577 | $ 4,800,281 | 6.5% |

# Base Case Projections – Excluding Secured Noteholder (Deutsche Bank) Collateral

**Specialty Trust, Inc.**
**(Debtor-in-Possession)**
Summary of Projected Cash Flows for the Reorganized Debtors

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 3,435,000 | $ 5,570,000 | $ 18,600,000 | $ 3,380,000 | $ 33,120,832 | $ 64,105,832 |
| Interest Income | 255,407 | 346,681 | 179,543 | 122,828 | - | 904,458 |
| Other Income | 3,640 | 26,540 | 3,000 | 3,000 | 2,750 | 38,930 |
| Cash Interest Expense | (1,554,085) | (3,229,515) | - | - | - | (4,783,600) |
| Management & Servicing Fees | (591,806) | (952,611) | (830,280) | (635,883) | (556,981) | (3,567,561) |
| REO Carry Costs | (775,995) | (498,576) | (373,826) | (332,492) | (138,276) | (2,119,164) |
| General and Administrative | (676,834) | (184,720) | (188,795) | (192,994) | (197,320) | (1,440,662) |
| Chapter 11 Fees & Expenses | (3,556,192) | - | - | - | - | (3,556,192) |
| Cash Available / (Required) for Debt Repayment | $ (3,460,865) | $ 1,077,800 | $ 17,389,642 | $ 2,344,458 | $ 32,231,005 | $ 49,582,040 |
| | | | | | | |
| Secured Lender Repayments at Exit | (20,000,000) | - | - | - | - | (20,000,000) |
| Exit Facility Draws / (Repayments) | 23,460,865 | (1,077,800) | (17,389,642) | (2,344,458) | (14,981,166) | (12,332,202) |
| Incentive Fees - Exit Lender | - | - | - | - | (7,762,427) | (7,762,427) |
| Incentive Fees - Exit Lender (Estate Option) | - | - | - | - | (7,762,427) | (7,762,427) |
| **Total Change in Cash** | $ - | $ - | $ - | $ - | $ 1,724,984 | $ 1,724,984 |
| | | | | | | |
| Beginning Cash | $ - | $ - | $ - | $ - | $ - | $ - |
| Change in Cash | - | - | - | - | 1,724,984 | 1,724,984 |
| Ending Cash | $ - | $ - | $ - | $ - | $ 1,724,984 | $ 1,724,984 |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | 29,315,000 | 16,500,000 | 56.3% |
| Unsecured Claims | $ 73,515,577 | $ 1,724,984 | 2.3% |

# Downside Case Projections – Excluding Secured Noteholder (Deutsche Bank) Collateral

**Specialty Trust, Inc.**
**(Debtor-in-Possession)**
Summary of Projected Cash Flows for the Reorganized Debtors

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 2,576,250 | $ 4,177,500 | $ 13,950,000 | $ 2,535,000 | $ 24,840,624 | $ 48,079,374 |
| Interest Income | 255,407 | 346,681 | 179,543 | 122,828 | | 904,458 |
| Other Income | 3,640 | 26,540 | 3,000 | 3,000 | 2,750 | 38,930 |
| Cash Interest Expense | (1,554,085) | (3,342,194) | | | | (4,896,279) |
| Management & Servicing Fees | (592,639) | (962,611) | (840,260) | (645,883) | (567,815) | (3,609,228) |
| REO Carry Costs | (775,995) | (498,576) | (373,826) | (332,492) | (138,276) | (2,119,164) |
| General and Administrative | (676,834) | (184,720) | (188,795) | (192,994) | (197,320) | (1,440,662) |
| Chapter 11 Fees & Expenses | (3,556,192) | | | | | (3,556,192) |
| Cash Available / (Required) for Debt Repayment | $ (4,320,449) | $ (437,378) | $ 12,729,642 | $ 1,489,458 | $ 23,939,964 | $ 33,401,237 |
| | | | | | | |
| Secured Lender Repayments at Exit | (20,000,000) | - | - | - | - | (20,000,000) |
| Exit Facility Draws / (Repayments) | 24,320,449 | 437,378 | (12,729,642) | (1,489,458) | (23,939,964) | (13,401,237) |
| Incentive Fees - Exit Lender | - | - | - | - | - | - |
| Incentive Fees - Exit Lender (Estate Option) | - | - | - | - | - | - |
| **Total Change in Cash** | $ - | $ - | $ - | $ 0 | $ (0) | $ (0) |
| | | | | | | |
| Beginning Cash | $ - | $ - | $ (0) | $ (0) | $ (0) | $ - |
| Change in Cash | - | (0) | - | 0 | (0) | (0) |
| Ending Cash | $ - | $ (0) | $ (0) | $ (0) | $ (0) | $ (0) |

