1  IRA D. KHARASCH (CA Bar No. 109084)
   VICTORIA A. NEWMARK (CA Bar No. 183581)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Boulevard, 11th Floor
3  Los Angeles, California  90067-4100
   Telephone: 310/277-6910
4  Facsimile: 310/201-0760
   Email: ikharasch@pszjlaw.com
5          vnewmark@pszjlaw.com

6
   SALLIE B. ARMSTRONG (NV Bar No. 1243)
7  MICHELLE N. KAZMAR (NV Bar No. 10098)
   DOWNEY BRAND LLP
8  427 West Plumb Lane
   Reno, Nevada 89509
9  Telephone:  775/329-5900
   Facsimile:  775/786-5443
10 Email:  reno@downeybrand.com

11
   *Attorneys for Debtors and*
12 *Debtors in Possession*

13              UNITED STATES BANKRUPTCY COURT
                 FOR THE DISTRICT OF NEVADA
14

15 In re:                              Chapter 11

16 SPECIALTY TRUST, INC., et al.[1]    **Jointly Administered under**
                                       **Case No. 10-51432-GWZ**
17 ☐ Affects this Debtor
   ☒ Affects all Debtors              Case Nos.:
18 ☐ Affects Specialty Acquisition Corp.   10-51432
   ☐ Affects SAC II                    10-51437
19 ☐ Affects SAC D-1, LLC              10-51440
                                       10-51441
20
                                       **FIRST AMENDED CHAPTER 11 PLAN**
21                                     **OF REORGANIZATION PROPOSED BY**
                                       **THE DEBTORS (DATED APRIL 27, 2011)**
22

23                                     Hearing Date:  June 3, 2011
                                       Hearing Time:  2:00 p.m.
24

25

26

27 _____
   [1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if
28 applicable, are:  Specialty Trust, Inc. (2463); Specialty Acquisition Corp. (3680); SAC II (2463); and SAC D-1, LLC
   (1858).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# **TABLE OF CONTENTS**

**Page**

I. DEFINITIONS AND RULES OF CONSTRUCTION ........................................................ 1
    A.   Definitions. .................................................................................................. 1
    B.   Rules of Construction. ............................................................................... 10
II. DESIGNATION OF CLASSES AND TREATMENT OF CLAIMS AND INTERESTS........... 11
    A.   Summary and Classification of Claims and Interests. .................................. 11
    B.   Allowance and Treatment of Unclassified Claims (Administrative Claims and Priority Tax Claims). ............................................................................................................. 12
        1.   Administrative Claims. .................................................................... 12
        2.   Priority Tax Claims. ........................................................................ 14
    C.   Classification and Treatment of Classified Claims and Interests. .................. 15
        1.   Class 1 US Bank Allowed Secured Claims .......................................... 15
        2.   Class 2 Secured Noteholder Secured Claims (Deutsche Bank)................. 16
        3.   Class 3 Secured Tax Claims .............................................................. 19
        4.   Class 4 ST Secured Claims Against SAC II .......................................... 20
        5.   Class 5 ST Secured Claims Against SAC ............................................. 20
        6.   Class 6 JSSD SAC II Secured Claim.................................................... 21
        7.   Class 7 Ryland Homes SAC II Secured Claim ...................................... 21
        8.   Class 8 General Unsecured Claims. .................................................... 21
        9.   Class 9 Subordinated Claims against Specialty Trust (BONY) ................ 23
        10.   Class 10 (Interests). ....................................................................... 24
        11.   Class 11 City National Allowed ST Secured Claim ............................... 25
III. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... 25
    A.   Assumption of Executory Contracts and Unexpired Leases............................. 25
        1.   Assumption of Agreements. .............................................................. 25
        2.   Cure Claims. .................................................................................. 26
        3.   Objections to Assumption. ............................................................... 26
        4.   Resolution of Claims Relating to Assumed Agreements.......................... 27
    B.   Rejection of Executory Contracts and Unexpired Leases............................... 27
        1.   Rejected Agreements. ...................................................................... 27
        2.   Bar Date for Rejection Damage Claims. .............................................. 28
    C.   Post-Petition Contracts and Leases. ........................................................... 28
IV. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN................................ 28
    A.   Funding of the Plan. .................................................................................. 28
        1.   Northlight Exit Facility. ................................................................... 28
    B.   Continued Corporate Existence and Vesting of Assets in Reorganized Debtors .................. 30
    C.   Management of the Reorganized Debtors....................................................... 30
        1.   Appointment of Plan Representative; Supervisory Board. ...................... 30
        2.   Powers and Duties of the Reorganized Debtors. ................................... 30
        3.   Management of the Debtors' Mortgage Loan and Real Property Portfolio......... 32
    D.   Objections to Claims or Interests. ............................................................... 32
    E.   Distribution of Property Under the Plan. ...................................................... 32
        1.   Manner of Payments Under the Plan. ................................................. 33
        2.   No De Minimis Distributions............................................................. 33
        3.   No Distribution With Respect to Disputed Claims. ............................... 33
        4.   Delivery of Distributions and Undeliverable/Unclaimed Distributions. ........... 34
        5.   Estimation of Disputed Claims or Interest for Distribution Purposes. ............ 35
        6.   Cancellation of Unsecured Notes and Unsecured Noteholders Indenture ............ 35
    F.   Full Satisfaction. ...................................................................................... 35
    G.   Compliance with Tax Requirements............................................................. 36
    H.   Setoff, Recoupment and Other Rights. ........................................................ 36
    I.   Conditions to Effectiveness. ...................................................................... 36
    J.   Authorization of Entity Action. .................................................................. 37

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

V. OTHER PLAN PROVISIONS ........................................................................... 37
    A.   Exculpation:  No Liability for Solicitation or Prosecution of Confirmation. ................. 37
    B.   Revocation of Plan/No Admissions. ........................................................... 38
    C.   Modifications of the Plan. ........................................................................ 38
    D.   Dissolution of Committee. ........................................................................ 38
    E.   Exemption from Certain Transfer Taxes. ..................................................... 38
    F.   Successors and Assigns. .......................................................................... 39
    G.   Saturday, Sunday or Legal Holiday. ........................................................... 39
    H.   Headings. ........................................................................................... 39
    I.   Governing Law. ................................................................................... 39
    J.   Form of Agreements and Documents. ......................................................... 39
VI. EFFECT OF CONFIRMATION OF THE PLAN ............................................... 40
    A.   Discharge and Injunction. ....................................................................... 40
    B.   Payment of U.S. Trustee Fees. ................................................................. 41
    C.   Retention of Jurisdiction. ........................................................................ 41
VII. RECOMMENDATION AND CONCLUSION ................................................... 44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# LIST OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| A | Northlight Exit Facility Term Sheet |
| B | Release Price Supplement to Northlight Exit Facility Term Sheet (Redacted) |

This Plan of Reorganization is proposed by Specialty Trust, Inc. and its jointly-administered chapter 11 affiliates, the debtors and debtors in possession in the above-captioned chapter 11 cases ("Proponents"):

## I.

## DEFINITIONS AND RULES OF CONSTRUCTION

**A.**    **Definitions.**

In addition to such other terms as are defined elsewhere in the Plan, the following terms (which appear in the Plan as capitalized terms) have the following meanings as used in the Plan:

"Administrative Claim" means a Claim for administrative costs or expenses under Bankruptcy Code section 503.

"Allowed Claim" means:

(a)    with respect to a Claim arising prior to the Petition Date :

(i)    Either:  (1) a proof of Claim was timely filed; or (2) a proof of Claim is deemed timely filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a Final Order; and

(ii)    Either:  (1) the Claim is not a Disputed Claim; or (2) the Claim is allowed by a Final Order or under the Plan; and

(b)    with respect to a Claim arising on or after the Petition Date, a Claim that has been allowed pursuant to Section II.B of the Plan.

Unless otherwise specified in the Plan, an Allowed Claim does not include interest on the Claim accruing after the Petition Date.  Moreover, any portion of a Claim that is satisfied, released or waived during the Cases is not an Allowed Claim.

"Allowed Interest" means:

(a)    Either (a) a proof of Interest was timely filed; or (2) a proof of Interest is deemed timely filed either under Bankruptcy Rule 3003(b) or by Final Order; and

(b)    Either (a) the Interest is neither a Disputed Interest nor a Disallowed Interest, or (2) the Interest is allowed either by a Final Order or Under the Plan.

"Associated Released Parties" means, with respect to a specified entity, its officers, directors, agents, employees, advisors and professionals acting in their capacity as such,

1

1  representatives, shareholders, partners, parents, affiliates, members, managers, predecessors and

2  successors, past and present; provided, however, that Associated Released Parties excludes any

3  entity identified in Section IX.D.c. of the Disclosure Statement or any supplement thereto.

4      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as

5  the same may be amended from time to time to the extent applicable to the Cases.

6      "Bankruptcy Rules" means, collectively, (a) the Federal Rules of Bankruptcy Procedure and

7  (b) the local rules of the Court, as applicable in the Cases.

8      "BONY" means The Bank of New York Mellon.

9      "Business Day" means a day that is not a Saturday, Sunday, or legal holiday.

10      "Cases" means the Debtors' cases under chapter 11 of the Bankruptcy Code.

11      "Causes of Action" means all causes of action which are Property of the Estate as of the

12  Effective Date including any actions that arise pursuant to sections 544-553 of the Bankruptcy

13  Code, and any actions against present or former officers, directors, agents and/or representatives of

14  the Debtors under applicable law.

15      "City National Bank" means City National Bank, a National Banking Association, which

16  has a first priority security interest in certain undeveloped real estate located along the bank of the

17  Truckee River in Reno, Nevada.

18      "City National Bank Restructured Note" means the secured promissory note to be issued by

19  Reorganized ST to City National Bank, and that will be attached to the Plan Supplement prior to the

20  voting deadline.

21      "Claim" means a claim against one or more of the Debtors or one or more of the Debtors'

22  property, as defined by Bankruptcy Code section 101(5).

23      "Class" means a class of Claims or Interests as classified in Section II.C.

24      "Committee" means the Official Committee of Equity Security Holders

25      "Confirmation Date" means the date of entry of the Confirmation Order.

26      "Confirmation Hearing" shall mean the date that will be set by the Bankruptcy Court for the

27  hearing on the confirmation of the Plan.

28      "Confirmation Order" means an order of the Court confirming the Plan .

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

"Consolidated Phase 4 Note" means that certain promissory note in the face amount of $3,645,000 issued by SAC to ST and secured by a deed of trust on the Consolidated Phase 4 Property.

"Consolidated Phase 4 Property" means that certain real property consisting of 54 partially improved residential lots located in Sparks, Nevada that is owned by SAC.

"Coolidge 140 Note" means that certain promissory note in the face amount of $2,113,650 issued by SAC II to ST and secured by a deed of trust on the Coolidge 140 Property.

"Coolidge 140 Property" means that certain real property consisting of 140 acres of farm land located in Coolidge, Arizona that is owned by SAC II.

"Cotton Lane Note" means that certain promissory note in the face amount of $2,625,000 issued by SAC to ST and secured by a deed of trust on the Cotton Lane Property.

"Cotton Lane Property" means that certain real property located in Goodyear, Arizona that is owned by SAC.

"Court" means the United States Bankruptcy Court for the District of Nevada, Northern Division, or any other court that exercises jurisdiction over the Cases.

"Creditor" means "creditor" as defined in section 101(10) of the Bankruptcy Code.

"CRO" shall mean Grant Lyon, or any successor appointed by the Court, in his capacity as Chief Restructuring Officer.

"Cure Claims" means the right to payment of cash or the distribution of other property (as the parties may agree or the Court may order), as necessary to cure defaults under an executory contract or unexpired lease of the Debtors, or as otherwise required by Bankruptcy Code section 365(b) as a condition of assumption, so that the Reorganized Debtors may assume the contract or lease pursuant to Bankruptcy Code section 1123(b)(2).

"Debtors" means, collectively, (i) Specialty Trust, Inc., a Maryland corporation REIT, (ii) Specialty Acquisition Corp., a Delaware corporation, (iii) SAC II, a Nevada limited liability company and (iv) SAC D-1, LLC, an Arizona limited liability company.

"Deutsche Bank" means Deutsche Bank National Trust Company.

"DIP Facility" means that certain debtor-in-possession financing facility, or facilities, by and

3

1    between the DIP Lender and certain of the Debtors, as approved by the Court pursuant to that

2    certain order dated December 15, 2010 and as amended from time to time.

3        "DIP Facility Documents" means the financing documents with respect to the DIP Facility.

4        "DIP Lender" means the lender under the DIP Facility.

5        "Disallowed" or "Disallowed Claim" or "Disallowed Interest" means a Claim or Interest, or

6    any portion thereof, that:    (a) is not listed on the Debtors' Schedules, or is listed therein as

7    contingent, unliquidated, disputed, or in an amount equal to zero, and whose holder has failed to

8    timely file a proof of Claim or proof of Interest; or (b) has been disallowed pursuant to order of the

9    Court.

10        "Discharged Liabilities" has the meaning ascribed to it in Section VII.A of the Plan.

11        "Disclosure Statement" means the disclosure statement to accompany the Plan, as it

12    subsequently may be modified or amended, and all exhibits thereto.

