Ira D. Kharasch (CA Bar No. 109084)
Victoria A. Newmark (CA Bar No. 183581)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760
Email: *ikharasch@pszjlaw.com*
       *vnewmark@pszjlaw.com*

*Attorneys for Debtors and Debtors in Possession*

Sallie B. Armstrong (NV Bar No. 1243)
DOWNEY BRAND LLP
427 West Plumb Lane
Reno, Nevada 89509
Telephone: 775/329-5900
Facsimile: 775/786-5443
Email: *sarmstrong@downeybrand.com*

*Local Counsel for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Chapter 11 |
| SPECIALTY TRUST, INC., et al. | **Jointly Administered under Case No. 10-51432-GWZ** |
| ☐ Affects this Debtor<br>☑ Affects all Debtors<br>☐ Affects Specialty Acquisition Corp.<br>☐ Affects SAC II<br>☐ Affects SAC D-1, LLC | Case Nos.<br>10-51432<br>10-51437<br>10-51440<br>10-51441 |
| | **MOTION FOR ORDER APPROVING BID PROCEDURES AND OVERBID PROTECTIONS, INCLUDING BREAK-UP FEE, RE EXIT FINANCING UNDER FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS (DATED APRIL 27, 2011) AND GRANTING RELATED RELIEF** |
| | Hearing Date: May 17, 2011 (OST Requested)<br>Hearing Time: 2:00 p.m. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# I.
# INTRODUCTION

By this Motion, the Debtors seek approval of the (i) Exit Facility Bid Procedures set forth on **Exhibit A** hereto; (ii) approval of the Break-Up Fee and expenses for due diligence and the cost to document the exit facility in favor of Northlight Real Estate Group LLC (or its affiliate) (the "Stalking Horse Financer" or "Northlight"); and (iii) for any other relief as the Court deems appropriate and just in relation to the foregoing.

Pursuant to the Debtors' proposed Plan, the Debtors intend to enter into the Northlight Exit Facility with Northlight for up to $28 million to fund the Debtor's exit from chapter 11 and to fund requirements under the plan, including, but not limited to, (i) payment of certain secured claims; (ii) funding the litigation trust to pursue the estates' causes of action; (iii) payment of operating expenses during the liquidation of the Debtors' assets; (iv) payment of carrying costs associated with property in the portfolio; and (v) paying for such other working capital needs of the Reorganized Debtors as may be required from time to time.

The material terms of the Northlight Exit Facility are set forth in that Term Sheet attached as **Exhibit B** hereto. The Term Sheet and Plan both contemplate that the proposed Northlight Exit Facility, as more fully set forth in the Northlight Exit Financing Term Credit and Security Agreement (the "Stalking Horse Agreement"), will be subject to the opportunity for overbid pursuant to the Exit Facility Bid Procedures. The Stalking Horse Agreement is attached as **Exhibit C** hereto.

Under the Northlight Term Sheet, Northlight is entitled to certain bid protections in the event of a successful overbid, including a break-up fee of $1,500,000 (the "Break-Up Fee") and reimbursement of its expenses incurred in connection with the Stalking Horse Agreement and certain due diligence costs estimated to be $250,000 (the "Expense Reimbursement").

If a successful overbid is received, the Debtors will seek to confirm such overbid in connection with the Plan confirmation hearing on June 3, 2011. If no successful overbid is received, the Debtors will proceed with confirmation of the Plan with the existing Northlight Exit Facility as embodied in the Stalking Horse Agreement at the time of the confirmation hearing.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The Debtors respectfully submit that allowing overbids pursuant to the Exit Facility Bid Procedures will maximize the value of the Exit Facility for the benefit of the Debtors' estates and creditors by hopefully resulting in an improvement to the current Stalking Horse Agreement.

## II.
## STATEMENT OF FACTS

### A.    Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of this Case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.    General Background

On April 20, 2010 (the "Petition Date"), the Debtors commenced these Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or unsecured creditors' committee has been appointed in the Cases.

### C.    The Stalking Horse Purchase Agreement

On April 27, 2011, the Debtors filed their *First Amended Chapter 11 Plan of Reorganization Proposed by the Debtors (Dated April 27, 2011)* (the "Plan").  [Docket No. 773] Under the Plan, the Debtors intend to enter into the Northlight Exit Facility pursuant to the terms set forth in the Stalking Horse Agreement upon the Effective Date, the material economic terms of which are:

| Loan: | Two senior secured facilities consisting of a $23.5 million loan (Tranche 1) and a $4.5 million loan (Tranche 2); but if Deutsche Bank noteholders vote to reject the Plan, then a consolidated single loan of $27 million (Option B). |
|---|---|
| Term: | Four year term, with two one-year extensions (provided the conditions for such extensions are met). |
| Interest: | 18% per annum to be paid monthly in arrears on the last date of each month. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Incentive Plan Payment or Distribution Participation Payments: | Northlight will receive a share of the net liquidation proceeds of the collateral after the loans are fully satisfied in percentage amounts ranging 30% to 55% depending on the type of collateral and when such collateral is sold based upon the Incentive Plan Payment schedule set forth on Exhibit C to the Term Sheet. Under Option B, if Deutsche Bank noteholders object to the Northlight Exit Facility and retain their first priority lien on Tranche 2 Collateral, then Northlight will receive 90% of all net liquidation proceeds after the Loan is fully satisfied. |
|---|---|
| Commitment Fee: | 2% of the total Loan Amounts due and payable upon the initial funding. |
| Extension Fee: | 1% of the outstanding Loan Amounts due and payable prior to the granting of the two one year extensions. |
| Default Rate: | 4% in excess of the rate of interest in effect. |
| Management Fees: | Approximately $980,000 for the year 1 Management Fee. Fees that have been earned but not paid will accrue at a rate of 18% annualized. |
| Servicing Advances: | 16% annualized rate. |
| Collateral: | Tranche 1:  First lien security interest on all assets. Tranche 2:  If Deutsche Bank noteholders vote to accept the Plan, a first priority lien on all assets pledged to Deutsche Bank or the assets of SAC II that are indirectly pledged to Deutsche Bank and a perfected second lien on all assets held as collateral by Tranche 1. |

The intended uses of the Northlight Exit Facility are to: (i) repurchase US Bank's existing loan for $16.5 million in full satisfaction of such debt; (ii) repay the DIP facility; (iii) pay the estates' professional fees ; (iv) fund $300,000 into a litigation trust to pursue the Causes of Action; and (v) establish an Operating Reserve with a $2 million minimum reserve balance to pay for expenses of the liquidation of the estates, such as for example carrying costs of the Debtors' properties, among other uses.

The Release Price Supplement to the Northlight Exit Facility Term Sheet is attached to the Plan as Exhibit B.  The Northlight Exit Facility Term Sheet and the Release Price Supplement to same are only summaries, and the actual terms are governed by the Northlight Exit Facility (i.e., the Stalking Horse Agreement) and Northlight Asset Management and Service Agreement which are attached the Plan Supplement.  The actual release prices set forth in the chart on the Release Price Supplement and the Northlight Exit Facility are redacted, and will be provided to bidders upon the signing of a confidentiality agreement, and will be filed under seal.

**D.    Exit Facility Bid Procedures**

The terms of the proposed Exit Facility Bid Procedures are set forth in full on **Exhibit A** hereto.  Following is a summary of the key terms:

| | |
|---|---|
| Bid Deadline: | May 25, 2011 at 4:00 p.m. |
| Auction: | June 1, 2011 at 9:00 a.m. |
| Approval of Successful Bid: | June 3, 2011 at 2:00 p.m. |
| Preliminary Interested Investor: | Execution of a confidentiality agreement. |
| Qualified Bid: | A bid that meets the below requirements, as more fully set forth in the Exit Facility Bid Procedures. |
| Deposit: | $500,000 (with the exception of Northlight) |
| Competing Exit Facility Documents: | Executed exit facility documents that have a value greater than the Stalking Horse Agreement. |
| Initial Overbid: | In addition, the Bid (other than the Bid from Northlight) must provide for incremental liquidity under the Competing Exit Facility Documents at closing greater than the Stalking Horse Agreement by at least the Initial Overbid, which shall have a value of at least:   (i) $1,500,000 (the "Break-Up Fee"); (ii) up to $250,000, which represents expenses paid to date by the Debtors for diligence costs and attorneys fees of the Stalking Horse Financer plus an |

| | estimate of future expenses (the "Expense Reimbursement"); and (iii) provide for improved estimated recoveries under the Plan (through reduced rates, incentive fees or otherwise) of at least $500,000 (the "Initial Overbid Increment"). The Break-Up Fee and Expense Reimbursement must be paid at closing and shall be added to the loan obligations under the Competing Exit Facility Documents. |
|---|---|
| No Contingencies: | No financing or diligence contingencies. |
| Irrevocable: | Bids must be held open and irrevocable until the closing of the Auction, or if selected as the Successful Bid or Backup Bid, until the earlier of the closing or 20 days after entry of the Confirmation Order. |
| Corporate Authority: | Written evidence demonstrating authority to enter into the transaction. |
| Proof of Financial Ability to Perform: | Written evidence satisfactory to the Debtors and the Consultation Parties that the Bidder can close. |
| Minimum Overbid Increment: | Any overbid at the Auction shall be in increments of $100,000 in value. |
| Consultation Parties: | The Debtors will consult with the Consultation Parties, who are counsel for Deutsche Bank and Fortress & Taberna Preferred Funding VII LLC, on key aspects of the Bidding Procedures, including determination of the Successful Bid and the Backup Bidder. |
| Confirmation Hearing: | The Debtors will seek approval of the Exit Facility with the Successful Bidder at the Confirmation Hearing. |

The Debtors, in consultation with their investment banker ("Imperial Capital") have developed a list of parties who the Debtors believe may potentially be interested in consummating, and who the Debtors reasonably believe would have the financial resources to, consummate a competing Exit Facility to that of the Stalking Horse Financer (a "Competing Exit Facility"). The Debtors and Imperial Capital have been in the process of contacting these parties to explore their interest in pursuing a Competing Exit Facility, which parties include any party that had previously

executed a confidentiality agreement with the Debtors for the Plan or Exit Facility, any party previously contacted regarding the Exit Facility, and other potential strategic investors. Upon entry of an order approving this Motion, the Debtors will mail each such party the Information Package, which is comprised of a cover letter, the Exit Facility Bid Procedures, and a copy of the Stalking Horse Agreement and Plan.

The Debtors reserve the right to determine what is the highest and best bid as set forth in the Exit Facility Bid Procedures after consultation with their financial and legal advisors and the Consultation Parties. In making this decision, the Debtors, in consultation with their financial and legal advisors and the Consultation Parties. This determination shall take into account any factors the Debtors, upon consultation with the Consultation Parties, reasonably deem relevant to the merits of the Qualified Bid to the Debtors' estates, including, inter alia, the following: (i) the amount and nature of the consideration; (ii) any price adjustments or improvements to the economics of the Exit Facility, including, but not limited to the interest, fees, rates, penalties, or Incentive Payment Plan percentages; (iii) proposed covenants in the Competing Exit Facility Documents; or (iv) the ability of the Qualified Bidder to close the proposed Exit Facility.

## III.
## ARGUMENT

### A.    GOOD CAUSE EXISTS TO APPROVE THE BIDDING PROCEDURES

The Exit Facility Bidding Procedures are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best terms for the Exit Facility, which is a clear benefit to the Debtors' estates. Historically, bankruptcy courts have approved bidding procedures under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). In determining whether the debtor-in-possession has complied with the sound business judgment rule, the court must consider whether: (a) there has been "[a]ny improper or bad motive," (b) the "price is fair and the negotiations or bidding has occurred at arm's length," and (c) the sale followed "[a]dequate procedures, including proper exposure to the market and accurate and reasonable notice

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

to all parties in interest." *In re Castre*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004). When applying the rule, "the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) (considering the rule in the context of the debtor's decision to reject a contract). In the context of this rule, courts often approve overbid procedures. *See, e.g., In re Crown Corp.*, 679 F.2d 774, 777 (9th Cir. 1982). This court enjoys broad powers to approve such measures. "the court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the bankruptcy code]." 11 U.S.C. § 105(a); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986); *accord In re Geothermal Resources Int'l*, 93 F.3d 648, 651 (9th Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983) (noting a bankruptcy judge's "broad administrative power" and "substantial freedom to tailor his orders" to a case at hand). Here, the proposed Exit Facility Bidding Procedures comport with the Debtors' sound business judgment. Principally, the Exit Facility Bidding Procedures permit qualified bidders to submit topping bids. In this way, the Exit Facility Bidding Procedures embody an arm's-length process and ensure competitive bidding over the Northlight Exit Facility. This, in turn, will ensure that the terms of the Exit Facility are optimized for the benefit of all creditors and the bankruptcy estates.

## B.    THE BREAK-UP FEE AND EXPENSE REIMBURSEMENTS SHOULD BE APPROVED

The Debtors submit that sufficient cause exists to approve the proposed Break-Up Fee, Expense Reimbursement, and other bid protections. Specifically, Northlight has expended, and likely will continue to expend, considerable time, money and energy pursuing the Northlight Exit Facility, will have engaged in extended and lengthy, good faith negotiations, and will provide a floor bid for the Exit Facility that Northlight has agreed to provide the Reorganized Debtors in order to allow the Debtors to exit bankruptcy. The Stalking Horse Agreement with Northlight is the culmination of these efforts.

Moreover, the bid protections provide a material inducement for, and a condition of, Northlight's entry into the Stalking Horse Agreement. The Debtors believe that they are fair and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

reasonable in view of, among other things, (a) the intensive analysis, due diligence investigation, and negotiation undertaken by Northlight in connection with the Northlight Exit Facility, and (b) the fact that the efforts of Northlight will have increased the chances that the Debtors will receive the highest and best offer for the Northlight Exit Facility, by establishing a bid standard or minimum for other bidders, and serving as a catalyst for other potential or actual bidders, to the benefit of the estate, creditors, and all other parties in interest.

