**PLAN SUPPLEMENT**
**EXHIBIT B**


**Northlight Asset Management and Servicing Agreement**

DRAFT DATED 6/1/11

Deleted: 4/20/11

NORTHLIGHT ASSET MANAGEMENT II LLC,
as Asset Manager and Servicer


And


SPECIALTY TRUST, INC.,
SPECIALTY ACQUISITION CORP.,
SAC II
and
SAC D-1, LLC,
as Owner


WITH


NORTHLIGHT SPECIAL GP I LLC
("NORTHLIGHT"), ON BEHALF OF ONE OR MORE
FUNDS OR MANAGED ACCOUNTS MANAGED BY
NORTHLIGHT OR ITS AFFILIATES (INCLUDING,
WITHOUT LIMITATION NORTHLIGHT REAL
ESTATE OPPORTUNITY FUND I, LP) joining in as
Lender

Deleted: NORTHLIGHT REAL ESTATE OPPORTUNITY FUND I, LP, a Delaware limited partnership


ASSET MANAGEMENT AND SERVICING
AGREEMENT

Deleted: _____


Dated as of June ___, 2011

THIS ASSET MANAGEMENT AND SERVICING AGREEMENT, dated as of June ____, 2011, is entered into by and among SPECIALTY TRUST, INC., a Maryland corporation ("Specialty"), SPECIALTY ACQUISITION CORP. ("Acquisition"), a Delaware corporation, SAC II, a Nevada corporation ("SAC II") and SAC D-1, LLC, a Nevada limited liability company ("SAC D", and collectively, with Specialty, Acquisition, and SAC II, the "Owner") and NORTHLIGHT ASSET MANAGEMENT II LLC, a Delaware limited liability company, as Servicer hereunder (in such capacity as servicer hereinafter sometimes referred to as the "Servicer"), with NORTHLIGHT SPECIAL GP I LLC ("NORTHLIGHT"), ON BEHALF OF ONE OR MORE FUNDS OR MANAGED ACCOUNTS MANAGED BY NORTHLIGHT OR ITS AFFILIATES (INCLUDING, WITHOUT LIMITATION NORTHLIGHT REAL ESTATE OPPORTUNITY FUND I, LP), joining in as Lender.

[Deleted: _____]

[Deleted: NORTHLIGHT REAL ESTATE OPPORTUNITY FUND I, LP, a Delaware limited partnership]

WHEREAS, on even date herewith, Servicer's affiliate, Northlight Real Estate Opportunity Fund I, LP, a Delaware limited partnership made a $28,000,000 exit financing loan to Borrower (the "Loan"), pursuant to the terms of that certain Credit Agreement defined below;

WHEREAS, as collateral securing the Loan, Owner, as Borrower therein, has pledged to Lender (as defined below) certain Mortgage Loans (as defined below) and certain REO Property (as defined below), as more particularly described in the Credit Agreement;

WHEREAS, Owner desires that the Servicer manage the assets comprised of the REO Property and service and manage the Mortgage Loans, all as contemplated by this Agreement;

NOW, THEREFORE, it is hereby agreed by and among the Servicer and Borrower as follows:

ARTICLE I

Definitions

Section 1.01    Definitions.

Capitalized terms used but not defined in this Agreement are used as defined in the Credit Agreement, as applicable.  Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

Agreement:    This Asset Management and Servicing Agreement and all amendments hereof and supplements and exhibits hereto.

Collection Account:  An Eligible Account into which all accounts receivable, Asset Sales proceeds, borrower scheduled debt service, insurance and condemnation proceeds and the like are deposited as and when received from third parties (including Mortgagors) by Servicer, and from which monies are transferred into the Operating Account.

2

**Credit Agreement:**  The Exit Financing Term Credit and Security Agreement dated as of June ___, 2011 among Specialty Trust, Inc., a Maryland corporation and Specialty Acquisition Corp., a Delaware corporation, SAC II, a Nevada corporation and SAC D-1, LLC, a Nevada limited liability company (collectively, the "Borrower") reorganized debtors and debtors in possession in Chapter 11 bankruptcy cases jointly administered under case No. 10-51432-GWZ (collectively, the "Case") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court,") and Northlight Special GP I LLC ("Northlight"), on behalf of one or more funds or managed accounts managed by Northlight or its affiliates (including, without limitation Northlight Real Estate Opportunity Fund I, LP), as lender

**Deleted:** _____

**Eligible Account:**  An account (i) maintained with a depository institution whose short-term debt obligations at the time of any deposit in the account are rated at least "A-1" by S&P and at least "P-1" by Moody's or (ii) otherwise acceptable to Lender.

**Deleted:** Northlight Real Estate Opportunity Fund I, LP, a Delaware limited partnership

**Escrow Account:**  The Eligible Account or Accounts established and maintained pursuant to Section 3.09.

**Escrow Amounts:**  As defined in Section 3.09.

**Indemnification:**  As defined in Section 7.01.

**Interested Person:**  Means, as of any date of determination, any of the Servicer, , the Seller, the Borrower, the Agent, the Lender, and any of their respective Affiliates.

**Monthly Report:**  As defined in Section 4.01.

**Mortgage Loans:**  Shall mean the loans listed in Exhibit A to the Credit Agreement pledged to Lender as Collateral for the Loan.

**Mortgage:**  Shall mean the underlying deed of trust, mortgage or security deed granted by the underlying borrower of the Mortgage Loan.

**Mortgage Property:**  Shall mean the underlying property and improvements secured by any Mortgage.

**Mortgagor:**  Shall mean the underlying borrower of a Mortgage Loan.

**Officer's Certificate:**  A certificate signed by the President, an Executive Vice President, a Senior Vice President, a Vice President, the Treasurer, Assistant Treasurer, the Secretary, an Assistant Secretary or any other authorized officer of the Servicer, and delivered to the Agent.

**Operating Account:**  An Eligible Account into which funds received from the Collection Account are transferred, from which Servicer makes Advances (to the extent cash is available or likely to be recoverable pursuant to Section 2.01(i)), nets its fees, and pays operating expenses, and from with Asset Income is distributed to Owner into the Operating Reserve Account, subject to the terms of the Credit Agreement.

Owner:  As defined in the preamble to this Agreement.

Person:  means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

Quarterly Report:  As defined in Section 4.01.

Servicer Termination Event:  As defined in Section 6.01.

Servicer Advance:  As defined in Section 2.02(k).

Servicing Officer:  Any Vice President, Treasurer, Assistant Treasurer, Secretary or Assistant Secretary of the Servicer or any other Person designated as such in a written notice furnished to the Owner and the Agent by the Servicer.

Yearly Report:  As defined in Section 4.01.

Section 1.02    Interest Calculations.

All calculations of interest with respect to any Mortgage Loan provided for herein shall be made in accordance with the terms of the related Mortgage Note and Mortgage or, if such documents do not specify the basis upon which interest accrues thereon, on the basis of a 360-day year consisting of twelve 30-day months.  All dollar amounts calculated hereunder shall be rounded to the nearest penny with one-half of one penny being rounded down.

ARTICLE II

Representations, Warranties and Covenants of the Servicer

Section 2.01    Representations and Warranties of Servicer.    The Servicer hereby represents and warrants to the Owner as of the effective date of this Agreement that:

(a)    Existence and Power.  The Servicer is duly organized, validly existing and in good standing under the laws of its state of organization and isduly qualified to do business and is in good standing as a foreign entity in each jurisdiction in which its business is conducted, except where the failure to so qualify would not have a material adverse effect on the business of the Servicer.

(b)    Power and Authority; Due Authorization, Execution and Delivery.  The execution and delivery by the Servicer of this Agreement and the performance of its obligations hereunder has been duly authorized by all necessary company action on its part.  This Agreement has been duly executed and delivered by the Servicer.

(c)    No Conflict.  The execution and delivery by the Servicer of this Agreement and the performance of its obligations hereunder do not

4

contravene or violate (i) its certificate of formation or operating agreement or similar document, (ii) any law, rule or regulation applicable to it, (iii) any restrictions under any agreement, contract or instrument to which it is a party or by which it or any of its property is bound, or (iv) any order, writ, judgment, award, injunction or decree of any Governmental Authority or tax, regulatory, accounting or licensing body or other body binding on or affecting it or its property.

(d)   Governmental Authorization.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory, tax, accounting or licensing body or other body is required for the due execution and delivery by the Servicer of this Agreement and the performance of its obligations hereunder.

(e)   Actions, Suits.   There are no regulatory or other actions, suits or proceedings pending, or to the best of the Servicer's knowledge, threatened, against or affecting the Servicer, or any of its properties, in or before any court, arbitrator or Governmental Authority or regulatory, accounting, tax or licensing body or other body which could reasonably be expected to have a material adverse effect on the business of the Servicer. The Servicer is not in default with respect to any order, writ, judgment, award, injunction or decree of any court or arbitrator, or any regulatory, tax, accounting or licensing body or Governmental Authority, binding on it or affecting it or any of its assets or properties.

(f)   Binding Effect.  This Agreement constitutes the legal, valid and binding obligations of the Servicer enforceable against the Servicer in accordance with its respective terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

(g)   Places of Business and Locations of Records.  The principal place of business and chief executive office of the Servicer and the office where it keeps all of its Records are located at 24 West 40th Street, New York, NY 10018.

(h)   Notices.  The Servicer agrees to timely provide prior written notice to the Owner and the Agent of any change to such address in accordance with the terms of this Agreement.   The Servicer's Federal Employer Identification Number is _____.

Section 2.02    Affirmative Covenants of the Servicer.  The Servicer hereby agrees that:

5

(a)    Reporting. The Servicer will maintain and consistently apply, for itself, a system of accounting established and administered according to GAAP, and furnish or cause to be furnished to the Owner and Lender copies of notices or communication, including but not limited to any notice or communication relating to any default or litigation along with the Monthly Report being provided pursuant to Section 4.01 (a) unless the Servicer determines that such notice or communication should be provided prior to the delivery of such Monthly Report and Servicer shall further provide such other information, documents, records or reports relating to the Mortgage Loans or the condition or operations, financial or otherwise, of the Servicer as Lender may from time to time reasonably request, in writing, in order to protect the interests of Lender under or as contemplated by this Agreement and the Loan Documents promptly following such request.

(b)    Notices. The Servicer will notify Lender and Owner in writing, by means of an Officer's Certificate, of any of the following promptly upon (and in any event no later than fifteen (15) days following the end of the prior calendar month (in accordance with Section 4.01 below) after learning of the occurrence thereof, describing the same and, if applicable, the steps being taken with respect thereto:

(i)    Judgments and Proceedings. The entry of any judgment or decree or the institution of any litigation, arbitration proceeding or governmental proceeding by or against the Servicer to the extent that the same has had or could reasonably be expected to have a material adverse effect on the business of the Servicer.

(ii)    Material Adverse Effect. The occurrence of any event or condition that has had, or could reasonably be expected to have, a material adverse effect on the Collateral.

(c)    Compliance with Laws and Preservation of Corporate Existence. The Servicer will comply in all material respects with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject except to the extent that any such non-compliance could not reasonably be expected to have a material adverse effect.

(d)    Audits. The Servicer will furnish to Lender from time to time such information with respect to the Servicer and the Mortgage Loans as Lender may reasonably request. The Servicer will, from time to time during regular business hours as requested by Lender upon reasonable notice, at reasonable intervals and at the Owner's expense, permit Lender, or its agents or representatives:  (i) to examine and make copies of all

6

books and records in the possession or under the control of the Servicer relating to the Collateral, and (ii) to visit the offices and properties of the Servicer for the purpose of examining such materials described above, and to discuss matters reasonably requested by Lender and relating to the Collateral or any Person's performance under any of the Loan Documents or any Person's performance under any of the documents included in the Mortgage Loan files and, in each case, with any of the directors, representatives, agents, officers or employees of the Servicer having knowledge of such matters.