**Recovery:**

| | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | 29,315,000 | 16,500,000 | 56.3% |
| Unsecured Claims | 73,515,577 | (0) | 0.0% |

# Exhibit 2

# Exhibit 2

## FINANCIAL PROJECTIONS

**UNDERLYING THE PROJECTIONS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE COMMITTEE, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE COMMITTEE AND THEIR ADVISORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE PROJECTIONS WILL BE REALIZED AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN. FURTHERMORE, THE PLAN CONTEMPLATES THE UTILIZATION OF A NEW ASSET MANAGER TO OVERSEE THE MANAGEMENT AND RESOLUTION OF THE DEBTOR'S ASSETS THAT MAY RESULT IN MATERIAL DEVIATIONS FROM THE PROJECTIONS AND ASSUMPTIONS PROVIDED BELOW.**

## Methodology & Key Assumptions

1. *Methodology.* The Committee has developed financial projections (the "Projections") for the Debtors' continued business operations upon emergence from chapter 11 through the fiscal year ending December 31, 2015. The Committee relied on the Debtors' plan projections for estimates of proceeds from loan repayments, asset sales, interest income and other income under three scenarios, "Upside Case," "Base Case" and "Downside Case." The "Upside Case," "Base Case" and "Downside Case" estimates were prepared by management based upon a number of assumptions with regard to the future performance of the Debtors, the real estate markets in which the Debtors operate, and recent third-party appraisals.

   Using the "Upside Case," "Base Case" and "Downside Case" the Committee prepared two sets of projections, one set reflects a $16.5 million payoff of the US Bank claim at exit and the other set reflects the US Bank claim not paid at exit, but receiving a Restructured Note with a 5 year term with an interest rate of US Bank Prime plus 2% paid in kind.

   The Projections were not prepared with a view toward compliance with the guidelines established by The American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the SEC regarding projections. Furthermore, the Projections have not been audited by the Debtors' independent accountants or tax advisors. Rather, the Projections reflect the forecasted cash flows of the business as such receipts and disbursements are projected to be realized by the Liquidating Trust.

2. *Exit Facility.* The Committee's Plan proposes exit financing of up to $12 million dollars, plus an additional $16.5 million dollars to pay off US Bank. The Committee has not yet obtained financing for either of these components of the Committee's Plan. The Projections assume the Exit Facility will receive 18% interest paid in kind with the exception that 12% interest will be paid in cash during the first 18 months following the exit.

3. *Projection Period.* The Projections were prepared for the fiscal years 2011 through 2015 (the "Projection Period"). The Debtors operate on a fiscal year ending December 31st.

4. *Plan Consummation.* The Projections assume the Plan will be confirmed and consummated and that the Debtors will emerge from chapter 11 on or about June 1, 2011.

5. *Macroeconomic and Market Conditions.* The Projections assume an increasingly stable to slowly improving macroeconomic environment and similar conditions within the markets in which the Debtors operate. The Projections contemplate a modest recovery in land and related real estate asset values in the Debtors' markets over the Projection Period.

6. *Loan Repayments and Asset Sales.* The Projections assume the repayment of all loans and the sale of all real estate owned ("REO") in the Debtors' portfolio occurs over the Projection Period. It is assumed that the Debtors will incur selling expenses equal to 10% of gross proceeds realized from REO assets to account for commissions, closing costs and other expenses typically borne by sellers. Net proceeds from loan repayments and asset sales, after all applicable costs, are utilized to repay the exit facility.

7. *Other Income.* Other income generated from the portfolio includes rental and farm income from certain REO properties.

8. *Interest Income.* Includes cash interest and fees received from certain performing or partially performing loans.

9. *Cash Interest Expense.* The Projections assume payment of partial cash interest on an Exit Facility at a rate of 12.0% during the first 18 months following exit.

10. *Management Fee.* The Projections include estimates of management fees equal to the management fees assumed in the Debtors' plan projections.