13        "Disputed Claim" of "Disputed Interest" means (i) with respect to a Claim arising before the

14    Petition Date (including a 503(b)(9) Claim) or an Interest, a Claim or Interest, or any portion

15    thereof, as to which a proof of Claim or proof of Interest has been filed or is deemed filed under

16    Bankruptcy Rule 3003(b), and an objection or complaint with respect to such Claim or Interest

17    (a) has been timely filed; and (b) has not been overruled or adjudicated against the objector by the

18    Court pursuant to a Final Order or withdrawn, and (ii) with respect to an Administrative Claim, a

19    Claim as to which a party in interest has objected within, if applicable, the time fixed for making

20    such objection.

21        "Effective Date" means the first Business Day (a) that is at least fourteen days after the

22    Confirmation Date; (b) on which no stay of the Confirmation Order is in effect; and (c) on which

23    the conditions set forth in Section IV.I have been satisfied or waived by the Debtors and Northlight.

24        "Estates" means the estates created in the Cases under 11 U.S.C. § 541.

25        "Exhibit Filing Date" means the last Business Day that is at least seven days prior to the last

26    date for timely objecting to the confirmation of the Plan.

27        "Filed" means duly and properly filed with the Court and reflected on the Court's official

28    docket.  "File," "Files," and "Filing" are all conjugations of Filed.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4

"Final Order" means an order or judgment of the Court entered on the Court's official docket, or an order or judgment made in accordance with Article VI hereof by a court of competent jurisdiction:

      (a)     that has not been reversed, rescinded, stayed, modified, or amended;

      (b)     that is in full force and effect; and

      (c)     with respect to which: (1) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely-filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (2) any such appeal or petition has been withdrawn, dismissed or resolved by the highest court to which the order or judgment was timely appealed or from which review, rehearing, remand, or a writ of certiorari was timely sought.

Notwithstanding the foregoing, the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to any such order shall not prevent such order from being a "Final Order."

"General Unsecured Claim" means a Claim that is not secured by a lien on property of the Estates or subject to a right of setoff pursuant to section 553 of the Bankruptcy Code and that is not an Administrative Claim, a Priority Claim, or a Priority Tax Claim.

"Guaranty Claim" means an unsecured Claim against a Debtor, for which another Debtor is the primary obligor.

"Impair" or "Impaired" means, when used in reference to a Class of Claims or Interests, a Class that that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Intercompany Claims" means all Claims (whether arising from contract, tort or otherwise) held by any of the Debtors against any other Debtor, whether or not a proof of Claim is filed or deemed filed pursuant to Bankruptcy Code section 501 in any of the Cases.

"Interest" means the interest, whether or not asserted, of any holder of an equity security of the Debtors, as defined in Bankruptcy Code section 101(17), and includes all membership interests and other ownership interests in the Debtors, options, warrants and other instruments or right to participate in the profits of the Debtors or their operations, and rights to acquire or receive any of the foregoing interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

"IRS" means the Internal Revenue Service of the United States of America.

"Jordanelle Property" means that certain real property located in Park City, Utah that is owned by SAC II.

"JSSD" means the Jordanelle Special Service District of Wasatch County, Utah.

"Net Cash Proceeds" means the cash or other proceeds (including a promissory note) received by a Debtor from the sale or other disposition of an asset, minus realtor commissions, legal fees and any other closing costs.

"New Secured Noteholder Collateral" means all of the real and personal property and other interests securing payment of the New Secured Notes.

"New Secured Noteholder Indenture" means that certain Second Amended and Restated Indenture Dated as of March 1, 2009 Related to Specialty Trust, Inc. Secured Investment Notes.

"New Secured Noteholders" means the holders of the New Secured Notes.

"New Secured Notes" means the secured investment notes under the New Deutsche Bank Indenture.

"Non-Ordinary Course Administrative Claim" means any Administrative Claim, other than Ordinary Course Administrative Claims, 503(b)(9) Claims, Professional Fee Claims, Cure Claims, or U.S. Trustee Fees.

"Northlight" means Northlight Real Estate Group LLC or any other affiliates that participate in the Northlight Exit Facility.

"Northlight Asset Management and Servicing Agreement" is the agreement between the Reorganized Debtors and Northlight Asset Management LLC or an affiliate thereof to provide asset management services for the Reorganized Debtors' real estate and mortgage loan portfolio substantially in the form attached to the Plan Supplement as Exhibit B.

"Northlight Exit Facility" means the secured credit facility designed to permit the Reorganized Debtors to satisfy their Plan obligations on and after the Effective Date substantially in the form attached to the Plan Supplement as Exhibit A.

"Northlight Exit Facility Term Sheet" means the term sheet summarizing the Northlight Exit Facility, attached to the Plan as Exhibit A.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6

"Old Secured Noteholder Collateral" means all of the real and personal property and other interests securing payment of the Old Secured Noteholders' Allowed Secured Claims.

"Old Secured Noteholder Indenture" means that certain Amended and Restated Indenture Dated as of August 1, 2006 Related to Specialty Trust, Inc. Collateralized Investment Notes.

"Old Secured Noteholders" means the holders of the Old Secured Notes.

"Old Secured Notes" means the secured investment notes under the Old Deutsche Bank Indenture.

"Ordinary Course Administrative Claims" means Administrative Claims based upon liabilities that the Debtors incur in the ordinary course of their business for goods and services and that are unpaid as of the Effective Date. Ordinary Course Administrative Claims do not include Professional Fee Claims, 503(b)(9) Claims, Cure Claims, U.S. Trustee Fees, tort claims, or other non-contractual claims upon which civil liability may be based that arose after the Petition Date but prior to the Effective Date.

"Petition Date" means April 20, 2010.

"Plan" means this "Chapter 11 Plan of Liquidation Proposed by the Debtors (Dated March 25, 2011)," as it subsequently may be modified or amended.

"Plan Bid Procedures" means the procedures that the Debtors anticipate will be approved by the Bankruptcy Court pursuant to a separate motion that will provide Northlight bid protection as the stalking horse provider of the financing proposed under the Plan, including a break-up fee, and that will govern the process by which other entities may submit higher and better bids prior to the Confirmation Hearing than the Northlight proposal as delineated in the Northlight Exit Facility and the Northlight Asset Management and Servicing Agreement.

"Plan Representative" means the individual selected to fill this role in accordance with Section IV.C of the Plan.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed concurrently with the Plan, and may be amended, supplemented, or modified from time to time.

"Priority Claim" means an Allowed Claim entitled to priority against any Estate under

7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Bankruptcy Code sections 507(a)(4), 507(a)(5), or 507(a)(7).

"Priority Tax Claim" means an Allowed Claim entitled to priority against one or more of the Estates under Bankruptcy Code section 507(a)(8), and excludes any Claims for taxes attributable to the period after the Petition Date.

"Pro Rata" means proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the Allowed Claim, is the same as the ratio of (x) the amount of consideration available for distribution on account of Allowed Claims in the Class or Classes which share in the relevant consideration distributed to (y) the amount of all Allowed Claims of the Class or Classes that will share in the relevant consideration distributed.

"Professional Fee Claim" means a Claim under Bankruptcy Code sections 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred during the pendency of the Cases for which one or more of the Estates is liable for payment (but excluding any Substantial Contribution Claim and any Claim of the Unsecured Noteholders Indenture Trustee for its fees and costs).

"Rejection Damage Claim" means a Claim arising under Bankruptcy Code section 365 from the rejection by any of the Debtors of a lease or contract.

"Reorganized Debtors" means ST, SAC II, SAC, and SAC D-1 following the Effective Date.

"Ryland Homes" means Ryland Homes of California, Inc.

"SAC" means Specialty Acquisition Corp., a Delaware corporation, one of the above-captioned debtors and debtors in possession.

"SAC II" means SAC II, a Nevada limited liability company, one of the above-captioned debtors and debtors in possession.

"SAC D-1" means SAC D-1, LLC an Arizona limited liability company, one of the above-captioned debtors and debtors in possession.

"Schedule of Assumed Agreements" means the schedule of executory contracts and unexpired leases that the Debtors will assume on the Effective Date, together with proposed amount of Cure Claims. A substantially final form of the Schedule of Assumed Agreements is set forth in

8

Exhibit C to the Plan Supplement.  Any revisions or amendments thereto shall be filed by the Exhibit Filing Date.

"Schedule of Rejected Agreements" means the schedule of executory contracts and unexpired leases that the Debtors will reject on the Effective Date.  A substantially final form of the Schedule of Rejected Agreements is set forth in Exhibit D to the Plan Supplement.  Any revisions or amendments thereto shall be filed by the Exhibit Filing Date.

"Schedules" means the Schedules of Assets and Liabilities Filed by the Debtors, as such Schedules may have been, or may subsequently be, amended before the Effective Date.

"Secured Claim" means a Claim that is secured by a lien on the property of one or more of the Estates or that is subject to a right of setoff under section 553 of the Bankruptcy Code.  A Claim is a Secured Claim only to the extent of the value of the holder of such Claim's interest in the collateral that is property of one or more of the Estates or to the extent of the amount subject to setoff, as applicable, as determined under Bankruptcy Code section 506(a).   Any defenses, counterclaims, rights of offset or recoupment of the Debtors or the Estates with respect to such Secured Claim shall vest in and inure to the benefit of the Reorganized Debtors.

"Shareholder" means the holder of an equity security in ST.

"Specialty Financial Management Agreement" means that certain management agreement between Specialty Trust and Specialty Financial Corp.

"Specialty Mortgage Servicing Agreement" means the Master Loan Participation and Servicing Agreement by and between Specialty Trust, Inc. and Specialty Mortgage Corp.

"ST" means Specialty Trust, Inc., a Maryland corporation REIT, one of the above-captioned debtors and debtors in possession.

"Substantial Contribution Claim" means any Allowed Administrative Claim in recognition of a substantial contribution in connection with the Cases and the Plan pursuant to section 503(b)(3)(D) of the Bankruptcy Code.

"Supervisory Board" means the individuals selected to fill this role in accordance with Section IV.C of the Plan.

"Taberna Entities" means Taberna Preferred Funding, Ltd. VII and Taberna Preferred

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9

Funding, Ltd. VIII.

"Unimpair" or "Unimpaired" means, with respect a Class of Claims or Interests, that the Class is not Impaired. An Unimpaired Class is not entitled to vote on the Plan.

"Unsecured Noteholders" means the holders of unsecured notes issued by ST pursuant to the Unsecured Noteholders Indenture.

"Unsecured Noteholders Claim" means the Allowed General Unsecured Claim held by the Unsecured Noteholders arising from or relating to the Unsecured Noteholders Indenture in the amount of $29,064,444.45.

"Unsecured Noteholders Indenture" means the Junior Subordinated Indenture between Specialty Trust, Inc. and The Bank of New York Mellon as Trustee Dated as of May 1, 2009.

"Unsecured Noteholders Indenture Trustee" means BONY, as trustee under the Unsecured Noteholders Indenture.

"US Bank" means U.S. Bank National Association.

"US Bank SAC II Collateral" means all of the real and personal property of SAC II that secures a US Bank Allowed Secured Claim.

"US Bank SAC Collateral" means all of the personal property of SAC that secures a US Bank Secured Claim.

"US Bank ST Collateral" means all of the real and personal property of ST that secures a US Bank Allowed Secured Claim.

"U.S. Trustee" means the Office of the United States Trustee for the District of Nevada.

"U.S. Trustee Fees" means fees or charges assessed by the U.S. Trustee against the Estates pursuant to 28 U.S.C. § 1930.

"Williams Canyon Note" means that certain promissory note in the face amount of $841,050 issued by SAC II to ST and secured by a deed of trust on the Williams Canyon Property.

"Williams Canyon Property" means that certain 28.09 acres of real property located in Silverado, California that is owned by SAC II.

**B.** **Rules of Construction.**

1. The rules of construction in Bankruptcy Code section 102 apply to the Plan to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

extent not inconsistent herewith.

2.      Bankruptcy Rule 9006(a) applies when computing any time period under the Plan.

3.      A term that is used in the Plan and that is not defined in the Plan has the meaning attributed to that term, if any, in the Bankruptcy Code or the Bankruptcy Rules.

4.      The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

5.      Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

6.      Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms. No material change to the form or terms may be made after the Confirmation Date without the consent of any party materially adversely affected.

7.      Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

8.      Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of the Plan.

9.      Unless otherwise specified, all references to Sections or Exhibits are references to the Plan's Sections or Exhibits.

10.     The words "herein," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion hereof.

## II.

## DESIGNATION OF CLASSES AND TREATMENT OF CLAIMS AND INTERESTS

### A.      Summary and Classification of Claims and Interests.

This Section classifies Claims and Interests — except for Administrative Claims and Priority Tax Claims, which are not classified — for all purposes, including voting, confirmation, and distribution under the Plan. A Claim or Interest is classified in a Class only to the extent that the Claim or Interest falls within the Class description. To the extent that part of the Claim or Interest falls within a different Class description, the Claim or Interest is classified in that different Class.

For example, in the event that a Creditor has collateral securing its Claim that is worth less than the amount owed to the Creditor, the Creditor's Claim would be classified in a secured creditor class to the extent of the value of that Creditor's collateral and an unsecured Claim to the extent of any deficiency between the amount of the Creditor's claim and the value of the collateral securing the Claims.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.

The treatment in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any liens) that each entity holding an Allowed Claim or an Interest may have in or against the Debtors, the Estates, or their respective property. This treatment supersedes and replaces any agreements or rights those entities may have in or against the Debtors, the Estates, or their respective property. All distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed Claim, if any.