The Break-Up Fee in this case is not comparable to a traditional asset purchase agreement, but more akin to a break-up fee that would be offered to a plan proponent or an equity sponsor of a plan for allowing overbids to its plan. In such cases, the Debtors submit that the Break-Up Fee of $1.5 million, which is 5.3% of the overall Loan Amounts under the Northlight Exit Facility, and the Expense Reimbursement of $250,000, which when combined with the Break-Up Fee is 6.2% of the overall Loan Amounts under the Exit Facility, is within the range of reasonableness approved for bid protections in connection with plan sponsorship. *See, e.g., In re RathGibson, Inc.*, Case No. 09-12452 KJR (Bankr D. Del.) (6.2% breakup fee as percentage of aggregate plan commitment approved); *In re Accuride Corp.*, Case No. 09-13449 BLS (Bankr. D. Del.) (7.1% breakup fee as percentage of aggregate plan commitment approved); *In re Key Plastics, Inc.*, Case No. 08-11326 CSS (Bankr. D. Del. ) (5.5% breakup fee approved as percentage of aggregate plan commitment approved).

Northlight will be unwilling to permit overbids to the Northlight Exit Facility unless the Debtors are able to provide the bid protections and authorize payment of the Break-Up Fee and Expense Reimbursement as an expense of administration. Accordingly, the Debtors request that the Court approve the bid protections included in the Exit Facility Bid Procedures and the payment of the Break-Up Fee and expenses contemplated therein.

///

///

///

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# IV.
## CONCLUSION

For all the foregoing reasons, the Debtors respectfully request that the Court enter an order (a) approving the proposed Exit Financing Bid Procedures and bid protections contained therein; (b) authorizing payment of a Break-Up Fee and Expense Reimbursement, if applicable, to Northlight; and (c) granting such other relief as is fair and equitable.

Dated: May 4, 2011

PACHULSKI STANG ZIEHL & JONES LLP
Ira D. Kharasch (CA Bar No. 109084)
Victoria A. Newmark (CA Bar No. 183581)

and

DOWNEY BRAND LLP

By: _____
Sallie B. Armstrong (NV Bar No. 1243)
Michelle N. Kazmar (NV Bar No. 10093)

*Attorneys for Debtors and Debtors in Possession*

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPECIALTY TRUST, INC., et al., | ) | Case No. 10-51432-GWZ |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## EXIT FACILITY BID PROCEDURES

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the exit facility (the "Exit Facility") that will be implemented through *the Debtors' First Amended Chapter 11 Plan of Reorganization Proposed by the Debtors (Dated April 27, 2011)* (the "Plan"). Specifically, the Debtors have entered into that Exit Financing Term Sheet (the "Term Sheet") with Northlight Real Estate Group LLC ("Northlight" or "Stalking Horse Financer"), which Term Sheet is attached as Exhibit A to the Plan that outlines the key terms of the Exit Facility. The proposed Northlight Exit Financing Term Credit and Security Agreement (the "Stalking Horse Agreement") is the stalking horse bid against which all bids shall be measured. The Stalking Horse Bid is subject to the receipt of higher or otherwise better bids and the corresponding entry into a loan agreement with a Successful Bidder (as defined below) according to these Bid Procedures.

Any terms not defined herein shall have the meaning ascribed to them in the Plan.

---

### I.
### Important
(All times are prevailing Pacific time)

- **May 25, 2011 at 4:00 p.m.:** Deadline to submit Bids to be considered for the Auction

- **June 1, 2011 at 9:00 a.m.:** Proposed date of Auction

- **June 3, 2011 at 2:00 p.m.:** Confirmation Hearing Date

---

DOCS_LA:237098.6

## II.
## Marketing Process

**A.    Contact Parties**

The Debtors, in consultation with their investment banker ("Imperial Capital") have developed a list of parties (each, individually, a "Contact Party", and collectively, the "Contact Parties") who the Debtors believe may potentially be interested in, and who the Debtors reasonably believe would have the financial resources to, consummate a competing Exit Facility to that of the Stalking Horse Financer (a "Competing Exit Facility"). The Debtors and Imperial Capital have been in the process of contacting the Contact Parties to explore their interest in pursuing a Competing Exit Facility. The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding the Exit Facility, regardless of whether such parties expressed any interest, at such time, in pursuing an Exit Facility. The Debtors will continue to discuss and may, in their reasonable discretion, supplement the list of Contact Parties throughout the marketing process, as appropriate.

The Debtors may distribute to each Contact Party an "Information Package," which is comprised of:

(a)    A cover letter;

(b)    A copy of these Bid Procedures; and

(c)    A copy of the Stalking Horse Agreement and Plan.

Parties interested in conducting due diligence regarding the Debtors and receiving an Information Package should contact the Debtors' investment bankers, Imperial Capital LLC, 2000 Avenue of the Stars, 9th Floor South, Los Angeles, CA 90067, Attn: Jeff Finn (Jfinn@imperialcapital.com, 310-246-3653).

**B.    Access to Diligence Materials**

To participate in the bidding process and to receive access to any materials relating to the Debtors (the "Diligence Materials"), a party must submit to the Debtors an executed confidentiality agreement. At the reasonable business judgment of the Debtors, those parties that have executed a confidentiality agreement prior to the approval of these Bid Procedures may not have to execute another confidentiality agreement.

A Contact Party that executes a confidentiality agreement or otherwise is deemed qualified by the Debtors may qualify for access to the Diligence Materials and shall be a "Preliminarily Interested Investor."

All requests for Diligence Materials must be directed to Imperial Capital.

C.    **Auction Qualification Process**

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), shall be determined by the Debtors to satisfy each of the following conditions:

(1)    Good Faith Deposit:  Each Bid (other than the Bid from Northlight) must be accompanied by a deposit to an interest bearing escrow account to be identified and established by the Debtors in an amount of $500,000 (the "Good Faith Deposit").

(2)    Terms:  Bids(s) must be on terms that, in the Debtors' business judgment are higher or otherwise better than the terms of the Stalking Horse Agreement.  A Bid must include executed exit facility documents pursuant to which the Bidder proposes to effectuate the competing exit facility (the "Competing Exit Facility Documents"). A Bid shall include a copy of the Stalking Horse Agreement marked to show all changes requested by the Bidder (including those related to pricing, including incentive fees).  In addition, the Bid (other than the Bid from Northlight) must provide for incremental liquidity under the Competing Exit Facility Documents at closing greater than the Stalking Horse Agreement by at least the Initial Overbid, which shall have a value of at least:  (i) $1,500,000 (the "Break-Up Fee"); (ii) up to $250,000 which represents expenses paid to date by the Debtors for diligence costs and attorneys' fees of the Stalking Horse Financer, and an estimate of future expenses to be incurred in connection with the documentation of the Stalking Horse Bid (the "Expense Reimbursement"); and (iii) provide for improved estimated recoveries under the Plan (through reduced rates, incentive fees or otherwise) of at least $500,000 (the "Initial Overbid Increment").  The Break-Up Fee and Expense Reimbursement must be paid at closing and shall be added to the loan obligations under the Competing Exit Facility Documents.

(3)    Corporate Authority:  Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Competing Exit Facility; provided, however, that, if the Bidder is an entity specially formed for the purpose of effectuating the Competing Exit Facility, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Competing Exit Facility by the equity holder(s) of such Bidder.

(4)    Proof of Financial Ability to Perform:  Written evidence that the Debtors, in consultation with counsel for Deutsche Bank and Fortress & Taberna Preferred Funding VII LLC (collectively, the "Consultation Parties"), reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Competing Exit Facility.  Such information should include, *inter alia,* the following:

(a)    contact names, email addresses and telephone numbers for verification of financing sources,

3

     (b)     evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Competing Exit Facility;

     (c)     the Bidder's current financial statements (audited if they exist); and

     (d)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Competing Exit Facility.

(5)     <u>Contingencies</u>:  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(6)     <u>Irrevocable</u>:  A Bid must be irrevocable until the closing of the Auction, provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (as defined herein), such bid shall continue to remain irrevocable, subject to the terms and conditions of the Bid Procedures.

(i)     <u>Bid Deadline</u>:  The Debtors must receive a Bid in writing, on or before May 25, 2011 at 4:00 p.m. (prevailing Pacific time) or such later date as may be agreed to by the Debtors (the "<u>Bid Deadline</u>").  To be considered, Bids must be sent to the following at or before the Bid Deadline: (i) counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles, CA 90067, Attn: Ira Kharasch (ikharasch@pszjlaw.com); (ii) investment bankers for the Debtors, Imperial Capital LLC, 2000 Avenue of the Stars, 9th Floor South, Los Angeles, CA 90067, Attn: Jeff Finn (Jfinn@imperialcapital.com); (iii) counsel for Deutsche Bank, as Indenture Trustee, Morgan Lewis & Bockius LLP, 300 South Grand Ave., 22nd Flr., Los Angeles, CA 90071, Attn: Richard Esterkin (resterkin@morganlewis.com); and (v) counsel for Fortress & Taberna Preferred Funding VII LLC, Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086, Attn: Gerard S. Catalanello (gcatalanello@duanemorris.com).

     A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "<u>Qualified Bid</u>," and such Bidder shall constitute a "<u>Qualified Bidder</u>." Notwithstanding the foregoing definitions, the Stalking Horse Agreement constitutes the Qualified Bid of the Stalking Horse Financer, and the Stalking Horse Financer is a Qualified Bidder.

## III.
## Auction

     If one or more Qualified Bid is received by the Bid Deadline (other than the Stalking Horse Agreement), the Debtors will conduct an auction (the "<u>Auction</u>") to determine the highest or otherwise best Qualified Bid.  This determination shall take into account any factors the Debtors, upon consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, *inter alia*, the following: (i) the amount and nature of the consideration; (ii) any price adjustments or improvements to the economics of the Exit Facility, including, but not limited to the interest, fees, rates, penalties, or Incentive Payment Plan percentages;

4

(iii) the proposed covenants included in the Competing Exit Facility Documents; or (iv) the ability of the Qualified Bidder to close the proposed Exit Facility (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtors will not conduct the Auction.

The Auction shall take place at 9:00 a.m. (prevailing Pacific time) on June 1, 2011 at the offices of Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles, CA 90067, or such later time on such day or other place as the Debtors shall notify all Bidders who have submitted Qualified Bids. The Auction shall be transcribed and shall be conducted according to the following procedures:

**A.    The Debtors Shall Conduct the Auction.**

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Stalking Horse Agreement or, in the event a higher or otherwise better Bid is received, such Qualified Bid (the "Auction Baseline Bid"). All Qualified Bids made after the announcement of the Auction Baseline Bid shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all Bidders (including Northlight) who have submitted Qualified Bids. In consultation with the Consultation Parties, during the course of the Auction, the Debtors may require Overbids to be submitted on a sealed basis, which results of such sealed bids will be announced and placed on the record at the Auction. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Auction Baseline Bid and all Overbids.

The Debtors, after consultation with the Consultation Parties, shall have the right to modify the conduct of the Auction.

**B.    Terms of Overbids.**

An "Overbid" is any Bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(1)    **Minimum Overbid Increment.**

Any Overbid after the Auction Baseline Bid shall be made in increments having a value of at least $100,000 (the "Minimum Overbid Increment"); provided that the Debtors shall retain the right to modify the bid increment requirements at the Auction as they may deem appropriate.

(2)      **Remaining Terms are the Same as for Qualified Bids.**

Any Overbid must remain open and binding on the Bidder(s) until and unless the Debtors accept a higher or otherwise better Overbid, subject to the requirements of the Backup Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors after consultation with the Consultation Parties) demonstrating such Bidder's ability to close the Competing Exit Facility proposed by such Overbid.

(3)      **Announcing Overbids.**

The Debtors shall announce at the Auction the material terms of each Overbid and the resulting benefit to the Debtors' estates based on, *inter alia,* the Bid Assessment Criteria.

(4)      **Consideration of Overbids.**

The Debtors reserve the right to make one or more adjournments in the Auction to, among other things:  facilitate discussions between the Debtors, the Consultation Parties, and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors and the Consultation Parties may require that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Competing Exit Facility on the prevailing Overbid terms.

**C.      Backup Bidder.**

Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid(s) at the Auction, as determined by the Debtors, in the exercise of their business judgment, after consultation with the Consultation Parties, shall be required to serve as a backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Pacific time) on the date that is twenty (20) days after entry of the Confirmation Order (the "Outside Backup Date") or the closing of the Exit Facility with the Successful Bidder.  Following entry of the Confirmation Order, if the Successful Bidder fails to consummate an approved Exit Facility, because of a breach or failure to perform on the part of such Successful Bidder, the Debtors, in consultation with the Consultation Parties, may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Exit Facility, with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Successful Bidder's deposit, if any, shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder.  The closing date to consummate the Exit Facility with the Backup Bidder shall be no later than ten (10) days after the date that the Debtors provide notice (the "Notice") to the Backup Bidder that the Successful Bidder failed to consummate an approved Exit Facility and that the Debtors desire to consummate the Exit Facility

6

with the Backup Bidder. The deposit, if any, of the Backup Bidder shall be held by the Debtors until the earlier of two (2) business days after (a) the closing of the Exit Facility with the Successful Bidder or (b) the Outside Backup Date, provided however, that in the event the Successful Bidder does not consummate the Exit Facility as described above and the Debtors provide the Notice to the Backup Bidder, the Backup Bidder's deposit shall be held until the closing of the Exit Facility with the Backup Bidder. In the event that the Debtors fail to consummate a Exit Facility with the Backup Bidder as described above, the Backup Bidder's deposit shall be forfeited to the Debtors' estates, and the Debtors specifically reserve the right to seek all available damages from the defaulting Backup Bidder.

**D.      Additional Procedures.**

After consultation with the Consultation Parties, the Debtors may announce at the Auction modifications or amendments to the procedural rules that are reasonable under the circumstances (e.g., the amount of time to make subsequent Overbids, whether a non-conforming Bid should nevertheless be deemed a Qualified Bid, etc.) for conducting the Auction so long as such rules are not inconsistent with these Bid Procedures.

**E.      Presence of Qualified Bidder.**

Each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative or agent.

**G.      Consent to Jurisdiction as Condition to Bidding.**

The Stalking Horse Financer, all Qualified Bidders, and all other Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Stalking Horse Agreement, the Auction or the construction and enforcement of any Competing Exit Facility Documents.