(e)    Compliance with Mortgage File Documents.  The Servicer, as provided in accordance with the terms of this Agreement,  will timely and fully perform and comply in all material respects with all provisions, covenants and other promises required to be observed by it under the documents included in the Mortgage Loan files related to the Mortgage Loans.

(f)    Ownership.  The Servicer will, at Owner's sole cost and expense, cause to be taken all necessary action to maintain, in favor of Owner and Lender, any valid and perfected first priority security interest in all Collateral, free and clear of any adverse claims (other than Permitted Liens), including, without limitation, the filing of all financing statements or other similar instruments or documents, necessary under the UCC (or any comparable law) of all appropriate jurisdictions to maintain the perfection the first priority security interest of Lender in the Collateral and such other action to perfect, protect or more fully evidence the interest of Lender in the Collateral and under the Loan Documents as Lender may reasonably request.

(g)    Proper Conduct of Business.  The Servicer shall conduct its business in the ordinary course and in accordance with customary and usual procedures of institutions which service mortgage loans, respectively, including without limitation in accordance with standard practices acceptable and common in the industry for properties similar to the Mortgage Loans and REO Property.

(h)    Collections.  If the Servicer receives any collections on or proceeds of any Mortgage Loan, any REO Property or any Collateral, the Servicer will, as provided for in this Agreement, remit such proceeds to the Operating Reserve Account as soon as practicable following receipt thereof.

(i)    Loss Payee.  The Servicer shall cause to be taken, at the Owner's sole cost and expense, all reasonable actions necessary to ensure that (i) the loss payee under each insurance policy with respect to the related Mortgage Loan which has been procured by the related Mortgagor or otherwise is Owner and Lender and/or their respective successors or assigns as their interests may appear, (and (iii) that upon receipt of written notice of

7

termination from an insurer under an insurance policy applicable to any Mortgage within five (5) Business Days of its receipt of such notice.

(j) <u>Protection of Security</u>. The Servicer shall allow Lender, or any of its agents (including Servicer) or any Person on its behalf: (i) to inspect the any of the Mortgaged Property, during normal business hours, upon reasonable prior written notice requesting such inspection; (ii) to appear in or intervene in any proceeding or matter affecting any Mortgage Loan or other Collateral or the value thereof; (iii) to initiate, commence, appear in and defend any foreclosure, action, bankruptcy or proceeding which could affect the security of the Collateral or the value thereof, or the rights and powers of Lender (provided, however, except after an Event of Default has occurred, Lender shall not initiate or commence such foreclosure, action, bankruptcy or proceeding if Owner or Servicer is vigorously pursuing appropriate action to protect the security of the Collateral or the value thereof); (iv) to contest by litigation or otherwise any lien asserted against the Mortgage Loans or other Collateral or against the related Mortgaged Property, or the personal property identified therein; and/or (v) to make payments on account of such encumbrances, charges, or liens and to service any assigned Mortgage Loan and take any action it may deem appropriate to collect any Collateral or any part thereof or to enforce any rights with respect thereto. All costs and expenses, including without limitation attorneys' fees (including, but not limited to, those incurred on appeal), that Lender may incur with respect to any of the foregoing and any expenditures it may make to protect or preserve the Collateral or the rights of Lender, shall be (as provided in the Credit Agreement) paid for by the Owner. The Owner shall repay the same to Lender, as the case may be, immediately upon written demand, and if not paid within fifteen (15) days of such demand, together with interest at the Default Interest Rate from the date of such demand until it is repaid.

(k) <u>Servicer Advances</u>. The Servicer may make any advances it deems commercially reasonably necessary to protect and preserve the Collateral, and ensure the same remains subject only to Permitted Liens, or to accomplish any of the directives it receives from Lender under Section 2.02(j) above, and be entitled to receive interest on such advance at the rate described in <u>Schedule 3.06</u> attached hereto..

Section 2.03    <u>Negative Covenants of The Servicer</u>.

Until the Maturity Date, the Servicer hereby covenants that:

(a) <u>Liens</u>. The Servicer shall not create, incur, assume or suffer to exist any adverse claim (other than Permitted Liens) upon (including, without limitation, the filing of any financing statement) or with respect to, any of the Collateral, or assign any right to receive income with respect thereto.

8

    (b)    <u>Servicer's Actions Regarding Mortgage Loan Borrowers</u>.  The Servicer shall not waive, modify, release, or consent to postponement on the part of a Mortgagor of any term or provision of any Mortgage Loan, except as provided for in Section 3.01 of this Agreement.

ARTICLE III

Administration and Servicing of Mortgage Loans

Section 3.01   <u>The Servicer</u>.

    (a)    Owner hereby engages and authorizes Servicer, within guidelines prescribed by this Agreement, to perform the services set forth below as to the Mortgage Loans and the REO Property and the Servicer, as an independent contract servicer, hereby accepts said engagement and authorization and agrees to provide adequate personnel to render capable and competent services and to use the skills and efforts of Servicer diligently to perform said services. In accepting said engagement, the Servicer further agrees that it shall service, manage and administer the Mortgage Loans and REO Property, as applicable,  for the benefit of Owner and Lender, and shall have full power and authority, acting alone, to do any and all things in connection with such servicing, management and administration which the Servicer may deem necessary or desirable and consistent with the terms of this Agreement and each other Mortgage Loan document.  The Servicer shall service and manage the Mortgage Loans and the REO Property, as applicable,  in accordance with the Loan Documents and Mortgage Loan documents, in a proper and prudent manner, in accordance with standard practices acceptable and common in the industry for properties similar to the Mortgage Loans and REO Property and shall take all other steps directly or indirectly related to servicing, including, but not limited to, collections, reporting, protection of the Mortgaged Property, liquidations, foreclosures, in accordance with the terms and conditions of the related Mortgage Loan and related documents and in compliance with applicable laws and regulations.

    (b)    Subject to the terms of this Agreement, the Servicer may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Servicer's good faith determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of Owner or Lender.  Without limiting the generality of the foregoing, the Servicer shall continue, and is hereby authorized and empowered to execute and deliver on behalf of Owner, as an authorized party, all instruments of satisfaction, cancellation, partial release, full release and discharge and all other comparable instruments with respect to

the Mortgage Loans and the Mortgaged Properties, to the extent consistent with the Mortgage Loan documents. If reasonably required by the Servicer, the Owner shall furnish the Servicer with limited powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under and in conformance with the terms of this Agreement.

(c)    Notwithstanding anything to the contrary contained herein, the Servicer, in servicing and administering the Mortgage Loans, shall employ or cause to be employed procedures (including collection, foreclosure and REO Property management procedures) and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account, in accordance with the Mortgage Loan documents, and accepted mortgage servicing practices of prudent servicing institutions servicing mortgage loans similar to the Mortgage Loans and giving due consideration to Owner's and Lender's reliance on the Servicer.

(d)    The Servicer shall deliver a list of Servicing Officers to the Owner and the Agent on or before the Closing Date and shall revise such list from time to time, as appropriate, and shall deliver all revisions promptly to Owner and Lender.

(e)    The Servicer agrees that Owner entity decisions, including, but not limited to, the sale of the Owner, issuance of common stock by the Owner, acquisition of additional assets and incurrence of entity-level debt will be made by the Owner's Board of Directors.

(f)    Upon completing due diligence, Servicer will prepare a special servicing business plan for each loan being serviced by Servicer based on status, location, future funding requirements and asset type. For loans that are non-performing, the business plan will include:

- Resolution Strategy – Discounted Payout, Loan Restructuring, Foreclosure.

- Expected Proceeds from the Resolution.

- Expenses associated with the resolution, including foreclosure, construction completion, asset management and disposition expenses.

Section 3.02    Collection of Mortgage Loan Payments.

(a)    The Servicer shall use its best efforts to collect all payments called for under the terms and provisions of the Mortgage Loans and shall, to the

extent such procedures shall be consistent with this Agreement, follow such collection procedures as it follows with respect to mortgage loans that it services for its own account. Consistent with the foregoing, and without limiting the generality of the foregoing, the Servicer may in its discretion (i) waive any late payment charge or any assumption fees or other fees which may be collected in the ordinary course of servicing such Mortgage Loan and (ii) arrange with a Mortgagor a schedule for the payment of interest and principal due and unpaid on the related Mortgage Loan.

(b)     The Servicer shall direct each Mortgagor, insurer and other Person making payments with respect to a Mortgage Loan, or the related Mortgaged Property or the purchaser of any REO Property to make all payments on the related Mortgage Loan or Mortgaged Property into Collection Account. The Servicer, at the direction of Owner and Lender, shall establish or maintain, as applicable, the Collection Account, the Escrow Account and the Operating Account, each at the Owner's sole cost and expense (including the customary fees of the  account bank).   The Servicer, Lender, Owner and the account bank shall on or prior to the commencement date hereof, enter into a DACA with respect to the Collection Account, Escrow Account and Operating Account substantially in the form attached hereto as Exhibit A.

(c)     All amounts on deposit in the Collection Account will be transferred on no less that a weekly basis to Operating Account.  Lender shall at all times during the term of the Credit Agreement have a first priority perfected security interest in the  Collection Account, and Escrow Account and the Operating Account, and the funds on deposit therein.

(d)     The Servicer shall remit to the Operating Account, all payments and collections received or paid by it with respect to the Mortgage Loans, the Mortgaged Properties and the Collateral received into the Collection Account as soon as practicable following receipt thereof in immediately available or "cleared" funds, including, without duplication:

    (i)     all payments received on account of principal on the Mortgage Loans (including, without limitation, all principal prepayments );

    (ii)    all payments received on account of interest on the Mortgage Loans;

    (iii)   all net liquidation proceeds or subsequent recoveries on Mortgage Loans and cash proceeds from the rental and sale of REO Property;

    (iv)   any late payment fees received on account of the Mortgage Loans;

    (v)    any extension fees received on account of the Mortgage Loans; or

11

(vi)  all insurance proceeds, and any insurance policy deductible amounts paid by the Servicer; and

(vii)  all cash collected as the result of any litigation.

Section 3.03   Maintenance of Insurance; Property Protection Expenses.

(a)  The Servicer, for so long as it acts as servicer under this Agreement, shall cause to be maintained, at the Owner's expense, for each Mortgage Loan and for each Mortgaged Property acquired upon foreclosure or by deed in lieu of foreclosure (including REO Property) (in each case, as applicable, in such instances where Owner has not otherwise obtained such insurance) insurance policies consistent with the requirements set forth in the Mortgage Documents or policies currently in place as to existing REO Property.

(b)  Each such insurance policy shall contain a standard mortgagee clause that names Northlight Special GP I LLC ("Northlight"), on behalf of one or more funds or managed accounts managed by Northlight or its affiliates (including, without limitation Northlight Real Estate Opportunity Fund I, LP) as an additional insured and loss payee thereunder and shall require at least thirty (30) days' prior written notice to the holder of the related Mortgage, in the case of termination or cancellation other than for nonpayment of premiums, and at least ten (10) days' prior written notice to the holder of the related Mortgage, in the case of termination or cancellation for nonpayment of premiums.

> **Deleted:** *"NORTHLIGHT REAL ESTATE OPPORTUNITY FUND I, LP, a Delaware limited partnership joining in as Lender and/or its successors and assigns"*
>
> **Formatted:** Font: Bold, Italic

(c)  Amounts collected by the Servicer under any such policies in connection with the Mortgage Loans (or for REO Property) shall be remitted by the Servicer to the Collection Account, then into the Operating Account as soon as practicable following receipt thereof.

Section 3.04   Management and Realization Upon Defaulted Mortgage Loans; Asset Management of REO Property.