11. *REO Carry Costs.* The Projections include certain carry costs associated with REO properties during the course of the Projection Period. These include tax, insurance, maintenance, legal, utilities, professional and appraisal expenses.

12. *General and Administrative Costs.* The Projections assume that there will be certain monthly costs necessary for the Debtors to continue limited operations. These include payroll, legal, accounting, foreclosure, board fees and liquidating trustee fees.

13. *Chapter 11 Administrative Fees & Expenses.* Approximately $1.5 million of bankruptcy fees and expenses will be paid at the Plan effective date. Pursuant to the Waterfall described below, the balance will be paid over time as assets are sold. The Committee believes that these costs will be paid in full prior to December 31, 2012.

14. *Waterfall.* The Projections assume that the proceeds from the sale of assets will be applied as follows:

     i. to fund any costs and expenses due to Exit Facility lender;
     ii. to fund working capital of the Liquidating Trust and pay any remaining chapter 11 administrative fees and expenses;
     iii. to fund the payment of any interest due to the Exit Facility lender;
     iv. to repay any outstanding Exit Facility principal;
     v. to distribute funds pursuant to the Plan.

15. *Recovery.* Following the repayment of the Exit Facility and the sale or repayment of all assets in the Debtors' portfolio, estimates are made as to the amount of net proceeds distributable to satisfy the secured claims of US Bank and the Secured Noteholders (Deutsche Bank) by aggregating proceeds which resulted from the sale or repayment of US

Bank or Secured Noteholder (Deutsche Bank) collateral less an estimate of the costs associated with the resolution of the assets securing their claims. Following the distribution of net proceeds to satisfy the secured portion of US Bank's claim or the Secured Noteholders (Deutsche Bank) claims, the remaining distributable proceeds are applied to estimated aggregate unsecured claims. Aggregate unsecured claims include US Bank's deficiency claim, Unsecured Noteholder claims, Secured Noteholder (Deutsche Bank) deficiency claims and an estimate of other unsecured claims. The Projections assume repayment of the DIP Facility at exit as outlined in the Plan.

**Upside Case Projections: US Bank paid $16.5m at Exit per Option 1 of the Plan**

Specialty Trust, Inc.
Summary of Projected Cash Flows for the Liquidating Trust

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 4,306,000 | $ 36,308,935 | $ 22,096,375 | $ 14,580,000 | $ 27,149,457 | $ 104,440,767 |
| Interest Income | 276,941 | 399,543 | 120,459 | 67,224 | - | 864,168 |
| Other Income | 12,140 | 43,540 | 18,333 | - | - | 74,013 |
| Litigation Recoveries | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |
| Cash Interest Expense | (1,567,356) | (3,212,687) | - | - | - | (4,780,044) |
| Management & Servicing Fees | (692,878) | (1,110,088) | (778,273) | (654,833) | (532,129) | (3,768,202) |
| REO Carry Costs | (872,794) | (730,845) | (452,589) | (316,600) | (99,092) | (2,471,919) |
| General and Administrative | (4,533,025) | (424,720) | (368,795) | (312,894) | (317,320) | (5,956,854) |
| **Cash Available / (Required) for Debt Repayment** | $ (3,070,973) | $ 31,273,679 | $ 20,635,510 | $ 13,362,797 | $ 26,200,916 | $ 88,401,929 |
| | | | | | | |
| Secured Lender Repayments at Exit | (3,500,000) | | | | | (3,500,000) |
| Exit Facility Draws / (Repayments) | 23,070,973 | (25,443,494) | | | | (2,372,522) |
| Secured Noteholder (Deutsche Bank) Repayments | - | (2,947,792) | (11,015,266) | | (1,948,150) | (15,911,207) |
| Secured Noteholder (US Bank) Repayments | (16,500,000) | | | | | (16,500,000) |
| **Total Change in Cash** | $ - | $ 2,882,393 | $ 9,620,244 | $ 13,362,797 | $ 24,252,766 | $ 50,118,200 |
| | | | | | | |
| **Beginning Cash** | $ - | $ - | $ 2,882,393 | $ 12,502,637 | $ 25,865,434 | $ - |
| Change in Cash | - | 2,882,393 | 9,620,244 | 13,362,797 | 24,252,766 | 50,118,200 |
| **Ending Cash** | $ - | $ 2,882,393 | $ 12,502,637 | $ 25,865,434 | $ 50,118,200 | $ 50,118,200 |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | NA | 16,500,000 | NA |
| Deutsche Bank Secured Claim | NA | 15,911,207 | NA |
| Unsecured Claims | $ 62,054,969 | $ 50,118,200 | 80.8% |