**B.**     **Allowance and Treatment of Unclassified Claims (Administrative Claims and Priority Tax Claims).**

    **1.**     **Administrative Claims.**

        **a.**     **Allowance of Administrative Claims.**

**Allowance of Ordinary Course Administrative Claims**:    An entity holding an Ordinary Course Administrative Claim may, but need not, File a motion or request for payment of its Claim. The Debtors or the Reorganized Debtors or any other party in interest may File an objection to an Ordinary Course Administrative Claim in their discretion. Unless an objection is filed to an Ordinary Course Administrative Claim, such Claim will be an Allowed Claim in accordance with the terms and conditions of the particular transaction that gave rise to the Claim.

**Allowance of Professional Fee Claims**: Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be an Allowed Claim only if, and to the extent that:

    (i)     on or before sixty days after the Effective Date, the entity holding such Professional

Fee Claim both Files with the Court a final fee application or a motion requesting allowance of the fees and reimbursement of expenses and serves the application or motion on the Debtors, the Reorganized Debtors, the Plan Representative and the U.S. Trustee; and

(ii)     the Court determines it is an Allowed Claim.

The Debtors, the Reorganized Debtors, the Plan Representative or any other party in interest may File an objection to such application or motion by no later than thirty days after the Filing and service of such application or motion.  Entities holding Professional Fee Claims that do not timely File and serve a fee application or motion for allowance of a Professional Fee Claim will be forever barred from asserting those Claims against the Debtors, the Reorganized Debtors, the Estates, or their respective property.

Allowance of Cure Claims:  Cure Claims shall be allowed in accordance with the procedures set forth in Section III.A.2 below.

Allowance of Non-Ordinary Course Administrative Claims:  Unless otherwise expressly provided in the Plan, Non-Ordinary Course Administrative Claims and Substantial Contribution Claims will be Allowed Claims only if:

(i)     unless a different procedure has been approved by the Court prior to the Confirmation Hearing, on or before sixty days after the Effective Date, the entity holding such Non-Ordinary Course Administrative Claim or Substantial Contribution Claims both Files with the Court a motion requesting allowance of the Non-Ordinary Course Administrative Claim or Substantial Contribution Claim and serve the motion on the Reorganized Debtors and the U.S. Trustee; and

(ii)     the Court determines it is an Allowed Claim.

The Debtors, the Reorganized Debtors, or any other party in interest may File an objection to such motion within thirty days after the expiration of the deadline for the Filing of a Non-Ordinary Course Administrative Claim or Substantial Contribution Claim set forth in subparagraph (i), above (i.e., within ninety days after the Effective Date), unless such time period for Filing such objection is extended by the Court.  Entities holding Non-Ordinary Course Administrative Claims or Substantial Contribution Claims that do not timely File and serve a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

13

1    request for payment will be forever barred from asserting those Claims against the Debtors, the

2    Reorganized Debtors, the Estates, or their respective property.

3          **b.**    **Treatment of Administrative Claims.**

4        <u>Treatment of Allowed Ordinary Course Administrative Claims</u>:  Unless otherwise agreed,

5    Allowed Ordinary Course Administrative Claims will be paid by the Debtors or the Reorganized

6    Debtors in accordance with the terms and conditions of the particular transaction that gave rise to

7    the Allowed Claim.

8        <u>Treatment of any Allowed Substantial Contribution Claim</u>:  Any Allowed Substantial

9    Contribution Claim shall be paid by the Debtors or the Reorganized Debtors the same as if it were a

10   Professional Fee Claim.

11       <u>Treatment of Professional Fee Claims</u>:  Unless otherwise agreed, an Allowed Professional

12   Fee Claim will be paid by the Debtors or the Reorganized Debtors, as applicable, after the Court

13   determines such Claim is an Allowed Claim, and in accordance with the projections attached to the

14   Disclosure Statement.

15       <u>Treatment of Cure Claims</u>:  The Reorganized Debtors will pay the Allowed amounts of Cure

16   Claims to the non-Debtor parties to the executory contracts or unexpired leases.

17       <u>Treatment of U.S. Trustee Fees Under 28 U.S.C. § 1930</u>:  The Debtors will pay to the

18   U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 on the Effective Date.

19       <u>Treatment of Non-Ordinary Course Administrative Claims</u>:  Unless the entity holding a

20   Non-Ordinary Course Administrative Claim Allowed by the Court agrees to different treatment, the

21   Reorganized Debtors will pay the full amount of such Allowed Non-Ordinary Course

22   Administrative Claim in the same manner as the treatment of the Professional Fee Claims as

23   described above.

24       <u>Treatment of Claims Under the DIP Facility</u>:  The DIP Lender will receive, in full and final

25   satisfaction of the Debtors' obligations under the DIP Facility cash in full the amount of its claims

26   unless the DIP Lender agrees to a different treatment.

27       **2.**    <u>**Priority Tax Claims.**</u>

28       The Priority Tax Claims include (i) an IRS Claim against ST of $177,560.37 and (ii) an IRS

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

14

1    Claim against SAC of $5,000.00.

2         Unless otherwise agreed, the Reorganized Debtors will pay to an entity holding an Allowed

3    Priority Tax Claim the full amount of the Allowed Priority Tax Claim, plus interest calculated at the

4    federal judgment rate, in equal, amortized, annual installments beginning on the first anniversary of

5    the Petition Date that falls on a date following the occurrence of the Effective Date and, thereafter,

6    on each anniversary of the Petition Date through the fifth anniversary of the Petition Date.   The

7    Debtors and Reorganized Debtors reserve all rights to object to these claims.

8    **C.    Classification and Treatment of Classified Claims and Interests.**

9         **1.    Class 1 US Bank Allowed Secured Claims**

10             **a.    Class 1A US Bank Allowed ST Secured Claim**

11   Classification:  Class 1A consists of the US Bank Allowed Secured Claim against ST.

12   Impairment:  Impaired

13   Voting Rights:  Class 1A is entitled to vote on the Plan.

14   Treatment:  Holders of an Allowed Class 1 Claim will receive, in full and final satisfaction of their

15   Allowed Class 1 Secured Claims, a discounted payoff amount of $16.5 million within ten days after

16   the Effective Date as a full release of all of its Allowed Claims against the Debtors.

17             **b.    Class 1B US Bank SAC II Secured Claims**

18   Classification:  Class 1B consists of US Bank Allowed Secured Claims against SAC II.

19   Impairment:  Impaired

20   Voting Rights:  Class 1B is entitled to vote on the Plan.

21   Treatment:  The Class 1B Claim will be satisfied by reason of the payment to be made on account

22   of the Class 1A Claim.

23             **c.    Class 1C US Bank SAC Secured Claims**

24   Classification:  Class 1C consists of US Bank Allowed Secured Claims against SAC.

25   Impairment:  Impaired

26   Voting Rights:  Class 1C is entitled to vote on the Plan.

27   Treatment:  The Class 1C Claim will be satisfied by reason of the payment to be made on account

28   of the Class 1A Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

15

**2.**    **Class 2 Secured Noteholder Secured Claims (Deutsche Bank)**

      **a.**    **Class 2A Old Secured ST Noteholder Secured Claims**

<u>Classification</u>:  Class 2A consists of the Old Secured Noteholders' Allowed Secured Claims against ST.

<u>Impairment</u>:  Impaired.

<u>Voting Rights</u>:  Class 2A is entitled to vote on the Plan.

<u>Treatment</u>:  Holders of Allowed Class 2A Claims will retain liens secured by the Old Secured Noteholder Collateral.  Holders of Class 2A Claims shall be entitled to exercise all of the legal, equitable, and contractual rights pursuant to the terms of the Old Secured Noteholder Indenture and the Old Secured Notes; provided, however, that the Reorganized Debtors may seek a determination by the Court pursuant to Bankruptcy Code section 502(c) estimating the amount of the Old Secured Noteholders' deficiency claim for all purposes, including distributions under the Plan.

In the event that the Court determines that the claims held by the Old Secured Noteholders are wholly unsecured, because there is no equity in the collateral securing those claims, or for any other reason, as of the Effective Date, the Old Secured Noteholder Indenture shall be terminated and the Old Secured Noteholders' Claims shall be treated as Class 8A Claims under the terms of this Plan.  Following such termination, Deutsche Bank shall have no further obligations under the terms of the Old Secured Noteholder Indenture.  Notwithstanding such termination, Deutsche Bank shall retain its rights under the Old Secured Noteholder Indenture including, without limitation, the right to indemnification for any loss, liability or expense in connection with the performance of its duties under the Old Secured Noteholder Indenture and the right to receive reimbursement of any expenses that has incurred, or may incur in the future, in relation to the performance of its duties as indenture trustee, its right to payment of its fees as indenture trustee and its right to charge distributions that the Old Secured Noteholders may receive on account of the Old Secured Notes, including distributions under this Plan.

Notwithstanding any other provision of this Plan to the contrary, any distributions to which the Old Secured Noteholders may be entitled under this Plan, whether by reason of their Class 2A Claims or by reason of any Class 8A deficiency claim, shall be paid in the first instance to Deutsche

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Bank, which may deduct any fees or expense reimbursements to which it may be entitled under the

2  terms of the Old Secured Noteholder Indenture and remit the balance of such distribution or

3  distributions to the Reorganized Debtors for distribution in accordance with the terms of this Plan.

4      In addition to any other distribution to which the holders of Allowed Claims in Class 2A

5  may be entitled, and without regard to the value of any collateral securing the Class 2A Claims,

6  each holder of an Allowed Class 2A Claim shall receive one (1) Class A share in reorganized ST for

7  every $1,000 of Allowed Claim held by that Class 2A Claimant.

8      **b.**    **Class 2B New Secured Noteholder ST Secured Claims**

9  <u>Classification</u>:  Class 2B consists of the New Secured Noteholders' Allowed Secured Claims

10  against ST.

11  <u>Impairment</u>:  Impaired.

12  <u>Voting Rights</u>:  Class 2B is entitled to vote on the Plan.

13  <u>Treatment</u>:  Holders of Allowed Class 2B Claims will retain liens secured by the New Secured

14  Noteholder Collateral.

15      *Option 1:  Plan Rejection.*  In the event Class 2B rejects the Plan, holders of Class 2B

16  Claims shall be entitled to exercise all of the legal, equitable, and contractual rights pursuant to the

17  terms of the New Secured Noteholder Indenture and the New Secured Notes with respect to the

18  New Secured Noteholder Collateral.

19      *Option 2:  Plan Acceptance.*  In the event Class 2B accepts the Plan, Class 2B will be treated

20  in accordance with the Northlight Exit Facility as described in Article IV.A of the Plan, and the

21  Reorganized Debtors will market and sell the REO properties and mortgage loans that are New

22  Secured Noteholder Collateral or that indirectly secure the New Secured Notes through ST's pledge

23  of its stock in SAC II.  Pursuant to the Northlight Exit Facility, Class 2B's collateral will be

24  subordinated to a first priority senior lien of Northlight in the amount of $4.5 million.  As adequate

25  protection for the subordination of its senior lien, Class 2B shall receive a replacement lien on all of

26  the Reorganized Debtors' assets and the proceeds of those assets; provided that such replacement

27  lien shall be subordinate to the liens granted to Northlight under the Northlight Exit Facility and to

28  the Distribution Participation Payments to which Northlight is entitled under the terms of the

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES, CALIFORNIA

17

Northlight Exit Facility. Such replacement liens shall be automatically released upon sales of assets in compliance with the Northlight Exit Facility, and will then be transferred to the proceeds of such sales. Class 2B shall receive the Net Cash Proceeds from the sale of its collateral [including property of SAC II that indirectly secures the New Secured Notes by the Reorganized Debtors] after the payment to Northlight of its share of the net liquidation proceeds pursuant to the Incentive Payment Plan as defined in the Northlight Exit Facility Term Sheet.

In the event that Class 2B accepts the Plan, as of the Effective Date, the New Secured Noteholder Indenture shall be terminated. Following such termination, Deutsche Bank shall have no further obligations under the terms of the New Secured Noteholder Indenture. Notwithstanding such termination, Deutsche Bank shall retain its rights under the New Secured Noteholder Indenture including, without limitation, the right to indemnification for any loss, liability or expense in connection with the performance of its duties under the New Secured Noteholder Indenture and the right to receive reimbursement of any expenses that has incurred, or may incur in the future, in relation to the performance of its duties as indenture trustee, its right to payment of its fees as indenture trustee and its right to charge distributions that the New Secured Noteholders may receive on account of the New Secured Notes, including distributions under this Plan.

Notwithstanding any other provision of this Plan to the contrary, any distributions to which the New Secured Noteholders may be entitled under this Plan, whether by reason of their Class 2B Claims or by reason of any Class 8A deficiency claim, shall be paid in the first instance to Deutsche Bank, which may deduct any fees or expense reimbursements to which it may be entitled under the terms of the New Noteholder Indenture and remit the balance of such distribution or distributions to the Reorganized Debtors for distribution in accordance with the terms of this Plan.

Under Option 1 above, the Reorganized Debtors may seek to estimate the Old Secured Noteholders' or New Secured Noteholders' deficiency claims (if any) pursuant to Bankruptcy Code section 502(c) for all purposes, including distributions under the Plan. Notwithstanding anything contained in this Plan to the contrary, the Unsecured Noteholders shall also have the right to challenge the extent, priority and/or validity of the Old Secured Noteholders Secured Claims and/or the New Secured Noteholders Secured Claims by commencing an adversary proceeding in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

18

the Court at any time up to the Effective Date of this Plan. In the event that such an adversary proceeding is commenced, no distributions of Net Cash Proceeds shall be made to the holders of the Class 2A and Class 2B Claims until either: (a) a written agreement is entered into by and between the holders of the Class 2A and Class 2B Claims, on the one hand, and the Unsecured Noteholders, on the other, resolving the disputes; or (b) a Final Order is entered by the Court determining the nature, extent and validity of the Claims in question.