**H.      Closing the Auction.**

The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors and the Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction (the "Successful Bid" and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors, in consultation with their financial and legal advisors and the Consultation Parties, shall consider the Bid Assessment Criteria. The Auction shall be adjourned at the time that all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid and the Debtors and the Consultation Parties have determined a Successful Bid. The Auction shall not close until: (i) the Successful Bidder has submitted executed Exit Facility Documents memorializing the terms of the Successful Bid(s) to the Debtors; and (ii) the Debtors have executed the Exit Facility Documents within one (1) business day after adjournment of the Auction (but in any event prior to the commencement of the Confirmation Hearing). Within one (1) business day after the closing of the Auction (but in any event prior to the commencement of the Confirmation Hearing), the Debtors will file with the Court a notice of Successful Bidder and the Backup Bidder.

The Debtors shall not consider any Bids submitted after the closing of the Auction.

## V.
## Confirmation Hearing

The Debtors have a confirmation hearing on the Plan (the "Confirmation Hearing") scheduled for June 3, 2011, at which hearing the Debtors will seek approval of the Exit Facility with the Successful Bidder and the Backup Bidder. Objections to the entry into the Competing Exit Facility with the Successful Bidder or Backup Bidder must be filed and served so that they are actually received by the Debtors no later than 10:00 a.m. (prevailing Pacific time) on June 3, 2011 on the following: (i) counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles, CA 90067, Attn: Ira Kharasch (ikharasch@pszjlaw.com); (ii) investment bankers for the Debtors, Imperial Capital LLC, 2000 Avenue of the Stars, 9th Floor South, Los Angeles, CA 90067, Attn: Marc Bilbao (Mbilbao@imperialcapital.com); (iii) counsel for Deutsche Bank, as Indenture Trustee, Morgan Lewis & Bockius LLP, 300 South Grand Ave., 22nd Flr., Los Angeles, CA 90071, Attn: Richard Esterkin (resterkin@morganlewis.com); and (v) counsel for Fortress & Taberna Preferred Funding VII LLC, Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086, Attn: Gerard S. Catalanello (gcatalanello@duanemorris.com).

## VI.
## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders (other than Northlight, which is not required to submit a Good Faith Deposit) shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates except as explicitly set forth in these Bid Procedures or as otherwise ordered by the Court. The Good Faith Deposits of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Confirmation Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder as set forth in Section III.C above. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning Exit Facility, its Good Faith Deposit shall be credited towards the Breakup Fee.

# EXHIBIT B

EXIT FINANCING TERM SHEET



**SPECIALTY TRUST, INC.**
**CHAPTER 11 EXIT FINANCING TERM SHEET**

---

*This Term Sheet is solely an indication of general terms and is provided for discussion purposes only. This is not a commitment and it creates no binding obligation on either party hereto, as it has not been approved by Lender under its normal approval procedures. This summary does not define all of the terms and conditions of a proposed financing, and is subject to completion of legal due diligence, environmental due diligence and satisfactory documentation.*

*This Term Sheet is based upon our present understanding of the Borrower's capital requirements. As additional facts and circumstances become known to us, we may impose additional terms and conditions. In addition, this outline is subject to among other things, the absence of a material adverse change in the business, condition (financial or otherwise), operations, performance, properties and prospects of the Borrower..*

---

**Borrower:**  Specialty Trust, Inc. ( the "**Borrower**"),  a debtor and debtor in possession in a Chapter 11 case (the "**Bankruptcy Case**") filed in the Bankruptcy Court of the District of Nevada (the "**Bankruptcy Court**") is a mortgage finance company that acquired and held, in a tax-advantaged real estate investment trust or REIT structure, mortgage loans and mezzanine loans (together, the "**Portfolio**") secured by property located primarily in the States of Nevada, Arizona and California.

**The Portfolio:**  The Portfolio includes a mix of REO and real estate loans whose current carrying value is approximately $213 million, which include $122 million of real estate loans, $60 million of REO property and $31 million of unpledged assets, all as more fully described in Exhibit A of this Term Sheet.

**Lender:**  Northlight Real Estate Group LLC ("**Northlight**") or any of its affiliates and any other third party arranged by Northlight that agrees to participate in the Loan provided that shareholders of the Borrower shall have the option of participating in the Loan for a maximum amount equal to 49% of the Loan Amount (collectively, the "**Lender**"), the election to avail themselves of such option will be disclosed to Northlight no later than thirty (30) days prior to the scheduled close of the loan

**Loan:**  Two senior secured facilities (the "Loans") consisting of a $23.5MM loan commitment ("Tranch 1") and a $4.5MM loan commitment ("Tranche 2") in connection with the Plan of Reorganization as further detailed below (the "Loan Amounts") Provided, however, should the Deutsche Bank noteholders object to the proposed Exit Financing terms and conditions and elect to

retain their first priority lien against their collateral, the Loans will be consolidated to a single $27.0MM commitment as described as Option B on Exhibit D.

On the Closing Date, the Borrower will draw $23.3MM from the Loan Amount in order to pay for the initial capital requirements associated with the Plan of Reorganization. These expenses include the (i) repurchase US Bank's existing bank loan, in full satisfaction thereof, at a discounted amount of $16.5 million (the "**Existing Bank Debt**"); (ii) repay the DIP facility; (iii) pay professional expenses as it relates to the Bankruptcy Case; (iv) fund $300,000 into a litigation trust, and (v) establish an Operating Reserve with $2MM (the "Minimum Reserve Balance").

The Borrower may draw against the capital commitment every six months to reestablish the Minimum Reserve Account.

Should the Loans be completely drawn by the Borrower, the Lender, at its sole discretion may provide additional capital to the Borrower on the same terms and conditions provided in this term sheet.

**Operating Reserve:**    An Operating Reserve will be established by the Borrower in connection with the Plan of Reorganization. This Reserve will be responsible for the collection of all proceeds realized by the borrower in connection with the liquidation of the Portfolio. Additionally, the Operating Reserve will receive monies from capital draws made in connection with the Loans. The Operating Reserve will be used to (i) pay for operating expenses during the liquidation of the Portfolio, including the payment of Asset Management Fees and Servicing Fees (as hereinafter defined); (ii) pay for carrying costs associated with REO property in the Portfolio; (iii) pay for such other working capital needs of the Borrower as may be approved by the Lender from time to time; (iv) payment of Principal and Interest on the Loans; (v) pay for other costs and expenses associated with the closing transactions contemplated hereunder, including the payment of any origination fees and other fees due upon such closing; (vi) distribution of excess proceeds to participants in the estate.

The Operating Reserve will be pledged to Lender and subject to a Control Account Agreement in form and substance satisfactory to Lender.

The Minimum Reserve Balance maintain a minimum balance of $2MM, to be reestablished periodically from collections and sale of Collateral and capital calls made by the Borrower on the undrawn commitment of the Loans. At the sole discretion of the Lender, the Minimum Reserve Balance may be lowered as the portfolio is liquidated.

| | |
|---|---|
| **Closing Date:** | On or about June 15, 2011 (the "**Closing Date**"). |
| **Term:** | Four (4) years from the Closing Date, provided, however, that at the request of the Borrower, upon not less than 120 days prior written notice, the term may be extended for  up to  two additional one  (1) year renewal terms (the "**Final Maturity Date**") provided that at the time Borrower seeks to exercise each such extension (a) there are no Events of Default existing and (b) there is no outstanding accrued interest and (c) the principal balance has been reduced to a mutually agreed upon level based on a maximum loan amount. |
| **Recourse:** | The recourse obligations of the Borrower for the repayment of the Loans will be limited to environmental matters, intentional misrepresentation, misappropriation of funds (including proceeds paid under any insurance policies or condemnation proceedings, rents and security deposits), fraud, intentional waste, an unauthorized transfer, voluntary and involuntary bankruptcy and any other similar matters as may be required by Lender. |
| **Commitment Fee:** | A commitment fee equal to 2.0% of the total Loan Amounts (the "**Commitment Fee**") will be earned by Northlight and due and payable upon initial funding of the Loans. |
| **Extension Fee:** | An extension fee of 1.0% of the outstanding Loan Amounts (the "**Extension Fee**") will be due and payable to the Lender on or prior to the granting of each of the two one (1) year extensions. |
| **Interest:** | The Loans will bear interest equal to 18.0% per annum (the "**Interest Rate**") to be paid, in cash, monthly in arrears, on the last day of each month (each such date, an "**Interest Payment Date**"). For the first 18 months from the Closing Date, 12% of the interest accrued will be due and payable on a monthly basis. If there is insufficient cash in the Operating Reserve, the Borrower may request a capital call from the undrawn commitment amount from the Lender. After the first 18 months from the Closing Date, all interest will accrue if there is insufficient cash in Operating Reserve and the Loans have been completely drawn.<br><br>Interest will be calculated on an actual days elapsed and 360 day basis. |
| **Default Rate:** | 4.0% in excess of the rate of interest otherwise in effect. |
| **Amortization:** | None. The Loans will be interest only (subject to pay downs from  Mandatory  Repayments).  In  all  events  the  entire |

outstanding principal balance will become due and payable on the Final Maturity Date.

**Cash Waterfall:** All proceeds derived from the sale, disposition or use of the Collateral will be applied as follows:

First, to the payment of any costs and expenses due the Lender;

Second, to pay for working capital of the Borrower including, the payment of the Asset Management Fees and Servicing Fees (as hereinafter defined);

Third, to top up the Operating Reserve to the Minimum Reserve Balance

Fourth, to the payment of any interest due Lender and not previously paid out of cash flow or capital calls on the undrawn commitment;

Fifth, to the repayment of any then outstanding principal due the Lender;

Sixth, to distribute proceeds from litigation pursued by the litigation trust, if any, together with interest on the same accrued at the rate of 8%, beginning at the time of the Northlight loan repayment; which distributions will be made to parties in interest pursuant to the Plan of Reorganization ("POR");

Seventh, to the Lender through its participation in the Incentive Payment Plan as defined in Exhibit C, and

Eighth, to distribute remaining funds pursuant to the terms of the POR.

**Collateral:** Subject to a further determination based upon due diligence, the Loans will be secured by the following (the "**Loan Collateral**"):

Tranche 1: A perfected first lien security interest, and first mortgage security interest, as the case may be, in all assets, including, but not limited to, the proceeds of such assets, and the Operating Reserve, held by the Borrower and its subsidiaries and affiliated entities, but excluding those assets that are collateral for Tranche 2.

Tranche 2 (only applicable if Deutsche Bank noteholders vote in favor of plan / Exit Financing proposal): A perfected first lien security interest, and first mortgage security interest, as the case may be in, in those assets that are directly pledged to Deutsche Bank, or the assets of SAC II that are indirectly pledged to Deutsche Bank and a perfected second lien interest, and second mortgage security interest, as the case may be in all assets, including but not limited to, the proceeds of such assets, and the Operating Reserve, held as collateral by Tranche 1.

**Asset Management and Servicing Agreement:** The Borrower will enter into an Asset Management Agreement and Servicing Agreement (the "**Asset Management**

**Agreement**") with Northlight Asset Management LLC or an affiliate thereof (hererinafter sometimes referred to as either "**NAM**" or the "**Servicer**") to provide asset management services for the Portfolio on substantially the terms and condition set forth in Exhibit B annexed hereto.

| | |
|---|---|
| **Management and Servicing Fees:** | The Servicer will be paid the Asset Management Fees and Servicing Fees as contemplated and defined in Exhibit B and provided for in the Asset Management Agreement. |
| **Prepayment Penalty:** | Loans may not be prepaid, in whole or in part, except for mandatory prepayments, until the first anniversary of the closing date. |
| **Documentation:** | The loan documents evidencing the Loans, as contemplated hereunder, will include, inter alia, a Credit Agreement, Security Agreements, Pledge Agreements, and other ancillary loan documents incorporating the terms and conditions set forth in this Term Sheet and such other terms and conditions as the parties may otherwise agree upon and such other documents as are usual for facilities and transactions of this type and which will be acceptable to the Lender, the Borrower and their respective counsel. |
| **Insurance:** | Insurance coverage must be acceptable to the Lender. |
| **Additional Debt:** | No other Borrower debt permitted. |
| **Reporting:** | Annual audited financials from the Borrower. Other quarterly and monthly unaudited schedules will be required, to be determined during due diligence. |
| **Representations and Warranties:** | Usual and customary for facilities and transactions of this type. |
| **Covenants:** | Usual and customary for facilities and transactions of this type. |
| **Events of Default:** | Usual and customary for facilities and transactions of this type |
| **Assumption Rights:** | The Borrower's rights and obligations are non assignable or assumable. |
| **Incentive Payment:** | Incentive Payments will be granted to the Lender, as defined in Exhibit C |

**Conditions**

**Precedent:**

The obligation of the Lender to fund the Loans payable on the Closing Date or on any date subsequent thereto will be subject to customary conditions precedent, including without limitation, the following conditions precedent (**"Conditions Precedent"**):

  i. Evidence of Borrower's good standing and qualification to do business satisfactory to the Lender;

  ii. Approval and confirmation from the Bankruptcy Court of the Borrower's Plan of Reorganization and approval of the Loans in connection therewith;

  iii. Resolution of all related-party contracts and other potential conflicts of interests to the satisfaction of the Lender;

  iv. All Loan Documentation in form and substance satisfactory to Lender;

  v. The Lender will have been granted a perfected priority security interest in all the Loan Collateral in form and substance satisfactory to the Lender;

  vi. Representations, warranties, resolutions, opinions of counsel, certificates, certified corporate documents, good standing certificates, and other supporting documents as the Lender may reasonably require, including without limitation, information and opinions related to the ownership structure of the Borrower, all in form and substance acceptable to the Lender;

  vii. Borrower will have delivered to Lender evidence satisfactory to Lender and its counsel that any management fees payable to any third party manager during the term of the Loans will be subordinate to the interests of Lender;

  viii. Agreement with US Bank for the purchase or repayment of the Existing Bank Debt for a discounted amount satisfactory to the Lender;

  ix. Intercreditor Agreement and Standstill Agreement with Deutsche Bank, in form and content mutually acceptable to Lender and Northlight, and their respective counsel;

  x. An environmental report acceptable to Lender;

  xi. Satisfactory survey and title policy and customary due diligence by the Lender;

  xii. Satisfactory review of plans, specifications, soil reports, and engineering studies and satisfactory review of the Construction Budget and construction contract by construction consultant;

  xiii. Formal Credit Committee approval by the Lender;

  xiv. Evidence that insurance coverage in the amounts and of the types satisfactory to the Lender are in effect and for which premiums have been fully prepaid and naming the Lender, as loss payee;

xv. No material adverse change in the financial market, the business of the Borrower, the Portfolio or the Exit Loan Collateral, Repurchased Loan Collateral or the Sponsors shall have occurred;

xvi. Payment of all closing costs and fees and all unpaid expenses of the Lender for which the Lender has not previously received and the Expense Deposit; and

xvii. Execution of the Asset Management and Servicing Agreement containing substantially the terms and conditions set forth in Exhibit B annexed hereto and otherwise acceptable to the Lender.