(a)   The Servicer shall manage, conserve, insure, protect and operate each REO Property for the Owner and Lender solely for the purpose of its prudent and prompt disposition and sale. The Servicer shall, either itself or through an agent selected by the Servicer, manage, conserve, insure, protect and operate each REO Property in the same manner that it manages, conserves, insures, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the related REO Property is managed. The Servicer shall attempt to sell an REO Property (and may temporarily rent the same) on such terms and conditions as set forth in this Section 3.04 and the terms of the Credit Agreement.

12

(b)     Other than as set forth in the following sentence, all revenues received by the Servicer with respect to an REO Property shall be collected in the Collection Account and then remitted by the Servicer for deposit into the Operating Account, as soon as practicable following the Servicer's receipt thereof. The Servicer shall retain from such revenues an amount equal to the reasonable expenses actually incurred by the Servicer in its operation, management and maintenance of the related REO Property from the date the related Mortgaged Property becomes REO Property to the date of such sale, following its delivery to the Agent of a written itemized and detailed calculation of such amounts and a written certification to the Agent as to the reasonableness of such expenditures; provided, that, following the occurrence of a Servicer Termination Event, the right of the Servicer to retain such funds shall be subject to such limits and conditions as the Agent may specify in a written notice to the Servicer.

(c)     Subject to the provisions of the Credit Agreement, the disposition and temporary rental of REO Property shall be carried out by the Servicer in a commercially reasonable manner for cash at such price, and upon such terms and conditions, as the Servicer deems to be in the best interest of the Owner and the Lender and, as soon as practicable thereafter, the expenses of such sale and temporary rental shall be paid; provided Lender may direct the Servicer with respect to any such disposition so long as in compliance with the provisions of the Credit Agreement. All net liquidation proceeds on Mortgage Loans and cash proceeds of the rental and sale of REO Property received and collected by the Servicer in the Collection Account shall be remitted by the Servicer for deposit into the Operating Account, as soon as practicable following the Servicer's receipt thereof.

| Deleted: T |
| --- |

(d)     Subject to the provisions of this Agreement, Servicer shall render or cause to be rendered the following services to Owner and Lender with respect to each of the REO Properties in accordance with the express provisions of this Agreement:

     (i)     Analyze and make recommendations regarding the annual budget for each REO Property, appropriate bank accounts and investments of excess funds, collection of monies from the tenants and other third parties, compliance with any applicable legal requirements for the REO Property, the presentation or handling of any claims, litigation or administrative proceedings involving the REO Property and appropriate insurance coverages, amounts of coverage and deductibles;

     (ii)     assemble and analyze information regarding the financial operations of the REO Property;

      (iii)    review and analyze the financial history of the REO Property, existing and proposed leases, review market information for the REO Property and the area surrounding the REO Property and make strategic recommendations regarding Owner's investment in the REO Property;

      (iv)    review and analyze any offers to purchase the REO Property in whole or in part; and

      (v)    conduct such other review and analyses as is reasonably requested by Owner and Lender, and assist the parties in the orderly disposition of the REO Properties as contemplated by the terms of the Credit Agreement.

    (e)    For income producing properties or development opportunities that are owned by Owner, Servicer may elect to either engage a third-party property manager or manage the properties themselves. Should Servicer choose to manage the property themselves, it will be entitled to charge a standard, arms-length property management fee approved by both the Lender and Owner's Board of Directors.

    (f)    The foregoing provisions shall also apply to the Mortgage Loans.

**Section 3.05**    Owner to Cooperate.

    (a)    Upon any prepayment pursuant to the Credit Agreement, the Servicer is authorized to execute, pursuant to the authorization contained in Section 3.01(b), an instrument of satisfaction regarding the related Mortgage, which instrument of satisfaction shall be recorded by the Servicer if required by applicable law, at the Owner's sole expense, and shall be delivered to the Person entitled thereto.

    (b)    In order to facilitate the foreclosure of the Mortgage securing any Mortgage Loan that is in default, the Owner shall, if so requested in writing by the Servicer and at the Owner's sole expense, execute an appropriate assignment in the form provided to the Owner by the Servicer to assign such Mortgage Loan for the purpose of collection to the Servicer (any such assignment shall unambiguously indicate that the assignment is for the purpose of collection only) and, upon such assignment, such assignee for collection will thereupon bring all required actions in its own name and otherwise enforce the terms of the Mortgage Loan and remit the net liquidation proceeds received with respect thereto for deposit into the Operating Account, as soon as practicable following receipt thereof. In the event that all delinquent payments due under any such Mortgage Loan are paid by the related Mortgagor and any other defaults thereto are cured, the Servicer shall promptly reassign such Mortgage Loan to the Owner.

14

Section 3.06    Servicing and Asset Management Compensation.

As compensation for its services hereunder, the Servicer shall be entitled to payment of the Fees in accordance with Schedule 3.06 attached hereto. Owner shall be required to pay all expenses incurred by Servicer in connection with Servicer's activities hereunder (including with respect to the Servicer, payment of all other fees and expenses not expressly stated hereunder to be for the account of the Owner or the Lender). Any fees not promptly paid or reimbursed shall accrue interest as set forth in Schedule 3.06.

Section 3.07    Enforcement.

The Servicer shall, consistent with customary servicing procedures, act with respect to the Mortgage Loans in such manner as will maximize the receipt of principal and interest on such Mortgage Loans and net liquidation proceeds with respect to liquidated Mortgage Loans. The Servicer shall exercise its discretion, consistent with customary servicing procedures, and the terms of this Agreement, with respect to the enforcement of defaulted Mortgage Loans and delinquent Mortgage Loans in such manner as will maximize the receipt of principal and interest with respect thereto, including but not limited to the sale (as applicable) of such Mortgage Loan to a third party (any such sale being made only with the prior written consent of Lender), the modification of such Mortgage Loan, or foreclosure upon the related Mortgaged Property and disposition thereof. The decision of the Servicer to foreclose on a defaulted Mortgage Loan shall be subject to a written certification by the Servicer delivered to Lender that, in the reasonable opinion of the Servicer, the proceeds of such foreclosure would exceed the costs and expenses of bringing such a proceeding. If such certification is not delivered, then the Servicer shall deal with such Mortgage Loan in a manner consistent with the servicing standard set forth in Section 3.01 hereof. In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be issued to Specialty Acquisition Corp., SAC II and/or Specialty Trust, Inc.. The Servicer shall not foreclose on any Mortgage Loan with an outstanding principal balance in excess of One Million Dollars ($1,000,000), unless it has received a Phase I environmental audit with respect to the applicable Mortgaged Property and such audit provides that, as of the date of such audit, no Hazardous Materials are located on such Mortgaged Property, no violation of Environmental Laws exists with respect to such Mortgaged Property and no Phase II environmental audit is recommended with respect to such Mortgaged Property. In the event that a Phase I indicates that Hazardous Materials are located on such Mortgaged Property, then in such event, the Lender shall make the determination as to whether to proceed with any such foreclosure.

Section 3.08    Satisfaction of Mortgages.

The Servicer shall not (i) satisfy or release a Mortgage without having obtained payment in full of the indebtedness secured by such Mortgage or (ii) otherwise prejudice any rights the Owner or Lender may have under the related Mortgage Loan documents except as otherwise provided in this Agreement.

Section 3.09    Collection of Taxes, Assessments and Similar Items; Escrow Accounts.

15

(a)    To the extent required by the related Mortgage Note and not violative of applicable law, the Servicer shall, if the Servicer has not already done so, establish and maintain one or more accounts (each, an "Escrow Account") and promptly deposit and retain therein all collections from the Mortgagors, distributions from the Collection Account pursuant to Section 3.02(c) herein (or advances by the Servicer) for amounts payable in respect of taxes, assessments, hazard insurance premiums or comparable items (the "Escrow Amounts") for the account of the Mortgagors. Nothing in this Agreement shall require the Servicer to compel a Mortgagor to establish an Escrow Account in violation of applicable law.

(b)    Withdrawals of amounts on deposit in the Escrow Accounts may be made only to effect timely payment of Escrow Amounts, to reimburse the Servicer out of related collections for any payments made pursuant to Section 3.09 (c) (with respect to taxes and assessments and insurance premiums), to refund to any Mortgagors any sums determined to be overages, to pay interest, if required by law or the terms of the related Mortgage or Mortgage Note, to Mortgagors on balances in the related Escrow Account or to clear and terminate the Escrow Accounts at the termination of this Agreement.

(c)    The Servicer shall advance any payments referred to in Section 3.09 (a) that are not timely paid by the Mortgagors on the date when the tax, premium or other cost for which such payment is intended is due, but the Servicer shall be required so to advance only to the extent that such advances, in the good faith judgment of the Servicer, will be recoverable by the Servicer out of insurance proceeds, liquidation proceeds or otherwise.

Section 3.10    Monthly Reconciliation

The Servicer shall, on or before the twentieth (20th) day following the close of the prior calendar month (concurrently with the delivery of the monthly report described in Section 4.01 below), remit into the Operating Reserve Account all net funds remaining in the Operating Account, less a sufficient reserve as determined by Servicer in the exercise of its commercially reasonable judgment. Such net funds shall be net of the fees described in Schedule 3.06 hereof, and if insufficient funds exist to pay such fees, the same shall be deferred and accrue interest at the rate sect for on said Schedule 3.06 until such time as sufficient funds exist in the Operating Account to pay the same.

**Formatted:** Superscript

ARTICLE IV

Reports

Section 4.01    Reports.

(a)    Monthly Report.  As soon as available and in any case no later than fifteen (15) days after the end of the prior month, the Servicer shall deliver to the Owner and Lender a monthly report (each, a "Monthly Report") in substantially the form and format attached hereto as Exhibit B.

(b)    Additional Reports.  All reports described in Schedule 3.06 hereof.

(c)    Servicers Annual Financials.  Servicer shall deliver to Lender and Owner annual financial statements of Servicer, in form and content reasonably acceptable to Lender and owner.

(d)    Compliance Certificate.  The Servicer shall deliver to the Lender and the Owner, together with its delivery of the Servicer's annual financial statements required hereunder, a compliance certificate in substantially the form of Exhibit C attached hereto, signed by the Servicer's Authorized Officer and dated the date of such annual financial statement.

ARTICLE V

Mergers; No Assignment

Section 5.01    Merger or Consolidation of, or Assumption of the Obligation of, the Servicer.

Any Person into which the Servicer may be merged or consolidated, or any Person resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 5.02    Servicer Not to Assign.

The Servicer shall not assign this Agreement or the servicing of the Mortgage Loans hereunder, or delegate its rights or duties hereunder or portion thereof, or sell or otherwise dispose of all or substantially all of its assets or property, without the prior written consent of the Lender, which consent shall be granted or withheld in the sole discretion of the Lender.

ARTICLE VI

Servicer Termination Events

Section 6.01    Servicer Termination Event.

(a)    The occurrence of any of the following events shall constitute a "Servicer Termination Event" hereunder:

(i)    the Servicer fails to perform or observe any covenant or agreement of the Servicer under this Servicing Agreement and such failure

17

continues unremedied for fifteen (15) Business Days after the written notification thereof by Lender to the Servicer, or if Servicer is undertaking to remedy such failure, up to an additional fifteen (15) Business Days to remedy such failure (for a total of 30 Business Days) if it is diligently prosecuting such cure;

(ii)    the Servicer fails to make tender of any payment or deposit actually received by Servicer in accordance with the provisions of this Agreement;

(iii)    any representation or warranty made or deemed to be made by the Servicer proves false or incorrect in any material respect, unless such breach is otherwise cured to the satisfaction of the Lender (in its sole discretion) within thirty (30) days of notice to the Servicer with respect thereto, or if Servicer is undertaking to remedy such breach, up to an additional sixty (60) days (for a total of ninety [90] days) if it is diligently prosecuting such cure;

(iv)    the commencement of any litigation, investigation or proceeding before any court or arbitrator, or before any tax, licensing, regulatory or licensing body or other body, or before any Governmental Authority, against the Servicer, which is reasonably likely to materially impair the ability of the Servicer to perform its obligations under this Agreement and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed;

(v)    the entry of one or more judgments or decrees against the Servicer involving, in the aggregate, a liability of greater than Five Hundred Thousand Dollars ($500,000.00), and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed; or

(vi)    an Event of Bankruptcy with respect to the Servicer.