## Base Case Projections: US Bank paid $16.5m at Exit per Option 1 of the Plan

**Specialty Trust, Inc.**
**Summary of Projected Cash Flows for the Liquidating Trust**

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 4,306,000 | $ 8,228,935 | $ 20,490,000 | 9,730,000 | $ 32,230,832 | $ 74,985,767 |
| Interest Income | 276,941 | 404,493 | 179,543 | 122,828 | - | 983,804 |
| Other Income | 12,140 | 43,540 | 20,000 | 19,167 | 9,167 | 104,013 |
| Litigation Recoveries | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |
| Cash Interest Expense | (1,567,356) | (3,208,457) | - | - | - | (4,775,813) |
| Management & Servicing Fees | (687,747) | (1,066,524) | (922,527) | (690,630) | (598,763) | (3,966,191) |
| REO Carry Costs | (872,794) | (730,845) | (458,506) | (378,455) | (152,307) | (2,592,906) |
| General and Administrative | (4,533,025) | (424,720) | (366,795) | (312,994) | (317,320) | (5,956,854) |
| **Cash Available / (Required) for Debt Repayment** | $ (3,065,842) | $ 3,246,423 | $ 18,939,715 | $ 8,489,916 | $ 31,771,608 | $ 58,781,820 |
| | | | | | | |
| Secured Lender Repayments at Exit | (3,500,000) | | | | | (3,500,000) |
| Exit Facility Draws / (Repayments) | 23,065,842 | (3,246,423) | (18,939,715) | (8,489,916) | (1,107,590) | (8,717,802) |
| Secured Noteholder (Deutsche Bank) Repayments | - | - | - | - | (10,123,825) | (10,123,825) |
| Secured Noteholder (US Bank) Repayments | (16,500,000) | - | - | - | - | (16,500,000) |
| **Total Change in Cash** | $ - | $ 0 | $ - | $ (0) | $ 19,940,193 | $ 19,940,193 |
| | | | | | | |
| Beginning Cash | $ - | $ - | $ 0 | $ 0 | $ (0) | - |
| Change in Cash | - | 0 | - | (0) | 19,940,193 | 19,940,193 |
| Ending Cash | $ - | $ 0 | $ 0 | $ (0) | $ 19,940,193 | $ 19,940,193 |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | NA | 16,500,000 | NA |
| Deutsche Bank Secured Claim | NA | 10,123,825 | NA |
| Unsecured Claims | $ 67,842,351 | $ 19,940,193 | 29.4% |

**Downside Case Projections: US Bank paid $16.5m at Exit per Option 1 of the Plan**

Specialty Trust, Inc.
Summary of Projected Cash Flows for the Liquidating Trust

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 3,229,500 | $ 6,171,701 | $ 15,367,500 | $ 7,297,500 | $ 24,173,124 | $ 56,239,325 |
| Interest Income | 276,941 | 404,493 | 179,543 | 122,828 | - | 983,804 |
| Other Income | 12,140 | 43,540 | 20,000 | 19,167 | 9,167 | 104,013 |
| Litigation Recoveries | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |
| Cash Interest Expense | (1,567,356) | (3,349,876) | - | - | - | (4,917,233) |
| Management & Servicing Fees | (688,997) | (1,083,191) | (959,193) | (746,463) | (666,263) | (4,144,108) |
| REO Carry Costs | (872,794) | (730,845) | (458,506) | (378,455) | (152,307) | (2,592,906) |
| General and Administrative | (4,533,025) | (424,720) | (368,795) | (312,394) | (317,320) | (5,956,854) |
| **Cash Available / (Required) for Debt Repayment** | $ (4,143,592) | $ 1,031,103 | $ 13,780,549 | $ 6,001,582 | $ 23,046,400 | $ 39,716,043 |
| | | | | | | |
| Secured Lender Repayments at Exit | (3,500,000) | - | - | - | - | (3,500,000) |
| Exit Facility Draws / (Repayments) | 24,143,592 | (1,031,103) | (13,780,549) | (6,001,582) | (17,222,585) | (13,892,227) |
| Secured Noteholder (Deutsche Bank) Repayments | - | - | - | - | (5,823,815) | (5,823,815) |
| Secured Noteholder (US Bank) Repayments | (16,500,000) | 0 | - | - | (0) | (16,500,000) |
| **Total Change in Cash** | $ - | $ (0) | $ - | $ - | $ (0) | $ - |
| | | | | | | |
| **Beginning Cash** | $ - | $ - | $ (0) | $ - | $ (0) | $ - |
| Change in Cash | - | (0) | - | - | (0) | (0) |
| **Ending Cash** | $ - | $ (0) | $ (0) | $ - | $ (0) | $ (0) |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | NA | $ 16,500,000 | NA |
| Deutsche Bank Secured Claim | NA | $ 5,823,815 | NA |
| Unsecured Claims | $ 72,142,361 | $ (0) | 0.0% |