In addition to any other distribution to which the holders of Allowed Claims in Class 2B may be entitled, and without regard to the value of any collateral securing the Class 2B Claims, each holder of an Allowed Class 2B Claim shall receive one (1) Class A share in reorganized ST for every $1,000 of Allowed Claim held by that Class 2B Claimant. For the avoidance of doubt, the deferral of distributions of Net Cash Proceeds provided for in the preceding paragraph shall not apply to the distribution of Class A shares provided for in this paragraph.

**3.    Class 3 Secured Tax Claims**

This Class includes the following Secured Claims asserted against the applicable Debtor on the chart below.

| Plan Subclass | Debtor against which Claim is asserted and Claim Amount |
|---|---|
| 3A | ST<br>San Joaquin County, CA $3,745.44 |
| 3B | ST<br>Orange County, CA $8,286.11 |
| 3C | SAC II<br><br>Pinal County, AZ claim $8,286.11 |

Impairment: Impaired

Voting Rights: Classes 3A, 3B and 3C are entitled to vote on the Plan.

Treatment: Holders of Allowed Class 3A, 3B, and 3C Claims will retain their liens on their collateral and will receive, at the election of the Debtors or the Reorganized Debtors as applicable, (1) payment in cash in full on the later of the Effective Date, or the date on which their claim becomes an Allowed Claim, or (2) the right to exercise their remedies with respect to their collateral.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**4.    Class 4 ST Secured Claims Against SAC II**

**a.    Coolidge 140 Secured Claim**

Classification:   Class 4A consists of the Allowed Secured Claim held by ST against SAC II on account of the Coolidge 140 Note.

Impairment:  Unimpaired

Voting Rights:  Class 4A is not entitled to vote on the Plan.

Treatment:   The holder of the Allowed Class 4A Claim will retain its rights against SAC II in accordance with the original terms of the Coolidge 140 Note, related deed of trust, and any other security interests securing the Coolidge 140 Note.

**b.    Williams Canyon Secured Claim**

Classification:   Class 4B consists of the Allowed Secured Claim held by ST against SAC II on account of the Williams Canyon Note.

Impairment:  Unimpaired

Voting Rights:  Class 4B is not entitled to vote on the Plan.

Treatment:   The holder of the Allowed Class 4B Claim will retain its rights against SAC II in accordance with the original terms of the Williams Canyon Note, related deed of trust, and any other security interests securing the Williams Canyon Note.

**5.    Class 5 ST Secured Claims Against SAC**

**a.    Cotton Lane Secured Claim**

Classification:   Class 5A consists of the Allowed Secured Claim held by ST against SAC on account of the Cotton Lane Note.

Impairment:  Unimpaired

Voting Rights:  Class 5A is not entitled to vote on the Plan.

Treatment:  The holder of Allowed Class 5A Claim will retain its rights against SAC in accordance with the original terms of the Cotton Lane Note, related deed of trust and other security interests securing the Cotton Lane Note.

### b.    Consolidated Phase 4 Secured Claim

<u>Classification</u>:  Class 5B consists of the Allowed Secured Claim held by ST against SAC on account of the Consolidated Phase 4 Note.

<u>Impairment</u>:  Unimpaired

<u>Voting Rights</u>:  Class 5B is not entitled to vote on the Plan.

<u>Treatment</u>:  The holder of Allowed Class 5B Claim will retain its rights against SAC in accordance with the original terms of the Consolidated Phase 4 Note, the related deed of trust and other security interests securing the Consolidated Phase 4 Note.

### 6.    <u>Class 6 JSSD SAC II Secured Claim</u>

<u>Classification</u>:  Class 6 consists of the JSSD disputed Secured Claim on the Jordanelle Property of SAC II.

<u>Impairment</u>:  Unimpaired

<u>Voting Rights</u>:  Class 6 is not entitled to vote on the Plan.

<u>Treatment</u>:  The holder of the Class 6 Claim will retain its rights against SAC II pursuant to applicable law, subject to the rights of the Debtors to dispute such claim.

### 7.    <u>Class 7 Ryland Homes SAC II Secured Claim</u>

<u>Classification</u>:  Class 7 consists of Ryland Homes' disputed secured claim against property owned by SAC II.

<u>Impairment</u>:  Impaired

<u>Voting Rights</u>:  Class 7 is entitled to vote on the Plan.

<u>Treatment</u>:  If the holder of the Class 7 Secured Claim obtains an Allowed Claim, the Class 7 Claimant will retain its lien and will receive, at the election of the Reorganized Debtors, (i) payment in full, or (ii) the right to exercise its non-bankruptcy law remedies with respect to its collateral.

### 8.    <u>Class 8 General Unsecured Claims</u>

<u>Classification</u>:   Class 8 (and each subclass of Class 8) consists of General Unsecured Claims asserted against the applicable Debtor on the chart below, but excludes the unsecured claims of Class 9.

| Plan Subclass | Debtor against which Claim is Asserted |
|---|---|

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

|  | Claim Holders |  |
|---|---|---|
| 8A Impaired | **ST** |  |
| 8B Impaired | **SAC**<br><br>Non-Contingent Allowed Claims:<br>Tholl Fence/ | $330.00 |
| 8C Impaired* | **SAC II**<br><br>Non-Contingent Allowed Claims:<br>Ballard Spahr/<br>NAI Horizon Valuation/<br>Samuels, Green & Steel LLP/<br>Scythe & Spade of AZ LLC/<br>Southwest Groundwater Consulting/ | $13,107.36<br>$4,753.54<br>$3,600.00<br>$5,000.00<br>$5,454.29 |
| 8D Impaired | **SAC D-1**<br>Non-Contingent Allowed Claims:<br>None |  |

Impairment:  Impaired

Voting Rights:  Classes 8A – 8D are entitled to vote on the Plan.

Treatment:   Holders of Allowed Claims in Class 8A will each receive, along with the Class 9 claimants as set forth below: (i) their Pro Rata Share of Net Proceeds of Causes of Action as set forth in the Northlight Exit Facility Term Sheet; and (2) their Pro Rata share of any assets of Reorganized ST remaining after payment in full of (i) all amounts owing under the Northlight Exit Facility, (ii) Allowed Class 1A, 2B (if Class 2B accepts the Plan) and 3A Secured Claims; and (iii) all asset management fees and other costs incurred by Reorganized ST, subject to the waterfall provisions of the Northlight Exit Facility described in Section IV.A of the Plan.

Allowed Claims in Class 8A shall bear interest from and after the Effective Date at the federal judgment rate or such other rate as is necessary to comply with section 1129 of the Bankruptcy Code.

In addition to any other distribution to which the holders of Allowed Claims in Class 3A may be entitled, each holder of an Allowed Class 8A Claim shall receive one (1) Class A share in reorganized ST for every $1,000 of Allowed Claim held by that Class 8A Claimant.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

22

1    Holders of Allowed Claims in Classes 8B and 8C with claims under $14,000 will receive a

2    payment of cash for the full amount of their Allowed Claims, without interest, on the Effective

3    Date. Holders of Allowed Claims in Classes 8B, 8C, and 8D with Claims over $14,000 will each

4    receive their Pro Rata Share of any Net Cash Proceeds of each of their respective estates remaining

5    after payment in full of any Allowed Secured Claims in each of their respective estates, subject to

6    the waterfall provisions of the Northlight Exit Facility described in Section IV.A of the Plan (if

7    applicable). Holders of Allowed Classes 8B, 8C and 8D claims that hold a guaranty of a secured

8    claim must first look to their collateral for satisfaction of their claims before receiving a distribution

9    as a Class 8 claimant. The Proponents reserve the right to assert at the confirmation hearing that

10    Class 8B and 8C Claims are Unimpaired.

11    **9.    Class 9 Subordinated Claims against Specialty Trust (BONY)**

12    Classification: Class 9 consists of the Claims of Unsecured Noteholders.

13    Impairment: Impaired

14    Voting Rights: Class 9 is entitled to vote on the plan.

15    Treatment: Holders of Allowed Claims in Class 9 will receive the same treatment as holders

16    in Class 8A, except that any distribution to Allowed Claims in Class 9 will be subject to the

17    subordination provisions set forth in the Unsecured Noteholders Indenture. The Debtors believe

18    that pursuant to such subordination provisions in the Unsecured Noteholders Indenture, the Class 9

19    claimants are only subordinated to the Claims of the Deutsche Bank New Secured Noteholders and

20    Old Secured Noteholders (as opposed to being subordinated to other Creditors), and distributions

21    under the Plan will effectuate such subordination. However, notwithstanding the foregoing, any

22    Creditor can challenge the Debtor's position that the Unsecured Noteholders are only subordinated

23    to the Deutsche Bank Old Secured Noteholders and New Secured Noteholders, or the position that

24    the Unsecured Noteholders are even subordinated to the Deutsche Bank Old Secured Noteholders

25    and New Secured Noteholders, by filing a motion with the Bankruptcy Court within sixty days after

26    the Effective Date.

27    In addition to any other distribution to which the holders of Allowed Claims in Class 9 may

28    be entitled, each holder of an Allowed Class 9 Claim shall receive one (1) Class B share in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

23

reorganized ST for every $1,000 of Allowed Claim held by that Class 9 Claimant.

**10.    Class 10 (Interests)**

Classification:  Class 10 consists of Interests asserted against the applicable Debtor on the chart below:

| Plan Subclass | Debtor against which Interest is asserted |
|---|---|
| 10A | ST |
| 10B | SAC |
| 10C | SAC II |
| 10D | SAC D-1 |

**a.    Class 10A – ST**

Impairment:  Impaired

Voting Rights:  Class 10A is entitled to vote on the Plan.

Treatment:  Upon the Effective Date, the equity interests in ST held by the Holders of Interests in Class 10A (Shareholders) will be cancelled and of no further force of effect.  Notwithstanding the cancellation of their Interests in ST, the holders of Allowed Interests in Class 10A shall receive, pro rata in accordance with the number of Allowed Interests held by each Interest holder, all funds remaining after the holders of all Allowed Claims against ST have been paid in full, and after the Northlight Exit Facility and all costs of Debtors' liquidation have been repaid in full, in accordance with the Plan.

**b.    Class 10B – SAC**

Impairment:  Unimpaired

Voting Rights:  Class 10B is not entitled to vote on the Plan.

Treatment:  ST, as the holder of 100 % of the Interests in SAC, will retain its Interests in the stock of SAC.

**c.    Class 10C – SAC II**

Impairment:  Unimpaired

Voting Rights:  Class 10C is not entitled to vote on the Plan.

Treatment:  ST, as the holder of Interests in SAC II, will retain its Interests in SAC II.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

24

### d.    Class 10D – SAC D-1 LLC

<u>Impairment</u>:  Impaired

<u>Voting Rights</u>:  Class 10D is not entitled to vote on the Plan.

<u>Treatment</u>:  SAC, as the holder of Interests in SAC D-1, will retain its Interests in SAC D-1.

### 11.    **Class 11 City National Allowed ST Secured Claim**

<u>Classification</u>:  Class 11 consists of the City National Bank Allowed Secured Claim against ST.

<u>Impairment</u>:  Impaired

<u>Voting Rights</u>:  Class 11 is entitled to vote on the Plan.

<u>Treatment</u>:  The Holder of an Allowed Class 11 Claim will retain its lien on the City National Bank collateral and will receive, in full and final satisfaction of its Allowed Class 11 Secured Claim the City National Bank Restructured Note, which shall bear the following terms:

1.    A restructured promissory note in the principal amount of its Allowed Class 11 Secured Claims on the Effective Date.

2.    Interest:  The interest rate will be 4.25% per annum, or such other rate of interest as is necessary to comply with section 1129(b) of the Bankruptcy Code, with interest to accrue.

3.    Amortization:  None

4.    Maturity Date:  Three (3) years from the Effective Date

5.    Prepayment Penalty:  None.

### III.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    **Assumption of Executory Contracts and Unexpired Leases.**

1.    **Assumption of Agreements.**

On the Effective Date, the Debtors shall assume all executory contracts and unexpired leases of the Debtors listed on the Schedule of Assumed Agreements.

The Debtors reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date to: (a) delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (b) add any executory contract or unexpired lease and provide for its assumption under the Plan. The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to any agreement affected by the amendment.

The Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements as of the date of the Confirmation Hearing. Any executory contracts that are to be assumed or assigned after the date of the Confirmation Hearing and prior to the Effective Date will be the subject of a separate motion to be heard by the Court between the date of the Confirmation Hearing and the Effective Date.

**2.      Cure Claims.**

Exhibit C to the Plan Supplement contains a list of proposed amounts of Cure Claims for all contracts or leases scheduled to be assumed. The Debtors or the Reorganized Debtors shall pay Allowed Cure Claims on or before ten days following the Effective Date, or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, if applicable, or (c) any other matter pertaining to assumption, the Cure Claim shall be paid promptly following the time when an order resolving the dispute and approving the assumption becomes a Final Order. Pending a Final Order resolving such a dispute, the applicable lease or contract shall be neither assumed nor rejected, and the Reorganized Debtors may, no later than ten days following a Final Order resolving such dispute, elect to reject the lease or contract subject to the dispute.