**Brokerage:**

Borrower will indemnify, defend and hold the Lender and its officers, directors and members and their affiliates harmless from and against any losses in any way relating to or arising from any claim by any person or entity that such person or entity acted on behalf of the Borrower in connection with the Loan.

**Indemnification:**

The Borrower will indemnify Northlight, the Lender and their affiliates and hold each of them harmless from and against all costs, expenses (including reasonable fees and disbursements of counsel) and liabilities arising out of or relating to any litigation or other proceedings (regardless of whether such indemnified Person is a party thereto) which relate to the proposed transactions, including the financing contemplated hereby or any transactions connected therewith, provided that such indemnified Person will not be indemnified for its gross negligence or willful misconduct.

**Expenses,**
**Due Diligence Deposit**
**And Break Up Fee:**

Business and valuation due diligence has been completed by the Lender. As previously agreed to in the original Northlight Chapter 11 Exit Financing Term Sheet, submitted and approved by the court on {xxx, xx, xxxx} the Borrower agreed to pay up to a maximum of $75,000 of expenses associated with the Lender's valuation due diligence. As of the date of this letter, the Borrower has reimbursed the Lender $50,000 of the $75,000 commitment.

Upon acceptance of the terms of this Term Sheet, the Borrower will be obligated to reimburse the Lender for all legal due diligence and environmental due diligence up to $100,000.

Upon the completion of all due diligence, the parties shall submit a binding commitment letter, which will be submitted to the Bankruptcy Court for its approval as part of the Plan of Reorganization. Upon the approval by the Bankruptcy Court of

the Lender as the Stalking Horse, including a break-up fee in the amount of $1,500,000. The Borrower will be responsible for all of the Lender's expenses associated with the documentation and closing of the loans.

**Expiration Date:**    If not executed by Borrower and returned to Northlight by 5 PM EST on March 10, 2011, this Letter of Interest will terminate on such date, without further notice or act of any kind by Northlight or any other party.

**Miscellaneous:**    New York law to govern

Waiver of trial by jury

Consent to jurisdiction of state and federal courts located in the State of New York

**[Signatures on Following Page]**

Submitted by:

NORTHLIGHT REAL ESTATE GROUP LLC

By: _____
M. Benjamin Cody
Chief Investment Officer


Accepted by:

SPECIALTY TRUST, INC.

By _____

Name: _____

Title: _CRO_____

Date: _3/20/11_____

**EXHIBIT A**

**THE BORROWER PORTFOLIO**

To be provided by Borrower including outstanding principal balance, carrying value and assigned debt.

Tranche #1

Tranche #2

EXHIBIT B

ASSET MANAGEMENT AND SERVICING AGREEMENT

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Minimum Release Prices** | To Be Provided By Northlight |
| **Asset Management and Servicing** | NAM will be engaged as a traditional, third-party asset manager (the "**Asset Manager**") for the day-to-day activities and managing the assets to the plan created during the due diligence process. In addition, NAM will be responsible for Loan Servicing (the "Servicer") utilizing either NAM's internal servicing system or the Borrowers servicing system at NAM's election.   NAM will be responsible for reporting to the Board of Directors of Borrower ("BOD") and the Lender collection activities on a regular basis. |
| **BOD Roles and Responsibilities** | Borrower entity decisions, including, but not limited to, the sale of the Borrower, issuance of common stock by the Borrower, acquiring additional assets and incurring entity-level debt will be made by the BOD. |
| **Due Diligence** | Upon completing due diligence, NAM will prepare a special servicing business plan for each loan being serviced by NAM based on status, location, future funding requirements, and asset type.  For loans that are non-performing, the business plan will include:<br><br>1)   Resolution Strategy – Discounted Payout, Loan Restructuring, Foreclosure.<br>2)   Expected Proceeds from the Resolution.<br>3)   Expenses associated with the resolution including foreclosure, construction completion, asset management and disposition expenses. |
| **Reporting** | NAM will be responsible for providing monthly (unaudited), quarterly (unaudited) and annual (audited) reports to the BOD.  Reporting requirements, include, but is not limited to:<br><br>1)   Asset level reports – Status of each loan and how it compares favorably or unfavorably to the business plan.<br>2)   Portfolio level reports – Including a mark-to-market for both the portfolio and individual assets.<br>3)   Financial Statements for the Borrower |

| Loan Servicing Fees | At the election of the Borrower, NAM may either 1) utilize the existing systems of Specialty Finance, Inc. (the "Servicing System") to manage loan servicing of Borrowers or 2) continue use of a third-party servicing system.  If  access is to the Servicing System  is granted by the Borrower or if the system of an outside provider is used in the alternative, NAM will not charge a loan servicing fee.  If the Borrower denies NAM access to the Servicing System, or if the currently-used system of an outside provider is not used, NAM will charge Borrower  a servicing fee equal to 0.30% of the unpaid principal balance for loan servicing and data migration to NAM's internal systems (the "**Servicing Fee**") annually. REO properties or loans that are foreclosed and that no longer require loan servicing will not be charged a Servicing Fee. |
|---|---|
| Asset Management Fees | As Asset Manager, NAM will receive an individual asset management fee as defined in the chart below (the "**Asset Management Fee**" and together with the Servicing Fee, the "**Fees**") which is a priority payment as defined in the Waterfall.  It is anticipated that the year 1 Management Fee will be a maximum amount of approximately $980,000.  NAM will not collect an annual Asset Management Fee for assets that have been resolved, but in no circumstance will the annual Asset Management fee be less than $100,000 per annum<br><br>The Fees  that has been earned, but not paid (the "Accrued Fees"), by the Borrower will accrue at a rate of 18% annualized.  Accrued Fees will be subject to the terms and conditions of the Waterfall defined above.<br><br>Fees payable under the Asset Management and Servicing Agreement are a secured priority payment for the Borrower.<br><br>Allocation of the fees will be determined following legal due diligence. |
| Property Management | For income producing properties or development opportunities that are owned by the Borrower, NAM may elect to either engage a third-party property manager or manage the properties themselves.  Should NAM choose to manage the property themselves, it will  be entitled to charge a standard, arms-length property management fee approved by both the Lender and the BOD |
| Removal of NAM | Following the full repayment of the Loan, the BOD may elect to terminate the Asset Management and Servicing Agreement with NAM upon six (6) months prior  written notice. |
| Servicing Advances | Although the amount of the Loan to the Borrower should be enough to manage the assets, NAM will agree to provide Servicing Advances ("**Servicing Advances**").  Any Servicing Advances incurred by NAM will be repayable to the Servicer pari-passu with Accrued Fees earned by NAM.  Servicing Advances will accrue interest at  a rate of 16% annualized. |
| Right To Purchase Assets | In the ordinary course of managing the loan portfolio, NAM, or an affiliated entity, retains the right to purchase loans or REO assets from the Borrower.  Any asset acquired by NAM or an affiliated entity will require the prior   approval of the BOD, such not to be unreasonably withheld or delayed.  This right to purchase assets is neither a Right of First Refusal nor a Right of First Offer to purchase assets. |
| Right to | NAM, or an affiliated entity, retains the ability to purchase equity interests from |

| Purchase BORROWER Equity | Borrower shareholders seeking liquidity.  Any equity interest acquired by NAM or an affiliated entity will require the prior approval of the BOD, not to be unreasonably withheld or delayed. |
|---|---|
| Indemnification | The Borrower will indemnify NAM for all actions pertaining to asset management, with the exception of gross negligence and willful misconduct. |

Exhibit C

Incentive Payment Plan

As part of the Lender's commitment to the Loans, the Lender, at no additional cost, will receive a share of the net liquidation proceeds after the Loans are fully satisfied as set forth below:

| All splits below are expressed as (Northlight / Estate) | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5+ |
| Tranche #1 Collateral | Loan is not prepayable | 40/60 | 45/55 | 50/50 | 55/45 |
| Tranche #2 Collateral | Loan is not prepayable | 30/70 | 35/65 | 40/60 | 40/60 |

Exhibit D
Option B

Should the Deutsche Bank noteholders object to the proposed Exit Financing terms and conditions and retain their priority first lien against their collateral as described in Tranche #2 of the Loans, Northlight is willing to provide the exit financing under the same terms and conditions described in the above term sheet with the exception of the following changes:

- The Minimum Reserve Balance will be $1.75MM
- The Loan Commitment will be for $27MM versus the $28MM contemplated under the current term sheet
- The Lender will receive 90% of all net liquidation proceeds after the Loan is fully satisfied  versus the schedule provided in Exhibit C.

Should the Deutsche Bank Noteholders seek third-party asset management services, Northlight will provide a proposal to provide third party loan servicing and asset management services to the Tranche #2 collateral.

# EXHIBIT C

*DRAFT DATED 4/25/11*

EXIT FINANCING
TERM CREDIT AND SECURITY AGREEMENT

This Exit Financing Term Credit and Security Agreement (this "Agreement") is dated as of _____, 2011, and is among  Specialty Trust, Inc., a Maryland corporation ("Specialty") and Specialty Acquisition Corp. ("Acquisition"), a Delaware corporation, SAC II, a Nevada corporation ("SAC II") and SAC D-1, LLC, a Nevada limited liability company (collectively, the "Borrower") reorganized debtors in Chapter 11 bankruptcy cases jointly administered under case No. 10-51432-GWZ (collectively, the "Case") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court,") and Northlight Real Estate Opportunity Fund I, LP, a Delaware limited partnership ("Lender").

INTRODUCTORY STATEMENT

On April 20, 2010 (the "Petition Date"), Specialty filed a voluntary petition with the Bankruptcy Court initiating its Case and has continued in the possession of its assets and in the management of its business pursuant to Bankruptcy Code §§ 1107 and 1108.

On December 14, 2010, Lender loaned to Borrower, as debtors-in-possession, the sum of $3,500,000 (the "DIP Loan"), pursuant to the terms of that certain Debtor-in-Possession Term Credit and Security Agreement (the "DIP Loan Agreement").

In connection with the Case, Borrower has filed its Disclosure Statement with the Bankruptcy Court on April 25, 2011 (the "Disclosure Statement"), whereby Borrower has disclosed its intention to secure an exit financing loan from Lender in the aggregate amount of $28,000,000, comprised of a $23,500,000 Tranche A note ("Tranche A"), and a $4,500,000 Tranche B note ("Tranche B," and collectively with the Tranche A note, the "Loan"), which Loan may be modified to a single note in the amount of $27,000,000 in the event the Deutsche Bank (as defined below) noteholders elect to accept its current collateral package in partial satisfaction of its pre-petition loan to Borrower, all as approved pursuant to Borrower's Plan of Reorganization in the Case (the "Plan"), and this Agreement shall be modified to comport to the terms set forth on Exhibit D attached hereto.

The proceeds of the Loan will be used for the purposes set forth below in this Agreement, subject to the terms of this Agreement and the Plan.

To provide security for the repayment of the Loan and the payment of the other Obligations (as defined below) of the Borrower hereunder and under the other Loan Documents, Borrower shall provide to Lender, pursuant to this Agreement, all ancillary loan documents executed in connection with this Agreement and the Plan, the following (each as more fully described herein):

(a)      For *[the Tranche A and Tranche B portions of]* the Loan: A perfected first lien security interest, and first mortgage security interest, as the case may be, in all assets, including, but not limited to, the proceeds of such assets and any third-party borrower reserves established thereunder, proceeds from the Litigation Account (as defined below), and the Operating Reserve Account (as defined below), held by the Borrower and its subsidiaries and

affiliated entities*[, but excluding those assets that are collateral for the Tranche B portion of the Loan].*

*[(b) For the Tranche B portion of the Loan (assuming that the Deutsche Bank loan has not been repaid out of Borrower assets pursuant to the Confirmation Order): A perfected first lien security interest, and first mortgage security interest, as the case may be in, in those assets that are directly pledged to Deutsche Bank, or the assets of SAC II that are indirectly pledged to Deutsche Bank.]*

(c)    pursuant to the Confirmation Order, a first priority perfected Lien on, and security interest in, all present and after-acquired property of Borrower, subject to the exclusions set forth in Section 2 below).

Accordingly, the parties hereto hereby agree as follows:

SECTION 1

DEFINITIONS

1.1    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>6% Accrual</u>": the difference between the Interest Rate (as defined below) and the current Pay Rate (as defined below), applicable for the first eighteen (18) months of the term.

"<u>Accounts</u>":  all of the accounts, instruments, documents, chattel paper and general intangibles of Borrower, whether secured or unsecured, whether now existing or hereafter created or arising, and whether or not specifically assigned to the Lender, including, without limitation, all "accounts" as defined in Article 9 of the UCC.

"<u>Affiliate</u>":  as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

"<u>Anti-Terrorism Laws</u>" shall have the meaning as ascribed to such term in Section 3.7.

"<u>Asset Income</u>":  any income generated from any of the Collateral (as defined below) pledged as security for the Loan, including debt service payments from third party borrowers, rental income, forfeited reserves, insurance or casualty proceeds, condemnation proceeds and the like constituting Proceeds (as defined below) or otherwise, distributed to Borrower from Asset Manager from the "Operating Account" (as established and defined pursuant to the terms of the Asset Management and Servicing Agreement), and any Proceeds in

2

the Litigation Account, which is received by Borrower related to any Property (as defined below) or Collateral.

"Asset Management and Servicing Agreement": the Asset Management and Servicing Agreement, to be executed on the Closing Date, between Borrower and Northlight Asset Management II LLC, an Affiliate of Lender, to provide asset management services for the Collateral, as approved in the Plan and Confirmation Order.

"Asset Management Fees and Servicing Fees": the fees and expenses due and payable to Northlight Asset Management II LLC under the terms of the Asset Management and Servicing Agreement.

"Asset Manager": Northlight Asset Management II LLC, a Delaware limited liability company.