(b)    Upon the occurrence and during the continuation of a Servicer Termination Event, Lender may, by notice given in writing to the Servicer hereunder and the Servicer, terminate all of the rights and obligations of the Servicer under this Agreement.    Upon the termination of this Agreement, Servicer shall, upon request and direction of Lender but at the expense of the Servicer, deliver to Lender or Servicer (with a copy to the Owner) all documents relating to the Mortgage Loans held and remitted by the Servicer and relating to the Mortgage Loans, and shall otherwise use its best efforts to effect the orderly and efficient transfer of servicing rights and obligations to such successor Servicer.    Without limiting the generality of the foregoing, the Servicer shall (i) immediately remit for deposit into the Operating Reserve Account, all collections on and

18

proceeds of the Mortgage Loans and the Mortgaged Properties that shall at the time be held by the Servicer and (ii) shall thereafter remit for deposit into the Operating Reserve Account, as soon as practicable following receipt thereof all collections on and proceeds of the Mortgage Loans and the Mortgaged Properties thereafter received by the predecessor Servicer. All reasonable costs and expenses (including without limitation attorneys' fees and expenses) incurred in connection with such transfer of servicing duties pursuant to this Section shall be paid by the Servicer.

Section 6.02    Appointment of Successor.

On and after the effect date of any termination of the Servicer pursuant to Section 6.01, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested to any successor Servicer.

ARTICLE VII

Section 7.01    Indemnification.

(a)    Servicer agrees to indemnify and hold Lender and Owner and their respective members harmless from and against any and all liabilities, claims, obligations, expenses, losses, damages, judgments or other injuries (including, but not limited to, attorneys' fees, costs and expenses of litigation and appeals) which Lender, Owner and/or its/their members may incur or suffer in connection with fraud, negligent acts, any action or claim against Lender or Owner arising out of the performance of Servicer's obligations hereunder, willful misconduct or knowing misrepresentations of material fact by Servicer, acting as such under the provisions hereof.

(b)    Owner agrees to indemnify and hold Servicer harmless from and against any and all liabilities, claims, obligations, expenses, losses, damages, judgments or other injuries (including, but not limited to, attorneys' fees, costs and expenses of litigation and appeals) which Servicer may incur or suffer in connection with fraud or negligent acts, any action or claim against Servicer arising out of the performance of Owner's obligations hereunder, willful misconduct or knowing misrepresentation of a material fact by Owner, acting as such under the provisions hereof.

Section 7.02    Survival.    The indemnifications contained in Section 7.1 hereof shall survive any termination of this Agreement for a period of one (1) year.

ARTICLE VIII

Termination

Section 8.01    Termination.

19

The respective obligations and responsibilities of the Owner, the Servicer, and Lender created hereby shall continue after repayment of all Obligations under the Credit Agreement for annual renewable terms; provided, however, following the full repayment of the Obligations, Owner's Board of Director's may elect to terminate this Agreement at any time upon six (6) months prior written notice.

## ARTICLE IX

### Miscellaneous Provisions

Section 9.01    Waiver and Amendment.

(a)    No failure or delay on the part of the Owner, or Lender in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy. The rights and remedies herein provided shall be cumulative and nonexclusive of any rights or remedies provided by law. Any waiver of this Agreement shall be effective only in the specific instance and for the specific purpose for which given.

(b)    No provision of this Agreement may be amended, supplemented, modified or waived except in a writing executed by all of the parties hereto.

Section 9.02    Recordation of Agreement.

This Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by Lender in its sole discretion but at the expense of the Servicer following the occurrence and during the continuation of a Servicer Termination Event.

Section 9.03    **GOVERNING LAW.**

**THIS AGREEMENT SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.**

Section 9.04    CONSENT TO JURISDICTION.

EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR NEW YORK STATE COURT SITTING IN NEW YORK, NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY SUCH PERSON PURSUANT TO THIS AGREEMENT, AND EACH SUCH PARTY HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT. EACH PARTY HERETO HEREBY AND IRREVOCABLY WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH A COURT OR THAT SUCH COURT IS AN INCONVENIENT 'FORUM. ANY JUDICIAL PROCEEDING BY ANY PARTY HERETO OR THE LENDER AGAINST ANY OTHER PARTY HERETO OR THE LENDER OR ANY AFFILIATE OF ANY PARTY HERETO OR A LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY DOCUMENT EXECUTED BY ANY PARTY HERETO OR THE LENDER PURSUANT TO THIS AGREEMENT SHALL BE BROUGHT ONLY IN A COURT IN NEW YORK, NEW YORK. ANY JUDGMENT OR ORDER ENTERED BY A COURT IN NEW YORK, NEW YORK IN AN ACTION COVERED BY THIS SECTION 9.04 MAYBE ENTERED WITH AND ENFORCED BY ANY COURT OF COMPETENT JURISDICTION.

Section 9.05    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT EXECUTED BY ANY PARTY HERETO PURSUANT TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER OR THEREUNDER.

Section 9.06    Notices.

(a)    All communications and notices provided for hereunder shall be in writing (including bank wire, telecopy or electronic facsimile transmission or similar writing). Each such notice or other communication shall be deemed effective (i) if given by telecopy, then upon written confirmation of transmittal and the receipt thereof, (ii) if given by mail, then three (3) Business Days after the time such communication is deposited in the mail properly addressed and with first class postage prepaid, (iii) if given by overnight courier or similar overnight delivery, then one (1) Business Day after the time such communication is delivered to such delivery service or (iv) if given by any other means, then when received at the address for notices specified pursuant to this Section 9.06.

(b)    Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this Section, notices, demands, instructions and other communications in writing shall be given to or made upon the

21

respective parties hereto at their respective addresses (or to their respective facsimile numbers) indicated below, and, in the case of telephonic confirmation of receipt of a facsimile copy, by calling the telephone number or numbers indicated for such party below:

If to the Owner:                    Specialty Trust, Inc.
                                    8700 Technology Way
                                    Reno, NV 89521
                                    Attention: [Grant Lyon]

If to the Servicer:                 Northlight Asset Management II LLC
                                    24 West 40th Street, 12th Floor
                                    New York, NY 10018
                                    Telecopier No.: 646-495-1601
                                    Telephone No.: 212-247-1777

If to Lender:                       Northlight Special GP I LLC ("Northlight"), on
                                    behalf of one or more funds or managed accounts
                                    managed by Northlight or its affiliates (including,
                                    without limitation Northlight Real Estate
                                    Opportunity Fund I, LP),
                                    c/o Northlight Financial LLC
                                    24 West 40th Street, 12th Floor
                                    New York, New York 10018
                                    Attention: Robert Woods

**Deleted:** *Northlight Real Estate Opportunity Fund I, LP*

**Formatted:** Font: Bold, Italic

Section 9.07    Severability of Provisions.

Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 9.08    Assignment.

This Agreement may not be assigned by the Owner or the Servicer without the prior written consent of Lender. The rights of Lender hereunder may be assigned by Lender without the consent of the Servicer, or the Owner to any successor Lender under the Credit Agreement.

Section 9.09    Third-Party Beneficiaries.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. The Owner shall collaterally assign all of its rights and obligations hereunder to Lender. Servicer hereby acknowledges that the Owner has granted a security interest in all such rights, remedies and powers to Lender pursuant to the Credit Agreement. The Servicer agrees that, upon written notice by Lender to the Servicer that an Event of Default has occurred and is continuing under and as defined in the Credit Agreement, Lender shall be entitled to exercise all of the Owner's rights and remedies under this Agreement (including, without limitation, the right to give or withhold any consents or approvals of the Owner to be given or withheld hereunder) and the Servicer agrees to cooperate fully with Lender in the exercise of such rights, remedies and powers.

Section 9.10    Counterparts.

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of a signature page to this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, the Owner, the Servicer, the Servicer, the Back-up Servicer and the Agent have caused this Agreement to be duly executed by their respective officers all as of the day and year first above written.

**NORTHLIGHT ASSET MANAGEMENT II LLC,**
As Servicer

By:       _____
Name:  _____
Title:    _____


NORTHLIGHT SPECIAL GP I LLC ("NORTHLIGHT"), ON BEHALF OF ONE OR MORE FUNDS OR MANAGED ACCOUNTS MANAGED BY NORTHLIGHT OR ITS AFFILIATES (INCLUDING, WITHOUT LIMITATION NORTHLIGHT REAL ESTATE OPPORTUNITY FUND I, LP) , joining in as Lender:

By: _____
Name: _____
Title: _____

| Formatted: Indent: First line: 0", Space Before: 0 pt |
| --- |

<u>OWNERS</u>:

SPECIALTY TRUST, INC., a Maryland
corporation

By: _____
    Name:
    Title:


SPECIALTY ACQUISITION CORP., a
Delaware corporation

By: _____
    Name:
    Title:

SAC II, a Nevada corporation

By: _____
    Name:
    Title:

SAC D-1, LLC, a Nevada limited liability
company

By: _____
    Name:
    Title:

EXHIBIT A

FORM OF DEPOSIT ACCOUNT CONTROL AGREEMENT

EXHIBIT B

FORM OF MONTHLY REPORT

[See Attached]

EXHIBIT C

FORM OF COMPLIANCE CERTIFICATE

To: _____, as the Owner
Northlight Special GP I LLC ("Northlight"), on behalf of one or more funds or managed accounts managed by Northlight or its affiliates (including, without limitation Northlight Real Estate Opportunity Fund I, LP),

This Compliance Certificate is furnished pursuant to that certain Asset Management and Servicing Agreement dated as of _____, 2011 among SPECIALTY TRUST, INC., a Maryland corporation ("Specialty") AND SPECIALTY ACQUISITION CORP. ("Acquisition"), a Delaware corporation, SAC II, a Nevada corporation ("SAC II") and SAC D-1, LLC, a Nevada limited liability company (collectively, the "Owner") and NORTHLIGHT ASSET MANAGEMENT II LLC, a Delaware limited liability company, as Servicer hereunder (in such capacity as servicer hereinafter sometimes referred to as the "Servicer"), with Northlight Special GP I LLC ("Northlight"), on behalf of one or more funds or managed accounts managed by Northlight or its affiliates (including, without limitation Northlight Real Estate Opportunity Fund I, LP), joining in as Lender.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.    I am the duly elected _____ of the Servicer.

2.    I have reviewed the terms of the Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Servicer during the accounting period covered by the attached financial statements.

3.    The review described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes a Servicer Termination Event, as defined under the Agreement, during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, [except as set forth in paragraph 4 below].

[4.    Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which the Servicer has taken, is taking, or proposes to take with respect to each such condition or event: _____].

5.    The attached financial statements present fairly the financial condition and results of operations of the Servicer and have been prepared in accordance with the Servicer's modified-cash-basis system of accounting, consistently applied.