**Upside Case Projections: US Bank receives restructured note per Option 2 of the Plan**

Specialty Trust, Inc.
Summary of Projected Cash Flows for the Liquidating Trust

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 4,306,000 | $ 36,308,935 | $ 22,096,375 | $ 14,580,000 | $ 27,149,457 | $ 104,440,767 |
| Interest Income | 276,941 | 399,543 | 120,459 | 67,224 | - | 864,168 |
| Other Income | 12,140 | 43,540 | 18,333 | - | - | 74,013 |
| Litigation Recoveries | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |
| Cash Interest Expense | (539,480) | (859,816) | - | - | - | (1,399,297) |
| Management & Servicing Fees | (692,878) | (1,110,088) | (778,273) | (654,833) | (532,129) | (3,768,202) |
| REO Carry Costs | (872,794) | (730,845) | (452,589) | (316,600) | (99,092) | (2,471,919) |
| General and Administrative | (4,533,025) | (424,720) | (388,795) | (312,894) | (317,320) | (5,956,854) |
| **Cash Available / (Required) for Debt Repayment** | $ (2,043,097) | $ 33,626,550 | $ 20,635,510 | $ 13,362,797 | $ 26,200,916 | $ 91,782,676 |
| | | | | | | |
| Secured Lender Repayments at Exit | (3,500,000) | - | - | - | - | (3,500,000) |
| Exit Facility Draws / (Repayments) | 5,543,097 | (6,225,245) | (124,123) | - | - | (806,271) |
| Secured Noteholder (Deutsche Bank) Repayments | - | (1,786,316) | (12,182,539) | - | (1,948,150) | (15,917,005) |
| Secured Noteholder (US Bank) Repayments | - | (25,614,989) | (6,570,531) | - | - | (32,185,520) |
| **Total Change in Cash** | $ - | $ - | $ 1,758,318 | $ 13,362,797 | $ 24,252,766 | $ 39,373,880 |
| | | | | | | |
| Beginning Cash | $ - | $ - | $ - | $ 1,758,318 | $ 15,121,115 | $ - |
| Change in Cash | - | - | 1,758,318 | 13,362,797 | 24,252,766 | 39,373,880 |
| **Ending Cash** | $ - | $ - | $ 1,758,318 | $ 15,121,115 | $ 39,373,880 | $ 39,373,880 |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | NA | $ 32,185,520 | NA |
| Deutsche Bank Secured Claim | NA | $ 15,917,005 | NA |
| Unsecured Claims | $ 62,049,171 | $ 39,373,880 | 63.5% |