**3.      Objections to Assumption.**

Any entity who is a party to an executory contract or unexpired lease that will be assumed under the Plan and that objects to such assumption or the amount of the proposed Cure Claim must

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

26

File with the Court and serve upon interested parties a written statement and supporting declaration stating the basis for its objection. This statement and declaration must be Filed and served by no later than May 23, 2011. Any entity that fails to timely File and serve such a statement and declaration will be deemed to waive any and all objections to the proposed assumption of its contract or lease and the amount of the proposed Cure Claim. In the absence of a timely objection by an entity who is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination as to the amount of any cure and compensation due under the executory contract or unexpired lease, and that the Reorganized Debtors have demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease. If the Debtors amend Exhibit C to the Plan Supplement, then any entity that is a party to an executory contract or unexpired lease that is affected by the amendment shall have fourteen (14) days from the giving of notice of any such amendment to object to the amendment.

**4.      Resolution of Claims Relating to Assumed Agreements.**

In accordance with the procedures set forth in Section III.A.2 relating to the payment of the Cure Claims with respect to executory contracts or unexpired leases that will be assumed under the Plan, payment of the Cure Claim shall be deemed to satisfy, in full, any pre petition or post-petition arrearage or other Claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the amount of the Cure Claim is less than the amount set forth in such proof of Claim or the Schedules. Upon the tendering of the payment of the Cure Claim, any such Claim with respect to such agreement shall be Disallowed, without further order of the Court or action by any party.

**B.      Rejection of Executory Contracts and Unexpired Leases.**

**1.      Rejected Agreements.**

On the Effective Date, the Debtors will reject all executory contracts and unexpired leases set forth on the Schedule of Rejected Agreements as well as all executory contracts and unexpired leases that are not set forth on the Schedule of Assumed Agreements or on the Schedule of Rejected Agreements. The Confirmation Order will constitute a Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases not previously assumed or deferred under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

27

**2.**     **Bar Date for Rejection Damage Claims.**

Any Rejection Damage Claim or other Claim for damages arising from the rejection of an executory contract or unexpired lease under the Plan must be Filed and served upon the Plan Representative and counsel to the Reorganized Debtors within thirty days after the mailing of notice of the occurrence of the Effective Date. Any such Claims that are not timely filed and served will be forever barred and unenforceable against the Debtors, the Reorganized Debtors, the Plan Representative, the Estates, and their respective properties, and any persons or entities holding such claims or claiming to have such claims, will be barred from receiving any distributions under the Plan on account of such untimely claims.

**C.**     **Post-Petition Contracts and Leases.**

Except as expressly provided in the Plan or the Confirmation Order, all contracts, leases, and other agreements that the Debtors entered into after the Petition Date will be retained by the Reorganized Debtors.

**IV.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**A.**     **Funding of the Plan.**

Obligations required to be satisfied in cash under the Plan on and after the Effective Date will be satisfied from the Reorganized Debtors' cash on hand, the lease or sale of assets, revenues, and the proceeds of the Northlight Exit Facility, substantially on the key terms and conditions described below. Unless such sale has been approved by unanimous vote of Reorganized ST's Board of Directors, Court approval will be necessary for the Reorganized Debtors to sell any of their assets. In considering such approval, the Court shall apply the standards otherwise applicable to sales pursuant to Bankruptcy Code section 363(b).

**1.**     **Northlight Exit Facility.**

The Debtors will enter into the Northlight Exit Facility (unless a higher and better proposal is submitted by another entity pursuant to the Plan Bid Procedures) upon the Effective Date, which is described in detail in the Northlight Exit Facility Term Sheet attached to the Plan as Exhibit A. Under the Northlight Exit Facility, up to $28 million of new senior secured indebtedness will be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

28

1   incurred to pay off US Bank's Claims at a discount, as well as the DIP Lender's interests in the DIP

2   Facility, with the balance to be used by the Debtors in connection with the operations under the Plan

3   (the "Northlight Loan") for the following purposes (i) pay professional expenses as they relates to

4   the Cases; (ii) fund $300,000 into a segregated account for the pursuit of the Causes of Action;

5   (iii) pay for operating expenses during the liquidation of the portfolio; (iv) pay for carrying costs

6   associated with REO property in the portfolio; (v) fund an interest reserve account and operating

7   reserve account; (vi) pay for such other working capital needs of the Reorganized Debtors as may

8   be approved by Northlight from time to time; and (vii) pay for other costs and expenses associated

9   with the closing of the Northlight Exit Facility.  The loans under the Northlight Exit Facility have a

10   four year term, with two one-year extensions.

11   The material terms of the Northlight Exit Facility are described in the Northlight Exit

12   Facility Term Sheet, including, but not limited to: (i) the structure of the loan depending upon

13   whether Class 2B accepts or rejects the Plan; (ii) the term of the loan; (iii) the commitment and

14   extension fee; (iv) the non-default and default interest rates, as well as amortization; (v) the cash

15   waterfall from the proceeds derived from the sale, disposition or use of the assets of the Estate,

16   including Northlight's Incentive Payment Plan as defined in Exhibit C to such term sheet

17   (Northlight does not receive an Incentive Payment based upon any litigation recoveries from the

18   pursuit of Causes of Action); and (vi) the primary terms of the Northlight Asset Management and

19   Service Agreement.  The Release Price Supplement to the Northlight Exit Facility Term Sheet is

20   attached to the Plan as Exhibit B.  The Northlight Exit Facility Term Sheet and the Release Price

21   Supplement to same are only summaries, and the actual terms are governed by the Northlight Exit

22   Facility and Northlight Asset Management and Service Agreement which are attached the Plan

23   Supplement.  The actual release prices set forth in the chart on the Release Price Supplement and

24   the Northlight Exit Facility are redacted.  The actual release prices will be provided to Creditors

25   upon the signing of a confidentiality agreement and will be filed under seal.

26   In addition, the holders of claims or interests in Classes 8A, 9 and 10 will also have the

27   option to participate as lenders in the Northlight Exit Facility, in an amount up to 49% of the total

28   amount of the loan by notifying the Debtors and Northlight of their intention to participate no later

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

29

than 30 days prior to the scheduled closing date of the Northlight Exit Facility. However, in the event that Class 2B votes to reject the Plan, holders of Class 8A claims resulting in a deficiency claim as a result of being a member of Class 2B shall not be allowed to participate as a lender in the Northlight Exit Facility.

A draft of the proposed Northlight Exit Facility document(s) is attached to the Plan Supplement as Exhibit A.

**B.    Continued Corporate Existence and Vesting of Assets in Reorganized Debtors**

On and after the Effective Date, each of the Reorganized Debtors will continue to exist as a separate corporation or a limited liability company (as the case may be depending on the entity structure currently being used by each Debtor). Such corporate or limited liability company existence shall be deemed to be continued notwithstanding any provision of applicable non-bankruptcy law triggering the dissolution of any business entity upon the cancellation or extinguishment of all of its equity interests or the termination of the sole remaining equity interest holder.

Except as otherwise provided in the Plan, on and after the Effective Date, all assets and property of the Estates, and any property acquired by such Debtors under or in connection with the Plan will vest in the applicable Reorganized Debtor free and clear of all Claims, liens, charges, other encumbrances and Interests.

**C.    Management of the Reorganized Debtors.**

**1.    Appointment of Plan Representative; Supervisory Board.**

After the Effective Date, the Reorganized Debtors will be managed under normal rules of corporate governance. Further provisions regarding the governance and management of the Reorganized Debtors are set forth in the Bylaws and Articles of Incorporation of ST attached to the Plan Supplement.

**2.    Powers and Duties of the Reorganized Debtors.**

The Reorganized Debtors, through the Plan Representative, shall make distributions to creditors consistent with the Plan and otherwise hold and liquidate all assets and property of the Estates in accordance with the provisions of the Plan. The Reorganized Debtors, the Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

30

1    Representative, and the Supervisory Board shall not be required to post a bond in favor of the

2    United States.

3        The Reorganized Debtors, acting through the Plan Representative, shall have the power and

4    authority to perform the following acts, in addition to any powers granted by law or conferred by

5    any other provision of the Plan and orders of the Bankruptcy Court; provided, however, that

6    enumeration of the following powers shall not be considered in any way to limit or control the

7    power of the Reorganized Debtors or the Plan Representative, subject to the authority of the

8    Supervisory Board, to act as specifically authorized by any other provision of the Plan or orders of

9    the Bankruptcy Court, and to act in such manner as the Plan Representative may deem necessary, or

10   desirable to discharge all obligations assumed by the Reorganized Debtors as provided herein, and

11   to conserve and protect the assets of the Estates, including without limitation and by example only:

12       a.      manage all property of the Estates and to execute, acknowledge and deliver any and

13   all instruments as may be appropriate or necessary;

14       b.      make interim and final distributions of the Estates' assets to the holders of Allowed

15   Claims and Interests pursuant to the terms of the Plan;

16       c.      file objections to the allowance or priority of Claims, Administrative Expenses or

17   Interests;

18       d.      determine tax issues or liabilities in accordance with section 505 of the Bankruptcy

19   Code;

20       e.      administer the collection, prosecution, settlement, assignment, conveyance or

21   abandonment of the Causes of Action;

22       f.      file all tax and regulatory forms, returns, reports and other documents required by

23   applicable federal, state and local laws and regulations; and

24       g.      file suit or any appropriate motion for relief in the Court or in any other court of

25   competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with

26   the exercise of its rights, powers or duties.

27       In connection with the above, the Reorganized Debtors shall, as of and after the Effective

28   Date, be a representative of the Estates pursuant to Bankruptcy Code section 1123, appointed for the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   purposes of, among other things, pursuing the Causes of Action. In furtherance of that objective,

2   the Reorganized Debtors shall have the rights of a trustee under Bankruptcy Code section 1106 as it

3   relates to the Causes of Action. The Reorganized Debtors shall have the full power and authority to

4   commence, if not already commenced, prosecute, settle, assign, convey and abandon any action

5   related to the Causes of Action. The Reorganized Debtors shall be authorized to retain

6   professionals without Court approval (which may include existing professionals retained by the

7   Committee, and which need not be "disinterested"). The reasonable professional fees (including

8   any contingency fees), expenses, and costs of such professionals are to be paid out of the assets of

9   the Reorganized Debtors.

10          **3.      Management of the Debtors' Mortgage Loan and Real Property Portfolio.**

11          The Debtors will enter into the Northlight Asset Management and Servicing Agreement in

12   substantially in the form of Exhibit B to the Plan Supplement. The Asset Management and

13   Servicing Agreement provides for asset management services for the Debtors' real estate and

14   mortgage loan portfolio (the "Asset Manager"), and the material terms are summarized in Exhibit B

15   to the Northlight Exit Facility Term Sheet.

16   **D.     Objections to Claims or Interests.**

17          Except as otherwise provided herein (regarding allowance of Administrative Claims),

18   objections to any Claims or Interests shall be Filed and served upon the holder of the affected Claim

19   or Interest no later than the date that is the later of (a) six months after the Effective Date, unless

20   extended by the Court, and (b) six months after the date on which the affected proof of Claim or

21   Interest has been filed, unless extended by the Court.

22   **E.     Distribution of Property Under the Plan.**

23          The following procedures set forth in the Plan apply to distributions made pursuant to the

24   Plan by the Reorganized Debtors, which will make all distributions under the Plan unless otherwise

25   provided. In connection with the Plan, to the extent applicable, the Reorganized Debtors, when

26   making distributions under the Plan, shall comply with all tax withholding and reporting

27   requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan

28   shall be subject to such withholding and reporting requirements.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Distributions to the Old Secured Noteholders (Class 2A) and to the Old Secured Noteholders (Class 2B) shall be made to Deutsche Bank, which may deduct any fees, expenses or other charges to which it is entitled under the terms of the applicable indenture, following which Deutsche Bank shall remit any remaining distribution to the Reorganized Debtors for distribution directly to the holders of Class 2A or Class 2B Claims (or on account of any deficiency claim held by the Old Secured Noteholders or New Secured Noteholders, as applicable).   Unless the Court orders otherwise, in order to give effect to the subordination provisions of the indenture governing the Unsecured Noteholders, until the Claims of the Old Secured Noteholders and the New Secured Noteholders have been paid in full, any distribution to which the Unsecured Noteholders may be entitled shall be distributed as provided above with respect to the distributions to the Old Secured Noteholders and the New Secured Noteholders.  Following payment in full of the Claims held by the Old Secured Noteholders and the New Secured Noteholders distributions on account of the Unsecured Noteholders Claim shall be made to the Unsecured Noteholders Indenture Trustee to be applied in accordance with the Unsecured Noteholders Indenture.

1.    **Manner of Payments Under the Plan.**

Payments to domestic entities holding Allowed Claims will be tendered in U.S. Dollars and will be made by checks drawn on a domestic bank or by wire transfer from a domestic bank. Payments made to any foreign Creditors holding Allowed Claims may be paid, at the option of the Reorganized Debtors, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

2.    **No De Minimis Distributions.**

Notwithstanding anything to the contrary in the Plan, no payment of less than $100.00 will be made to any entity pursuant to the Plan.  No consideration will be provided in lieu of the de minimis distributions that are not made under this Section.