"Asset Sale": any sale, issuance, conveyance, transfer, lease or other disposition by any Borrower, in one or a series of related transactions, of any Property.

"Bankruptcy Code": The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 - 1330.

"Bankruptcy Court": see the meaning set forth in preamble to this Agreement.

"Borrower": has the meaning set forth in the preamble to this Agreement.

"Borrower Agreements": all agreements and contracts to which any Borrower is a party as of the date hereof, or to which any Borrower becomes a party after the date hereof, as each such agreement may be amended, supplemented or otherwise modified from time to time.

"Borrowing": the making of the Loan (as defined below) on a Closing Date.

"Budget": is defined in Section 2.1.

"Business Day": any day other than a Saturday, Sunday or other day on which banks in the State of New York are required or permitted to close.

"Case": has the meaning set forth in the preamble to this Agreement.

"Cash Equivalents": (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within six (6) months from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies ("S&P"), or Moody's Investors Service, Inc. ("Moody's"); (c) commercial paper maturing no more than six months from the date of creation thereof and, at the time of acquisition, having a rating of A-2 or P-2 or better from either S&P or

3

Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any commercial bank organized under the Laws of the United States of America or any state thereof or the District of Columbia having combined capital and surplus of not less than $500,000,000 (any such commercial bank, an "Acceptable Bank"); (e) eurodollar time deposits having a maturity of less than six months purchased directly from any Acceptable Bank or any commercial bank having (or the parent of which has) a rating of A-1 or P-1 or better from either S&P or Moody's; (f) reverse repurchase agreements having a term of thirty days or less with any Acceptable Bank or any commercial bank having a rating of A-1 or P-1 or better from either S&P or Moody's relating to marketable direct obligations issued or unconditionally guaranteed by the United States but only if the securities collateralizing such reverse repurchase agreements are delivered to the Borrower or its custodian; (g) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (h) securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (d) of this definition; and (i) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (h) above.

"Chattel Paper": all "chattel paper" as defined in Article 9 of the UCC, including, without limitation, "electronic chattel paper" or "tangible chattel paper", as each term is defined in Article 9 of the UCC.

"Closing Date": the date on which the conditions precedent to the making of the Loan set forth in Section 4.1 have been satisfied or waived.

"Collateral": the meaning set forth in Section 2.7(b).

"Collateral Records": all books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"Collateral Support": all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Confirmation Order": an order of the Bankruptcy Court confirming the Plan in the Case.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of the Property owned or leased by it is bound.

4

"Default": any of the events specified in Section 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Default Interest Rate": four percent (4%) over the Interest Rate.

"Deutsche Bank": Deutsche Bank National Trust Company, solely in its capacity as indenture trustee pursuant to that Second Amended and Restated Indenture dated as of March 1, 2009 related to Specialty Trust, Inc. Secured Investment Notes.

"DACA": an acceptable Deposit Account Control Agreement with the depositary bank holding the Operating Reserve Account, in favor of Lender.

"DIP Loan": has the meaning set forth in the preamble to this Agreement.

"DIP Loan Agreement": has the meaning set forth in the preamble to this Agreement.

"Disclosure Statement": has the meaning set forth in the preamble to this Agreement.

"Distribution Participation Payments": See Section 2.10 below.

"Documents": all "documents" as defined in Article 9 of the UCC.

"Dollars" and "$": Lawful money of the United States of America.

"Environmental Laws": means any and all Laws relating to (a) the protection of the environment, (b) emissions, discharges, or releases of pollutants, contaminants, chemicals, or hazardous or toxic substances or wastes into the environment including ambient air, surface water, ground water, or land, or (c) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes or the clean-up or other remediation thereof.

"Event of Default": the meaning set forth in Section 7.

"Excluded Claims": any and all commercial tort claims.

"Exit Financing": consummation of exit financing of Borrower pursuant to its Plan of Reorganization.

"GAAP": generally accepted accounting principles in the United States of America as consistently applied.

"Governmental Authority": any Federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality or any court, in each case whether of the United States or a foreign country.

"Indebtedness": at any time and with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for

the deferred purchase price of property or services (other than property, including inventory, and services purchased, and trade payables, other expense accruals and deferred compensation items arising, in the ordinary course of business, including negotiated trade terms and Chapter 11 expense accruals), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business), (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all capital lease obligations of such Person, (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, (g) all obligations of such Person in respect of Indebtedness of others referred to in clauses (a) through (f) above arising under any guaranty of such indebtedness, and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Insurance": shall mean insurance policies covering Collateral (regardless of whether the Lender is the loss payee thereof).

"Intellectual Property": has the meaning set forth in Section 3.5.

"Interest Payment Date": (a) the twentieth (20th) day of each calendar month, and (b) the date of any repayment or prepayment made in respect thereof.

"Interest Rate": an interest rate of eighteen percent (18%) per annum.

"Law": means any statute, Law, regulation, ordinance, rule, treaty, judgment, order, decree, permit, concession, franchise, license, agreement or other governmental restriction of the United States or any state or political subdivision thereof. Any reference to a Law includes any amendment or modification to such Law, and all regulations, rulings, and other Laws promulgated under such Law.

"Lender": has the meaning set forth in the preamble to this Agreement.

"Lien": with respect to any Property, any mortgage, lien (statutory or other), pledge, charge, hypothecation, assignment, deposit arrangement, security interest, encumbrance or other security agreement or preferential arrangement of any kind or nature in respect of such Property.

"Litigation Account": is described in the Plan and the Confirmation Order, and shall be comprised of proceeds from any suit against certain present or former officers, directors, agents and/or representatives of Borrower, utilizing the $300,000 funding described in Section 2.1 below; the Litigation Account shall be subject to the Lien of Lender, and shall be subject to distribution as described in the Cash Waterfall provisions of Section 2.9 below.

"Loan": has the meaning set forth in the preamble to this Agreement.

6

"Loan Amount": means $28,000,000, plus the 6% Accrual, as and if applicable.

"Loan Documents": this Agreement, the Note(s) and any other instrument or agreement executed and delivered in connection herewith.

"Material Adverse Effect": a material adverse effect on (a) the Property, business, operations and/or financial condition of Borrower taken as a whole other than such effects as result solely (i) from the commencement of the Case and the performance and satisfaction of the Borrower's obligations and duties under the Plan and the Loan Documents or (ii) from the existence of pre-petition claims or pre-petition defaults arising from or related to any pre-petition contracts, (b) the validity or enforceability of the Order or any of the Loan Documents, (c) the rights and remedies of Lender under the Order and the Loan Documents, (d) timely payment of the principal of or interest on the Loan or other amounts payable in connection therewith, or (e) the validity, perfection or priority of a Lien in favor of the Lender on any of the Collateral.

"Maturity Date": _____, 2015 [4 years from Closing Date], provided, however, at Borrower's option, the Maturity Date may be extended for two (2) additional periods of twelve (12) months each (each, an "Extension Term"), upon one hundred twenty (120) days advance written notice to Lender, provided (i) no Event of Default exists either at the time of such extension notice or as of the commencement of such Extension Term, (ii) the 6% Accrual (or any other interest accrual) has been brought current, (iii) the principal amount of the Loan has been reduced to (x) $8,000,000 and a 45% loan-to-value ratio for the first such extension, and (y) $4,000,000 and a 35% loan-to-value ratio for the second such extension (or such other acceptable balance/ratio as determined by Lender in the exercise of its sole judgment at the time), based upon Asset Sales and the maximum loan amounts and values described in Section 2.11 below, and (iv) Borrower pays to Lender a one percent (1%) extension fee on the then outstanding Loan balance for each such extension.

"Minimum Reserve Balance": shall mean, as to the Operating Reserve Account, $2,000,000, or such lesser amount as determined by Lender in the exercise of its sole judgment as Asset Sales occur, as the same shall be re-established from time to time.

"Money": shall mean "money" as defined in the UCC.

"Net Cash Proceeds": in connection with any Asset Sale, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale net of (a) any amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale (including, without limitation, any Lien pursuant hereto, and/or any release price specified therefore), (b) any bona fide direct, actual and reasonable costs incurred by Borrower or its employees or agents in connection with such Asset Sale, together with any fees and costs otherwise due and payable under the Loan Documents (including Asset Management Fees and Servicing Fees), and (c) any amounts earmarked under the Plan in connection with such Asset Sale, **plus** any Asset Income.

7

"Note" or "Notes": has the meaning set forth in Section 2.2.

"Obligations": (a) the principal of and interest on the Loan and (b) all other present and future, fixed or contingent, obligations and liabilities (monetary or otherwise) of the Borrower to Lender under the Loan Documents, including, without limitation, all costs and expenses payable under this Agreement.

"OFAC": shall have the meaning as ascribed to such term in Section 3.7.

"Operating Reserve Account": an account to be established in connection with the Plan and the Loan and into which (a) all Net Cash Proceeds, *[and]* (b) capital call proceeds, *[(c) certain proceeds from the funding of Tranche A, and (c) draws as permitted by the terms of this Agreement from Tranche B, will be deposited]*, which shall be pledged to Lender pursuant to Section 2.7 below. The Operating Reserve will be used to (i) pay for operating expenses during the liquidation of the Assets, including the payment of Asset Management Fees and Servicing Fees; (ii) pay for carrying costs associated with REO Properties; (iii) pay for such other working capital needs of the Borrower as may be approved by the Lender from time to time; (iv) payment of principal and interest on the Loan; (v) pay for other costs and expenses associated with the closing the transactions contemplated hereunder, including the payment of any origination fees and other fees due upon such closing; (vi) distribution of excess proceeds to participants in the estate.

"Pay Rate": a current pay rate of twelve percent (12%) per annum, which shall be the effective pay rate of interest for the first eighteen (18) months of the term, with the balance forming the 6% Accrual to be added to the Loan Amount.

"Plan": has the meaning set forth in the preamble to this Agreement.

"Permitted Liens" or "Permitted Encumbrances": means and refers to those Liens which are permitted to exist pursuant to Section 3.3 below.

"Person": any natural person, corporation, division of a corporation, partnership, trust, joint venture, association, company, estate, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date": has the meaning set forth in the Introductory Statement hereto.

"Proceeds": (i) all "proceeds" as defined in Article 9 of the UCC, and (ii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Property": any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"REO Property": shall mean any property owned by any Borrower as a result of any foreclosure, forfeiture, deed in lieu thereof, or any other enforcement action by such Borrower.

8

"<u>Requirements of Law</u>": as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any Law, treaty, rule or regulation or determination of an arbitration or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"<u>Responsible Officer</u>": as to any Person, the president, the chief executive officer, the chief restructuring officer, the chief financial officer, the treasurer, the secretary, the assistant secretary or any officer at the level of vice president or higher but with respect to financial matters, the chief financial officer, treasurer or comptroller.

"<u>Section 365</u>": the meaning set forth in Section 3.5.

"<u>Subsidiary</u>": with respect to any Person (herein referred to as the "parent"), any corporation, association or other business entity (whether now existing or hereafter organized) of which at least a majority of the securities or other ownership interests having ordinary voting power for the election of directors is, at the time as of which any determination is being made, owned or controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

*["<u>Tranche A</u>":  has the meaning set forth in the preamble to this Agreement.*

*"<u>Tranche B</u>":  has the meaning set forth in the preamble to this Agreement.]*

"<u>UCC</u>" shall mean the Uniform Commercial Code, as in effect from time to time in the State of Maryland, Delaware or Nevada, as applicable; provided, however, that if, by reason of mandatory provisions of law, the attachment, perfection or priority of any security interest granted herein is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Maryland, Delaware or Nevada, as applicable, then, as to the attachment, perfection or priority of such security interest, "UCC" shall mean the Uniform Commercial Code in effect from time to time in such other jurisdiction.

"<u>USB</u>" and "<u>USB Loan Facility</u>":  U.S. Bank National Association ("<u>USB</u>"), as administrative agent in connection with the loan facility(ies) provided for in that certain Second Amended and Restated Credit Agreement, dated as of February 1, 2010, among, on the one hand, the agent and certain lenders thereto (the "<u>USB Loan Facility</u>").

1.2     <u>Terms Generally</u>.  The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections and subsections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

1.3    Accounting Terms.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time.

1.4    Computation of Time.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

SECTION 2

AMOUNT AND TERMS OF LOAN

2.1    Loan.  Subject to the provisions hereof, including satisfaction of all conditions precedent set forth in Section 4.1, Lender agrees, on the terms and conditions hereinafter set forth, to make the Loan to the Borrower on the Closing Date.  On the Closing Date, all of *[Tranche A] [the Loan]* will be funded and disbursed as follows:  (i) to fund the Operating Reserve Account in a minimum amount of $2,000,000, (ii) to pay for working capital needs of Borrower as expressly set forth in the budget approved by Lender and pursuant to the Plan or as may be modified and so approved by Lender in writing from time to time ("Budget"), (iii) to pay for costs and expenses incurred in closing the Loan, including any due diligence costs and expenses of Lender related to the Exit Financing, (iv) to retire the DIP Loan pursuant to sums due and owing under the DIP Loan Agreement (including any exit/deferred structuring fees thereunder), (v) to retire the USB Loan Facility in the amount of $16,500,000 (i.e., at a discount, as detailed in the Disclosure Statement and the Plan), (vi) to pay certain professional expenses relating to the Case as approved by Lender and detailed in the Plan (with any remaining balance being deferred and paid pursuant to the Cash Waterfall provisions of Section 2.9), and (vii) $300,000 to fund litigation expenses for the Litigation Account.

2.2    Repayment of Loan; Evidence of Debt.  Each Borrower hereby, unconditionally promises to pay the then unpaid principal amount of the Loan on the Maturity Date.  Each Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loan from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.3.

Borrower will execute and deliver to Lender a promissory note for each of Tranche A and Tranche B, dated as of the Closing Date evidencing the Exit Loan, substantially in the form of Exhibit A attached hereto with appropriate insertions as to date and principal amount (the "Note" or "Notes").

2.3    Interest Rate and Payment Dates.

(a)    The Loan shall bear interest for each day outstanding at the Interest Rate; provided, however, that interest for the first eighteen (18) months of the Loan term shall be due and payable at the Pay Rate, and the 6% Accrual shall be added to the Loan Amount and compound at the Interest Rate on a monthly basis.