Deleted: NORTHLIGHT REAL ESTATE OPPORTUNITY FUND I, LP, a Delaware limited   partnership

Formatted: Font: Bold, Italic
Formatted: Font: Bold, Italic
Formatted: Font: Bold, Italic

Deleted: NORTHLIGHT REAL ESTATE OPPORTUNITY FUND I, LP, a Delaware limited partnership,

Formatted: Font: Bold, Italic

The foregoing certifications, together with the financial statements delivered with this Certificate in support hereof, are made and delivered as of _____, 20____

By: _____

Name: _____

Title: _____

SCHEDULE 3.06

ASSET MANAGEMENT AND SERVICING AGREEMENT

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Reporting** | Servicer will be responsible for providing monthly (unaudited), quarterly (unaudited) and annual (audited) reports to Owner.  Reporting requirements, include, but is not limited to:<br><br>Asset level reports – Status of each Mortgage Loan and how it compares favorably or unfavorably to the business plan.<br><br>Portfolio level reports – Including a mark-to-market for both the portfolio and individual assets.<br><br>Financial Statements for Owner |
| **Loan Servicing Fees** | Servicer may utilize the existing systems of Specialty Finance, Inc. (the "Servicing System") to manage loan servicing of Owners (or continue use of a third-party servicing system).  If such Servicing System is turn key, Asset Manager/Servicer shall charge $150,000 for loan servicing (the **"Servicing Fee"**) annually. REO properties or loans that are foreclosed and that no longer require loan servicing will not be charged a Servicing Fee. *[OPEN]* |
| **Asset Management Fees** | As Asset Manager, Servicer will receive an individual asset management fee as defined in the chart attached (the **"Asset Management Fee"** and together with the Servicing Fee, the **"Fees"**) which is a priority payment as defined in the Credit Agreement.  It is anticipated that the year 1 Asset Management Fee will be a *maximum* amount of approximately $980,000, subject to adjustment on a project-by-project basis as assets are sold.  Servicer will not collect an annual Asset Management Fee for assets that have been resolved, but in no circumstance will the annual Asset Management fee be less than $100,000 per annum<br><br>The Fees  that has been earned, but not paid (the "Accrued Fees"), by Owner will accrue at a rate of 18% annualized.  Accrued Fees will be subject to the terms and conditions of the Waterfall defined above. |
| **Property Management** | For income producing properties or development opportunities that are owned by Owner, Servicer may elect to either engage a third-party property manager or manage the properties themselves.  Should Servicer choose to manage the property themselves, it will  be entitled to charge a standard, arms-length property management fee approved by both the Lender and Owner's Board of Directors. Only one management |

Formatted: Font: Bold, Italic

| | fee would be charged to a project, either my Asset Manager or such third party. |
|---|---|
| **Servicing Advances and Payment of Fees** | Although the amount of the Loan to Owner should be enough to manage the assets, Servicer will agree to provide Servicing Advances ("**Servicing Advances**"). Any Servicing Advances incurred by Servicer will be repayable to the Servicer pari-passu with Accrued Fees earned by Servicer. Servicing Advances will accrue interest at a rate of 16% annualized. Fees payable under the Asset Management and Servicing Agreement are secured by and otherwise payable as set forth in the waterfall provisions of Section 2.09 of the Credit Agreement. |
| **Right To Purchase Assets** | In the ordinary course of managing the loan portfolio, Servicer, or an affiliated entity, retains the right to purchase loans or REO Property from Owner. Any asset acquired by Servicer or an affiliated entity will require the prior approval of Owner's Board of Directors, such not to be unreasonably withheld or delayed. This right to purchase assets is neither a Right of First Refusal nor a Right of First Offer to purchase assets. |
| **Right to Purchase BORROWER Equity** | Servicer, or an affiliated entity, retains the ability to purchase equity interests from Borrower shareholders seeking liquidity. Any equity interest acquired by Servicer or an affiliated entity will require the prior approval of Owner's Board of Directors, not to be unreasonably withheld or delayed. |

**Formatted:** Font: 8 pt, Do not check spelling or grammar

**Formatted:** Font: 12 pt, Check spelling and grammar

**PLAN SUPPLEMENT**
**<u>EXHIBIT C</u>**


**<u>Schedule of Assumed Agreements</u>**


(None at this time)

**PLAN SUPPLEMENT**
**Exhibit D**


**Schedule of Rejected Agreements**


1.    Specialty Financial Management Agreement

2.    Specialty Mortgage Servicing Agreement

3.    Master Loan Participation and Servicing Agreement between Specialty Mortgage Corp. and   Specialty Trust, Inc. relating to any mortgage loan for which the Participation Percentage of Specialty Trust, Inc. is 100%, except for that Master Loan Participation and Servicing Agreement related to the Sedona Parcel C (#2) mortgage loan.

**PLAN SUPPLEMENT**
**Exhibit E**


**Bylaws of Specialty Trust**

# BYLAWS

## OF

## SPECIALTY TRUST, INC.

### June __, 2011

### ARTICLE I

### STOCKHOLDERS

SECTION 1.  <u>Annual Meeting</u>.  The Corporation shall hold an annual meeting of its stockholders to elect directors and transact any other business within its power on such date and time each year as shall be set by the Board of Directors.  Except as the Charter or statute provides otherwise, any business may be considered at an annual meeting without the purpose of the meeting having been specified in the notice.  Failure to hold an annual meeting does not invalidate the Corporation's existence or affect any otherwise valid corporate acts.  Meetings of stockholders shall be held at the principal office of the Corporation or at such other place in the United States as set forth from time to time by the Board of Directors."

SECTION 2.  <u>Special Meetings</u>.  Special meetings of the stockholder for any purpose or purposes may be called at any time by the President, by the Chairman of the Board of Directors, by a majority of the Board of Directors, by a majority of the Independent Directors (as defined in Section 2 of Article II hereof), or by the written request of stockholders entitled to cast a majority of the votes which all stockholders are entitled to cast at the particular meeting, addressed to the Secretary and then the Secretary shall proceed to call a special meeting only as may be required by law.

SECTION 3.  <u>Notices</u>.  Notice of the annual meeting and of any special meeting of stockholders shall, at least ten days but not more than ninety days prior to the date thereof, be given to each stockholder entitled to vote thereat and each other stockholder entitled to notice of the meeting.  Notice is given to a stockholder when it is personally delivered to it, left at its residence or usual place of business, or mailed to it at its address as it appears on the records of the Corporation.  Notwithstanding the foregoing provisions, each person who is entitled to notice waives notice if, before or after the meeting, such stockholder signs a waiver of notice which is filed with the records of the stockholders' meeting, or is present at the meeting in person or by proxy.  Every notice of an annual meeting or a special meeting shall state the time and place of the meeting.  If the meeting is a special meeting or notice of the purpose or purposes is required by statute, the notice shall also briefly state the purpose or purposes thereof, and no business, other than that specified in such notice and matters germane thereto, shall be transacted at the meeting without further notice to stockholders not present in person or by proxy.

SECTION 4.  <u>Quorum; Manner of Acting and Adjournment</u>.  Unless statute or the Charter provides otherwise, at a meeting of stockholders the presence in person or by proxy of stockholders entitled to cast a majority of all the votes of each class of the Corporation's shares entitled to be cast at the meeting constitutes a quorum, and a majority of all the votes cast at a meeting at which a quorum is present is sufficient to approve any matter which properly comes before the meeting, except that a plurality of all the votes cast at a meeting at which a quorum is present is sufficient to elect a director.

1

Whether or not a quorum is present, a meeting of stockholders convened on the date for which it was called may be adjourned from time to time without further notice by a majority vote of the stockholders present in person or by proxy to a date not more than 120 days after the original record date. Any business which might have been transacted at the meeting as originally notified may be deferred and transacted at any such adjourned meeting at which a quorum shall be present.

SECTION 5.  Organization.  At every meeting of the stockholders, the Chairman of the Board, if there be one, shall conduct the meeting or, in the case of vacancy in office or absence of the Chairman of the Board, one of the following officers present shall conduct the meeting in the order stated: the Vice Chairman of the Board, if there be one, the President, the Vice Presidents in their order of rank and seniority, or a Chairman chosen by the stockholders entitled to cast a majority of the votes which all stockholders present in person or by proxy are entitled to cast, shall act as Chairman, and the Secretary or, in his or her absence, an assistant secretary, or in the absence of both Secretary and assistant secretaries, a person appointed by the Chairman, shall act as Secretary.

SECTION 6.  Voting.  Unless the Charter or these Bylaws provide for a greater or lesser number of votes per share or limits or denies voting rights, each outstanding share of stock, regardless of class, is entitled to one vote on each matter submitted to a vote at a meeting of stockholders.  In all elections for directors, each share of stock may be voted for as many individuals as there are directors to be elected and for whose election the share is entitled to be voted, but cumulative voting is not permitted.

SECTION 7.  Proxies.  A stockholder may vote the stock the stockholder owns of record either in person or by proxy.  A stockholder may sign a writing authorizing another person to act as proxy.  Signing may be accomplished by the stockholder or the stockholder's authorized agent signing the writing or causing the stockholder's signature to be affixed to the writing by any reasonable means, including facsimile signature.  A stockholder may authorize another person to act as proxy by transmitting, or authorizing the transmission of, a telegram, cablegram, datagram, or other means of electronic transmission to the person authorized to act as proxy or to a proxy solicitation firm, proxy support service organization, or other person authorized by the person who will act as proxy to receive the transmission.  Unless a proxy provides otherwise, it is not valid more than 11 months after its date.  A proxy is revocable by a stockholder at any time without condition or qualification unless the proxy states that it is irrevocable and the proxy is coupled with an interest.  A proxy may be made irrevocable for so long as it is coupled with an interest.  The interest with which a proxy may be coupled includes an interest in the stock to be voted under the proxy or another general interest in the Corporation or its assets or liabilities.

SECTION 8.  Voting Lists.  At each meeting of stockholders, a full, true and complete list of all stockholders entitled to vote at such meeting, showing the number and class of shares held by each and certified by the transfer agent for such class or by the Secretary, shall be furnished by the Secretary.

SECTION 9.  Conduct of Business.  Nominations of persons for election to the Board of Directors and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders (a) pursuant to the Corporation's notice of meeting, (b) by or at the direction of the Board of Directors or (c) by any stockholder of the Corporation who was a stockholder of record at the time of giving notice provided for in Article I, Section 10, who is entitled to vote at the meeting and who complied with the notice procedures set forth in Article I, Section 10.  The chairman of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made in accordance with the procedures set forth in this Section and Article I, Section 10, and, if any proposed nomination or business is not in compliance with this Section and Article I, Section 10, to declare that such defective nomination or proposal be disregarded.

2

SECTION 10. <u>Stockholder Proposals</u>. For any stockholder proposal to be presented in connection with an annual meeting of stockholders of the Corporation (other than proposals made under Rule 14a-8 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), including any proposal relating to the nomination of a director to be elected to the Board of Directors of the Corporation, the stockholder putting forth such proposal must have given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not less than 90 days before the first anniversary of the mailing date of the notice of the preceding year's annual meeting. Such stockholder's notice shall set forth (a) as to each person whom the stockholder proposes to nominate for election or reelection as a director all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors pursuant to Regulation 14A under the Exchange Act (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); (b) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and of the beneficial owner, if any, on whose behalf the proposal is made; and (c) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made, (i) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner and (ii) the class and number of shares of stock of the Corporation which are owned beneficially and of record by such stockholder and such beneficial owner.