**Base Case Projections: US Bank receives restructured note per Option 2 of the Plan**

**Specialty Trust, Inc.**
**Summary of Projected Cash Flows for the Liquidating Trust**

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 4,306,000 | $ 8,228,935 | $ 20,490,000 | $ 9,730,000 | $ 32,230,832 | $ 74,985,767 |
| Interest Income | 276,941 | 404,493 | 179,543 | 122,828 | - | 983,804 |
| Other Income | 12,140 | 43,540 | 20,000 | 19,167 | 9,167 | 104,013 |
| Litigation Recoveries | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |
| Cash Interest Expense | (539,480) | (855,586) | - | - | - | (1,395,066) |
| Management & Servicing Fees | (687,747) | (1,066,524) | (922,527) | (690,630) | (598,763) | (3,966,191) |
| REO Carry Costs | (872,794) | (730,845) | (458,506) | (378,455) | (152,307) | (2,592,906) |
| General and Administrative | (4,533,025) | (424,720) | (368,795) | (312,994) | (317,320) | (5,956,854) |
| **Cash Available / (Required) for Debt Repayment** | $ (2,037,966) | $ 5,599,294 | $ 18,939,715 | $ 8,469,916 | $ 31,171,608 | $ 62,162,567 |
| | | | | | | |
| Secured Lender Repayments at Exit | (3,500,000) | | | | | (3,500,000) |
| Exit Facility Draws / (Repayments) | 5,537,966 | (5,599,294) | (872,104) | (104,092) | (93,480) | (1,131,004) |
| Secured Noteholder (Deutsche Bank) Repayments | - | - | (1,609,589) | (1,196,376) | (7,293,341) | (10,099,306) |
| Secured Noteholder (US Bank) Repayments | - | - | (16,458,022) | (7,189,448) | (11,418,378) | (35,065,848) |
| **Total Change in Cash** | $ - | $ 0 | $ - | $ - | $ - | $ 12,366,410 |
| | | | | | | |
| **Beginning Cash** | $ - | $ - | $ 0 | $ 0 | $ 0 | $ - |
| Change in Cash | - | 0 | 0 | 0 | 12,366,410 | 12,366,410 |
| **Ending Cash** | $ - | $ 0 | $ 0 | $ 0 | $ 12,366,410 | $ 12,366,410 |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | NA | 35,065,848 | NA |
| Deutsche Bank Secured Claim | NA | 10,099,306 | NA |
| Unsecured Claims | $ 67,866,871 | $ 12,366,410 | 18.2% |

**Downside Case Projections: US Bank receives restructured note per Option 2 of the Plan**

Specialty Trust, Inc.
Summary of Projected Cash Flows for the Liquidating Trust

| | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | | |
| Net Loan Repayments / Asset Sales | $ 3,229,500 | $ 6,171,701 | $ 15,367,500 | $ 7,297,500 | $ 24,173,124 | $ 56,239,325 |
| Interest Income | 276,941 | 404,493 | 179,543 | 122,828 | - | 983,804 |
| Other Income | 12,140 | 43,540 | 20,000 | 19,167 | 9,167 | 104,013 |
| Litigation Recoveries | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |
| Cash Interest Expense | (539,480) | (997,005) | - | - | - | (1,536,486) |
| Management & Servicing Fees | (688,997) | (1,083,191) | (959,193) | (746,463) | (666,263) | (4,144,108) |
| REO Carry Costs | (872,794) | (730,845) | (458,506) | (378,455) | (152,307) | (2,592,906) |
| General and Administrative | (4,533,025) | (424,720) | (368,795) | (312,894) | (317,320) | (5,956,854) |
| **Cash Available / (Required) for Debt Repayment** | $ (3,115,716) | $ 3,383,974 | $ 13,780,549 | $ 6,001,582 | $ 23,046,400 | $ 43,096,790 |
| | | | | | | |
| Secured Lender Repayments at Exit | (3,500,000) | - | - | - | - | (3,500,000) |
| Exit Facility Draws / (Repayments) | 6,615,716 | (3,383,974) | (4,896,937) | (108,864) | (99,120) | (1,873,179) |
| Secured Noteholder (Deutsche Bank) Repayments | - | - | (766,802) | (806,660) | (3,478,363) | (5,051,825) |
| Secured Noteholder (US Bank) Repayments | - | - | (8,116,810) | (5,086,058) | (19,468,917) | (32,671,786) |
| **Total Change in Cash** | $ 0 | $ 0 | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Beginning Cash** | $ - | $ 0 | $ 0 | $ 0 | $ 0 | $ - |
| Change in Cash | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ending Cash** | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |

| Recovery: | Claim | Recovery ($) | Recovery (%) |
|---|---|---|---|
| DIP Facility Claim | $ 3,500,000 | $ 3,500,000 | 100.0% |
| US Bank Claim | NA | 32,671,786 | NA |
| Deutsche Bank Secured Claim | NA | 5,051,825 | NA |
| Unsecured Claims | $ 72,914,352 | $ 0 | 0.0% |