3.    **No Distribution With Respect to Disputed Claims.**

No payments, distributions of other property, or other consideration of any kind shall be made on account of any Disputed Claim or Disputed Interest unless and until such Claim or Interest becomes an Allowed Claim or Allowed Interest or is deemed to be such for purposes of distribution,

and then only to the extent that the Claim or Interest becomes, or is deemed to be for distribution purposes, an Allowed Claim or Allowed Interest. Unless otherwise provided herein, any holder of a Claim or Interest that becomes an Allowed Claim or an Allowed Interest after the Effective Date will receive its distribution within ten days from the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest.

**4.       Delivery of Distributions and Undeliverable/Unclaimed Distributions.**

**a.       Delivery of Distributions in General.**

Except as provided with respect to the Claims held by the Old Secured Noteholders, the New Secured Noteholders, and the Unsecured Noteholders, the Reorganized Debtors shall make distributions to each holder of an Allowed Claim or Allowed Interest by mail as follows: (a) at the address set forth on the proof of Claim or proof of Interest filed by such holder of an Allowed Claim or Allowed Interest; (b) at the address set forth in any written notice of address change delivered to the Plan Representative after the date of any related proof of Claim; (c) at the address reflected in the Schedules if no proof of Claim or proof of Interest is filed and the Plan Representative has not received a written notice of a change of address; and (d) with respect to Administrative Claims, the address provided by the holder of the Claim or, if none is provided, at the address set forth in the Debtors' books and records.

**b.       Undeliverable and Unclaimed Distributions.**

If the distribution to the holder of any Allowed Claim or Allowed Interest is returned as undeliverable, no further distribution shall be made to such holder unless and until a Reorganized Debtor, as applicable, is notified in writing of such holder's then current address. Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Reorganized Debtor pursuant to this Section until such time as a distribution becomes deliverable. All undeliverable cash distributions will be held in unsegregated, interest-bearing bank accounts for the benefit of the entities entitled to the distributions. These entities will be entitled to any interest actually earned on account of the undeliverable distributions. The bank account will be maintained in the name of the Reorganized Debtor, but it will be accounted for separately.

Any holder of an Allowed Claim or Allowed Interest who does not assert a claim in writing

34

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  for an undeliverable distribution within one year after the Effective Date shall no longer have any

2  claim to or interest in such undeliverable distribution, and shall be forever barred from receiving

3  any distributions under the Plan, or from asserting a claim against the Debtors, the Estates, the

4  Reorganized Debtors or their respective property, and the Claim giving rise to the undeliverable

5  distribution will be discharged.  The Reorganized Debtors will be enabled and empowered to retain

6  all such undeliverable distributions for distribution as otherwise provided for in Debtor's Plan.

7       Nothing contained in the Plan shall require the Debtors or Reorganized Debtors to attempt to

8  locate any holder of an Allowed Claim or Allowed Interest.

9       **5.    Estimation of Disputed Claims or Interest for Distribution Purposes.**

10      The Debtors or the Reorganized Debtors, as applicable, may move, pursuant to Bankruptcy

11 Code section 502(c), for a Court order estimating any Disputed Claim or Disputed Interest.  The

12 estimated amount of any Disputed Claim or Disputed Interest so determined by the Court shall

13 constitute the maximum recovery that the holder thereof may recover after the ultimate liquidation

14 of its Disputed Claim or Disputed Interest, irrespective of the actual amount ultimately allowed.

15      **6.    Cancellation of Unsecured Notes and Unsecured Noteholders Indenture**

16      Except to the extent the notes are reinstated or unimpaired  under the Plan, as of the

17 Effective Date the notes issued under the Unsecured Noteholders Indenture together with the

18 Unsecured Noteholders Indenture shall be cancelled and deemed null and void and of no further

19 force or effect without any further action on the part of the Court, the Debtors, or any other person;

20 *provided, however,* that the cancellation of the Unsecured Noteholders Indenture: (i) shall not

21 impair the rights of the Unsecured Noteholders under the Plan; and (ii) shall not impair the rights of

22 the Unsecured Noteholders Indenture Trustee under the Unsecured Noteholders Indenture and the

23 Plan, including the right of the Unsecured Noteholders Indenture Trustee to enforce the Unsecured

24 Noteholders Indenture Trustees' lien under the Unsecured Noteholders Indenture.

25 **F.    Full Satisfaction.**

26      The Plan Representative shall make, and each holder of a Claim or Interest shall receive, any

27 distributions provided for in the Plan in full satisfaction and discharge of such Claim or Interest.

28 Such satisfaction shall not release or discharge the liability of any non-debtor entity on account of

1  such Claim, except to the extent that such liability is reduced by virtue of a distribution made

2  pursuant to the Plan.

3  **G.      Compliance with Tax Requirements.**

4          The Plan Representative shall comply with all withholding and reporting requirements

5  imposed on it by governmental units, if any, and all distributions pursuant to the Plan shall be

6  subject to such withholding and reporting requirements.

7  **H.      Setoff, Recoupment and Other Rights.**

8          Notwithstanding anything to the contrary contained in the Plan, the Debtors or the

9  Reorganized Debtors may, but shall not be required to, setoff, recoup, assert counterclaims or

10  withhold against the distributions to be made pursuant to the Plan on account of any claims that the

11  Debtors, the Estates or the Reorganized Debtors may have against the entity holding an Allowed

12  Claim; provided, however, that neither the failure to effect such a setoff or recoupment, nor the

13  allowance of any Claim against the Debtors or the Reorganized Debtors, nor any partial or full

14  payment during the Cases or after the Effective Date in respect of any Allowed Claim, shall

15  constitute a waiver or release by Debtors, the Estates or the Reorganized Debtors of any claim that

16  they may possess against such holder.

17  **I.      Conditions to Effectiveness.**

18          The Plan shall not become binding unless and until the Effective Date occurs. The Effective

19  Date is the first Business Day on which all of the following conditions have been satisfied as set

20  forth below or waived:

21          1.      The Confirmation Order shall have become a Final Order.

22          2.      No request for revocation of the Confirmation Order under section 1144 of the

23  Bankruptcy Code has been made, or, if made, remains pending.

24          3.      Each exhibit, document or agreement to be executed in connection with the Plan

25  shall be in final form acceptable to the Debtors and Northlight.

26          4.      The Northlight Exit Facility shall be in full force and effect and all conditions therein

27  to the obligations of the parties to such loans shall have been satisfied or waived as set forth in the

28  Northlight Exit Facility.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

36

5.      All other agreements, writings and undertakings required under the Plan shall be executed and ready for consummation.

6.      The Reorganized Debtors shall mail a "Notice of Occurrence of Effective Date" to all Creditors and Interest holders of record as of the date of entry of the Confirmation Order upon the occurrence of the Effective Date.

Except as specified above, the requirement that the conditions to the occurrence of the Effective Date be satisfied may be waived in whole or in part, and the time within which any such conditions must be satisfied may be extended by the Debtors with the consent of Northlight.

**J.      Authorization of Entity Action.**

Each of the matters provided for under the Plan or any action to be taken by or required of the Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by equityholders, creditors, or managers, officers or directors of the Debtors, or any of them.

**V.**

**OTHER PLAN PROVISIONS**

**A.      Exculpation:  No Liability for Solicitation or Prosecution of Confirmation.**

Conditioned on the occurrence of the Effective Date, none of the Debtors, the Estates, the CRO, the lenders and agent under the Northlight Exit Facility, the DIP Lenders, or any of the foregoing parties' respective Associated Released Parties shall have or incur any liability to any holder of a Claim or Interest, or to one another, for any act or omission occurring on or after the Petition Date through to and including the Effective Date in connection with, related to, or arising out of the Cases, the pursuit of confirmation of the Plan, the consummation or administration of the Plan, or property to be distributed under the Plan, except to the extent that the act or omission is determined by Final Order to be solely due to its own respective willful misconduct or gross negligence, and in all respects, the Debtors, the Estates, the CRO, the lenders and agent under the Northlight Exit Facility, the DIP Lenders, or any of the foregoing parties' respective Associated Released Parties shall be entitled to rely on the advice of their respective counsel with respect to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

37

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    their duties and responsibilities during the Cases and under the Plan.

2    **B.    Revocation of Plan/No Admissions.**

3    The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.

4    Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective

5    Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the

6    Disclosure Statement will:  (a) be deemed to be an admission by the Debtors with respect to any

7    matter set forth in the Plan, including liability on any Claim or the propriety of any Claim's

8    classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any

9    Interests in, the Debtors or the Estates, or of any claims of the Debtors or the Estates; or

10    (c) prejudice in any manner the rights of any party in any further proceedings.

11    **C.    Modifications of the Plan.**

12    The Plan may be modified at any time before or after confirmation, subject to sections 1125

13    and 1127 of the Bankruptcy Code by the Debtors.

14    **D.    Dissolution of Committee.**

15    On the Effective Date, the Committee shall be released and discharged from the rights and

16    duties arising from or related to the Cases, except with respect to final applications for

17    professionals' compensation.   The professionals retained by the Committee and the members

18    thereof shall not be entitled to compensation or reimbursement of expenses for any services

19    rendered or expenses incurred after the Effective Date except for services rendered and expenses

20    incurred in connection with any applications by such professionals or Committee members for

21    allowance of compensation and reimbursement of expenses pending on the Effective Date or timely

22    filed after the Effective Date as provided in the Plan, as approved by the Court.

23    **E.    Exemption from Certain Transfer Taxes.**

24    In accordance with Bankruptcy Code section 1146(c), the issuance, transfer or exchange of a

25    security, or the making or delivery of an instrument of transfer under the Plan may not be taxed

26    under any law imposing a stamp tax or similar tax.   The Confirmation Order shall direct all

27    governmental officials and agents to forego the assessment and collection of any such tax or

28    governmental assessment and to accept for filing and recordation any of the foregoing instruments

or other documents without payment of such tax or other governmental assessment.

**F.      Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**G.      Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

**H.      Headings.**

The headings used in the Plan are inserted for convenience only and do not constitute a portion of the Plan or in any manner affect the provisions of the Plan or their meaning.

**I.      Governing Law.**

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada without giving effect to the principles of conflict of laws thereof.

**J.      Form of Agreements and Documents.**

All documents and agreements to be Filed with the Court as part of the Plan or which are to become Exhibits to the Plan, the Disclosure Statement, the Plan Supplement or which are to be executed or delivered in connection with the Plan, and any revisions or amendments thereto prior to the Effective Date, shall be in form and substance acceptable to the Debtors in their sole discretion prior to any Filing, execution, delivery or amendment.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# VI.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.**    **Discharge and Injunction.**

The rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever arising prior to the Effective Date, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Estates and their property.

Except as otherwise provided in the Plan or the Confirmation Order, the Plan and Confirmation Order shall, on the Effective Date:  (a) discharge and release the Debtors, the Estates, the Reorganized Debtors and their property to the fullest extent permitted by Bankruptcy Code sections 524 and 1141, from all Claims and Interests, including all debts, obligations, demands, liabilities, Claims, and Interests that arose before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i) (collectively, "Discharged Liabilities"), regardless of whether or not (i) a proof of Claim or Interest based on such Discharged Liability is filed or deemed filed, (ii) a Claim or Interest based on such Discharged Liability is allowed pursuant to Bankruptcy Code section 502, or (iii) the holder of a Claim or Interest based on such Discharged Liability has or has not accepted the Plan; (b) void any judgment underlying a Discharged Liability discharged hereunder; and (c) preclude all entities from asserting against the Debtors, the Estates, the Reorganized Debtors, or their respective property any Discharged Liability based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date, all entities who have held, currently hold, or may hold a Discharged Liability against the Debtors, the Estates, the Reorganized Debtors or their respective property that is based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, that otherwise arose or accrued prior to the Effective Date, or that is otherwise discharged pursuant to the Plan, shall be permanently enjoined from taking any of the following actions on account of any such Discharged Liability (the "Permanent Injunction"):  (a) commencing

40

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or continuing in any manner any action or other proceeding against the Debtors, the Estates, the Reorganized Debtors or their respective property that is inconsistent with the Plan or the Confirmation Order; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors, the Estates, the Reorganized Debtors or their respective property other than as specifically permitted under the Plan or the Confirmation Order; (c) creating, perfecting, or enforcing any lien or encumbrance against the Debtors, the Estates, the Reorganized Debtors or their respective property; and (d) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the discharge provisions of Bankruptcy Code section 1141. Any entity injured by any willful violation of such Permanent Injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

**B.    Payment of U.S. Trustee Fees.**

The Debtors or the Reorganized Debtors shall pay all of their respective U.S. Trustee Fees in accordance with Section II.B.2.

**C.    Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Court shall retain jurisdiction over the Cases after the Effective Date to the fullest extent provided by law, including the jurisdiction, consistent with the Confirmation Order, to:

1.    Allow, disallow, determine, liquidate, classify, establish the priority or secured or unsecured status of, estimate, or limit any Claim or Interest;

2.    Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    Resolve any motions pending on the Effective Date to assume, assume and assign, or reject any executory contract or unexpired lease to which one or more of the Debtors is a party or with respect to which one or more of the Debtors may be liable and to hear, determine and, if necessary, liquidate, any and all Claims arising therefrom;

4.      Enforce or adjudicate any disputes regarding the Northlight Exit Facility, or any alternative exit facility;

5.      Ensure that distributions to holders of Allowed Claims or Allowed Interests, including but not limited to Administrative Claims, are accomplished pursuant to the provisions of the Plan;

6.      Adjudicate, determine and resolve any and all applications, motions, adversary proceedings, and contested or other matters involving the Debtors, including any relating to the Causes of Action that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan;

7.      To effectuate, if requested by the Reorganized Debtors, any sales of assets.

8.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with the Plan;

9.      Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's rights or obligations in connection with the Plan;

10.     Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code section 1127, or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any order of the Court, the Plan, the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

12.     Adjudicate, determine and resolve any claims and causes of action provided for and retained under the Plan or pursuant to the Confirmation Order, including the Causes of Action;

42

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

13.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan; and

15.     Enter orders closing the Cases.

If the Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter, this section shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

80662-002\DOCS_LA:235181.8

1

## VII.

2

## RECOMMENDATION AND CONCLUSION

3        The CRO and the Debtors believe that Plan confirmation and implementation are preferable

4   to any alternatives available to creditors and results in the greatest recovery for the greatest number

5   of constituents under the circumstances.    Accordingly, the CRO and the Debtors submit that

6   confirmation of the Plan should be supported by creditors as the most favorable alternative.