10

(b)     If all or a portion of (i) any principal of the Loan, (ii) any interest payable thereon, or (iii) any other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), the principal of the Loan and any such overdue interest or other amount shall bear interest at the Default Interest Rate, in each case from the date of such non-payment until such overdue principal, interest or other amount is paid in full (as well after as before judgment).

(c)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (b) of this subsection shall be payable from time to time on demand, and the 6% Accrual may be accrued as contemplated hereby.

(d)     The Loan shall be interest only, with no principal amortization other than the application of Net Cash Proceeds from Asset Sales and Asset Income to the then-existing principal balance as described in Section 2.11 below, with a balloon payment equal to the Loan Amount, plus accrued Interest, the 6% Accrual and expenses, due in one lump sum on the Maturity Date.

(e)     Borrower may borrow from the Tranche B portion of the Loan to fund interest payments and, on six (6)-month intervals, draw sums to ensure the Operating Reserve Account is funded to the required minimum $2,000,000 level.

(f)     After the first 18 months from the Closing Date and if the Tranche B portion of the Loan has been fully drawn, to the extent there is insufficient sums in the Operating Reserve Account to pay monthly debt service at the Pay Rate or Interest Rate, as then-applicable, all interest shall accrue and be added to the Loan Amount, to be repaid out of the Cash Waterfall provisions contained in Section 2.9 below.

2.4     Computation of Interest.  Interest shall be calculated on the basis of the actual number of days in a year for the actual days elapsed, based upon a 360 day year.

2.5     Optional Prepayment.  From and after the twelve (12)-month anniversary of the Closing Date, Borrower may at any time, without premium or penalty, prepay the Loan in whole or in part.  Accrued interest (including the 6% Accrual) on any principal amount prepaid shall be due on the prepayment date.  Once repaid, no portion of the Loan may be re-borrowed.  Such repayment shall in no way diminish Borrower's obligations to pay Lender Distribution Participation Payments as described in Section 2.10 below.

2.6     Taxes.  All payments made by Borrower under this Agreement and the Note(s) shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any Note).

11

2.7    <u>Priority and Liens</u>.

(a)    Borrower hereby covenants, represents and warrants that, upon entry of Confirmation Order, the Obligations of the Borrower hereunder and under the other Loan Documents and the Order, (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, as to Tranche A, shall be secured by a perfected first priority Lien on and security interest in all of Borrower's Collateral, excluding the Collateral serving as collateral for Deutsche Bank, which shall solely secure Tranche B, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, as to Tranche B, shall be secured by a perfected first priority Lien on and security interest in all of Borrower's Collateral serving as collateral for Deutsche Bank.

(b)    In furtherance of Section 2.7(a) above, to secure the Borrower's Obligations, the Borrower hereby grants to Lender a security interest and continuing perfected first Lien (or second Lien, as applicable) on all of the Borrower's right, title and interest in, to and under the following, and only the following (all of which being herein collectively referred to as the "<u>Collateral</u>"):

(i)    the secured loans of Specialty described in <u>Exhibit "B"</u> attached hereto and incorporated herein by this reference, including, without limitation, all Collateral Support therefor (collectively, the "<u>Third Party Loans Receivable</u>");

(ii)    the real property described in <u>Exhibit "B"</u> attached hereto and incorporated herein by this reference (collectively, the "<u>Owned Real Property</u>");

(iii)    Insurance to the extent applicable to the Owned Real Property;

(iv)    to the extent not otherwise included above, all Collateral Records relating to any of the foregoing;

(v)    the Operating Reserve Account (and attendant DACA); and

(vi)    to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

For avoidance of doubt, such <u>Exhibit "B"</u> specifies the relative lien position of Lender being granted in each element of the Collateral.

(c)    Borrower acknowledges that it shall enter into separate security agreements, pledge agreements, and/or mortgages, deeds of trust or other security instruments with respect to such Collateral at the request of and on terms reasonably satisfactory to Lender.

2.8    <u>Structuring Fee</u>.    A structuring fee equal to two percent (2%) of the Loan Amount shall be due and payable on the Closing Date (collectively, the "<u>Structuring Fee</u>").

2.9    <u>Cash Waterfall</u>.    All Net Cash Proceeds from the Collateral will be applied as follows:

First, to the payment of any costs and expenses due the Lender;

Second, to pay for working capital of Borrower including, the payment of the Asset Management Fees and Servicing Fees;

Third, to ensure the Minimum Reserve Balance is maintained in the Operating Reserve Account;

Fourth, to the payment of any interest due Lender (at the Pay Rate, Interest Rate or on the 6% Accrual, as applicable) and not previously paid out of Net Cash Proceeds *[or capital calls under Tranche B of the Loan]*;

Fifth, to the extent of proceeds in excess of the corresponding release price, if any, to any remaining professional fees not paid at Closing pursuant to Section 2.1 (vi);

Sixth, to the repayment of any then-outstanding principal due the Lender;

Seventh, to distribute proceeds from litigation pursued by the Litigation Account, if any, together with interest on the same accrued at the rate of eight percent (8%), beginning at the time of full repayment of the Loan, which distributions will be made to parties in interest pursuant to the Plan;

Eighth, to the Lender through its participation in the Distribution Participation as described in Section 2.10 below; and

Ninth, to distribute remaining funds pursuant to the terms of the Plan.

2.10    Distribution Participation Payments. Subject to the cash flow waterfall provisions of Section 2.9, upon repayment of the Loan in full, Lender shall be entitled to received specified distribution participation payments of Net Cash Proceeds, as more particularly detailed as follows ("Distribution Participation Payments"):

| All splits below are expressed as (Lender/Borrower), commencing on the Closing Date | | | | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5+ |
| Tranche A Collateral | Loan is not prepayable | 40/60 | 45/55 | 50/50 | 55/45 |
| Tranche B Collateral | Loan is not prepayable | 30/70 | 35/65 | 40/60 | 40/60 |

Distribution Participation Payments shall continue until the Collateral is disposed of in full.

2.11    Release Prices and Procedures. It is the intent of the parties hereto that Loan principal payments/amortization after the first year's anniversary of the Closing Date will come from Asset Sales and Asset Income.

(a)    Within forty-five (45) days of the Closing Date, the new Board of Directors will choose one of the following options to govern the establishment of release prices

13

to permit Asset Sales by delivery of written notice to Lender (absent delivery of such notice, Option 1 will be deemed to apply):

> 1.    Asset Manager will have the ability to control the sale decision as long as the price received from each Asset Sale is greater than or equal to the release price further described below.  If Asset Manager has not assigned a release price for a specific Asset, the new Board of Directors will control the sale decision.

OR

> 2.    The new Board of Directors may control the sale decision as long as the following Asset Sales hurdles are acheived as of each anniversary of the Closing Date:

Loan Amortization on a per year basis
- End of Year 1 - $0MM
- End of Year 2 - $4,000,000 in Net Cash Proceeds to reduce the Loan Amount
- End of Year 3 - $6,000,000 in Net Cash Proceeds to reduce the Loan Amount
- End of Year 4 - $10,000,000 in Net Cash Proceeds to reduce the Loan Amount
- End of Extension 1 - $4,000,000 in additional Net Cash Proceeds to reduce the Loan Amount
- End of Extension 2 - Balance of Loan

> (b)    No Asset Sales can occur below the release prices described in Section 2.11(e).

> (c)    If working under Option 2, on the Second (2nd) anniversary of the Closing Date, Lender will have the right to appraise the portfolio to test the following loan-to-value requirements.  The appraisal group will be mutually agreed upon by Asset Manager, Lender and the Board of Directors, and shall be based upon an orderly liquidation of Assets analysis.  If the loan-to-value requirements below are not satisfied on the anniversary dates indicated, the decision regarding Asset Sales release prices shall revert to Asset Manager if Option 2 above has been elected.

Loan-to-value ratio of then-remaining Collateral to Loan Amount:
- End of Year 1 – No Requirement
- End of Year 2 – 65%
- End of Year 3 – 55%
- End of Year 4 – 45% -- the extension options are predicated upon meeting this hurdle
- End of Extension 1- 35% -- the last extension option is predicated upon meeting this hurdle
- End of Extension 2 – Balance is due

> (d)    If working under Option 2, to the extent either the required amortization or the loan-to-value tests are not satisfied in the timeframes required, for purposes of this Section 2.11 only, Asset Manager will have the ability to then control the Asset Sales until the

14

amortization and the loan-to-value ratio are in compliance without regard to specified release prices. After the Borrower is back in compliance, the Board of Directors will regain control of the asset sale decision, if option 2 has been elected.

       (e)    If working under Option 2, for the Board of Directors to maintain such control, interest due Lender (at the Pay Rate or Interest Rate, as then-applicable), must be kept on a current-pay basis, and may not be funded out of the Operating Reserve Account.

       (f)    For purposes of this Section 2.11, the following release prices shall govern and control, absent a failure of the amortization and/or loan-to-value requirements:

| Property | Release Price |
|---|---|
| 2522 Properties | REDACTED |
| Central Buchanan | |
| CIC&S | |
| Consolidated Phase 4 | |
| Coolidge 140 | |
| Coolidge 70 | |
| Cotton Lane | |
| Denver I25 | |
| Duck Creek | |
| Ecco Holdings | |
| Esperanza | |
| Joshua Tree | |
| Marina Village | |
| Mohave Vista | |
| PV Land Investments | |
| Sierra Vista | |
| Symphony | |
| William Long | |
| WHM Paloma | |
| 1st & Buchanan | |
| 5th & Lincoln | |
| 7th & Buchanan | |
| Conklin | |
| Desert Land | |
| Desert Quail | |
| Desert Oasis | |
| Johnson Steve | |
| Nadador | |
| Prime West Jordanelle | |
| Quarterhorse Trust | |
| S&T Ranch | |
| Sedona | |

| Vero Desert Lakes | |
|---|---|
| Waterfront | |
| | |

      (g)    By mutual written agreement of the parties, the Release Prices above may be suspended or modified based upon then-applicable market conditions.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES

      In order to induce Lender to make Loan hereunder, each Borrower represents and warrants to Lender as follows:

      3.1    <u>Organization and Authority</u>.  Each Borrower (a) is duly organized and validly existing under the laws of the jurisdiction of its incorporation/formation; (b) is foreign qualified to transaction business in each jurisdiction in which it currently conducts business outside of its state of incorporation/formation, and is in good standing in such foreign jurisdictions, (c) has the requisite corporate limited liability company power and authority to effect the transactions contemplated hereby and by the other Loan Documents, and (d) has all requisite corporate/limited liability company power and authority and the legal right to own, pledge, mortgage and operate its Properties, to lease the Properties it operates as lessee and to conduct its business as now or currently proposed to be conducted;  <u>provided</u>, that the Borrower makes no representation or warranty relating to whether any licenses, franchises, authorizations or permits granted to it by a Governmental Authority under applicable non-bankruptcy Law can be encumbered by a Lien pursuant Bankruptcy Code § 364 without also obtaining approval of such Lien from the relevant public utilities commission or other applicable Governmental Authority.

      3.2    <u>Due Execution; Binding Obligation</u>.  The execution, delivery and performance by each Borrower of each of the Loan Documents to which it is a party, and the entry of the Plan/Confirmation Order (i) are within the corporate/limited liability company power of each Borrower, have been duly authorized by all necessary corporate/limited liability company action, including the consent of shareholders/members where required, and do not (A) contravene the charter or by-laws/operating agreement of such Borrower (B) violate any Law or any order or decree of any Governmental Authority, in each case, which could reasonably be expected to have a Material Adverse Effect, (C) conflict with or result in a breach of, or constitute a default under, any material indenture, mortgage or deed of trust, any material provision of any security issued by such Borrower or any material lease, agreement, instrument or other undertaking binding on such Borrower or any of its Properties, or (D) result in or require the creation or imposition of any Lien upon any of the Property of such Borrower other than the Liens granted pursuant to this Agreement, the other Loan Documents or the Confirmation Order; and (ii) do not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority (other than the entry of the Confirmation Order).  This Agreement is, and each of the other Loan Documents to which each Borrower is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of such

16

Borrower enforceable against the Borrower in accordance with its terms and the Confirmation Order. Notwithstanding any of the foregoing, Borrower makes no representation or warranty relating to whether any licenses, franchises, authorizations or permits granted to it by a Governmental Authority under applicable non-bankruptcy Law can be encumbered by a Lien pursuant Bankruptcy Code § 364 without also obtaining approval of such Lien from the relevant public utilities commission or other applicable Governmental Authority.

3.3    Title to Assets; Liens. There are no Liens of any nature whatsoever on any Collateral other than: (i) Liens granted pursuant to the Confirmation Order and this Agreement; and (iii) other Permitted Liens. Schedule 3.3 hereto is a complete and correct list, as of the date of this Agreement, of each Lien (and the Collateral covered by each such Lien) securing Indebtedness of any Person and covering any Collateral ("Permitted Liens" or "Permitted Encumbrances").

3.4    The Confirmation Order. As of the Closing Date, the Confirmation Order has been entered and has not been stayed, amended, vacated, reversed, rescinded, appealed or otherwise modified in any respect.

3.5    Intellectual Property. Except as set forth in Schedule 3.5, Borrower owns, or, subject to Bankruptcy Code §365(c)(1)(B) (hereinafter, "Section 365") is licensed to use, all trademarks, tradenames, copyrights, technology, know-how and processes (the "Intellectual Property") which are necessary for the conduct of its business as currently conducted except for those the failure to own or license which could not be reasonably expected to have a Material Adverse Effect. No claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does Borrower know of any valid basis for any such claim, and the use of such Intellectual Property by Borrower does, subject to Section 365, not infringe on the rights of any Person.

3.6    Depositary, Custodial and Brokerage Accounts. Schedule 3.6 sets forth a true and complete list of all bank accounts, custodial accounts and brokerage accounts maintained by Borrower as of the date hereof.

3.7    Anti-Terrorism Law.

(a)    Neither Borrower nor, to the knowledge of Borrower, any of its Affiliates is in violation of any Requirement of Law relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

(b)    Borrower is not and, to the knowledge of Borrower, no Affiliate or broker or other agent of Borrower acting or benefiting in any capacity in connection with the Loan is any of the following:

(i)    a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

17

(ii)    a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)    a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("OFAC") at its official website or any replacement website or other replacement official publication of such list.