<u>ARTICLE II</u>

<u>DIRECTORS</u>

SECTION 1. <u>Number, Classification, Election and Term</u>. The affairs of the Corporation shall be under the direction and control of a Board of Directors which shall be initially composed of five (5) members who shall hold office until their successors are duly chosen and qualified. The directors shall be divided into five Classes, designated Class 1A, Class 1B, Class 2A, Class 2B and Class 3. The Class 1A and 2A Directors shall be elected by the holders of the Corporation's Class A shares. The Class 1B and 2B Directors shall be elected by the holders of the Corporation's Class B shares. The Class 3 Director shall be elected by a vote of all stockholders. The term of the initial Class I directors shall terminate on the date of the annual meeting of stockholders held in 2012. The term of the initial Class 2 and Class 3 directors shall terminate on the date of the annual meeting of stockholders held in 2013. At each annual meeting of stockholders beginning in 2012, successors to the class of directors whose term expires at that annual meeting shall be elected for a two-year term. The number of directors shall be increased or decreased from time to time by vote of a vote of at least sixty per cent (60%) of the entire Board of Directors; provided, however, that the number of directors may not exceed fifteen (15) nor be less than three (3) except as permitted by law. If the number of directors is changed, any increase or decrease shall be apportioned among the directors elected by the Class A and Class B stockholders so as to maintain the number of directors in each class as equal. A director shall hold office until the annual meeting for the year in which his or her term expires and until his or her successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.

SECTION 2. <u>Function of Directors</u>. The business and affairs of the Corporation shall be managed under the direction of the Board of Directors. All the powers of the Corporation are vested in and shall be exercised by or under the authority of the Board of Directors except as otherwise prescribed by statute, by the Charter or by these Bylaws.

SECTION 3. <u>Vacancies</u>. Any vacancy occurring on the Board of Directors with respect to a Class A director shall be filled by the other Class A director. Any vacancy occurring on the Board of Directors

3

with respect to a Class B director shall be filled by the other Class B director. Any vacancy occurring on the Board of Directors with respect to a Class 3 director shall be filled by a majority of the remaining directors. A director elected by the Board of Directors to fill a vacancy shall be elected to hold office until the next annual meeting of stockholders or until his successor is elected and qualified.

SECTION 4.  Resignations.  Any director or member of a committee may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of the receipt by the Chairman of the Board, the President or the Secretary. Acceptance of a resignation shall not be necessary to make it effective.

SECTION 5.  Removal.  At any meeting of stockholders duly called and at which a quorum is present, the stockholders may, by the affirmative vote of the holders of a majority of the votes entitled to elect a particular director, remove any director or directors from office with or without cause, and may elect a successor or successors to fill any resulting vacancies for the unexpired terms of removed directors.

SECTION 6.  Committees of the Board of Directors.  The Board of Directors may appoint from among its members an Executive Committee, an Audit Committee, a Compensation Committee and other committees composed of one or more directors and delegate to these committees any of the powers of the Board of Directors, except the power to authorize dividends of stock, elect directors, issue stock other than as provided in the next sentence, recommend to the stockholders any action which requires stockholder approval, amend these Bylaws, or approve any merger or share exchange which does not require stockholder approval.

Each committee may fix rules of procedure for its business.  One-third of the members of a committee shall constitute a quorum for the transaction of business and the act of a majority of those present at a meeting at which a quorum is present shall be the act of the committee.  The members of a committee present at any meeting, whether or not they constitute a quorum, may appoint a director to act in the place of an absent member..  Any action required or permitted to be taken at a meeting of a committee may be taken without a meeting, if a unanimous written consent which sets forth the action is signed by each member of the committee and filed with the minutes of the committee.  The members of a committee may conduct any meeting thereof by conference telephone in accordance with the provisions of Section 8 of this Article.

Subject to the provisions hereof, the Board of Directors shall have the power at any time to change the membership of any committee, to fill all vacancies, to designate alternative members to replace any absent or disqualified member, or to dissolve any such committee.

SECTION 7.  Meetings of the Board of Directors.  Meetings of the Board of Directors, regular or special, may be held at any place in or out of the State of Maryland as the Board of Directors may from time to time determine or as shall be specified in the notice of such meeting.

Members of the Board of Directors may participate in a meeting by means of a conference telephone or similar communications equipment if all persons participating in the meeting can hear each other at the same time.  Participation in a meeting by such means constitutes presence in person at a meeting.

The first meeting of each newly elected Board of Directors shall be held as soon as practicable after the annual meeting of the stockholders at which the directors were elected.  The meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors, or as shall be specified in a written waiver signed by all of the directors as provided in this Section 7, except that no notice shall be necessary if such meeting is held immediately after the adjournment, and at the site, of the annual meeting of stockholders.

Regular meetings of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board of Directors. Special meetings of the Board of Directors may be called at any time by two (2) or more directors or by a majority of the members of the executive committee, if one be constituted, in writing with or without a meeting of such committee, or by the Chairman of the Board of Directors or the President.

Special meetings may be held at such place or places in or out of the State of Maryland as may be designated from time to time by the Board of Directors; in the absence of such designation, such meetings shall be held at such places as may be designated in the notice of meeting.

Notice of the place and time of every special meeting of the Board of Directors shall be delivered by the Secretary to each director either personally or by telephone, telegraph, overnight courier or facsimile, or by leaving the same at his residence or usual place of business at least twenty-four (24) hours before the time at which such meeting is to be held or, if by first-class mail, at least 72 hours before the time of such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States Mail addressed to the director at his post office address as it appears on the records of the Corporation, with postage thereon paid. Unless the Bylaws or a resolution of the Board of Directors provides otherwise, the notice need not state the business to be transacted at, or the purposes of, any special meeting of the Board of Directors. No notice of any special meeting of the Board of Directors need be given to any director who attends except where a director attends a meeting for the express purpose of objecting to the transaction of any business because the special meeting is not lawfully called or convened, or to any director who, in writing executed and filed with the records of the meeting either before or after the holding thereof, waives such notice.

Any meeting of the Board of Directors, regular or special, may adjourn from time to time to reconvene at the same or some other place, and no notice need be given of any such adjourned meeting to those present at the adjourned meeting, other than by announcement. Notice of any reconvened meeting shall be given to directors not present at the adjourned meeting as provided in the preceding paragraph of these Bylaws.

SECTION 8. Informal Action by Directors. Unless otherwise provided by law, any action required to be taken at a meeting of the directors or any other action which may be taken at a meeting of the directors may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the directors.

SECTION 9. Quorum and Voting. At all meetings of the Board of Directors, a majority of the entire Board of Directors shall constitute a quorum for the transaction of business, and the action of a majority of the directors present at any meeting at which a quorum is present shall be the action of the Board of Directors unless the concurrence of a greater proportion is required for such action by law, the Charter or these Bylaws. If a quorum shall not be present at any meeting of directors, the directors present thereat may, by a majority vote, adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

SECTION 10. Organization. The Chairman of the Board shall preside at each meeting of the Board of Directors. In the absence or inability of the Chairman of the Board to preside at a meeting, the President or, in his absence or inability to act, another director chosen by a majority of the directors present, shall act as chairman of the meeting and preside thereat. The Secretary (or, in his absence or inability to act, any person appointed by the chairman of the meeting) shall act as Secretary of the meeting and keep the minutes thereof.

SECTION 11.  Compensation of Directors.  Directors shall be compensated for their service as directors in the amount of $10,000.00 per year, payable quarterly, and shall receive reimbursement of their out of pocket expenses incurred in attending meetings. Nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

SECTION 12.  Investment Policies and Restrictions.  The Board of Directors shall approve the investment policies of the Corporation.  The investment policies and compliance therewith shall be reviewed by directors at least annually to determine that the policies then being followed by the Corporation are in the best interest of the stockholders of the Corporation.  Each such determination and the basis therefor shall be set forth in the minutes of the meeting of the Board of Directors.

SECTION 13.  Presumption of Assent.  A director of the Corporation who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his or her dissent or abstention shall be entered in the minutes of the meeting or unless he or she shall file his or her written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any director who votes in favor of such action.

SECTION 14.  Advisory Directors.  The Board of Directors shall, by resolution, appoint an advisory director to the Board of Directors, such advisory director to be selected from among those individuals serving on the Official Committee of Equity Security Holders in the Corporation's bankruptcy case, or, if selected by such committee, an individual selected by such committee. The Board of Directors may appoint such additional advisory directors as it deems to be appropriate. Advisory directors shall not have the authority to participate by vote in the transaction of business.

ARTICLE III

OFFICERS

SECTION 1.  Officers.  The officers of the Corporation shall be a Chairman of the Board, a President, a Treasurer and a Secretary, who shall be elected by the Board of Directors to serve during the pleasure of the Board and until their respective successors are elected and qualified, except as otherwise provided in any employment agreement between the Corporation and any officer.  The Chairman of the Board shall always be a member of the Board of Directors. The Board of Directors may also appoint one or more Vice Presidents.  The same person may hold any two or more offices except those of President and Vice President.

SECTION 2.  Subordinate Officers, Committees and Agents.  The Board of Directors may from time to time elect such other officers and appoint such committees, employees or other agents as the business of the Corporation may require, including one or more assistant secretaries, and one or more assistant treasurers, each of whom shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws, or as the Board of Directors may from time to time determine.  The Board of Directors may delegate to any officer or committee the power to elect subordinate officers and to retain or appoint employees or other agents.

SECTION 3.  Chairman of the Board.  The Chairman of the Board shall preside at all meetings of the stockholders and the Board of Directors at which he or she is present.

6

SECTION 4. <u>President</u>. Unless otherwise provided by resolution of the Board of Directors, the President, in the absence of the Chairman of the Board, shall preside at all meetings of the Board of Directors and of the stockholders at which he shall be present. The President shall, subject to the control of the Board of Directors, in general supervise and control all of the business and affairs of the Corporation. The President may sign, with the Secretary or any other proper officer of the Corporation thereunto authorized by the Board of Directors, certificates for shares of the Corporation, any deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors have authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed; and in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the Board of Directors from time to time.

SECTION 5. <u>Vice Presidents</u>. In the absence of the President or in event of his or her death, inability or refusal to act, or at the request of the Chief Executive Officer or President, the Vice President or Vice Presidents shall perform the duties and exercise all the powers of the President and be subject to all the restrictions upon the President. The Vice President or Vice Presidents shall perform such other duties as from time to time may be assigned to him or her or them by the President or by the Board of Directors.

SECTION 6. <u>Secretary</u>. The Secretary shall keep the minutes of the stockholders' and of the Board of Directors' meetings in one or more books provided for that purpose, see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, be custodian of the corporate records and of the seal of the Corporation and keep a register of the post office address of each stockholder which shall be furnished to the Secretary by such stockholder, have general charge of the stock transfer books of the Corporation and, in general, perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to him or her by the President, the Chief Executive Officer or the Board of Directors.

SECTION 7. <u>Treasurer</u>. The Treasurer shall have charge and custody of and be responsible for all funds and securities of the Corporation, receive and give receipts for moneys due and payable to the Corporation from any source whatsoever, and deposit all such moneys in the name of the Corporation in such banks, trust companies or other depositories as shall be selected in accordance with these Bylaws and in general perform all of the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to him or her by the President, the Chief Executive Officer, the Chief Financial Officer or by the Board of Directors.

SECTION 8. <u>Other Officers</u>. The other officers of the Corporation shall perform such duties as the President may from time to time assign to them.

SECTION 9. <u>Removal</u>. Any officer elected by the Board of Directors may be removed, either for or without cause, at any time upon the vote of a majority of the Board of Directors. Any other employee of the Corporation may be removed or dismissed at any time by the President. The removal of an officer does not prejudice any of his or her contract rights.

SECTION 10. <u>Resignation</u>. Any officer or agent may resign at any time by giving written notice to the Board of Directors, or to the President or to the Secretary of the Corporation. Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

7

SECTION 11. Vacancies. A vacancy in any office because of death, resignation, removal, disqualification, or any other cause, shall be filled by the Board of Directors or by the officer or remaining members of the committee to which the power to fill such office has been delegated pursuant to Section 2 of this Article, as the case may be, and if the office is one for which these Bylaws prescribe a term, shall be filled for the unexpired portion of the term.