7

8   Dated:  April _____, 2011

PACHULSKI STANG ZIEHL & JONES LLP
Ira D. Kharasch (CA Bar No. 109084)
Victoria A. Newmark (CA Bar No. 183581)

9

10                                                    and

11                                                    DOWNEY BRAND LLP

12                                                    By: /s/ Sallie B. Armstrong _____
                                                         Sallie B. Armstrong (NV Bar No. 1243)
13                                                       Michelle N. Kazmar (NV Bar No. 10098)

14

15                                                    *Attorneys for Debtors and Debtors in Possession*

16   Approved by:

17   DATED: _____, 2011

18   Specialty Trust, Inc.

19

20   By: _____

21   Its: _____

22   DATED: _____, 2011

23   Specialty Acquisition Corp.

24

25

26   By: _____

27   Its: _____

28

*PACHULSKI STANG ZIEHL & JONES LLP*
*ATTORNEYS AT LAW*
*LOS ANGELES, CALIFORNIA*

44

DATED: _____, 2011

SAC II


By: _____

Its: _____


DATED: _____, 2011

SAC D-1, LLC


By: _____

Its: _____


DATED: _____, 2011

By:    Grant Lyons
       Chief Restructuring Officer

_____

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

80662-002\DOCS_LA:235181.8

# Exhibit A

# Exhibit A

EXIT FINANCING TERM SHEET



### SPECIALTY TRUST, INC.
### CHAPTER 11 EXIT FINANCING TERM SHEET

*This Term Sheet is solely an indication of general terms and is provided for discussion purposes only. This is not a commitment and it creates no binding obligation on either party hereto, as it has not been approved by Lender under its normal approval procedures. This summary does not define all of the terms and conditions of a proposed financing, and is subject to completion of legal due diligence, environmental due diligence and satisfactory documentation.*

*This Term Sheet is based upon our present understanding of the Borrower's capital requirements. As additional facts and circumstances become known to us, we may impose additional terms and conditions. In addition, this outline is subject to among other things, the absence of a material adverse change in the business, condition (financial or otherwise), operations, performance, properties and prospects of the Borrower..*

**Borrower:** Specialty Trust, Inc. ( the "**Borrower**"), a debtor and debtor in possession in a Chapter 11 case (the "**Bankruptcy Case**") filed in the Bankruptcy Court of the District of Nevada (the "**Bankruptcy Court**") is a mortgage finance company that acquired and held, in a tax-advantaged real estate investment trust or REIT structure, mortgage loans and mezzanine loans (together, the "**Portfolio**") secured by property located primarily in the States of Nevada, Arizona and California.

**The Portfolio:** The Portfolio includes a mix of REO and real estate loans whose current carrying value is approximately $213 million, which include $122 million of real estate loans, $60 million of REO property and $31 million of unpledged assets, all as more fully described in Exhibit A of this Term Sheet.

**Lender:** Northlight Real Estate Group LLC ("**Northlight**") or any of its affiliates and any other third party arranged by Northlight that agrees to participate in the Loan provided that shareholders of the Borrower shall have the option of participating in the Loan for a maximum amount equal to 49% of the Loan Amount (collectively, the "**Lender**"), the election to avail themselves of such option will be disclosed to Northlight no later than thirty (30) days prior to the scheduled close of the loan

**Loan:** Two senior secured facilities (the "Loans") consisting of a $23.5MM loan commitment ("Tranch 1") and a $4.5MM loan commitment ("Tranche 2") in connection with the Plan of Reorganization as further detailed below (the "Loan Amounts") Provided, however, should the Deutsche Bank noteholders object to the proposed Exit Financing terms and conditions and elect to

retain their first priority lien against their collateral, the Loans will be consolidated to a single $27.0MM commitment as described as Option B on Exhibit D.

On the Closing Date, the Borrower will draw $23.3MM from the Loan Amount in order to pay for the initial capital requirements associated with the Plan of Reorganization. These expenses include the (i) repurchase US Bank's existing bank loan, in full satisfaction thereof, at a discounted amount of $16.5 million (the "**Existing Bank Debt**"); (ii) repay the DIP facility; (iii) pay professional expenses as it relates to the Bankruptcy Case; (iv) fund $300,000 into a litigation trust, and (v) establish an Operating Reserve with $2MM (the "Minimum Reserve Balance").

The Borrower may draw against the capital commitment every six months to reestablish the Minimum Reserve Account.

Should the Loans be completely drawn by the Borrower, the Lender, at its sole discretion may provide additional capital to the Borrower on the same terms and conditions provided in this term sheet.

|                     |                                                                  |
|---------------------|------------------------------------------------------------------|
| **Operating Reserve:** | An Operating Reserve will be established by the Borrower in connection with the Plan of Reorganization. This Reserve will be responsible for the collection of all proceeds realized by the borrower in connection with the liquidation of the Portfolio. Additionally, the Operating Reserve will receive monies from capital draws made in connection with the Loans. The Operating Reserve will be used to (i) pay for operating expenses during the liquidation of the Portfolio, including the payment of Asset Management Fees and Servicing Fees (as hereinafter defined); (ii) pay for carrying costs associated with REO property in the Portfolio; (iii) pay for such other working capital needs of the Borrower as may be approved by the Lender from time to time; (iv) payment of Principal and Interest on the Loans; (v) pay for other costs and expenses associated with the closing the transactions contemplated hereunder, including the payment of any origination fees and other fees due upon such closing; (vi) distribution of excess proceeds to participants in the estate. |

The Operating Reserve will be pledged to Lender and subject to a Control Account Agreement in form and substance satisfactory to Lender.

The Minimum Reserve Balance maintain a minimum balance of $2MM, to be reestablished periodically from collections and sale of Collateral and capital calls made by the Borrower on the undrawn commitment of the Loans. At the sole discretion of the Lender, the Minimum Reserve Balance may be lowered as the portfolio is liquidated.

| | |
|---|---|
| **Closing Date:** | On or about June 15, 2011 (the "**Closing Date**"). |
| **Term:** | Four (4) years from the Closing Date, provided, however, that at the request of the Borrower, upon not less than 120 days prior written notice, the term may be extended for up to two additional one (1) year renewal terms (the "**Final Maturity Date**") provided that at the time Borrower seeks to exercise each such extension (a) there are no Events of Default existing and (b) there is no outstanding accrued interest and (c) the principal balance has been reduced to a mutually agreed upon level based on a maximum loan amount. |
| **Recourse:** | The recourse obligations of the Borrower for the repayment of the Loans will be limited to environmental matters, intentional misrepresentation, misappropriation of funds (including proceeds paid under any insurance policies or condemnation proceedings, rents and security deposits), fraud, intentional waste, an unauthorized transfer, voluntary and involuntary bankruptcy and any other similar matters as may be required by Lender. |
| **Commitment Fee:** | A commitment fee equal to 2.0% of the total Loan Amounts (the "**Commitment Fee**") will be earned by Northlight and due and payable upon initial funding of the Loans. |
| **Extension Fee:** | An extension fee of 1.0% of the outstanding Loan Amounts (the "**Extension Fee**") will be due and payable to the Lender on or prior to the granting of each of the two one (1) year extensions. |
| **Interest:** | The Loans will bear interest equal to 18.0% per annum (the "**Interest Rate**") to be paid, in cash, monthly in arrears, on the last day of each month (each such date, an "**Interest Payment Date**"). For the first 18 months from the Closing Date, 12% of the interest accrued will be due and payable on a monthly basis. If there is insufficient cash in the Operating Reserve, the Borrower may request a capital call from the undrawn commitment amount from the Lender. After the first 18 months from the Closing Date, all interest will accrue if there is insufficient cash in Operating Reserve and the Loans have been completely drawn.<br><br>Interest will be calculated on an actual days elapsed and 360 day basis. |
| **Default Rate:** | 4.0% in excess of the rate of interest otherwise in effect. |
| **Amortization:** | None. The Loans will be interest only (subject to pay downs from Mandatory Repayments). In all events the entire |

outstanding principal balance will become due and payable on the Final Maturity Date.

**Cash Waterfall:**

All proceeds derived from the sale, disposition or use of the Collateral will be applied as follows:

First, to the payment of any costs and expenses due the Lender;

Second, to pay for working capital of the Borrower including, the payment of the Asset Management Fees and Servicing Fees (as hereinafter defined);

Third, to top up the Operating Reserve to the Minimum Reserve Balance

Fourth, to the payment of any interest due Lender and not previously paid out of cash flow or capital calls on the undrawn commitment;

Fifth, to the repayment of any then outstanding principal due the Lender;

Sixth, to distribute proceeds from litigation pursued by the litigation trust, if any, together with interest on the same accrued at the rate of 8%, beginning at the time of the Northlight loan repayment; which distributions will be made to parties in interest pursuant to the Plan of Reorganization ("POR");

Seventh, to the Lender through its participation in the Incentive Payment Plan as defined in Exhibit C, and

Eighth, to distribute remaining funds pursuant to the terms of the POR.

**Collateral:**

Subject to a further determination based upon due diligence, the Loans will be secured by the following (the "**Loan Collateral**"):

Tranche 1: A perfected first lien security interest, and first mortgage security interest, as the case may be, in all assets, including, but not limited to, the proceeds of such assets, and the Operating Reserve, held by the Borrower and its subsidiaries and affiliated entities, but excluding those assets that are collateral for Tranche 2.

Tranche 2 (only applicable if Deutsche Bank noteholders vote in favor of plan / Exit Financing proposal): A perfected first lien security interest, and first mortgage security interest, as the case may be in, in those assets that are directly pledged to Deutsche Bank, or the assets of SAC II that are indirectly pledged to Deutsche Bank and a perfected second lien interest, and second mortgage security interest, as the case may be in all assets, including but not limited to, the proceeds of such assets, and the Operating Reserve, held as collateral by Tranche 1.

**Asset Management and Servicing Agreement:**

The Borrower will enter into an Asset Management Agreement and Servicing Agreement (the "**Asset Management**

Agreement") with Northlight Asset Management LLC or an affiliate thereof (hereinafter sometimes referred to as either "NAM" or the "Servicer") to provide asset management services for the Portfolio on substantially the terms and condition set forth in Exhibit B annexed hereto.

**Management and Servicing Fees:**

The Servicer will be paid the Asset Management Fees and Servicing Fees as contemplated and defined in Exhibit B and provided for in the Asset Management Agreement.

**Prepayment Penalty:**

Loans may not be prepaid, in whole or in part, except for mandatory prepayments, until the first anniversary of the closing date.

**Documentation:**

The loan documents evidencing the Loans, as contemplated hereunder, will include, inter alia, a Credit Agreement, Security Agreements, Pledge Agreements, and other ancillary loan documents incorporating the terms and conditions set forth in this Term Sheet and such other terms and conditions as the parties may otherwise agree upon and such other documents as are usual for facilities and transactions of this type and which will be acceptable to the Lender, the Borrower and their respective counsel.

**Insurance:**

Insurance coverage must be acceptable to the Lender.

**Additional Debt:**

No other Borrower debt permitted.

**Reporting:**

Annual audited financials from the Borrower. Other quarterly and monthly unaudited schedules will be required, to be determined during due diligence.

**Representations and Warranties:**

Usual and customary for facilities and transactions of this type.

**Covenants:**

Usual and customary for facilities and transactions of this type.

**Events of Default:**

Usual and customary for facilities and transactions of this type

**Assumption Rights:**

The Borrower's rights and obligations are non assignable or assumable.