(c)    Neither Borrower nor, to the knowledge of Borrower, any broker or other agent of Borrower acting in any capacity in connection with the Loan (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in Section 3.7(b), (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.8    Litigation.  Except as disclosed on Schedule 3.8 (setting forth the names of the other parties thereto, a brief description of such litigation, whether or not such litigation is covered by insurance and, if so, whether the defense thereof and liability therefor has been accepted by the applicable insurance company indicating whether such acceptance of such defenses with or without a reservation of rights, the commencement date of such litigation and the amount sought to be recovered by the adverse parties thereto or the amount which is otherwise in controversy), to the best knowledge of Borrower, there is no action, suit, proceeding, inquiry, hearing or investigation pending or threatened, in any court of law or in equity, or before any Governmental Authority, which could reasonably be expected to (a) result in any Material Adverse Change in the business operations of Borrower, or (b) result in any Material Adverse Effect.  To the best knowledge of Borrower, Borrower is not in violation of or default with respect to any order, writ, injunction, decree or demand of any such court or Governmental Authority where such default could reasonably be expected to result in a Material Adverse Change.

## SECTION 4

## CONDITIONS PRECEDENT

4.1    Conditions to Borrowing  The obligations of Lender to make the Loan are subject to the satisfaction, immediately prior to or currently with the making of such Loan of the

18

following conditions precedent, unless Lender has previously waived any such condition precedent in writing:

(a)    Loan Documents. (i) Lender shall have received this Agreement, executed and delivered by a duly authorized officer of Borrower; (ii) Lender shall have received the Note conforming to the requirements hereof and executed by a Responsible Officer of Borrower; and (iii) Lender shall have received such other documents, including security agreements, pledge agreements and other relative collateral documents, that are customary in such transactions, in form and substance satisfactory to Lender.

(b)    Corporate Documents and Proceedings. Lender shall have received from Borrower a certificate of the Secretary or an Assistant Secretary or a duly authorized officer of Borrower dated the Closing Date, in form and content substantially similar to Exhibit C attached hereto.

(c)    Confirmation Order. Before the Closing Date, Lender shall have received a copy of the Confirmation Order approving the Loan Documents and granting the Liens described in Section 2.7 and finding that Lender is extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code, which Confirmation Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to Lender, (iii) shall be in full force and effect and (iv) shall not have been stayed, reversed, vacated, rescinded, modified, appealed or amended in any respect.

(d)    Payment of Expenses. All expenses of Lender for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel and other advisors to Lender on or before the Closing Date) shall be deducted from the funding of the Loan.

(e)    No Injunction. No Law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the judgment of Lender would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loans.

(f)    Payment of Structuring Fee. The Structuring Fee shall be deducted from the funding of the Loan and shall be deemed fully-earned by the Lender and nonrefundable upon payment.

(g)    Additional Matters. All corporate/limited liability company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement and the other Loan Documents shall be reasonably satisfactory in form and substance to Lender, and Lender shall have received such other documents and legal opinions in respect of any aspect or consequence of the transactions contemplated hereby or thereby as it shall reasonably request.

(h)    Collateral Security. Security documentation duly executed by Borrower or other applicable party thereto, consisting of the following:

19

(1)     A mortgage/deed of trust with respect to each REO Property;

(2)     A blanket security agreement from each Borrower;

(3)     Financing Statements;

(4)     Any applicable DACA;

(5)     ALTA mortgage title insurance policies or unconditional commitments therefore, with endorsements and exceptions reasonably requested by Lender, issued by one or more title companies reasonably satisfactory to Lender with respect to each mortgaged REO Property (each, a "Title Policy" and collectively the "Title Policies"), which Title Policies shall be obtained and paid for by Borrower, in amounts not less than the appraised value of each pledged REO Property, together with a title report issued by a title company with respect thereto, dated not more than thirty (30) days prior to the Closing Date and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to Lender;

(6)     Evidence satisfactory to Lender that Borrower has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes payable in connection with recording the mortgages/deeds of trust on the REO Property in the appropriate real estate records; and

(7)     Note endorsements/allonges, assignments of loan documents and such other documentation reasonably required by Lender to evidence the pledge to Lender of the existing Borrower-owned loans serving as Collateral for the Loan.

(i)     *[Intercreditor and Standstill Agreement with Deutsche Bank, in form and content acceptable to Lender;]*

(j)     Evidence that insurance coverage in amounts and of the types set forth in Schedule 4.1(j) are in effect and for which premiums have been fully prepaid and naming Lender as loss payee.

(k)     Asset Management and Servicing Agreement. Enter into the Asset Management and Servicing Agreement with Asset Manager. In connection therewith, Borrower has transferred to Asset Manager all loan documentation, closing binders, servicing records, payment histories, invoices and correspondence relating to the loans being pledged as a portion of the Collateral to be managed and services under the Asset Management and Servicing Agreement.

## SECTION 5

## AFFIRMATIVE COVENANTS

Each Borrower hereby agrees that, so long as the Loan remains outstanding and unpaid or any other amount is owing to Lender hereunder or under any other Loan Document, each Borrower shall:

20

5.1    Certain Information. Furnish to counsel to Lender, promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower with the Bankruptcy Court or the United States Trustee in the Case, or distributed by or on behalf of the Borrower to any official committee appointed in the Case; provided, that nothing in this Section 5.1 shall be, or be deemed to be, a waiver of any evidentiary privilege (whether between the Borrower and its attorneys or otherwise).

5.2    Maintenance of Property: Insurance. Keep all of its Property useful and necessary in its business in good working order and condition subject to ordinary wear and tear, except where failure to do so could not reasonably be expected to have a Material Adverse Effect and maintain its pre-petition quality insurance policies, naming Lender as an additional loss payee/insured. So long as any Obligations remain outstanding, (a) Borrower shall operate, maintain and preserve all material rights, privileges, franchises, licenses and other properties and assets necessary to conduct its business operations, in accordance with all applicable governmental Laws, ordinances, approvals, rules and regulations, and (b) Borrower shall not without first receiving written approval of Lender, consolidate with, remove, materially alter, discontinue the use of, sell, transfer, assign, hypothecate or otherwise dispose of to any Person, any part of its properties and assets necessary for the continuance of its business operations, as presently conducted and as presently contemplated, other than in the normal course of business or as otherwise permitted pursuant to this Agreement.

5.3    Inspection of Property: Books and Records: Discussions. Keep proper books or records and accounts in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and permit representatives of Lender to visit and inspect any of its Properties and examine and make abstracts from any of its books and records at any reasonable time or times and with reasonable notice and to discuss the business, operations, Properties and financial and other condition of the Borrower with officers and employees of the Borrower and with its independent certified public accountants; provided, that nothing in this Section 5.3 shall be, or be deemed to be, a waiver of any evidentiary privilege (whether between the Borrower and its attorneys or otherwise).

5.4    Notices. Promptly, and in any event within three (3) Business Days after a Responsible Officer becomes aware thereof, give notice to Lender of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any post-petition Contractual Obligation of the Borrower that could reasonably be expected to have a Material Adverse Effect or (ii) litigation, investigation or proceeding which may exist at any time between any Borrower and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)    any post-confirmation litigation or proceeding affecting any Borrower (i) an adverse determination in which could reasonably be expected to have a Material Adverse Effect or (ii) in which injunctive or similar relief is sought; and

21

(d)    any development or event which has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this subsection shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower has taken or propose to take with respect thereto.

5.5    <u>Payment of Taxes</u>  Except as set forth on <u>Schedule 5.5</u> to this Agreement, pay and discharge all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any of its Properties, prior to the date on which penalties attach thereto, and all lawful claims for sums that have become due and payable which, if unpaid, might become a Lien on the Collateral. Also, Borrower shall require all borrower loans pledged as Collateral for the Loan to remain current in the payment of its taxes, and all such taxes are current, except as disclosed on said <u>Schedule 5.5</u>.

5.6    <u>Cooperation with Consultants</u>.  Assist and cooperate, in all reasonable respects, with representatives of such consulting firm (including, without limitation, Asset Manager) as may be retained by Lender (or its counsel from time to time), acting on behalf of Lender, in their review of the preparation and presentation of the financial statements and other information of the Borrower delivered to Lender pursuant hereto, and in their performance of such other tasks as directed by Lender or its counsel.

5.7    <u>Reporting Requirements</u>.

(a)  As soon as available, and in any event within ninety (90) days of the end of each fiscal year of Borrower, Borrower shall furnish to Lender, certified as true and correct by a Responsible Officer, a copy of (i) the annual operating statement for each project forming part of the Collateral, (ii) the independently reviewed financial statements of Borrower (commencing December 31, 2011), in form and substance reasonably satisfactory to Lender (audited after the first anniversary of the Closing Date), and (iii) annual cash flow projections of Borrower, together with such other information respecting the condition of Borrower, and the Collateral as Lender may from time to time reasonably request in writing.

(b)  Within thirty (30) days following the end of the applicable quarter, Borrower shall furnish to Lender (i) a quarterly operating statement for the Collateral covering the prior calendar quarter and cash flow reports of Borrower, certified as true and correct by a Responsible Officer.

(c)    Within twenty (20) days after filing, Borrower shall provide to Lender copies of tax returns of Borrower and Guarantor.

(d)    Such other information as may be reasonably requested from Lender from titme to time, including, without limitation, all reports and data provided to Borrowers and Lender under the terms of the Asset Management and Servicing Agreement.

5.8    <u>Further Assurances</u>.  Borrower shall execute and deliver from time to time, promptly after any reasonable request therefor by Lender, any and all instruments, agreements

and documents and shall take such other action as may be necessary or desirable in the reasonable opinion of Lender to maintain, perfect or insure Lender's security provided for herein and in the other Loan Documents, including, without limitation, the execution of UCC-1 renewal statements, the execution of such amendments to the security deed and the other Loan Documents and the delivery of such available endorsements to the title insurance policy, all as Lender shall reasonably require, and Borrower shall pay all reasonable out-of-pocket third party fees and expenses (including reasonable attorneys' fees) related thereto.

5.9    <u>Trade Names</u>.  Borrower shall promptly notify Lender in writing of any change in the legal, trade or fictitious business names used by Borrower and shall, upon Lender's request, execute any additional financing statements and other certificates necessary to reflect the change in trade names or fictitious business names.

5.10    <u>Representations and Warranties</u>.  Until repayment of the Notes and all other obligations secured by the Loan Documents, the representations and warranties of Section 4 shall remain true and complete.

5.11    <u>Advances</u>.  So long as any Obligations remain outstanding, if Borrower should fail (i) to perform or observe, or (ii) to cause to be performed or observed, any covenant or obligation of Borrower under this Agreement or any of the other Loan Documents, the failure of which could reasonably be expected to have a Material Adverse Effect, then Lender, upon the giving of reasonable notice may (but shall be under no obligation to) take such steps as are necessary to remedy any such non-performance or non-observance and provide for payment thereof.  All amounts advanced by Lender pursuant to this Section 5.11 shall become an additional obligation of Borrower to Lender secured by the Loan Documents and shall become due and payable by Borrower on the next Interest Payment Date, together with interest thereon at a rate per annum equal to the Default Interest Rate (such interest to be calculated from the date of such advancement to the date of payment thereof by Borrower).

5.12    <u>Environmental Matters</u>.

(a)    Each Borrower and related Person will comply in all material respects with all Environmental Laws now or hereafter applicable to such party and shall obtain, at or prior to the time required by applicable Environmental Laws, all environmental, health and safety permits, licenses and other authorizations necessary for its operations and will maintain such authorizations in full force and effect.

(b)    Borrower will promptly furnish to Lender written notices of violation, orders, claims, citations, complaints, penalty assessments, suits or other proceedings received by the Borrower, or of which it has notice, pending or threatened against the Borrower, by any Governmental Authority with respect to any alleged violation of or non-compliance with any Environmental Laws or any permits, licenses or authorizations in connection with its ownership or use of its properties or the operation of its business that could, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

## SECTION 6

## NEGATIVE COVENANTS

6.1    <u>Use of Proceeds</u>    Borrowers shall not (a) use the proceeds of the Loan for purposes other than those described or contemplated herein, or (b) use any portion of the Loan or the Collateral to commence or prosecute any action or objection with respect to the Liens granted to Lender pursuant to this Agreement and the Confirmation Order.

6.2    <u>No Additional Debt</u>    Borrower shall not occur any additional debt outside the ordinary course of business, which shall mean solely items identified in the Budget approved by Lender; provided, however, any such additional debt so approved shall be unsecured and subordinate to the Loan and related liens.

6.3    <u>No Change in Character of Business or Location of Chief Executive Office</u>.    So long as any Obligations remain outstanding (a) the chief executive office of Borrower shall be located at 8700 Technology Way, Reno, Nevada 89521, (b) the business operations and Collateral shall be owned and held by Borrower, and (c) Borrower shall not effect a material change in the nature and character of its business as presently conducted and as presently contemplated and disclosed to Lender.

6.4    <u>Permitted Encumbrances Only</u>.    So long as any Obligations remain outstanding, Borrower shall not create, incur, assume or suffer to exist any mortgage, deed of trust, pledge, lien, security interest, encumbrance, attachment, levy, distraint, or other judicial process and burdens of any kind and nature on or with respect to the Collateral, except the Permitted Encumbrances.    Borrower shall not grant, consent or otherwise agree to, or suffer to exist liens, encumbrances or negative pledges with respect to any Collateral, other than (a) liens in favor of Lender, (b) liens in favor of Deutsche Bank as contemplated by this Agreement, or (c) any other liens in favor of Lender hereinafter arising.

6.5    <u>Affiliate Loans</u>.    From and after the Closing Date, Borrower shall not provide or suffer to exist any loans from Borrower to any subsidiary or Affiliate of Borrower.

## SECTION 7

## EVENTS OF DEFAULT

If one or more of the following events (herein called "<u>Events of Default</u>") shall occur and be continuing:

24

(a)    Failure by Borrower to pay any monetary amount when due under any Loan Document which failure has not been cured upon the expiration of ten (10) days after written notice of such failure by Lender to Borrower.

(b)    Failure by Borrower to perform any material obligation not involving the payment of money, or to comply with any other material term or condition applicable to a Borrower, under any Loan Document which failure has not been cured upon the expiration of thirty (30) days after written notice of such failure by Lender to such Borrowers, or such additional period of time as is reasonably required (not to exceed 90 days), provided such Borrower has commenced and is diligently prosecuting such cure.