SECTION 12. Compensation. The salaries or other compensation , if any, of the officers elected by the Board of Directors shall be fixed from time to time by the Board of Directors or by such officer as may be designated by resolution of the Board of Directors. The salaries or other compensation of any other officers, employees and other agents shall be fixed from time to time by the officer or committee to which the power to elect such officers or to retain or appoint such employees or other agents has been delegated pursuant to Section 2 of this Article. No officer shall be prevented from receiving such salary or other compensation by reason of the fact that he is also a director of the Corporation.

ARTICLE IV

STOCK

SECTION 1. Certificates. Each stockholder shall be entitled to a certificate or certificates which shall represent and certify the number and kind and class of shares owned by it in the Corporation. Each certificate shall be signed by the Chairman of the Board or the President or a Vice President and countersigned by the Secretary or an assistant secretary or the Treasurer or an assistant treasurer.

The signatures may be either manual or facsimile signatures. In case any officer who has signed any certificate ceases to be an officer of the Corporation before the certificate is issued, the certificate may nevertheless be issued by the Corporation with the same effect as if the officer had not ceased to be such officer as of the date of its issue. Each stock certificate shall include on its face the name of the Corporation, the name of the stockholder and the class of stock and number of shares represented by the certificate. If the Corporation has authority to issue stock of more than one class, the stock certificate shall contain on its face or back a full statement or summary of the designations and any preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms and conditions of redemption of the stock of each class which the Corporation is authorized to issue and if the Corporation is authorized to issue any preferred or special class in series, the differences in the relative rights and preferences between the shares of each series to the extent they have been set, and the authority of the Board of Directors to set the relative rights and preferences of subsequent series. In lieu of such full statement or summary, there may be set forth upon the face or back of the certificate a statement that the Corporation will furnish to any stockholder upon request and without charge, a full statement of such information. Such request may be made to the Secretary or to the Corporation's transfer agent. Every stock certificate representing shares of stock which are restricted as to transferability by the Corporation shall contain a full statement of the restriction or state that the Corporation will furnish information about the restriction to the stockholder on request and without charge. A stock certificate may not be issued until the stock represented by it is fully paid, except in the case of stock purchased under a plan, agreement or transaction as permitted by law and with such statement on future payments as required by law.

SECTION 2. Lost Certificates. The Board of Directors may order a new certificate or certificates of stock to be issued in place of any certificates shown to have been lost or destroyed under such terms and conditions as to it may seem reasonable. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such stolen, lost or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond, with sufficient surety to the

8

Corporation to indemnify it against any loss or claim which may arise by reason of the issuance of a new certificate.

SECTION 3.  Transfer Agents and Registrars.  At such time as the Corporation lists its securities on a national securities exchange or the Nasdaq National Market, or such earlier time as the Board of Directors may elect, the Board of Directors shall appoint one or more banks or trust companies in such city or cities as the Board of Directors may deem advisable, from time to time, to act as transfer agents and/or registrars of the shares of stock of the Corporation; and, upon such appointments being made, no certificate representing shares shall be valid until countersigned by one of such transfer agents and registered by one of such registrars.

SECTION 4.  Transfer of Stock.  No transfers of shares of stock of the Corporation shall be made if (i) void ab initio pursuant to the Charter, or (ii) the Board of Directors, pursuant to the Charter, shall have refused to transfer such shares; provided, however, that nothing contained in these Bylaws shall impair the settlement of transactions entered into on the facilities of the New York Stock Exchange or any other national securities exchange or automated inter-dealer quotation system.  Permitted transfers of shares of stock of the Corporation shall be made on the stock records of the Corporation only upon the instruction of the registered holder thereof, or by his attorney thereunto authorized by power of attorney duly executed and filed with the Secretary or with a transfer agent or transfer clerk, and upon surrender of the certificate or certificates, if issued, for such shares properly endorsed or accompanied by a duly executed stock transfer power and the payment of all taxes thereon.  Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, as to any transfers not prohibited by the Charter or by action of the Board of Directors thereunder, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

SECTION 5.  Fixing of Record Dates.  The Board of Directors may fix, in advance, a date as the record date for the purpose of determining stockholders entitled to notice of, or to vote at, any meeting of stockholders, or stockholders entitled to receive payment of any dividend or the allotment of any rights, or in order to make a determination of stockholders for any other proper purpose.  Such date, in any case, may not be prior to the close of business on the day the record date is fixed nor, subject to Section 4 of Article I, more than ninety (90) days, or in case of a meeting of stockholders, less than ten (10) days, prior to the date on which the particular action requiring such determination of stockholders is to be taken.

SECTION 6.  Registered Stockholders.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments, if any, a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by law or the Charter.

SECTION 7. <u>Regulations; Book-Entry System</u>. The Board of Directors may make such additional rules and regulations, not inconsistent with the Bylaws or the Charter, as it may deem expedient concerning the issue, transfer and registration of certificates for shares of stock of the Corporation.

Further, the Corporation may participate in one or more systems under which certificates for shares of stock are replaced by electronic book-entry pursuant to such rules, terms and conditions as the Board of Directors may approve and subject to applicable law, notwithstanding any provisions to the contrary set forth in this Article.

ARTICLE V

SEAL

The Board of Directors may provide a suitable seal for the Corporation, which may be either facsimile or any other form of seal and shall remain in the custody of the Secretary. If the Board of Directors so provides, it shall be affixed to all certificates of the Corporation's stock and to other instruments requiring a seal. If the Corporation is required to place its corporate seal to a document, it is sufficient to meet the requirement of any law, rule, or regulation relating to a corporate seal to place the word "(seal)" adjacent to the signature of the person authorized to sign the document on behalf of the Corporation.

ARTICLE VI

SIGNATURES

SECTION 1. <u>Checks, Drafts, Etc</u>. All checks, drafts and orders for the payment of money, notes and other evidences of indebtedness, issued in the name of the Corporation, shall, unless otherwise provided by resolution of the Board of Directors, be signed by the President, a Vice President or an Assistant Vice President and countersigned by the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary.

SECTION 2. <u>Stock Transfer</u>. All endorsements, assignments, stock powers or other instruments of transfer of securities standing in the name of the Corporation shall be executed for and in the name of the Corporation by the President or Vice President or by such officer as the Board of Directors may designate.

ARTICLE VII

FISCAL YEAR

The fiscal year of the Corporation shall be the twelve calendar months period ending December 31 in each year, unless otherwise provided by the Board of Directors.

SECTION VIII

INDEMNIFICATION

SECTION 1. <u>Procedure</u>. Any indemnification, or payment of expenses in advance of the final disposition of any proceeding, shall be made promptly, and in any event within 60 days, upon the written request of the director or officer entitled to seek indemnification (the "Indemnified Party"). The right to indemnification and advances hereunder shall be enforceable by the Indemnified Party in any court of competent jurisdiction, if (i) the Corporation denies such request, in whole or in part, or (ii) no

10

disposition thereof is made within 60 days. The Indemnified Party's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be reimbursed by the Corporation. It shall be a defense to any action for advance for expenses that (a) a determination has been made that the facts then known to those making the determination would preclude indemnification or (b) the Corporation has not received either (i) an undertaking as required by law to repay such advances in the event it shall ultimately be determined that the standard of conduct has not been met or (ii) a written affirmation by the Indemnified Party of such Indemnified Party's good faith belief that the standard of conduct necessary for indemnification by the Corporation has been met.

SECTION 2. Exclusivity, Etc. The indemnification and advance of expenses provided by the Charter and these Bylaws shall not be deemed exclusive of any other rights to which a person seeking indemnification or advance of expenses may be entitled under any law (common or statutory), or any agreement, vote of stockholders or disinterested directors or other provision that is consistent with law, both as to action in his or her official capacity and as to action in another capacity while holding office or while employed by or acting as agent for the Corporation, shall continue in respect of all events occurring while a person was a director or officer after such person has ceased to be a director or officer, and shall inure to the benefit of the estate, heirs, executors and administrators of such person. All rights to indemnification and advance of expenses under the Charter of the Corporation and hereunder shall be deemed to be a contract between the Corporation and each director or officer of the Corporation who serves or served in such capacity at any time while this Bylaw is in effect. Nothing herein shall prevent the amendment of this Bylaw, provided that no such amendment shall diminish the rights of any person hereunder with respect to events occurring or claims made before its adoption or as to claims made after its adoption in respect of events occurring before its adoption. Any repeal or modification of this Bylaw shall not in any way diminish any rights to indemnification or advance of expenses of such director or officer or the obligations of the Corporation arising hereunder with respect to events occurring, or claims made, while this Bylaw or any provision hereof is in force. The Corporation shall not be liable for any payment under this Bylaw in connection with a claim made by a director or officer to the extent such director or officer has otherwise actually received payment under insurance policy, agreement, vote or otherwise, of the amounts otherwise indemnifiable hereunder.

SECTION 3. Severability; Definitions. The invalidity or unenforceability of any provision of this Article VIII shall not affect the validity or enforceability of any other provision hereof. The phrase "this Bylaw" in this Article VIII means this Article VIII in its entirety.

## SECTION IX

## SUNDRY PROVISIONS

SECTION 1. Books and Records. The Corporation shall keep correct and complete books and records of its accounts and transactions and minutes of the proceedings of its stockholders and Board of Directors and of any executive or other committee when exercising any of the powers of the Board of Directors. The books and records of the Corporation may be in written form or in any other form which can be converted within a reasonable time into written form for visual inspection. Minutes shall be recorded in written form but may be maintained in the form of a reproduction. The original or a certified copy of the Bylaws shall be kept at the principal office of the Corporation.

SECTION 2. Voting Upon Shares in Other Corporations. Stock of other corporations or associations, registered in the name of the Corporation, may be voted by the President, a Vice President, or a proxy appointed by either of them. The Board of Directors, however, may by resolution appoint

11

some other person to vote such shares, in which case such person shall be entitled to vote such shares upon the production of a certified copy of such resolution.

SECTION 3. <u>Annual Statement of Affairs</u>. The President or chief accounting officer shall prepare annually a full and correct statement of the affairs of the Corporation, to include a balance sheet and a financial statement of operations for the preceding fiscal year. The statement of affairs shall be submitted at the annual meeting of the stockholders and, within 20 days after the meeting, placed on file at the Corporation's principal office.

SECTION 4. <u>Mail</u>. Except as herein expressly provided, any notice or other document which is required by these Bylaws to be mailed shall be deposited in the United States mails, postage prepaid.

SECTION 5. <u>Reliance</u>. Each director, officer, employee and agent of the Corporation shall, in the performance of his or her duties with respect to the Corporation, be fully justified and protected with regard to any act or failure to act in reliance in good faith upon the books of account or other records of the Corporation, upon the opinion of counsel or upon reports made to the Corporation by any of its officers or employees or by the adviser, accountants, appraisers or other experts or consultants selected by the Board of Directors or officers of the Corporation, regardless of whether such counsel or expert may also be a director.

SECTION 6. <u>Certain Rights of Directors, Officers, Employees and Agents</u>. The directors shall have no responsibility to devote their full time to the affairs of the Corporation. Any director or officer, employee or agent of the Corporation, in his or her personal capacity or in a capacity as an affiliate, employee or agent of any other person, or otherwise, may have business interests and engage in business activities similar to or in addition to those of or relating to the Corporation.

SECTION 7. <u>Loss of Deposits</u>. No director shall be liable for any loss which may occur by reason of the failure of any bank, trust company, savings and loan association or other institution with whom moneys or stock of the Corporation have been deposited.

## SECTION X

## AMENDMENTS

These Bylaws may be amended or replaced, or new Bylaws may be adopted, either (1) by the vote of the stockholders entitled to cast at least a majority of the votes which all stockholders are entitled to cast thereon at any duly organized annual or special meeting of stockholders, or (2), with respect to those matters which are not by statute reserved exclusively to the stockholders, by vote of a majority of the Board of Directors in office at any regular or special meeting of the Board of Directors. It shall not be necessary to set forth such proposed amendment, repeal or new Bylaws, or a summary thereof, in any notice of such meeting, whether annual, regular or special.

12

**SECRETARY'S CERTIFICATE OF ADOPTION OF BYLAWS**

**OF**

**SPECIALTY MORTGAGE TRUST, INC.**

I, the undersigned, do hereby certify:

1.      That I am the duly elected and acting Secretary of Specialty Trust, Inc., a Maryland corporation.

2.      That the foregoing Bylaws constitute the Bylaws of said corporation as adopted by said corporation by order of the United States Bankruptcy Court for the District of Nevada in Case No. 10-51432 GWZ on June __, 2011.

IN WITNESS WHEREOF, I have hereunto subscribed my name this __ day of _____, 2011.

_____

_____
Secretary

13

**PLAN SUPPLEMENT**
**Exhibit F**


**Articles of Incorporation**

## ARTICLES OF AMENDMENT AND RESTATEMENT

## OF

## SPECIALTY TRUST, INC.

Specialty Trust, Inc., a Maryland corporation (the "Corporation"), hereby certifies to the State Department of Assessments and Taxation of Maryland that:

1.    The Corporation desires to amend and restate its charter to read in its entirety as follows:

### ARTICLE I

### INCORPORATOR

The undersigned, Phillip R. Pollock, whose address is c/o Tobin & Tobin, 500 Sansome Street, 8th Floor, San Francisco, CA 94111, being at least 18 years of age, does hereby form a corporation under the general laws of the State of Maryland.

### ARTICLE II

### NAME

The name of the corporation (which is hereinafter called the "Corporation") is:

Specialty Trust, Inc.

### ARTICLE III

### PURPOSES

On April 20, 2010, the Corporation and certain of its subsidiaries (collectively, the "Debtors") filed a voluntary petition in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), initiating a debtors in possession Chapter 11 bankruptcy case (Case No. 10-51432). On March 25, 2011, the Debtors filed a proposed Plan of Reorganization with the Bankruptcy Court (such Plan of Reorganization as it may be amended from time to time, the "Plan"). The Corporation is formed for the purpose of carrying on any lawful business not inconsistent with the Plan or any order of the Bankruptcy Court.

### ARTICLE IV

### PRINCIPAL OFFICE

The address of the principal office of the Corporation in this State is c/o The Corporation Trust Incorporated, 300 East Lombard Street, Baltimore, Maryland 21202.

### ARTICLE V

1

## RESIDENT AGENT

The name and address of the resident agent of the Corporation are The Corporation Trust Incorporated, 300 East Lombard Street, Baltimore, Maryland 21202.

## ARTICLE VI

## CAPITAL STOCK

A.     The total number of shares of stock which the Corporation has authority to issue is 50,000,000 shares, $0.01 par value per share, of capital stock, of which ___ shares are designated as Class A common stock and ___ shares are designated as Class B common stock. The aggregate par value of all authorized shares having a par value is $500,000.00. The Board of Directors, with the approval of a majority of the entire Board and without any action by the stockholders of the Corporation, may amend the charter from time to time to increase or decrease the aggregate number of shares of stock or the number of shares of stock of any class or series that the Corporation has authority to issue.

B.     The following is a description of the preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends, qualifications and terms and conditions of redemption of the Class A and Class B common stock of the Corporation:

(1)     Each share of Class A and Class B common stock shall have one vote as herein provided, and, except as otherwise provided in respect of any class of capital stock hereafter classified or reclassified, the exclusive voting power for all purposes shall be vested in the holders of the Class A and Class B common stock.

(2)     Subject to the provisions of law, no dividends, including dividends payable in shares of the Corporation's capital stock, may be paid on the Class A or Class B common stock.

(3)     In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of neither the Class A or Class B common stock shall be entitled, after payment or provision for payment of the debts and other liabilities of the Corporation and the amount to which the holders of any class of capital stock hereafter classified or reclassified having a preference on distributions in the liquidation, dissolution or winding up of the Corporation shall be entitled, to share in the remaining net assets of the Corporation; such remaining net assets shall be distributed in accordance with the terms of the Plan.

C.     Upon the filing of these articles of amendment and restatement, the outstanding shares of common stock shall be retired and restored to the status of authorized but unissued stock and an equal number, in the aggregate, of shares of Class A and Class B common stock shall be issued at a price per share determined by the Board of Directors.

## ARTICLE VII

2

<u>DIRECTORS</u>

A.      The number of directors of the Corporation shall be five, which number may be increased or decreased pursuant to the Bylaws of the Corporation, but shall never be less than the minimum number permitted by the General Laws of the State of Maryland now or hereafter in force.  If the number of directors is changed, any increase or decrease shall be apportioned among the directors elected by the Class A and Class B stockholders so as to maintain the number of directors by each Class as equal.  A director shall hold office until the annual meeting for the year in which his her term expires and until his or her successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.  Any vacancy occurring on the Board of Directors with respect to a Class 1A or 2A director shall be filled by the other Class A director.  Any vacancy occurring on the Board of Directors with respect to a Class 1B or 2B director shall be filled by the other Class B director.  Any vacancy occurring on the Board of Directors with respect to a Class 3 director shall be filled by a majority of the remaining directors.  No decrease in the number of directors constituting the Board of Directors shall affect the tenure of office of any director.

B.      The directors shall be divided into three classes, designated Class 1A, Class 1B, Class 2A, Class 2B and Class 3.  The Class 1A and 2A directors shall be elected by the holders of the shares of Class A common stock.  The Class 1B and 2B directors shall be elected by the holders of the shares of Class B common stock.  The Class 3 director shall be elected by a vote of all stockholders.  The term of the initial Class 1A and 1B directors shall terminate on the date of the annual meeting of stockholders held in 2012.  The term of the initial Class 2A and 2B directors and the Class 3 director shall terminate on the date of the annual meeting of stockholders held in 2013.  At each annual meeting of stockholders beginning in 2012, successors to the class of directors whose term expires at that annual meeting shall be elected for a two-year term.

C.      The names of the initial directors who will serve until the annual meeting of stockholders for the year in which his or her term expires and until their successors are elected and qualify are as follows:

| [_____] | Class 1A |
| [_____] | Class 1B |
| [_____] | Class 2A |
| [_____] | Class 2B |
| [_____] | Class 3 |

D.      Whenever the holders of any one or more series of preferred stock of the Corporation shall have the right, voting separately as a class, to elect one or more directors of the Corporation, the Board of Directors shall consist of such directors so elected in addition to the number of directors fixed as provided in paragraph A of this Article VII or in the Bylaws.  Notwithstanding the foregoing, and except as otherwise may be required by law, whenever the holders of any one or more series of preferred stock of the Corporation shall have the right, voting separately as a class, to elect one or

more directors of the Corporation, the terms of the director or directors elected by such holders shall expire at the next succeeding annual meeting of stockholders.

     E.     Subject to the rights of the holders of any class separately entitled to elect one or more directors, the stockholders may, by the affirmative vote of the holders of a majority of the votes entitled to elect a particular director, remove any director or directors from office with or without cause, and may elect a successor or successors to fill any resulting vacancies for the unexpired terms of removed directors.

## ARTICLE VIII

### CHARTER AMENDMENTS

     A.     The Corporation reserves the right to make any amendment of the charter, now or hereafter authorized by law, including any amendment which alters the contract rights, as expressly set forth in the charter, of any shares of outstanding stock.

     B.     The Board of Directors of the Corporation may authorize the issuance from time to time of shares of its stock of any class, whether now or hereafter authorized, or securities convertible into shares of its stock of any class, whether now or hereafter authorized, for such consideration as the Board of Directors may deem advisable, subject to approval by the Bankruptcy Court and to such restrictions or limitations, if any, as may be set forth in the Bylaws of the Corporation.

     C.     Subject to approval by the Bankruptcy Court, the Board of Directors of the Corporation may, by articles supplementary, classify or reclassify any unissued stock from time to time by setting or changing the preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends, qualifications, or terms or conditions of redemption of the stock.

## ARTICLE IX

### PREEMPTIVE RIGHTS

     No holder of shares of stock of any class shall have any preemptive right to subscribe to or purchase any additional shares of any class, or any bonds or convertible securities of any nature; provided, however, that the Board of Directors may, in authorizing the issuance of shares of stock of any class, confer any preemptive right that the Board of Directors may deem advisable in connection with such issuance.

## ARTICLE X

### INDEMNIFICATION

     The Corporation shall indemnify (A) its directors and officers, whether serving the Corporation or at its request any other entity, to the full extent required or permitted by the General Laws of the State of Maryland now or hereafter in force, including the advance of expenses under the procedures and to the full extent permitted by law and (B) other employees and agents to such extent as shall be authorized by the Board of Directors or the Corporation's Bylaws and be permitted by law. The foregoing rights of indemnification shall not be exclusive of any other rights to which those seeking

indemnification may be entitled. The Board of Directors may take such action as is necessary to carry out these indemnification provisions and is expressly empowered to adopt, approve and amend from time to time such Bylaws, resolutions or contracts implementing such provisions or such further indemnification arrangements as may be permitted by law. No amendment of the charter of the Corporation or repeal of any of its provisions shall limit or eliminate the right to indemnification provided hereunder with respect to acts or omissions occurring prior to such amendment or repeal.

ARTICLE XI

PERSONAL LIABILITY

To the maximum extent that Maryland law in effect from time to time permits limitation of the liability of directors and officers, no director or officer of the Corporation shall be liable to the Corporation or its stockholders for money damages. Neither the amendment nor repeal of this Article, nor the adoption or amendment of any other provision of the charter or Bylaws inconsistent with this Article, shall apply to or affect in any respect the applicability of the preceding sentence with respect to any act or failure to act which occurred prior to such amendment, repeal or adoption.

ARTICLE XII

MAJORITY VOTE

Notwithstanding any provision of law requiring the authorization of any action by a greater proportion than a majority of the total number of shares of all classes of capital stock or of the total number of shares of any class of capital stock, such action shall be valid and effective if authorized by the affirmative vote of the holders of a majority of the total number of shares of all classes outstanding and entitled to vote thereon, except as otherwise provided in this charter.

IN WITNESS WHEREOF, I have signed these Articles of Incorporation and acknowledge the same to be my act on this 25th day of January, 2008.


INCORPORATOR


/s/ Phillip R. Pollock
Phillip R. Pollock


2.    The provisions set forth in these articles of amendment and restatement are all the provisions of the Corporation's charter currently in effect.

3.    This amendment and restatement of the charter has been approved and advised by the Board of Directors of the Corporation and approved by the stockholders.

SPECIALTY TRUST, INC.

WITNESS:

_____                    By: _____
Grace C. Caudill                                      Nello Gonfiantini III
Corporate Secretary                                President


THE UNDERSIGNED, President of Specialty Trust, Inc., who executed on behalf of the Corporation the Articles of Amendment and Restatement of which this Certificate is made a part, hereby acknowledges in the name and on behalf of said Corporation the foregoing Articles of Amendment and Restatement to be the corporate act of said Corporation and hereby certifies that the matters and facts set forth herein with respect to the authorization and approval thereof are true in all material respects under the penalties of perjury.


_____
Nello Gonfiantini III
President


Filing Party's Return Address:

The Corporation Trust Incorporated
300 East Lombard Street
Baltimore, Maryland 21202


*C:\Documents and Settings\gld\Local Settings\Temporary Internet Files\OLKC7\SMT ArticlesofAmendmentandRestatement 042011.doc*

6

**PLAN SUPPLEMENT**
**Exhibit G**


**City National Bank Restructured Note**


[To be submitted later]