**Incentive Payment:**

Incentive Payments will be granted to the Lender, as defined in Exhibit C

**Conditions**

**Precedent:**   The obligation of the Lender to fund the Loans payable on the Closing Date or on any date subsequent thereto will be subject to customary conditions precedent, including without limitation, the following conditions precedent (**"Conditions Precedent"**):

    i.  Evidence of Borrower's good standing and qualification to do business satisfactory to the Lender;

    ii.  Approval and confirmation from the Bankruptcy Court of the Borrower's Plan of Reorganization and approval of the Loans in connection therewith;

    iii.  Resolution of all related-party contracts and other potential conflicts of interests to the satisfaction of the Lender;

    iv.  All Loan Documentation in form and substance satisfactory to Lender;

    v.  The Lender will have been granted a perfected priority security interest in all the Loan Collateral in form and substance satisfactory to the Lender;

    vi.  Representations, warranties, resolutions, opinions of counsel, certificates, certified corporate documents, good standing certificates, and other supporting documents as the Lender may reasonably require, including without limitation, information and opinions related to the ownership structure of the Borrower, all in form and substance acceptable to the Lender;

    vii.  Borrower will have delivered to Lender evidence satisfactory to Lender and its counsel that any management fees payable to any third party manager during the term of the Loans will be subordinate to the interests of Lender;

    viii.  Agreement with US Bank for the purchase or repayment of the Existing Bank Debt for a discounted amount satisfactory to the Lender;

    ix.  Intercreditor Agreement and Standstill Agreement with Deutsche Bank, in form and content mutually acceptable to Lender and Northlight, and their respective counsel;

    x.  An environmental report acceptable to Lender;

    xi.  Satisfactory survey and title policy and customary due diligence by the Lender;

    xii.  Satisfactory review of plans, specifications, soil reports, and engineering studies and satisfactory review of the Construction Budget and construction contract by construction consultant;

    xiii.  Formal Credit Committee approval by the Lender;

    xiv.  Evidence that insurance coverage in the amounts and of the types satisfactory to the Lender are in effect and for which premiums have been fully prepaid and naming the Lender, as loss payee;

xv. No material adverse change in the financial market, the business of the Borrower, the Portfolio or the Exit Loan Collateral, Repurchased Loan Collateral or the Sponsors shall have occurred;

xvi. Payment of all closing costs and fees and all unpaid expenses of the Lender for which the Lender has not previously received and the Expense Deposit; and

xvii. Execution of the Asset Management and Servicing Agreement containing substantially the terms and conditions set forth in Exhibit B annexed hereto and otherwise acceptable to the Lender.

**Brokerage:**                  Borrower will indemnify, defend and hold the Lender and its officers, directors and members and their affiliates harmless from and against any losses in any way relating to or arising from any claim by any person or entity that such person or entity acted on behalf of the Borrower in connection with the Loan.

**Indemnification:**            The Borrower will indemnify Northlight, the Lender and their affiliates and hold each of them harmless from and against all costs, expenses (including reasonable fees and disbursements of counsel) and liabilities arising out of or relating to any litigation or other proceedings (regardless of whether such indemnified Person is a party thereto) which relate to the proposed transactions, including the financing contemplated hereby or any transactions connected therewith, provided that such indemnified Person will not be indemnified for its gross negligence or willful misconduct.

**Expenses,**
**Due Diligence Deposit**
**And Break Up Fee:**          Business and valuation due diligence has been completed by the Lender.   As previously agreed to in the original Northlight Chapter 11 Exit Financing Term Sheet, submitted and approved by the court on {xxx, xx, xxxx} the Borrower agreed to pay up to a maximum of $75,000 of expenses associated with the Lender's valuation due diligence.  As of the date of this letter, the Borrower has reimbursed the Lender $50,000 of the $75,000 commitment.

Upon acceptance of the terms of this Term Sheet, the Borrower will be obligated to reimburse the Lender for all legal due diligence and environmental due diligence up to $100,000.

Upon the completion of all due diligence, the parties shall submit a binding commitment letter, which will be submitted to the Bankruptcy Court for its approval as part of the Plan of Reorganization.  Upon the approval by the Bankruptcy Court of

the Lender as the Stalking Horse, including a break-up fee in the amount of $1,500,000. The Borrower will be responsible for all of the Lender's expenses associated with the documentation and closing of the loans.

**Expiration Date:**

If not executed by Borrower and returned to Northlight by 5 PM EST on March 10, 2011, this Letter of Interest will terminate on such date, without further notice or act of any kind by Northlight or any other party.

**Miscellaneous:**

New York law to govern

Waiver of trial by jury

Consent to jurisdiction of state and federal courts located in the State of New York

**[Signatures on Following Page]**

Submitted by:

NORTHLIGHT REAL ESTATE GROUP LLC

By: _____

M. Benjamin Georg
Chief Investment Officer


Accepted by:

SPECIALTY TRUST, INC.

By _____

Name: C. GRANT LYON

Title: CRO

Date: 3/20/11

# EXHIBIT A

## THE BORROWER PORTFOLIO

To be provided by Borrower including outstanding principal balance, carrying value and assigned debt.

Tranche #1

Tranche #2

EXHIBIT B

ASSET MANAGEMENT AND SERVICING AGREEMENT

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Minimum Release Prices** | To Be Provided By Northlight |
| **Asset Management and Servicing** | NAM will be engaged as a traditional, third-party asset manager (the "Asset Manager") for the day-to-day activities and managing the assets to the plan created during the due diligence process. In addition, NAM will be responsible for Loan Servicing (the "Servicer") utilizing either NAM's internal servicing system or the Borrowers servicing system at NAM's election.   NAM will be responsible for reporting to the Board of Directors of Borrower ("BOD") and the Lender collection activities on a regular basis. |
| **BOD Roles and Responsibilities** | Borrower entity decisions, including, but not limited to, the sale of the Borrower, issuance of common stock by the Borrower, acquiring additional assets and incurring entity-level debt will be made by the BOD. |
| **Due Diligence** | Upon completing due diligence, NAM will prepare a special servicing business plan for each loan being serviced by NAM based on status, location, future funding requirements, and asset type.  For loans that are non-performing, the business plan will include:<br><br>1)  Resolution Strategy – Discounted Payout, Loan Restructuring, Foreclosure.<br>2)  Expected Proceeds from the Resolution.<br>3)  Expenses associated with the resolution including foreclosure, construction completion, asset management and disposition expenses. |
| **Reporting** | NAM will be responsible for providing monthly (unaudited), quarterly (unaudited) and annual (audited) reports to the BOD.  Reporting requirements, include, but is not limited to:<br><br>1)  Asset level reports – Status of each loan and how it compares favorably or unfavorably to the business plan.<br>2)  Portfolio level reports – Including a mark-to-market for both the portfolio and individual assets.<br>3)  Financial Statements for the Borrower |

| | |
|---|---|
| **Loan Servicing Fees** | At the election of the Borrower, NAM may either 1) utilize the existing systems of Specialty Finance, Inc. (the "Servicing System") to manage loan servicing of Borrowers or 2) continue use of a third-party servicing system. If access is to the Servicing System is granted by the Borrower or if the system of an outside provider is used in the alternative, NAM will not charge a loan servicing fee. If the Borrower denies NAM access to the Servicing System, or if the currently-used system of an outside provider is not used, NAM will charge Borrower a servicing fee equal to 0.30% of the unpaid principal balance for loan servicing and data migration to NAM's internal systems (the "**Servicing Fee**") annually. REO properties or loans that are foreclosed and that no longer require loan servicing will not be charged a Servicing Fee. |
| **Asset Management Fees** | As Asset Manager, NAM will receive an individual asset management fee as defined in the chart below (the "**Asset Management Fee**" and together with the Servicing Fee, the "**Fees**") which is a priority payment as defined in the Waterfall. It is anticipated that the year 1 Management Fee will be a maximum amount of approximately $980,000. NAM will not collect an annual Asset Management Fee for assets that have been resolved, but in no circumstance will the annual Asset Management fee be less than $100,000 per annum

The Fees that has been earned, but not paid (the "Accrued Fees"), by the Borrower will accrue at a rate of 18% annualized. Accrued Fees will be subject to the terms and conditions of the Waterfall defined above.

Fees payable under the Asset Management and Servicing Agreement are a secured priority payment for the Borrower.

Allocation of the fees will be determined following legal due diligence. |
| **Property Management** | For income producing properties or development opportunities that are owned by the Borrower, NAM may elect to either engage a third-party property manager or manage the properties themselves. Should NAM choose to manage the property themselves, it will be entitled to charge a standard, arms-length property management fee approved by both the Lender and the BOD |
| **Removal of NAM** | Following the full repayment of the Loan, the BOD may elect to terminate the Asset Management and Servicing Agreement with NAM upon six (6) months prior written notice. |
| **Servicing Advances** | Although the amount of the Loan to the Borrower should be enough to manage the assets, NAM will agree to provide Servicing Advances ("Servicing Advances"). Any Servicing Advances incurred by NAM will be repayable to the Servicer pari-passu with Accrued Fees earned by NAM. Servicing Advances will accrue interest at a rate of 16% annualized. |
| **Right To Purchase Assets** | In the ordinary course of managing the loan portfolio, NAM, or an affiliated entity, retains the right to purchase loans or REO assets from the Borrower. Any asset acquired by NAM or an affiliated entity will require the prior approval of the BOD, such not to be unreasonably withheld or delayed. This right to purchase assets is neither a Right of First Refusal nor a Right of First Offer to purchase assets. |
| **Right to** | NAM, or an affiliated entity, retains the ability to purchase equity interests from |

| Purchase BORROWER Equity | Borrower shareholders seeking liquidity. Any equity interest acquired by NAM or an affiliated entity will require the prior approval of the BOD, not to be unreasonably withheld or delayed. |
|---|---|
| Indemnification | The Borrower will indemnify NAM for all actions pertaining to asset management, with the exception of gross negligence and willful misconduct. |

Exhibit C

Incentive Payment Plan

As part of the Lender's commitment to the Loans, the Lender, at no additional cost, will receive a share of the net liquidation proceeds after the Loans are fully satisfied as set forth below:

| All splits below are expressed as (Northlight / Estate) | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5+ |
| Tranche #1 Collateral | Loan is not prepayable | 40/60 | 45/55 | 50/50 | 55/45 |
| Tranche #2 Collateral | Loan is not prepayable | 30/70 | 35/65 | 40/60 | 40/60 |

Exhibit D
Option B

Should the Deutsche Bank noteholders object to the proposed Exit Financing terms and conditions and retain their priority first lien against their collateral as described in Tranche #2 of the Loans, Northlight is willing to provide the exit financing under the same terms and conditions described in the above term sheet with the exception of the following changes:

- The Minimum Reserve Balance will be $1.75MM
- The Loan Commitment will be for $27MM versus the $28MM contemplated under the current term sheet
- The Lender will receive 90% of all net liquidation proceeds after the Loan is fully satisfied  versus the schedule provided in Exhibit C.

Should the Deutsche Bank Noteholders seek third-party asset management services, Northlight will provide a proposal to provide third party loan servicing and asset management services to the Tranche #2 collateral.

# Exhibit B

# Exhibit B

## Minimum Release Prices

(a)    Within forty-five (45) days of the Closing Date, the new Board of Directors will choose one of the following options to govern the establishment of release prices to permit Asset Sales but delivery of written notice to Lender (absent deliver of such notice, option 1 will be deemed to apply):

1.    Lender will have the ability to control the sale decision as long as the price received from each Asset Sale is greater than the release price further described below.  If Lender has not assigned a release price for a specific Asset, the new Board of Directors will control the sale decision.

OR

2.    The new Board of Directors may control the sale decision as long as the following Asset Sales hurdles are acheived as of each anniversary of the Closing Date:

Loan Amortization
- End of Year 1 - $0MM
- End of Year 2 - $4,000,000 in Net Cash Proceeds to reduce the Loan Amount
- End of Year 3 - $6,000,000 in Net Cash Proceeds to reduce the Loan Amount
- End of Year 4 - $10,000,000 in Net Cash Proceeds to reduce the Loan Amount
- End of Extension 1 - $4,000,000 in additional Net Cash Proceeds to reduce the Loan Amount
- End of Extension 2 - Balance of Loan

(b)    No Asset Sales can occur below the release prices described in section (e) below.

(c)    On the Second (2nd) anniversary of the Closing Date, Lender will have the right to appraise the portfolio to test the following loan-to-value requirements.  The appraisal group will be mutually agreed open by Lender and the Board of Directors.  If the loan-to-value requirements below are not satisfied on the anniversary dates indicated, the decision regarding Asset Sales release prices shall revert to Lender if option 2 above has been elected.

Loan-to-value ratio of then-remaining Collateral to Loan Amount:
- End of Year 1 – No Requirement
- End of Year 2 – 65%
- End of Year 3 – 55%
- End of Year 4 – 45% -- the extension options are predicated upon meeting this hurdle
- End of Extension 1- 35% -- the last extension option is predicated upon meeting this hurdle
- End of Extension 2 – Balance is due

(d)    To the extent either the requried amortization or the loan-to-value tests are not satisfied in the timeframes required, for purposes of this section only, Lender will have the ability to then control the Asset Sales until the amortization and the loan-to-value ratio are in compliance without regard to specified release prices. After the Borrower is back in compliance, the Board of Directors will regain control of the asset sale decision, if option 2 has been elected.

(e)    For purposes of this section, the following release prices shall govern and control, absent a failure of the amortization and/or loan-to-value requirements:

| Property | NL Reserve Price |
| --- | --- |
| 2522 Properties | |
| Central Buchanan | |
| CIC&S | |
| Consolidated Phase 4 | |
| Coolidge 140 | |
| Coolidge 70 | |
| Cotton Lane | |
| Denver I25 | |
| Duck Creek | |
| Ecco Holdings | |
| Esperanza | |
| Joshua Tree | |
| Marina Village | |
| Mohave Vista | |
| PV Land Investments | |
| Sierra Vista | |
| Symphony | |
| William Long | |
| WHM Paloma | |
| 1st & Buchanan | |
| 5th & Lincoln | |
| 7th & Buchanan | |
| Conklin | |
| Desert Land | |
| Desert Quail | |
| Desert Oasis | |
| Johnson Steve | |
| Nadador | |
| Prime West Jordanelle | |
| Quarterhorse Trust | |
| S&T Ranch | |
| Sedona | |
| Vero Desert Lakes | |
| Waterfront | |

(f)    By mutual written agreement of the parties, the Release Prices above may be suspended or modified based upon then-applicable market conditions.