(c)    Any representation or warranty by a Borrower in any Loan Document is materially and adversely false, incorrect, or misleading as of the date made.

(e)    Any Borrower (i) admits in writing its inability to pay its monetary obligations as they become due, (ii) makes a general assignment for the benefit of creditors, or (iii) applies for, consents to, or acquiesces in, the appointment of a trustee, receiver, or other custodian for any Borrower or the property of Borrower or any part thereof, or in the absence of such application, consent, or acquiescence, a trustee, receiver, or other custodian is appointed for Borrower or the property of any Borrower or any part thereof, and such appointment is not discharged within ninety (90) days.

(f)    Except for the Case, commencement of any case under the Bankruptcy Code, Title 11 of the United State Code, or commencement of any other bankruptcy arrangement, reorganization, receivership, custodianship, or similar proceeding under any federal, state, or foreign Law by or against any Borrower and with respect to any such case or proceeding that is involuntary, such case or proceeding is not dismissed with prejudice within ninety (90) days of the filing thereof.

(g)    A final judgment or decree for monetary damages or a monetary fine or penalty (not subject to appeal or as to which the time for appeal has expired) in excess of $250,000 and not covered by Borrower's insurance policies is entered against any Borrower by any Government Authority, which together with the aggregate amount of all other such judgments and decrees against any Borrower that remain unpaid or that have not been discharged, bonded off or stayed and are uninsured exceeds $500,000, is not paid and discharged, bonded off or stayed within thirty (30) days after the entry thereof.

(h)    Commencement of any action or proceeding which seeks as one of its remedies the dissolution of any, which is not defended by such party and released/discharged within sixty (60) days of such filing.

(i)    All or any material part of the property of any Borrower is attached, levied upon, or otherwise seized by legal process, and such attachment, levy, or seizure is not quashed, stayed, or released within forty-five (45) days of the date thereof.

(j)    The occurrence of any transfer not permitted pursuant to the Loan Documents, unless prior to such transfer Lender has delivered to Borrower the written consent to such Transfer.

(k)    The occurrence of any Event of Default under any other Loan Document or the Asset Management and Servicing Agreement.

(l)    The Loan Documents and the Confirmation Order shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to Section 364 of the Bankruptcy Code against the Borrower, or the Borrower shall so allege in any pleading filed in any court, or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower or the Borrower shall so state.

## SECTION 8

## REMEDIES; APPLICATION OF PROCEEDS

8.1    <u>Remedies</u>.  Notwithstanding any provision to the contrary herein or any of the other Loan Documents, upon the occurrence and during the continuance of any Event of Default under this Agreement, or upon the occurrence and during the continuance of an Event of Default under any of the other Loan Documents, then Lender shall, at its option, have the remedies provided in the Loan Documents including, without limitation, the option to declare all outstanding indebtedness and other obligations under the Loan Documents to be immediately due and payable without presentment, demand, protest or notice of any kind, and the following remedies:  Lender may, at its option, apply any of Borrower's funds in its possession to the outstanding indebtedness under the Note(s) whether or not such indebtedness is then due; and/or Lender may exercise all rights and remedies available to it under any or all of the Loan Documents.  Nothing contained in this Agreement or in any of the Loan Documents shall in any way restrict or limit the rights, remedies and recourse to all assets for Borrower (whether held separately, in a marital community or otherwise) for all amounts due and payable with respect to the Loan and all other amounts due under the Loan Documents.  Upon the occurrence and continuance of an Event of Default, interest shall accrue at the Default Rate of Interest without the requirement of the provision of written notice to Borrower, nor written notice of acceleration.

8.2    <u>Application of Proceeds</u>.  Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, upon the occurrence and during the continuance of an Event of Default, any payment by the Borrower on account of principal of and interest on the Loan and any proceeds arising out of any realization (including after foreclosure or pursuant to Section 8.1 above) upon the Collateral shall be applied as follows: first, to the payment in full of all costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) paid or incurred by Lender in connection with any such realization upon the Collateral, and second, to the payment in full of the Loan (including any accrued and unpaid interest thereon, and any fees and other Obligations in respect thereof).

8.3    <u>Remedies Cumulative</u>.    Each and every right, power and remedy hereby specifically given to Lender shall be in addition to every other right, power and remedy specifically given under this Agreement, the Confirmation Order or the other Loan Documents now or hereafter existing at law or in equity, or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or, so long as not inconsistent with Lender's exercise of another remedy, simultaneously and as often and in such order as may be deemed expedient by Lender. All such rights, powers and remedies shall be cumulative and, so long as not inconsistent with Lender's exercise of another remedy, the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others. No delay or omission of Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein. In the event that the Lender shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Lender may recover reasonable expenses, including attorney's fees, and the amounts thereof shall be included in such judgment.

## SECTION 9

## NON-RECOURSE OBLIGATIONS

Notwithstanding anything to the contrary contained herein or elsewhere, Borrower shall be liable to Lender, without limitation, for Lender's harm, loss (including lost interest and principal on the Loan), damage, costs and expenses (including Lender's reasonable attorneys' fees and court and collection costs), but only to the extent thereof, arising out of or in connection with any of the following circumstances:

(a)    any failure by Borrower upon an Event of Default to apply all rents, issues and profits from the Property to the Loan or to operating expenses per the approved Budget;

(b)    any fraud or intentional breach of any material representation or warranty by Borrower;

(c)    any waste respecting all or any part of the Collateral;

(d)    any misappropriation or misapplication of the proceeds of the Loan, insurance proceeds, eminent domain or condemnation awards or other sums of a similar nature;

(e)    any destruction of the Collateral (or any part thereof) in or from an uninsured or underinsured casualty for which Borrower is required to obtain and maintain insurance (except that with respect to any underinsured casualty, Borrower shall have no liability under this Section if Lender expressly approved Borrower's insurance that was in place at the time of such casualty);

(f)    any failure to pay real estate taxes, special improvement assessments or other Impositions, if any, and insurance premiums with respect to the Collateral;

27

(g)    any seizure or forfeiture of the Collateral, any portion thereof or Borrower's interest therein, pursuant to any federal, state or local criminal Laws, including without limitation racketeering, income tax evasion or illegal drugs;

(h)    any transfer of the Collateral, any portion thereof or Borrower's interest therein, in violation of the restrictions set forth in the Loan Documents;

(i)    any fees, disbursements, compensation, distributions, and other payments of any kind whatsoever that are directly or indirectly paid to or received by the holders of any equity interest in Borrower or by any other direct or indirect Affiliates of Borrower or such equity interest holders in violation of any provision of any of the Loan Documents;

(j)    except for the Case, in the event of (i) any filing by Borrower of any voluntary petition under the Bankruptcy Code, (ii) the taking by Borrower of any comparable action under any federal or state law, (iii) the filing of any involuntary petition under the Bankruptcy Code against Borrower, by any partner or member of Borrower, or by any Affiliate of Borrower, (iv) consent to the appointment of a receiver by Borrower, or (v) the taking of comparable action under any federal or state law against Borrower, by any partner or member of Borrower, or by any Affiliate of Borrower, the Loan shall become fully recourse against Borrower.

## SECTION 10

## MISCELLANEOUS

10.1    <u>Amendments and Waivers</u>.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower shall be effective unless the same shall be in writing and signed Lender and each Borrower, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by Lender and Borrower.

10.2    <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission or similar writing) and shall be given to such party at its address or facsimile number set forth in Schedule 10.2, or at such other address or facsimile number as such party may specify from time to time.  Each such notice, request or other communication shall be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in Schedule 10.2 and the appropriate answer-back is received, (b) if given by mail, 48 hours after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid or (c) if given by any other means, when delivered at the address specified in Schedule 10.2.

10.3    <u>No Waiver; Remedies Cumulative</u>.  No failure or delay on the part of Lender in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between the Borrower and Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof of the exercise of any other right, power

28

or privilege hereunder or thereunder. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which Lender would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

      10.4    <u>Survival of Representations and Warranties</u>.  All representations and warranties made herein and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Notes.

      10.5    <u>Payment of Expenses and Taxes</u>.  Each Borrower agrees (a) to pay or reimburse Lender for all its reasonable out-of-pocket costs and reasonable expenses incurred in connection with the development, preparation and execution of, any amendment, supplement or modification to, and the enforcement or preservation of any rights under, this Agreement, the Notes, the other Loan Documents, and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, internal collateral auditing and monitoring expenses, the reasonable fees and disbursements of counsel to Lender  and other professionals engaged by Lender, (b) to pay or reimburse Lender for all its costs and expenses reasonably incurred in connection with the enforcement or preservation of any rights under this Agreement, the Note, the other Loan Documents, the Confirmation Order and any such other documents following the occurrence and during the continuance of a Default or an Event of Default, including, without limitation, the reasonable fees and disbursements of counsel to Lender and other professionals engaged by the Lender, (c) to pay, and indemnify and hold harmless Lender from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the Notes, the other Loan Documents, the Confirmation Order and any such other documents and (d) to pay, and indemnify and hold harmless Lender (and its directors, officers, employees and agents) from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of this Agreement, the Notes, the other Loan Documents, the orders or the use of the proceeds of the Loan (all the foregoing in this clause (e), collectively, the "<u>indemnified liabilities</u>"), <u>provided</u>, that the Borrower shall have no obligation hereunder to Lender with respect to indemnified liabilities determined by the final judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of Lender.

      10.6    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Borrower and Lender and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

      10.7    <u>Right of Setoff</u>.  Subject to the giving of the notice as described in Section 7, notwithstanding the provisions of Section 362 of the Bankruptcy Code and any other rights and

remedies of Lender now or hereafter granted under applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrower or to any other Person, any such notice being hereby expressly waived, to set off any other indebtedness or other obligation at any time held or owing by Lender to or for the credit or the account of the Borrower against and on account of the Obligations of the Borrower to Lender under this Agreement or under any of the other Loan Documents, and all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

10.8    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

10.9    GOVERNING LAW.    THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

10.10    SUBMISSION TO JURISDICTION; WAIVERS

(a)    EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN NEW YORK, NEW YORK.

(b)    EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN CLAUSE (A) ABOVE AND ANY COUNTERCLAIM THEREIN.

10.11    Effectiveness. This Agreement shall become effective once (i) Lender and each Borrower shall have each signed a counterpart hereof and (ii) the Bankruptcy Court shall have entered the Confirmation Order.

10.12    Headings Descriptive. The headings of the several Sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

30

10.13  Marshalling; Recapture.  Subject to Section 8.1 above, Lender shall not be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations.  To the extent Lender receives any payment by or on behalf of the Borrower, which payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to the Borrower or its estate, trustee, receiver, custodian or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof which has been paid, reduced or satisfied by the amount so repaid shall be reinstated by the amount so repaid and shall be included within the liabilities of the Borrower to Lender as of the date such initial payment, reduction or satisfaction occurred.

10.14  Severability.  In case any provision in or obligation under this Agreement, the Notes or the other Loan Documents shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.15  Joint and Several Liability.  Subject to Section 9 above, the liability of each entity comprising Borrower shall be joint and several, and, except as the context otherwise requires, each reference herein and in any other Loan Document to "Borrower" shall mean and be a reference to each Borrower.  Each entity comprising Borrower agrees that any and all of the Obligations shall be the joint and several liability of each of them notwithstanding any absence herein or in any other Loan Document of a reference such as "jointly and severally" with respect to such Obligation.

10.16.  Indemnification.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AGREES TO PROTECT, INDEMNIFY, DEFEND AND SAVE HARMLESS LENDER AND ITS MEMBERS, MANAGERS, DIRECTORS, OFFICERS, AGENTS, ATTORNEYS AND EMPLOYEES FOR, FROM AND AGAINST ANY AND ALL LIABILITY, EXPENSE OR DAMAGE OF ANY KIND OR NATURE AND FOR, FROM AND AGAINST ANY SUITS, CLAIMS OR DEMANDS, INCLUDING REASONABLE LEGAL FEES AND EXPENSES ON ACCOUNT OF ANY MATTER OR THING OR ACTION OR FAILURE TO ACT BY LENDER, WHETHER IN SUIT OR NOT, ARISING OUT OF THIS AGREEMENT OR IN CONNECTION HEREWITH, EXCLUDING, HOWEVER, ANY MATTERS ARISING OUT OF INDEMNIFIED PARTY'S NEGLIGENCE OR WILLFUL MISCONDUCT OR ANY MATTERS ARISING AFTER LENDER HAS TAKEN TITLE TO OR POSSESSION OF ANY PART OF THE PROJECT. Upon receiving knowledge of any suit, claim or demand asserted by a third party that Lender believes is covered by this indemnity, Lender shall give Borrower notice of the matter and an opportunity to defend it, at Borrower's sole cost and expense, with legal counsel selected by Borrower and reasonably satisfactory to Lender.  Lender may also require Borrower to so defend the matter.  The foregoing indemnity shall not terminate upon the foreclosure, release or other termination of the security deeds/mortgages or repayment of the Loan, but will survive foreclosure or conveyance in lieu of foreclosure and the repayment of the obligations and the discharge and release of the security deeds/mortgages and the Loan Documents.

31

10.17  <u>Brokers</u>.  Except for Imperial Capital LLC,  whose commission shall be borne by Borrower, Borrower and Lender represent to each other that neither of them knows of any brokerage commissions or finders' fee due or claimed with respect to the loan transaction contemplated hereby.  Borrower and Lender shall indemnify and hold harmless the other party for, from and against any and all loss, damage, liability, or expense, including costs and reasonable attorney fees, which such other party may incur or sustain by reason of or in connection with any misrepresentation by the indemnifying party with respect to the foregoing.

*[Remainder of page intentionally left blank]*

*DRAFT DATED 4/25/11*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duty executed as of the day and the year first written.

BORROWERS:

SPECIALTY TRUST, INC., a Maryland corporation

By:_____
    Name:
    Title:

SPECIALTY ACQUISITION CORP., a Delaware corporation

By:_____
    Name:
    Title:

SAC II, a Nevada corporation

By:_____
    Name:
    Title:

SAC D-1, LLC, a Nevada limited liability company

By:_____
    Name:
    Title:

**LENDER:**

**NORTHLIGHT REAL ESTATE
OPPORTUNITY FUND I, LP**

By:_____
    Name:
    Title: